UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAY 3 0 2014

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   MAY 3 0 2014

CLERK

## UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| HOWARD STIRK HOLDINGS, LLC, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No.  14-1090 |
| ) | |
| FEDERAL COMMUNICATIONS ) | |
| COMMISSION and UNITED ) | |
| STATES OF AMERICA, ) | |
| ) | |
| Respondents. ) | |

## PETITION FOR REVIEW OF FINAL ORDER
## ON TELEVISION JOINT SALES AGREEMENTS

Pursuant to Section 402(a) of the Communications Act of 1934, 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342-2344, and Federal Rule of Appellate Procedure 15, Howard Stirk Holdings, LLC ("HSH") hereby petitions this Court for review of the Report and Order of the Federal Communications Commission ("FCC" or the "Commission") captioned *In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, 2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules, and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Promoting Diversification of Ownership In the Broadcasting Services, and Rules and Policies Concerning Attribution of Joint Sales Agreements In Local Television Markets*, MB Docket Nos. 14–50, 09–182, 07–294, and 04–256; FCC 14–28 (rel. April 15, 2014) (the "Commission's Order"). The Commission's Order was published in the Federal

Register on May 20, 2014.  79 Fed. Reg. 28996.  A true and accurate copy of the Commission's Order is attached hereto as Exhibit A.  Venue lies in this Court pursuant to 28 U.S.C. § 2343.

The Commission's Order addresses the attribution of television joint sales agreements ("JSAs") for the purposes of applying the broadcast ownership rules.  A JSA can generally be described as an agreement in which one station sells the advertising time for another station.  The new rule provides, in relevant part, that television JSAs that permit one station to sell 15% or more of the advertising time of another separately owned station in the same market, are attributable interests for purposes of applying the broadcast ownership rules.

The Court should set aside the Commission's Order on the grounds that the new rule (1) was adopted in violation of the Telecommunications Act of 1996, (2) is arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706, and (3) is otherwise not in accordance with the law.

Accordingly, HSH requests that this Court hold unlawful, vacate, and set aside the Commission's Order and grant such additional relief as may be necessary and appropriate.

DATED:     May 30, 2014

Respectfully submitted,

Colby M. May, Esq. (D.C. Bar No. 394340)
*Counsel for Howard Stirk Holdings, LLC*
Colby M. May, Esq., P.C.
P. O. Box 15473
Washington, DC 20003
(202) 544-5171
Fax:  (202) 544-5172

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAY 30 2014

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   MAY 30 2014

CLERK

HOWARD STIRK HOLDINGS, LLC, )
)
Petitioner, )
)
v. ) Case No. **14-1090**
)
FEDERAL COMMUNICATIONS )
COMMISSION and UNITED )
STATES OF AMERICA, )
)
Respondents. )

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and District of Columbia Circuit

Rule 26.1, Howard Stirk Holdings, LLC ("HSH") hereby submits the following disclosure

statement:  HSH is in the business of owning and operating television stations.  HSH has no

parent company and no public company owns more than 10% of its stock.

DATED:  May 30, 2014

Respectfully submitted,

Colby M. May, Esq. (D.C. Bar No. 394340)
*Counsel for Howard Stirk Holdings, LLC*
P. O. Box 15473
Washington, DC 20003
(202) 544-5171
Fax: (202) 544-5172





UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAY 3 0 2014

RECEIVED

FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   MAY 3 0 2014

CLERK

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of May, 2014, I caused a true and accurate copy of the

foregoing to be served by on the following by the delivery methods identified below:

Jonathan Sallet, Esq.
General Counsel
Federal Communications Commission
445 12th Street, S.W.
Washington D.C. 20554

**Via Hand Delivery**

The Honorable Eric Holder
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington D.C. 20530-0001

**Via First-Class Mail, Postage Prepaid**

Colby M. May, Esq. (D.C. Bar No. 394340)
*Attorney for Howard Stirk Holdings, LLC*
*P. O. Box 15473*
*Washington, DC 20003*
*(202) 544-5171*
*Fax: (202) 544-5172*



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAY 3 0 2014

RECEIVED



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED

MAY 3 0 2014

CLERK

# Exhibit A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| 2014 Quadrennial Regulatory Review – Review of | ) | MB Docket No. 14-50 |
| the Commission's Broadcast Ownership Rules and | ) | |
| Other Rules Adopted Pursuant to Section 202 of | ) | |
| the Telecommunications Act of 1996 | ) | |
| | ) | |
| 2010 Quadrennial Regulatory Review – Review of | ) | MB Docket No. 09-182 |
| the Commission's Broadcast Ownership Rules and | ) | |
| Other Rules Adopted Pursuant to Section 202 of | ) | |
| the Telecommunications Act of 1996 | ) | |
| | ) | |
| Promoting Diversification of Ownership | ) | MB Docket No. 07-294 |
| In the Broadcasting Services | ) | |
| | ) | |
| Rules and Policies Concerning | ) | MB Docket No. 04-256 |
| Attribution of Joint Sales Agreements | ) | |
| In Local Television Markets | ) | |
| | ) | |

**FURTHER NOTICE OF PROPOSED RULEMAKING AND REPORT AND ORDER**

**Adopted:  March 31, 2014**                    **Released:  April 15, 2014**

**Comment Date:  [45 days after publication in the Federal Register]**
**Reply Comment Date:  [75 days after publication in the Federal Register]**

By the Commission:  Chairman Wheeler and Commissioners Clyburn and Rosenworcel issuing separate statements; Commissioners Pai and O'Rielly dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Heading                                                                    Paragraph #

I.    INTRODUCTION .................................................................................................... 1
II.   BACKGROUND ..................................................................................................... 9
III.  MEDIA OWNERSHIP RULES ............................................................................ 15
      A.  Local Television Ownership Rule ................................................................ 15
      B.  Local Radio Ownership Rule ....................................................................... 74
      C.  Newspaper/Broadcast Cross-Ownership Rule ........................................... 113
      D.  Radio/Television Cross-Ownership Rule ................................................... 200
      E.  Dual Network Rule ...................................................................................... 226
IV.   DIVERSITY ORDER REMAND .......................................................................... 242
      A.  Introduction ................................................................................................. 242
      B.  Background .................................................................................................. 246
      C.  Discussion ................................................................................................... 263

V. DISCLOSURE OF SHARED SERVICE AGREEMENTS................................................................ 320
   A.  Introduction.......................................................................................................................... 320
   B.  Background........................................................................................................................... 321
   C.  Discussion............................................................................................................................ 328
VI. REPORT AND ORDER............................................................................................................... 340
   A.  Attribution of Television JSAs ........................................................................................... 340
   B.  Filing Requirements and Transition Procedures................................................................. 366
   C.  National Sales Representatives ........................................................................................... 368
VII. PROCEDURAL MATTERS........................................................................................................ 373
VIII. ORDERING CLAUSES ............................................................................................................ 383
APPENDIX A - Final Rule Changes
APPENDIX B - Proposed Rule Changes
APPENDIX C - Final Regulatory Flexibility Analysis
APPENDIX D - Supplemental Initial Regulatory Flexibility Analysis

## I.  INTRODUCTION

     1.     Today we take another major step in our review of our broadcast ownership rules.  Our ongoing 2010 Quadrennial Review has generated a high level of interest and participation, creating an extensive record that continues to attract significant and substantive input well after the formal comment periods have expired.  Such participation demonstrates that our broadcast ownership rules continue to be of importance and interest to market participants, public watchdogs, and consumers alike.  We wish to build on that record to resolve the ongoing 2010 proceeding, and we are cognizant of our statutory obligation to review the broadcast ownership rules every four years.  To accomplish both objectives, with this Further Notice of Proposed Rulemaking ("FNPRM") we are initiating this 2014 Quadrennial Review; incorporating the existing 2010 record into this proceeding; proposing rules that are formulated based on our evaluation of that existing record; and seeking new and additional information and data on market conditions and competitive indicators as they exist today.  Ultimately, the rules we adopt in this 2014 proceeding will be based on a comprehensive, refreshed record that reflects the most current evidence regarding the media marketplace.  We also consider related issues posed in our 2010 Quadrennial Review proceeding concerning the attribution and disclosure of agreements between broadcast stations, and in the accompanying Report and Order ("Order"), we determine that certain television joint sales agreements ("JSAs") are attributable.

     2.     The existing record demonstrates not only the dynamic changes that are taking place in the media marketplace but also the continued and vital importance of traditional media outlets to local communities.  The proliferation of broadband Internet connections and other technological advances have changed the ways in which many consumers access entertainment, news, and information programming.  Yet traditional media outlets are still essential to achieving the Commission's goals of competition, localism, and viewpoint diversity.  In particular, the record demonstrates that broadcast television and newspapers continue to be the most significant sources of local news content.[1]  And while the popularity of news websites unaffiliated with traditional media is increasing, the overwhelming majority of local news content available online originates from newspapers and local broadcast television stations.[2]

     3.     In addition, the record demonstrates that some broadcasters continue to generate significant and increasing local advertising revenue and improve their bottom lines with online advertising revenue.  While nearly every industry struggled through the recent global financial crisis, some broadcasters have rebounded in a significant way and appear poised to grow stronger.  At the same time, other broadcasters are less well positioned and continue to struggle, often in crowded major

---

[1] *See infra* ¶¶ 130-131.

[2] *See infra* ¶¶ 130-131.

markets. The forthcoming voluntary incentive auction of broadcast television spectrum, which is critically important to the Commission's efforts to unleash the full transformative potential of broadband Internet, will provide those and other broadcasters with a new and unique financial opportunity.[3] We anticipate that the incentive auction will both free up significant spectrum for mobile broadband and result in an even healthier broadcast industry.[4]

4.      While broadband Internet has impacted the lives of many consumers in myriad ways, including access to media content, millions of Americans continue to lack access to broadband at speeds necessary to take advantage of online content available via streaming or download.[5] For these Americans — disproportionately those in rural areas, in low-income groups, on Tribal lands, and in U.S. Territories — traditional media still may be their only source of entertainment and local news and information content.[6]

5.      It is clear that the impact of new technologies on the media marketplace is already significant. If broadband penetration continues to rise, which is a policy priority of the Commission, it may have major implications for a future review of our broadcast ownership rules. At this time, however, we believe that the broadcast ownership rules proposed herein remain necessary to protect and promote the Commission's policy goals in local markets.

6.      With these considerations in mind, we issue this FNPRM to seek additional comment on the appropriateness of the broadcast ownership rules to today's evolving marketplace. We seek comment on whether to eliminate two rules that under prevailing market conditions no longer appear to be supported by their original rationales, and we propose to modernize and streamline additional rules. Specifically, as explained in greater detail below, we seek comment on whether to eliminate restrictions on newspaper/radio combinations because, on the record developed in the 2010 Quadrennial Review proceeding, the link between those limitations and the Commission's goal of promoting viewpoint diversity appears to be too tenuous to justify retaining the limitations. We seek comment on whether to eliminate the radio/television cross-ownership rule in favor of reliance on the local radio rule and the local television rule. We propose to retain the current local television ownership rule with a minor modification to update the previous analog contour provision in light of the digital transition. We seek comment on whether to retain the prohibition on the cross-ownership of newspapers and television stations, and if so, should we reform the restriction to consider waivers for newspaper/television combinations. We propose to retain the current local radio ownership rule and the dual network rule without modification. We seek comment on these proposals.

---

[3] *See Expanding the Economic and Innovative Opportunities of Spectrum Through Incentive Auctions*, GN Docket No. 12-268, Notice of Proposed Rulemaking, 27 FCC Rcd 12357, 12359, 12364, ¶¶ 4, 16 (2012) ("*Incentive Auctions NPRM*").

[4] *See id.* at 12359, ¶ 4. The incentive auction is likely to affect the broadcast television industry in a number of respects, and, as discussed herein, we seek comment on the significance of these potential changes in the context of this quadrennial review proceeding. We anticipate being able to conduct the incentive auction in 2015.

[5] *See Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996, as Amended by the Broadband Data Improvement Act*, GN Docket No. 11-121, Eighth Broadband Progress Report, 27 FCC Rcd 10342, 10369, ¶ 44 (2012) ("*Eighth Broadband Progress Report*") (finding that approximately 19 million Americans lack access to fixed broadband meeting the 4 Mbps/1 Mbps speed benchmark).

[6] *Id.*

7.     Also, we seek additional comment on issues referred to us in the Third Circuit's remand in *Prometheus II* of certain aspects of the Commission's 2008 *Diversity Order*.[7]  Specifically, we tentatively conclude that the revenue-based eligible entity standard should be reinstated, as well as the associated measures to promote the Commission's goal of encouraging small business participation in the broadcast industry, which we believe will cultivate innovation and enhance viewpoint diversity.  As directed by the court, we consider the socially and economically disadvantaged business definition as a possible basis for favorable regulatory treatment, as well as other possible definitions that would expressly recognize the race and ethnicity of applicants.[8]  We tentatively conclude that the record from the 2010 Quadrennial Review proceeding does not satisfy the demanding legal standards the courts have said must be met before the Government may implement preferences based on such race- or gender-conscious definitions and we seek further comment.  We discuss the Commission's recent initiatives to foster diversity, including efforts to promote minority and female participation in communications industries, the release of minority and female broadcast ownership data, the ongoing study of Hispanic television, and the recent clarification of the Commission's policies and procedures for evaluating potential foreign investment in broadcast licensees.  We seek comment on these proposals and conclusions.

8.     Finally, we take steps herein to address concerns about the use of a variety of sharing agreements between independently owned television stations.  First, this FNPRM proposes to define a category of sharing agreements designated as Shared Service Agreements ("SSAs") and proposes to require commercial television stations to disclose those SSAs.  We believe that this action will lead to more comprehensive information about the prevalence and content of SSAs between television stations.  The current lack of information impedes the Commission's and the public's assessment of the level of influence and control that these agreements may confer over independent stations.  In addition, in the Order, we adopt attribution standards for a specific category of sharing agreements, television JSAs.  Consistent with Commission precedent with respect to radio JSAs, as well as radio and television local marketing agreements ("LMAs"), we find that certain agreements convey sufficient influence to be akin to ownership and we will therefore attribute to the brokering station same-market television JSAs that cover more than 15 percent of the weekly advertising time for the brokered station.

## II.    BACKGROUND

9.     The media ownership rules subject to this quadrennial review are the local television ownership rule, the local radio ownership rule, the newspaper/broadcast cross-ownership rule, the radio/television cross-ownership rule, and the dual network rule.[9]  Congress requires the Commission to review these rules every four years to determine whether they "are necessary in the public interest as the result of competition" and to "repeal or modify any regulation [the Commission] determines to be no longer in the public interest."[10]  The Third Circuit has instructed that "necessary in the public interest" is a "'plain public interest' standard under which 'necessary' means 'convenient,' 'useful,' or 'helpful,' not

---

[7] *Prometheus Radio Project v. FCC*, 652 F.3d 431, 437 (3d Cir. 2011) ("*Prometheus II*"); *see also Promoting Diversification of Ownership in the Broadcasting Services*, MB Docket No. 07-294, Report and Order and Third Further Notice of Proposed Rulemaking, 23 FCC Rcd 5922 (2008) ("*Diversity Order*" and "*Diversity Third FNPRM*").

[8] *Prometheus II*, 652 F.3d at 471-73.

[9] These rules are found, respectively, at 47 C.F.R. §§ 73.3555(b), (a), (d), and (c) and 47 C.F.R. § 73.658(g).

[10] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) ("Appropriations Act") (amending Sections 202(c) and 202(h) of the 1996 Act).  In 2004, Congress revised the then-biennial review requirement to require such reviews quadrennially.  *See* Appropriations Act § 629, 118 Stat. at 100.

'essential' or 'indispensable.'"[11] There is no "'presumption in favor of repealing or modifying the ownership rules.'"[12] Rather, the Commission has the discretion "to make [the rule] more or less stringent."[13] This 2014 Quadrennial Review will focus on identifying a reasoned basis for retaining, repealing, or modifying each rule consistent with the public interest.[14]

10.     The Commission began the 2010 proceeding with a series of workshops held between November 2009 and May 2010. Participants in the workshops discussed the scope and content of the review process. Thereafter the Commission released a *Notice of Inquiry* ("*NOI*") on May 25, 2010, seeking comment on a wide range of issues to help determine whether the current media ownership rules continue to serve the Commission's policy goals.[15] Subsequently, the Commission commissioned eleven economic studies, conducted by outside researchers and Commission staff, which were peer reviewed and then released to the public, in order to provide data on the impact of market structure on the Commission's policy goals of competition, localism, and diversity.[16]

11.     After the release of the *NOI*, the Court of Appeals for the Third Circuit issued its opinion in *Prometheus II*, which considered appeals from the Commission's review of the media ownership rules in the *2006 Quadrennial Review Order*.[17] The court affirmed the Commission's decision to retain the

---

[11] *Prometheus Radio Project v. FCC*, 373 F.3d 372, 394 (3d Cir. 2004) ("*Prometheus I*"). The court also concluded that the Commission is required "to take a fresh look at its regulations periodically in order to ensure that they remain 'necessary in the public interest.'" *Id.* at 391.

[12] CBS NPRM Comments at 3 (citing *Fox Television Stations v. FCC*, 280 F.3d 1027, 1048 (D.C. Cir. 2002); *Sinclair Broad. Group, Inc. v. FCC*, 284 F.3d 148, 159 (D.C. Cir. 2002)). The court in *Prometheus I* determined that Section 202(h) does not carry a presumption in favor of deregulation. *See Prometheus I*, 373 F.3d at 395 (rejecting the "misguided" findings in *Fox* and *Sinclair* regarding a "'deregulatory presumption'" in Section 202(h)); *see also Prometheus II*, 652 F.3d at 444-45 (confirming the standard of review under Section 202(h) adopted in *Prometheus I*).

[13] *Prometheus I*, 372 F.3d at 395; *see also Prometheus II*, 652 F.3d at 445.

[14] *See Prometheus I*, 373 F.3d at 395; *Prometheus II*, 652 F.3d at 445.

[15] *See 2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 09-182, Notice of Inquiry, 25 FCC Rcd 6086 (2010) ("*NOI*").

[16] *Media Bureau Announces the Release of Requests for Quotation for Media Ownership Studies and Seeks Suggestions for Additional Studies in Media Ownership Proceeding*, MB Docket No. 09-182, Public Notice, 25 FCC Rcd 7514 (Med. Bur. 2010); *FCC Releases Five Research Studies on Media Ownership and Adopts Procedures For Public Access to Underlying Data Sets*, MB Docket No. 09-182, Public Notice, 26 FCC Rcd 8472 (Med. Bur. 2011); *FCC Releases Three Additional Research Studies on Media Ownership*, MB Docket No. 09-182, Public Notice, 26 FCC Rcd 10240 (Med. Bur. 2011); *FCC Releases the Final Three Research Studies on Media Ownership*, MB Docket No. 09-182, Public Notice, 26 FCC Rcd 10380 (Med. Bur. 2011). The media ownership studies for the 2010 Quadrennial Review proceeding are available at http://www.fcc.gov/encyclopedia/2010-media-ownership-studies. In the *NPRM*, the Commission sought formal comment on the studies. *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 09-182, Notice of Proposed Rulemaking, 26 FCC Rcd 17489, 17556-64, ¶¶ 171-93 (2011) ("*NPRM*"). Few commenters provided specific criticisms of individual studies, though the University of Southern California Annenberg School for Communications & Journalism ("USC") provided an all-around critique of the studies. USC NPRM Comments at 5 (submitted on behalf of the Communication Policy Research Network). Overall, we find that the studies provide useful data and analysis regarding the impact of market structure on the Commission's policy goals, and we will discuss the studies in the context of the relevant rule sections below.

[17] *Prometheus II*, 652 F.3d at 431; *2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 06-121, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2016-17, ¶ 9 (2008) ("*2006 Quadrennial Review Order*").

local television and radio rules in order to protect competition in local media markets.[18] The court also affirmed the Commission's retention of the dual network rule based on potential harm to competition that would result from mergers among the top four networks.[19] In addition, the court affirmed the Commission's conclusion to retain the radio/television cross-ownership rule based on its contribution to the Commission's diversity goal.[20] The Third Circuit vacated and remanded the newspaper/broadcast cross-ownership rule as modified by the Commission in the *2006 Quadrennial Review Order* on procedural grounds, concluding that the Commission had failed to comply with the notice and comment provisions of the Administrative Procedure Act ("APA").[21] Finally, the court vacated and remanded a number of measures adopted in the Commission's 2008 *Diversity Order*.[22] Specifically, the court vacated and remanded measures adopted in the *Diversity Order* that were designed to increase ownership opportunities for "eligible entities," including minority- and women-owned entities, because it determined that the Commission's revenue-based eligible entity definition was arbitrary and capricious.[23] The court directed the Commission to address this issue in the course of the 2010 Quadrennial Review.

12. On December 22, 2011, the Commission released the *NPRM*, in which the Commission proposed modest, incremental changes to the broadcast ownership rules and sought comment on those changes. The Commission also sought comment in the *NPRM* on the aspects of the Commission's 2008 *Diversity Order* that the Third Circuit had remanded in *Prometheus II*, as well as other actions that the Commission might take to increase the level of broadcast station ownership by minorities and women. Finally, the Commission sought comment on various attribution issues that define which interests in a licensee must be counted in applying the broadcast ownership rules. In particular, the Commission sought comment on the impact of certain programming or other sharing agreements between stations and whether it should modify the broadcast attribution rules to account for such agreements or adopt disclosure requirements. In doing so, the Commission referenced its pending proceeding regarding the potential attribution of television JSAs. In that proceeding, the Commission had tentatively concluded that television JSAs have the same effects in local television markets that radio JSAs do in local radio markets and that the Commission should therefore attribute television JSAs.

13. On November 14, 2012, the Media Bureau released a report on the ownership of commercial broadcast stations ("*2012 323 Report*").[24] Consistent with other data and extensive comment already in the record, the *2012 323 Report* confirmed low levels of broadcast station ownership by women and minorities — a fact long recognized by the Commission.[25] On December 3, 2012, the

---

[18] *Prometheus II*, 652 F.3d at 460-61, 462-63. The local radio rule was also retained, in part, to help promote the Commission's diversity goal. *See id.* at 462-63.

[19] *Id.* at 463-64.

[20] *Id.* at 456-58.

[21] *Id.* at 453. The court did not address the substantive modifications to the rule.

[22] *Id.* at 471.

[23] *Id.*

[24] *See 2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 09-182, Report on Ownership of Commercial Broadcast Stations, 27 FCC Rcd 13814 (Med. Bur. 2012) ("*2012 323 Report*"). The *2012 323 Report* is based on ownership information, as of November 1, 2009, and October 1, 2011, submitted by broadcasters in their biennial Form 323 filings. *See* FCC Form 323, Ownership Report for Commercial Broadcast Stations, *available at* http://transition.fcc.gov/Forms/Form323/323.pdf; *see also* 47 C.F.R. § 73.3615.

[25] *See, e.g., Diversity Order*, 23 FCC Rcd at 5924, ¶ 1 (noting that "minority- and women-owned businesses" historically have not been "well-represented in the broadcasting industry"); *Policies and Rules Regarding Minority and Female Ownership of Mass Media Facilities*, MM Docket No. 94-149, Notice of Proposed Rulemaking, 10 FCC Rcd 2788, 2789, ¶ 5 (1995) ("[D]espite the Commission's efforts to increase minority ownership of broadcast and cable facilities, minorities today remain significantly underrepresented among mass media owners.").

Commission granted the request of several parties for "an additional, formal opportunity to comment on the [*2012 323 Report*]."[26]  On May 30, 2013, the Minority Media and Telecommunications Council ("MMTC") submitted a study titled "The Impact of Cross Media Ownership on Minority/Women Owned Broadcast Stations" ("MMTC Cross-Ownership Study").[27]  The Commission sought comment on this study during the summer of 2013.[28]

14.     *Policy Goals*.  The media ownership rules have consistently been found to be necessary to further the Commission's longstanding policy goals of fostering competition, localism, and diversity. We seek additional comment on the *NPRM*'s tentative conclusion that these policy goals continue to be the appropriate framework within which to evaluate and address minority and female interests as they relate to the broadcast ownership rules.[29]

## III.     MEDIA OWNERSHIP RULES

### A.     Local Television Ownership Rule

#### 1.     Introduction

15.     Based on the record that was compiled for the 2010 Quadrennial Review, we tentatively conclude that the current local television ownership rule remains necessary in the public interest and should be retained with a limited modification.[30]  As discussed below, we believe that, based on the current media marketplace and the record in this proceeding, the public interest would be best served by replacing the Grade B contour overlap test used to determine when to apply the local television ownership rule with a digital noise limited service contour ("NLSC") test, rather than the DMA-based approach proposed in the *NPRM*.  We believe that the local television ownership rule is necessary to promote competition.  We further believe that the competition-based rule we propose in this FNPRM also would promote viewpoint diversity by helping to ensure the presence of independently owned broadcast television stations in local markets and would be consistent with our localism goal.[31]  We find that the

---

[26] *See Commission Seeks Comment on Broadcast Ownership Report*, MB Docket No. 09-182, Public Notice, 27 FCC Rcd 15036 (Med. Bur. 2012) ("*2012 323 Report PN*").

[27] Letter from David Honig, President, MMTC, to Chairwoman Mignon Clyburn, Commissioner Ajit Pai, and Commissioner Jessica Rosenworcel, FCC (May 30, 2013) (attaching Mark Fratrik, BIA/Kelsey, The Impact of Cross Media Ownership on Minority/Women Owned Broadcast Stations (May 30, 2013) ("MMTC Cross-Ownership Study")) ("MMTC May 30, 2013 *Ex Parte* Letter").

[28] *Media Bureau Invites Comments on Study Submitted by the Minority Media and Telecommunications Council in 2010 Quadrennial Review of Broadcast Ownership Rules*, Public Notice, 28 FCC Rcd 8244 (Med. Bur. 2013) ("Public Notice Seeking Comment on MMTC Cross-Ownership Study").

[29] 26 FCC Rcd at 17497, ¶ 21.  Based on the record developed in response to the *NPRM*, we continue to believe that the longstanding policy goals of competition, localism, and diversity are broadly defined to promote the core responsibilities of broadcast licensees. *See id.*  We are not persuaded by the comments in the record that it would be appropriate to adopt any additional formal policy goals. *See, e.g.*, Diversity and Competition Supporters ("DCS") NPRM Comments at 5 (proposing that the Commission adopt the goals of remedying the present effects of past discrimination and preventing future discrimination); Don Schellhardt ("Schellhardt") NPRM Comments at 6 (urging the Commission to add promoting "robust employment" as a policy goal); Writers Guild of America, East, AFL-CIO ("WGAE") NPRM Comments at 2-3 (asserting that the Commission must add the additional goal of increasing the resources devoted to diverse local news programming in order to effectively promote the core policy goals of competition, localism, and diversity).  We seek comment on this tentative conclusion.

[30] Section 202(h) of the 1996 Act, 47 U.S.C. § 303 note; *NPRM*, 26 FCC Rcd at 17498, ¶ 26; *see also 2006 Quadrennial Review Order*, 23 FCC Rcd at 2060, ¶ 87.

[31] Consistent with the Commission's finding in the *2006 Quadrennial Review Order*, we tentatively find that the evidence in the record fails to demonstrate that the local television ownership rule threatens local programming.  23 FCC Rcd at 2067, ¶ 103.  For example, broadcasters assert that eliminating the rule would promote localism, as the efficiencies of common ownership allow broadcasters to initiate or retain local news and public interest

(continued....)

local television ownership rule we propose in this FNPRM would be consistent with our goal of promoting minority and female ownership of broadcast television stations. Finally, we believe that our proposed limited modification of the rule will better promote competition, and that this benefit would outweigh any burdens, which would be minimized by our proposal to grandfather combinations as described herein.

16. We propose to modify the local television ownership rule to allow an entity to own up to two television stations in the same DMA if: (1) the digital NLSCs of the stations (as determined by section 73.622(e) of the Commission's rules) do not overlap; or (2) at least one of the stations is not ranked among the top-four stations in the market and at least eight independently owned television stations would remain in the DMA following the combination.[32] In calculating the number of stations remaining post-merger, only those stations whose digital NLSC overlaps with the digital NLSC of at least one of the stations in the proposed combination would be considered, which would be consistent with the contour overlap provision of the current rule. In addition, we propose to retain the existing failed/failing station waiver policy. We seek comment on these proposed modifications to the local television ownership rule and ask whether there have been any developments since the *NPRM* that we should take into account in our review of the rule. We seek comment on the costs and benefits of our proposed local television ownership rule. To the greatest extent possible, commenters should quantify the expected costs or benefits of the proposed rule and provide detailed support for any actual or estimated values provided, including the source of such data and/or the method used to calculate reported values.

**2. Background**

17. In the *NPRM*, the Commission proposed to retain the local television ownership rule, with one modification. Specifically, the *NPRM* proposed to retain the top-four prohibition, eight-voices test, and numerical limits of the existing rule, while proposing to replace the Grade B contour overlap provision with a DMA-based approach, under which the Commission would prohibit ownership of two stations in the same DMA unless at least one of the stations is not rated in the top four and at least eight independent voices would remain after the transaction.[33] The *NPRM* also invited comment on whether to adopt a market size waiver standard, the impact of multicasting on the local television ownership rule, and the impact of the proposed rule on minority and female ownership.[34]

18. Multiple commenters supported the Commission's proposal to retain the local television ownership rule to promote competition.[35] Many commenters also asserted that the rule remains necessary to protect the Commission's localism and viewpoint diversity goals and to promote minority and female

---

(Continued from previous page) ————————————————

programming. *See, e.g.,* Grant Group NPRM Comments at 10; LIN NPRM Comments at 4; National Association of Broadcasters ("NAB") NPRM Comments at 18-20. By contrast, public interest commenters assert that while common ownership may produce efficiencies, such efficiencies do not always result in increased local content. *See, e.g.,* Free Press NPRM Comments at 46-48 (citing Danilo Yanich, Ownership Matters: Localism, Local Television News, and the FCC (May 20, 2009) (presented at the International Communication Association annual meeting)). We note that in *Prometheus II* upheld the Commission's rationale in the *2006 Quadrennial Review Order* for retaining the local television ownership rule. *See Prometheus II,* 652 F.3d at 458-62.

[32] *See* Appendix B; *see also* 47 C.F.R. § 73.622(e).

[33] *NPRM,* 26 FCC Rcd at 17502-07, ¶¶ 36-51.

[34] *Id.* at 17508-11, ¶¶ 52-59.

[35] *See* American Cable Association ("ACA") NPRM Comments at 12; DISH Network ("DISH") NPRM Reply at 1; Free Press NPRM Comments at 44-45; National Telecommunications Cooperative Association ("NTCA") NPRM Reply at 5.

ownership.[36]  Others, particularly public advocacy commenters, urged the Commission not only to retain the television ownership limits, but to tighten them.[37]  Free Press and UCC *et al.* argued that the ability to multicast has eliminated the need for common ownership of multiple stations, and they asserted that returning to the single-license rule could create ownership opportunities for minorities and women.[38]

19.     In contrast, broadcast industry commenters asserted that the local television ownership rule should be eliminated or substantially relaxed as a result of competition for viewers and advertising revenue from non-broadcast video alternatives.[39]  Many broadcasters argued that such relief is particularly warranted in small and mid-sized markets, where the current rule generally does not allow any common ownership.[40]  Broadcasters asserted also that eliminating the rule would promote localism, as the efficiencies of common ownership would allow broadcasters to initiate or retain local news and public interest programming, which requires significant capital investment.[41]  In addition, broadcasters asserted that common ownership can benefit the Commission's viewpoint diversity goals, as owners of station combinations have natural incentives to counterprogram their stations to maximize audience and revenue share.[42]

### 3.    Discussion

20.     *Market.*  As proposed in the *NPRM*, we tentatively find that the local television ownership rule continues to be necessary to promote competition among broadcast television stations in local television viewing markets.[43]  ACA and WGAW supported the Commission's decision in the NPRM to focus its analysis on the promotion of competition among local broadcast television stations.[44]  In particular, WGAW asserted that the Internet is not a substitute for local television stations, primarily because the Internet is not yet an independent source of local news, and cannot be considered a competitor in local television markets.[45]  Conversely, many broadcasters opposed the Commission's

---

[36] Communications Workers of America ("CWA") NPRM Comments at 4-6; CWA NPRM Reply at 5-6; DCS NPRM Comments at 38; WGAE NPRM Comments at 3; Writers Guild of America, West, Inc. ("WGAW") NPRM Comments at 3.

[37] Schellhardt NPRM Comments at 2, 7; Free Press NPRM Comments at 44-45; Free Press NPRM Reply at 18-22; National Hispanic Media Coalition ("NHMC") *et al.* NPRM Comments at 3-5; Office of Communication of United Church of Christ ("UCC") *et al.* NPRM Comments at 24.

[38] Free Press NPRM Comments at 44-45; Free Press NPRM Reply at 20-21; UCC *et al.* NPRM Comments at 24.

[39] Belo NPRM Comments at 3-4; CBS NPRM Comments at 10; Entravision NPRM Comments at 4; Cedar Rapids Television ("CRT") NPRM Comments at 13; Grant Group NPRM Comments at 7-10; Gray NPRM Comments at 6-7; LIN NPRM Comments at 3-4; NAB NPRM Comments at 11-12; Nexstar NPRM Comments at 8-10.  In addition, Sinclair asserted that the Commission could allocate more stations if it wants to promote competition in local television markets.  *See* Sinclair NPRM Comments at 11.

[40] *See* Coalition of Smaller Market Television Stations ("Small Market Coalition") NPRM Reply at 7; CRT NPRM Comments at 13; Grant Group NPRM Comments at 7-10; Gray NPRM Comments at 6-7; Nexstar NPRM Comments at 9-10.

[41] *See* Grant Group NPRM Comments at 10; Gray NPRM Comments at 7-8; LIN NPRM Comments at 4; NAB NPRM Comments at 18-20; Nexstar NPRM Comments at 22-23.

[42] *See* Gray NPRM Comments at 7; Nexstar NPRM Comments at 15.

[43] *NPRM*, 26 FCC Rcd at 17500, ¶ 33; *see also Prometheus II*, 652 F.3d at 458-61 (upholding the Commission's decision to retain the local television ownership rule in order to promote competition among broadcast television stations in local markets).

[44] ACA NPRM Comments at 12; WGAW NPRM Comments at 2.

[45] WGAW NPRM Comments at 2-3 (citing findings from Media Ownership Study 6, Less of the Same:  The Lack of Local News on the Internet 10, by Matthew Hindman (2011) ("Media Ownership Study 6")); *but see* Nexstar

(continued....)

decision to focus on competition among local broadcast television stations and asserted that stations face competition for audience share and advertising revenue from non-broadcast video alternatives, such as multichannel video programming distributors ("MVPDs") and the Internet.[46] According to these commenters, the Commission is compelled to consider such competing sources of video programming in its local television ownership rule and, as a result, must eliminate or substantially relax the rule.[47] Although we believe the record in the 2010 Quadrennial Review proceeding supports our view of the appropriate parameters for defining the market, we seek comment on whether developments since the *NPRM* should cause us to shift the focus of our analysis.

21. First, we believe that the video programming market remains the relevant market for review of the local television ownership rule.[48] We also believe that the video programming market is distinct from the radio listening market. While multiple broadcast commenters argued in favor of an expansive market definition that would include nearly all forms of media, we tentatively find such arguments to be unpersuasive.[49] The Commission has previously found that the video programming market is distinct from other media markets because consumers do not view non-video entertainment options (*e.g.*, listening to music or reading) and non-delivered video options (*e.g.*, DVDs or movie theaters) as good substitutes for watching television, and there is no evidence in the current record that would cause us to disturb these findings.[50]

---

(Continued from previous page) ————————————
NPRM Reply at 5 (stating that 202(h) does not require a media alternative to be a perfect substitute to be considered a competitor).

[46] *See* Belo NPRM Comments at 3, 6; CBS NPRM Comments at 11; CRT NPRM Comments at 12-13; Entravision NPRM Comments at 4-5; Grant Group NPRM Comments at 8; NAB NPRM Comments at 12; NAB NPRM Reply at 9-10; Nexstar NPRM Comments at 6-9; Nexstar NPRM Reply at 3-4; Sinclair NPRM Comments at 9-10. In addition, many broadcasters asserted that they compete for advertising revenue with non-video sources of information and entertainment, such as radio stations, newspapers, billboards, and magazines. *See, e.g.*, Belo NPRM Comments at 3, 6; CRT NPRM Comments at 12-13; NAB NPRM Comments at 12.

[47] *See, e.g.*, Belo NPRM Comments at 3-4; CBS NPRM Comments at 10; NAB NPRM Comments at 11-12; NAB NPRM Reply at 9-10; *see also* The Walt Disney Company ("Disney") NPRM Reply at 2-3 (arguing that the Commission should consider growth of new media outlets and, instead of regulating the broadcast industry, should find ways to incent ownership of broadcast stations).

[48] *See NPRM*, 26 FCC Rcd at 17500-01, ¶ 33; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2064, ¶ 97 (analyzing the local television ownership rule in the context of the video programming market); *2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 02-277, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13672-73, ¶¶ 142-145 (2003) (referring to the video programming market as the "delivered video programming market") ("*2002 Biennial Review Order*"). Although the video programming market broadly speaking also includes video programming delivered via MVPDs and the Internet, as discussed in paragraphs 22-25 and consistent with Commission precedent cited here, we tentatively conclude that non-broadcast sources of video programming should not be included in our analysis of the local television ownership rule at this time. *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2064, ¶ 97; *2002 Biennial Review Order*, 18 FCC Rcd at 13673, ¶ 145.

[49] *See, e.g.*, Belo NPRM Comments at 3, 6; CRT NPRM Comments at 12-13; NAB NPRM Comments at 12.

[50] *2002 Biennial Review Order*, 18 FCC Rcd at 13672-73, ¶ 142. In addition, we note the *NPRM*'s tentative conclusion that it is not now appropriate to expand the relevant product market beyond video programming to include non-video information sources of local news and information. *NPRM*, 26 FCC Rcd at 17501, ¶ 35. This tentative conclusion was based on evidence that Internet-only websites provide only a small amount of local news content and a lack of evidence that non-video information sources modify their programming decisions based on the actions of local broadcast television stations or vice versa. *Id.* We did not receive significant comment on this specific issue in the 2010 proceeding, and we seek comment on whether we should confirm the *NPRM*'s tentative conclusion for the reasons discussed therein. *Id.*

22. Second, we believe that our analysis regarding the local television ownership rule should continue to focus on promoting competition among broadcast television stations in local television viewing markets.[51] In order to compete effectively in its local market, and thereby gain market share, a broadcast television station must invest in better programming and provide programming tailored to the needs and interests of the local community, including local news and public interest programming.[52] By strengthening their position in the local market, television broadcasters are better able to compete for advertising revenue and retransmission consent fees, an increasingly important source of revenue for many stations. Viewers in the local market benefit from such competition among numerous strong rivals in the form of higher quality programming.[53]

23. While we are keenly aware of the growing popularity of video programming delivered via MVPDs and the Internet, we tentatively find that competition from such video programming providers is currently of limited relevance for the purposes of our analysis. These programming alternatives compete largely in national markets — cable network programming is generally uniform across all markets, as is video programming content available via the Internet — and, unlike local broadcast stations, such programming providers are not likely to respond to conditions in local markets.[54] Though certain broadcast commenters disputed this notion, we tentatively find their arguments to be unsupported by evidence of non-broadcast video programmers modifying their programming decisions based on the competitive conditions in a particular local market.[55]

24. In addition, we tentatively find that broadcast television's strong position in the local advertising market supports our view that non-broadcast video programmers are not yet meaningful substitutes in local television markets. Broadcasters asserted that we should expand the relevant market, in part because of increased competition for advertising from non-broadcast sources of video programming, particularly in the local advertising market.[56] The data do not support this claim. From 2008 through 2011, though overall local advertising spending was down from its highs in 2005 and 2006, local broadcast television's market share actually increased and achieved the highest levels since 2004.[57]

---

[51] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2064, ¶ 97.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] Entravision NPRM Comments at 4-5 (claiming that the Commission should not focus on whether non-broadcast video providers alter their behavior based on changes in the local market, but whether local television stations can survive the loss of audience share and advertising revenue resulting from viewers' reliance on non-broadcast video alternatives); NAB NPRM Comments at 15 (asserting that platforms such as cable, satellite, and new media — as distinguished from program networks — have incentives to compete in local markets to gain subscribers and local advertising revenue); Sinclair NPRM Comments at 9-10 (asserting that cable news channels should be considered competitors to local newscasts, even though cable news is generally national in scope, because many viewers watch local newscasts to obtain national news); Nexstar NPRM Reply at 5 (suggesting that broadcasters must compete with national cable networks even if the cable network does not react to competitive changes in local markets).

[56] *See, e.g.*, NAB NPRM Comments at 12-16.

[57] SNL KAGAN, ADVERTISING FORECASTS: U.S. MARKET TRENDS & DATA FOR ALL MAJOR MEDIA 25-26 (2011) ("SNL KAGAN ADVERTISING FORECASTS 2011"). For the election years in this time period, broadcast television's advertising revenue market share increased from 13.6 percent in 2008 to 15.8 percent in 2010; for non-election years, the market share increased from 13.4 percent in 2009 to 14.9 percent in 2011. *Id.* In addition, market share in 2012, an election year, is expected to rise to 16.0 percent. *Id.* at 26. We note also that broadcast television's share of national advertising revenue has remained relatively consistent since 2008, and the industry has seen significant gains in retransmission consent fees and online revenue. In fact, total broadcast television revenue for 2012 is predicted to reach its highest level since 2000. *See id.* at 147 (reporting approximately $26.3 billion in total revenue for 2000); SNL KAGAN, ECONOMICS OF BROADCAST TV RETRANSMISSION REVENUE 2 (2012) ("SNL KAGAN BROADCAST TV RETRANSMISSION REVENUE") (predicting approximately $24.8 billion in total revenue for 2012).

While the shares of local advertising on cable television and the Internet also increased during this time period, those gains do not appear to be at the expense of broadcast television stations.[58] We seek comment on whether there have been any significant changes since these figures became available.

25. For the foregoing reasons, we believe that broadcast television stations continue to play a unique and vital role in local communities that is not meaningfully duplicated by non-broadcast sources of video programming. In addition to providing viewers with the majority of the most popular programming on television,[59] broadcast television stations remain the primary source of local news and public interest programming.[60] Moreover, millions of U.S. households lack broadband access at speeds sufficient to stream or download video programming available via the Internet.[61] Accordingly, we tentatively find that the record continues to support a local television ownership rule designed to promote

---

[58] SNL KAGAN ADVERTISING FORECASTS 2011 at 25-26. NAB asserted that the recent growth in television station advertising revenue is temporary and not likely to "address the structural changes that have taken place in the [television] market" because the predicted 2012 advertising revenues for the broadcast television industry are below the levels achieved in 2006. NAB NPRM Reply at 10 & n.36. While advertising revenues for broadcast television stations were lower during this period, we believe the evidence does not support the conclusion that this was the result of a unique change in the television marketplace; instead, the total advertising market for all media experienced a significant contraction, which was most likely the result of the global financial crisis that impacted nearly all markets. SNL KAGAN ADVERTISING FORECASTS 2011 at 20. Moreover, total station revenue for 2012 was predicted to exceed the total station revenue for 2006 and to grow steadily through 2017. *Id.* at 147; SNL KAGAN BROADCAST TV RETRANSMISSION REVENUE at 2. However, we seek comment on whether any structural changes have occurred in the television marketplace and, if so, whether to adjust our 2014 Quadrennial Review analysis to account for such changes.

[59] See paragraphs 234 and 235, *infra*, for a discussion of the popularity of broadcast network programming relative to cable network programming in the context of the dual network rule. *See also* National Association of Broadcasters, *Testimony of Hearst Television President and CEO David Barrett on "The Future of Video"* (press release), June 27, 2012 ("[A]pproximately 96 . . . of the top 100 shows are on broadcast television.").

[60] The current record demonstrates that, at present, alternative video programmers do not generate significant amounts of original local content. While the growth of local and hyperlocal websites may change our analysis in the future, currently many communities lack access to broadband connections to take advantage of such websites. Also, currently the vast majority of original content on the Internet is generated by traditional media outlets such as broadcast television stations or newspapers, and may be repackaged by other web outlets. *See, e.g.,* PEW RESEARCH CENTER'S PROJECT FOR EXCELLENCE IN JOURNALISM, HOW NEWS HAPPENS: A STUDY OF THE NEWS ECOSYSTEM OF ONE AMERICAN CITY (2010) ("PEW BALTIMORE STUDY"), *available at* http://www.journalism.org/files/legacy/Baltimore%20Study_Jan2010_0.pdf; STEVE WALDMAN AND THE WORKING GROUP ON INFORMATION NEEDS OF COMMUNITIES, FCC, THE INFORMATION NEEDS OF COMMUNITIES: THE CHANGING MEDIA LANDSCAPE IN A BROADBAND AGE 123-24 (2011) ("INFORMATION NEEDS OF COMMUNITIES"), *available at* http://transition.fcc.gov/osp/inc-report/The_Information_Needs_of_Communities.pdf (referencing several studies to support the conclusion that "the growing number of web outlets relies on a relatively fixed, or declining, pool of original reporting provided by traditional media"). These studies were cited in the record earlier in this proceeding and no evidence was submitted to refute their validity or otherwise demonstrate that alternate video programmers are producing a significant amount of original local content. In addition, the findings of these studies are consistent with Media Ownership Study 6, which found that, in the top 100 markets, there is a very limited amount of local news content available on the Internet that is not provided by traditional media organizations (*e.g.,* broadcasters or print media). Media Ownership Study 6 at 29-30.

[61] See Eighth Broadband Progress Report, 27 FCC Rcd at 10369, ¶ 44 (finding that approximately 19 million Americans lack access to fixed broadband meeting the 4 Mbps/1 Mbps speed benchmark). Some broadcasters inferred from the *NPRM* that the Commission will not consider the impact of the Internet until there is 100 percent access to broadband — a position that these commenters challenged. *See, e.g.,* Belo NPRM Comments at 5; Nexstar NPRM Comments at 12; Nexstar NPRM Reply at 6. It is not our position that broadband deployment and adoption must be universal to warrant inclusion in this rule; however, the current level of access to and adoption of such service are certainly relevant when considering the extent to which video programming provided via the Internet is a meaningful substitute for broadcast television stations in local television viewing markets.

competition among broadcast television stations.[62] We believe the 2010 Quadrennial Review record supports the use of this approach, and we seek comment on whether this market definition should apply for purposes of our 2014 Quadrennial Review.

26.     *Contour Overlap.* The *NPRM* proposed to eliminate the Grade B contour overlap test and rely solely on Nielsen DMAs to determine when to apply the local television ownership rule.[63] The *NPRM* recognized that the DMA approach could have a disproportionate impact in certain DMAs and sought comment on the impact of such a change.[64] As discussed below, we tentatively find that the public interest is best served by retaining the contour-based approach of the previous rule but by replacing the analog Grade B contour with the digital NLSC. We seek comment on whether any developments have occurred since the *NPRM* that should cause us to reconsider our proposed approach.

27.     No commenter specifically supported the Commission's tentative proposal to adopt a DMA-based approach. According to NAB, adopting the DMA-based approach proposed in the *NPRM* could unduly prohibit common ownership in certain markets, such as geographically large markets in the western United States, where such ownership is currently permissible under the existing rule.[65] To avoid this outcome, NAB recommended that the Commission replace the Grade B contour with the digital NLSC, which NAB stated more closely delineates a particular station's service area than the station's DMA.[66]

28.     Based on the comments in the 2010 Quadrennial Review record, we believe that the proposed DMA-only approach would unnecessarily expand the reach of the local television ownership rule in certain DMAs and thus would be overbroad. Therefore, we tentatively decline to adopt that approach. NAB argues that relying instead on the digital NLSC, which the Commission has treated as the functional equivalent of the Grade B contour,[67] would serve the purpose of establishing a trigger that

---

[62] We note that our proposal to limit the relevant market to broadcast television stations in local television viewing markets is consistent with current Department of Justice ("DOJ") precedent. *See, e.g.*, Complaint at ¶¶ 14-22, *United States v. Gannett Co., Inc., et al.*, No. 1:13-cv-01984 (D.D.C. Dec. 16, 2013) (finding the relevant markets for analysis to be broadcast television spot advertising (product market) in the St. Louis DMA (geographic market)); Complaint at ¶¶ 38-44, *United States v. Comcast Corp.*, No. 1:11-cv-00106 (D.D.C. Jan. 18, 2011) (excluding broadcast television from the "video programming distribution" market, which included MVPDs and Online Video Programming distributors ("OVDs")); *see also* DOJ February 20, 2014 *Ex Parte* Comments at 5, 8 (confirming that the relevant markets for antitrust review are the broadcast television spot advertising market in the stations' specific geographic market); Timothy J. Brennan & Michael A. Crew, *Gross Substitutes vs. Marginal Substitutes: Implications for Market Definition in the Postal Sector, in* The Role of the Postal and Delivery Sector in a Digital Age 1-15 (Michael A. Crew & Timothy J. Brennan eds. 2013) (arguing that the loss of customers to a new technology does not necessarily mean that the new technology should be included in the market definition of the existing technology).

[63] *NPRM*, 26 FCC Rcd at 17502, ¶ 37.

[64] *Id.* at 17503, ¶ 39.

[65] NAB NPRM Comments at 29-30.

[66] *See id.*; NAB NPRM Reply at 16.

[67] *See, e.g., Stephen Diaz Gavin, Esq.*, Letter, 25 FCC Rcd 1851, 1857-58 (Med. Bur. 2010); *Advanced Television Systems and their Impact Upon the Existing Television Broadcast Service*, MB Docket No. 87-268, Seventh Report and Order and Eighth Further Notice of Proposed Rulemaking, 22 FCC Rcd 15581 (2007) (discussion of "DTV Power" in DTV Table Appendix B treats the Grade B and NLSC contours as comparable by using the Grade B contour for stations that did not have a DTV channel); *Implementation of the Satellite Home Viewer Extension and Reauthorization Act of 2004*, MB Docket No. 05-49, Report and Order, 20 FCC Rcd 17278, 17292, ¶ 31 (2005); *Second Periodic Review of the Commission's Rules and Policies Affecting the Conversion to Digital Television*, MB Docket No. 03-15, Report and Order, 19 FCC Rcd 18279, 18311, ¶ 72 (2004); *Review of the Commission's Rules and Policies Affecting the Conversion to Digital Television*, MM Docket No. 00-39, Report and Order and Further Notice of Proposed Rulemaking, 16 FCC Rcd 5946, 5956, ¶ 22 (2001). By contrast, there is no digital counterpart

(continued....)

would accurately reflect current digital service areas while avoiding any potential disruptive impact, and we believe that approach is reasonable. In addition, consistent with previous Commission decisions, we tentatively find that retaining a contour-based approach would serve the public interest by promoting local television service in rural areas.[68] In particular such an approach would continue to allow station owners in rural areas to build or purchase an additional station in remote portions of the DMA, so long as there is no digital NLSC overlap.[69] It is important that our local television ownership rule take into account the current digital service area of a station. We confirm that the digital NLSC is an accurate measure of a station's current service area and thus would be an appropriate standard. Thus, under the modified rule we propose today, we would continue to define the geographic dimensions of the local television market by reference to DMAs, but we would replace the analog Grade B contour with the digital NLSC, such that within a DMA an entity could own or operate two stations in a market if the digital NLSCs of those stations did not overlap.[70] To the extent that the digital NLSC of two stations in the same DMA overlapped, then the stations serve the same area, even if there was no analog Grade B contour overlap prior to the digital transition, and in that case the combination would be permitted only if it satisfied the top-four prohibition and the eight-voices test.

29.     The *NPRM* described the potential benefits of a DMA-based approach, including correlation with DMA-wide carriage of broadcast signals pursuant to mandatory carriage requirements and benefits similar to those realized by the geographic market definition in the radio rule. For the reasons discussed above, however, that approach could have a negative impact in certain DMAs. We seek comment on our tentative conclusion that the alternative approach we propose in this FNPRM would avert the negative impact of the DMA-based approach, accurately reflect current digital service areas, and appropriately balance our public interest goals.

30.     *Grandfathering.* We tentatively affirm the *NPRM*'s proposal to grandfather existing ownership combinations that would exceed the numerical limits under the revised contour approach, though we tentatively find that the sale of such combinations must comply with the local television

---

(Continued from previous page) ———————————

to a station's analog city grade contour. Accordingly, consistent with case law developed after the digital transition, we would continue to evaluate all future requests for new or continued satellite status on an ad hoc basis. *See, e.g., HBK NV LLC*, Memorandum Opinion and Order, 25 FCC Rcd 2354 (Med. Bur. 2010); *see also Television Satellite Stations Review of Policies and Rules*, MM Docket No. 87-8, Report and Order, 6 FCC Rcd 4212, 4215 (1991) (subsequent history omitted).

[68] *See Review of the Commission's Regulations Governing Television Broadcasting*, MM Docket No. 91-221, Report and Order, 14 FCC Rcd 12903, 12928-29, ¶¶ 51-53 (1999) ("*1999 Ownership Order*"); *2006 Quadrennial Review Order*, 23 FCC Rcd at 2067-68, ¶ 104. In the *2002 Biennial Review Order*, in which the local television ownership rule was relaxed, the Commission eliminated the contour overlap provision. 18 FCC Rcd at 13691-92, ¶¶ 185-87. However, in recognition of the unique circumstances involving stations without Grade B contour overlap, the Commission adopted waiver criteria that would permit common ownership if the applicant could demonstrate "that the stations have no Grade B overlap and that the stations are not carried by any MVPD to the same geographic area." *Id.* at 13692, ¶ 187. The revised rule adopted in the *2002 Biennial Review Order* was overturned on appeal. *Prometheus I*, 373 F.3d at 474-77. We believe our proposal to adopt the digital NLSC standard is in the public interest and is supported by the record, and we decline to propose alternate possible solutions, such as waiver criteria similar to those adopted in the *2002 Biennial Review Order*. However, we invite commenters to propose alternate solutions if they object to our approach.

[69] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2068, ¶ 104.

[70] The Commission previously determined that the DMA is the most appropriate definition of the geographic dimensions of the local television market, and we do not intend to disturb that finding. *1999 Ownership Order*, 14 FCC Rcd at 12926, ¶ 47. We note that the approach we propose here is consistent with our approach under the prior local television ownership rule.

ownership rule then in effect.[71] We seek comment on whether we should adopt this approach in our 2014 quadrennial proceeding.

31.     Multiple broadcast commenters in the 2010 Quadrennial Review proceeding supported the Commission's tentative conclusion to grandfather existing ownership combinations.[72] These commenters asserted that requiring divestiture would be fundamentally unfair to existing licensees that acquired station combinations in good faith based on existing rules.[73] In addition, some commenters recommended that grandfathered combinations should be freely transferable. Grant Group asserted that sales of grandfathered combinations should be permissible in perpetuity because, according to Grant Group, the proposed rule change results from a change in technology, the digital transition, and not a change in policy concerning common ownership.[74]

32.     UCC *et al.*, however, opposed the Commission's tentative decision to grandfather existing combinations, and they asserted that grandfathered combinations should not be freely transferable.[75] According to UCC *et al.*, requiring divestitures within a reasonable compliance period would create ownership opportunities for new entrants, including minorities and women.[76] UCC *et al.* urge the Commission — in the event grandfathering is permitted — to "follow its usual practice" and require compliance with the local television ownership rule at the time of sale of a grandfathered combination.[77]

33.     We tentatively find that the concerns raised by those in favor of permitting grandfathering and the transfer of grandfathered combinations would largely be addressed by our proposal to retain a contour overlap provision in the local television ownership rule and to substitute the digital NLSC for the Grade B contour. The contour element of the rule would effectively maintain the status quo for most, if not all, owners of duopolies formed as a result of the previous Grade B contour overlap provision. Consistent with the tentative conclusion in the *NPRM*, however, we propose to grandfather ownership of existing combinations of television stations, if any, that would exceed the ownership limit as a result of the change to the digital NLSC test we propose herein. Even in limited circumstances, compulsory divestiture is disruptive to the marketplace and is a hardship for individual

---

[71] *NPRM*, 26 FCC Rcd at 17503, ¶ 39. In addition, we propose that all permanent waivers from the prior rule that previously have been granted would continue in effect under the new rule, but, like any newly grandfathered combinations, could not be transferred/assigned intact unless the combination complies with the local television ownership rule in effect at the time of the transfer/assignment.

[72] Grant Group NPRM Comments at 11; NAB NPRM Reply at 16; Sinclair NPRM Comments at 13.

[73] Grant Group NPRM Comments at 11; Sinclair NPRM Comments at 13.

[74] Grant Group NPRM Comments at 12; *see also* NAB NPRM Reply at 16. In addition, Grant Group asserted that prohibiting the sale of grandfathered combinations would require the unwinding of successful station combinations and, as a result of the loss of joint efficiencies, there would be a danger that such forced divestiture could result in failed stations. Grant Group NPRM Comments at 12; *see also* NAB NPRM Reply at 16-17 (asserting that disallowing transfers of grandfathered combinations could result in loss of station value and require the unwinding of successful joint operations). Also, it asserted that the inability to transfer the station combination intact could discourage continued investment in existing combinations, as the licensee could not recapture the investment at the time of sale. Grant Group NPRM Comments at 13; *see also* Sinclair NPRM Comments at 13 (asserting that prohibiting the sale of grandfathered combinations would "significant[ly] impact . . . the value of the stations").

[75] UCC *et al*. NPRM Comments at 25.

[76] *Id.* They asserted also that permitting the sale of grandfathered combinations would compound the harm associated with grandfathering because minorities and women are less likely to be able to obtain financing for duopolies. *Id.*

[77] *Id.*

owners; we believe any benefits to our policy goals (including promoting ownership diversity) would be outweighed by these countervailing equitable considerations.[78]

34.     We propose, however, to require that the sale of any such grandfathered combination comply with the local television ownership rule in place at the time the transfer of control or assignment application is filed.[79] As stated above, the digital NLSC is an accurate measure of a station's digital service area. If the digital NLSC of two stations in the same DMA overlap, then the stations serve the same area, even if there was no Grade B contour overlap prior to the digital transition. Accordingly, requiring that the sale of a grandfathered combination comply with the new standard would be consistent with our rationale for adopting the digital NLSC-based standard and would not cause hardship by requiring premature divestiture. Consistent with the Commission's previous decisions, we tentatively find that the public interest would not be served by allowing grandfathered combinations to be freely transferable in perpetuity where a combination does not comply with the local television ownership rule at the time of transfer/assignment.[80] We seek comment on this tentative conclusion.

35.     *Numerical Limits.* The Commission proposed in the *NPRM* to retain the current numerical limits in the local television ownership rule.[81] We seek comment on whether to adopt that proposal, thereby permitting a licensee to own up to two stations (*i.e.*, a duopoly) in a market, subject to the other requirements proposed in this FNPRM.

36.     In the 2010 Quadrennial Review proceeding, ACA agreed with the Commission's assessment that there have not been sufficient changes in the marketplace to disturb the justification in the *2006 Quadrennial Review Order* for retaining the existing numerical limit, and other commenters supported generally the Commission's decision not to modify the rule to permit additional consolidation.[82] Certain public advocacy commenters, however, urged the Commission to tighten the numerical limits and return to the previous single-station rule.[83] According to Free Press and UCC *et al.*, additional restrictions are warranted because of broadcasters' multicast capabilities.[84] Moreover, Free Press asserted that permitting duopolies has not served the public interest; in particular, it asserted that consolidation has not led to increased local news programming.[85] In addition, NHMC *et al.* and UCC *et*

---

[78] *See, e.g., Amendment of Sections 73.34, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations,* Docket No. 18110, Second Report and Order, 50 FCC 2d 1046, 1080, ¶ 112 (1975) ("*1975 Second Report and Order*") (stating that "divestiture should be limited to use in only the most egregious cases"); *see also 2002 Biennial Review Order,* 18 FCC Rcd at 13808, ¶ 484.

[79] *See, e.g., 2002 Biennial Review Order,* 18 FCC Rcd at 13809-10, ¶ 487.

[80] *1975 Second Report and Order,* 50 FCC 2d at 1076, ¶ 103; *see also 2002 Biennial Review Order,* 18 FCC Rcd at 13809-10, ¶ 487 (finding that allowing grandfathered combinations to be freely transferable "would hinder [the Commission's] effort to promote and ensure competitive markets" and that "[g]randfathered combinations, by definition, exceed the numerical limits that . . . promote the public interest as related to competition"). Under our proposed approach, we would continue to allow *pro forma* changes in ownership and involuntary changes of ownership due to death or legal disability of the licensee. *1975 Second Report and Order,* 50 FCC 2d at 1076, ¶ 103.

[81] *NPRM,* 26 FCC Rcd at 17507, ¶ 51.

[82] ACA NPRM Comments at 12; *see also* CWA NPRM Comments at 4-5; WGAW NPRM Comments at 3.

[83] Free Press NPRM Comments at 44-45; Free Press NPRM Reply at 18-22; NHMC *et al.* NPRM Comments at 3-5; UCC *et al.* NPRM Comments at 24.

[84] Free Press NPRM Comments at 44-45; Free Press NPRM Reply at 20-21; UCC *et al.* NPRM Comments at 24.

[85] Free Press NPRM Reply at 18-19. To support this assertion, Free Press cited (1) research it conducted, in conjunction with Consumers Union and Consumer Federation of America, that was submitted in the 2006 Quadrennial Review proceeding that purported to show that duopolies do not "exhibit statistically significant increases in either market share or hours of news"; and (2) a 2009 study conducted by Dr. Danilo Yanich concluding that duopoly stations provided less local content in their newscasts than independently owned stations. *Id.* at 19

(continued....)

*al.* stated that returning to the single-station rule would increase ownership opportunities for minorities and women.[86]

37.     As explained in greater detail in the paragraphs below on multicasting, many broadcast commenters objected to any proposal to tighten the existing local television rule that is premised on multicasting capabilities. In addition, NAB and the Small Market Coalition challenged allegations that duopolies have not served the public interest.[87] According to these commenters, the record demonstrates that common ownership has resulted in increased local news and public interest programming, as well as diverse program offerings that would not be possible without the operational efficiencies achieved through common ownership.[88] NAB asserted also that there is "extensive empirical evidence" that demonstrates that local station combinations have served the Commission's public interest goals.[89] And, according to the Small Market Coalition, duopolies have provided advertisers with improved advertising options and, in some circumstances, preserved stations that would have failed absent common ownership thus benefitting competition.[90]

38.     In addition, CBS and Entravision urged the Commission to relax the ownership restrictions and allow a licensee to own up to three television stations (a "triopoly") in a local market.[91] CBS asserted that such an increase is warranted, in part, because of the Commission's action in the 2002 biennial ownership review allowing triopolies in certain markets.[92] Entravision asserted that such changes would be reasonable in light of increased competition from non-broadcast video alternatives — particularly in larger markets — and the public interest benefits that result from common ownership of local television stations.[93]

39.     We seek comment on our preliminary view that the local television marketplace has not changed significantly since the *NPRM* to justify either tightening or loosening the current numerical limits of the local television rule. Ownership of a second in-market station can create substantial efficiencies, which may allow a local broadcast station to invest in programming that meets the needs of its local

(Continued from previous page) ————————————————

(citing Consumers Union *et al.* Jan. 16, 2007 Reply, MB Docket No. 06-121, at 95; Danilo Yanich, Ownership Matters: Localism, Local Television News, and the FCC (May 20, 2009) (presented at the International Communication Association annual meeting)).

[86] NHMC *et al.* NPRM Comments at 3-5; UCC *et al.* NPRM Comments at 24; *see also* Free Press NPRM Comments at 44 (asserting that tightening the television ownership limits could promote ownership diversity by creating ownership opportunities for new entrants); Free Press NPRM Reply at 19.

[87] NAB NPRM Reply at 7-8; Small Market Coalition NPRM Reply at 5-7.

[88] NAB NPRM Reply at 7-8; Small Market Coalition NPRM Reply at 5-7.

[89] NAB NPRM Reply at 8 (citations omitted); *see also* NAB NPRM Comments at 20 n.79 (citing multiple studies submitted in previous reviews, including studies commissioned by the Commission, that, according to NAB, demonstrate that commonly owned stations are more likely to offer local news and public interest programming, to offer more news programming, and/or to be more popular with viewers than independently owned stations).

[90] Small Market Coalition NPRM Reply at 7.

[91] CBS NPRM Comments at 12-13 (asserting that triopolies should be permitted in the nation's largest media markets); Entravision NPRM Comments at 9-10 (asserting that duopolies should be permitted in all markets, with triopolies allowed in markets with 18 or more television stations, subject to certain behavioral measures to mitigate potential anticompetitive impact of additional consolidation).

[92] CBS NPRM Comments at 12 (citing *2002 Biennial Review Order*, 18 FCC Rcd at 13677, ¶ 153). We note that the numerical limits adopted in the 2002 biennial review proceeding were overturned on appeal. *Prometheus I*, 373 F.3d at 418-20.

[93] Entravision NPRM Comments at 9-10.

community, such as local news or other public interest programming.[94] Notably, we tentatively find that there is substantial evidence in the record that the duopolies permitted subject to the restrictions of the current rule have created tangible public interest benefits for viewers in local television markets that more than offset any potential harms that are associated with common ownership.[95] Moreover, as discussed in greater detail in the paragraphs below on multicasting, we believe that the ability to multicast is not a substitute for common ownership of multiple stations and, therefore, would not justify tightening the existing numerical limits. We seek comment on these tentative findings.

40.     Similarly, we do not believe there have been sufficient changes in the local television marketplace to justify ownership of a third in-market station. We seek comment on this tentative conclusion. The primary "change" in the marketplace cited by those commenters in favor of loosening the rule is competition from non-broadcast alternatives. As discussed above, however, we believe the local television ownership rule is designed to promote competition among broadcast television stations in local television markets, and we have tentatively concluded that it is not yet appropriate to consider competition from non-broadcast sources in evaluating whether the rule remains necessary. Even if we were to consider such competition, Entravision, which supported ownership of up to two stations in all markets and up to three stations in markets with 18 or more television stations, conceded that such consolidation is likely to threaten our competition and diversity goals by jeopardizing small and mid-sized broadcasters.[96] Without significant evidence of the public interest benefits that could result from the ownership of three stations in a local market, we do not believe that there is adequate justification at this time for increasing the numerical limits.

41.     *Top-Four Prohibition.* We propose to continue to prohibit mergers between two top-four-rated stations in a local market, consistent with the tentative conclusion in the *NPRM*.[97] We tentatively find that the top-four prohibition remains necessary to promote competition in the local

---

[94] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2064-65, ¶ 98.

[95] *See, e.g.*, Belo NOI Comments at 6-9 (providing evidence of increased local news and information programming, including increased news staff in certain markets, that Belo asserted are the result of efficiencies gained from common ownership); LIN NPRM Comments at 17-19, Att. 1 (providing evidence of increased local news and public interest programming, including locally produced local sports programming, and niche programming that LIN asserted are the result of efficiencies gained from common ownership); Nexstar NPRM Comments at 15, 18, 23-24 (providing evidence of increased local news and information programming that Nexstar asserted are the result of efficiencies gained from common ownership); *see also* NAB NPRM Reply at 7-8; Small Market Coalition NPRM Reply at 5-7; *but see* Free Press NPRM Reply at 18-19 (asserting that common ownership does not serve the public interest and citing evidence that, according to Free Press, demonstrates that common ownership does not result in increased local news content).

[96] Entravision NPRM Comments at 9-10. To combat these harms, Entravision proposed a series of "behavioral regulations" that the Commission could adopt in tandem with loosening the ownership restrictions. *Id.* at 10-12. The Commission declined to adopt this proposal in the 2006 Quadrennial Review proceeding, a decision that was upheld in *Prometheus II*, and we see no changes in the local television marketplace that would warrant reconsideration of the Commission's previous decision. *See Prometheus II*, 652 F.3d at 458-61 (upholding the Commission's decision to retain the pre-2003 local television ownership rule). The Commission has long applied structural local media ownership rules and has previously rejected proposals for instituting behavioral rules. *See, e.g., 2002 Biennial Review Order*, 18 FCC Rcd at 13859-60, ¶¶ 623-26 (retaining the structural ownership rules approach and rejecting proposed behavioral rules that failed to address the Commission's public interest goals); *see also 2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 02-277, Notice of Proposed Rulemaking, 17 FCC Rcd 18503, 18520-21, 18522, ¶¶ 49, 55 (2002) (seeking comment regarding whether to replace the structural ownership rules with a different approach, such as behavioral rules). We propose to affirm this approach, as we continue to believe that behavioral rules are not appropriate substitutes for our structural local media ownership rules. We seek comment on this proposal.

[97] *NPRM*, 26 FCC Rcd at 17503-04, ¶ 40.

television marketplace. We seek comment on whether there have been any developments since the *NPRM* that we should consider with regard to this issue.

42.     In the 2010 Quadrennial Review proceeding, ACA and WGAW supported the Commission's decision to retain the top-four prohibition.[98] ACA stated that the marketplace had not changed since the Commission preserved the prohibition in the *2006 Quadrennial Review Order*; therefore, the rationale for the prohibition still held.[99] In addition, WGAW disputed broadcasters' claims that top-four mergers would produce increases in local news programming.[100] WGAW supported the Commission's findings regarding the likelihood that top-four stations already provide local news, and, in WGAW's experience, the merger of two stations with existing, independent news operations resulted not in more original news content but in the repurposing of the same news content across the commonly owned stations.[101]

43.     Conversely, broadcast commenters asserted that the top-four prohibition was no longer necessary as a result of competition from alternative sources of video programming, and they disputed the Commission's rationale for upholding the prohibition.[102] For example, NAB asserted that there was not a natural break in the audience share between the fourth- and fifth-rated stations, particularly in small and mid-sized markets that often have only one or two dominant stations in the market.[103] In addition, NAB stated that permitting top-four combinations in such markets would allow the combined stations to compete more effectively against the dominant market station(s), as well as non-broadcast video alternatives.[104] And, according to NAB and Nexstar, stations have natural incentives to compete in order to maximize revenue, regardless of market rank or station ownership.[105] Finally, broadcasters asserted that eliminating the top-four prohibition would benefit localism through increased local news and local public interest programming, and they urged the Commission to find that the top-four prohibition is not necessary to promote viewpoint diversity.[106]

44.     Consistent with previous Commission decisions, we propose to continue to prohibit mergers involving two of the top-four stations in a market because we believe such combinations would

---

[98] ACA NPRM Comments at 12; WGAW NPRM Comments at 4.

[99] ACA NPRM Comments at 12.

[100] WGAW NPRM Comments at 4.

[101] *Id.* at 3-4.

[102] *See* CRT NPRM Comments at 13; NAB NPRM Comments at 23-24; Nexstar NPRM Comments at 16-17; Sinclair NPRM Comments at 13-14.

[103] *See, e.g.*, NAB NPRM Comments at 23; NAB NPRM Reply at 11. To support its challenge of the Commission's top-four rated station threshold, NAB submitted a market revenue analysis that found that there are many markets with "substantial gaps" in revenue other than between the fourth and fifth ranked stations. NAB NPRM Reply Att. A at 2 (Mark Fratrik, Reforming Local Ownership Rules: Station and Market Analyses (Apr. 17, 2012)). We note, however, that this analysis evaluates revenue share, and therefore does not disturb the Commission's previous determination that audience share is the appropriate metric for purposes of the top-four prohibition — a determination that we tentatively affirm. *See, e.g., 2002 Biennial Review Order*, 18 FCC Rcd at 13695, ¶ 195 n.407.

[104] NAB NPRM Comments at 23.

[105] *See id.* at 24; Nexstar NPRM Comments at 16-17.

[106] *See, e.g.*, NAB NPRM Comments at 24-25; Nexstar NPRM Comments at 17-18. Given that we tentatively find that it is necessary to retain the top-four prohibition in order to promote competition, we do not feel the need to consider whether it is also necessary to do so in order to promote our localism or viewpoint diversity goals, but commenters are invited to offer their views on this approach.

be the most deleterious to competition.[107]  The Commission has previously identified potential harms associated with top-four combinations, and we found no evidence in the 2010 Quadrennial Review record to disturb the Commission's previous findings.[108]  Accordingly, we continue to believe that top-four combinations would often result in a single firm obtaining a significantly larger market share than other firms in the market and that such combinations could create welfare harms.[109]  Top-four combinations have been found to reduce incentives for local stations to improve their programming, as once strong rivals suddenly have incentives to coordinate their programming in order to minimize competition between the commonly owned stations.[110]  In addition, in general, there remains a significant "cushion" of audience share points that separates the top-four stations in a market from the fifth-ranked station.[111]  Accordingly, we tentatively find that the public interest is best served by retaining the top-four prohibition.  We seek comment on this tentative conclusion.

45.      The *NPRM* also sought comment on certain circumstances in which a licensee is able to obtain control over two of the top-four stations in a market through a transaction or series of transactions, sometimes referred to as "affiliation swaps," that do not require prior Commission approval.[112]  Based on our review of the 2010 Quadrennial Review record, we tentatively find that such transactions should be subject to the top-four prohibition because we believe they circumvent the intent of our rule and are not in the public interest.  We seek comment on whether we should adopt this approach.

46.      Mediacom/Suddenlink asserted that such transactions should be prohibited because the harms associated with a single entity owning two top-four stations are the same, regardless of when the

---

[107] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2066-67, ¶ 102; *2002 Biennial Review Order*, 18 FCC Rcd at 13694, ¶ 194.  We note that each decision to retain the top-four prohibition was subsequently upheld on appeal.  In each instance, the court found that the Commission's line-drawing was supported by "ample evidence in the record."  *See Prometheus II*, 652 F.3d at 460-61; *Prometheus I*, 373 F.3d at 417-18.

[108] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2066-67, ¶ 102; *2002 Biennial Review Order*, 18 FCC Rcd at 13694, ¶ 194.  Indeed, the primary argument that such combinations would not harm competition rests on the purported existence of competition from non-broadcast video alternatives.  However, as discussed above, we have tentatively determined that it is not yet appropriate to consider such alternatives in the local television ownership rule; accordingly, we propose to decline to do so here.

[109] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2066, ¶ 102; *2002 Biennial Review Order*, 18 FCC Rcd at 13695, ¶ 194.

[110] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2066, ¶ 102; *2002 Biennial Review Order*, 18 FCC Rcd at 13695, 13697, ¶¶ 194, 200.  Previous research has found little risk that these competitive harms would result from mergers that do not involve two of the top-four stations.  *2002 Biennial Review Order*, 18 FCC Rcd at 13695, ¶ 194.

[111] The Nielsen Company ("Nielsen"), All-Day Audience Share Data for May 2012 (9 a.m.–midnight) ("Nielsen Audience Share Data May 2012") (evaluation of ratings share data for the fourth- and fifth-rated broadcast television stations in each DMA with at least five full-power television stations).  Multiple broadcast commenters asserted that the top-four prohibition should be rejected because the ratings cushion between the fourth- and fifth-rated station does not exist in every market.  *See, e.g.*, NAB NPRM Comments at 23.  The Commission has never based the top-four prohibition solely on the existence of the ratings cushion in every market; nor do we propose to do so today.  Notably, in the *2002 Biennial Review Order*, the Commission determined that the cushion existed in two-thirds of the markets with five or more full-power commercial television stations.  18 FCC Rcd at 13694-95, ¶ 195.  The court in *Prometheus I* cited specifically to this finding as evidence to support the Commission's line-drawing decision.  373 F.3d at 418; *see also Prometheus II*, 652 F.3d at 460-61 (upholding, again, the Commission's rationale for retaining the top-four prohibition).  Therefore, we tentatively reject any claim that the top-four prohibition cannot be supported because the ratings cushion is not present in every market.  The cushion continues to exist in most markets and, as such, it continues to support our tentative decision to retain the top-four prohibition.

[112] *NPRM*, 26 FCC Rcd at 17505, ¶ 45.

duopoly is created.[113] Accordingly, these commenters asserted that the top-four prohibition should apply both to station acquisitions and to subsequent affiliation swaps.[114] Broadcast commenters, however, opposed extending application of the top-four prohibition beyond the initial station acquisition. These commenters asserted that the rule would punish existing duopoly owners that improve station performance and would require extensive Commission involvement in station programming and personnel decisions.[115] Many broadcast commenters also insisted this prohibition would violate the First Amendment.[116]

47.     In general, national network affiliation is a significant driver of a station's audience share. The Commission has previously found that, nationally, the Big Four networks (*i.e.*, ABC, CBS, Fox, and NBC) are the highest rated networks and that, in general, the national audience statistics are reflected in the rankings in the local markets.[117] Recent Nielsen data confirm this finding.[118] Accordingly, an affiliation swap involving a top-four station and a non-top-four station will nearly always result in the non-top-four station becoming a top-four station after the swap. Because such affiliation swaps do not involve the assignment or transfer of a station license, the transaction is not subject to prior Commission approval under Section 310(d) of the Communications Act of 1934. Thus, by engaging in an affiliation swap, parties can achieve a top-four station combination that would otherwise have been prohibited by the Commission's rules.

48.     This fact is evidenced in the Honolulu, Hawaii, DMA, where an affiliation swap between a top-four station and a non-top-four station — which was commonly owned with a different top-four station in the market — was executed.[119] In addition to the affiliation swap, the parties swapped certain of the stations' non-network programming and the stations' call signs, purportedly to avoid viewer confusion.[120] Thus, the stations (though not the licenses) effectively changed hands without prior Commission approval — approval that was not technically required.[121] Consistent with our observation

---

[113] Mediacom Communications Corp. and Cequel Communications LLC d/b/a/ Suddenlink Communications ("Mediacom/Suddenlink") NPRM Comments at 18.

[114] *Id.*

[115] CBS NPRM Comments at 14-15 (asserting that regulation of affiliation swaps would run counter to the Commission's recent history of deregulation in matters involving network affiliations, including elimination of the prohibition on network ownership of television stations in small markets and repeal of the "secondary affiliation rule"); LIN NPRM Comments at 20; Sinclair NPRM Comments at 16.

[116] LIN NPRM Comments at 20-21; Nexstar NPRM Comments at 17 n.32; Sinclair NPRM Comments at 18.

[117] *See, e.g., 2002 Biennial Review Order*, 18 FCC Rcd at 13695, ¶ 196; *see also infra* ¶¶ 234-235 (discussing the ratings of the top-four national networks).

[118] *See* Nielsen Audience Share Data May 2012 (evaluation of network affiliation data for the top-four rated broadcast television stations by DMA).

[119] *See KHNL/KGMB License Subsidiary, LLC*, Memorandum Opinion and Order and Notice of Apparent Liability for Forfeiture, 26 FCC Rcd 16087, 16091, ¶ 14 (Med. Bur. 2011), *application for review pending*. The Media Bureau was highly critical of the transactions at issue in this case, but ultimately determined that, based on the existing rules, it could not find a violation of the local television ownership rule. *Id.* at 16095, ¶ 23. In noting its concerns about such transactions, the Media Bureau stated that its decision did not preclude consideration of these issues in the context of individual licensing proceedings and that the Commission would explore affiliation swaps in the context of the ongoing media ownership proceeding. *Id.* We share the Media Bureau's earlier concerns, and our proposal here would prevent licensees from circumventing the top-four prohibition in this manner in the future.

[120] *Id.* at 16088, ¶ 3.

[121] Indeed, in that example, the amount of consideration paid for the then higher-rated station's network affiliation and other non-license assets suggests that not only was the creation of a top-four duopoly the likely result of the transaction, but the intended result. *Id.* at 16088, ¶ 4 (noting that Raycom, which acquired the network affiliation associated with the higher-rated station, paid $22 million under the terms of the agreements).

above regarding the correlation between affiliation with a Big Four network and market rank, following the affiliation swap, the non-top-four station became a top-four station.[122] By structuring these transactions so as to evade Commission review, a single entity was able to acquire control over a second top-four station in the market, a result that is prohibited under the local television ownership rule.

49. We tentatively find that transactions involving the sale or swap of network affiliations between in-market stations that result in an entity holding an attributable interest in two top-four stations can be used to evade the top-four prohibition. Accordingly, in order to close this loophole, we propose to clarify that such transactions must comply with the top-four prohibition at the time the agreement is executed. Specifically, we believe an entity should not be permitted to directly or indirectly own, operate, or control two television stations in the same DMA through the execution of any agreement (or series of agreements) involving stations in the same DMA, or any individual or entity with a cognizable interest in such stations, in which a station (the "new affiliate") acquires the network affiliation of another station (the "previous affiliate"), if the change in network affiliations would result in the licensee of the new affiliate, or any individual or entity with a cognizable interest in the new affiliate, directly or indirectly owning, operating, or controlling two of the top-four rated television stations in the DMA at the time of the agreement.[123] We propose to find any party that has control over two top-four stations in the same DMA as a result of such transactions to be in violation of the top-four prohibition and subject to enforcement action.[124] We seek comment on these proposals. In addition, we seek comment on whether and how station owners are attempting to circumvent the top-four prohibition, or any other of the media ownership rules, through the invention of similar devices.[125]

50. We seek comment on whether this application of the top-four prohibition is consistent with the Commission's policy to avoid constraints on commercial activities that are designed to effect station improvements.[126] We continue to encourage licensees to improve the quality of the programming

---

[122] *See id.* at 16094, ¶ 21; *see also* Nielsen, All-Day Audience Share Data for May 2009 and November 2009 (9 a.m.–midnight) (confirming that, following the transaction, the non-top four station became a top-four station, and *vice versa*).

[123] 47 C.F.R. § 73.3555(b)(1)(i). In addition, we propose that, for purposes of making this determination, the new affiliate's post-consummation ranking would be the ranking of the previous affiliate at the time the agreement is executed, determined in accordance with section 73.3555(b)(1)(i) of the Commission's rules. *Id.*

[124] Application of this rule would be prospective, and parties that acquired control over a second in-market top-four station by engaging in such transactions prior to the release date of a decision to adopt such a rule would not be subject to divestiture or enforcement action. Consistent with *KHNL/KGMB License Subsidiary*, such transactions that would not be subject to such a rule could still be considered in the context of individual licensing proceedings. 26 FCC Rcd at 16092, ¶ 15 (citing 47 U.S.C. § 309(k)(1)(A)). All future transactions would be required to comply with the Commission's rules then in effect. We seek comment on this approach.

[125] While we have tentatively determined that the present circumstances support prospective application of this rule, parties are on notice that similar efforts to evade the media ownership rules could be subject to enforcement action.

[126] *See 1999 Ownership Order*, 14 FCC Rcd at 12933-34, ¶¶ 64-66. While certain commenters argued to the contrary, for the reasons discussed herein, acquiring control over a second in-market top-four station through the transactions described above is easily distinguishable from other, legitimate actions a station may undertake to increase ratings at the expense of a competitor. In addition, Sinclair cautioned the Commission against interfering in the free market negotiation of affiliation agreements — which it asserted occur often and for valid business reasons — based upon a single instance where the Commission believes an affiliation swap constituted an "end run" around the top-four prohibition. *See* Sinclair NPRM Comments at 16-18 (referencing *KHNL/KGMB License Subsidiary*). Contrary to Sinclair's assertion, we do not believe that it is necessary, or wise, to permit additional parties to evade the top-four prohibition before we act, nor do we believe that our proposal today is likely to have a significant impact on the negotiation of affiliation agreements. Consistent with Sinclair's comments, we believe that the negotiation of affiliation agreements typically does not involve affiliation swaps and, therefore, would be unaffected by our proposal today. And while such swaps may not occur often, given the potential of such transactions to undermine the local television ownership rule, we believe that the application of the top-four prohibition to such

(continued....)

and operation of their stations in ways that are consistent with the Commission's rules and policies. Moreover, we do not believe that closing this loophole in the top-four prohibition violates the First Amendment. Indeed, recent constitutional challenges to the media ownership rules have been rejected, and we tentatively find that this application of the top-four prohibition withstands First Amendment scrutiny for the same reasons.[127]

51.     *Eight-Voices Test.*  Consistent with the proposal in the *NPRM*, we tentatively conclude that a merger between two in-market stations with overlapping contours should not be permitted unless there would be at least eight independently owned commercial and noncommercial television stations remaining in the market post-merger, and at least one station is not a top-four station.[128]  We tentatively find that the eight-voices test continues to be necessary to promote competition in local television markets.  We seek comment on these tentative conclusions.

52.     In the 2010 Quadrennial Review proceeding, WGAW supported retaining the eight-voices test, stating that the test promotes competition by ensuring a minimum number of competitors.[129]  According to WGAW, this competition encourages diversity, as stations must offer diverse programming and viewpoints in order to compete effectively.[130]

53.     However, broadcast commenters asserted that the eight-voices test is not necessary to promote competition.[131]  Broadcasters asserted that the test prevents stations in small and mid-sized markets from achieving financial benefits and operating efficiencies that could be passed on to consumers in the form of increased local news and locally oriented programming.[132]  Furthermore, many broadcast

(Continued from previous page) ——————————————————————
transactions would be necessary.  We do not believe there is a reliable marketplace solution that would restrain the use of affiliation swaps to evade the top-four prohibition.  We seek comment on these views.

[127] In *Prometheus II*, the court, under the rational basis standard of review, found that the media ownership rules do not violate the First Amendment "because they are rationally related to substantial government interests in promoting competition and protecting viewpoint diversity."  652 F.3d at 464.  The court rejected broadcasters' claims that the rules "are impermissible attempts by the FCC to manipulate content" and rejected Sinclair's argument that the local television ownership rule "violates the First Amendment because it 'singles out television stations.'"  *Id.* at 465; *see also Sinclair*, 284 F.3d at 168-69 (finding that the local television ownership rule does not violate the First Amendment under the rational basis review standard and rejecting arguments that the rule should be subject to either intermediate or strict scrutiny).  The approach we propose today would clarify that the top-four prohibition would apply to certain agreements that are the functional equivalent of a transfer of control or assignment of license.  Accordingly, this application of the top-four prohibition would be subject to the same constitutional analysis.  Pursuant to that constitutional analysis, as noted above, courts have repeatedly found that the local television ownership rule, which includes the top-four prohibition, does not violate the First Amendment.

[128] *NPRM*, 26 FCC Rcd at 17506, ¶ 46.

[129] WGAW NPRM Comments at 5.

[130] *Id.*

[131] *See* Belo NPRM Comments at 8-9; CRT NPRM Comments at 13; NAB NPRM Comments at 27; NAB NPRM Reply at 15; Nexstar NPRM Comments at 19-20; Sinclair NPRM Comments at 4, 21.  NAB stated also that the eight-voices test should be rejected because it cannot guarantee that each voice in the market will provide "diverse viewpoints."  NAB NPRM Reply at 15.  We note that the eight-voices test is designed to promote competition, and not viewpoint diversity, though we do believe that promoting competition can indirectly promote viewpoint diversity.

[132] *See* Belo NPRM Comments at 8-9; Grant Group NPRM Comments at 9; NAB NPRM Comments at 27; NAB NPRM Reply at 15; Nexstar NPRM Comments at 21.  According to NAB, reducing the voices count to six or seven (as discussed in the *NPRM*) would still not provide relief to stations in small markets that NAB alleged are impacted disproportionately by the ownership restrictions and are less able to support local news operations.  NAB NPRM Comments at 28-29 (asserting that a six-voices test would only allow new combinations in ten markets in DMAs 101-210); *see also* Tribune NPRM Reply at 34 (asserting that adopting a six- or seven-voices threshold would have

(continued....)

commenters argued that, based on the *Sinclair* decision, the definition of "voices" should be expanded to include other media such as MVPDs, the Internet, and newspapers.[133]

54.     Our view is that the 2010 Quadrennial Review record does not reveal sufficient changes in the local television marketplace to warrant modification of the eight-voices test at this time. Consistent with the Commission's prior position, we tentatively find that, in order to permit common ownership of two in-market stations with digital NLSC overlap, there should be a minimum of eight independently owned and operated television stations in the market post-merger.[134] We believe this minimum threshold would help ensure robust competition among local television stations in the markets where common ownership is permitted under our proposed rule, as it would increase the likelihood that each such market would be served by stations affiliated with each of the Big Four networks as well as at least four independently owned and operated stations unaffiliated with these major networks. Indeed, nearly every market with eight or more full-power television stations — absent a waiver of the local television ownership rule or unique circumstances — is served by each of the Big Four networks and at least four independent competitors unaffiliated with a Big Four network.[135] Competition among these independently owned stations is important, as it serves to improve the programming offered both by the major network stations and the independent stations, including increased local news and public interest programming.[136] We note that this competition is perhaps most valuable during the parts of the day in which local broadcast stations do not transmit the programming of affiliated broadcast networks. Moreover, because there continues to be a significant gap in audience share between the top-four stations in a market and the remaining stations in most markets, we continue to believe that it is appropriate to retain the eight-voices test, which helps to promote at least four independent competitors before common ownership is allowed.[137] We seek comment on our tentative conclusion that, in light of this concentration and consistent with the *2006 Quadrennial Review Order*, it remains prudent to require the presence of at least four additional independently owned and operated competitors in the market in order to promote competition in the local television market before permitting any common ownership in that market.[138] We are most interested in learning whether any new information has become available since the *NPRM* that we should take into account in considering this issue.

55.     We tentatively find that it is appropriate to include only full-power television stations in the voice count. The primary purpose of the rule is to promote competition among broadcast television stations in local television viewing markets; therefore, we tentatively find that it would be inappropriate to include other types of media when counting voices. We note that in the *2006 Quadrennial Review Order* the Commission addressed the *Sinclair* court's criticisms of the eight-voices test, specifically the rationale for defining voices differently in the radio-television cross ownership rule and the local television ownership rule.[139] The Commission detailed its rationale for limiting voices in the television rule to only

(Continued from previous page) ————————————
only a minimal impact on competition). Similarly, Grant Group argued in favor of a four-voices test, which it asserted would allow incremental relief to television broadcasters in small markets while retaining a "diversity floor" in each market. Grant Group NPRM Comments at 9.

[133] *See* CRT NPRM Comments at 13; Grant Group NPRM Comments at 10; NAB NPRM Comments at 28; NAB NPRM Reply at 14; Sinclair NPRM Comments at 2; Tribune NPRM Comments at 70-71; *see also Sinclair*, 284 F.3d at 162-65.

[134] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2065, ¶ 99.

[135] *See* BIA/Kelsey, BIA Media Access Pro 4.6 Television Database as of Aug. 30, 2012 (evaluation of the network affiliation data for stations in DMAs with eight or more full-power television stations).

[136] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2065, ¶ 99.

[137] *See id.*

[138] *Id.*

[139] *Id.* at 2066, ¶ 100; *see also Sinclair*, 284 F.3d at 162-65.

full-power television stations, a rationale that was subsequently upheld on appeal in *Prometheus II*, and to which we propose to continue to adhere herein.[140] We seek comment on our view that *Sinclair* does not compel us to include additional voices in the eight-voices test.

    56.    *Market Size Waivers.* The *NPRM* sought comment on whether the Commission should adopt a waiver standard for markets where the rules would otherwise limit ownership to a single television station, and, if so, how such a waiver standard should be structured.[141] The *NPRM* sought comment also on whether such a market size waiver, which could even allow combinations between top-four stations, would promote additional local news offerings in small markets that are less able to support four local news operations.[142] Based on our review of the 2010 Quadrennial Review record, we tentatively conclude that a market size waiver standard is not necessary. Instead, we tentatively conclude that retention of the existing failed/failing station waiver policy would serve the public interest and we seek additional comment on whether we should relax the waiver criteria or establish additional grounds for waiver.[143]

    57.    CWA and Free Press opposed relaxation of the waiver criteria in response to the *NPRM*.[144] Broadcast commenters, however, supported adoption of a more flexible waiver standard for small and mid-sized markets. Many such commenters advocated elimination of the failed/failing requirement from the existing standard and recommended that we place a greater emphasis on the ability of the waiver applicant to initiate or sustain local news and public affairs programming.[145] LIN and New Vision/TTBG offered detailed alternative waiver standards that would be more permissive than the criteria under the existing policy.[146]

    58.    We seek comment on our tentative conclusion that establishing a new market size waiver standard is not needed. Having evaluated the various proposed waiver standards proffered by commenters, we are concerned that many of the proposed waiver criteria would be difficult to monitor or

---

[140] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2066, ¶ 100; *see also Prometheus II*, 652 F.3d at 460. The Commission determined that the primary goal of the local television ownership rule was to promote competition among local television stations, and not to foster viewpoint diversity because there were other outlets for diversity of viewpoint in local markets; therefore, although other types of media contribute to viewpoint diversity, the Commission determined that they should not be counted as voices under the local television ownership rule. *2006 Quadrennial Review Order*, 23 FCC Rcd at 2066, ¶ 100.

[141] *NPRM*, 26 FCC Rcd at 17508, ¶ 52.

[142] *Id.* at 17508, ¶ 53.

[143] Under this policy, an applicant must demonstrate that one of the broadcast television stations involved in the proposed transaction is either failed or failing and that the in-market buyer is the only reasonably available candidate willing and able to acquire and operate the station; and selling the station to an out-of-market buyer would result in an artificially depressed price. 47 C.F.R. § 73.3555, Note 7; *see also NPRM*, 26 FCC Rcd at 17509, ¶ 54 (seeking comment on whether to readopt some or all of the current failed/failing station waiver policy).

[144] CWA NPRM Comments at 4; Free Press NPRM Reply at 18.

[145] *See* Belo NPRM Comments at 9-10; Gray NPRM Comments at 9; Sinclair NPRM Comments at 16; *see also* NAB NPRM Reply at 16 n.53 (asserting that the current waiver standard is too restrictive because of the failed/failing requirement and the audience share limit, which is difficult to satisfy due to the popularity of network programming). In addition, Sinclair asserted that the waiver standard should permit the proposed combination unless it can be definitively shown that the combination would harm the public interest. Sinclair NPRM Comments at 16.

[146] LIN NPRM Comments at 22-23 (providing distinct waiver criteria for the eight-voices test and the top-four prohibition); New Vision/TTBG NPRM Comments at 15-16 (proposing a "Market Position Standard" and a "Likely to Increase News Programming Standard"). The Small Market Coalition, in its reply comments, supported the waiver criteria proposed by LIN and stated that the criteria proposed by New Vision/TTBG also deserve consideration. Small Market Coalition NPRM Reply at 8-9.

enforce, are not rationally related to the ability of each station to compete in the local market, and could be manipulated in order to obtain a waiver. Ultimately, we predict that such standards would significantly expand the circumstances in which a waiver of the local television ownership rule would be granted. We are concerned that such relaxation would be inconsistent with our tentative conclusion that the public interest is best served by retaining the existing television ownership limits. Moreover, we believe that the existing waiver standard is not unduly restrictive and that it provides appropriate relief in markets of all sizes.[147] Waiver of our rules is meant to be exceptional relief, and we tentatively find that the existing waiver criteria strike an appropriate balance between enforcing the ownership limits and providing relief from the rule on a case-by-case basis.

59.     In addition, we tentatively find that it is not necessary to modify the existing waiver standard in order to promote additional local news, as the current policy already indirectly takes this into consideration in cases involving failing stations. Indeed, parties frequently pledge to continue and/or increase local news offerings in order to demonstrate that the proposed transaction would produce public interest benefits.[148] Our commitment to promoting increased local news remains strong, and we believe that the existing waiver policy helps further that goal. We seek comment on whether there is new information since the *NPRM* that would alter our preliminary views on this issue.

60.     We seek comment on our tentative conclusion that maintaining the failed/failing station waiver policy will serve the public interest. While we propose to retain the existing failed/failing station waiver policy, we acknowledge that some industry participants have argued that certain elements of the existing policy are too restrictive. Accordingly, we seek comment on potential changes to the policy to address those circumstances. For example, are there circumstances in which we should refrain from applying the four-percent all-day audience share requirement or adopt a higher threshold? If so, what circumstances would justify such a change? Are any other changes appropriate? We encourage commenters to provide alternative waiver criteria for our consideration, including specific justifications for such criteria, as well as the potential impact on our policy goals.

61.     *Multicasting.* The *NPRM* sought comment on whether the transition to digital television, and specifically a station's ability to multicast multiple program streams has eliminated the need to permit common ownership of two stations in local television markets, as the local television ownership rule does. The 2010 Quadrennial Review record does not persuade us that multicasting justifies imposition of a single-station ownership restriction or other tightening of the current ownership limits. We seek comment on whether there have been any developments since the *NPRM* that should cause us to reevaluate this position.

---

[147] A survey of recent transactions demonstrates that waiver under the failed/failing station policy is frequently granted in small and mid-sized markets. *See, e.g., Freedom Broadcasting of New York Licensee, L.L.C.*, Letter, 27 FCC Rcd 2498 (Med. Bur. 2012) (granting waiver under the failed/failing station policy in the Albany-Schenectady-Troy, New York, DMA – DMA #58); *Riverside Media, LLC*, Letter, 26 FCC Rcd 16038 (Med. Bur. 2011) (granting waiver under the failed/failing station policy in the Ft. Smith-Fayetteville-Springdale-Rogers, Arkansas, DMA – DMA #101); *ACME Television, Inc.*, Letter, 26 FCC Rcd 5189 (Med. Bur. 2011) (granting waiver under the failed/failing station policy in the Green Bay-Appleton, Wisconsin, DMA – DMA #69); *Estes Broadcasting, Inc.*, Letter, 25 FCC Rcd 7956 (Med. Bur. 2010) (granting waiver under the failed/failing station policy in the Tyler-Longview, Texas, DMA – DMA #107); *Borger Broadcasting, Inc., Debtor in Possession*, Letter, DA 10-209 (MB, rel. Jan 29, 2010) (granting waiver under the failed/failing station policy in the Amarillo, Texas, DMA – DMA #130); *Davis Television Clarksburg, LLC*, Memorandum Opinion and Order, 23 FCC Rcd 5472 (Med. Bur. 2008) (granting waiver under the failed/failing station policy in the Clarksburg-Weston, West Virginia, DMA – DMA #170).

[148] *See, e.g., Freedom Broadcasting*, 27 FCC Rcd at 2500; *ACME Television*, 26 FCC Rcd at 5193-94; *Davis Television*, 23 FCC Rcd at 5474, ¶ 7.

62.     In response to the *NPRM*, Free Press and UCC *et al.* asserted that, because multicasting offers stations the ability to provide multiple programming streams without owning a second station, the duopoly rule should be eliminated in favor of the previous single-station rule.[149] These commenters asserted that, in light of the ability to multicast, allowing a broadcaster to acquire a second in-market station is an inefficient use of spectrum.[150]

63.     Broadcasters, however, asserted that the ability to multicast does not justify tightening (or failing to loosen) the local television ownership rule. According to broadcasters, multicasting has provided significant benefits to local markets, as stations are now providing programming that was not previously available over-the-air.[151] These broadcasters stated, however, that the ability to multicast does not replicate the benefits of common ownership of a second in-market station. For example, multicast channels do not have must-carry rights and, according to broadcasters, it is difficult to obtain carriage for multicast channels on satellite and cable systems.[152] Broadcasters asserted that because an estimated 90 percent of households receive broadcast signals via a subscription service, the lack of carriage translates to decreased advertising revenues on the multicast stream.[153] Moreover, instead of multicasting, many broadcasters are utilizing their digital spectrum to offer a higher quality HD signal on their main programming feed or other innovative services, such as mobile DTV.[154]

64.     We tentatively concur with the broadcast commenters that, while multicasting has produced public interest benefits, the ability to multicast does not justify tightening the current numerical limits. Based on evidence in the 2010 Quadrennial Review record, broadcasting on a multicast stream does not — at present — produce the cost savings and additional revenue streams that can be achieved by owning a second in-market station.[155] Therefore, tightening the numerical limits might prevent those broadcasters in markets where common ownership is permitted under the existing rule from achieving the efficiencies and related public interest benefits associated with common ownership. Accordingly, our view based on the most recent record is that it is not appropriate to adjust the numerical limits as a result

---

[149] Free Press NPRM Comments at 44; Free Press NPRM Reply at 20-21; UCC *et al.* NPRM Comments at 24.

[150] Free Press NPRM Comments at 44-45; UCC *et al.* NPRM Comments at 24-25.

[151] This additional programming includes local news and public interest programming, niche programming, programming targeted to African-American audiences, Spanish-language programming, and national networks (including Big Four networks that have been made available in small markets only though dual affiliations enabled by multicasting). *See* Belo NPRM Comments at 13-14; Gray NPRM Comments at 12-13; NAB NPRM Comments at 30; NAB NPRM Reply at 18; New Vision/TTBG NPRM Comments at 18-19; Small Market Coalition NPRM Reply at 12-13; *but see* CWA NPRM Comments at 4 (asserting that broadcasters have failed to make sufficient use of their multicast channels to provide local news and public interest programming).

[152] Belo NPRM Comments at 11-12; Gray NPRM Comments at 13-14; New Vision/TTBG NPRM Comments at 17; NAB NPRM Comments at 31; NAB NPRM Reply at 17-18; Nexstar NPRM Reply at 13 (noting that when carriage is negotiated, the station is not likely to be compensated by the MVPD for such carriage); Tribune NPRM Reply at 36. New Vision/TTBG stated that they have been successful in obtaining carriage of multicast streams on some cable systems but were having difficulties in obtaining carriage on smaller cable systems that lack channel capacity. New Vision/TTBG NPRM Comments at 17. They also stated that in many small and mid-sized markets, DISH Network and DIRECTV do not carry any multicast channels. *Id.*

[153] Belo NPRM Comments at 11-12; Gray NPRM Comments at 13-14; New Vision/TTBG NPRM Comments at 17; NAB NPRM Comments at 31 (asserting that in 2010, for television stations across all markets, multicast revenue represented, on average, 0.4 percent of total station revenue); NAB NPRM Reply at 18; Nexstar NPRM Reply at 13.

[154] Belo NPRM Comments at 12-13; Gray NPRM Comments at 14; NAB NPRM Comments at 31; NAB NPRM Reply at 17; Nexstar NPRM Reply at 13.

[155] Belo NPRM Comments at 11-12; Gray NPRM Comments at 13-14; New Vision/TTBG NPRM Comments at 17; NAB NPRM Comments at 31; NAB NPRM Reply at 17-18; Nexstar NPRM Reply at 13; Tribune NPRM Reply at 36.

of stations' multicasting capability.[156] We seek comment, however, on whether we should reconsider our position within the context of the 2014 Quadrennial Review proceeding.

65. Moreover, as discussed above, we tentatively find that the public interest is served by retaining the current numerical ownership limits; we believe that doing so would promote competition in local television markets.[157] Therefore, as the court noted in *Prometheus II*, even if multicasting did generate cost savings and new revenue streams similar to owning a second in-market station — though we believe that at present it does not — we are not required "to promulgate a more restrictive rule just because entities may gain similar economies of scale and generate new revenue by multicasting."[158] Indeed, for the reasons discussed herein, we propose not to make such a change, and we seek comment on the potential consequences of such an approach for purposes of the 2014 Quadrennial Review.

66. The *NPRM* sought comment also on the impact of dual network affiliations on local markets and whether the Commission should limit the ability of stations to utilize their multicast capacity to form dual affiliations with certain networks.[159] As discussed below, we propose to decline to regulate such dual affiliations in the context of the media ownership rules at this time, and we seek comment on this proposal.

67. In the 2010 Quadrennial Review proceeding, cable commenters asserted that allowing stations to utilize their multicast capability to form dual affiliations with multiple Big Four networks creates an end-run around the local television ownership rule, particularly the top-four prohibition, and they urged the Commission to regulate this practice.[160] These commenters asserted that dual affiliations involving two Big Four networks harm competition and give such stations unfair bargaining power in retransmission consent negotiations.[161] In addition, Mediacom/Suddenlink asserted that dual affiliations involving two Big Four networks harms diversity and localism, as the station's multicast capacity is not being used for new, innovative programming.[162]

68. By contrast, broadcast commenters asserted that dual affiliations via multicasting, including multiple Big Four affiliations, serve the public interest and should not be regulated by the Commission.[163] These commenters noted that many small markets do not have enough full-power

---

[156] We note that the Commission has authorized channel sharing by broadcast television stations in connection with the incentive auction of broadcast television spectrum and that the statutory provision mandating the incentive auction protects the must-carry rights of stations that voluntarily relinquish spectrum usage rights in order to channel share. *See Innovation in the Broadcast Television Bands*, ET Docket No. 10-235, Report and Order, 27 FCC Rcd 4616, 4621-24, ¶¶ 11-18 (2012); Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, § 6403(a)(4), 126 Stat. 156 (2012). We seek comment on the potential impact of this aspect of the incentive auction for purposes of the media ownership rules.

[157] *See supra* ¶¶ 39-40.

[158] 652 F.3d at 461.

[159] *NPRM*, 26 FCC Rcd at 17510, ¶ 57; *see also* Letter from Matthew A. Brill, Latham & Watkins LLP, Counsel for Time Warner Cable, to Marlene H. Dortch, Secretary, FCC, at 4 (Aug. 3, 2011) (citing Price Colman, *D2 Offers A1 Opportunity for Big Four Nets*, TVNEWSCHECK, Apr. 20, 2011, http://www.tvnewscheck.com/article/50699/d2-offers-a1-opportunity-for-big-four-nets) (asserting that multicasting enables the creation of virtual duopolies, in which a single station affiliates with more than one national network and multicasts dual programming) (visited Jan. 30, 2014).

[160] Mediacom/Suddenlink NPRM Comments at 18; Time Warner Cable Inc. ("TWC") NPRM Comments at 20; TWC NPRM Reply at 12-16.

[161] Mediacom/Suddenlink NPRM Comments at 18-19; TWC NPRM Comments at 21; TWC NPRM Reply at 13-14.

[162] Mediacom/Suddenlink NPRM Comments at 18-19.

[163] CBS NPRM Comments at 14-15 (asserting that regulation of dual affiliations would run counter to the Commission's recent history of deregulation in matters involving network affiliations, including elimination of the

(continued....)

stations to affiliate with each of the national networks, and absent the use of multicast capability to form dual affiliations, such markets would not have access to the programming of all Big Four networks.[164] Gray asserted also that dual affiliation benefits local communities by increasing the availability of local newscasts through the multicast stream and by replacing distant network affiliates on subscription services with a local affiliate that is better able to provide programming responsive to the local market.[165] Moreover, according to Sinclair, any efforts by the Commission to regulate affiliations on multicast streams would "raise serious First Amendment concerns" and would frustrate a station's ability to provide programming that could better serve the community.[166] Sinclair asserted also that it would be "illogical" to prohibit broadcasters in larger, more competitive markets from affiliating with multiple Big Four networks while permitting stations in smaller markets to do so.[167] Finally, multiple broadcasters cautioned that efforts to regulate multicast programming could conflict with the Commission's efforts to repurpose UHF Band spectrum for flexible use through the incentive auction of broadcast television spectrum.[168] We seek comment on these multicasting issues in general and, in particular, on any potential impact on the incentive auction.

69.    We do not believe the 2010 Quadrennial Review record supports regulation within the context of our media ownership rules to restrict the use of multicast capability to form dual affiliations. The commenters were primarily concerned with such dual affiliations involving two Big Four networks. Evidence available during the 2010 proceeding indicates that dual affiliations involving two Big Four networks via multicasting are generally — if not exclusively — limited to smaller markets with an insufficient number of full-power commercial television stations to accommodate each Big Four network[169] or where other unique marketplace factors are responsible for creating the dual affiliation

---

(Continued from previous page) ─────────────────────

prohibition on network ownership of television stations in small markets and repeal of the "secondary affiliation rule"); Gray NPRM Comments at 14-15; Sinclair NPRM Comments at 18-19; Small Market Coalition NPRM Reply at 11-12 (asserting that a multicast stream is not another station and should not be subject to the local television ownership rule).

[164] Gray NPRM Comments at 14-15; NAB NPRM Comments at 30; Sinclair NPRM Comments at 18-19.

[165] Gray NPRM Comments at 15. Gray's KXII-TV, Sherman, Texas, an affiliate of both CBS and Fox, offers individually branded newscasts on each programming stream. *Id.* According to Gray, the CBS newscast is a more traditional news program, while the Fox newscast focuses on issues of interest to younger viewers. *Id.*

[166] Sinclair NPRM Comments at 18; *see also* Small Market Coalition NPRM Reply at 13-14.

[167] Sinclair NPRM Comments at 19.

[168] *See* Belo NPRM Comments at 14 (asserting that it was the intent of Congress in the legislation authorizing the incentive auction to promote channel sharing); CBS NPRM Comments at 16 (asserting that dual affiliations using multicast capability may become necessary to preserve service to local markets as a result of the loss of full-power stations in the incentive auction).

[169] BIA data from 2012 indicate that there are approximately 40 instances of dual affiliation via multicasting involving multiple Big Four networks. Each market in which we identified such dual affiliation was outside the top-100 ranked DMAs, with the vast majority of such markets — approximately 73 percent — containing three or fewer full-power commercial television stations. *See* BIA/Kelsey, BIA Media Access Pro 4.6 Television Database as of Mar. 31, 2012 (evaluation of instances of dual network affiliations via multicasting). These findings are consistent with the data and estimates provided by cable commenters, as a significant majority of the dual affiliations identified in these comments involved a Big Four network and a "Little Two" network (*i.e.*, The CW or MyNetworkTV). *See, e.g.*, Mediacom/Suddenlink NPRM Comments at 19 n.37 (referencing article that identified approximately 70 dual affiliations involving either two Big Four networks or a Big Four network and a Little Two network as of April 2011, and estimating that, as of the filing of the comments, there were approximately 150 Big Four/Little Two dual affiliations). We tentatively find that Big Four/Little Two dual affiliations via multicasting, regardless of market rank, do not raise sufficient competitive concerns to justify an amendment to our local television ownership rule.

arrangements.[170] While there may be potential harms that result from certain dual network affiliations, we tentatively agree with broadcast commenters that the potential benefits of dual affiliation via multicasting in these smaller markets, including dual affiliation with more than one Big Four network, outweigh any potential harms to our policy goals. Indeed, we believe that a significant benefit of the multicast capability is the ability to bring more local network affiliates to smaller markets, thereby increasing access to popular network programming and local news and public interest programming tailored to the specific needs and interests of the local community.[171] Based on the 2010 Quadrennial Review record, it appears that marketplace incentives operate to limit the occurrence of dual affiliations via multicasting involving multiple Big Four networks to these smaller markets.[172] For these reasons, we tentatively decline to regulate dual affiliations at this time, and we seek comment on this approach within the context of any marketplace changes that may have occurred since the *NPRM*.

70. *Minority and Female Ownership.* The Commission sought comment on the impact of the proposed local television ownership rule on minority and female ownership opportunities, as well as the impact of diverse television ownership on viewpoint diversity.[173] We tentatively find that the local television ownership rule proposed in this FNPRM is consistent with our goal to promote minority and female ownership of broadcast television stations. We seek comment on this tentative conclusion.

71. In response to the *NPRM*, public interest commenters asserted that minorities and women continue to be underrepresented in broadcast television ownership and argued that the Commission should not relax the local television ownership rule, as additional consolidation could reduce the already low levels of minority and female ownership.[174] In addition, NHMC *et al.* and UCC *et al.* suggested the Commission tighten the television ownership limits in order to create new ownership opportunities for minorities and women.[175] With respect to the impact of diverse ownership on viewpoint diversity, NHMC *et al.* argued that station ownership impacts the issues covered by a station and the way in which those issues are covered.[176] They asserted that, because station ownership does not generally reflect the diversity of local communities, television programming inadequately represents issues of importance to

---

[170] For example, in some markets a local station has chosen not to affiliate with a Big Four network in favor of providing religious, foreign language, or locally oriented programming, and all remaining full-power commercial television stations in the market are already affiliated with a different Big Four network. Therefore, dual affiliation of more than one Big Four network is necessary for a local affiliate of each Big Four network to serve that market. We seek comment on our belief that there is no benefit in either encouraging an independent station to carry network programming it does not want or in depriving a market of a local affiliate of a Big Four network.

[171] For example, a local network affiliate is more likely to carry local emergency information (*e.g.*, storm warnings or school closings) and/or local news programming tailored to the needs of the local community than a distant market affiliate imported by an MVPD.

[172] Larger markets generally have more full-power commercial television stations that will compete for a Big Four or other national network affiliation. Therefore, if a current network affiliate declines to renew or loses its network affiliation, dual affiliation would not be necessary in order to preserve a local network affiliate in the market. Such competition has likely contributed to the lack of Big Four dual affiliations in larger markets.

[173] *NPRM*, 26 FCC Rcd at 17511, ¶ 59; *see also 2012 323 Report Comments PN* (requesting comment on the ownership data in the *2012 323 Report*).

[174] *See* Alliance for Women in Media, Inc. ("AWM") NPRM Comments at 3; DCS NPRM Comments at 7; Free Press NPRM Comments at 19-20; Free Press NPRM Reply at 47-48; The Leadership Conference on Civil and Human Rights ("LCCHR") NPRM Comments at 2; NHMC *et al.* NPRM Comments at 2-3.

[175] *See* NHMC *et al.* NPRM Comments at 3-5; UCC *et al.* NPRM Comments at 24; *see also* Free Press NPRM Comments at 44 (asserting that tightening the television ownership limits could promote ownership diversity by creating ownership opportunities for new entrants ); Free Press NPRM Reply at 19.

[176] NHMC *et al.* NPRM Comments at 2-3.

minorities and rural Americans; they argued that, therefore, the Commission should adopt rules to promote diverse television ownership.[177]

72.      Commenters also have expressed concern that the Commission's forthcoming incentive auction will lead to increased consolidation and a decrease in the number of television stations owned by minorities and women.[178]  Moreover, UCC *et al.* contended that the incentive auction is likely to have a negative impact on ownership diversity and that therefore the Commission should assess the impact of the incentive auction in the context of this quadrennial review or, at a minimum, maintain the existing ownership rules until the impact of the incentive auction is fully established.[179]  By contrast, other commenters asserted that the incentive auction will have no more than a collateral impact on television ownership and does not provide a basis for deferring action on our ownership rules.[180]

73.      As discussed above, we tentatively find that the 2010 Quadrennial Review record demonstrates that the existing local television ownership rule remains necessary to promote competition among broadcast television stations in local markets.  Moreover, we believe the competition-based rule would also indirectly advance our viewpoint diversity goal by helping to ensure the presence of independently owned broadcast television stations in the local market, thereby increasing the likelihood of a variety of viewpoints.[181]  In addition, while we do not propose to retain the rule with the specific purpose of preserving the current levels of minority and female ownership, we tentatively find that retaining the existing rule would effectively address the concerns of those commenters who suggested that additional consolidation would have a negative impact on minority and female ownership of broadcast television stations.[182]  We seek comment on how any developments since the *NPRM* may affect these tentative findings.  In addition, we seek comment on whether the incentive auction has the potential to

---

[177] *See id.*

[178] *See* NHMC *et al.* NPRM Comments at 34-35; Free Press 323 Report Comments at 23; LCCHR 323 Report Comments at 3; Media Alliance 323 Report Comments at 2-3; National Association of Black-Owned Broadcasters ("NABOB") 323 Report Comments at 14 n.30; UCC *et al.* 323 Report Comments at ii, 17-22; Association of Free Community Papers ("AFCP") *et al.* 323 Report Reply at 4.

[179] UCC *et al.* 323 Report Comments at 16-18, 22-24; *see also* AFCP *et al.* 323 Report Reply at 5 (urging the Commission to publish "analysis on projected Spectrum Auction participation, license transfer and subsequent market-specific valuations").

[180] *See* Bonneville International Corporation and The Scranton Times, L.P. ("Bonneville/Scranton") 323 Report Reply at 10.

[181] *See* Media Ownership Study 9, A Theoretical Analysis of the Impact of Local Market Structure on the Range of Viewpoints Supplied 2-3, by Isabelle Brocas, Juan D. Carrillo, and Simon Wilkie (2011) ("Media Ownership Study 9") (finding, based on theoretical analysis, that the presence of more independently owned outlets can increase viewpoint diversity in a market).  Premised on the reasonable assumption that there is more than one viewpoint on many issues, Media Ownership Study 9 supports the related conclusion that information transmission is improved when there is competition among firms with similar viewpoints.  *Id.* at 26-27.  Similarly, Media Ownership Study 2 examines the effects of media market structure on consumer demand and welfare, finding that "the representative consumer values different viewpoints in the reporting of information on news and current affairs, more information on community news, and more information that reflects the interests of women and minorities."  Media Ownership Study 2, Consumer Valuation of Media as a Function of Local Market Structure 0, by Scott J. Savage and Donald M. Waldman (2011) ("Media Ownership Study 2").  It finds, using simulation techniques, that any negative effects on diversity associated with common ownership of television stations in a market are smaller in markets with multiple independent television voices.  *See* Media Ownership Study 2 at 49.

[182] We note also that we propose to retain without modification the current failed/failing station waiver policy, including the out-of-market-buyer solicitation requirement — the failed station solicitation rule ("FSSR") — which promotes new entry in a market by ensuring that out-of-market entities interested in purchasing a station, including minorities and women, will have an opportunity to bid.  *See 1999 Ownership Order,* 14 FCC Rcd at 12937, ¶ 74.

impact minority and female broadcast ownership and whether any such impacts should affect our 2014 Quadrennial Review.[183]

### B. Local Radio Ownership Rule

#### 1. Introduction

74. Based on the 2010 Quadrennial Review record, we tentatively find that the current local radio ownership rule remains necessary in the public interest and should be retained without modification.[184] We believe that the rule is necessary to promote competition. In addition, we believe that the radio ownership limits promote viewpoint diversity "by ensuring a sufficient number of independent radio voices and by preserving a market structure that facilitates and encourages new entry into the local media market."[185] Similarly, we tentatively find that a competitive local radio market helps to promote localism, as a competitive marketplace will lead to the selection of programming that is responsive to the needs and interests of the local community.[186] We tentatively find also that the local radio ownership rule is consistent with our goal of promoting minority and female ownership of broadcast television stations. Finally, we believe that these benefits outweigh any burdens that may result from our proposal to retain the rule without modification. We seek comment on these tentative conclusions.

75. In accordance with these tentative conclusions, we propose that an entity may continue to own: (1) up to eight commercial radio stations in radio markets with 45 or more radio stations, no more than five of which can be in the same service (AM or FM); (2) up to seven commercial radio stations in radio markets with 30-44 radio stations, no more than four of which can be in the same service (AM or FM); (3) up to six commercial radio stations in radio markets with 15-29 radio stations, no more than four of which can be in the same service (AM or FM); and (4) up to five commercial radio stations in radio markets with 14 or fewer radio stations, no more than three of which can be in the same service (AM or FM), provided that an entity may not own more than 50 percent of the stations in such a market, except that an entity may always own a single AM and single FM station combination.[187] We seek comment on the costs and benefits of our proposal to retain the existing local radio ownership rule. To the greatest extent possible, commenters should quantify the expected costs or benefits of retaining the rule and provide detailed support for any actual or estimated values provided, including the source of such data and/or the method used to calculate reported values.

---

[183] The Commission released the *Incentive Auctions NPRM* in September 2012 and has not yet adopted final rules for the incentive auction. We contemplate conducting the auction itself sometime in 2015. The Commission has recognized the potential for the incentive auction to impact broadcasters' ongoing compliance with our media ownership rules. *See Incentive Auctions NPRM*, 27 FCC Rcd at 12474, ¶ 356. Accordingly, the Commission proposed, in the *Incentive Auctions NPRM*, to grandfather any station combinations that would no longer comply with our media ownership rules as a result of the auction. *Id.* In addition, the Commission invited comment, in the context of the incentive auction proceeding, on "measures that the Commission might take outside of the context of the multiple ownership rules to address any impact on diversity that may result from the incentive auction." *Id.* at 12474, ¶ 357.

[184] Section 202(h) of the 1996 Act, 47 U.S.C. § 303 note.

[185] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2077, ¶ 127 (citing *2002 Biennial Review Order*, 18 FCC Rcd at 13739, ¶¶ 305-06).

[186] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2075, ¶ 124; *2002 Biennial Review Order*, 18 FCC Rcd at 13738, ¶ 304 (citing generally *Revision of Radio Rules and Policies*, MM Docket No. 91-140, Report and Order, 7 FCC Rcd 2755 (1992) ("*1992 Radio Ownership Order*"); *Amendment of Section 73.3555 of the Commission's Rules, the Broadcast Multiple Ownership Rules*, MM Docket No. 87-7, First Report and Order, 4 FCC Rcd 1723 (1989)).

[187] 47 C.F.R. § 73.3555(a).

### 2. Background

76.    In the *NPRM*, the Commission proposed to retain the local radio ownership rule without modification, including the AM/FM subcaps, and sought comment on this tentative conclusion.[188] The Commission also sought comment on whether and, if so, how, to incorporate new audio platforms into the rule and on the impact of such platforms on the broadcast radio industry.[189] In addition, the *NPRM* sought comment on whether to adopt a specific waiver standard for the local radio ownership rule and on how the proposed rule would affect minority and female ownership opportunities.[190]

77.    In response, public advocacy commenters and Mt. Wilson agreed that the Commission should continue to regulate broadcast radio ownership, and they supported the Commission's proposal to retain the existing rule and/or urged the Commission to tighten the radio ownership limits.[191] In support of this position, certain of these commenters pointed to increased levels of consolidation that occurred following the adoption of the current ownership limits by Congress in the 1996 Act.[192] According to these commenters, consolidation has led to decreased competition in local radio markets, which has produced homogenous programming that is not responsive to local communities.[193] Many commenters also asserted that any additional loosening of the local radio ownership restrictions could negatively impact minority and female ownership of broadcast radio stations.[194]

78.    By contrast, broadcast commenters generally opposed the Commission's proposal to retain the existing local radio ownership rule, instead arguing that the radio ownership limits should be eliminated or, at the very least, loosened.[195] They asserted that the current rule is no longer necessary to promote competition due to increased competition from non-broadcast audio platforms, such as satellite radio and Internet-based audio services (including via mobile devices).[196] CBS and NAB[197] stated also

---

[188] *NPRM*, 26 FCC Rcd at 17511-12, ¶¶ 61-62.

[189] *Id.* at 17514, ¶¶ 68-69.

[190] *Id.* at 17518, ¶¶ 81-83.

[191] AWM NPRM Comments at 2-3; American Association of Independent Music ("A2IM") NPRM Comments at 3; Schellhardt NPRM Comments at 2-3, 7; Future of Music Coalition ("FMC") NPRM Comments at 4; Mt. Wilson FM Broadcasters, Inc. ("Mt. Wilson") NPRM Comments at 4-5; musicFIRST Coalition NPRM Comments at 1-2; NHMC *et al.* NPRM Comments at 4; UCC *et al.* NPRM Comments at 28.

[192] AWM NPRM Comments at 2; A2IM NPRM Comments at 2; Mt. Wilson NPRM Comments at 5; musicFIRST Coalition NPRM Comments at 1-2.

[193] *See* AWM NPRM Comments at 2; A2IM NPRM Comments at 2; Mt. Wilson NPRM Comments at 5; musicFIRST Coalition NPRM Comments at 1-2; NHMC *et al.* NPRM Comments at 3, 12-16, 20-21. In its reply, NAB disputed this assertion, citing data provided in its comments to the *NPRM* regarding format diversity, as well as evidence from Media Ownership Studies 7 and 8B that consolidation often promotes format diversity. NAB NPRM Reply at 21-22; *see also* Media Ownership Study 7, Radio Station Ownership Structure and the Provision of Programming to Minority Audiences: Evidence from 2005- 2009, by Joel Waldfogel (2011) ("Media Ownership Study 7"); Media Ownership Study 8B, Diversity in Local Television News, by Lisa M. George and Felix Oberholzer-Gee (2011) ("Media Ownership Study 8B").

[194] *See* AWM NPRM Comments at 3; Free Press NPRM Comments at 23; LCCHR NPRM Comments at 2-3; NHMC *et al.* NPRM Comments at 3-5; UCC *et al.* NPRM Comments at 28.

[195] ARSO NPRM Comments at 5; CBS NPRM Comments at 18-19; M. Kent Frandsen ("Frandsen") NPRM Comments at 2-3; NAB NPRM Comments at 32-33; NAB NPRM Reply at 19-21; *but see* Mt. Wilson NPRM Comments at 4-5 (a broadcast radio station owner arguing that the radio ownership limits, including the AM/FM subcaps, should be tightened in order to promote the Commission's competition, localism, and diversity goals); Mt. Wilson NPRM Reply at 2-3.

[196] ARSO NPRM Comments at 5; CBS NPRM Comments at 18-19; Frandsen NPRM Comments at 2-3; NAB NPRM Comments at 32-33; NAB NPRM Reply at 19-21; *see also* Disney NPRM Reply at 2-3 (arguing that the

(continued....)

that the rule is not necessary to promote our localism and diversity goals and noted that the Commission has previously stated that the primary purpose of the local radio ownership rule is to promote competition.[198] We invite commenters to provide any updated information concerning these issues.

### 3. Discussion

79.    *Market.* In the *NPRM*, the Commission tentatively concluded that the relevant market for review of the local radio ownership rule is the radio listening market and that it is not appropriate, at this time, to expand that market to include non-broadcast sources of audio programming.[199] Based on our review of the 2010 Quadrennial Review record, we believe this approach is appropriate, and we seek comment on whether we should maintain this market definition.[200]

80.    Public advocacy commenters supported the Commission's tentative conclusions in the *NPRM*. These commenters asserted that new audio platforms often serve different audiences than traditional broadcast radio stations, which continue to play an important role in local communities.[201] In addition, musicFIRST noted that NAB has previously asserted that the Sirius/XM merger would result in a satellite radio "monopoly," which is inconsistent with NAB's position that broadcast radio stations compete with non-broadcast audio platforms.[202]

81.    Many broadcast commenters opposed our proposal to exclude non-broadcast sources of audio programming from the radio listening market. According to these broadcasters, broadcast radio stations compete for listeners and advertising revenue with non-broadcast sources of audio programming, such as satellite radio and Internet-based audio services. Therefore, these broadcasters advocated loosening or eliminating the local radio ownership limits to take account of this competition.[203]

82.    Despite broadcasters' claims to the contrary, we tentatively find that, for purposes of the Commission's ownership rules, non-broadcast sources of audio programming are not yet meaningful substitutes for broadcast radio stations with respect to either listeners or advertisers.[204] While alternate

---

(Continued from previous page) ——————————
Commission should consider growth of new media outlets and, instead of regulating broadcast industry, should find ways to incent ownership of broadcast stations).

[197] Mt. Wilson asserted in its reply comments that NAB does not speak for the entire broadcast radio industry, or even the entirety of the NAB membership. Mt. Wilson NPRM Reply at 3-4. Instead, according to Mt. Wilson, NAB's comments reflect the position of group owners at the expense of independent station owners. *See id.* at 4.

[198] CBS NPRM Comments at 18-19; NAB NPRM Comments at 33-38.

[199] *NPRM*, 26 FCC Rcd at 17513-14, ¶ 68; *see also 2006 Quadrennial Review Order*, 23 FCC Rcd at 2071, ¶ 114 (confirming the geographic and product markets for local radio ownership rule relied on in the *2002 Biennial Review Order*); *2002 Biennial Review Order*, 18 FCC Rcd at 13705, ¶ 245 (declining to include non-broadcast sources of delivered audio media, such as Internet audio streaming and satellite radio, in the radio listening market). Although the radio listening market broadly speaking may be defined to include satellite radio or Internet audio streaming, this tentative conclusion is consistent with Commission decisions not to expand the market and rule to include non-broadcast sources of audio programming. *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2071, ¶ 114; *2002 Biennial Review Order*, 18 FCC Rcd at 13705, ¶ 245.

[200] *See NPRM*, 26 FCC Rcd at 17514-15, ¶¶ 69, 71, 74.

[201] *See* A2IM NPRM Comments at 2; FMC NPRM Comments at 6.

[202] musicFIRST Coalition NPRM Comments at 3-4.

[203] CBS NPRM Comments at 18-19; Frandsen NPRM Comments at 2-3; NAB NPRM Comments at 32-33; NAB NPRM Reply at 19-21.

[204] *See, e.g.*, NAB NPRM Reply at 20-21. While NAB cited multiple sources that demonstrate that consumer interest in non-broadcast audio platforms is increasing — a conclusion we do not doubt — NAB failed to demonstrate that this increased interest was at the expense of broadcast radio listening or that these alternative platforms were meaningful substitutes for broadcast radio. Other commenters asserted that these alternate

(continued....)

platforms such as satellite radio and Internet-delivered audio are growing in popularity, broadcast radio remains the dominant radio technology. In 2012, 92 percent of Americans age 12 or older listened to broadcast radio, a figure that has remained essentially constant over the last decade.[205] Satellite radio still serves only a small portion of the population, even though its subscription rates continue to climb.[206] And though recent data suggest that a significant portion of adult U.S. broadband households (42 percent) listen to Internet-delivered audio programming, we note that millions of U.S. households continue to lack broadband connections.[207] In addition, only 14 percent of Internet radio listeners listen in their cars, where most broadcast radio listening occurs.[208] Thus, we tentatively conclude that Internet-delivered audio programming is not yet a meaningful substitute for broadcast radio listening for most listeners. We seek comment on this tentative conclusion and invite commenters to provide any more recent relevant information and data.

83.    We believe, moreover, that satellite radio and content delivered via the Internet generally are national platforms that are not likely to respond to competitive conditions in local markets. Satellite radio content is uniform nationally, and there is no evidence in the record that content decisions are made based on competitive conditions in local markets. Similarly, there is no evidence in the record that Internet radio stations and other Internet-delivered audio programming providers (excluding streams of local broadcast radio stations) modify their programming decisions to respond to competitive conditions in local markets. Ultimately, we tentatively find that only local broadcasters provide programming based on the unique characteristics of their respective local markets. As the Commission has stated previously, it is the competition between such rivals that most benefits listeners in a local market and serves the public interest — competition that is currently lacking from non-broadcast audio alternatives.[209]

---

(Continued from previous page) ————————————

platforms, while important, have not yet replaced broadcast radio stations. *See* A2IM NPRM Comments at 2 (asserting that alternate audio platforms often serve different markets and that broadcast radio remains an important platform for independent labels and artists); FMC NPRM Comments at 6 (citing research that demonstrates that young people continue to rely on broadcast radio for exposure to new music).

[205] The PEW RESEARCH CENTER'S PROJECT FOR EXCELLENCE IN JOURNALISM, THE STATE OF THE NEWS MEDIA 2013: AN ANNUAL REPORT ON AMERICAN JOURNALISM, Audio Data (2013), *available at* http://stateofthemedia.org/; *see also* The PEW RESEARCH CENTER'S PROJECT FOR EXCELLENCE IN JOURNALISM, THE STATE OF THE NEWS MEDIA 2012: AN ANNUAL REPORT ON AMERICAN JOURNALISM, Audio Essay (2012) ("STATE OF THE NEWS MEDIA 2012"), *available at* http://stateofthemedia.org/overview-2012/ (finding that 93 percent of Americans age 12 or older listened to broadcast radio); *NPRM*, 26 FCC Rcd at 17514, ¶ 69 n.155.

[206] *See* Sirius XM Radio Inc., *SEC Form 10-Q for the Quarterly Period Ended March 31, 2012*, at 29 (stating that as of March 31, 2012, there were 22,297,420 total subscribers, compared to 20,564,028 as of March 31, 2011).

[207] TargetSpot, *TargetSpot Issues 2012 Digital Audio Benchmark and Trend Study* (press release), May 9, 2012 ("TargetSpot Press Release"); *Eighth Broadband Progress Report*, 27 FCC Rcd at 10369, 10387, ¶ 44, Table 17 (finding that approximately 19 million Americans lack access to fixed broadband meeting the 4 Mbps/1 Mbps speed benchmark and that the adoption rate for the U.S. as a whole for broadband connections of at least 3 Mbps/768 kbps is approximately 40.4 percent). It is not our position that broadband deployment and adoption must be universal before we will consider Internet-delivered audio programming to be a competitor in the local radio listening market; however, the current level of penetration of broadband service is certainly relevant when considering the extent to which this platform is a meaningful substitute for broadcast radio stations.

[208] TargetSpot Press Release; *see also* STATE OF THE NEWS MEDIA 2012 at Audio Essay ("Two-thirds of traditional radio listening occurs away from home, largely in automobiles."). We note that in-car options for accessing Internet-delivered audio programming are increasing. *See* STATE OF THE NEWS MEDIA 2012 at Audio Essay; *see also* NAB NPRM Reply at 20-21.

[209] *2002 Biennial Review Order*, 18 FCC Rcd at 13716, ¶ 246.

Therefore, we propose to continue to limit the relevant market for our local radio ownership rule to broadcast radio stations in local radio listening markets,[210] and we seek comment on this proposal.

84.     In addition, broadcast radio's consistently strong position in both local and national advertising markets appears to support our tentative finding that non-broadcast sources of audio programming are not significant competitors at this time. Broadcasters asserted that we should expand the relevant market for review, in part, because of competition for advertising revenue from non-broadcast audio sources; however, recent advertising data do not support this contention.[211] From 2008 through 2011, broadcast radio's local advertising revenue market share increased each year, reaching 16.6 percent in 2011.[212] In the national advertising market during that same time period, broadcast radio's market share remained stable (between 1.8 and 2.0 percent).[213] By contrast, satellite radio's advertising revenue market share in both the local and national markets did not exceed 0.1 percent.[214] And while "Internet advertising" has seen significant gains in advertising revenue market share both locally and nationally, evidence suggests that the revenue is not attributable in any significant portion to providers of Internet-delivered audio programming.[215] For example, in 2011, online-only audio programming providers were estimated to have earned approximately $295 million in advertising revenue.[216] By contrast, in 2011, the total broadcast radio advertising revenue market was projected at approximately $17.8 billion.[217] We seek comment on whether there have been any significant changes since these figures became available.

---

[210] We note that our proposal to limit the relevant market to broadcast radio stations in local radio listening markets is consistent with current DOJ precedent in evaluating proposed mergers involving broadcast radio stations. *See, e.g.,* Complaint at ¶ 9, *United States v. Cumulus Media Inc.*, No. 1:11CV01619 (D.D.C. Sept. 8, 2011) ("The relevant markets. . . are the sale of radio advertising time to advertisers targeting listeners in two separate Arbitron Metro Survey Areas ('MSAs') by radio stations in those MSAs."); *see also* DOJ February 20, 2014 *Ex Parte* Comments at 5, 8 (confirming that the relevant markets for antitrust review are the broadcast radio spot advertising market in the stations' specific geographic market); Timothy J. Brennan & Michael A. Crew, *Gross Substitutes vs. Marginal Substitutes: Implications for Market Definition in the Postal Sector, in* The Role of the Postal and Delivery Sector in a Digital Age 1-15 (Michael A. Crew & Timothy J. Brennan eds. 2013) (arguing that the loss of customers to a new technology does not necessarily mean that the new technology should be included in the market definition of the existing technology).

[211] *See, e.g.,* NAB NPRM Comments at 32-33.

[212] SNL KAGAN ADVERTISING FORECASTS 2011 at 25-26.

[213] *Id.*

[214] *Id.*

[215] *See id.* at 25, 79-87. In its analysis of Internet advertising, SNL Kagan breaks down the various types of Internet advertising by category (*e.g.*, display ads or search), including subcategories of display ads, such as social networks, online video, and other. *Id.* at 82. There is no category or subcategory associated with online audio. So while some portion of Internet advertising may be associated with online audio providers, the amount does not appear to be significant enough to warrant independent classification. Moreover, the stability of broadcast radio's advertising revenue market share suggests that the revenue associated with online audio is not having a significant impact, if any at all, on local broadcast radio stations.

[216] Suzanne Vranica & Ethan Smith, *Internet Radio Wants More Ad Dollars,* THE WALL STREET JOURNAL ONLINE, Dec. 22, 2011, http://online.wsj.com/article/SB10001424052970203686204577112981195732246.html (visited Jan. 30, 2014). Pandora, the Internet's most popular audio service, earned approximately $240 million in advertising revenue in its fiscal year ended January 31, 2012. Pandora Media, Inc., *SEC Form 10-K for the Annual Period Ended January 31, 2012,* at 40. Pandora acknowledges that it may have difficulty increasing its advertising revenue at the expense of local broadcasters, stating that "[a]dvertisers may be reluctant to migrate advertising dollars [from terrestrial broadcast stations] to our internet-based platform." *Id.* at 8.

[217] SNL KAGAN ADVERTISING FORECASTS 2011 at 132. We note that NAB conceded that local radio broadcasting revenues have improved in recent years, but it argued that there has been a "structural change in the audio

(continued....)

85. *Market Size Tiers*. The *NPRM* proposed to retain the current approach of setting numerical limits based on market size tiers and determining the market size based on the number of commercial and noncommercial radio stations in the local market.[218] We tentatively conclude that we should adopt these proposals and seek comment on this approach.

86. In the 2010 Quadrennial Review proceeding, no commenters objected to the proposal to retain the market size tiers approach. The Commission's experience in applying the local radio ownership rule supports retention of the existing framework in order to promote competition. Consistent with previous decisions, we tentatively find that setting numerical ownership limits based on market size tiers helps prevent the formation of market power in local radio markets by ensuring that one or a few station owners cannot "lock up" the limited available radio spectrum. We believe that the bright-line approach benefits transaction participants by expediting the processing of assignment/transfer of control applications and by providing clear guidance in terms of which transactions comply with the local radio ownership limits. We seek comment on whether the existing framework should continue to apply in the 2014 Quadrennial Review proceeding.

87. Some commenters sought modifications to the way in which the number of stations owned by a licensee is calculated within the existing tiers. For instance, Mid-West Family asserted that the current mechanism is inconsistent with *Prometheus I* because it counts each station as equal in an Arbitron-defined market and thus fails to take into account differences in coverage area, revenue, and audience share.[219] Mid-West Family suggested the Commission assign different values to stations based on station class (*e.g.*, Class C FM stations = 1 station; Class A FM stations = .5 station).[220] Alternatively, Mt. Wilson asserted that digital multicast streams should be counted toward the numerical limits where the station is using the multicast stream to broadcast a commonly owned out-of-market station.[221]

88. We tentatively decline to modify the current rule's method of calculating the number of stations a licensee owns. We seek comment on Mid-West Family's assessment that the *Prometheus I* decision mandates an adjustment, in light of the court's *Prometheus II* decision upholding the existing rule's methodology.[222] Our preliminary view is that adopting Mid-West Family's approach would permit potentially significant consolidation in local radio markets, which would be inconsistent with the rationale for our proposal, discussed in greater detail below, to retain the existing numerical ownership limits. Finally, we propose to reject Mt. Wilson's proposal. As discussed in greater detail below in the context of the AM/FM subcaps, digital radio is still a growing technology; there is no mandate requiring its adoption; and it has not yet achieved widespread deployment or consumer acceptance. Therefore, we

(Continued from previous page) ————————————————

marketplace" because overall revenues were below levels earned in 2005 and 2006 and are not expected to reach those levels until 2015. NAB NPRM Comments at 34 n.130. While total advertising revenue for local radio stations did decline from 2006-2009, with the most significant declines in 2008 and 2009, the evidence does not support the conclusion that this was a result of a unique change in the audio marketplace; instead, the total advertising market for all media experienced a significant contraction that was most likely the result of the global financial crisis that impacted nearly all markets. SNL KAGAN ADVERTISING FORECASTS 2011 at 20. Moreover, overall advertising revenues for the broadcast radio industry have steadily improved since 2010 and are predicted to grow through 2020. *Id.* at 20. However, we seek comment on whether any structural changes have occurred in the audio marketplace and, if so, whether to adjust our 2014 Quadrennial Review analysis to account for such changes.

[218] *NPRM*, 26 FCC Rcd at 17514-15, ¶¶ 70-71.

[219] Mid-West Family NPRM Comments at 10.

[220] *Id.* at 10-13.

[221] Mt. Wilson NPRM Comments at 9-11.

[222] *See Prometheus II*, 652 F.3d at 462-63.

tentatively find that it is premature to amend our local radio ownership rule as a result of digital technology, and we seek comment on this approach.[223]

89.     *Numerical Limits*.  The *NPRM* proposed to retain the existing numerical limits.[224]  As discussed above, many commenters in the 2010 Quadrennial Review proceeding supported the Commission's proposal to retain its existing limits, while other commenters argued in favor of loosening or tightening the existing limits.[225]  However, no commenters proposed specific numerical limits to replace the existing limits.  For the reasons discussed below, we propose to adopt the tentative conclusion in the *NPRM* to retain the existing numerical ownership limits for each existing market size tier.

90.     In the *2006 Quadrennial Review Order*, the Commission rejected calls to relax the numerical ownership limits, finding instead that retaining the existing limits was necessary to protect against excessive market concentration.[226]  The Commission noted that, following the relaxation of the local radio ownership limits by Congress in the 1996 Act, there had been substantial consolidation of radio ownership both nationally and locally.[227]  Evidence in the record demonstrated that, in local markets, the largest firms often dominated the market in terms of audience and revenue share.[228]  The Commission ultimately concluded not only that the existing limits were not unduly restrictive, but also that permitting additional consolidation would not be in the public interest.[229]  The *Prometheus II* court upheld the Commission's decision.[230]

91.     The Commission determined also in the *2006 Quadrennial Review Order* that tightening the radio ownership limits was not justified based on the record.[231]  The Commission held that tightening the ownership limits would be inconsistent with Congress's decision to relax the limits in the 1996 Act and would ignore the financial stability that consolidation brought to the radio industry.[232]  In addition, the Commission determined that tightening the rule would require significant divestitures that would disrupt the radio marketplace and could undermine the ability of local stations to provide quality programming to their local markets.[233]  While acknowledging that grandfathering was an option to avoid the disruptive

---

[223] *See infra* ¶ 103.

[224] *NPRM*, 26 FCC Rcd at 17515, ¶ 72.  In addition, the *NPRM* sought comment on Clear Channel's proposal to allow increased ownership in larger markets by creating additional tiers.  *Id.* at 17515, ¶ 73.  Clear Channel suggested an increase from eight to ten in the number of stations a single entity may own in markets with between 55 and 64 stations and from eight to twelve in the number of stations that a single entity may own in markets with 65 or more stations.  Clear Channel NOI Comments at 33.  No party provided comments on this proposal and, as discussed below, we tentatively find that the record supports retaining the existing numerical limits (*i.e.*, the existing number of tiers and the numerical limits associated with each); therefore, we tentatively decline to adopt the new ownership tiers proposed by Clear Channel.

[225] *See supra* ¶¶ 77-78

[226] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2072, ¶ 118.

[227] *Id.* at 2072-73, ¶ 118

[228] *Id.* at 2073, ¶ 118.

[229] *Id.* at 2073-74, ¶ 118.

[230] *Prometheus II*, 652 F.3d at 462.

[231] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2074, ¶ 119.

[232] *Id.* at 2072, 2074, ¶¶ 117, 119.

[233] *Id.* at 2074, ¶ 120.

impact of divestitures, the Commission determined that grandfathering in this instance would not be in the public interest.[234]

92.     Based on the 2010 Quadrennial Review record, we tentatively find that the competitive conditions in the radio marketplace that supported the Commission's decision to retain the existing numerical limits in the *2006 Quadrennial Review Order* are essentially unchanged.[235] Evidence from 2012 shows that in local markets, the largest commercial firms continue to enjoy substantial advantages in revenue share — on average, the largest firm in each Arbitron Metro market has a 45 percent share of the market's total radio advertising revenue, with the largest two firms accounting for 73 percent of the revenue.[236] In more than a third of all Arbitron Metro markets, the top two commercial station owners control at least 80 percent of the radio advertising revenue.[237] With respect to ratings, the top-four firms continue to dominate audience share.[238] Therefore, we do not believe the public interest would be served by relaxing the existing numerical limits. We seek comment on whether there are any more recent data that point toward a different conclusion.

93.     We note also that the record in the 2010 Quadrennial Review proceeding does not reflect changes in the marketplace that warrant reconsideration of the Commission's previous decision not to

---

[234] *Id.* at 2074-75, ¶ 121; *but see 2002 Biennial Review Order*, 18 FCC Rcd at 13808-09, ¶¶ 484-86 (finding in favor of grandfathering under the circumstances presented in that proceeding following modification of the local radio ownership rule).

[235] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2073, ¶ 118. According to BIA data, the number of commercial station owners nationally has decreased approximately 39 percent between 1996 and 2012 — the same decrease reported in the *2006 Quadrennial Review Order* — though the rate of consolidation has slowed in recent years. *See* BIA/Kelsey, BIA Media Access Pro 4.6 Radio Database as of March 1, 2012 (evaluation of national ownership data for the 1996 through 2012 time period); *see also NOI*, 25 FCC Rcd at 6087-88, ¶ 4; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2073, ¶ 118 ("The number of commercial radio station owners declined by 39 percent between 1996 and 2007, with most of the decline occurring during the first few years after the 1996 Act.").

[236] *See* BIA/Kelsey, BIA Media Access Pro 4.6 Radio Database as of March 31, 2012 ("BIA Media Access Pro Database March 31, 2012") (evaluation of advertising revenue market share data for all Arbitron Metro markets).

[237] According to BIA data, in the 50 largest markets, on average, the top two firms account for 60 percent of radio advertising revenue in the market; in the 100 smallest markets, on average, the top two firms account for 79 percent of market revenue. *See id.* (evaluation of advertising revenue market share data for all Arbitron Metro markets). Additionally, we note that the Commission previously found that consolidation had resulted also in an "appreciable, albeit small" increase in radio advertising rates. *2006 Quadrennial Review Order*, 23 FCC Rcd at 2073, ¶ 118. Consistent with the tentative conclusion in the *NPRM*, we propose to focus on competition in the radio listening market, the market that has a direct impact on listeners. *NPRM*, 26 FCC Rcd at 17514, ¶ 68 n.153. We note, however, that current advertising data support the Commission's finding in the *2006 Quadrennial Review Order*, upheld by the court in *Prometheus II*, that consolidation in the radio market leads to an increase in advertising rates. According to SQAD data, since the 1996 Act was passed through June 2011, the cost of radio advertising nearly doubled. *See* SQAD, SQAD Spot Radio Database as of June 26, 2012 (monthly advertising sales data across all markets from February 1996 through June 2011). By contrast, data from the Bureau of Labor Statistics show that the consumer price index ("CPI") increased 43 percent during the same time period. *See* Bureau of Labor Statistics, *Consumer Price Index*, http://www.bls.gov/cpi/ (All Items Indexes from February 1996 through June 2011) (visited Jan. 30, 2014). Stated differently, the CPI increased approximately 3 percent per year during this time period, while the annual growth rate in radio prices was approximately 6.5 percent.

[238] Ownership concentration among the top-four firms in a market is very high, which provides these firms with a significant advantage in attracting audience share. BIA data indicate that the four firm market concentration ratios (*i.e.*, the percentage of audience share attributed to the four largest firms in the market) average 94 percent in smaller markets and 84 percent in the 50 largest markets. *See* BIA Media Access Pro Database March 31, 2012 (evaluation of ratings share data for all Arbitron Metro markets).

make the limits more restrictive, as some commenters recommended.[239] We believe that tightening the restrictions would disregard the previously identified benefits of consolidation in the radio industry and would be inconsistent with the 1996 Act.[240] Further, tightening the rule would require divestitures that we believe would be disruptive to the radio industry and would upset the settled expectations of individual owners. We seek comment on whether any benefits derived from tightening the limits would outweigh these countervailing considerations.[241] In addition, we seek comment on our continued belief that, for the reasons stated in the *2006 Quadrennial Review Order*, tightening the limits while grandfathering existing combinations would not be in the public interest and should be avoided.[242]

94. *Clarification of Application of Local Radio Ownership Rule.* In the *2002 Biennial Review Order*, the Commission adopted the current standard of using Arbitron Metro areas, where available, for the application of the numerical radio ownership limits.[243] At that time, the Commission also adopted certain procedures and safeguards designed to guide the implementation of the revised local radio ownership rule and to deter parties from attempting to circumvent the rule through the manipulation of Arbitron market definitions.[244] Years of experience applying the current approach suggest certain aspects of the current standard that we believe merit clarification or further action to fulfill the intent of the *2002 Biennial Review Order*.[245]

---

[239] *See* Mt. Wilson NPRM Comments at 4-5; musicFIRST Coalition NPRM Comments at 1-2; NHMC *et al.* NPRM Comments at 4; UCC *et al.* NPRM Comments at 28.

[240] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2074, ¶ 119 (acknowledging the "benefits that consolidation has brought to the financial stability of the radio industry").

[241] *See, e.g.*, musicFIRST Coalition NPRM Comments at 1-2 (arguing that tightening the limits would promote program diversity); NHMC *et al.* NPRM Comments at 4 (arguing that tightening the limits would promote diverse ownership); UCC *et al.* NPRM Comments at 28-29 (arguing that tightening the limits would promote minority and female ownership opportunities, particularly if grandfathering is prohibited).

[242] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2074-75, ¶ 121 (finding that grandfathering would exacerbate competitive imbalances enjoyed by existing group owners and would disfavor those that would be prevented from assembling competing combinations under more restrictive ownership limits). The *2006 Quadrennial Review Order* stated that, "[a]lthough the Commission previously chose to grandfather existing station combinations based on countervailing considerations, we find that doing so now is not in the public interest." *Id.* (internal citations omitted).

[243] *2002 Biennial Review Order*, 18 FCC Rcd at 13725-28, ¶¶ 275-81.

[244] *See, e.g., id.* at 13726, ¶ 278.

[245] Multiple parties raised other issues in the 2010 Quadrennial Review proceeding that we tentatively decline to address specifically herein. Mid-West Family requested changes to the grandfathering rules regarding transfers of control due to death or other departure of shareholders/partners of closely held businesses, asserting that such transfers of control should be treated the same as transfers that occur pursuant to a will or intestacy. Mid-West Family NPRM Comments at 4-10. In addition, UCC *et al.* argued that the Commission should consider reversing its decision in the *2002 Biennial Review Order* to grandfather certain radio station combinations, particularly in light of the elimination of the eligible entity exception, which they asserted could present ownership opportunities for minorities and women. UCC *et al.* NPRM Comments at 28-29; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13810-12, ¶¶ 488-90 (discussing the eligible entity exception to the grandfathering provisions). By contrast, Frandsen argued that the Commission should permit the sale of grandfathered clusters to any party. Frandsen NPRM Comments at 4-5. We tentatively decline at this time to address the issues raised by Mid-West Family, UCC *et al.*, and Frandsen. As we have proposed to retain the existing numerical limits, we see no reason at this time to reverse or expand the grandfathering policies that apply to existing combinations. We have previously found Mid-West Family's requested relief to be outside the scope of the quadrennial review proceeding. *2006 Quadrennial Review Order* at 2082, ¶ 138 n.434. Moreover, as discussed in Section IV.C.1, *infra*, we have proposed to reinstate the eligible entity exception. We seek comment on these tentative conclusions.

95.     The *2002 Biennial Review Order* prohibits a party from receiving the benefit of a change in Arbitron Metro boundaries or "home" market designation unless that change has been in place for at least two years (or, in the case of a "home" designation change, the station's community of license is within the Metro).[246] The Commission does not apply the two-year waiting period to Arbitron Metro changes resulting from a Commission-approved change in community of license to an area outside the Metro's boundaries.[247] We propose to clarify that the exception to the waiting period for Commission-approved changes applies only where the community of license change also involves the physical relocation of the station facilities to a site outside the relevant Arbitron Metro market boundaries. Otherwise, the licensee of a station currently located in an Arbitron Metro could use the exception to reduce the number of its stations listed as "home" to that Metro, without triggering the two-year waiting period and without any change in physical coverage or market competition, merely by specifying a new community of license located outside the Metro. Thus, this clarification safeguards the local radio ownership limits from manipulation based on Arbitron market definition. We seek comment on this proposed clarification.

96.     Note 4 to section 73.3555 of the Commission's rules ("Note 4") grandfathers existing station combinations that do not comply with the numerical ownership limits of section 73.3555(a). Certain circumstances, however, require applicants to come into compliance with the numerical ownership limits despite the fact that the relevant station may have been part of an existing grandfathered cluster. One such circumstance is a community of license change, which occasionally can lead to difficulty in the case where an applicant with a grandfathered cluster of stations seeks to move a station's community of license outside the relevant Arbitron Metro. Given that the Commission relies on BIA for market designations, such an applicant may be prevented from demonstrating compliance with the multiple ownership limits because the station proposing to change its community will continue to be listed by BIA as "home" to the Metro until the community of license change has taken place. To resolve this practical issue, we tentatively propose to allow a temporary waiver of the radio multiple ownership limits for three months in this limited instance to allow BIA sufficient time to change the affected station's "home" designation following a community of license relocation. We also propose to exempt from the requirements of Note 4 "intra-Metro" community of license changes — from one community to another within the same Arbitron Metro. We tentatively find that, in the majority of cases, such a move will have little or no impact on the state of competition within the local market. We seek comment on these proposed adjustments to the operation of Note 4.

97.     In its comments in the 2010 Quadrennial Review proceeding, ARSO renewed its longstanding request that the Commission redefine local radio markets for Puerto Rico.[248] ARSO argues that Arbitron's definition of the entire island of Puerto Rico as a single Arbitron Metro market does not accurately reflect market and geographic realities, which prevent stations from competing island-wide. ARSO requests that we:  (1) redefine the local radio markets in Puerto Rico using the eight Metropolitan Statistical Areas defined by the Office of Management and Budget ("OMB"); or (2) redefine the local radio markets using the three Combined Statistical Areas defined by OMB; or (3) treat Puerto Rico as a non-Arbitron Metro area and redefine its local markets using contour-overlap methodology. The Commission has consistently waived the Arbitron Metro definition for applicants in Puerto Rico and employed the contour-overlap methodology in the course of implementing the *2002 Biennial Review Order*.[249] The Commission has previously stated that it would address ARSO's request for relief in a

---

[246] *2002 Biennial Review Order*, 18 FCC Rcd at 13726, ¶ 278.

[247] *See, e.g., Instructions to FCC 314*, Worksheet 3, at 3 (Oct. 2012), *available at* http://transition.fcc.gov/Forms/Form314/314.pdf.

[248] ARSO NPRM Comments at 4; *see also* ARSO's Petition for Reconsideration of the *2002 Biennial Review Order* filed on September 3, 2003, in Dockets 02-277, 01-235, 01-317, 00-244, and 03-130.

[249] *See, e.g., WTOK-FM, San Juan, Puerto Rico*, Letter, 28 FCC Rcd 2860 (Med. Bur. 2013).

future proceeding.[250] We seek comment on ARSO's suggestions and on the effectiveness of the Commission's prior waivers of the definition in this context.

98. *AM/FM Subcaps.* The *NPRM* proposed to retain the existing AM/FM subcaps, finding that the rationales for doing so set forth in the *2006 Quadrennial Review Order* were still valid, namely to promote new entry and to account for the technological and marketplace differences between AM and FM stations and thereby promote competition.[251] In addition, the *NPRM* sought comment on the impact of the digital radio transition on the AM/FM subcaps, as well as issues regarding the aggregation of multiple AM stations to provide signal coverage in large geographic areas or in areas with mountainous terrain. Consistent with the proposal in the *NPRM*, we tentatively find that there have not been significant changes in the broadcast radio marketplace with respect to the rationale for maintaining the AM/FM subcaps since the conclusion of our 2006 Quadrennial Review proceeding, and we propose to retain the existing AM/FM subcaps for the reasons set forth in the *2006 Quadrennial Review Order.*[252] We seek comment on this approach.

99. In the 2010 Quadrennial Review proceeding, Mt. Wilson asserted that the subcaps should be tightened, in conjunction with tightening the numerical ownership limits, in order to promote the Commission's policy goals.[253] A2IM and FMC supported our tentative conclusion to retain the AM/FM subcaps. They asserted that the AM band, in particular, is a critical point of new entry in the marketplace, particularly for minorities and women, and that further consolidation resulting from elimination of the subcaps could negatively impact minority and female ownership of broadcast radio stations.[254] In addition, these commenters objected to eliminating the subcaps in order to permit broadcasters to rebroadcast programming in a local market.[255] A2IM asserted also that additional consolidation in the FM band could lead to a lack of local and diverse radio content.[256] NAB disputed this assertion, arguing that common ownership may provide greater content diversity.[257]

100. Many broadcast commenters, however, supported eliminating the AM/FM subcaps. They asserted that the caps are no longer necessary to address any technological and marketplace disparities between AM and FM stations, as a result of the increased competitiveness of AM stations in local markets, the growth of digital radio technologies, Internet streaming, and changes to the FM translator rules.[258] In addition, NAB disputed the tentative conclusion that the subcaps promote new entry, asserting instead that elimination of the subcaps could spur market activity that leads to divested properties that could be purchased by new entrants, including small businesses and minority and women-owned businesses.[259] NAB asserted also that eliminating the subcaps could lead to growth of financially

---

[250] *See, e.g., 2006 Quadrennial Review Order,* 23 FCC Rcd at 2080-81, ¶ 136 n.427.

[251] *NPRM,* 26 FCC Rcd at 17516, ¶ 77.

[252] *2006 Quadrennial Review Order,* 23 FCC Rcd at 2078-80, ¶¶ 130-34.

[253] Mt. Wilson NPRM Comments at 2-7.

[254] A2IM NPRM Comments at 3; FMC NPRM Comments at 6.

[255] A2IM NPRM Comments at 3; FMC NPRM Comments at 6.

[256] A2IM NPRM Comments at 3.

[257] NAB NPRM Reply at 23 n.89.

[258] ARSO NPRM Comments at 5; CBS NPRM Comments at 19; Clear Channel NOI Comments at 39-42; Frandsen NPRM Comments at 5-6; NAB NPRM Comments at 38-39. Consistent with our proposal to exclude Internet delivery of audio programming from the relevant market, we tentatively find that it is not yet appropriate to consider the impact of Internet streaming of local radio stations on our AM/FM subcaps. *See supra* ¶¶ 82-83.

[259] NAB NPRM Comments at 39.

viable AM clusters that could provide programming for traditionally underserved demographic groups.[260] According to NAB and Frandsen, eliminating the subcaps would provide flexibility to licensees to structure their station groups based on market-specific conditions without increasing the number of stations an entity may own.[261]

101.    We tentatively agree with the commenters in the 2010 Quadrennial Review proceeding that supported retention of the AM subcaps in order to promote new entry.[262]  Consistent with Commission precedent, we believe that broadcast radio, in general, continues to be a more likely avenue for new entry in the media marketplace — including entry by small businesses and entities seeking to serve niche audiences — as a result of radio's ability to more easily reach certain demographic groups and the relative affordability of radio stations compared to other mass media.[263]  AM stations are generally the least expensive option for entry into the radio market, often by a significant margin, and therefore permit new entry for far less capital investment than is required to purchase an FM station.[264]  While some commenters suggested that eliminating the subcaps could result in divestiture of properties that could be acquired by new entrants, we tentatively find that this speculative rationale is not persuasive.  Therefore, consistent with Commission precedent, we believe that the public interest is best served by retaining the existing AM subcaps, which would continue to further competition, and possibly also viewpoint diversity, by promoting new entry.[265]  We seek comment on this issue and invite commenters to provide any new relevant information that has become available since the *NPRM*.

102.    In addition, we tentatively find that there continue to be technical and marketplace differences between AM and FM stations that justify retention of both the AM and FM subcaps in order to promote competition in local radio markets.  As the Commission has noted previously, FM stations enjoy unique technical advantages over AM stations, such as increased bandwidth and superior audio signal fidelity.[266]  In addition, AM signal propagation varies with the time of day (*i.e.*, AM signals travel much farther at night than during the day), and many AM stations are required to cease operation at sunset.  These technological differences often, but not always, result in greater listenership and revenues for FM stations.

103.    While the Commission has previously stated that digital radio technology may help AM stations to level the playing field with FM stations, we tentatively find that this is not yet the case.[267]  Deployment of digital radio technology for both AM and FM stations is limited and has not changed

---

[260] *Id.*; *see also* Frandsen NPRM Comments at 6 (asserting that eliminating the subcaps could make AM station clusters stronger competitors).

[261] Frandsen NPRM Comments at 6; NAB NPRM Comments at 39.

[262] *See* A2IM NPRM Comments at 3; FMC NPRM Comments at 6.

[263] *See, e.g.*, *2006 Quadrennial Review Order*, 23 FCC Rcd at 2079-80, ¶ 133; *2002 Biennial Review Order*, 18 FCC Rcd at 13739, ¶ 306.  Examination of FCC Form 323 ownership data for 2011 supports this finding, as minority and female ownership of radio stations far exceeds that of television stations.  *See generally 2012 323 Report*, 27 FCC Rcd 13814.

[264] For example, from 2008 through 2010, AM stations in Classes C and D had the lowest average station sales price (*e.g.*, $310,000 per station for AM Classes C and D in 2010, compared to $520,000 for the cheapest FM option – Class C3), with the average AM station generally selling for far less than the average FM station.  SNL KAGAN, RADIO STATION DEALS DATABOOK 137 (2011).

[265] *See, e.g.*, *2006 Quadrennial Review Order*, 23 FCC Rcd at 2079-80, ¶ 133 (finding that "[n]ew entry promotes outlet diversity, which in turn enhances diversity and the public interest"); *but see infra* ¶¶ 145-148 (seeking comment on the Commission's tentative finding that radio stations are not among the primary outlets that contribute to viewpoint diversity in local markets).

[266] *See, e.g.*, *id.* at 2080, ¶ 134; *2002 Biennial Review Order*, 18 FCC Rcd at 13733-34, ¶ 294.

[267] *See, e.g.*, *2002 Biennial Review Order*, 18 FCC Rcd at 13734, ¶ 294 n.628.

significantly in recent years.[268]  In addition, we believe it is important to consider consumer adoption when evaluating the impact of digital radio on the technological and marketplace differences between AM and FM stations.  AM stations will not be able to realize the potential competitive benefits of transitioning to digital if listeners are largely unable to receive the digital broadcasts.  Recent digital radio deployment data suggest that FM stations may actually be increasing the technological divide through greater adoption rates of digital radio technology.[269]  Furthermore, consumers have been slow to adopt radios capable of receiving digital signals, though consumer awareness of the technology is relatively high and there are efforts to increase the availability of such radios, particularly as standard or optional equipment in many new car models.[270]  We propose to continue to monitor the impact of the digital radio transition in future media ownership proceedings.  We seek comment on this approach.

104.    Furthermore, we tentatively find that the recent changes to the FM translator rules, "to allow AM stations to use currently authorized FM translator stations to retransmit their AM service within their AM stations' current coverage areas" have not yet significantly impacted the technological and marketplace differences between AM and FM stations.[271]  While this change has been beneficial for many AM stations, many more AM stations have not availed themselves of the opportunity and/or lack the ability to do so.  Consequently, we believe that FM stations generally continue to enjoy significant advantages over AM stations.[272]  We propose to continue to monitor the impact of this change in future media ownership proceedings, and we seek comment on this approach.[273]

---

[268] *See* STATE OF THE NEWS MEDIA 2012 at Audio Essay (finding that 17 radio stations added digital signals in 2011, compared to 21 radio stations in 2010).

[269] Based on staff analysis of Consolidated Database System ("CDBS") license data as of May 10, 2012, and broadcast station totals as of March 31, 2012, of the 10,267 licensed FM stations (commercial and educational), 1,704 have notified the Commission that they have commenced digital operations (approximately 16.6 percent), while only 299 of the 4,762 licensed AM stations have filed such notifications (approximately 6.3 percent).  *See Broadcast Station Totals as of March 31, 2012*, Press Release (MB, rel. Apr. 12, 2012), *available at* http://transition.fcc.gov/Daily_Releases/Daily_Business/2012/db0412/DOC-313533A1.pdf.

[270] *See* STATE OF THE NEWS MEDIA 2012 at Audio Essay; iBiquity Digital Corp., *HD Radio™ Technology Continues Momentum with Additional Automakers Committed, More Vehicles and Increased Standardization* (press release), Jan. 11, 2012; iBiquity Digital Corp., *MEDIA ALERT:  America's Best Selling Car To Offer HD Radio™ Technology* (press release), Aug. 24, 2011.

[271] *Amendment of Service and Eligibility Rules for FM Broadcast Translator Stations*, MB Docket No. 07-172, Report and Order, 24 FCC Rcd 9642, 9642, ¶ 1 (2009); *see also Creation of a Low Power Radio Service and Amendment of Service and Eligibility Rules for FM Broadcast Translator Stations*, MM Docket No. 99-25, Fourth Report and Order and Third Order on Reconsideration, 27 FCC Rcd 3364, 3394-95, ¶¶ 66-70 (2012) (modifying date restriction on cross-service translators to include any additional new FM translator stations authorized from the 2003 filing window).

[272] We note that we did not receive significant comments addressing the issue that, in the absence of subcap restrictions, AM station owners could acquire additional AM stations to address signal coverage issues. *See, e.g.,* Entercom NOI Reply at 2.  No party made a compelling case as to why the changes to the FM translator rules were insufficient to address these specific signal coverage concerns.  Moreover, even if such a case could be made, we believe that the harms to competition and viewpoint diversity discussed herein that would result from eliminating the AM subcaps outweigh any benefits associated with the ability to increase signal coverage in certain markets through greater consolidation of AM stations.

[273] The Commission has recently initiated a proceeding to explore ways to revitalize the AM band.  *See Revitalization of the AM Radio Service*, MB Docket No. 13-249, Notice of Proposed Rulemaking, 28 FCC Rcd 15221 (2013).  Similarly, we propose to monitor that proceeding for any future impact on the AM marketplace that may warrant consideration in our media ownership proceedings.  We seek comment on any present implications of these revitalization efforts for the 2014 Quadrennial Review.

105.     Finally, while the technological and marketplace differences between AM and FM stations generally benefit FM stations, and thus support retention of the FM subcaps, there continue to be many markets in which AM stations are "significant radio voices."[274]  For example, a study provided by Clear Channel found that throughout the 300 Arbitron Metro markets, there are 187 AM stations ranked in the top five in terms of all-day audience share.[275]  And according to NAB, AM stations are among the top revenue earners in some of the largest radio markets (e.g., New York, Chicago, and Los Angeles).[276]  Therefore, we tentatively find that retention of the existing AM subcaps is necessary to prevent a single station owner from acquiring excessive market power through concentration of ownership of AM stations in markets in which AM stations are significant radio voices.

106.     In addition, as discussed above, we tentatively conclude that it is not in the public interest to tighten the numerical ownership limits; therefore, we see no need to reassess the subcaps associated with each numerical tier, as proposed by Mt. Wilson.[277]  Indeed, tightening the subcaps absent a concurrent tightening of the numerical ownership limits would result in an internal inconsistency in the rule, as an entity would be unable to own all the stations otherwise permitted under certain numerical tiers.  For example, in markets with 30-44 stations, an entity currently may own up to seven stations, provided that no more than four of the stations are in the same service.  If the subcap was tightened to three stations in the same service, an entity could then only own up to six stations, even though the rule's premise is that the public interest is best served by permitting ownership of up to seven stations in this particular market.  We seek comment on whether there is any reason we should adopt different subcaps despite this potential inconsistency.

107.     *Market Size Waivers.*  Though the *NPRM* sought comment on whether to adopt a specific waiver standard, no commenter proposed such a standard in the 2010 Quadrennial Review proceeding.  We tentatively decline to adopt a specific waiver standard for the local radio ownership rule.  We seek comment on whether it is sufficient that, consistent with Commission precedent, parties that wish to seek a waiver of the local radio ownership rule may do so pursuant to the general waiver standard under section 1.3 of the Commission's rules.[278]

---

[274] *Prometheus II*, 652 F.3d at 463.

[275] Clear Channel NOI Comments at 39 (citing Mark Fratrik, The Importance of AM Stations in Local Radio Markets 2 (June 30, 2010) (Attachment D of Clear Channel NOI Comments)); *see also* NAB NPRM Comments at 38 (citing Clear Channel NOI Comments).  These data do not, however, demonstrate that there is no longer any competitive difference between AM and FM stations, as Clear Channel and NAB contended.  Across all 300 Arbitron Metro markets, there are 1,500 total stations that would be ranked in the top five (discounting any potential ties for the number five ranking), which means that AM stations account for approximately 12.5 percent of the top five stations in these markets.  FM stations clearly continue to enjoy an overall competitive advantage over AM stations.  In addition, we note that, since the study submitted by Clear Channel was completed, the number of Arbitron Metro markets has decreased to 274.

[276] In an effort to dispute the Commission's finding that AM stations are generally at a competitive disadvantage relative to FM stations, NAB provided 2010 BIA data showing that five of the top ten stations in the country in terms of revenue are AM stations.  NAB NPRM Comments at 38 (citing BIA Media Access Pro data provided at Attachment H of NAB NPRM Comments).  However, review of only the top ten stations provides an incomplete picture of the competitive landscape.  For example, when 2010 BIA revenue data are analyzed for the top 50 stations, only 16 are AM stations, and only 25 of the top 100 stations are AM stations.  *See* BIA/Kelsey, BIA Media Access Pro 4.6 Radio Database as of May 10, 2012 (evaluation of 2010 revenue data).  Far from demonstrating that FM stations do not enjoy a competitive advantage over AM stations, the BIA data confirm it.  The data also confirm that AM stations are significant voices in some radio markets, including some of the largest markets.

[277] Mt. Wilson NPRM Comments at 2-7.

[278] *See, e.g., 2002 Biennial Review Order*, 18 FCC Rcd at 13746-47, ¶ 326; *see also* 47 C.F.R. § 1.3.

108.    *Minority and Female Ownership.*  The Commission sought comment on how the radio rule affects minority and female ownership opportunities, including specific comment on the results of Media Ownership Study 7, which analyzes the relationship between ownership structure and the provision of radio programming targeted to African-American and Hispanic audiences.[279]  We tentatively find that the radio ownership rule proposed in this FNPRM is consistent with our goal to promote minority and female ownership of broadcast radio stations.  We seek comment on this tentative conclusion.

109.    In the 2010 Quadrennial Review proceeding, public interest commenters asserted that minorities and women continue to be underrepresented in broadcast radio ownership.[280]  They urged the Commission to avoid loosening the radio ownership limits, as additional consolidation could reduce the already low levels of minority and female ownership of broadcast radio stations, and to take steps to increase minority and female ownership.[281]  A2IM and FMC asserted also that the AM/FM subcaps should be retained because they promote new entry, particularly for minorities and women.[282]

110.    DCS supported the findings of Media Ownership Study 7 regarding programming preferences for minority audiences, as compared to the listening preferences of the White population, and the positive relationship between minority ownership of radio stations and the total amount of minority radio programming available in the market.[283]  These findings, according to DCS, suggest that minority audiences benefit from increased minority ownership of radio stations, which supports the Commission's goal to promote minority media ownership.[284]  In addition, NHMC *et al.* argued that station ownership impacts the issues covered by a station and the way in which those issues are covered.[285]  They asserted that because station ownership does not generally reflect the diversity of local communities, radio programming inadequately represents issues of importance to minorities and rural Americans.[286]  Therefore, they concluded that the Commission should adopt rules to promote diverse radio ownership, including tightening the numerical ownership limits.[287]

111.    As noted above, we tentatively find that retaining the existing competition-based numerical limits would indirectly promote our viewpoint diversity goal, in part by preserving ownership opportunities for new entrants, including minority- and female-owned businesses.  Moreover, part of the rationale for our proposal to retain the AM/FM subcaps is to promote new entry, particularly in the AM band, which has historically provided low-cost ownership opportunities for new entrants, including minorities and women.

---

[279] *See NPRM*, 26 FCC Rcd at 17563-54, ¶ 193 (discussing the findings of Media Ownership Study 7 with respect to minority and female ownership and seeking comment on the same); *see also 2012 323 Report Comments PN* (requesting comment on the ownership data in the *2012 323 Report*).

[280] AWM NPRM Comments at 3; DCS NPRM Comments at 7; Free Press NPRM Comments at 20-21; LCCHR NPRM Comments at 2.

[281] *See* AWM NPRM Comments at 3; DCS NPRM Comments at 7; FMC NPRM Comments at 4; Free Press NPRM Comments at 20-21; LCCHR NPRM Comments at 2-4.

[282] A2IM NPRM Comments at 3; FMC NPRM Comments at 6.

[283] DCS NPRM Comments at 6-7; *see also NPRM*, 26 FCC Rcd at 17518, ¶ 83 ("Acknowledging that Black and Hispanic listeners have different viewing preferences from the . . . White population, the data suggest that there is a positive relationship between minority ownership of radio stations and the total amount of minority radio programming available in the market."); Media Ownership Study 7 at 13, 24.

[284] DCS NPRM Comments at 7-8.

[285] NHMC *et al.* NPRM Comments at 2-3.

[286] *Id.*

[287] *See id.* at 3-5.

112.    We tentatively decline to tighten the local radio rule's ownership limits in order to promote increased minority and female ownership, as some recommend.  While we remain committed to promoting minority and female ownership, it is one of many — sometimes competing — goals that we must balance when setting our numerical ownership limits.  As discussed above, we believe that tightening the local radio rule's ownership limits would ignore the benefits of consolidation in the radio industry and therefore be inconsistent with the 1996 Act.[288]  Furthermore, we believe that tightening the local radio rule would require divestitures that would be disruptive to the radio industry.[289]  In addition, while we do not propose to retain the rule specifically to preserve the current levels of minority and female ownership, we tentatively find that retaining the existing rule effectively would address the concerns of those commenters who suggest that additional consolidation would have a negative impact on minority and female ownership of broadcast radio stations.  Ultimately, we tentatively find that, based on the record in the 2010 Quadrennial Review proceeding, the current competition-based limits reflect an appropriate balance of our policy goals and that retaining these limits would serve the public interest and simultaneously promote viewpoint diversity.  We seek comment on our tentative conclusions and invite commenters to provide any evidence bearing on this issue that has become available since the *NPRM*.

### C.    Newspaper/Broadcast Cross-Ownership Rule

#### 1.    Introduction

113.    Since 1975, the newspaper/broadcast cross-ownership rule ("NBCO rule") has prohibited common ownership of a daily newspaper and a full-power broadcast station (AM, FM, or TV) if the station's service contour encompasses the newspaper's city of publication.[290]  This absolute ban on newspaper/broadcast cross-ownership remains in effect today despite the Commission's attempts over the last decade to modify the restriction.[291]  Most recently, in the *2006 Quadrennial Review Order*, the Commission adopted a revised standard whereby waiver requests for certain mergers in the top 20 Nielsen DMAs were granted a favorable presumption.[292]  The Third Circuit, however, vacated and

---

[288] *See supra* ¶ 91 (discussing the benefits of consolidation in the radio industry).

[289] *See supra* ¶ 93 (finding that divestiture would be required if the radio ownership limits were tightened because the public interest would not be served in these circumstances by grandfathering existing ownership combinations).

[290] *See 1975 Second Report and Order*, 50 FCC 2d at 1074-78, ¶¶ 99-107.

[291] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2018-57, ¶¶ 13-79 (adding a waiver provision to the NBCO rule, which the Third Circuit vacated and remanded in *Prometheus II*, 652 F.3d at 453); *2002 Biennial Review Order*, 18 FCC Rcd at 13747-67, 13790-807, ¶¶ 328-69, 432-81 (replacing the NBCO rule with cross-media limits, which were remanded by the Third Circuit in *Prometheus I*, 373 F.3d at 402-03).

[292] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2018-57, ¶¶ 13-79.  The rule adopted in the 2006 *Quadrennial Review Order* provided that:  "(1) No license for an AM, FM or TV broadcast station shall be granted to any party (including all parties under common control) if such party directly or indirectly owns, operates or controls a daily newspaper and the grant of such license will result in: (i) The predicted or measured 2 mV/m contour of an AM station, computed in accordance with § 73.183 or § 73.186, encompassing the entire community in which such newspaper is published; or (ii) The predicted 1 mV/m contour for an FM station, computed in accordance with § 73.313, encompassing the entire community in which such newspaper is published; or (iii) The Grade A contour of a TV station, computed in accordance with § 73.684, encompassing the entire community in which such newspaper is published. (2) Paragraph (d)(1) of this section shall not apply in cases where the Commission makes a finding pursuant to Section 310(d) of the Communications Act that the public interest, convenience, and necessity would be served by permitting an entity that owns, operates or controls a daily newspaper to own, operate or control an AM, FM, or TV broadcast station whose relevant contour encompasses the entire community in which such newspaper is published as set forth in paragraph (d)(1) of this section. (3) In making a finding under paragraph (d)(2) of this section, there shall be a presumption that it is not inconsistent with the public interest, convenience, and necessity for an entity to own, operate or control a daily newspaper in a top 20 Nielsen DMA and one commercial AM, FM or TV broadcast station whose relevant contour encompasses the entire community in which such newspaper is published as set forth in paragraph (d)(1) of this section, provided that, with respect to a combination including a

(continued....)

remanded the revisions on procedural grounds, finding that the Commission had failed to provide adequate public notice of its proposed rule pursuant to the APA.[293] Although the Court in *Prometheus I* affirmed the Commission's conclusion that an absolute ban is not necessary, the Court in *Prometheus II* did not reach the Commission's substantive modifications to the NBCO rule.[294]

114.     We continue to believe that some restriction on newspaper/broadcast cross-ownership is necessary to protect and promote viewpoint diversity in local markets.[295] We seek comment on that tentative conclusion. Our view is consistent with the Commission's longstanding rationale for the NBCO rule.[296] As the Commission recognized in the *2002 Biennial Review Order*, "[a] diverse and robust marketplace of ideas is the foundation of our democracy."[297] The Supreme Court has recognized the importance of the Commission's role in promoting viewpoint diversity, calling it a "basic tenet of national communications policy."[298]

115.     As discussed below, daily newspapers and local television stations (and their affiliated websites) continue to be the dominant providers of local news and information to which consumers

---

(Continued from previous page)

commercial TV station, (i) The station is not ranked among the top four TV stations in the DMA, based on the most recent all-day (9 a.m.–midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service; and (ii) At least 8 independently owned and operating major media voices would remain in the DMA in which the community of license of the TV station in question is located (for purposes of this provision major media voices include full-power TV broadcast stations and major newspapers). (4) In making a finding under paragraph (d)(2) of this section, there shall be a presumption that it is inconsistent with the public interest, convenience, and necessity for an entity to own, operate or control a daily newspaper and an AM, FM or TV broadcast station whose relevant contour encompasses the entire community in which such newspaper is published as set forth in paragraph (d)(1) of this section in a DMA other than the top 20 Nielsen DMAs or in any circumstance not covered under paragraph (d)(3) of this section. (5) In making a finding under paragraph (d)(2) of this section, the Commission shall consider: (i) Whether the combined entity will significantly increase the amount of local news in the market; (ii) Whether the newspaper and the broadcast outlets each will continue to employ its own staff and each will exercise its own independent news judgment; (iii) The level of concentration in the Nielsen Designated Market Area (DMA); and (iv) The financial condition of the newspaper or broadcast station, and if the newspaper or broadcast station is in financial distress, the proposed owner's commitment to invest significantly in newsroom operations. (6) In order to overcome the negative presumption set forth in paragraph (d)(4) of this section with respect to the combination of a major newspaper and a television station, the applicant must show by clear and convincing evidence that the co-owned major newspaper and station will increase the diversity of independent news outlets and increase competition among independent news sources in the market, and the factors set forth above in paragraph (d)(5) of this section will inform this decision. (7) The negative presumption set forth in paragraph (d)(4) of this section shall be reversed under the following two circumstances: (i) The newspaper or broadcast station is failed or failing; or (ii) The combination is with a broadcast station that was not offering local newscasts prior to the combination, and the station will initiate at least seven hours per week of local news programming after the combination." 47 C.F.R. § 73.3555(d).

[293] *Prometheus II*, 652 F.3d at 445, 453.

[294] *Prometheus I*, 373 F.3d at 398-400; *Prometheus II*, 652 F.3d at 445.

[295] The Commission has described viewpoint diversity as "the availability of media content reflecting a variety of perspectives." *2002 Biennial Review Order*, 18 FCC Rcd at 13627, ¶ 19.

[296] *1975 Second Report and Order*, 50 FCC 2d at 1074-78, ¶¶ 99-107.

[297] *2002 Biennial Review Order*, 18 FCC Rcd at 13627, ¶ 19.

[298] *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 663-64 (1994) ("*Turner I*") ("[T]he widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." (quoting *United States v. Midwest Video Corp.*, 406 U.S. 649, 668 n.27 (1972) (plurality opinion) (quoting *Associated Press v. United States*, 326 U.S. 1, 20 (1945)))). The Court stated that "assuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Turner I*, 512 U.S. at 663.

turn.[299]  Evidence in the 2010 Quadrennial Review proceeding does not suggest that the Internet, for all its ability to make infinite sources of information immediately and globally accessible, has yet tilted that balance.[300]  Thus, the "diverse and antagonistic sources" that the NBCO rule historically has protected — daily newspapers and local television stations — are still the primary outlets of local news and information that consumers use.  Comments in the current record touting the localism benefits of newspaper/broadcast cross-ownership or claiming a competitive need for traditional media to achieve economies of scale in today's marketplace, while providing a fuller understanding of the newsgathering efficiencies of cross-owned properties and the current financial challenges facing traditional media, were not substantially different from those made in previous reviews, and we do not believe they diminish the viewpoint diversity rationale for the rule.[301]  Moreover, the efficiencies that may be gained from newspaper/broadcast combinations do not necessarily lead to gains in localism.[302]  As explained below, we seek comment on the extent to which this dominance of daily newspapers and local televisions stations in the provision of local news and information persists today.

116.     However, the Commission found in previous reviews that the nearly 40-year-old blanket prohibition on newspaper/broadcast cross-ownership is overly broad, and the Third Circuit upheld those findings.[303]  It is possible that some newspaper/broadcast combinations could be allowed without unduly harming viewpoint diversity.  To that end, we seek comment on whether the prohibition on newspaper/radio combinations should be lifted.  We ask what impact such a modification would have on viewpoint diversity in local markets.  Research shows that most radio stations do not produce significant amounts of local news and that most consumers do not rely on radio stations as their primary source of local news.[304]  Given that the newspaper/television restriction has always been the crux of the NBCO rule, we seek comment regarding the added value of the rule's newspaper/radio component.  We seek comment, therefore, on whether there is sufficient justification under the legal standards of Section 202(h) for continuing to restrict newspaper/radio combinations.  We seek comment also on the costs and benefits associated with retaining or eliminating the restriction on newspaper/radio combinations.  To the greatest extent possible, commenters should quantify the expected costs or benefits of the rule and any alternatives and provide detailed support for any actual or estimated values provided, including the source of such data and/or the method used to calculate reported values.

117.     We invite comment also on whether and in what way we should modify the newspaper/television cross-ownership restriction.  Although further comment is welcome, we are disinclined to impose a bright-line rule permitting combinations in certain circumstances.  Instead we seek comment on approaches that would maintain the ban on newspaper/television combinations in all markets but that would allow applicants the opportunity to seek approval of particular transactions.  The Commission could consider any waiver requests on a purely case-by-case basis, assessing each request independently and considering the totality of the circumstances each proposed transaction presents, including all asserted and potential likely public interest implications of the specific proposed combination.  We seek comment on this approach, including the costs and benefits associated with a pure

---

[299] *See infra* ¶¶ 128-133.

[300] *See infra* ¶¶ 128-133.

[301] *See infra* ¶¶ 134-142.

[302] *See* INFORMATION NEEDS OF COMMUNITIES at 349 (commenting that mergers between newspapers and television stations "could simply improve the bottom line of a combined company *without* actually increasing the resources devoted to local newsgathering in a community") (emphasis in original).

[303] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2021-22, ¶¶ 18-19; *2002 Biennial Review Order*, 18 FCC Rcd at 13762-67, ¶¶ 361-67; *Prometheus I*, 373 F.3d at 398-400 (finding that the Commission reasonably concluded that a blanket prohibition is unnecessary but remanding the Commission's modification of the rule).

[304] *See infra* ¶ 146.

case-by-case review of waiver applications. To the greatest extent possible, commenters should quantify the expected costs or benefits of this proposal and any alternatives and provide detailed support for any actual or estimated values provided, including the source of such data and/or the method used to calculate reported values.

118.    We also invite further comment on a case-by-case waiver approach that would include presumptions that favor or disfavor the grant of waiver requests in accordance with certain prescribed guidelines. This approach would build on proposals in the *NPRM* to modify the vacated 2006 rule. Under this approach, a request for waiver of the newspaper/television cross-ownership prohibition would be entitled to a presumption that it is consistent with the public interest, convenience, and necessity to allow an entity to own, operate, or control one daily newspaper and one full-power television station in a top-20 Nielsen DMA provided that: (1) the television station is not ranked among the top-four television stations in the DMA, based on the most recent all-day (9 a.m.–midnight) audience share, as measured by Nielsen or by any comparable professional, accepted audience ratings service, and (2) at least eight independently owned and operating major media voices will remain in the DMA. Major media voices would include full-power television broadcast stations and newspapers that are published at least four days a week within the DMA in the dominant language of the market and have a circulation exceeding 5 percent of the households in the DMA. In all other cases and in any DMA below the top-20 there would be a presumption that granting a waiver to permit a newspaper/television combination is inconsistent with the public interest, convenience, and necessity. A party seeking to overcome a presumption would carry the burden of proof that the proposed combination will or will not unduly harm viewpoint diversity within the DMA. As provided below, we seek comment on all aspects of this framework, including the costs and benefits of each of the elements discussed herein. To the greatest extent possible, commenters should quantify the expected costs or benefits of this approach and any alternatives and provide detailed support for any actual or estimated values provided, including the source of such data and/or the method used to calculate reported values.

119.    As described in more detail below, we seek comment on various other issues regarding a newspaper/television cross-ownership restriction. First, any restriction would be modified to replace the obsolete analog Grade A contour with an approach that approximates the outdated contour as closely as possible. We propose to prohibit common ownership of a full-power television station and a daily newspaper when: (1) the television station's community of license and the newspaper's community of publication are in the same Nielsen DMA, and (2) the principal community contour ("PCC") of the television station, as defined in section 73.625 of the Commission's rules, encompasses the entire community in which the newspaper is published.[305] Second, the restriction would not include the four-factor test that all waiver applicants, even those entitled to a favorable presumption, were required to satisfy under the 2006 rule.[306] As discussed below, we believe that the factors are for the most part vague, subjective, difficult to prove and enforce, and/or not directly linked to viewpoint diversity. Third, the restriction would not include a local news exception, such as the one permitted by the 2006 rule under which the Commission reversed the negative presumption against a waiver when the proposed combination involved a broadcast station that had not been offering local newscasts and the applicants

---

[305] 47 C.F.R. § 73.625. A daily newspaper is defined as "one which is published four or more days per week, which is in the dominant language in the market, and which is circulated generally in the community of publication." *Id.* § 73.3555, Note 6 (clarifying that college newspapers are not considered to be circulated generally).

[306] Under the four-factor test, waiver applicants were required to make showings regarding: (1) the extent to which the combined entity would increase the amount of local news in the market; (2) the ability of the newspaper and broadcast outlets to each continue to employ its own staff and exercise its own independent news judgment; (3) the level of concentration in the DMA; and (4) the financial condition of the newspaper or broadcast station, and if the newspaper or broadcast station was in financial distress, the proposed owner's commitment to invest significantly in newsroom operations. *Id.* § 73.3555(d)(5).

committed to airing at least seven hours of local news per week after the transaction.[307] As described below, we believe that the potential difficulties in monitoring and enforcing the exception would render it meaningless. Fourth, we propose to include in any restriction an exception for merger applicants that demonstrate that either the television station or the newspaper has failed or is failing.

120. Finally, we tentatively agree with DCS that the NBCO rule does not have a significant impact on minority ownership,[308] and we believe that these modest revisions we put forth for comment would be unlikely to have a disproportionate effect on either minority or female owners. We seek comment on whether the benefits of the revisions we describe here in the interest of protecting viewpoint diversity would outweigh any burdens that could result from such revisions, which we would minimize by grandfathering any combinations that would become newly non-compliant because of the revisions.

## 2. Background

121. The *NPRM* inquired about detailed scenarios in connection with proposed rule modifications. In response, the Commission received substantial comments, amounting to several hundred pages of filings. For convenience and clarity, the background and comments related to the separate issues and subparts of this rule are summarized together with the substantive discussion of those elements in the following Discussion section. First, we discuss our tentative conclusion that the NBCO rule continues to serve the Commission's policy goals. Next, we seek comment on whether to eliminate the newspaper/radio cross-ownership restriction as unnecessary. Last, we seek comment on each of the specific elements of our possible modification to the newspaper/television cross-ownership restriction.

## 3. Discussion

### a. Policy Goals

122. *Background.* In the *NPRM*, the Commission tentatively affirmed the Commission's past determinations that the NBCO rule promotes viewpoint diversity but is not necessary to advance its localism and competition goals.[309] Consistent with previous Commission findings, the Commission tentatively concluded that, although an absolute ban is overly broad, some newspaper/broadcast cross-ownership restrictions continue to be necessary to protect and promote viewpoint diversity.[310] The Commission's reasoning centered on evidence that newspapers and local television stations, and their affiliated websites, are the primary sources that consumers rely on for local news and information.[311] The Commission recognized that newspaper/broadcast cross-ownership may provide certain benefits that promote its localism goal.[312] Thus, it tentatively affirmed the Commission's earlier findings that the opportunity to share newsgathering resources and to realize other efficiencies derived from economies of scale and scope may improve the ability of commonly owned media outlets to provide local news and information.[313] It tentatively concluded, as the Commission found in previous ownership reviews, that newspapers and broadcast stations do not compete in the same product market and, therefore, that the rule is not necessary to promote its competition goal.[314]

---

[307] *Id.* § 73.3555(d)(7)(ii).

[308] DCS NPRM Comments at 40-43 (recognizing that "cross-ownership appears to have little impact on minority ownership").

[309] *NPRM*, 26 FCC Rcd at 17520-21, ¶ 89.

[310] *Id.*

[311] *Id.*

[312] *Id.*

[313] *Id.*

[314] *Id.*

123. *Discussion.* We seek comment on the current validity of the Commission's tentative conclusion in the *NPRM* that newspapers and local television stations, and their affiliated websites, are the dominant sources consumers rely on for local news and therefore that cross-ownership restrictions continue to be necessary under Section 202(h) to promote viewpoint diversity in local markets. We propose to adopt the *NPRM*'s tentative findings that the NBCO rule is not necessary to foster our localism and competition goals. While we recognize that the rule may hinder the realization of certain efficiencies that could result in the production of more local news, we anticipate that modifications of the rule, such as those outlined below, could enable such efficiencies, and thereby potentially promote localism, in situations where viewpoint diversity would not be unduly sacrificed.

### (i) Viewpoint Diversity

124. In the 2010 Quadrennial Review proceeding, newspaper and media owners proffered two principal arguments to support their position that the Commission's diversity goal no longer justifies a prohibition on newspaper/broadcast cross-ownership. They argued, first, that ownership does not necessarily influence viewpoint and, second, that an array of diverse viewpoints is widely available from an abundance of outlets, particularly via the Internet. Both of these arguments were addressed by the Commission in the 2002 and 2006 media ownership reviews and by the Third Circuit in *Prometheus I*.[315] The Third Circuit agreed with the Commission that, although these arguments provide an appropriate basis for relaxing the absolute ban on newspaper/broadcast cross-ownership, they do not mandate the removal of all restrictions on such combinations.[316] We seek comment on our tentative conclusion that neither of these arguments presents a reason for eliminating the NBCO rule in the 2014 Quadrennial Review proceeding.

125. With respect to the first argument, several commenters claimed that various studies, including several commissioned by the agency for the 2010 Quadrennial Review proceeding and previous ownership reviews, show a lack of correlation between the viewpoints of a newspaper and of a broadcast station under common ownership.[317] Commenters alleged that the Commission has not presented evidence that commonly owned newspapers and broadcast stations speak with a single editorial voice.[318] Cox cited a 2008 study by David Pritchard *et al.* finding that cross-owned properties are just as likely as non-cross-owned properties to present "conflicting and antagonistic viewpoints."[319] In addition,

---

[315] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13762-67, ¶¶ 361-67; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2038-39, ¶ 49; *Prometheus I*, 373 F.3d at 399-401.

[316] *Prometheus I*, 373 F.3d at 399-401. As noted above, the court in *Prometheus II* vacated and remanded the NBCO rule for failure to comply with the APA's notice and comment requirements; it did not consider the substance of the rule. *Prometheus II*, 652 F.3d at 445, 453.

[317] NAB NPRM Comments at 42-45; The Newspaper Association of America ("NAA") NPRM Comments at 18-20; Tribune NPRM Comments at 17-24; Fox NPRM Comments at 25-26.

[318] NAB NPRM Comments at 44-45; NAB NPRM Reply at 26-28; Cox Media Group ("Cox") NPRM Comments at 10-12; Tribune NPRM Comments at 17-24; NAA NPRM Comments at 18-20; NAA NPRM Reply at 3-4; *see also* Morris NPRM Comments at 6; Journal Communications NPRM Reply at 4. For example, NAA noted that a February 2012 survey of its membership revealed zero instances where the same individuals made the editorial decisions of cross-owned properties. NAA NPRM Comments at 18-19 n.71; NAA NPRM Reply at 3-4. Tribune provided information to demonstrate that its ownership does not influence its newspapers' presidential endorsements. Tribune NPRM Comments at 19. Fox stated that the Commission itself has acknowledged that its cross-owned properties in the New York metropolitan area have not adversely affected viewpoint diversity and have benefited the public interest. Fox NPRM Comments at 28-31 (citing *K. Rupert Murdoch*, Memorandum Opinion and Order, 21 FCC Rcd 11499, 11502 (2006)).

[319] Cox NPRM Comments at 10-12 (citing David Pritchard *et al.*, *One Owner, One Voice? Testing a Central Premise of the Newspaper-Broadcast Cross-Ownership Policy*, 13 COMM. L. & POL'Y 1 (2008) ("2008 Pritchard Study")); Cox Enterprises, Inc. ("Cox") NOI Reply at 22-24 (describing 2008 Pritchard Study); *see also* Journal

(continued....)

broadcasters submitted that audience preferences have a greater influence on editorial slant than ownership and that owners of multiple outlets have an incentive to vary their editorial approaches in order to appeal to a broader range of consumers.[320]

126.    It is perhaps not surprising that newspaper and broadcast owners were able to supply a number of examples in support of their position that cross-owned properties may present different viewpoints.  The Commission acknowledged in the 2002 ownership proceeding that, "as the market becomes more fragmented and competitive, media owners face increasing pressure to differentiate their products, including by means of differing viewpoints."[321]  The record before the Commission in 2002 and 2006 included specific examples where cross-ownership did not have an apparent effect on viewpoint.[322]  The Commission noted, however, that ample evidence also pointed in the other direction.[323]  Because the Commission was unable to conclude that common ownership always harms viewpoint diversity, the Commission concluded in its 2002 proceeding and affirmed in its 2006 proceeding that a blanket prohibition is unsustainable.[324]  Nevertheless, the Commission did not eliminate all restrictions on newspaper/broadcast cross-ownership.  In affirming the Commission's decision to maintain regulatory oversight, the Third Circuit recognized that evidence undermining the premise that ownership always influences viewpoint does not signify that a connection never exists.[325]

127.    We do not believe that the 2010 Quadrennial Review record compels us to alter our earlier conclusion that cross-ownership can diminish viewpoint diversity.  For example, the authors of Media Ownership Study 9 find that ownership concentration may adversely affect viewpoint diversity and the quality of local news.[326]  We find that the results of Media Ownership Studies 8A and 8B, suggesting that ownership structure does not have a marked impact on viewpoint diversity, cannot serve as a basis for assessing the impact of the NBCO rule.[327]  The analysis in Media Ownership Study 8B did not include

(Continued from previous page) ————————————————————
Communications NPRM Reply at 4 (stating that its multiple media properties in Milwaukee "frequently take different positions that span the political spectrum on a wide variety of issues").

[320] Cox NPRM Comments at 11; NAB NPRM Comments at 44-45.

[321] *2002 Biennial Review Order*, 18 FCC Rcd at 13764-65, ¶ 364.

[322] *Id*. at 13762-65, ¶¶ 361-64; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2038-39, ¶ 49.

[323] *2002 Biennial Review Order*, 18 FCC Rcd at 13762-65, ¶¶ 361-64; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2038-39, ¶ 49.

[324] *2002 Biennial Review Order*, 18 FCC Rcd at 13764-65, ¶ 364; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2038-40, ¶¶ 47-52.

[325] *Prometheus I*, 373 F.3d at 400-01; *see also 2006 Quadrennial Review Order*, 23 FCC Rcd at 2038-39, ¶ 49 (stating that the Commission was "not in a position to conclude that ownership can never influence viewpoint").

[326] Media Ownership Study 9.  Tribune argued, however, that the outcome of the study's theoretical analysis was predetermined by what it characterized as a biased assumption that media owners have a preference over the policy outcome.  Tribune NPRM Comments at 22-23; *see also* Tribune NPRM Reply at 16-17.

[327] *See* Media Ownership Study 8A, Local Media Ownership and Viewpoint Diversity in Local Television News, by Adam D. Rennhoff, and Kenneth C. Wilbur (2011) ("Media Ownership Study 8A"); Media Ownership Study 8B.  In addition, Media Ownership Study 3 was designed to examine the impact of media market structure, including newspaper/broadcast cross-ownership, on viewpoint diversity (and localism), using political knowledge and political participation as performance indicators.  The study's premise was that greater viewpoint diversity would result in better informed voters and increased voter turnout.  The study found that some factors, notably the magnitude of political advertising, affected these performance indicators, but it did not find significant market structure effects.  Media Ownership Study 3, How the Ownership Structure of Media Markets Affects Civic Engagement and Political Knowledge, 2006-2008, by Lynn Vavreck, Simon Jackman, and Jeffrey B. Lewis (2011) ("Media Ownership Study 3").  The lack of a demonstrated connection between market structure and political engagement does not, however,

(continued....)

any variables pertaining to newspaper/broadcast cross-ownership,[328] and Media Ownership Study 8A examined only newspaper/television cross-ownership, for which its data was particularly limited.[329] The 2008 Pritchard Study cited by Cox supports the proposition that cross-ownership does not diminish viewpoint diversity; however, its analysis includes only three cross-ownership situations.[330] The editorial restraint exhibited by media owners in the three markets Pritchard studied does not negate what Pritchard calls the "theoretical power" of media owners to control viewpoint.[331] Even if cross-media owners do not exercise that power frequently, we believe it is important to restrict cross-ownership of the dominant local news providers in markets where viewpoint diversity is insufficiently robust to withstand the potential loss of an independently owned voice. We seek comment on this view.

128. With respect to the second argument, opponents asserted that the rule cannot be justified on diversity grounds because consumers today have nearly ubiquitous access to a multitude of voices.[332] We believe that the media environment has changed dramatically since 1975 when the average American read one local print newspaper and watched one of three evening newscasts in real time.[333] Without question, the Internet, MVPD services, and other technological developments have profoundly changed the ways in which people access, consume, and share news and information. In its 2002 and 2006 ownership decisions, the Commission described the rapid advancements in the media industry at great length. Since then, those changes have been compounded as both providers and consumers of news use the Internet even more intensely. As the Commission concluded in its 2002 and 2006 proceedings, we believe the proliferation of media outlets since 1975 may well render the absolute ban on newspaper/broadcast cross-ownership obsolete.[334]

---

(Continued from previous page) ————————————————

cause us to alter our view that preserving viewpoint diversity serves the public interest because political engagement is just one facet of the broader positive impact of viewpoint diversity on civic engagement and public discourse.

[328] Media Ownership Study 8B at 10.

[329] *See* Media Ownership Study 8A at 17 (available data on newspaper/television cross-ownership includes a small sample set and little variation over time).

[330] 2008 Pritchard Study at 16-19 (comparing three cross-owned combinations with a control group of separately owned properties). David Pritchard authored a media ownership study for the Commission's 2002 ownership review, which also found that cross-owned properties do not necessarily speak with a single voice. Media Ownership Working Group Study 2, Viewpoint Diversity in Cross-Owned Newspapers and Television Stations: A Study of News Coverage of the 2000 Presidential Campaign, by David Pritchard (2002). The Commission characterized Pritchard's 2002 study, which examined ten newspaper/television combinations, as limited in scope. The Commission found that the results of the study, while suggesting that cross-ownership does not create a predictable pattern of editorial coverage, did not provide a sufficient basis to conclude that "common ownership never results in common slant." *2002 Biennial Review Order*, 18 FCC Rcd at 13762-63, ¶ 361.

[331] 2008 Pritchard Study at 24.

[332] *See, e.g.*, Tribune NPRM Comments at 1-3. To support its position that local media markets enjoy abundant diversity, Tribune provided the number of available news outlets (television and radio stations, daily and weekly newspapers, local cable networks, and local independent news websites) and the corresponding number of owners in each of the five markets in which Tribune had cross-ownership interests (Los Angeles, Chicago, South Florida, Hartford-New Haven, and New York City). Tribune NPRM Comments at 24-28; *see also* Tribune NPRM Reply at 17-18.

[333] *See, e.g.*, Tribune NPRM Comments at 4-8.

[334] *But see* Free Press NPRM Comments at 39-40 (arguing that "there is little policy or record support for relaxing the NBCO rule in the first place"); American Federation of Television and Radio Artists ("AFTRA") NPRM Comments at 1-3 (opposing any relaxation of the NBCO rule given increased concentration of media ownership); Media Access Project and Prometheus Radio Project ("MAP/Prometheus") NPRM Comments at 3 (arguing that the Commission should not adopt any waiver criteria). We note that Free Press, which supported the current ban on all

(continued....)

129.    The debate among commenters in the 2010 Quadrennial Review proceeding focused on whether changes in the media environment, particularly those related to the Internet, upend the diversity rationale for maintaining *any* restrictions on newspaper/broadcast cross-ownership. In the *NPRM*, the Commission cited evidence that, despite the evolving marketplace, newspapers and local television stations, and their affiliated websites, are still the most relied-upon sources of local news and information.[335] CWA agreed that television stations and newspapers "continue to dominate the local news and information landscape."[336] It urged the Commission to be mindful of the findings in the Information Needs of Communities Report that the dominant online providers of local news are "the new media manifestations of old media companies, most notably the websites of local newspapers and TV newscasts."[337] Likewise, Free Press argued that the Internet serves most often as an additional platform for the dominant media providers and has not led to a significant increase in independent outlets that regularly engage in professional journalism.[338] On the other hand, A. H. Belo and Morris asserted that consumers are turning increasingly to the Internet for not only national and international news, but also local news and information.[339] NAB argued that the findings in a study by the Pew Research Center contradict the Commission's conclusion that traditional media are affiliated with most of the websites that Americans visit for local news and information.[340]

(Continued from previous page) ———————————
newspaper/broadcast cross-ownership, contemplated the availability of waivers using the Commission's traditional waiver test. Free Press NPRM Comments at 39.

[335] *NPRM*, 26 FCC Rcd at 17523-25, ¶¶ 96-97 (stating that three-quarters of Americans obtain news from a local television station, 37 percent of Americans in 2010 reported reading a newspaper the preceding day, 67 percent of the top 200 news websites are associated with legacy media and 48 percent of those websites are associated with newspapers in particular, and that very little online news content is unaffiliated with traditional media); *but see* Cox NPRM Comments at 12-14 (asserting that the scale and scope of newsgathering operations were designed to be supported by an audience much larger in size than 37 percent of Americans).

[336] CWA NPRM Reply at 1-2.

[337] CWA NPRM Comments at 3; *see also* CWA NPRM Reply at 3-4 (citing a Pew report finding that 57 percent of those surveyed access local news online only through a website affiliated with a broadcaster or newspaper); AFCP *et al.* NPRM Comments at 10 (stating that the bulk of local news available from new online sources is repurposed from traditional outlets).

[338] Free Press NPRM Comments at 23-25, 33-35, 38 (arguing that cross-ownership restrictions promote viewpoint diversity both offline and online); Free Press NPRM Reply at 2-5 (contending that newspapers and broadcast stations continue to be the dominant original sources of local news both offline and online and citing the Pew Baltimore Study and Media Ownership Study 6 for support). WGAE downplayed the diversity of voices on the Internet given that broadcasters view news as "platform-neutral" and write news content for both on-air and online delivery. In addition, WGAE stated that CBS has consolidated its Internet operations so that a single website contains all the Internet content for all CBS-owned television and radio stations in a market and that CBS's local Internet operations are coordinated by national management. WGAE NPRM Comments at 3-5.

[339] A. H. Belo NPRM Comments at 5-8; Morris NPRM Comments at 6-8; Morris NPRM Reply at 3-5; *see also* NAA NPRM Comments at 3 (citing the Information Needs of Communities Report for the finding that 18- to 29-year-olds receive their news online more than from any other source).

[340] NAB NPRM Comments at 42-43 n.162 (citing the study's finding that the 79 percent of Americans who use the Internet visit websites unaffiliated with traditional media sources as their first or second choice to obtain information regarding 15 of the 16 topics identified for the study); *see also* Morris NPRM Reply at 4; NAB NPRM Reply at 24-26. We note, however, that the study cited by NAB found that, when the habits of all Americans were considered (as opposed to just those who use the Internet), unaffiliated websites were the first choice (or tied with newspapers as first) for only five of the 16 topics identified. Pew Research Center's Project for Excellence in Journalism, Pew Internet & American Life Project, and the knight Foundation, How People Learn About Their Local Community 22 (2011) ("How People Learn About Their Local Community"), *available at* http://www.knightfoundation.org/media/uploads/publication_pdfs/Pew_Knight_Local_News_Report_FINAL.pdf. Furthermore, the study also found that television is overwhelmingly the most frequently used medium for news and
(continued....)

130.    While the extent to which Americans turn to news websites unaffiliated with traditional media may be increasing,[341] it appears that such sources have not supplanted print newspapers and local television stations, and their affiliated websites, as the dominant providers of local news.[342] As a threshold matter, online services and information are not available or not enjoyed at full capacity by many Americans due to disparities in broadband availability and adoption rates.[343] Furthermore, according to a recent Pew Report on the State of the News Media, "local TV remains America's most popular source of local news and information."[344] Commission staff reported in the Information Needs of Communities Report that, on a typical day, 78 percent of Americans obtain news from their local television station.[345] A recent trade association analysis reportedly concluded that viewership of local evening news broadcasts in the 10 largest markets exceeded the five highest rated cable news programs combined by more than 430 percent.[346] Although more consumers now turn to the Internet than to print newspapers for news and information, newspapers (both the print and online versions) are relied upon for the widest range of local news topics,[347] and newspaper websites are the primary traditional source of local news for online

(Continued from previous page) ————————————————————————

information, and that websites unaffiliated with traditional media are the fifth most frequently used medium, trailing behind television, word-of-mouth, radio, and newspapers. *Id.* at 3, 13.

[341] *See, e.g.*, STATE OF THE NEWS MEDIA 2012 at Digital Essay; THE PEW RESEARCH CENTER FOR THE PEOPLE & THE PRESS, IN CHANGING NEWS LANDSCAPE, EVEN TELEVISION IS VULNERABLE 6-8, 17-18, 20, 23-25 (2012) ("CHANGING NEWS LANDSCAPE"), *available at* http://www.people-press.org/files/legacy-pdf/2012%20News%20Consumption%20Report.pdf (noting the rise of news on social networks).

[342] STATE OF THE NEWS MEDIA 2012 at Digital Essay. The report concludes that "[a]s readers migrate to the web, however, one thing has remained remarkably stable: the news organizations Americans turn to. The traditional players remain the most popular sources for digital news." *Id.* Residents of small towns and rural areas rely more heavily on traditional print and broadcast media than their urban and suburban counterparts. Although urban and suburban residents are more likely to use a combination of traditional and digital news platforms, their preferred online news sources include the websites of local television stations and newspapers. PEW RESEARCH CENTER'S PROJECT FOR EXCELLENCE IN JOURNALISM, PEW INTERNET & AMERICAN LIFE PROJECT, AND THE KNIGHT FOUNDATION, HOW PEOPLE GET LOCAL NEWS AND INFORMATION IN DIFFERENT COMMUNITIES 2-4 (2012) ("HOW PEOPLE GET LOCAL NEWS AND INFORMATION"), *available at* http://pewinternet.org/~/media//Files/Reports/2012/PIP_Local_News_Community_Types.pdf; *see also* CHANGING NEWS LANDSCAPE at 10-11 (finding that "[d]espite the rapid growth of digital news, more Americans continue to get news from traditional news platforms than from digital platforms").

[343] *Eighth Broadband Progress Report*, 27 FCC Rcd at 10344, 10346, ¶¶ 1, 5 (finding that "approximately 19 million Americans live in areas still unserved by terrestrial-fixed broadband" and that "only 40 percent of Americans that have the option to do so adopt fixed broadband meeting the speed benchmark").

[344] STATE OF THE NEWS MEDIA 2012 at Local TV Essay; *see also* CHANGING NEWS LANDSCAPE at 2-3, 9 (finding that although viewership of local television news has declined, particularly among younger Americans, "[t]elevision continues to be the public's top daily news source").

[345] INFORMATION NEEDS OF COMMUNITIES at 84; *see also* HOW PEOPLE LEARN ABOUT THEIR LOCAL COMMUNITY at 13 (finding that 74 percent of American adults obtain local news at least weekly from a local television station and/or its website, the most of any source measured in the survey); CHANGING NEWS LANDSCAPE at 9 (stating that 55 percent of survey respondents reported watching television news the preceding day).

[346] *See* Carl Marcucci, *Broadcast News Dominates Cable in Top 10 Markets*, RBR.COM, Sept. 12, 2012, http://rbr.com/broadcast-news-dominates-cable-five-fold-in-nyc/ (reporting that the figure in the top three markets was 168 percent and in the largest market, New York, was 18 percent) (visited Jan. 30, 2014).

[347] HOW PEOPLE LEARN ABOUT THEIR LOCAL COMMUNITY at 1-2 (explaining that "local TV draws a mass audience largely around a few popular subjects; local newspapers attract a smaller cohort of citizens but for a wider range of civically oriented subjects").

consumers in the vast majority of large markets.[348] In addition, many local television stations have become "major online sources of news," even surpassing the popularity of newspaper websites in a number of local markets.[349] The author of Media Ownership Study 6 concludes that "[n]ewspapers and television stations dominate what local news can be found online."[350] The author found that only 17 of the 1,074 local news websites he examined were unaffiliated with traditional print or broadcast media.[351] As the Commission described in the *NPRM*, the results of Media Ownership Study 6 are supported by data from other studies demonstrating a consumer preference for websites affiliated with legacy media.[352] We seek comment on our assessment of the current record and we invite commenters to provide any updated information or evidence regarding consumer reliance on unaffiliated online sources for local news and information.

131. Even websites unaffiliated with newspapers and television stations often contain local news content that originates from those traditional sources.[353] The results of the Pew Baltimore Study revealed new media's "limited role" in providing original reporting.[354] The Information Needs of Communities Report points to a number of studies demonstrating that "the growing number of web outlets relies on a relatively fixed, or declining, pool of original reporting provided by traditional media."[355] In addition, Media Ownership Study 6 finds a dearth of independent websites with original

---

[348] STATE OF THE NEWS MEDIA 2012 at Local TV Essay (reporting that newspaper websites "outdraw" local television websites in 40 of the top 50 markets); INFORMATION NEEDS OF COMMUNITIES at 55, 81.

[349] INFORMATION NEEDS OF COMMUNITIES at 78, 81 (finding that the most popular local websites in 14 markets are associated with local television stations); STATE OF THE NEWS MEDIA 2012 at Local TV Essay (noting the online dominance of local television stations in some markets, particularly those in which the local newspaper's website is behind a paywall).

[350] Media Ownership Study 6 at 11. Tribune disputed the finding in Media Ownership Study 6 that most online news and information is repurposed from traditional sources. Tribune argued that, by basing its analysis at the DMA level, the study overlooked the myriad of local and hyperlocal websites that target smaller geographic areas or focus on more specific areas of local interest. Tribune NPRM Reply at 6-7. NAA observed that even when new online media sources repurpose content from traditional media sources, they often contribute to diversity by adding their own editorial viewpoints to the information. NAA NPRM Reply at 5-6.

[351] Media Ownership Study 6 at 11. The Pew Research Center found a similar trend. It observed that brand matters: traditional news organizations are associated with two-thirds of the 25 most popular news websites in the United States. STATE OF THE NEWS MEDIA 2012 at Digital Essay (finding that "[m]ost digital traffic comes to news sites through their home pages, not through search engines or social media"); *see also NPRM*, 26 FCC Rcd at 17524, ¶ 97 (citing Pew's State of the News Media 2010 Report for evidence that 67 percent of the roughly 200 news websites most frequently visited in the fall of 2009 were associated with legacy media, and 48 percent were associated with newspapers in particular). We note that the Third Circuit cautioned the Commission against viewing affiliated websites as independent news sources. *See Prometheus I*, 373 F.3d at 405-06 ("There is a critical distinction between websites that are independent sources of local news and websites of local newspapers and broadcast stations that merely republish the information already being reported by the newspaper or broadcast station counterpart. The latter do not present an 'independent' viewpoint and thus should not be considered as contributing diversity to local markets.").

[352] *NPRM*, 26 FCC Rcd at 17524-25, ¶ 97.

[353] *See id.*

[354] PEW BALTIMORE STUDY at 1-4 (finding that independent online media sources in Baltimore generally "disseminate stories from other places" and that traditional sources, mainly newspapers, provide 95 percent of the city's original news content). Tribune claimed that the Pew Baltimore Study overlooked the valuable contributions of local bogs and websites. Tribune NPRM Reply at 7-9. The Information Needs of Communities Report found, however, that although local blogs and websites offer alternative channels for news distribution and interpretation, they currently do not offer a substitute for the traditional media's role in the gathering and reporting of news. INFORMATION NEEDS OF COMMUNITIES at 15-19, 123-25.

[355] INFORMATION NEEDS OF COMMUNITIES at 123-24.

local news content.[356]  Commenters in the 2010 Quadrennial Review proceeding tended to agree that most independent online sources, particularly news aggregator websites, currently do not provide a substitute for the original reporting by professional journalists associated with traditional local media.[357]  Media Ownership Study 6 cautions that even the independent local websites that produce high-quality content are not necessarily substitutes for traditional media outlets.[358]  We invite commenters to submit updated information or evidence regarding the prevalence of original local news content on websites unaffiliated with traditional media outlets.

132.  Fox contended that the salient issue when considering the Internet's effect on viewpoint diversity is "not its relative popularity as measured by consumer use at any given moment" but its ability to enable all outlets to have an equal capacity to reach citizens.[359]  Newspaper and broadcast owners further argued that the NBCO rule is outmoded due to the various ways in which the Internet provides access to diverse sources of local news and information from anywhere at any time.  For example, Tribune discussed how Internet users select the news they want to consume, gathered from websites anywhere around the globe, to read at a time and location of their choosing on any one of a variety of devices.[360]  Arguing that Internet websites assume many of the functions of traditional media, Tribune noted that consumers can use Internet browsers or "apps" to obtain sports scores, election returns, traffic updates, and breaking news.[361]  It asserted that information regarding local issues, such as a proposed

---

[356] Media Ownership Study 6 at 21-24 (finding that the majority of posts on unaffiliated local news websites "involve commentary on stories and features found in traditional media outlets"); *see also id.* at 15-21.

[357] For example, Cox observed that new media platforms, while diverting audience share and revenue from traditional media, are not producing local news and information content.  Cox NPRM Comments at 6-7 (stating that alternative distributors of local news and information are not filling the void left by the shrinking operations of newspapers); *see also* Free Press NPRM Reply at 14 (noting that Cox acknowledges that new online media sources do not contribute substantively to viewpoint diversity in local markets).  NAA recognized that, despite the growth in hyperlocal websites and the nearly limitless range of viewpoints available online and through MVPD delivery, new media sites typically do not replicate the kind of local investigative journalism that has been the province of newspapers.  NAA NPRM Comments at 8-10 (referencing the Information Needs of Communities Report and the U.S. Senate Commerce Committee hearing on The Future of Journalism).  AFTRA complained that online news aggregators undercut the ability of traditional media to provide professional journalism but do not contribute original local news content.  AFTRA NPRM Comments at 1, 3-4 (stating that "new media sources have not adequately substituted for the declining legacy media sources"); *but see* Tribune NPRM Reply at 6-10 (discounting findings that most online news coverage is derivative and arguing that the "symbiotic relationship" between new and traditional media sources is an example of how the Internet has altered the "gatekeeper" role of publishers and broadcasters).

[358] Media Ownership Study 6 at 23.

[359] Fox NPRM Comments at 25; *see also* Morris NPRM Reply at 8-9 (arguing that "regardless of comparative popularity, the key to diversity in the information marketplace is the basic availability of alternative media sources"); Bonneville/Scranton NPRM Comments at 20-21 (arguing that the Internet has altered traditional media's gatekeeping power over news and information).

[360] Tribune NPRM Comments at 31-43; *see generally* Fox NPRM Comments at 7-19 (discussing the impact of the Internet on the media marketplace).

[361] Tribune NPRM Comments at 32, 34-35.  Tribune further asserted that the initiative to reallocate part of the television broadcast spectrum reflects the Commission's recognition that fewer television stations are necessary to serve the public interest.  Tribune NPRM Reply at 2.  We believe Tribune's argument is misplaced.  Neither Congress, in the Spectrum Act, nor the Commission, in implementing Congress's mandate to conduct an incentive auction of broadcast television spectrum, has made any finding as to the number of television stations necessary to serve the public interest.  Incentive auctions are a voluntary, market-based means of repurposing spectrum by encouraging licensees to voluntarily relinquish spectrum usage rights in exchange for a share of the proceeds from the auction of new licenses to use the repurposed spectrum.  *See Incentive Auctions NPRM*, 27 FCC Rcd at 12359, ¶ 3.

zoning ordinance, often can be found on the websites of local governments.[362] Tribune also claimed that data from the past three Presidential election cycles demonstrate a steady increase in the number of Americans using the Internet to obtain news or information about politics or elections.[363]

133. At the current time and based on the record before us, we tentatively find that the record does not support the conclusion that the impact of the Internet has obviated the need for cross-ownership restrictions. The NBCO rule is intended to preserve access to a variety of viewpoints on substantive matters of local concern.[364] We tentatively find that the diversity of local news coverage is not enhanced by the fact that newspapers from around the world are only a click away. Remote access to hometown sports scores and local weather reports expands the availability, but not the diversity, of information. While we tentatively agree with Tribune that the presence of local and specialized websites "enriches the conversation,"[365] the record in the 2010 Quadrennial Review proceeding does not appear to demonstrate that most local, hyperlocal, and niche websites fill the role of local television stations or daily newspapers.[366] In addition, the studies that Tribune cited in support of its assertion that Americans increasingly use the Internet to obtain election information concluded that television remains the primary source for such information among all Americans.[367] Although the 2010 Quadrennial Review record does not appear to provide convincing evidence that the Internet eliminates entirely the need for cross-ownership restrictions, we seek comment on our tentative assessment of the record. We also seek comment on whether there have been any changes in the Internet's role in the current marketplace for local news and information that we should consider in our 2014 Quadrennial Review.[368]

### (ii) Localism

134. Several opponents of the NBCO rule noted that the Commission has recognized that cross-ownership can produce a higher quantity and quality of news and information programming.[369]

---

[362] Tribune NPRM Comments at 32-33.

[363] *Id.* at 38-39 (noting also the increase in Americans' use of the Internet with respect to the previous three mid-term elections).

[364] As the Third Circuit observed, the availability of the Internet "does not mean that it is providing independent local news." *Prometheus I*, 373 F.3d at 407-08.

[365] Tribune NPRM Reply at 15. Tribune claimed that local and specialized websites "serve as alternative sources of information and debate." *Id.* at 6-15; *see also* Tribune NPRM Comments at 43-44. For instance, Tribune discovered more than 40 websites that mentioned the planned closure of coal-fired electric power plants in Chicago. Tribune NPRM Reply at 10-11. However, most of the websites identified by Tribune regarding the Chicago story are associated either with traditional media outlets or with enterprises that have a national or global focus, such as the Sierra Club, *Solar Thermal Magazine*, and *The Huffington Post*.

[366] *See* INFORMATION NEEDS OF COMMUNITIES at 16-17, 123-25 (finding that most unaffiliated local and hyperlocal websites are not equipped to fill gaps left by professional journalists). Furthermore, although the websites of local governments provide valuable information, our cross-ownership rule is intended to promote viewpoint diversity among media sources, and one of the media's most revered roles is to function as a watchdog over government action. *See Prometheus I*, 373 F.3d at 407 (stating that "local governments are not, themselves, 'media outlets' for viewpoint-diversity purposes").

[367] PEW INTERNET, PEW INTERNET & AMERICAN LIFE PROJECT, THE INTERNET'S ROLE IN CAMPAIGN 2008, at 5 (2009), *available at* http://www.pewinternet.org/~/media//Files/Reports/2009/The_Internets_Role_in_Campaign_2008.pdf; PEW INTERNET, PEW INTERNET & AMERICAN LIFE PROJECT, THE INTERNET AND CAMPAIGN 2010, at 3 (2011); *available at* http://pewinternet.org/~/media//Files/Reports/2011/Internet%20and%20Campaign%202010.pdf.

[368] *See NPRM*, 26 FCC Rcd at 17525, ¶ 97 (stating the Commission's intent to "continue to monitor and assess the Internet's role in the marketplace for local news and information").

[369] NAB NPRM Comments at 40-41, 45-47; Tribune NPRM Comments at 12-14; Fox NPRM Comments at 23-24.

Newspaper and broadcast owners argued that cross-ownership advances the Commission's localism goal by enhancing efficiencies in local news production and distribution.[370] Tribune provided several examples illustrating how its cross-owned properties in Chicago, Los Angeles, and Hartford collaborate and leverage their newsgathering resources to provide better and faster news coverage.[371] CRT detailed how the cooperative efforts of its cross-owned properties have enhanced their ability to inform the community during severe weather events and to provide in-depth coverage of political events.[372] Journal Communications asserted that, although its newspaper and broadcast properties are separately managed and operated, the efficiencies gained from combining certain back-office functions have enabled its cross-owned properties to devote more resources to local news programming.[373] A. H. Belo claimed that such efficiencies allow greater investment in investigative journalism, and pointed to the numerous awards its newspapers and television stations earned as proof of the results.[374] NAA also provided examples of cross-owned combinations that have earned national and regional journalism awards.[375]

135. The evidence in the 2010 Quadrennial Review record does not appear to negate the basic proposition that newspaper/broadcast cross-ownership may enable commonly owned properties to produce and disseminate more and sometimes better local news. As acknowledged in the *NPRM*, the Commission has found that cross-ownership may produce such benefits to localism.[376] We recognize that localism benefits are not guaranteed, however. The Commission sought comment in the *NPRM* not only on the benefits of cross-ownership generally, but also specifically on how to weigh the finding in Media Ownership Study 4 that an increased amount of local news on a cross-owned television station does not necessarily translate into more local news at the market level.[377] The author of the study theorized that cross-owned stations may tend to "crowd out" the news production of other stations.[378]

---

[370] Cox NPRM Comments at 2-8, 15-17; Cox NOI Reply at 12-17 (describing how its newsgathering operations in Atlanta and Dayton have been enhanced by newspaper/broadcast cross-ownership); Tribune NPRM Comments at 3; Tribune NPRM Reply at 15-20 (claiming that four studies conducted for either the 2010 Quadrennial Review or the 2006 Quadrennial Review demonstrate that cross-ownership increases the amount of news and information on commonly owned properties, without adversely affecting viewpoint diversity); Journal Communications NPRM Reply at 4 (arguing that the sharing of news content enables cross-owned properties to supplement their local news coverage); NAB NPRM Comments at 47; NAB NPRM Reply at 28-29; Morris NPRM Reply at 7-8.

[371] Tribune NPRM Comments at 14-17; *but see* Letter from Chris Powell, Vice President and Managing Editor, Journal Inquirer, to FCC Commissioners, at 1-2 (Jan. 18, 2012) (arguing that the efficiencies Tribune has gained through its 12 years of cross-ownership waivers in Connecticut have created unfair advantages over competing news outlets that are in compliance with the NBCO rule and that national repeal of the rule would lead to "less competition, less employment, less journalism, and more concentration of power").

[372] CRT NPRM Comments at 1-8 (noting that its television station has been the only locally owned and operated television station in Iowa since 1996 and that its locally owned newspaper began in 1883).

[373] Journal Communications NPRM Reply at 3-4.

[374] A. H. Belo NPRM Comments at 8-10.

[375] NAA NPRM Comments at 12-15; *see also* NAA NPRM Reply at 2-3. NAA also cited findings from Media Ownership Studies 1 and 4, as well as prior Commission studies, that cross-ownership promotes localism. NAA NPRM Comments at 15-18; *see also* Media Ownership Study 1, Local Media Ownership and Media Quality, by Adam D. Rennhoff and Kenneth C. Wilbur (2011) ("Media Ownership Study 1"); Media Ownership Study 4, Local Information Programming and the Structure of Television Markets, by Jack Erb (2011) ("Media Ownership Study 4").

[376] *NPRM*, 26 FCC Rcd at 17525, ¶ 98 (citing *2002 Biennial Review Order*, 18 FCC Rcd at 13753-60, 13760-61, ¶¶ 342-54, 356-58; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2038, ¶ 46).

[377] *NPRM*, 26 FCC Rcd at 17525, ¶ 98.

[378] Media Ownership Study 4; *see also* Free Press NPRM Comments at 28-30 (echoing the "crowding-out" hypothesis in Media Ownership Study 4); Free Press NPRM Reply at 6-9.

136. Contrary to the broadcasters' view,[379] CWA and Free Press disputed the finding in Media Ownership Study 4 that cross-owned properties produce a greater amount of local news programming.[380] Free Press claimed that the result does not show a news increase at the station level when the actual news content is measured instead of the number of minutes listed in program guides.[381] Free Press further argued that the study's inclusion of "super station" WGN distorts the results.[382] Free Press agreed with the finding in Media Ownership Study 4 that cross-ownership may lead to a decrease in news output at the market level and claims that a study it performed in 2007 using the Commission's data confirmed that result.[383] In response, NAA argued that Free Press's 2007 study was discredited and that Free Press misunderstands how news is investigated and produced.[384]

137. The author of Media Ownership Study 4 cautions that the result showing less local news in markets with newspaper/broadcast cross-ownership is "imprecisely measured and not statistically different from zero."[385] Given that disclaimer, and the disputed evidence in the 2010 Quadrennial Review record, we propose not to accord much weight to the study's finding that the amount of local news at the market level may be negatively correlated with newspaper/broadcast cross-ownership. Despite the criticisms of the methodology used in Media Ownership Study 4, we think it reasonable to accept the premise that such cross-ownership may result in a greater amount of local news production by the cross-owned properties based on other record evidence.[386] We are aware, however, that such an outcome is not assured and depends in part on the owner's commitment to disseminate local news.

138. Cox argued that the harms to localism caused by the continuance of the NBCO rule would far outweigh the perceived benefits of the rule in preserving viewpoint diversity.[387] Both diversity

---

[379] NAB NPRM Comments at 45-47; Fox NPRM Comments at 24-25; Morris NPRM Reply at 7-8.

[380] CWA NPRM Comments at 8-9 (noting that the study does not account for effects on viewpoint diversity or minority and female ownership, is not based on the actual content aired, and does not measure for qualitative effects); Free Press NPRM Reply at 11-13.

[381] Free Press NPRM Reply at 11-13; *see also* CWA NPRM Comments at 8-9.

[382] Free Press NPRM Reply at 11-13. In addition, Free Press claimed that, when grandfathered combinations are analyzed separately from waived combinations, the results show that the former, which better reflect long-term cross-ownership effects, produce less local news than waived stations. Free Press NPRM Comments at 30-33; Free Press NPRM Reply at 9-11; *but see* Media Ownership Study 4 at 40-41 (finding that "especially grandfathered stations" air more local news than non-cross-owned stations); Morris NPRM Reply at 7-8 (arguing that "real-world" evidence demonstrates the public interest benefits of newspaper/broadcast combinations, particularly those of grandfathered combinations).

[383] Free Press NPRM Comments at 28-30 (acknowledging that almost none of the variables showing a negative correlation in Media Ownership Study 4 are "statistically different from zero"); Free Press NPRM Reply at 6-9 (citing Media Ownership Study 4's finding that an increase in news output at the station level does not spill over to the market level).

[384] NAA NPRM Reply at 6-9 (stating that television stations air stories perceived as newsworthy regardless of the presence of a cross-owned station within the same market).

[385] Media Ownership Study 4 at 24; *see also* NAB NPRM Comments at 46 n.178; NAA NPRM Comments at 16 n.62; Morris NPRM Reply at 8 n.16.

[386] *See NPRM*, 26 FCC Rcd at 17525, ¶ 98 (citing *2002 Biennial Review Order*, 18 FCC Rcd at 13753-60, 13760-61, ¶¶ 342-54, 356-58; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2038, ¶ 46); *see also* NAB NPRM Comments at 45-47; NAB NPRM Reply at 28-29; Cox NPRM Comments at 2-8, 15-17; Tribune NPRM Comments at 3, 12-17; Tribune NPRM Reply at 15-20; Fox NPRM Comments at 23-25; Morris NPRM Reply at 7-8; Journal Communications NPRM Reply at 3-4; CRT NPRM Comments at 3-8; A. H. Belo NPRM Comments at 8-10; NAA NPRM Comments at 12-18; NAA NPRM Reply at 2-3.

[387] Cox NPRM Comments at 15-17 (noting that newspaper circulation has declined every quarter since 2003; newspaper revenues decreased 6 percent in 2010, following a 26 percent drop in 2009; newspapers employ 26

(continued....)

and localism are important goals. We believe the nation's interest in maintaining a robust democracy through a "multiplicity of voices" justifies maintaining certain NBCO restrictions even if doing so prevents some combinations that might create cost-savings and efficiencies in news production. Moreover, we do not believe that the elimination of the NBCO rule would necessarily result in benefits to localism. We seek comment on whether a continued restriction, with the modifications described below, would minimize any potential effects on localism while preserving and promoting viewpoint diversity.

### (iii)     Competition

139.     Traditionally, the Commission does not evaluate the NBCO rule in terms of its competition goal because it has found that newspapers and broadcast stations do not compete in the same product market.[388] However, some commenters in the 2010 Quadrennial Review proceeding expressed concerns about the impact of the NBCO rule on competition more generally. For example, NAB claimed that restricting newspaper/broadcast combinations hinders the ability of broadcasters to compete more effectively for viewers and advertising dollars.[389] Morris suggested that the NBCO rule puts newspaper/broadcast owners at a competitive disadvantage because they cannot acquire as many media properties as broadcast-only owners.[390] Several commenters argued that repeal of the rule is essential to relieve the struggling media industry.[391] Tribune stated that traditional media owners suffered tremendous losses due to the financial crisis at the same time that new technologies pose challenges to traditional business models.[392] Tribune provided statistics demonstrating steep declines in the advertising and circulation revenues of newspapers[393] and in the advertising revenues of the broadcast industry.[394] Cox

(Continued from previous page) ————————————————
percent fewer people than in 2000; and annual reporting and editorial spending by newspapers fell by $1.6 billion between 2006 and 2009).

[388] *2002 Biennial Review Order*, 18 FCC Rcd at 13748-53, ¶¶ 331-41; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2032, ¶ 39 n.131.

[389] NAB NPRM Comments at 39-40.

[390] Morris NPRM Comments at 11-13.

[391] For example, NAB argued that the financial challenges facing owners of newspapers and broadcast stations obviate any justification for the NBCO rule and observed that the authors of Media Ownership Study 1 question whether there is an economic basis for retaining the rule. NAB NPRM Comments at 41-42. In addition, NAA argued that newspaper journalism is under threat and that the outdated NBCO rule impedes the newspaper industry's ability to provide first-class journalism to local communities. NAA NPRM Comments at 1-4. NAA cited findings from the Information Needs of Communities Report demonstrating newspaper cutbacks in recent years, especially in small to mid-sized markets. *Id.* at 6-8 (stating, for example, that more than 200 newspapers in the United States closed or eliminated a newsprint edition from 2007 to 2010). AFCP *et al.* claimed, however, that large, consolidated media companies have long abandoned the type of local news coverage that hometown papers provide. AFCP *et al.* NPRM Comments at 6-8 (imploring the Commission not to ignore or discount the contributions of community papers to localism). Tribune disputed such a claim and argued that AFCP *et al.* were essentially asking for special protection from competition. Tribune NPRM Reply at 20-22.

[392] Tribune NPRM Comments at 52-53; *see also* A. H. Belo NPRM Comments at 5-8 (arguing that the NBCO rule hinders the ability of newspapers and broadcasters to create new business models, which they must do to address increasing audience fragmentation); CRT NPRM Comments at 8-11 (citing the Information Needs of Communities Report for evidence of declining newspaper and television revenues and citing findings that the Internet has surpassed newspapers as a source of national and international news); Morris NPRM Reply at 5-7 (arguing that the rule's repeal would help traditional media outlets address their competitive and financial challenges and better serve the public by enabling efficiencies of scale, enhancing newsgathering capabilities, and encouraging investment); NAB NPRM Reply at 28-29 (claiming that the need for cross-ownership has never been greater).

[393] Tribune NPRM Comments at 45-51 (noting, for example, that the advertising revenues of newspapers dropped 48 percent from 2006 to 2010 and that paid circulation is less than 66 percent of the newspaper industry's 1975 level); *see also* Tribune NPRM Reply at 22-27 (citing evidence from the Information Needs of Communities Report and NAA's comments to the *NPRM*). NAA claimed that, despite a three-fold increase in the United States' population,
(continued....)

argued that the rapidly declining audience share of newspapers can no longer be used to single them out for a cross-ownership prohibition.[395] Morris asserted that, in light of the economic challenges facing traditional media, it would be "irrational to handicap the parties best situated to continue to provide the resources necessary for local newsgathering and enterprise journalism."[396]

140.     In contrast, AFCP *et al.* urged the Commission to consider more than "the simple narrative" of declining advertising revenues.[397] They submitted that the Commission should examine newsroom contractions and bankruptcies within a broader context that includes the repayment of "borrowed fortunes."[398] They warned that any relaxation of the NBCO rule would compound such problems, as further cross-media mergers would result in greater debt in the industry.[399] Similarly, Free Press argued that consolidation and the accompanying debt loads are partly responsible for the financial downturn in the newspaper industry.[400] Free Press provided several examples of newspaper companies that have separated their cross-owned combinations, or are considering doing so.[401] It asserted that "it is not the FCC's duty to bail out a few conglomerates that mismanaged their businesses."[402] According to CWA, "the Commission should not look at television as a lifeline for local newspapers."[403] CWA argued that the answer does not lie in further media consolidation, which it asserted would reduce viewpoint

(Continued from previous page) ————————————————

paid daily newspaper circulation is currently at World War II-era levels. It stated that overall newspaper advertising revenues fell 47 percent from 2005 to 2009, with classified advertising, which accounted for 40 percent of print advertising revenue in 2000, dropping from $19.6 billion in 2000 to $5.6 billion in 2010. NAA NPRM Comments at 5-6.

[394] Tribune NPRM Comments at 51-52 (stating, among other things, that the overall revenue of the television industry fell 46 percent since 2000); *but see* CWA NPRM Comments at 9-10 (asserting that broadcast television continues to be a "major and profitable part of the media industry" and that consumers benefit when there is competition from the online sector for advertising dollars).

[395] Cox NPRM Comments at 12-14.

[396] Morris NPRM Comments at 19-21. Morris stated that the Commission's statutory mandate is to determine whether ownership rules serve the public interest; it is not to withhold relief unless circumstances become so dire that the newspaper industry's survival is at stake. Morris NPRM Reply at 6.

[397] AFCP *et al.* NPRM Comments at 5. AFCP *et al.* reminded the Commission of its obligation to take a "fresh look" at the NBCO rule and of its stated intention to analyze the impact of consolidation in media markets. *Id.* at 3-5.

[398] *Id.* at 5.

[399] *Id.*; *see also* CWA NPRM Reply at 4-5 (claiming that the "extraordinary debt" incurred as a result of media consolidation shows that a relaxed NBCO rule would lead to more debt, more job losses, and less local news and information).

[400] Free Press NPRM Comments at 36-39; Free Press NPRM Reply at 15-17.

[401] Free Press NPRM Comments at 37-38; Free Press NPRM Reply at 16-17. Free Press also asserted that newspapers' profit margins, while lower than in the era of monopoly profits, often exceed the S&P average operating margin. Free Press NPRM Comments at 35-36; *but see* Tribune NPRM Reply at 22-24 (arguing that the findings in the Information Needs of Communities Report regarding newspapers' declining revenues trump Free Press's "general and outdated statistical assertions" regarding profit margins).

[402] Free Press NPRM Comments at 39; Free Press NPRM Reply at 17; *but see* Tribune NPRM Reply at 24-27 (contending that it is not seeking a bail-out but merely the same freedom to pursue the kinds of economies of scale that other media enjoy and that it was advocating its position on the NBCO rule long before it went into bankruptcy).

[403] CWA NPRM Comments at 4.

diversity and make it more difficult for online news sites to compete with traditional media.[404] Rather, CWA argued, innovative journalistic ventures should be afforded the opportunity to survive and grow.[405]

141. Although we share the concerns of many Americans about the future of the newspaper industry, we agree with Free Press and CWA that it would be inappropriate to relax the NBCO rule on the ground that newspapers are struggling to reinvent a successful business model.[406] We maintain that the pertinent issue for this part of our analysis is whether the NBCO rule is necessary to promote competition between newspapers and broadcast stations. The Commission already has determined that it is not. We do not believe we could justify jeopardizing viewpoint diversity in local markets based on assertions that the rule limits opportunities for traditional media owners to increase revenue. Nonetheless, given that the revisions to the NBCO rule considered below would narrow its application, we seek comment on the extent to which such revisions would mitigate any unintended harms.

142. As CWA noted, the "news business was and is changing."[407] Traditional news providers need to create innovative strategies to keep pace with the evolving media industry. Free Press observed that the popularity of newspaper websites offers newspaper owners the opportunity to strengthen their business model by leveraging their advantages in the market for online content.[408] Despite the bleak outlook for newspapers' print revenues, there have been some encouraging signs that traditional media are finding new ways to monetize their content.[409] We recognize that the adjustments needed to survive

---

[404] *Id.* at 1-4, 8-12 (citing evidence from the Information Needs of Communities Report showing that even the down-sized newsrooms of traditional media have many more reporters than start-up online news enterprises). According to CWA, "[t]he role of the Commission is to allow for vibrant competition, not ensure a fixed profit margin for [b]roadcasters." *Id.* at 8-11 (arguing that the Commission should "allow an environment for experimentation and growth for all local media enterprises, established or not").

[405] *Id.* at 4, 8-12 (asserting that the Commission should not stifle innovation by letting the leading media organizations "crowd out" start-ups).

[406] Free Press NPRM Comments at 39; Free Press NPRM Reply at 17; CWA NPRM Reply at 6-7; *see also* AFCP *et al.* NPRM Comments at 2-3 (asserting that the Communications Act compels the Commission "to place the broad public interest above the narrow interest of broadcasting and daily newspaper corporations"). CWA suggested that the government could assist struggling newspapers through other policy initiatives, such as tax incentives. CWA NPRM Comments at 11.

[407] CWA NPRM Comments at 4.

[408] Free Press NPRM Comments at 38-39; *see also* INFORMATION NEEDS OF COMMUNITIES at 55 (stating that "from a traffic perspective, newspapers have come to dominate the Internet on the local level"). However, NAA observed that, although newspapers' online advertising revenue increased by $1 billion between 2005 and 2010, newspapers' print advertising decreased by $24.6 billion during that period. NAA NPRM Comments at 10-12 (arguing that the adaptation of newspapers to online methods have not enabled the industry to overcome its revenue losses). NAA explained that "online news aggregators, search engines, and online news forums regularly copy or summarize newspaper content and sell their own advertising to accompany the content, thereby diverting revenue away from the entity that has invested its own earnings to generate that content." *Id.* at 6.

[409] Various media researchers report that newspaper companies and local television stations are successfully experimenting with new revenue models and finding creative ways to increase online revenue. *See, e.g.,* INFORMATION NEEDS OF COMMUNITIES at 56; Michael Malone, *Borrell: Stations Seeing 35% Boost in Online Revenue This Year*, BROADCASTING & CABLE, Apr. 3, 2012, http://www.broadcastingcable.com/article/482671-Borrell_Stations_Seeing_35_Boost_in_Online_Revenue_This_Year.php (visited Jan. 30, 2014); BIA/Kelsey, *BIA/Kelsey Reports Local Television Revenues Rose 23.2% to $19.4 Billion in 2010, Driven by Political Campaigns and National Advertising* (press release), Apr. 29, 2011; STATE OF THE NEWS MEDIA 2012 at Digital Essay, Newspapers Essay; *see also* Staff, *Station News Staffing Soared in 2011*, TVNEWSCHECK, July 11, 2012, http://www.tvnewscheck.com/article/60714/station-news-staffing-soared-in-2011 (visited Jan. 30, 2014); Rich Smith, *Did Warren Buffett Just Save the Newspaper Industry?*, DAILYFINANCE, May 25, 2012, http://www.dailyfinance.com/2012/05/25/did-warren-buffett-just-save-the-newspaper-industry/ (visited Jan. 30, 2014).

this transition period may pose insurmountable challenges for some owners. Accordingly, as discussed below, we propose to include an exception to the cross-ownership restriction when either the newspaper or the television station involved in a proposed merger is failed or failing. We believe the risk that a common owner will influence the viewpoint of a newly acquired outlet is preferable to the greater diversity harm of losing the outlet altogether.

143.     We seek comment, for purposes of the 2014 Quadrennial Review proceeding, on our tentative view, as described above and consistent with Commission precedent, that the NBCO rule is not necessary to promote our localism and competition goals but that some form of cross-ownership restriction remains necessary to preserve and promote viewpoint diversity in local markets.

### b.     Newspaper/Radio Cross-Ownership

144.     *Background.* In the *NPRM*, the Commission sought comment on whether it should eliminate the part of the NBCO rule that applies to newspaper/radio combinations.[410] The Commission tentatively concluded that radio stations are not the primary outlets that contribute to viewpoint diversity in local markets and that a substantial amount of news and talk show programming on radio stations is nationally syndicated, rather than locally produced.[411] The Commission's preliminary view was that radio stations are not a primary source that consumers turn to for local news and information and that, rather, consumers in markets of all sizes rely most heavily on other types of news outlets for local news and information.[412] The Commission asked whether newspaper/radio cross-ownership would promote localism and provide financially struggling newspapers and radio stations the opportunity to become vital participants in the news and information marketplace.[413]

145.     *Discussion.* We seek further comment on whether the restriction on newspaper/radio cross-ownership should be eliminated from the NBCO rule.[414] We seek comment on the Commission's tentative conclusions that radio stations are not the primary outlets that contribute to viewpoint diversity in local markets and that consumers rely predominantly on other outlets for local news and information.[415] Several commenters in the 2010 Quadrennial Review proceeding referenced the fact that promoting viewpoint diversity has been the Commission's lone justification for retaining the restriction.[416] As discussed above, the Commission has found repeatedly that the restriction does not promote its localism or competition goals, and we tentatively reaffirm those findings.[417] Therefore, we tentatively agree with

---

[410] *NPRM*, 26 FCC Rcd at 17529-30, ¶ 112.

[411] *Id.*

[412] *Id.*

[413] *Id.* In addition, the Commission asked whether it should substitute Arbitron market definitions for radio contours to determine when the NBCO rule is triggered for newspaper/radio combinations and whether existing combinations implicated by a rule change should be grandfathered. *Id.* at 17530-31, ¶¶ 113-14. We invite further comment also on these issues.

[414] Several commenters urged the Commission to abolish the restriction. *See* Cox NPRM Comments at 20-22; Bonneville/Scranton NPRM Comments at 1-22; NAA NPRM Comments at 23-24; NAA NPRM Reply at 10; NAB NPRM Comments at 49; NAB NPRM Reply at 29-30; Morris NPRM Comments at 4, 8-11; Morris NPRM Reply at 3, 8-10.

[415] Several commenters supported the Commission's view. Cox NPRM Comments at 20; Morris NPRM Comments at 8-11; Morris NPRM Reply at 8-9; Bonneville/Scranton NPRM Comments at 5-13, 18-19.

[416] Cox NPRM Comments at 20-21; Bonneville/Scranton NPRM Comments at 2; Morris NPRM Comments at 5-6; *see also* NAA NPRM Comments at 23-24. As we tentatively concluded above, however, we believe that the local radio rule remains necessary to promote competition and that it also fosters new entry (and thus viewpoint diversity) and promotes localism.

[417] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2032, 2038, ¶¶ 39 n.131, 46; *2002 Biennial Review Order*, 18 FCC Rcd at 13748-60, 13760-61, ¶¶ 331-54, 356-58.

several commenters that if the rule were no longer necessary to support the Commission's viewpoint diversity policy, then the newspaper/radio cross-ownership restriction would be left without a public interest rationale.[418] Under Section 202(h) of the 1996 Act, we must repeal or modify any media ownership regulations that no longer serve the public interest.[419] Accordingly, we seek comment on whether the newspaper/radio cross-ownership restriction advances our interest in promoting viewpoint diversity or whether we should eliminate the restriction and permit common ownership of newspapers and radio stations in all markets, within the prescribed limits of the local radio ownership rule.

146. Evidence from the Information Needs of Communities Report shows that consumers' reliance on radio news has declined steadily over the past two decades.[420] From 1991 to 2010, the number of people reporting that they listened to some news on the radio dropped from 54 percent to 34 percent.[421] Of the approximately 11,000 commercial radio stations in the country, only 30 are all-news radio stations, a reduction from the mid-1980s when there were 50 such stations.[422] Although a small number of commercial all-news radio stations in the nation's largest markets are very successful, radio stations in most cities do not provide much local journalism.[423] One finding showed that in 2007 more than 40 percent of radio stations carried news programming produced remotely by a commonly owned station outside the local market.[424] Typically, only one employee is involved in news output at a median-sized radio station.[425] Although the news-talk radio format has exploded in popularity, it has done little for traditional local radio news.[426] Eighty-six percent of programming on news-talk stations is nationally syndicated, rather than locally produced.[427] We invite commenters to provide any new data on these subjects that would be useful for our 2014 Quadrennial Review.

147. In seeking comment on the elimination of the newspaper/radio cross-ownership restriction, we note that the Commission has recognized since at least 1970 that radio does not play a

---

[418] *See* Cox NPRM Comments at 21-22; Bonneville/Scranton NPRM Comments at 1-2, 10-22.

[419] Section 202(h) of the 1996 Act, 47 U.S.C. § 303 note.

[420] *See* Bonneville/Scranton NPRM Comments at 11-12 (referencing the Information Needs of Communities Report).

[421] INFORMATION NEEDS OF COMMUNITIES at 62. Notably, the report did not define "news" or differentiate between syndicated national news, non-news talk radio, or local news. By way of comparison, the report states that newspaper readership dropped even more from 56 percent to 31 percent; however, much of that newspaper readership has simply shifted online. *Id.*; *see also* CHANGING NEWS LANDSCAPE at 9 (reporting declines of radio news listenership and newspaper readership to 33 percent and 29 percent, respectively); *but see* HOW PEOPLE LEARN ABOUT THEIR LOCAL COMMUNITY at 13 (finding that 51 percent of adults obtain some local information at least weekly from a radio station or its website); HOW PEOPLE GET LOCAL NEWS AND INFORMATION at 3 (finding that suburban residents are more likely than others to rely on local radio as a news platform, perhaps due to relatively longer commuting times).

[422] INFORMATION NEEDS OF COMMUNITIES at 14, 62.

[423] *Id.* at 14, 65-66; *see also* Bonneville/Scranton NPRM Comments at 12-13 (pointing to findings in the Pew Baltimore Study that the vast majority of Baltimore's radio stations did not broadcast any local news or original news reports).

[424] INFORMATION NEEDS OF COMMUNITIES at 63. While listeners in some markets have access to a commercial all-news radio station, those 30 stations represent a tiny fraction of the roughly 11,000 commercial radio stations in the country. Would their viewpoint diversity contributions provide a sufficient basis for imposing a newspaper/radio cross-ownership restriction?

[425] *Id.* at 64.

[426] *Id.* at 14, 66-67; *see also* Bonneville/Scranton NPRM Comments at 12-13 (pointing to similar findings in the Pew Baltimore Study).

[427] INFORMATION NEEDS OF COMMUNITIES at 14, 66-67.

dominant role in promoting viewpoint diversity.[428]  That year, while seeking comment on proposals that led to the adoption of the NBCO rule, the Commission identified as its foremost concern the common control of television stations and newspapers and noted the significant decline in the number of people relying primarily on radio for local news.[429]  Even as it adopted the NBCO rule in 1975, the Commission recognized that "a radio station cannot be considered the equal of either the paper or the television station in any sense, least of all in terms of being a source for news or for being the medium turned to for discussion of matters of local concern."[430]  The Commission, nevertheless, included newspaper/radio combinations within the NBCO prohibition "to encourage still greater diversity" because "even a smaller gain is worth pursuing."[431]  Since 1975, the Commission repeatedly has acknowledged radio's lesser contributions to viewpoint diversity.  For example, the Commission stated in its 2002 media ownership review that "broadcast radio generally has less of an impact on local diversity than broadcast television."[432]  In its 2006 review, it observed that "radio is a significantly less important source of news and information than newspapers or television."[433]  We seek comment on whether in today's marketplace the link between the newspaper/radio cross-ownership restriction and the Commission's goal of promoting viewpoint diversity has become too tenuous to support the rule under Section 202(h).

148.    We invite commenters to augment the record with any information or evidence regarding any impact on diversity in the local radio markets.  We note that Media Ownership Study 5 suggests that eliminating the restriction would be unlikely to affect either radio news variety or listening, given its finding that newspaper/radio cross-ownership is not correlated with either of those metrics.[434]  We seek comment on this finding.  Moreover, several commenters claimed that lifting the newspaper/radio cross-ownership restriction would revitalize local news on radio stations and would provide struggling newspapers with a broader base of financial support and an increased ability to reach audiences.[435]  Although we would not decide to eliminate the restriction based on those projected outcomes, we would welcome the accrual of any such incidental benefits and we seek comment on such commenters' assertions.  Further, we seek comment on to what extent, if any, our decisions regarding the

---

[428] *See* Bonneville/Scranton NPRM Comments at 5-10.

[429] *Amendment of Sections 73.35, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM and Television Broadcast Stations*, Docket No. 18110, Further Notice of Proposed Rulemaking, 22 FCC 2d 339, 344, ¶¶ 26-27 (1970) (citing evidence that radio was "significantly less important than television and newspapers as primary sources of news").

[430] *1975 Second Report and Order*, 50 FCC 2d at 1083, ¶ 115; *but see id.* at 1083-84, ¶ 116 (noting that radio may play a vital role in communities where there are no local television stations).

[431] *Id.* at 1076, ¶ 104.

[432] *2002 Biennial Review Order*, 18 FCC Rcd at 13800, ¶ 459.

[433] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2057, ¶ 80 n.259; *see also id.* at 2052, ¶ 73 (noting that "proposed newspaper/radio combinations will generally be less likely to raise concentration concerns than proposed newspaper/television combinations in light of the fact that radio is generally not as influential a voice as is television").  Radio's less influential role also is implied by the framework of the 2006 rule.  As commenters noted, radio stations do not merit consideration for purposes of counting the required minimum number of eight major media voices.  Morris NPRM Comments at 10; Bonneville/Scranton NPRM Comments at 8 n.16.  Further, the Commission has not perceived a need to adopt either a voices test for proposed newspaper/radio combinations or a radio parallel to the top-four television restriction in the NBCO rule.  *See* Bonneville/Scranton NPRM Comments at 8 n.16 (noting the lack of a voices test).

[434] Media Ownership Study 5, Station Ownership and the Provision and Consumption of Radio News 16-17, by Joel Waldfogel (2011) ("Media Ownership Study 5") (finding no statistically significant relationship between newspaper ownership of commercial news radio stations and the availability of news variety or listening).

[435] Cox NPRM Comments at 21-22; Morris NPRM Comments at 4-8, 13-18; Bonneville/Scranton NPRM Comments at 15-18.

newspaper/radio cross-ownership rule and radio/television cross-ownership rule, discussed below, should align given that the basis of our analysis for both rules may rest primarily on the contributions of radio to viewpoint diversity.[436]

149. Finally, we note that earlier this year MMTC submitted a study examining the issue of cross-owned media properties in a market. According to MMTC, the study indicated that cross-ownership does not have a disparate impact on minority and female broadcast owners. As discussed further below, we ask commenters to provide any demonstrable evidence of such a link that may have become available since the MMTC Cross-Ownership Study.

### c. Newspaper/Television Cross-Ownership Rule

#### (i) Case-by-Case Waiver Approach

150. *Background.* In the *NPRM*, the Commission tentatively concluded that it should reinstate a simplified version of the 2006 rule's framework generally prohibiting newspaper/broadcast cross-ownership but granting waiver requests on a case-by-case basis, using presumptive guidelines, when the proposed merger would not unduly harm viewpoint diversity in the local market.[437] The Commission sought comment on whether, alternatively, it should adopt a bright-line rule allowing mergers for newspaper/broadcast combinations in the top 20 DMAs in those situations where a waiver request would have been given a favorable presumption under a case-by-case approach.[438] The Commission noted that a bright-line rule for such newspaper/broadcast combinations would conserve resources and promote certainty but that a case-by-case approach would afford greater flexibility to account for the specific circumstances of a proposed merger.[439]

151. *Discussion.* Although further comment on the issue is welcome, we do not propose to adopt a bright-line rule allowing newspaper/television combinations, even under narrowly prescribed circumstances. The Commission noted in the *NPRM* that a bright-line rule permitting certain newspaper/broadcast combinations in the top 20 DMAs might promote consistency and certainty in the marketplace and reduce the need for a potentially costly waiver process.[440] We recognize that, under certain conditions, the largest markets may be able to accommodate a limited amount of consolidation without impairing viewpoint diversity. We also are aware that bright-line rules are more likely to produce predictable and consistent outcomes in an expeditious and less costly manner than rules that incorporate a waiver process, which is inherently more uncertain. We are concerned, however, that a bright-line rule is too blunt an instrument to be used for allowing newspaper/television cross-ownership, no matter how limited. For example, allowing certain combinations only in the top-20 DMAs could foreclose merger opportunities in smaller markets where viewpoint diversity is sufficiently robust. Conversely, such a bright-line rule might permit a combination in a top-20 DMA that would harm the public interest.

152. We tentatively conclude, therefore, that a general prohibition on newspaper/television combinations in all markets is the appropriate starting point when considering the impact of newspaper/television cross-ownership on viewpoint diversity. We believe the 2010 Quadrennial Review record supports this view. We recognize, however, that particular combinations might be shown to be consistent with our diversity goal, and so we propose to entertain waiver requests. A waiver process would enable the Commission to examine proposed mergers on a case-by-case basis to determine the

---

[436] *See infra* Section III.D; *see also* Morris NPRM Comments at 10-11 (stating that if radio stations are permitted to combine with television stations, then there is no logical basis for restricting them from merging with a newspaper).

[437] *NPRM*, 26 FCC Rcd at 17526, ¶ 103.

[438] *Id.* at 17526-27, ¶ 104.

[439] *Id.* at 17526-27, ¶¶ 103-04.

[440] *Id.* at 17526-27, ¶ 104.

likely effects on the affected market. Because the Commission would have the flexibility to evaluate the particular circumstances of a newspaper/television combination, it could tailor its decision accordingly.

153.    We believe that a case-by-case waiver approach would produce sensible outcomes and also improve transparency and public participation in the process. Such an approach would afford interested parties the opportunity to comment on a proposed newspaper/television combination because the parties to the transaction would be required to seek a waiver of the Commission's rules regardless of whether the transaction involved the transfer of a broadcast license.[441] To that end, we seek comment on whether, to enable a timely public response to a merger involving a newspaper purchase by a television licensee, we should require the station to file its waiver request prior to a newspaper acquisition, rather than at the time of the station's license renewal, and should require Commission staff to place such waiver requests on public notice. Under the Commission's current practice, if a television licensee purchases a newspaper that triggers the NBCO rule, then, absent a waiver, it must dispose of its station within one year or by the time of its next renewal date, whichever is longer. Alternatively, it can seek a waiver of the rule in conjunction with its license renewal, at which point interested parties are free to comment on the waiver request.[442] As a result, the opportunity to comment on a television station's acquisition of a newspaper may not occur until many years after consummation of the purchase. We therefore seek comment on requiring television licensees to file waiver requests prior to a newspaper acquisition in order to facilitate the public's timely participation. What are the benefits of this approach and what burdens, if any, would it impose on the applicants? Would the potential benefits outweigh any burdens?

154.    *Pure Case-by-Case Approach.* We also request comment on what type of waiver process would enable the Commission to identify any acceptable newspaper/television combinations most accurately and effectively. The Commission could implement a pure case-by-case approach that evaluates the totality of the circumstances for each individual transaction, considering each waiver request anew without measuring it against a set of defined criteria or awarding the applicant an automatic presumption based on a *prima facie* showing of particular elements. The Commission would not require any particular type of evidence to support a waiver applicant's showing that the proposed merger would not diminish viewpoint diversity, and thus would be in the public interest. Similarly, opponents of a transaction could offer a range of arguments and evidence concerning the unique characteristics of a transaction that weigh against the grant of that particular application. This approach could offer the Commission maximum flexibility and discretion in each case to decide whether a waiver would serve the public interest. Such a potentially broad inquiry would avoid a formulaic approach, which may not always adequately measure an imprecise quality like viewpoint diversity. On the other hand, a pure case-by-case approach might not promote consistency and certainty in the marketplace and could impose additional burdens or costs on the applicants, petitioners, or Commission. We seek comment on the pros and cons, costs and benefits of evaluating waiver requests on the individualized merits of each particular case without relying on presumptive guidelines or established criteria.

---

[441]  A newspaper owner seeking to obtain a television station license would need to seek a waiver of a newspaper/television cross-ownership rule as part of its application for assignment of license or transfer of control. In considering a bright-line rule approach, the *NPRM* indicated that an opponent of a transaction permitted under a bright-line rule would continue to have the option to file a petition to deny a broadcast license transfer and assignment application involving an NBCO combination. 26 FCC Rcd at 17527, ¶ 104. However, with respect to any newspaper purchases by broadcast owners that would be permitted under a bright-line rule, would-be petitioners would not have an opportunity to oppose the newspaper purchase because there would be no transfer application involved. A case-by-case waiver approach would resolve that issue as every proposed newspaper/television combination would require Commission approval.

[442]  *1975 Second Report and Order*, 50 FCC 2d at 1076, ¶ 103 n.26.

155.    Free Press argued in the 2010 Quadrennial Review record that the Commission's traditional waiver test would provide a sufficient mechanism for granting waivers of a blanket prohibition on newspaper/broadcast cross-ownership.[443] If the Commission were to adopt a case-by-case approach to waiver applications, we seek comment on whether, and if so how, the approach should differ from the Commission's traditional waiver standard under Commission rules.[444] Further, we seek comment on whether a case-by-case approach should incorporate, or disavow, the criteria for waiver set forth when the NBCO rule was adopted in 1975, and which are currently in effect. At the time of adoption, the Commission "contemplated waivers in four situations: (1) where there is an inability to dispose of an interest to conform to the rules; (2) where the only possible sale is at an artificially depressed price; (3) where separate ownership of the newspaper and station cannot be supported in the locality; and (4) where the purposes of the rule would not be served by divestiture."[445] Has the application of these criteria historically been useful to the industry, the public, or the Commission in evaluating transactions? Have they tended to create an insurmountable bar to the grant of applications or inhibited industry participants from considering transactions? Or do the conditions provide a loophole to the existing ban? Do the specific criteria add value to the standard included in the Commission's rules? Should different criteria be enunciated, for instance including any or all of the elements that are described as possible presumptions as described below? We seek comment on these issues.

156.    *Case-by-Case Approach with Presumptions.* In addition, we seek comment on an approach whereby the Commission would ascribe a favorable presumption to certain waiver applicants in the top-20 DMAs and a negative presumption to all other waiver applicants. As described below, we seek comment on requiring as conditions for a favorable presumption that: (1) the proposed merger does not involve a television station ranked among the top-four television stations in the DMA and (2) at least eight major media voices remain in the DMA following the transaction. In the 2010 Quadrennial Review proceeding, NAA warned that opportunities for acquisition and investment are stifled by the regulatory uncertainty and delay associated with even a straightforward waiver request entitled to a favorable presumption.[446] CRT called the NBCO waiver provision "convoluted,"[447] and Tribune claimed that the use of presumptions creates "uncertainty, additional cost and prejudice."[448] Nevertheless, presumptive guidelines would provide waiver applicants a greater degree of predictability than under a pure case-by-case approach while still affording the Commission some flexibility to take into account the particular circumstances of a proposed merger.[449] Newspaper and television station owners could make more informed decisions about whether to expend the time and resources to pursue a merger. Presumptive guidelines would not prevent a waiver applicant from submitting whatever evidence it deemed useful and would not constrain the Commission's decision-making discretion. However, by providing direction

---

[443] Free Press NPRM Comments at 39. Tribune also supported using the Commission's traditional waiver process but as a means of granting acceptable mergers that fall short of meeting the conditions of a bright-line rule allowing certain mergers. Tribune NPRM Comments at 57-58.

[444] 47 C.F.R. § 1.3.

[445] *Applications of Tribune Co. and its Licensee Subsidiaries, Debtors In Possession, et al.*, Memorandum Opinion and Order, 27 FCC Rcd 14239, 14247, ¶ 24 (Med. Bur. 2012) (citing *1975 Second Report and Order*, 50 FCC 2d at 1084-85, ¶¶ 117-19).

[446] NAA NPRM Reply at 12-13 (arguing that the undesirability of a case-by-case waiver approach is supported by the fact that no merger applications were filed during the period the 2006 rule was in effect).

[447] CRT NPRM Comments at 3, 11-12.

[448] Tribune NPRM Comments at 57-58.

[449] *But see* Morris NPRM Comments at 8 (citing *WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C. Cir. 1969); *P&R Temmer v. FCC*, 743 F.2d 918, 929 (D.C. Cir. 1984)) (arguing that a fixed waiver standard, and the use of a negative presumption, contravenes the Commission's obligation to evaluate waiver requests on an individualized basis and to provide a "safety valve" from its restrictions).

regarding what showings to make, presumptive guidelines could save a waiver applicant time and money and improve its chances for a successful outcome in warranted circumstances. On the other hand, the presumptions could lead to unintended consequences in specific situations, such as recommending denial of an application that could benefit the public interest as a result of the specific characteristics of the transaction and local market or the grant of an application that would not. We seek comment on the pros and cons, costs and benefits of adopting a case-by-case approach that includes presumptions and the trade-offs involved as compared to the pure case-by-case approach.

### (ii) The Scope of the Rule

157.    *Background.* The current rule prohibits common ownership of a daily newspaper and a television station when the Grade A contour of the station encompasses the entire community in which the newspaper is published.[450] We tentatively conclude that the rule should be updated to reflect the fact that, since the transition to digital television service, full-power television stations no longer have analog Grade A contours. In the *NPRM*, the Commission sought comment on whether it should modify the rule so that the cross-ownership prohibition is triggered when a daily newspaper and a television station are located in the same Nielsen DMA.[451] It asked what the impact of the change would be, and in particular whether many more newspaper/television combinations would be implicated under a DMA-based approach than under a contour-based approach.[452] The Commission's preliminary view was that DMA market definitions would reflect newspaper circulation and television viewing areas more accurately than the current approach.

158.    The Commission proposed to grandfather ownership of existing newspaper/television combinations that would be in violation of the NBCO rule as a result of shifting to a DMA-based approach. It tentatively concluded that requiring divestiture would be disruptive to the industry and a hardship for the individual owners. In addition, it sought comment on whether grandfathered combinations should be freely transferable in perpetuity.[453]

159.    *Discussion.* Based on the 2010 Quadrennial Review record, including the responses of many newspaper and broadcast owners, we propose to adopt an approach that uses both DMAs and contours. Newspaper and broadcast owners argued that, because DMAs can be much larger in size than the former Grade A contour areas, the *NPRM*'s proposed DMA-based approach would expand the reach of the rule too broadly.[454] Several commenters asserted that the approach proposed in the *NPRM* could prohibit cross-ownership when there is no overlap between the community in which a newspaper is published and the primary service area of a broadcast station.[455] To avoid that possibility, we propose to

---

[450] 47 C.F.R. § 73.3555(d)(1)(iii). The Commission retained the Grade A contour approach when it revised the NBCO rule in 2006. *2006 Quadrennial Review Order*, 23 FCC Rcd at 2093, App. A.

[451] *NPRM*, 26 FCC Rcd at 17525, ¶ 99.

[452] *Id.*

[453] *Id.*

[454] NAB NPRM Comments at 47-48; NAB NPRM Reply at 30-31; Tribune NPRM Comments at 62-63; Tribune NPRM Reply at 32-33; Cox NPRM Comments at 22-24; NAA NPRM Reply at 10-12; A. H. Belo NPRM Comments at 10-13; CRT NPRM Comments at 14-16. NAB claimed that there are 24 existing newspaper/broadcast combinations that are not implicated under the current NBCO rule that would be prohibited under a DMA-based approach. It is not clear, however, if that sum included newspaper/radio combinations. NAB NPRM Comments at 48. Conversely, AFCP *et al.* viewed a DMA-based approach as a loosening of the restriction within the top-20 DMAs because a favorable presumption would be granted to merger applicants from "disparate communities" scattered throughout a wide geographic area extending beyond local markets. AFCP *et al.* NPRM Comments at 11-13. We note that the NBCO rule likely would permit the type of mergers that concern AFCP *et al.* even under a Grade A contour approach.

[455] Tribune NPRM Comments at 62-63; Tribune NPRM Reply at 32-33; Cox NPRM Comments at 23-24; NAA NPRM Reply at 10-12.

prohibit cross-ownership of a full-power television station and a daily newspaper when: (1) the community of license of the television station and the community of publication of the newspaper are in the same Nielsen DMA, and (2) the PCC of the television station, as defined in section 73.625 of the Commission's rules, encompasses the entire community in which the newspaper is published. Both conditions would need to be met in order for the cross-ownership prohibition to be triggered. The DMA requirement would ensure that the newspaper and television station both serve the same economic market, while the contour requirement would ensure that they actually reach the same communities and consumers within that larger geographic market.[456] Further, if a newspaper's community of publication is located in a different DMA than the television station, then the station likely does not primarily serve the community of publication, despite the fact that the over-the-air signal reaches that community.[457] We note further, that a television station is not entitled to carriage on cable or satellite television systems outside its DMA, and thus would not be entitled to carriage in the newspaper's out-of-market community of publication.[458] We acknowledge that such an approach could permit combinations that would be prohibited under a contour-only approach; however, we believe that the number of instances where a station's PCC encompasses a newspaper's community of publication not located in the same DMA would be limited. We seek comment on this approach and note that, if adopted, it would apply irrespective of how we decide to evaluate requests for waiver of the prohibition.

160. Our proposed approach borrows from Cox's suggestion to employ both a DMA and a contour requirement.[459] While Cox proposed that we use a contour that is the digital equivalent of the former Grade A service contour,[460] we believe the better approach is to use the PCC, as suggested by NAB.[461] The PCC is a digital contour that ensures reliable service for the community of license.[462] Commission rules already define the PCC, and it can be verified in a straightforward manner if a dispute arose concerning the reach of the NBCO rule.

161. In the *NOI*, the Commission explained that it has defined one other digital television service contour, the digital NLSC.[463] However, the NLSC is roughly equivalent to the former analog Grade B service contour and approximates the same probability of service as that contour, which reaches

---

[456] Cox NPRM Comments at 22-24 (arguing that a dual requirement would reflect both the economic markets and actual audiences served by newspapers and television stations); *see also* A. H. Belo NPRM Comments at 11 (arguing that any cross-ownership restriction must not apply to newspapers and television stations in separate but neighboring DMAs); *but see* AFCP *et al.* NPRM Comments at 11-13 (warning that Nielsen's demarcations have "shifting borders"). Further, requiring that both the newspaper and television station be located in the same market would be logically consistent with a top-four restriction and an eight major media voices restriction, both of which focus on the circumstances in the relevant Nielsen DMA.

[457] A requirement that the newspaper and television station must be located in the same DMA and have overlapping service areas before the cross-ownership rule is triggered would harmonize this rule with the local television rule, which was revised in 1999 to require that the signals of television stations both overlap and be located in the same market before the television ownership rule is triggered. *1999 Ownership Order*, 14 FCC Rcd at 12926-29, ¶¶ 47-53. In so revising the television rule, the Commission determined that the DMA was a better measure of actual television viewing patterns and of the marketplace in which the television station competes. *Id.* at 12926, ¶ 47.

[458] *See* 47 C.F.R. §§ 76.55(e), 76.66(b).

[459] Cox NPRM Comments at 22-24.

[460] *Id.* at 23. As Cox acknowledged, the Commission would need to perform engineering calculations to create a digital equivalent of the analog Grade A contour, which has not yet been defined. *Id.* at 23 n.58.

[461] NAB NPRM Comments at 47-48 (referring to the PCC as the digital city grade contour).

[462] *See Review of the Commission's Rules and Policies Affecting the Conversion to Digital Television*, MM Docket No. 00-39, Report and Order and Further Notice of Proposed Rule Making, 16 FCC Rcd 5946, 5957-59, ¶¶ 25-31 (2001).

[463] *NOI*, 25 FCC Rcd at 6117-18, ¶ 103.

a broader geographic area than the Grade A service contour.[464] For that reason, we do not believe the NLSC would be an appropriate contour to use in conjunction with the NBCO rule. When the Commission initially adopted the NBCO rule, it deliberately chose the smaller Grade A contour to define the rule's boundaries.[465] We seek comment on our preference not to adopt the NLSC.

162.    The Commission recognized in the *NOI* that because the PCC is larger than the Grade A contour, its use could result in a more restrictive NBCO rule.[466] Our proposed approach, however, would be less restrictive than our initial proposal to rely solely on the DMA market definition to trigger the cross-ownership prohibition. In addition, we have examined size differentials between the PCC and the former Grade A contour for various categories of television stations, specifically, high-VHF, low-VHF, and UHF stations. While the PCC is slightly larger than the Grade A contour, we seek comment on our belief that the size differentials are not so great as to have a meaningful impact in terms of the proposed rule's applicability.[467]

163.    Furthermore, we believe the PCC would be preferable to the other suggestions commenters offered. NAA proposed that the Commission simulate a digital Grade A contour by applying to a station's NLSC the propagation and implementation margin factor it established for cable carriage of digital broadcast stations (*i.e.*, 20dB).[468] NAA asserted that the resulting simulated contour would be appropriate because the Commission developed the 20dB measurement using "Grade A-type signal quality factors."[469] We believe that using a measurement based on the signal quality required for cable carriage would impose too strict a standard for purposes of the NBCO rule because it would exclude parts of the coverage area that reliably receive the television signal. A. H. Belo and CRT suggested that the Commission add a mileage qualifier to the DMA measurement.[470] A. H. Belo and CRT, however, did not specify what mileage the qualifier should be or explain how the Commission could develop a mileage qualifier that would be meaningful. We seek comment on our view that using the PCC would be the superior approach.

164.    We are not inclined to adopt the suggestion of A. H. Belo and CRT to limit the application of the NBCO rule to "major" daily newspapers having a circulation exceeding 5 percent of the DMA's households.[471] Cox similarly argued that the NBCO rule should not be triggered unless the

---

[464] *Id.*

[465] The Commission adopted the Grade A contour as the trigger for the NBCO rule to be consistent with the trigger for the radio/television cross-ownership rule. *1975 Second Report and Order*, 50 FCC 2d at 1075, ¶ 102. In adopting the Grade A contour for the radio/television cross-ownership trigger, the Commission explicitly rejected the Grade B contour because of its larger size; rather, the Commission focused on the television station's provision of a usable signal for a primary service to the principal community of the other station. *Amendment of Sections 73.35, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Station*, Docket No. 18110, First Report and Order, 22 FCC 2d 306, 315, ¶¶ 31-32 (1970); *see also* A. H. Belo NPRM Comments at 11; CRT NPRM Comments at 14-15. Similarly, the digital PCC proposed herein reflects a television station's primary area of service, where a usable signal is most likely to be received.

[466] *NOI*, 25 FCC Rcd at 6117-18, ¶ 103.

[467] We estimate that for a large UHF station, the PCC extends 8 kilometers (5 miles) beyond an equivalent analog station's Grade A contour, and the PCC for a large VHF station extends from a range of 23 to 38 kilometers (14.3 to 23.6 miles) beyond an equivalent analog station's Grade A contour. We note that commenters, including both NAB and Tribune, supported using the PCC. NAB NPRM Comments at 47-48; Tribune NPRM Reply at 32-33.

[468] NAA NPRM Reply at 10-12.

[469] *Id.* at 12.

[470] A. H. Belo NPRM Comments at 12-13; CRT NPRM Comments at 15; *see also* Tribune NPRM Reply at 32-33 (supporting a mileage limit that "replicates the general reach" of the Grade A contour).

[471] A. H. Belo NPRM Comments at 12-13; CRT NPRM Comments at 15 n.29.

newspaper's circulation exceeds 5 percent of the households in the television station's community of license.[472] We seek comment on whether there are any reasons to change the current definition, which states that "a daily newspaper is one which is published four or more days per week, which is in the dominant language in the market, and which is circulated generally in the community of publication."[473] We note that the newspaper definition suggested by A. H. Belo and CRT could fail to trigger the rule when a newspaper is not widely circulated in the larger DMA despite its influence in its own community of publication. In addition, we are not inclined to adopt Cox's suggestion to impose a minimum circulation requirement within the television station's community of license. Under the vacated 2006 rule, a newspaper was not deemed a "major media voice" for purposes of the rule's eight voices test unless it had a circulation exceeding five percent of the households within the DMA.[474] Different definitions may serve different purposes, however, and we seek comment on whether the current requirement that a daily newspaper be published at least four days a week, in the dominant language in the market, and circulated generally in its community of publication is sufficient to ensure the significance of the newspaper for purposes of triggering the rule, thereby obviating specification of a minimum circulation amount or modification of the area of consideration. The Commission previously has determined that newspapers with these characteristics are significant enough to come within the scope of the NBCO rule,[475] and commenters in the 2010 Quadrennial Review record proceeding have not provided evidence that a less restrictive definition would be sufficient to protect viewpoint diversity.

165.     Several newspaper and broadcast owners supported the Commission's proposal to grandfather existing newspaper/television combinations that would be prohibited as the result of a revised rule.[476] Cox warned that forcing divestiture of a newspaper in today's climate could result in the newspaper's demise.[477] Commenters in support of grandfathering also argued that grandfathered and approved combinations should be freely transferable.[478] Tribune contended that the "need for continuing approvals every time that a commonly owned property is the subject of a sale or reorganization is costly, inefficient and will likely discourage investment by introducing significant uncertainty."[479]

166.     We seek comment on our tentative conclusion that, to the extent that an existing newspaper/television combination would become newly non-compliant as a result of our proposed modification of the NBCO rule, we should grandfather such combinations in order to avoid market disruption and to avoid penalizing licensees for the switch from an analog contour to a digital contour.

---

[472] Cox NPRM Comments at 23-24 (recommending that the Commission apply a circulation standard similar to that used for purposes of counting major media voices, but with the modification that the newspaper's circulation be measured within the television station's "home community").

[473] 47 C.F.R. § 73.3555, Note 6.

[474] 47 C.F.R. § 73.3555(c)(3)(iii).

[475] *1975 Second Report and Order*, 50 FCC 2d at 1075, 1099, ¶¶ 101-02, App. F (defining a daily newspaper as one that is published four or more days a week in the English language and circulated generally within its community of publication); *2002 Biennial Review Order*, 18 FCC Rcd at 13799-800, ¶¶ 457-58 (expanding the definition to include non-English daily newspapers printed in the dominant language of the market and retaining the other required criteria to satisfy the definition); *2006 Quadrennial Review Order*, 23 FCC Rcd at 2039-40, ¶ 52 n.171 (affirming the expanded definition adopted in the *2002 Biennial Review Order*).

[476] Cox NPRM Comments at 24; Tribune NPRM Comments at 62-63; Tribune NPRM Reply at 33; A. H. Belo NPRM Comments at 13; CRT NPRM Comments at 15-16; Journal Communications NPRM Reply at 5-6; NAA NPRM Reply at 12.

[477] Cox NPRM Comments at 24.

[478] *Id.*; Tribune NPRM Comments at 63; Tribune NPRM Reply at 33; A. H. Belo NPRM Comments at 13; Journal Communications NPRM Reply at 5-6.

[479] Tribune NPRM Comments at 63.

We believe that incorporating the PCC into the rule would limit the number of existing newspaper/television combinations that would fall in this category. Consistent with existing precedent, we do not believe grandfathered combinations should be transferrable.[480] We seek comment on our view that any future transfer of a grandfathered combination should comply with the applicable ownership rules, including the NBCO rule, in place at the time the transfer of control or assignment application is filed.[481]

### (iii)     Market Tiers

167.     *Background.* In the *NPRM*, the Commission proposed to differentiate between markets ranked among the top 20 DMAs and markets below the top 20 DMAs for purposes of determining whether a waiver request is entitled to a favorable presumption under the approach discussed in the *NPRM*.[482] Consistent with its findings in the *2006 Quadrennial Review Order*, the Commission's preliminary view was that the top 20 DMAs are notably different from other markets, both in terms of voices and in terms of television and radio households.[483] The Commission tentatively concluded that, based on the range of media outlets available in the top 20 DMAs, viewpoint diversity in those largest markets is healthy and vibrant in comparison to other DMAs.[484] It sought comment on its tentative conclusion that the viewpoint diversity level in the 20 largest DMAs is sufficient to consider adopting a regulatory framework that would accommodate a limited amount of newspaper/broadcast cross-ownership in those markets.[485] It also sought comment on its continued belief that markets below the top 20 DMAs generally cannot accommodate such cross-ownership absent particular circumstances warranting a waiver.[486] In addition, it asked whether a different demarcation point would more effectively protect and promote its goals.[487]

168.     *Discussion.* In the event we were to adopt a waiver standard with presumptive guidelines, we seek further comment on whether to grant a favorable presumption to waiver requests seeking approval for a merger in a top-20 DMA where certain conditions are met and to ascribe a negative presumption to waiver requests involving mergers in the remaining DMAs. As described below, we also seek comment on whether waiver requests for proposed newspaper/television combinations within the top-20 DMAs should be entitled to a favorable presumption only if the television station were not ranked among the top-four television stations within the DMA and there would be at least eight independently owned and operated major media voices remaining in the DMA post-transaction. We seek comment on the impact of such an approach on viewpoint diversity, particularly in the 20 largest DMAs,

---

[480] *See supra* note 80 and accompanying text.

[481] We do not intend to upset any filing deadlines the Commission has previously imposed on specific parties related to cross-ownership proceedings. In addition, consistent with the Commission's decision in the *2006 Quadrennial Review Order*, we would allow all grandfathered combinations or permanent waivers from the prior rule that previously have been granted to continue in effect under the rule ultimately adopted, to the extent that such grandfathering/permanent waivers would still be necessary to permit common ownership. 23 FCC Rcd at 2054-55, ¶ 76.

[482] *NPRM*, 26 FCC Rcd at 17527, ¶ 105. The Commission proposed a top-20 demarcation point for newspaper combinations involving either television or radio stations. Our proposal to lift the restriction on newspaper/radio cross-ownership would render moot the delineation of market tiers for such combinations. We seek comment, however, on whether a top-20 demarcation point should apply to newspaper/radio combinations in the event we retain a restriction on such combinations.

[483] *Id.*

[484] *Id.*

[485] *Id.* at 17528, ¶ 106.

[486] *Id.*

[487] *Id.* at 17528, ¶ 107.

and on how any such presumptive waiver standard would work.[488]  For each element we propose to include in a presumptive waiver standard, we seek comment on its usefulness and the costs and benefits of its inclusion.

169.    Some commenters in the 2010 Quadrennial Review proceeding asserted that differentiating the 20 largest DMAs from smaller markets would be arbitrary and capricious.[489]  On the other hand, there is evidence supporting such a distinction.  The greater demographic diversity found more frequently within larger populations is more likely to generate demand for a wider range of viewpoints.[490]  The larger populations of the top-20 DMAs may also be better able to provide the economic base to support a greater number of media outlets.  Indeed, evidence demonstrates a greater level of media diversity in the 20 largest DMAs that distinguishes those markets from the remaining DMAs.  Data show that, while there are at least 10 independently owned, commercial television stations in 14 of the top 20 DMAs, none of the DMAs ranked 21 through 25 has more than seven independently owned, commercial television stations.  Additionally, while 10 of the top 20 DMAs have at least two newspapers with a circulation of at least 5 percent of the households in that DMA, four of the five DMAs ranked 21 through 25 have only one such newspaper.[491]  Moreover, the top 20 markets, on average, have 15 independently owned television stations and major newspapers and approximately 2.6 million television households.  By comparison, DMAs 21 through 30 have on average nine major media voices and fewer than 1.2 million television households, representing drops of 37 percent and 56 percent from the top 20 markets, respectively.  DMAs 31 through 50 have average numbers of voices for each category similar to markets 21 through 30, but a lower number of television households averaging 795,000.  DMAs 51 through 210 show even more dramatic drops, with, on average, fewer than seven major media voices and approximately 240,000 television households, representing drops of 54 percent and 91 percent from the top 20 DMAs, respectively.[492]

170.    Several commenters in the 2010 Quadrennial Review proceeding contended that many lower-ranked DMAs are abundantly diverse.[493]  We emphasize that any presumptions would provide merely a starting point for our analysis of the likely impact of a proposed merger on a particular market.  A presumption could be overcome if the weight of the evidence favors the party with the burden of proof.  Waiver applicants in smaller markets would not be precluded from demonstrating that a proposed merger

---

[488] We tentatively conclude that any such rule should create a favorable presumption for waiver requests only in cases where the proposed combination consists of a single television station and single daily newspaper, as described above, and not in cases where the common ownership is proposed to include a television duopoly, regardless of whether a duopoly is permitted under the local television ownership rule.  We seek comment on this tentative conclusion.

[489] See Tribune NPRM Comments at 54-57; Tribune NPRM Reply at 27-30; Journal Communications NPRM Reply at 5; NAA NPRM Comments at 24-27.

[490] See, e.g., Lisa George & Joel Waldfogel, Who Affects Whom in Daily Newspaper Markets?, 111 J. POL. ECON. 765 (2003).

[491] As discussed further in Section III.C.3.c(v) below, a daily newspaper with a circulation exceeding 5 percent of the households in the DMA would be considered a major media voice and counted along with full-power television stations for determining compliance with the eight-voices restriction we propose herein.  See also 2006 Quadrennial Review Order, 23 FCC Rcd at 2042, ¶ 57.

[492] See BIA/Kelsey, BIA Media Access Pro 4.6 Television Database as of Sept. 26, 2013; see also NPRM, 26 FCC Rcd at 17527, ¶ 105 (providing similar BIA data as of Dec. 31, 2009).

[493] Tribune noted, for example, that the Hartford-New Haven DMA, ranked as market 30, has seven television station operators and eight "publishers," well above the nine major voices the Commission characterized as the average for markets 21 through 50.  Tribune NPRM Comments at 55-56; Tribune NPRM Reply at 30; see also Cox NPRM Comments at 26-29; Journal Communications NPRM Reply at 5; Morris NPRM Comments at 8; Bonneville/Scranton NPRM Comments at 4, 22-24.

would create efficiencies that would serve the public interest without harming viewpoint diversity in the local market.

171.    None of the commenters specified an alternative demarcation point, but a few commenters argued that the same standard should apply to all, or the majority of, markets.[494]  For example, Cox proposed a two-part test that it argued should apply to NBCO waiver requests in all markets.[495]  The first part of the test, Cox claimed, would protect viewpoint diversity by requiring that 20 independent media voices remain in the market following a proposed combination, which could include a newspaper and any broadcast properties that would be permitted under the local ownership rules.[496]  Cox proposed that independent media voices include independently owned daily newspapers, full-power television stations, full-power radio stations, cable and satellite television services (counted as one voice), and the Internet (counted as one voice).[497]  As Cox stated, the diversity prong of its proposed test was patterned in part after the radio/television cross-ownership rule.[498]  The second part of Cox's test, intended to preserve localism, would require that at least three independent media voices that produce and distribute local news and information programming, other than the combining properties, remain in the market post-transaction.[499]  We seek comment on Cox's suggestion.  For the reasons explained below in connection with the eight-voices restriction,[500] we believe that the first part of Cox's proposed test would define independent media voices too broadly.  As to the second part of Cox's proposed test, we believe it would be difficult to apply and enforce an objective, content-neutral standard of what constitutes an independent media voice that produces and distributes local news and information programming.  Moreover, nothing in the Cox proposal provided specific evidentiary support that relates the standard specifically to newspaper/television combinations.[501]

---

[494] Cox NPRM Comments at 27-29 (asserting that "large-market waiver relief is not sufficient to properly account for the needs of local communities); CRT NPRM Comments at 11-12 (urging the Commission to permit newspaper/broadcast combinations "in all or the great majority of markets"); A. H. Belo NPRM Comments at 10 (arguing that cross-ownership should be permitted in "a broad range of markets"); *see also* Tribune NPRM Comments at 55-56 (contending that "the Commission's own statistical counting and averaging" suggest that viewpoint diversity is sufficient in at least the top 50 DMAs, and even in all 210 DMAs).

[495] Cox NPRM Comments at 28-29.

[496] *Id.* at 28.

[497] *Id.*

[498] *Id.*; *see also* 47 C.F.R. § 73.3555(c) (requiring a minimum of 20 remaining independent media voices for certain radio/television combinations and specifying that media voices include, with certain qualifications, television stations, radio stations, newspapers, and cable systems).

[499] Cox NPRM Comments at 28.

[500] *See infra* ¶¶ 180-181.

[501] Other arguments raised in opposition to a top-20 DMA demarcation point related more to the necessity of the NBCO rule than to the differentiation of certain markets for purposes of a presumptive waiver standard.  For example, commenters argued that: (1) distinguishing the 20 largest markets would be unjustified because viewpoint diversity is not a rationale for the rule regardless of market size; (2) newspapers are struggling in smaller markets; (3) small-market combinations are committed to community service; and (4) traditional media companies in all markets face the same marketplace challenges. *See* NAA NPRM Comments at 24-27; Les Mann, Vice President, Huse Publishing Co., NPRM Reply at 1-4.  We have addressed these subjects in the above section discussing our policy goals. *See supra* Section III.C.3.a.

### (iv) Top-Four Restriction

172. *Background.* Consistent with the 2006 NBCO rule, the Commission proposed in the *NPRM* that newspaper/television combinations involving a television station ranked among the top-four television stations in the DMA would not be entitled to a favorable presumption.[502] The Commission proposed that television rankings be based on the most recent all-day (*i.e.*, 9:00 am to midnight) audience share, as measured by Nielsen or another comparable professional, accepted audience ratings service.[503]

173. The Commission's preliminary view was that "allowing a top-four station to merge with a daily newspaper would create the greatest risk of losing an independent voice in that market."[504] Based on the Commission's data analysis, the amount of local news drops significantly between the fourth- and fifth-ranked stations.[505] The most dramatic difference occurs in larger markets, where the fifth-ranked station generally provides no more than half the amount of local news aired on the fourth-ranked station.[506] The Commission sought comment on whether a different limit would be more appropriate, such as a top-five or top-six restriction.[507] It also asked if the restriction should depend on whether the station is affiliated with one of the four major broadcast networks, given evidence that such stations tend to air more local news.[508]

174. *Discussion.* If we were to adopt a waiver standard with presumptive guidelines, we would not provide a favorable presumption for newspaper/television combinations involving a television station ranked among the top-four television stations in the DMA. We would continue to determine a television station's ranking in accordance with section 73.3555(d)(3)(i) of the Commission's rules.[509] As stated in the *NPRM*, evidence shows that the top-four television stations in a DMA generally air more local news and information than the other television stations in the market, particularly in the larger DMAs.[510] We seek comment on our tentative conclusion that viewpoint diversity in even the largest markets could be harmed if a top-ranked television station merged with a daily newspaper within the same DMA. Therefore, regardless of the DMA's size, we believe that a proposed combination involving a top-four television station would be inconsistent with the public interest. We invite commenters to provide any new information or evidence that we should take into consideration regarding this issue.

175. We disagree with those commenters who contend that the rationale for allowing cross-ownership in the top 20 markets would also support not having a top-four restriction. NAA asserted that it would be capricious for the Commission to relax the NBCO rule on the basis of permitting newsgathering efficiencies but then prohibit newspapers from merging with the four television stations in the market that provide the most news. Similarly, Tribune argued that the localism benefits of cross-

---

[502] *NPRM*, 26 FCC Rcd at 17528-29, ¶¶ 108-10.

[503] 47 C.F.R. § 73.3555(d)(3)(i). The Commission also proposed to retain the definition of a daily newspaper. *NPRM*, 26 FCC Rcd at 17528, ¶ 108. As described above in the discussion of the scope of the rule we propose today, the current definition of a daily newspaper would continue to apply. *See* 47 C.F.R. § 73.3555, Note 6.

[504] *NPRM*, 26 FCC Rcd at 17528, ¶ 108.

[505] *Id.* (examining TMS and Nielsen data for 2009).

[506] *Id.* The Commission noted that the absolute amount of local news provided by the fifth-ranked station is not necessarily insignificant. *Id.* at 17528, ¶ 108 n.248.

[507] *Id.* at 17529, ¶ 110.

[508] *Id.* at 17529, ¶¶ 109-10 (observing the findings of Media Ownership Study 4 and the Information Needs of Communities Report).

[509] 47 C.F.R. § 73.3555(d)(3)(i).

[510] *NPRM*, 26 FCC Rcd at 17528-29, ¶¶ 108-10.

ownership accrue regardless of a station's ranking.[511] Our analysis of this rule, however, hinges not on whether it should be relaxed to enhance efficiencies that could promote localism, but on whether some form of the rule remains necessary to promote viewpoint diversity. Although we would hope that any permitted combinations under a revised rule would generate localism benefits, the NBCO rule is designed to protect viewpoint diversity. Under the presumptive waiver standard we seek comment on today, waiver applicants in the top-20 DMAs would be entitled to a favorable presumption on the theory that permitting certain newspaper/television combinations in those markets would not likely harm viewpoint diversity. Allowing the combination of a newspaper and a top-four station, however, could potentially harm viewpoint diversity precisely because the top-four television stations typically provide the most local news among television stations. A combination with one of those stations thus could result in a diminution of viewpoint diversity, and therefore we believe that a waiver request involving such a station should not be entitled to a favorable presumption. We seek comment on this proposition.

176. Other arguments also sidestep our diversity rationale. Tribune contended that combining with one of the market's weaker television stations may not provide the lifeline that many struggling newspapers need.[512] It further asserted that the rationale for the top-four restriction within the context of the local television rule — to preserve competition among the strongest television stations — is inapplicable to the NBCO rule.[513] Our primary intent, however, in considering whether to retain the top-four component of the NBCO rule, if amended, is to protect viewpoint diversity, not to save struggling newspapers or to promote competition. We seek comment on our position with respect to these assertions.

177. Finally, Fox claimed that a top-four restriction would violate the First Amendment because it would preclude a speaker from acquiring additional outlets based on the popularity of the speaker's content.[514] We disagree. As the U.S. Supreme Court stated, assuring "access to a multiplicity of information sources . . . promotes values central to the First Amendment."[515] We also disagree with Fox's assertion that such a restriction would be content-based. Rather, we believe the top-four restriction would operate on the content-neutral basis of market ranking.[516] We note that, within the context of the local television rule, the Third Circuit upheld the top-four restriction as a reasonable limit on market power.[517]

---

[511] Tribune NPRM Comments at 58-59. Tribune also argued that the Commission should not assume that stations affiliated with a broadcast network necessarily have better access to funding for local news coverage. Tribune NPRM Reply at 30-32. We do not, however, propose to revise the top-four restriction to include network affiliation.

[512] Tribune NPRM Comments at 58-59.

[513] Tribune NPRM Reply at 30-32.

[514] Fox NPRM Comments at 26-27; *see also* Tribune NPRM Reply at 30-32 (supporting Fox's position that a top-four restriction would violate the First Amendment).

[515] *Turner I*, 512 U.S. at 663.

[516] *Id.* at 642 ("[The] principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.") (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)) ("Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'").

[517] *Prometheus I*, 373 F.3d at 416-18.

### (v)    Eight Major Media Voices Restriction

178.    *Background.*  The Commission proposed that transactions that would leave fewer than eight independently owned and operating "major media voices" in the DMA would not be entitled to a favorable presumption under a presumptive waiver standard.[518]  Major media voices were defined in the *2006 Quadrennial Review Order* as full-power commercial and noncommercial television stations and major newspapers.[519]  The Commission sought comment on the potential impact of eliminating this voices test given its analysis that eight major media voices would remain in each of the top-20 DMAs even if all daily newspapers in those markets combined with television stations.[520]  The Commission also asked whether requiring a different number of voices would protect its diversity goal more effectively.[521]

179.    *Discussion.*  Were we to adopt the presumptive waiver standard on which we seek comment, we propose to ascribe a negative presumption to waiver requests for newspaper/television combinations in the top-20 DMAs if fewer than eight major media voices would remain in the DMA following the proposed merger.[522]  We believe we should continue to define major media voices as full-power television broadcast stations and newspapers that are published at least four days a week within the DMA in the dominant language of the market and have a circulation exceeding 5 percent of the households in the DMA.  None of the commenters in the 2010 Quadrennial Review proceeding addressed the impact of removing the eight-voices test from a presumptive waiver standard or recommended an alternative voices test for the top-20 DMAs.[523]  Notwithstanding the supposition in the *NPRM* that the eight-voices test may not have an impact in the top-20 DMAs currently, if we decide to adopt a presumptive waiver standard, then we propose to retain the test as the more cautious approach and to protect viewpoint diversity in the event that media diversity in a top-20 DMA drops to the point where the test would become a critical factor in promoting that goal.  The Commission included the eight-voices test in the 2006 waiver standard to prevent "a significant decrease in the number of independently owned major media voices" in the top-20 DMAs, and we seek comment on whether we should incorporate the test for the same reason if we adopt a presumptive waiver standard.[524]

180.    Some commenters recommended that we expand the definition of major media voices beyond full-power commercial and noncommercial television stations and major newspapers.[525]  For example, Cox urged the Commission to include in the definition full-power radio stations, cable and satellite television services (counted as one voice), and the Internet (counted as one voice).[526]  Cox argued that its approach would resemble the definition used for the radio/television cross-ownership rule.[527]

---

[518] *NPRM*, 26 FCC Rcd at 17529, ¶ 111.

[519] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2042, ¶ 57.  Major newspapers are newspapers that are published at least four days a week within the DMA in the dominant language of the market and have a circulation exceeding 5 percent of the households in the DMA.  *See* 47 C.F.R. § 73.3555(c)(3)(iii).

[520] *NPRM*, 26 FCC Rcd at 17529, ¶ 111.

[521] *Id.*

[522] *See* 47 C.F.R. § 73.3555(d)(3)(ii).

[523] As discussed, Cox proposed a requirement that, for all markets regardless of size, 20 independent media voices remain in the market, including three independent sources of local news.  Cox NPRM Comments at 28-29.  We sought comment on this suggestion in the foregoing discussion of market tiers.

[524] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2045, ¶ 60.

[525] Cox NPRM Comments at 28; Tribune NPRM Comments at 54-57; Tribune NPRM Reply at 27-30; NAA NPRM Reply at 15-16.

[526] Cox NPRM Comments at 28.

[527] *Id.*

Referencing the local television rule, Tribune asserted that a voices test should include radio stations, cable and satellite news channels, weekly newspapers, and independent websites with news and local information.[528] Our view is that neither of these comparisons should persuade us to expand our definition: this FNPRM seeks comment on repealing the radio/television cross-ownership rule, and only television stations count toward the minimum number of remaining media outlets required under the local television rule.[529] In addition, we are disinclined to agree with NAA that the definition should include any media outlet that "contribute[s] meaningfully to local news diversity," the determination of which would depend on the type of media outlet under consideration.[530] For practical and legal reasons, we believe it unwise to engage in the kind of subjective, content-based assessment that such a standard likely would entail. We seek comment on these views.

181.    We tentatively conclude that, for purposes of any newspaper/television cross-ownership rule that we may adopt, full-power television stations and major newspapers are the relevant voices that should be included in the definition of major media voices. As noted in the *2006 Quadrennial Review Order* and discussed above, television stations and major newspapers are the predominant sources consumers rely on for news and information.[531] In addition, evidence demonstrates that radio stations and independent websites generally do not originate significant amounts of local news.[532] Evidence also suggests that viewership of local broadcast television news far outstrips that of cable news programming.[533] Therefore, we believe that counting the full-power television stations and the major newspapers within a local market provides a reasonable proxy for the level of viewpoint diversity that is meaningful for purposes of our proposed rule, and we seek comment on this belief.

### (vi)    Four-Factor Test

182.    *Background.* Under the NBCO rule as revised in the *2006 Quadrennial Review Order*, the Commission considered four factors in evaluating a request for a rule waiver. All waiver applicants, regardless of whether they were entitled to a favorable presumption, were required to show:  (1) that the combined entity would significantly increase the amount of local news in the market; (2) that the newspaper and the broadcast outlets each would continue to employ its own staff and exercise its own independent news judgment; (3) the level of concentration in the Nielsen DMA; and (4) the financial condition of the newspaper or broadcast station, and if the newspaper or broadcast station was in financial distress, the proposed owner's commitment to invest significantly in newsroom operations.[534]

183.    In the *NPRM*, the Commission sought comment on whether to retain these four factors.[535] The Commission asked if the factors benefitted the waiver applicants or the Commission staff responsible for reviewing waiver requests.[536] It sought comment on whether the factors were overly subjective or

---

[528] Tribune NPRM Comments at 54-57.

[529] *See infra* Section III.D; 47 C.F.R. § 73.3555(b).

[530] NAA NPRM Reply at 15-16 (calling it "nonsensical" to include among the voices in the Washington, D.C., market, station WPXW, which airs no local news, but to exclude WAMU 88.5 FM, WTOP 103.5 FM, all-news cable channel NewsChannel 8, and dcist.com, all of which NAA asserts produce significant amounts of local news programming each week).

[531] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2042-44, ¶¶ 57-59.

[532] *See supra* ¶¶ 130-131, 145-146.

[533] *See supra* note 346 and accompanying text (citing study that compared viewership of local television news in New York City with the national audience of the five highest-rated cable news networks).

[534] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2049-54, ¶¶ 68-75; *see also* 47 C.F.R. § 73.3555(d)(5).

[535] *NPRM*, 26 FCC Rcd at 17531, ¶ 115.

[536] *Id.*

likely to create unnecessary delay.[537]  The Commission also asked whether, if the four-factor test were excluded from the rule, the presumptions in favor of or against a transaction should create a *prima facie* case, which would shift the burden of proof to the party seeking to overcome the presumption.[538]

184.     *Discussion.*  We propose not to include the four-factor test in any newspaper/television cross-ownership rule that we ultimately may adopt.  None of the commenters in the 2010 Quadrennial Review proceeding supported retaining the test.[539]  We tentatively conclude that the factors are not well-suited as standards required of every waiver applicant because they are vague, subjective, difficult to verify, and costly to enforce.  We would not discourage waiver applicants, particularly those in smaller markets, from attempting to strengthen their requests by presenting evidence in support of considerations like those reflected in the four factors.  Rather, the ill-defined nature of these factors leads us to believe that they should not be imposed automatically on every waiver applicant.  We seek comment on this approach.

185.     In the event we adopt a presumptive waiver standard, we seek further comment on whether, instead of a four-factor test, we should treat a presumption either in favor of or against a waiver request as establishing a *prima facie* case.  The party seeking to overcome the presumption would have the burden to show that the proposed newspaper/television combination would or would not unduly harm viewpoint diversity within the DMA.  To meet this burden, parties could present evidence, for instance, regarding the quantity and strength of existing local news providers within the DMA including, for example, their availability, accessibility, and focus on local news and information; the level and pervasiveness of their presence or influence within the DMA, particularly in those portions of the DMA that potentially would be most affected by the proposed merger; and the strength of the applicant's proposed local news and other local program offerings.  The impact on viewpoint diversity in the local market would be the focal point of our review.  Evidence related to other variables could shade our analysis but would not be necessary or sufficient.  We believe this type of narrowed approach would be consistent with our objective to rationalize the NBCO rule by linking its requirements to its purpose.

### (vii)     Overcoming the Negative Presumption

186.     *Background.*  In the *NPRM*, the Commission sought comment on whether to retain the criteria required by the *2006 Quadrennial Review Order* to overcome a negative presumption.[540]  Under the 2006 rule, a waiver applicant could overcome a negative presumption by demonstrating, with clear and convincing evidence, that the merged entity would increase the diversity of independent news outlets and the level of competition among independent news sources in the relevant market.[541]  The rule adopted in the *2006 Quadrennial Review Order* further stated that the Commission would reverse a negative presumption in two limited circumstances:  (1) when the proposed combination involved a failed/failing station or newspaper, or (2) when the proposed combination was with a broadcast station that was not offering local newscasts prior to the combination, and the station would initiate at least seven hours per week of local news after the combination.[542]  The *NPRM* asked whether these standards were sufficiently

---

[537] *Id.*

[538] *Id.*

[539] Free Press argued that the factors are vague, subjective, and unenforceable.  Free Press NPRM Comments at 39-43; *see also* MAP/Prometheus NPRM Comments at 3-5.  Tribune and Fox asserted that the Commission would risk running afoul of the First Amendment if it considered issues regarding the amount of news to be broadcast or the extent to which combined properties would exercise independent editorial judgment.  Tribune NPRM Comments at 59-61; Fox NPRM Comments at 27-28.

[540] *NPRM*, 26 FCC Rcd at 17531-32, ¶ 116.

[541] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2049, ¶ 68; *see also* 47 C.F.R. § 73.3555(d)(6).

[542] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2047-49, ¶¶ 65-67; *see also* 47 C.F.R. § 73.3555(d)(7).

objective and quantifiable.[543]  It asked also whether special consideration should be given to a transaction involving a station or newspaper that is failed or failing, and if so, what type of showing should be required.[544]  Finally, the *NPRM* sought comment on whether the Commission should adopt any other criteria, particularly given that licensees could seek waivers under section 1.3 of the Commission's rules.[545]

187.     *Discussion*.  We believe we should not adopt the criteria required by the *2006 Quadrennial Review Order* to overcome a negative presumption in any presumptive waiver standard that we may adopt, other than the failed/failing station or newspaper criterion.  In the preceding discussion of the four-factor test, we sought comment on whether we should enable merger applicants to overcome any negative presumption by demonstrating that the proposed transaction would not unduly harm viewpoint diversity within the DMA.  We seek comment on whether that standard also should replace the 2006 criteria requiring clear and convincing evidence that diversity and competition would increase.  We believe that the clear and convincing measure imposed an overly burdensome evidentiary standard, unnecessarily included a competition showing, and failed to identify relevant evidence that would support the diversity showing.  We are inclined to agree with Free Press that the exception for waiver applicants that commit to initiating weekly local news programming on a television station that has not been offering any local news would be too difficult to enforce.[546]  Not only do we think it would be impractical for the Commission to monitor the station's subsequent local news output, but we do not wish to engage in making content-based judgments regarding what constitutes local news.  For this reason and for the reasons stated above for proposing to reject the four-factor test, we are not inclined to adopt NAA's recommendation that any NBCO rule the Commission adopts include an exception when:  (1) the merger applicants commit to retaining, protecting, and exercising their respective editorial independence or (2) the merger applicants commit to adding news or public affairs programming to a broadcast station that previously had not been airing news.[547]  We seek comment on this approach.

188.     We propose to adopt a failed/failing entity exception, which would allow merger applicants to overcome a negative presumption under a presumptive waiver standard when a proposed combination involved a failed/failing television station or newspaper.  In addition, we similarly propose to consider an exception for failed/failing entities if we adopt a waiver standard that does not include presumptive guidelines.  As explained above in the discussion of our policy goals, we believe the continued operation of a local news outlet under common ownership would cause less harm to viewpoint diversity than would its complete disappearance from the market.  Noting that no alternative definitions were suggested in the 2010 Quadrennial Review proceeding, we seek comment on whether to incorporate the criteria adopted in the *2006 Quadrennial Review Order* to determine if a television station or newspaper is failed or failing.  Specifically, in order to qualify as failed, the newspaper or television station would have to show that it had stopped circulating or had been dark due to financial distress for at least four months immediately prior to the filing of the assignment or transfer of control application, or that it was involved in court-supervised involuntary bankruptcy or involuntary insolvency proceedings.[548]  To qualify as failing, the applicant would have to show that:  (1) if the television station was the failing entity, that it had a low all-day audience share (*i.e.*, 4 percent or lower); (2) the financial condition of the newspaper or television station was poor (*i.e.*, a negative cash flow for the previous three years); and

---

[543] *NPRM*, 26 FCC Rcd at 17531-32, ¶ 116.

[544] *Id.*

[545] *Id.*

[546] Free Press NPRM Comments at 43-44; *see also* MAP/Prometheus NPRM Comments at 5.

[547] NAA NPRM Reply at 14-16.  NAA did not specify what additional amount of news should be required.

[548] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2047-48, ¶ 65.

(3) the combination would produce public interest benefits.[549] In addition, the applicant would have to show that the in-market buyer was the only reasonably available candidate willing and able to acquire and operate the failed or failing newspaper or station and that selling the newspaper or station to any out-of-market buyer would result in an artificially depressed price.[550] We seek comment on whether to adopt such an exception for failed/failing entities regardless of the waiver standard we adopt.

### d. Minority and Female Ownership

189. *Background.* The Commission has provided several opportunities for public input on issues pertaining to minority and female ownership. It sought comment in the *NPRM* on how the proposed revisions to the NBCO rule could affect minority and female ownership opportunities.[551] Further, it asked how promotion of diverse ownership promotes viewpoint diversity. The Commission also sought comment on the minority and female ownership data contained in the *2012 323 Report.*[552] In addition, the Commission invited comment on the MMTC Cross-Ownership Study which seeks to examine "whether, and to what extent, cross-ownership might have a material adverse impact on minority and women ownership."[553] To inform our 2014 Quadrennial Review, we seek further comment below on the relationship of the NBCO rule to minority and female ownership.

190. *Discussion.* Some commenters criticized the Commission for proposing to relax the NBCO rule without first determining that there would be no negative impact on levels of minority and female ownership.[554] We recognize that the Third Circuit directed the Commission to address certain

---

[549] An applicant seeking a waiver of a newspaper/television cross-ownership prohibition on the basis that either the television station or the newspaper was failed or failing would be required to show that the tangible and verifiable public interest benefits of the combination outweighed any harms. Further, as is already the case with failed and failing station waivers of the local television rule, in seeking subsequent renewals of the television station's license, the owner of the combined entities would be required to certify to the Commission that the public interest benefits of the combination were being fulfilled, including a specific, factual showing of the program-related benefits that had accrued to the public. Cost savings or other efficiencies, standing alone, would not constitute a sufficient showing. *See 1999 Ownership Order*, 14 FCC Rcd at 12939, ¶ 81; 47 C.F.R. § 73.3555, Note 7; *see also 2006 Quadrennial Review Order*, 23 FCC Rcd at 2048, ¶ 65 n.216 (incorporating the failed and failing waiver standard into the NBCO rule). We seek comment on the implications of requiring such a showing.

[550] One way to satisfy this criterion would be to provide an affidavit from an independent broker affirming that active and serious efforts had been made to sell the newspaper or television station, and that no reasonable offer from an entity outside the market had been received. *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2048, ¶ 65 n.217. We seek comment on whether to adopt such a criterion.

[551] *NPRM*, 26 FCC Rcd at 17532, ¶ 117.

[552] *See 2012 323 Report Comments PN.*

[553] *Public Notice Seeking Comment on MMTC Cross-Ownership Study*, 28 FCC Rcd at 8244. MMTC commissioned BIA/Kelsey to conduct the study and submitted it to the Commission on May 30, 2013. *See* MMTC May 30, 2013 *Ex Parte* Letter at 1-2. On July 25, 2013, MMTC submitted additional data regarding the MMTC Cross-Ownership Study. *See* Letter from David Honig, President of MMTC, to Marlene H. Dortch, Secretary, FCC (July 25, 2013); *see also* Letter from David Honig, President of MMTC, to Marlene H. Dortch, Secretary, FCC (Aug. 1, 2013) (providing an expanded response to the Commission's question regarding peer review). Subsequently, pursuant to a Commission protective order, MMTC provided a list of the stations solicited to complete the study. Letter from Kenneth Mallory, Esq., MMTC Staff Counsel, to Marlene H. Dortch, Secretary, FCC (July 29, 2013). *See 2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 09-182, Protective Order, 28 FCC Rcd 10979 (Med. Bur. 2013).

[554] *See, e.g.*, Free Press NPRM Comments at 9-10; National Association of Latino Independent Producers ("NALIP") NPRM Reply at 1-2; AFCP *et al.* 323 Report Reply at 2-5; *see also* CWA NPRM Reply at 6; Free Press 323 Report Comments at 2-6, 11-12; Free Press 323 Report Reply at 1-6.

portions of the *Diversity Order* in the context of its quadrennial review.[555] We have considered carefully whether there is evidence in the current record that modifications to the NBCO rule, such as those we seek comment on above, would likely adversely affect minority and female ownership, and we tentatively conclude, as discussed below, that the current record does not establish that such harm is likely. We tentatively find that the information in the current record asserting a potential impact would not change our underlying analysis regarding the possible rule modifications set forth above.[556] Moreover, we reject the argument that the *Prometheus II* decision requires us to take no action unless we can show definitively that a rule change would have no negative impact on minority ownership levels. In any case, considering the low levels of minority and female ownership reflected in the *2012 323 Report*, we do not believe the record evidence shows that the cross-ownership ban has protected or promoted minority or female ownership of broadcast stations in the past 35 years, or that it could be expected to do so in the future. We seek comment on these views.

191.    We note that commenters in the 2010 Quadrennial Review record did not focus on the impact of newspaper/radio cross-ownership in particular.[557] None of these commenters seriously contended or provided any data showing that newspaper mergers with minority/female-owned radio stations would harm viewpoint diversity in local markets.[558] As discussed above, we do not believe that the vast majority of radio stations contribute significantly to viewpoint diversity.[559] Moreover, we have no evidence in the current record suggesting that minority/female-owned radio stations contribute more significantly to viewpoint diversity or broadcast greater amounts of local news on which consumers rely as a primary source of information than other radio stations.[560] Even if they did, we could not conclude that it would therefore be reasonable to restrain the ability of owners of all commercial radio stations to make business decisions to exit the market or to combine with a newspaper should the record otherwise support allowing such combinations. We invite commenters to provide any new relevant information, data, or evidence that should inform our 2014 Quadrennial Review.

192.    With respect to newspaper/television combinations, the current record reflects varying opinions concerning the impact of a rule modification on minority and female ownership. Several commenters made generalized assertions that cross-ownership hinders ownership opportunities for

---

[555] *See* Tribune NPRM Reply at 3-6 (construing the Third Circuit's mandate in these terms).

[556] As discussed below, the Commission is continuing to improve its collection of data on minority and female broadcast ownership, and the ongoing data collection will contribute to future quadrennial review proceedings. *See infra* ¶ 262. Our proposals and tentative conclusions in this FNPRM are supported by the current record and the most accurate data available. We invite commenters to provide any new information or data that would be useful for our 2014 Quadrennial Review.

[557] Bonneville/Scranton 323 Report Reply at 4-5 (noting the dearth of comment in support of the newspaper/radio cross-ownership restriction).

[558] NABOB argued that a merger with a newspaper would enable an owner of multiple radio stations to enhance its competitive advantage in obtaining advertising. NABOB 323 Report Comments at 10-11. NABOB did not, however, assert that newspaper/radio combinations would harm viewpoint diversity, and the Commission has found that the NBCO rule is not necessary to promote its competition goal.

[559] *See supra* ¶¶ 145-148.

[560] As discussed further in the Diversity section below, several of the most recent media ownership studies concluded that there is a positive relationship between minority station ownership and the provision of certain types of minority-oriented content or the consumption of broadcast content by minority audiences. *See infra* ¶ 253 (citing Media Ownership Study 8B at 15-17; Media Ownership Study 7 at 12-13, 19-21; Media Ownership Study 6 at 28). Several commenters also raised this issue. *See* NABOB 323 Report Comments at 4; LCCHR 323 Report Comments at 4; DCS 323 Report Comments at 4. That observation, however, does not alter our belief that radio stations — be they minority-owned or not — do not contribute significantly to local news and, thus, to viewpoint diversity.

minorities and women,[561] but they did not provide convincing evidence tying the *NPRM*'s specific proposals for this rule to any likelihood of such an effect. Some public interest organizations claimed that 19 minority-owned full-power commercial television stations would become prime acquisition targets if the rule was loosened as proposed in the *NPRM* because they are located in the top 20 DMAs and are not ranked among the top-four television stations in their respective markets.[562] NAA asserted, in contrast, that newspaper owners would not perceive any efficiencies to be gained by combining with most minority-owned stations because most such stations have niche programming formats, which often feature foreign language or religious programming, rather than general-interest local news.[563] NAA contended that, among the minority-owned televisions stations that would qualify under the waiver standard for the favorable presumption proposed in the *NPRM*, only two might be potential acquisition targets given that they regularly broadcast local news in English.[564] The National Association of Media Brokers ("NAMB") added that revising the NBCO rule would not likely spark interest in the purchase of minority-owned stations by newspaper companies given the large inventory of stations currently available for sale and the recent movement by companies, such as Media General, away from cross-ownership.[565] Despite some lingering concerns, DCS concluded that the cross-ownership restriction has little practical impact on minority ownership.[566]

193.    While we agree with the commenters that current levels of minority and female ownership are discouragingly low, we are not persuaded by evidence in the current record that the NBCO modifications we seek comment on above would adversely affect minority and female ownership levels. Even assuming that some minority-owned stations would become acquisition targets if the rule were loosened, we do not believe that such a possibility necessarily would preclude rule modifications that are otherwise consistent with our statutory mandate. To the extent that governmental action to boost ownership diversity is appropriate and in accordance with the law, we do not believe that any such action should be in the form of indirect measures that have no demonstrable effect on minority ownership and

---

[561] *See, e.g.*, CWA NPRM Comments at 8; CWA NPRM Reply at 1-3; Free Press NPRM Comments at 22; Free Press NPRM Reply at 54; Free Press 323 Report Comments at 4-5, 12; Free Press 323 Report Reply at 6-10; NABOB 323 Report Comments at 10-11. *See also* NHMC *et al.* NPRM Comments at 4-22 (using the examples of Los Angeles and the Rio Grande Valley to illustrate the extent of consolidation and the lack of minority ownership in the media industry); *but see* Tribune NPRM Reply at 17-20 (disputing NHMC *et al.*'s claims).

[562] Letter from Angela J. Campbell, Institute for Public Representation, Georgetown Law, counsel for UCC *et al.*, to Marlene H. Dortch, Secretary, FCC at 2 (Nov. 23, 2012); Free Press 323 Report Comments at 4, 13-15, 23 (finding that 46 percent of what it calculates to be 43 minority-owned television stations would be potential targets for purchase). We note that Free Press estimated a total of 43 minority-owned stations after making several adjustments, including the exclusion of stations in Puerto Rico, to the Commission's calculation of 69 minority-owned stations. Free Press 323 Report Comments at 13-15. We reject the recommendation of AFCP *et al.* that the Commission create a map or table of all newspaper/television combinations in the top 20 DMAs that would qualify for a favorable presumption if a presumptive waiver standard is adopted. AFCP *et al.* 323 Report Reply at 5. In proposing a demarcation point for market tiers, we carefully analyzed the diversity levels of the top 20 DMAs, and we believe it unnecessary to list every possible hypothetical newspaper/television combination that would qualify for a favorable presumption in those markets. *See supra* ¶¶ 168-171.

[563] NAA 323 Report Comments at 3-5.

[564] *Id.*; *see also* NAB 323 Report Reply at 7-8. *But see* Free Press 323 Report Reply at 6-9 (disputing NAA's premise that minority-owned television stations that broadcast primarily foreign language or religious content would not be acquisition targets); UCC *et al.* 323 Report Reply at 11-12 (arguing that television stations may be attractive acquisition targets for reasons, such as their must-carry rights, unrelated to their current programming, which a new owner may decide to replace anyway).

[565] NAMB 323 Report Comments at 5-6; *see also* NAB 323 Report Reply at 8-9.

[566] DCS NPRM Comments at 40-43. Accordingly, it did not oppose relaxation of the NBCO rule provided that any changes do not discourage or decrease minority ownership. *Id.*

yet constrain all broadcast licensees.[567] We seek comment on this tentative conclusion and its impact on any decision to modify our cross-ownership rules. Several commenters argued that promoting access to capital would advance minority ownership more effectively than either limiting the number of potential buyers for minority broadcast owners interested in selling or preventing minority broadcast owners from experimenting with print publication.[568] We address related proposals below.[569]

194. At this time, we are not convinced by the unsupported claim made by Free Press and UCC *et al.* that a top-four restriction, if adopted as part of a presumptive waiver standard, would decrease minority ownership.[570] Those commenters predicted that minority-owned television stations, the majority of which are stand-alone stations unaffiliated with a network, would be likely targets for acquisition if top-four television stations were excluded from cross-ownership.[571] As Tribune observed, however, a newspaper publisher that is foreclosed from buying a top-ranked television station may not necessarily seek to purchase a lower-ranked station.[572] In any event, station owners would not be compelled to sell their stations as a result of a modification to the NBCO rule. Moreover, a station owner that wishes to exit the market is not prevented from selling its station under the current NBCO ban, which merely eliminates newspaper owners as potential buyers. We note that the commenters' concern is in tension with the more frequent contention that the Commission has not been aggressive enough in encouraging investment in minority broadcasters.[573] The changes we seek comment on today could permit stand-alone stations without a network affiliation to compete better in the market and to improve their local news offerings by combining resources with an in-market daily newspaper, if they so desired and such an opportunity were available. We seek comment on the likelihood of such an effect.

195. In addition, commenters arguing that minority-owned broadcasters are competitively disadvantaged in the presence of large media conglomerates pointed to alleged effects of multiple station ownership, not cross-ownership of newspapers and broadcast stations.[574] As the Commission has found, newspapers and broadcast stations generally do not compete in the same product markets, and we do not believe that an owner of a newspaper/television combination would possess any greater ability to impede local competition among local television stations than the well-capitalized owner of a single media

---

[567] *See, e.g.*, NAA 323 Report Comments at 1-2 (arguing that there is "no rational linkage" between minority ownership of broadcast stations and cross-ownership).

[568] *See, e.g.*, NAMB 323 Report Comments at 6-8; NAA 323 Report Comments at 9-11; Bonneville/Scranton 323 Report Reply at 10-14; Morris 323 Report Reply at 3-6; NAB 323 Report Reply at 7-9; Tribune NPRM Reply at 18-19.

[569] *See infra* Section IV.C.3.

[570] Free Press NPRM Comments at 21-22; Free Press NPRM Reply at 53-54; UCC *et al.* NPRM Comments at 26-27; UCC *et al.* 323 Report Comments at 19.

[571] Free Press NPRM Comments at 21-22; Free Press NPRM Reply at 53-54; UCC *et al.* NPRM Comments at 26-27.

[572] Tribune NPRM Reply at 31.

[573] A newspaper owner may wish to make an attributable investment in a minority-owned station with no intent to influence programming content. Organizations representing minority-owned broadcasters generally seek forms of regulatory relief that will facilitate such investment. *See, e.g.*, DCS Supplemental NPRM Comments at 4-10, 26-27 (urging the Commission to promote investment by, *inter alia*, waiving local radio limits for entities that incubate a socially and economically disadvantaged business ("SDB"), relaxing the foreign ownership restrictions, and providing structural rule waivers for financing the construction of an SDB's unbuilt station); *Diversity Order*, 23 FCC Rcd at 5931-37, 5943, 5945, ¶¶ 17-34, 56, 62-63 (responding to the concerns of organizations representing minority groups by, *inter alia*, easing attribution limits, awarding duopoly priority to entities with incubator programs, and organizing an access to capital conference).

[574] *See, e.g.*, Free Press 323 Report Comments at 9-12, 21-22; NABOB 323 Report Comments at 10-11; UCC *et al.* 323 Report Reply at 12-13.

property. Free Press pointed to various financial pressures that it claims have forced a number of minority owners to exit the market.[575] To the extent that Free Press alleged that these financial difficulties stemmed from or were exacerbated by media consolidation, the consolidation to which Free Press refers is not related to the NBCO rule.[576] Given that an NBCO restriction did not prevent the minority owners Free Press identified from leaving the market and in light of the Commission's finding that newspapers and broadcast stations generally do not compete in the same product market, we seek further comment specifically on the relationship between the NBCO rule and minority and female ownership.

196.    The MMTC Cross-Ownership Study stated that "the impact of cross-media ownership on minority and women broadcast ownership is probably negligible."[577] MMTC indicated that the study surveyed both minority- and/or female-owned broadcast stations in markets with cross-owned media, along with non-minority/non-female-owned broadcast stations in the same markets, to explore whether there was a difference in the responses of the two groups regarding the importance of local cross-owned media.[578] According to MMTC, the study's findings showed a lack of concern by almost all of the respondents about the presence of cross-owned media in the market.[579] MMTC acknowledged, however, that the study was "not intended as a comprehensive random sample survey" and cautioned that the limited number of responses warrants "great care" in reaching any conclusions.[580]

197.    A number of commenters argued that the MMTC Cross-Ownership Study was critically flawed in its methodology and analysis and that the Commission cannot rely on the study as a basis for policy making.[581] These commenters identified the following as failures of the MMTC Cross-Ownership Study:  (1) an inadequately described sample and the conflation of multiple types of broadcast owners;[582] (2) a limited sample size;[583] (3) an exclusion of markets with cross-owned combinations receiving waivers;[584] (4) overdrawn conclusions about television markets;[585] (5) overreliance on online survey

---

[575] Free Press 323 Report Comments at 17-23 (providing examples of minority owners it claims struggled to compete or were forced out of business because they were in bankruptcy or overwhelmed by expenses such as the costs of the DTV transition, increasing programming costs, and the costs of paying competitive employee salaries).

[576] *Id.* at 9-12 (citing research that purports to explore the effects on ownership diversity of rule changes that allowed television duopolies and increased local ownership caps in television and radio).

[577] MMTC Cross-Ownership Study at 10.

[578] MMTC Cross-Ownership Study at i, 2-5, 9; *see also* MMTC May 30, 2013 *Ex Parte* Letter at 1-2.

[579] MMTC Cross-Ownership Study at i, 5-11; *see also* MMTC May 30, 2013 *Ex Parte* Letter at 1-2.

[580] MMTC Cross-Ownership Study at 9.

[581] Free Press MMTC Cross-Ownership Study Comments at 3-4; UCC *et al.* MMTC Cross-Ownership Study Reply at 7; UCC *et al.* MMTC Cross-Ownership Study Comments at 2, 6; Media Action Grassroots Network MMTC Cross-Ownership Study Reply at 2; Free Press MMTC Cross-Ownership Study Reply at 2-3, 11; NABOB MMTC Cross-Ownership Study Comments at 5-6.

[582] Free Press MMTC Cross-Ownership Study Comments at 4-13; Free Press MMTC Cross-Ownership Study Reply at 7; UCC *et al.* MMTC Cross-Ownership Study Comments at 6.

[583] NABOB MMTC Cross-Ownership Study Comments at 5-6; UCC *et al.* MMTC Cross-Ownership Study Comments at 5-6; Letter from The Leadership Conference on Civil and Human Rights, to Acting Chairwoman Mignon Clyburn, FCC, at 4 n.4 ("LCCHR July 23, 2013 *Ex Parte* Letter"); Free Press MMTC Cross-Ownership Study Reply at 3-4; UCC *et al.* MMTC Cross-Ownership Study Reply at 3. *See also* Philip M. Napoli, Fordham University ("Napoli") MMTC Cross-Ownership Study Reply at 3 (stating that the most significant shortcoming of the study is the low response rate).

[584] Free Press MMTC Cross-Ownership Study Comments at 14; UCC *et al.* MMTC Cross-Ownership Study Comments at 6.

responses;[586] (6) a dismissal of survey responses from owners that perceive cross-ownership as negatively impacting their businesses;[587] and (7) a lack of transparency in the peer review process.[588] UCC *et al.* and other commenters asserted that the Commission should not rely on the MMTC Cross-Ownership Study because it fails to address why an increase in cross-ownership would harm ownership opportunities for minorities and women; it is limited in scope; and it draws conclusions that are unsupported by the evidence.[589]

198.    In response, MMTC recognized that the MMTC Cross-Ownership Study is not dispositive but argued that it provides useful evidence about the impact of cross-ownership, noting the record was previously devoid of any such data.[590] MMTC defended the methodology, sample size, and peer review process of its study, and argued that the study's findings provide an indication that cross-ownership does not have a disparate impact on minority and female broadcast ownership.[591] Several industry commenters supported MMTC's efforts and argued that the study lends support for eliminating cross-ownership restrictions.[592] Other commenters asserted that the study demonstrates that cross-ownership is not a competitive concern of minority broadcasters.[593] NAB noted that the study

(Continued from previous page) ————————————————

[585] For example, Free Press argued that the MMTC Cross-Ownership Study draws conclusions about the impact of cross-ownership on television station owners when the study focuses on the radio market. Additionally, Free Press asserted the study does not provide enough information, including the number of television station owners surveyed, to make "sweeping conclusions" about the impact of the Commission's ownership rules on diversity in the television market. Free Press MMTC Cross-Ownership Study Comments at 15. *See also* Free Press MMTC Cross-Ownership Study Reply at 8 (stating the study primarily focused on the radio market with only two television station owners participating in the study).

[586] Free Press MMTC Cross-Ownership Study Comments at 15-16; Free Press MMTC Cross-Ownership Study Reply at 8.

[587] UCC *et al.* MMTC Cross-Ownership Study Reply at 4; Free Press MMTC Cross-Ownership Study Reply at 2; Free Press MMTC Cross-Ownership Study Comments at 17; Letter from Matthew F. Wood, Free Press Policy Director, to Marlene H. Dortch, Secretary, FCC, at 3 (June 26, 2013).

[588] Free Press MMTC Cross-Ownership Study Comments at 18; Free Press MMTC Cross-Ownership Study Reply at 10-11. *See also* Letter from Lauren M. Wilson, Free Press Policy Counsel, *et al.*, to Marlene H. Dortch, Secretary, FCC, at 3-4 (Sept. 23, 2013) (stating the study's peer review departed from the typical peer review process).

[589] UCC *et al.* MMTC Cross-Ownership Study Comments at 2, 4-6; UCC *et al.* MMTC Cross-Ownership Study Reply at 2; Free Press MMTC Cross-Ownership Study Reply at 3; LCCHR July 23, 2013 *Ex Parte* Letter at 4 n.4. UCC *et al.* asserted that while the MMTC study examines a limited question — whether minority or female owners in cross-owned markets respond differently to perceived competition than non-minority and non-female owners in the same market — the study's authors focused on the broader question of whether the existence of cross-owned media has a disparate impact on minority and female ownership. UCC *et al.* MMTC Cross-Ownership Study Comments at 5; UCC *et al.* MMTC Cross-Ownership Study Reply at 3-4.

[590] MMTC MMTC Cross-Ownership Study Comments at 2-3; MMTC MMTC Cross-Ownership Study Reply at 3-4, 8-9.

[591] MMTC MMTC Cross-Ownership Study Comments at 2-3; MMTC MMTC Cross-Ownership Study Reply at 3-4.

[592] Bonneville/Scranton MMTC Cross-Ownership Study Comments at 1-4; Morris MMTC Cross-Ownership Study Comments at 1-2, 4-6; NAB MMTC Cross-Ownership Study Comments at 6; NAB MMTC Cross-Ownership Study Reply at 3-4; NAA MMTC Cross-Ownership Study Comments at 1-2, 4. In addition, LaSalle County Broadcasting *et al.* noted that their experiences as an owners of cross-owned properties mirrored the MMTC Cross-Ownership Study's findings that cross-ownership in a market has little, if any, impact on minority and female ownership. LaSalle County Broadcasting *et al.* MMTC Cross-Ownership Study Comments at 2; LaSalle County Broadcasting *et al.* MMTC Cross-Ownership Study Reply at 1-2.

[593] LaSalle County Broadcasting *et al.* MMTC Cross-Ownership Study Comments at 6; LaSalle County Broadcasting *et al.* MMTC Cross-Ownership Study Reply at 3; Bonneville/Scranton MMTC Cross-Ownership

(continued....)

participants' responses focused on "general business concerns that all radio and television stations have in all markets regardless of the demographic makeup of their ownership" and is evidence of the competitive marketplace faced by broadcasters of various backgrounds.[594] Given the limitations of the study that even MMTC acknowledges, we do not believe we can draw definitive conclusions about the impact of cross-ownership on minority and female ownership from the MMTC Cross-Ownership Study alone. We invite commenters to provide additional evidence that bears on this issue, especially any evidence arising since MMTC's filing of the study.[595]

199.    Finally, we emphasize that, as proposed above, no newspaper/television combination would be permitted without a Commission waiver of a general rule prohibiting such combinations. Even a waiver request that would be granted a favorable presumption under a presumptive waiver standard would be subject to denial if the Commission found that the proposed transaction was likely to harm viewpoint diversity in the local market. A case-by-case waiver approach under either option we offer for comment would allow for close Commission examination of the particular circumstances of a proposed combination. Where the newspaper purchase of a television station, minority/female-owned or otherwise, would disserve the public interest, the Commission would deny the request for a rule waiver. We seek comment on whether a waiver requirement would provide adequate protection when the particular circumstances of a proposed merger run counter to our diversity goals.

### D.    Radio/Television Cross-Ownership Rule

#### 1.    Introduction

200.    We seek comment on whether the radio/television cross-ownership rule, which limits the combined number of commercial radio and television stations a single entity may own in the same market, is still necessary in the public interest or whether it should be repealed.[596] We seek comment on

---

(Continued from previous page) ────────────────
Study Comments at 3-4; Morris MMTC Cross-Ownership Study Comments at 4-5; NAB MMTC Cross-Ownership Study Comments at 5; NAA MMTC Cross-Ownership Study Comments at 1-2.

[594] NAB MMTC Cross-Ownership Study Comments at 4-6; NAB MMTC Cross-Ownership Study Reply at 1-2, 4; *see also* Morris MMTC Cross-Ownership Study Comments at 5-6. *But see* Free Press MMTC Cross-Ownership Study Comments at 16 (arguing the study participants' responses generally reflect the same concerns that are exacerbated by cross-ownership).

[595] Furthermore, we note that any attempt to conduct an empirical study of the relationship between cross-ownership restrictions and minority and female ownership would face obstacles that likely would make such study impractical and unreliable. A rigorous econometric analysis would require that we observe a sufficient number of markets in which cross-ownership and/or minority and female ownership levels recently have shown variation. Due to the Commission's cross-ownership restrictions having been in place for such a long period of time and to low levels of minority and female ownership, however, both cross-ownership and minority and female ownership levels show very little variation, making empirical study of the relationship between these multiple variables extremely difficult. In addition, any study necessarily would be based on a very small dataset for the same reasons. As a result of these limitations, any estimation of the relationship between cross-ownership restrictions and minority and female ownership is likely to be imprecise. Given such imprecision, we do not believe that a study could extrapolate with any degree of confidence the effect that changing the Commission's cross-ownership rules would have on minority and female ownership levels, and any attempt to do so would be misleading. Variation in ownership structure over time, resulting from additional cross-owned entities, could provide additional data points to study in the future. We seek comment on these views concerning the inherent challenges to conducting comprehensive research on these issues.

[596] The current rule restricts common ownership of multiple television and radio stations depending on the number of independent media owners that would remain in the local market. Specifically, the rule permits an entity to own, operate, or control up to two television stations and four radio stations in a market, so long as at least 10 independently owned media voices would remain post-merger, and a single entity to own up to two television and six radio stations, or one television station and seven radio stations, in a market as long as at least 20 independently owned media voices remained post-merger. A combination of one radio and up to two television stations is allowed

(continued....)

whether the current media marketplace and the evidence adduced in the 2010 Quadrennial Review proceeding support a conclusion that the local television ownership rule and the local radio ownership rule, which we propose to retain with limited modification elsewhere in this FNPRM, adequately serve the goals the radio/television cross-ownership rule was intended to promote, namely, competition and diversity in local markets. We seek comment on whether the benefits of eliminating this regulation would outweigh any potential costs and whether simplifying our rules in this way would have only a minimal effect in most markets. Moreover, we seek comment on whether repeal of this rule would be consistent with our goal of promoting minority and female ownership of broadcast stations. We invite commenters to discuss any relevant evidence in the 2010 Quadrennial Review record and submit any new evidence that bears on our review of this rule. In addition, we seek comment on the costs and benefits of retaining or eliminating the radio/television cross-ownership rule. To the greatest extent possible, commenters should quantify the expected costs or benefits of the rule and any alternatives and provide detailed support for any actual or estimated values provided, including the source of such data and/or the method used to calculate reported values.

## 2. Background

201. In the *NPRM*, the Commission tentatively concluded that the radio/television cross-ownership rule is not currently necessary to promote the public interest. The Commission sought comment on a range of issues, including whether radio and television stations constitute different markets, whether repeal of the rule would encourage more and better competition in local media markets, whether repeal of the rule would result in additional broadcast consolidation, and what impact, if any, repeal would have on small, independent broadcasters, including those stations owned by minorities and women.[597] The Commission indicated that changes in the marketplace and evidence from the media ownership studies specifically supported the tentative conclusion that the rule is not necessary to promote viewpoint diversity in local media markets.[598]

202. Most broadcast commenters in the 2010 Quadrennial Review proceeding supported the Commission's tentative conclusion that the radio/television cross-ownership rule should be repealed. NAB contended that the radio/television cross-ownership rule is not necessary to promote viewpoint diversity and that the Commission's most recent media ownership studies, as well as its studies in past years, clearly demonstrate that increased cross-ownership of radio and television stations produces

(Continued from previous page) ─────────────────────

regardless of the number of voices remaining in the market. In all instances, the entity must also comply with the applicable local radio and local television ownership limits. 47 C.F.R. § 73.3555(c)(2). The cross-ownership rule is triggered when a station's city of license is encompassed by a specified service contour of the other co-owned stations. *Id.* § 73.3555(c)(1).

[597] *NPRM*, 26 FCC Rcd at 17533-39, ¶¶ 119-35.

[598] *Id.* at 17534, ¶ 119. Media Ownership Study 8A analyzes the impact of radio/television cross-ownership on viewpoint diversity available in local markets by examining how consumers react to the content delivered to them. The study utilizes variations in viewing patterns of local television news programs as compared to local viewing patterns for national television news programs to develop a measure of diversity of content on local news programs, and relates changes in viewing patterns to changes in local media cross-ownership. The study finds that, in general, radio/television cross-ownership has a negligible effect on viewpoint diversity. *Id.* at 17537, ¶ 132 (citing Media Ownership Study 8A at 22). The data utilized and conclusions reached regarding newspaper/television cross-ownership in Media Ownership Study 8A are different from the data and conclusions for radio/television cross-ownership in that study. *See supra* note 329 and accompanying text. Media Ownership Study 8B examines the impact of media ownership, including radio/television cross-ownership, on the amount of programming provided in television news programs in three categories: politics, local programming, and issue diversity (*i.e.*, the diversity in coverage of news topics). This study found little evidence that market structure influences viewpoint diversity. The Commission noted, however, that, as it relates to issue diversity, the study finds that, for the majority of topics for which cross-ownership is statistically significant, increases in cross-ownership are associated with greater diversity. *NPRM*, 26 FCC Rcd at 17537, ¶ 132 (citing Media Ownership Study 8B at 15).

significant benefits to localism and diversity.[599] As such, NAB cited Media Ownership Study 8B for the proposition that: (1) there is no meaningful correlation between diversity of ownership and diversity of viewpoints; and (2) the agency's diversity goal is not aligned with the needs or desires of media consumers.[600]

203. Broadcast commenters further asserted that the cross-ownership rule is no longer necessary in light of competition from new media technologies and Internet-based information outlets.[601] Broadcasters also raised concerns regarding their ability to compete against local non-broadcast media outlets, which are not constrained by the Commission's cross-ownership limits.[602] NAB contended that elimination of the radio/television cross-ownership rule would help level the playing field between local broadcast stations and multichannel video and audio distributors.[603]

204. Broadcasters also noted that repeal of the rule would likely result in new economic efficiencies that could improve the production of local public affairs and informational programming. For example, Tribune cited to its own combination of broadcast stations WGN-TV and WGN(AM) in Chicago that share a "tip line" for news stories, which, Tribune asserted, allows each station to better cover local stories from more perspectives.[604] Elimination of the rule, stated Tribune, would benefit localism as it would increase the instances where co-owned broadcast facilities could work jointly and improve local news coverage.[605] Citing Media Ownership Study 4, NAB similarly contended that cross-ownership allows economies of scale, stating that commonly owned television stations show increases in news minutes for each additional radio station they own in a market.[606] In addition, CBS supported the *NPRM*'s tentative conclusion that the radio/television cross-ownership rule is not necessary to promote localism because radio stations generally are not the dominant sources of local news and information.[607] Thus, many broadcasters asserted, in light of the ability to achieve economies of scale and the lack of an offsetting benefit in the form of increased diversity, the Commission must repeal the rule.[608]

205. Not all broadcasters, however, agreed. Mt. Wilson, an independent broadcaster with two radio stations in the Los Angeles, California, market, explained that its primary competitor in the market is CBS, which owns six radio stations and two full-power television stations in the market in addition to multiple other media interests.[609] According to Mt. Wilson, CBS is able to wield significant power in the

---

[599] NAB NPRM Comments at 49; NAB NPRM Reply at 31 n.123. NAB asserted that "there is ample evidence in the record that radio-television combinations lead to consumer benefits, particularly the increased investment in news coverage." NAB NPRM Comments at 51. NAB further contended that only competitively viable broadcast stations have the resources necessary to provide the type of significant local presence the Commission envisions. *Id.* at 9.

[600] NAB NPRM Comments at 50 nn.190-91 (citing Media Ownership Study 8B at 15, 18).

[601] NAB NPRM Comments at 49-51.

[602] *Id.* at 49-50 (noting that there are no rules prohibiting a cable operator with a dominant position in the local market from acquiring up to eight radio stations, notwithstanding that the cable operator competes directly with television broadcasters for advertisers and audience).

[603] *Id.* at 49.

[604] Tribune NPRM Comments at 77.

[605] *Id.*; *see also* NAB NPRM Comments at 9.

[606] NAB NPRM Comments at 51. CBS also noted that the Media Ownership Study 4 appears to show that cross-owned stations air more local news on average than their non-cross-owned counterparts. CBS NPRM Comments at 8.

[607] CBS NPRM Comments at 7-8.

[608] NAB NPRM Comments at 50-51.

[609] Mt. Wilson NPRM Reply at 8.

radio market because of its ability to leverage its non-radio holdings.[610] Mt. Wilson argued that elimination of the radio/television cross-ownership rule would allow CBS to increase its co-owned radio stations in the market from six to eight, giving it a further competitive benefit to the disadvantage of independent broadcasters.[611] Mt. Wilson also asserted that, notwithstanding the competitive concerns raised by NAB and others, broadcasters have long faced competition from other media outlets, but reforming or eliminating the radio/television cross-ownership rule is the wrong remedy for such competition because it would benefit only group owners.[612]

206.    Commenters who supported retention of the rule also expressed concern about the potential loss of viewpoint diversity in local markets if the rule were to be repealed. They were skeptical of conclusions in the media ownership studies that consolidated broadcast stations air more local content, and thus, contribute more to viewpoint diversity than independent voices.[613] FMC asserted that parties supporting retention of the rule and touting efficiencies gained through common ownership routinely fail to demonstrate any consumer benefit from these approaches.[614] Commenters also asserted that the Commission must take into account the public's reliance on broadcast stations and newspapers as the primary sources of information for individuals to learn about their local communities and to participate in local civic affairs.[615]

207.    Public interest advocates, including Free Press and NHMC *et al.*, maintained that the sources of local news available online are not true competitors to traditional media, but rather they aggregate news or provide information that is virtually identical to that provided by the traditional media, and, therefore, should not be used to justify eliminating the radio/television cross-ownership rule.[616] Free Press contended that such media have "not come close" to replacing the local news gathering and information programming of broadcast television, radio, and newspapers and maintained that the number of diverse and independent producers of local news has remained stagnant or even shrunk in some communities, notwithstanding the "illusion of abundance."[617] NHMC *et al.* added that it would be

---

[610] *Id.* at 12-13. Mt. Wilson disagreed with the *NPRM*'s tentative conclusion that "most consumers do not consider radio and television to be substitutes for one another," an assumption it contended ignores advertisers and their practices. According to Mt. Wilson, permitting a group owner to offer access [to advertisers] to "still more group-owned radio stations" through repeal of the cross-ownership rule would adversely affect competition in local broadcast markets. *Id.*; *see also* AFCP *et al.* NPRM Comments at 4-5 n. 9.

[611] Mt. Wilson NPRM Reply at 13. Mt. Wilson added that retention of the cross-ownership rule would ensure that group owners such as CBS continue to have competition from independent radio owners, which benefits consumers by ensuring access to more locally focused programming from independent owners. *Id.* at 2-3, 8.

[612] Mt. Wilson July 3, 2012 *Ex Parte* Comments at 2. Moreover, Mt. Wilson contended that NAB's focus on competition with other media outlets was misplaced because the radio/television cross-ownership rule is intended to protect viewpoint diversity and ensure "a sufficient number of independent radio voices and . . . preserv[e] a market structure that facilitates and encourages new entry into the local media market." *Id.* at 7-8 (citing *NPRM*, 26 FCC Rcd at 17511-12, ¶ 61); *see also* Media Alliance 323 Report Comments at 2 (stating that "media consolidation has not worked to the advantage of single outlet owners or small chains").

[613] AFTRA NPRM Comments at 3.

[614] FMC NPRM Comments at 8-9.

[615] Free Press NPRM Comments at 24-25; NHMC *et al.* NPRM Comments at 37 (observing that over-the-air broadcast stations are free to the public and that radio reaches over 93 percent of Americans each week, with an even higher penetration rate in communities of color).

[616] Free Press NPRM Comments at 25 n.89; NHMC *et al.* NPRM Comments at 37; *see also* AFTRA NPRM Comments at 3-4.

[617] Free Press NPRM Comments at 25; Free Press NPRM Reply 4 (citing PEW BALTIMORE STUDY at 3-4); AFTRA NPRM Comments at 3-4 (arguing that lower barriers to entry on the Internet have resulted in websites that merely aggregate or comment on news reporting done by traditional television and newspaper outlets and contending that

(continued....)

reckless for the Commission to acknowledge, on the one hand, that much of the country is unserved or underserved by broadband — and thus lacks access to news and other programming on the Internet — while on the other hand, considering and factoring in Internet voices when examining repeal of the radio/television cross-ownership policy.[618]

208.    In addition, public interest commenters claimed that broadcast radio is one of the few remaining entry points into media ownership for women and minorities, and that its usefulness as such would potentially be limited if the radio/television cross-ownership rule were eliminated.[619]  Other commenters argued more generally that any media consolidation disproportionately affects opportunities for women and minorities to become and remain broadcast station owners and that female- and minority-owned stations thrive in markets that are less concentrated.[620]  NHMC *et al.* contended that strengthening, or at least retaining, broadcast ownership limits is one of the few race- and gender-neutral ways to increase broadcast station ownership by women and minorities, thereby, avoiding the constitutional concerns raised by race- and gender-specific remedies.[621]  NABOB asked that the Commission not take any action that would further erode minority broadcast ownership, particularly given that new media outlets are not positioned to replace traditional broadcasters and the information services they provide to minority communities.[622]  NABOB contended that any deregulation allows consolidation and it asserted that consolidation enhances an entity's competitive advantage in obtaining advertising.[623]

209.    We invite commenters to augment the 2010 Quadrennial Review record with any new or different evidence, data, or information relevant to our consideration of the radio/television cross-ownership rule in this consolidated docket.

---

(Continued from previous page) —————————————————

the Information Needs of Communities Report demonstrates that new media sources have contributed to a decline in access to local news rather than serving as an antidote).

[618] NHMC *et al.* NPRM Comments at 37.

[619] FMC also predicted that elimination of the radio/television cross-ownership rule would result in less access for local voices.  FMC NPRM Comments at 8-9; *see also* Free Press NPRM Comments at 26.

[620] Free Press NPRM Reply at 49-50.  Free Press offered the following findings on minority ownership of radio stations from its own research:  (1) markets with female and minority owners have fewer stations per owner on average than markets without them; (2) the level of market concentration is significantly lower in markets with female and minority owners (this holds true if the size of the market and the level of minority population in the market are held constant); (3) the probability that a particular station will be female- or minority-owned is significantly lower in more concentrated markets; and (4) the probability that a particular market will contain a female- or minority-owned station is significantly lower in more concentrated markets.  *Id.*  Free Press noted that such findings suggest that consolidation disproportionately affects opportunities for women and people of color to become and remain broadcast station owners.  *Id.*

[621] NHMC *et al.* NPRM Comments at 5.  Free Press agreed with NHMC *et al.* and contended that the Commission should not eliminate a rule that could diminish opportunities for women and people of color without providing an analysis of the impact on such groups or even a current tally of radio ownership levels by women and people of color.  Free Press NPRM Reply at 50-51.  NHMC *et al.* also criticized the lack of minority ownership data or other analysis that would support relaxation or elimination of the radio/television cross-ownership rule.  NHMC *et al.* Comments at 34.

[622] NABOB NOI Comments at 5.  NABOB asserted that, if the Commission does not take affirmative steps to prevent more ownership consolidation, "it must at least refrain" from relaxing its current cross-ownership rules.  NABOB 323 Report Comments at 3.  In contrast, NAB maintained that the Commission should be skeptical of unproven assumptions about the relationship between relaxation of ownership limits and a reduction in the number of minority-owned broadcast stations.  NAB NPRM Comments at 56.

[623] NABOB 323 Report Comments at 10-11.

### 3.    Discussion

210.    Considering the record in the 2010 Quadrennial Review proceeding and consistent with our tentative conclusion in the *NPRM*, we seek comment on whether the radio/television cross-ownership rule is still necessary to promote the public interest or whether the rule should be repealed.  We note that the record suggests that, unlike local television stations and daily newspapers, radio stations are not a dominant source of local news and information, and thus, we seek comment on whether retention of this rule is necessary to promote and preserve viewpoint diversity in local markets.[624]  Moreover, we seek comment on whether the existing rule offers substantial benefits in addition to our other rules.  We tentatively find, as the Commission consistently has in past proceedings, that this rule is not necessary to support our goals of competition or localism.

211.    *Viewpoint Diversity.*  Limiting the combined number of commercial radio and television stations that a single entity may own in a market was previously found necessary to promote a diversity of viewpoints.  We seek comment on the continued necessity of such a restriction.  We note that, despite our specific request in the *NPRM*,[625] no studies were submitted in the 2010 Quadrennial Review record to demonstrate that this rule supports viewpoint diversity or that repeal of the rule would cause a decrease in viewpoint diversity.  We seek comment on whether the local radio and local television ownership rules, which we propose to retain, as well as our proposed newspaper/television cross-ownership rule, would be sufficient to protect viewpoint diversity such that retaining the radio/television cross-ownership rule is unnecessary.[626]

212.    We seek comment on evidence in the 2010 Quadrennial Review record suggesting that radio stations are not currently a dominant source of local news and information.[627]  Consistent with our tentative conclusions in the *NPRM*, the record in the 2010 Quadrennial Review proceeding demonstrates that consumers rely primarily on local television stations and daily newspapers (and their affiliated websites) for their local news, and not on radio stations.[628]  If the record demonstrates that radio stations are not the primary outlets that contribute to local viewpoint diversity, what harm to viewpoint diversity would result from repealing the radio/television cross-ownership restriction?[629]  To the extent that noncommercial radio stations contribute to local news and information, we note that, because our

---

[624] We note, however, that we have tentatively concluded in this FNPRM that the local radio rule remains necessary to promote competition and that it also fosters new entry (and thus viewpoint diversity) and promotes localism.  *See supra* ¶ 74.

[625] *NPRM*, 26 FCC Rcd at 17537, ¶ 131.

[626] *See also* CBS NOI Reply at 19-20 (citing *2002 Biennial Review Order*, 18 FCC Rcd at 13774-75, ¶ 389).

[627] Local news and information has been the basis of our analysis of localism historically.  We note that FMC maintained that based on a 2010 Edison Research study, "young people still turn to radio as their first media outlet when looking for new music, [and] no known service has been able to usurp radio's important role as a communicator of culture."  FMC Comments at 6.  This commenter, however, did not identify the relationship of this fact to the radio/television cross-ownership rule in a manner showing that the rule should be maintained under Section 202(h).  Moreover, FMC's comment related to program diversity, which is not one of the core goals the Commission has sought to promote through the radio/television cross-ownership rule.

[628] PEW RESEARCH CENTER FOR THE PEOPLE & THE PRESS, AUDIENCE SEGMENTS IN A CHANGING NEWS ENVIRONMENT (2008), *available at* http://www.people-press.org/files/legacy-pdf/444.pdf; *see also* A. H. Belo NPRM Comments at 7 (stating that "daily newspapers and local television broadcasters remain the primary originators of local news and the principal vehicles for investigative or enterprise journalism"); Cox NPRM Comments at 20; Morris NPRM Comments at 8-11; Morris NPRM Reply at 8-9; Bonneville/Scranton NPRM Comments at 5-13, 18-19.  For additional discussion, see the NBCO rule section, *supra*, at paragraphs 130, 131, 145, and 146.

[629] The court recognized in *Prometheus I* that mergers involving media that are not significant sources of local news do not pose a serious threat to viewpoint diversity.  373 F.3d at 404-05.

ownership rules do not apply to noncommercial radio stations, the repeal of this rule would not impact their contribution to viewpoint diversity.[630] We seek comment on how this fact should affect our analysis.

213.    The Commission has previously acknowledged that radio is a distant third behind newspapers and television stations in terms of being an important provider of news and information.[631] Indeed, the Commission has long recognized that "a radio station cannot be considered the equal of either the newspaper or the television station in any sense, least of all in terms of being a source for news or for being the medium turned to for discussion of matters of local concern."[632] In the *2006 Quadrennial Review Order* the Commission decided to retain the radio/television cross-ownership rule on the basis that the public relied on both radio and television for news and information.[633] Information in the record in the 2010 Quadrennial Review proceeding, as well as the Information Needs of Communities Report and the most recent media ownership studies, suggest that local radio stations do not contribute to local viewpoint diversity to the same degree as local television stations and daily newspapers.

214.    As we discussed in the context of the NBCO rule above, recent evidence demonstrates that consumers regard local television stations and daily newspapers as the principal sources of local news and information.[634] According to a recent Pew study, this popularity has, in turn, encouraged many television stations to produce more local morning and mid-day news programming, further establishing television stations as the main providers of local news and information in local markets.[635] Independent television stations, particularly in those markets where they air local news, showed bigger audience or ratings gains in 2011 when compared to any of the stations affiliated with Big Four broadcast networks, which may provide more national programming content during those day parts.[636]

---

[630] *See* Media Ownership Study 5 at 4-5 (noting that a public news radio station serves about 40 percent of markets). The Information Needs of Communities Report notes that there are 185 self-defined all-news public radio stations. Additionally, according to the report, from 2004 to 2009, the number of public radio stations carrying local news or talk programming rose from 595 to 681, and the number of hours of such programming aired each week increased from 5,182 to 5,693. INFORMATION NEEDS OF COMMUNITIES at 67 (citing National Public Radio May 7, 2010 Comments, GN Docket No. 10-25, at 2-3, 7); *compare supra* note 424 (noting that only a very small number of commercial all-news radio stations exist).

[631] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2060, ¶ 84 n.279.

[632] *1975 Second Report and Order*, 50 FCC 2d at 1083, ¶ 115. In the 2002 media ownership review, the Commission similarly noted that "broadcast radio generally has less of an impact on local diversity than broadcast television." *2002 Biennial Review Order*, 18 FCC Rcd at 13800, ¶ 459; *see also* Bonneville/Scranton NPRM Comments at 5-10 (stating that the Commission has recognized since at least 1970 that radio does not play a key role in promoting local viewpoint diversity).

[633] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2059-60, ¶ 84. The Commission also noted that its decision to retain the radio/television cross-ownership rule was based, in part, on its desire to preserve the *status quo* given that the earlier cross media limits, which had formed the basis for the elimination of the radio/television cross-ownership rule, had been vacated. *Id.*

[634] *See supra* ¶ 145 (seeking comment on our tentative conclusion in the *NPRM* that radio stations are not the primary outlets that contribute to local viewpoint diversity and that consumers rely predominately on other outlets for local news and information).

[635] STATE OF THE NEWS MEDIA 2012 at Local TV Essay. Local television stations have begun to implement newscasts as early as 4 a.m., which encourages viewers to stay with the station through the 4:30 a.m. newscast, thereby increasing the station's visibility. *Id.* Also, the departure of the nationally syndicated Oprah Winfrey program has resulted in increased ratings for stations with 4 p.m. newscasts. *Id.*

[636] *Id.*

215.    As we describe in detail above,[637] the Information Needs of Communities Report records a steady decline over the past two decades in consumer reliance on commercial radio news.[638] The number of people who listen to some news on the radio dropped from 54 percent to 34 percent during that period.[639] Only 30 commercial radio stations out of over 11,000 are all-news radio stations, a reduction from 50 in the mid-1980s.[640] Although we acknowledge that a small number of commercial all-news radio stations in the nation's largest markets are very successful, radio stations in most cities do not provide local journalism.[641] Eighty-six percent of programming on news-talk stations is nationally syndicated, rather than locally produced.[642] We seek comment on whether there is any more recent countervailing evidence refuting these trends.

216.    Additionally, we seek comment on whether the existing radio/television cross-ownership rule provides meaningful additional restriction on consolidation, given that the local television and radio rules separately impose limitations on the amount of broadcast ownership permitted in local markets. Would the repeal of the rule have more than a minimal impact on broadcast consolidation in most local markets, as parties would continue to be constrained by the applicable local radio and local television ownership rules? As discussed in the *NPRM*, absent the radio/television cross-ownership rule, an entity approaching the limits of the existing cap, if constrained only by the local radio rule, would be permitted to acquire one or two additional radio stations in large markets, at most. Under the local radio rule, an entity owning six or seven radio stations can own as many as eight radio stations in the largest radio markets in the absence of the cross-ownership rule. We seek comment on whether the local radio rule is sufficient to protect competition in local radio markets. We believe the elimination of the radio/television cross-ownership rule would have no effect on the number of television stations an entity may own as the existing cross-ownership rule references the local television rule to determine how many television stations an entity may own.[643] We seek comment on this conclusion and on whether the radio/television cross-ownership rule has independent effects, aside from those provided by the other local ownership rules, on consolidation in most local markets.

217.    We also seek comment on the implications of the cross-ownership rule's two-tiered voice count restriction on broadcast consolidation in local markets. The restrictions appear to be readily met in many markets.[644] In many large markets, the requirement that at least 20 independently owned and

---

[637] *See supra* ¶ 146.

[638] *See* Bonneville/Scranton NPRM Comments at 11-12 (referencing the Information Needs of Communities Report).

[639] INFORMATION NEEDS OF COMMUNITIES at 62. Notably, the report did not define "news" or differentiate between syndicated national news, non-news talk radio, or local news. By way of comparison, the report states that newspaper readership dropped even more from 56 percent to 31 percent; however, much of that newspaper readership has simply shifted online. *Id.*

[640] INFORMATION NEEDS OF COMMUNITIES at 14, 62.

[641] INFORMATION NEEDS OF COMMUNITIES at 14, 65-66; *see also* Bonneville/Scranton NPRM Comments at 12-13 (pointing to findings in the Pew Baltimore Study that the vast majority of Baltimore's radio stations did not broadcast any local news or original news reports). One finding showed that in 2007, more than 40 percent of radio stations carried news programming produced remotely by a commonly owned station outside the local market. INFORMATION NEEDS OF COMMUNITIES at 63. Typically, only one employee is involved in news output at a median-sized radio station. *Id.* at 64.

[642] INFORMATION NEEDS OF COMMUNITIES at 14, 66-67; *see also* Bonneville/Scranton NPRM Comments at 12-13 (pointing to similar findings in the Pew Baltimore Study).

[643] *NPRM*, 26 FCC Rcd at 17535-56, ¶ 126; *see also* NAB NOI Comments at 76. The cross-ownership rule permits an entity to "trade" the opportunity to own a second television station, where permissible under the local television rule, for ownership of an additional radio station.

[644] *See supra* note 596.

operating media voices remain in order to own television stations and as many as six or seven radio stations is met or exceeded and therefore appears to have little effect. Similarly, in many small markets the requirement that at least 10 independently owned media voices remain in order to own a television station and as many as four radio stations is met, so that element of the rule presumably has a limited impact on the potential for consolidation in those markets. We seek comment on these findings and on markets where this element of the rule may have an impact on television/radio consolidation.[645] What is the significance of any such impact? We seek comment on whether the record from the 2010 Quadrennial Review proceeding or any more recent evidence establishes any particular or measurable potential harm that would likely result from repeal of this cross-ownership rule.

218.    *Competition.* Consistent with prior Commission holdings, we tentatively find that the radio/television cross-ownership rule is not necessary to promote competition. The Commission has found previously that most advertisers do not consider radio and television to be good substitutes for one another,[646] and that "television and radio stations neither compete in the same product market nor do they bear any vertical relation to one another."[647] This position is consistent with the long-standing conclusion of the Department of Justice, which considers radio advertising as a separate antitrust market for purposes of its competition analysis.[648] Similarly, we tentatively find that most consumers do not consider radio and television stations to be substitutes for one another and do not switch between television viewing and radio listening based on program content.[649] Nothing in the current record undermines our previous conclusion that a television-radio combination, therefore, cannot adversely affect competition in any relevant product market.[650] Given that radio and television stations do not appear to compete in the same market and that the local television and radio rules would prevent significant additional consolidation even in the absence of this rule, the 2010 Quadrennial Review record does not suggest that repeal of the radio/television cross-ownership rule would harm competition. We seek comment on whether any data or evidence made available since the *NPRM* warrants a renewed analysis of the competitive effect of the radio/television cross-ownership.

219.    *Localism.* Consistent with our tentative conclusion in the *NPRM* and previous Commission holdings, we tentatively find that the radio/television cross-ownership rule is not necessary to promote localism.[651] We seek comment on this tentative conclusion. Furthermore, we seek comment on whether elimination of this rule is likely to result in benefits to localism in the form of improved or expanded programming.

---

[645] *See, e.g.*, Mt. Wilson NPRM Reply at 8.

[646] *2002 Biennial Review Order*, 18 FCC Rcd at 13770-71, ¶ 377.

[647] *Id.* at 13772, ¶ 381.

[648] *2002 Biennial Review Order*, 18 FCC Rcd at 13714, ¶ 243 (citing Complaint at ¶¶ 11-14, *United States v. Clear Channel Commc'ns, Inc.*, No. 1:00CV02063 (D.D.C. Aug. 29, 2000); Complaint at ¶ 12, *United States v. EZ Commc'ns, Inc.*, No. 1:97CV00406 (D.D.C. Feb. 27, 1997)); *see also* DOJ February 20, 2014 *Ex Parte* Comments at 5, 8 (confirming that broadcast radio spot advertising and broadcast television spot advertising are distinct product markets).

[649] *NPRM*, 26 FCC Rcd at 17535, ¶ 124; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13771-72, ¶¶ 380-81 (finding radio and television advertising to be separate product markets because, among other factors, the formats used in radio broadcasting allow advertisers to target specific demographics more precisely than they can when they advertise on television; and, further, that radio and television utilize distinct programming based on their different technologies and those technological and programming differences are significant for viewers and advertisers alike).

[650] We do not believe that the current record supports the position of commenters who assert that radio and television stations compete in the same product market, but we seek comment on this view. *See* Mt. Wilson NPRM Reply at 8-13; AFCP *et al.* NPRM Comments at 4-5, n.9; NABOB 323 Report Comments at 10-11.

[651] *NPRM*, 26 FCC Rcd at 17535-36, ¶ 127; *2002 Biennial Review Order*, 18 FCC Rcd at 13772-73, ¶¶ 383-85.

220.     We sought comment in the *NPRM* on the relevance of the media ownership studies to our analysis of whether the radio/television cross-ownership rule promotes our localism goals. We specifically highlighted the findings in Media Ownership Study 1 and Media Ownership Study 4 about the correlation between the level of radio/television cross-ownership in a market and the amount of local television programming provided.[652] We stated in the *NPRM* that Media Ownership Study 1 examines how cross-ownership is associated with localism, as measured by the amount of local news provided in the market, and that the study finds that cross-ownership decreases local television news hours but raises ratings, which leads to ambiguous results.[653] Additionally, we observed the finding in Media Ownership Study 4 that, at the station level, radio/television cross-owned stations appear to air more local news on average, though the impact is marginal. The study showed that for every additional in-market radio station a parent owned, the television station aired 3.7 more minutes of local news.[654] Some commenters in the 2010 Quadrennial Review proceeding maintained that these media ownership studies support the conclusion that the cross-ownership rule cannot be justified based on localism concerns.[655] NAB stated that the record is clear that repeal of the radio/television cross-ownership rule would benefit both localism and diversity.[656]

221.     We agree with industry commenters who maintained that some limited cross-ownership could create efficiencies that could benefit the public should broadcasters choose to invest additional resources in the production of local news and information programming.[657] When broadcasters engage in joint operations, whether those operations are focused on programming and news gathering or back office matters, we believe it likely that financial efficiencies result. Such efficiencies could lead ultimately to consumer benefits in the form of additional station investments in equipment for radio or television newsrooms, an increase in staffing for news and informational programs, or additional local news coverage on radio stations.[658] We recognize the potential for such benefits and seek comment on the likely extent of such gains if the rule were repealed.

222.     *Minority and Female Ownership.* We also sought comment in the *NPRM* on the effect that eliminating the radio/television cross-ownership rule would have on our efforts to foster ownership diversity among minorities and females.[659] Further, the Commission sought comment on the minority and female ownership data contained in the *2012 323 Report*.[660] In addition, interested parties had the opportunity to comment on the MMTC Cross-Ownership Study, as discussed in the context of the NBCO rule above.[661] In response, several commenters criticized the Commission for proposing to relax any of its rules, including the radio/television cross-ownership rule, without first determining that there will be no negative impact on minority and female ownership.[662] We have considered carefully whether there is

---

[652] *NPRM*, 26 FCC Rcd at 17536-37, ¶¶ 128-30.

[653] *Id.* at 17536, ¶ 129 (citing Media Ownership Study 1 at 1, 16, 21, Table 3).

[654] *NPRM*, 26 FCC Rcd at 17536-37, ¶ 130 (citing Media Ownership Study 4 at 28).

[655] CBS NPRM Comments at 8 (citing Media Ownership Study 4 at 28).

[656] NAB NPRM Comments at 50-51; NAB NPRM Reply at 31 n.123 (citing multiple ownership studies).

[657] *See* Tribune NPRM Comments at 77; NAB NPRM Comments at 50-51; NAB NPRM Reply at 5-6; Tribune NPRM Reply at 16.

[658] *See NPRM*, 26 FCC Rcd at 17535, 17536-37, ¶¶ 125, 130.

[659] *Id.* at 17538, ¶ 134.

[660] *See 2012 323 Report Comments PN.*

[661] *See supra* ¶¶ 196-198.

[662] *See* NABOB 323 Report Comments at 2-3; Free Press NPRM Comments at 9-10; NALIP NPRM Reply at 1-2; *see also* CWA NPRM Reply at 6 (arguing that the Commission should not relax any ownership rules because it has not studied minority and female ownership issues adequately). As noted above in the context of the NBCO rule, we

(continued....)

evidence in the current record that elimination of the radio/television cross-ownership rule would likely adversely affect minority and female ownership, and we believe, as discussed above, that the current record does not establish that such harm is likely. Furthermore, we do not believe that record evidence shows that the cross-ownership ban has protected or promoted minority or female ownership of broadcast stations, or that it could be expected to do so in the future. Nevertheless, we invite commenters to submit further data on the connection, if any, between the radio/television cross-ownership rule and minority and female ownership.

223. Notably, radio/television cross-ownership combinations were not the focus of commenters' concerns raised in response to the *NPRM*. In fact, no commenter to the *NPRM* presented empirical data or other analyses that established that repeal of this rule would harm competition, localism, or viewpoint diversity in local markets. As discussed above, we tentatively conclude that the rule is not necessary to promote competition or localism, and the record reflects that most radio commercial stations do not broadcast significant amounts of local news and information. The current record does not suggest that minority/female-owned radio stations contribute more significantly to viewpoint diversity than other radio stations or broadcast more meaningful amounts of local news on which consumers rely as a primary source of information.[663] We seek comment on these views.[664] Recognizing that repeal of the rule would potentially allow for the acquisition of a limited number of additional radio stations in some markets by incumbent television broadcasters, we seek comment on the impact that elimination of the rule would have on media consolidation and thus on small broadcast owners, including minority and women owners. As noted above, the current radio/television rule already allows for a significant degree of cross-ownership of radio and television stations in a market. Second, the cross-ownership rule has always been accompanied by the ownership limitations contained in the local television and local radio rules, which we propose to retain substantively unchanged in order to protect competition in local markets. We seek comment on whether the local ownership rules are sufficient to protect minority and female broadcast owners from the competitive effects of media consolidation.

224. Moreover, while we acknowledge the concerns raised by NABOB and others advocating for additional minority ownership opportunities, we agree with commenters, including NAB, that the low level of minority and female broadcast ownership cannot be attributed solely or primarily to consolidation.[665] Nor has any commenter shown that these low levels of ownership are a result of the existing radio/television cross-ownership rule. We recognize the presence of many disparate factors,

---

(Continued from previous page)

tentatively reject arguments that the *Prometheus II* decision requires us to take no action unless we can show definitively that a rule change will have no negative impact on minority ownership levels. *See supra* ¶ 190.

[663] NAB asserted that the "Commission cannot rely on the unproven assertion of a causal connection between the structural rules . . . and the levels of minority and female ownership as rationale for retaining the existing rules." NAB 323 Report Rely at 5; *see also Prometheus I*, 373 F.3d at 395 (stating that "Section 202(h) requires the Commission periodically to justify its existing regulations . . . [a] regulation deemed useful when promulgated must remain so").

[664] As discussed further in the Diversity section below, several of the media ownership studies in this proceeding concluded that there is a positive relationship between minority station ownership and the provision of certain types of minority-oriented content or the consumption of broadcast content by minority audiences. *See infra* ¶ 253 (citing Media Ownership Study 8B at 15-17; Media Ownership Study 7 at 12-13, 19-21; Media Ownership Study 6 at 28). Several commenters also raised this issue. *See* NABOB 323 Report Comments at 4; LCCHR 323 Report Comments at 4; DCS 323 Report Comments at 4. This observation, however, does not alter our view that radio stations — be they minority-owned or not — do not contribute significantly to local news. We seek comment on whether recent evidence shows otherwise.

[665] *See, e.g.*, NAB NPRM Comments at 56.

including, most significantly, access to capital, as longstanding, persistent impediments to ownership diversity in broadcasting.[666] As discussed below, such factors require further study and consideration.

225. In this FNPRM, we reaffirm our commitment to broadcast ownership diversity as an important goal. The 2010 Quadrennial Review record, however, does not appear to establish that elimination of the radio/television cross-ownership rule would adversely affect ownership diversity.[667] We ask commenters to provide any demonstrable evidence of such a link that may have become available since the 2010 Quadrennial Review.

### E. Dual Network Rule

#### 1. Introduction

226. We tentatively find that the dual network rule, which permits common ownership of multiple broadcast networks, but prohibits a merger between or among the "top-four" networks (ABC, CBS, Fox, and NBC),[668] continues to be necessary to promote competition and localism and should be retained without modification.[669] In particular, we tentatively find that the top-four broadcast networks have a distinctive ability to attract, on a regular basis, larger primetime audiences than other broadcast and cable networks, which enables them to earn higher rates from those advertisers willing to pay a premium for such audiences. Thus, we believe that a combination between top-four broadcast networks would reduce the choices available to advertisers seeking large, national audiences, which could substantially lessen competition and lead the networks to pay less attention to viewer demand for innovative, high quality programming. We also tentatively find that the rule remains necessary to preserve the balance of bargaining power between the top-four networks and their affiliates, thus improving the ability of affiliates to exert influence on network programming decisions in a manner that best serves the interests of their local communities. We tentatively conclude that the benefits of retaining the rule outweigh any potential burdens. We seek comment on these tentative findings, particularly with respect to any relevant developments that may have occurred since the *NPRM*. We seek comment also on the costs and benefits of our proposal to retain the existing dual network rule. To the greatest extent possible, commenters should quantify the expected costs or benefits of the rule and provide detailed support for any actual or estimated values provided, including the source of such data and/or the method used to calculate reported values.

---

[666] Free Press agreed, in part, with this assessment, stating that "there are myriad factors contributing to the abysmal state of diverse ownership, including but not limited to institutional discrimination in financing and access to capital and deals . . . [h]owever, market consolidation is chief among these factors and even exacerbates the other barriers." Free Press 323 Report Reply at 4.

[667] NAMB contended that relaxation of the radio/television cross-ownership rule would not cause minority-owned stations to become likely take-over or purchase targets for large station groups. Even if this were to occur, NAMB added, minority broadcasters should have the same market opportunities to sell their stations as non-minority broadcasters. NAMB 323 Report Comments at 6. Likewise, NAMB asserted that eliminating the rule would not significantly reduce the inventory of stations available for interested minority purchasers and that the inventory of stations following elimination of the rule would be plentiful. *Id.* at 5; *see also* NAB 323 Report Reply at 8.

[668] The rule provides that "[a] television broadcast station may affiliate with a person or entity that maintains two or more networks of television broadcast stations *unless* such dual or multiple networks are composed of two or more persons or entities that, on February 8, 1996, were 'networks' as defined in [Section] 73.3613(a)(1) of the Commission's regulations . . . ." 47 C.F.R. § 73.658(g) (emphasis in original).

[669] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2082, ¶ 139; *2002 Biennial Review Order*, 18 FCC Rcd at 13858, ¶ 621. The Third Circuit upheld the Commission's decision in the *2006 Quadrennial Review Order* to retain the dual network rule to promote competition and localism. *Prometheus II*, 652 F.3d at 463-64.

### 2.  Background

227.    In the *NPRM*, the Commission sought comment on its tentative conclusion that the existing dual network rule should be retained without modification in order to promote competition.[670] The Commission also sought comment on the potential impact of top-four network mergers on localism.[671]

228.    Both CBS and Fox responded that the dual network rule should be repealed.[672] According to CBS, recent developments in the television marketplace have undermined the rationales for the rule, and the Commission is no longer justified in singling out the top-four broadcast networks for disparate treatment vis-à-vis cable networks.[673]  CBS stated that in recent years cable networks have modified their programming lineups to include more programming of the sort that, in the past, has aired primarily on broadcast networks (*e.g.*, original scripted dramas and sitcoms, national and local news, and sports programming).[674]  CBS noted that, under the dual network rule, "one entity can own an unlimited number of these cable networks — be they the most-watched or not in their universe — but cannot own even two of the four broadcast networks named in the dual network rule, even if those networks are not the most-watched."[675]  In addition, CBS asserted that there is no basis to restrict ownership of broadcast networks in light of the Commission's decision to allow NBC, a top-four broadcast network, to combine with Comcast, the nation's largest cable company and, among other things, the operator of five national cable networks.[676]

229.    By contrast, several commenters supported retention of the dual network rule.[677]  WGAW asserted that the rule remains necessary to promote competition in the market for primetime programming.[678]  Furthermore, the Affiliates Associations asserted that the dual network rule remains necessary to promote localism.[679]  According to the Affiliates Associations, the rule maintains "a proper balance in the network-affiliate relationship," which in turn protects the independent discretion of local affiliates to make programming decisions.[680]

---

[670] *NPRM*, 26 FCC Rcd at 17543, ¶ 144.

[671] *Id.* at 17544, ¶ 146.

[672] CBS NPRM Comments at 16-18; Fox NPRM Comments at 3, 19.

[673] CBS NPRM Comments at 16-18.

[674] *Id.* at 17.

[675] *Id.*

[676] *Id.*

[677] WGAW NPRM Comments at 6-9; ABC Television Affiliates Association, CBS Television Network Affiliates Association, and NBC Television Affiliates ("Affiliates Associations") NPRM Comments at 2-3; Independent Telephone and Telecommunications Alliance ("ITTA") NPRM Comments at 8; LCCHR NPRM Comments at 1, n.2.

[678] WGAW NPRM Comments at 6-7.  In addition, WGAW noted that, according to its own analysis, the top-four broadcast networks produce more than 70 percent of the programming they air during primetime. *Id.* at 7. According to WGAW, that percentage increases to 85 percent when primetime programming produced by Warner Bros. — co-owner, with CBS, of the fifth largest broadcast network, the CW — is considered. *Id.* at 7-8. WGAW urged the Commission not only to retain the dual network rule, but also to consider other measures to alleviate the lack of competition in the market for primetime entertainment programming. *Id.* at 8-9.  Specifically, WGAW proposed that the Commission limit the top-four broadcast networks to ownership of 50 percent of the primetime entertainment programming aired on their networks. *Id.* at 9.

[679] Affiliates Associations NPRM Comments at 1-2.

[680] *Id.*

230.    In addition, both TWC and ITTA contended that dual affiliation, the practice of a single TV station affiliating with two or more top-four broadcast networks in a single market, allows stations to circumvent the intent of the dual network rule.[681]  These parties urged the Commission to ensure that broadcasters cannot evade the purpose of the dual network rule through such dual affiliation practices.[682]

231.    By contrast, Fox argued that that the dual network rule should not be expanded to address dual affiliation practices.[683]  Fox stated that dual affiliation does not violate the intent of a rule "aimed entirely at preventing common ownership of networks."[684]  Furthermore, Fox stated that dual affiliation does not change the number of networks, or the number of network owners, in a given market.[685]  Fox also contended that the expansion of the rule, as proposed by TWC and ITTA, would change it from a rule designed to protect affiliates to one that actually restrains affiliates and reduces their bargaining power.[686]  For instance, Fox asserted that dual affiliation gives stations "a chance to level the playing field with often-dominant MVPDs when it comes to retransmission consent bargaining."[687]  Finally, Fox contended that any interpretation of the dual network rule that restricts a station's ability to affiliate with multiple networks would create a serious disincentive for a network affiliate to relinquish voluntarily its television broadcast spectrum as part of an incentive auction.[688]

232.    We invite commenters to augment the 2010 Quadrennial Review record with any new or different evidence, data, or information relevant to our consideration of the dual network rule in this consolidated docket.

### 3.    Discussion

233.    *Competition.*  Consistent with the Commission's tentative conclusion in the *NPRM*, we tentatively find that the dual network rule remains necessary in the public interest to foster competition in the provision of primetime entertainment programming and the sale of national advertising time.[689]  Specifically, as discussed in more detail below, we tentatively find that the primetime entertainment programming supplied by the top-four broadcast networks is a distinct product, the provision of which could be restricted if two of the four major networks were to merge.  We also tentatively find that, consistent with past Commission findings, the top-four broadcast networks comprise a "strategic group" in the national advertising market and compete largely among themselves for advertisers that seek to reach large, national mass audiences.[690]  Accordingly, we continue to believe that a top-four network

---

[681] TWC NPRM Comments at 3, 20; ITTA NPRM Comments at 7-8; TWC NPRM Reply at 12-13.

[682] TWC NPRM Comments at 3, 21; ITTA NPRM Comments at 8.

[683] Fox NPRM Reply at 17-18.

[684] *Id.*; *see also* Sinclair NPRM Reply at 6-7 (noting that the dual network rule effectively proscribes the behavior of broadcast networks not individual stations).

[685] Fox NPRM Reply at 19.

[686] *Id.*

[687] *Id.*  Furthermore, Fox noted that antitrust laws can address "any residual concerns with multiple affiliations unduly impacting competition."  *Id.* at 19 n.61.

[688] *Id.* at 20.

[689] *See NPRM*, 26 FCC Rcd at 17543, ¶ 144.

[690] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2082-84, ¶¶ 140-41; *2002 Biennial Review Order*, 18 FCC Rcd at 13852-55, ¶¶ 606-10.  A strategic group refers to a cluster of independent firms within an industry that pursue similar business strategies, in this case, networks that similarly seek to attract mass audiences and the advertisers that want to reach them.  *See 2002 Biennial Review Order*, 18 FCC Rcd at 13853, ¶ 607 n.1259.  In upholding the Commission's decision to retain the rule, the court in *Prometheus II* cited the Commission's reliance on several unique features of the top-four networks, including their operation as a strategic group in the national advertising market.  652 F.3d at 464.

merger would substantially lessen competition for advertising dollars in the national advertising market, which would, in turn, reduce incentives for the networks to compete with each other for viewers by providing innovative, high quality programming.[691] Based on their distinctive characteristics relative to other broadcast and cable networks, we tentatively find that the top-four broadcast networks serve a unique role in the provision of primetime entertainment programming and the sale of national advertising time that justifies retaining a rule specific to them. We seek comment on these tentative findings.

234.    As noted in the *NPRM*, in comparison to other broadcast and cable networks, the top-four broadcast networks achieve substantially larger primetime audiences, as measured both by the audience size for individual programs and by the audience size for each network as a whole.[692] Primetime broadcast network programming is generally designed to attract a mass audience, and financing such programming, in turn, requires the substantial revenue that only a mass audience can provide. The top-four broadcast networks supply their affiliated local stations with primetime entertainment programming intended to attract both mass audiences and the advertisers that want to reach such large, national audiences. By contrast, other broadcast networks, and many cable networks, tend to target more specialized, niche audiences.[693] As CBS noted, in recent years, some cable networks have moved away from serving niche audiences and have modified their primetime programming lineups to more closely resemble those of broadcast networks.[694] Nonetheless, with the exception of certain individual sports events or mini-series, even the highest rated primetime entertainment programs on cable networks achieve substantially smaller audiences than their broadcast network counterparts.[695] For instance, during 2011, the highest rated primetime entertainment programs on cable networks attracted, at most, between 8 and 9 million viewers.[696] By contrast, in any given week during the 2010-2011 television season, there were typically a dozen or more primetime entertainment programs on the top-four broadcast networks that attracted more than 10 million viewers, with the highest rated broadcast programs frequently attracting

---

[691] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2082-84, ¶¶ 140-41; *2002 Biennial Review Order*, 18 FCC Rcd at 13852-55, ¶¶ 606-10.

[692] *See NPRM*, 26 FCC Rcd 17541-42, ¶¶ 141-42.

[693] For example, Univision targets Hispanic viewers, and the CW network targets women between the ages of 18 and 34. *See* Univision Communications Inc., http://corporate.univision.com/ (visited Jan. 30, 2014); The CW Television Network, *About the CW*, http://www.cwtv.com/thecw/about-the-cw (visited Jan. 30, 2014). Due to their targeted approaches, programming on these networks attracts smaller audiences than the top-four networks. For example, during the 2010-2011 broadcast television season, the highest rated broadcast program that aired on a non-top-four network was *Soy Tu Dueña* on Univision, which ranked 91st overall. The highest rated English-language broadcast program on a non-top-four network was *America's Next Top Model* on the CW, which ranked 173rd overall. *See* Bill Gorman, *2010-11 Season Broadcast Primetime Show Viewership Averages*, TV BY THE NUMBERS, June 1, 2011, http://tvbythenumbers.zap2it.com/2011/06/01/2010-11-season-broadcast-primetime-show-viewership-averages/94407/ (visited Jan. 30, 2014).

[694] CBS NPRM Comments at 17.

[695] *See NPRM*, 26 FCC Rcd at 17541-42, ¶ 142.

[696] According to a review of week-by-week cable television ratings data from Nielsen, as provided on the website TV by the Numbers, the single highest rated episode of a cable network series in 2011 was an episode of *Jersey Shore*, which achieved an audience of 8.87 million when it appeared on MTV during the week of January 17-23, 2011. This review excluded TV news magazines and any series with less than four episodes (*e.g.*, individual sports events, news events, movies, and awards shows). Ratings data are for total viewers (live plus same-day DVR viewing). *See generally* TV by the Numbers, http://tvbythenumbers.zap2it.com/ (visited Jan. 30, 2014). For a list of the ten highest rated cable network series in 2011, see *The Top 10 Cable Shows of 2011*, USA TODAY, http://mediagallery.usatoday.com/The+top+10+cable+shows+of+2011/G3170?loc=interstitialskip (visited Jan. 30, 2014).

more than 20 million viewers, based on Nielsen data.[697] Thus, the audience size for individual primetime entertainment programs provided by each of the top-four broadcast networks remains unmatched by that of any other broadcast or cable network.[698]

235.    Furthermore, as measured at the network level, the average primetime audience size for each of the top-four broadcast networks remains significantly larger than the audience size for even the most popular cable networks. We recognize that consumers generally substitute between broadcast and cable networks and that the gap in size between broadcast and cable audiences has narrowed over time, such that the aggregate audience for cable networks is now larger.[699] Nevertheless, as stated in the *NPRM*, in 2009-2010 the average primetime audience for a top-four broadcast network remained substantially larger than the average primetime audience for other broadcast and cable networks.[700] We find that this gap in audience size continued in 2011. In 2011, the average primetime audience for a top-four broadcast network was nearly three times larger than the average primetime audience for the highest rated cable networks, based on SNL Kagan data.[701] In addition, the average primetime audience for the top-four broadcast networks was more than twice as large as that of the fifth highest-rated broadcast network, and more than five times larger than that of the next highest-rated English-language broadcast network.[702] As a result, based on the 2010 Quadrennial Review record, we tentatively find that, despite

---

[697] Specifically, staff reviewed week-by-week broadcast television ratings data from Nielsen, as provided on the website TV by the Numbers, for the 2010-2011 broadcast television season (Sept. 2010-May 2011). The staff's review excluded TV news magazines and any series with less than four episodes (*e.g.*, individual sports events, news events, movies, and awards shows). Ratings data are for total viewers (live plus same-day DVR viewing). *See generally* TV by the Numbers, http://tvbythenumbers.zap2it.com/ (visited Jan. 30, 2014). For a complete list of the average ratings for broadcast network programs for the 2010-2011 television season, see Bill Gorman, *2010-11 Season Broadcast Primetime Show Viewership Averages*, TV BY THE NUMBERS, June 1, 2011, http://tvbythenumbers.zap2it.com/2011/06/01/2010-11-season-broadcast-primetime-show-viewership-averages/94407/ (visited Jan. 30, 2014).

[698] In addition, the Commission sought comment in the *NPRM* on the role of the top-four broadcast networks in the provision of national news content. *NPRM*, 26 FCC Rcd at 17544-45, ¶ 145. Although no comments were filed on this issue, we note that the audience size for each of the three broadcast network evening newscasts (ABC, CBS, and NBC) further distinguishes these networks from other cable and broadcast networks. For instance, during 2011, more than four times as many people watched the three broadcast network evening newscasts as watched the highest-rated primetime shows on the top three cable news networks (CNN, Fox News, and MSNBC). STATE OF THE NEWS MEDIA 2012 at Network Essay.

[699] *See NPRM*, 26 FCC Rcd at 17541, ¶ 141.

[700] *Id.* (citing FCC staff analysis of Nielsen data for the period of September 29, 2009, through August 22, 2010).

[701] *See* SNL Kagan, TV Network Summary, Broadcast Networks by Average Prime Time TVHH Delivery (000) as of June 11, 2012 ("SNL Kagan Broadcast Networks by Average Prime Time TVHH Delivery June 11, 2012"); SNL Kagan, TV Network Summary, Basic Cable Networks by Average Prime Time TVHH Delivery (000) as of June 11, 2012. In 2011, the top-four broadcast networks had an average primetime audience of 5.11 million households, compared to approximately 1.82 million for the four highest-rated cable networks (USA, ESPN, Disney Channel, and TNT). Another way to examine the difference in ratings between the top-four broadcast networks and the cable networks is to look at the gap between the lowest-rated top-four broadcast network and the highest-rated cable network. During 2011, NBC was the lowest rated of the top-four broadcast networks, with an average primetime audience of nearly 4.26 million households. By contrast, the highest-rated cable network, USA Network (which is owned by NBCUniversal), had an average audience of approximately 2.15 million households, or roughly half the size of NBC's audience.

[702] *See* SNL Kagan Broadcast Networks by Average Prime Time TVHH Delivery June 11, 2012. We note that the fifth highest-rated broadcast network, Univision, is a Spanish-language network and may not significantly compete with the top-four broadcast networks for viewers. Univision had an average primetime audience of 1.92 million households. The next highest-rated English-language broadcast network was the CW, which ranked sixth overall, with an average primetime audience of approximately 0.94 million households.

the ability of certain primetime cable network programs to achieve large audiences on occasion, in general, primetime entertainment programming provided by the top-four broadcast networks remains a distinct product capable of attracting large audiences, the size of which individual cable networks cannot consistently replicate. We seek comment on whether this audience gap has narrowed significantly since the *NPRM*.

236. Another indicator that the top-four broadcast networks are distinct from cable networks is the wide disparity in advertising prices between them. Using data for 2009, the Commission found in the *NPRM* that the top-four broadcast networks generally earn higher advertising rates than cable networks.[703] In 2011, based on SNL Kagan data, the average advertising rate among the top-four broadcast networks, as measured in cost per thousand views (referred to as cost per mille or "CPM"), was $19.19.[704] By contrast, the four highest CPMs among non-sports cable networks were for MTV, Bravo, Discovery Channel, and TBS, which had an average CPM of $10.95, or approximately 43 percent less than that of the top-four broadcast networks.[705] The appeal of the top-four broadcast networks to advertisers seeking large, national audiences is also reflected in data on net advertising revenues. In 2011, the top-four broadcast networks averaged $3.17 billion in net advertising revenues, based on SNL Kagan data.[706] By contrast, the four non-sports cable networks with the highest net advertising revenue totals (Nickelodeon, USA Network, TNT, and MTV) averaged just under 1 billion dollars in net advertising revenues, or less than one-third of the average amount that the top-four broadcast networks received.[707] We invite commenters to provide any relevant data that has become available more recently.

237. We tentatively conclude that we should adopt our proposal in the *NPRM* to retain the existing dual network rule without modification in order to promote competition. We find force in WGAW's view that the rule remains necessary to promote competition in the market for primetime programming.[708] Specifically, we believe that the top-four broadcast networks have a distinctive ability to

---

[703] *See NPRM*, 26 FCC Rcd at 17542-43, ¶ 143.

[704] *See* SNL Kagan, TV Network Summary, Broadcast Networks by Calculated CPM ($) as of June 11, 2012.

[705] *See* SNL Kagan, TV Network Summary, Basic Cable Networks by Calculated CPM ($) as of June 11, 2012. Another way to examine the difference in advertising rates between the top-four broadcast networks and cable networks is to look at the gap between the lowest CPM among top-four broadcast networks ($15.72 for CBS) and the highest CPM among non-sports cable networks ($12.13 for MTV). For comparison, the CPM for the highest rated cable network, USA Network, was $6.28. The average CPM for cable networks in 2011 was $5.92, which lagged well behind the top-four broadcast networks. CPM data for other broadcast networks is either not available, or it is not comparable because of their more limited schedules. For instance, the CW had a much higher reported CPM of $38.96, but its schedule did not include the near 24-hour programming schedule of the major broadcast and cable networks. We note that advertising rates tend to be higher during primetime.

[706] *See* SNL Kagan, TV Network Summary, Broadcast Networks by Net Advertising Revenue ($000) as of June 11, 2012. Fox had the lowest net advertising revenues among the top-four broadcast networks in 2011, with approximately $2.72 billion. We note that Fox has a more limited schedule of programming, which reduces its total advertising revenues. Meanwhile, Univision ranked fifth among broadcast networks, with $0.71 billion in net advertising revenues, and the CW network ranked sixth, with $0.44 billion.

[707] *See* SNL Kagan, TV Network Summary, Basic Cable Networks by Net Advertising Revenue ($000) as of June 11, 2012. Nickelodeon had the highest net advertising revenues among non-sports cable networks, with approximately $1.09 billion.

[708] *See* WGAW NPRM Comments at 6-7. WGAW also proposed that the Commission consider other measures, in addition to the dual network rule, to limit the amount of primetime entertainment programming owned by the top-four networks. *Id.* at 9. WGAW stated that, as a result of the repeal of the Commission's former financial interest and syndication ("fin/syn") rules, the top-four broadcast networks now own a majority of the primetime entertainment programming that they provide to their affiliates. *Id.* at 6-8. The Commission's former fin/syn rules, which limited the amount of programming in primetime and syndication that the broadcast networks could own, were repealed in the mid-1990s. *Review of the Syndication and Financial Interest Rules*, MM Docket No. 95-39,

(continued....)

attract, on a regular basis, larger primetime audiences than other broadcast and cable networks, which enables them to earn higher rates from those advertisers that are willing to pay a premium for such audiences. Thus, we believe that a combination between top-four broadcast networks would reduce the choices available to advertisers seeking large, national audiences, which could substantially lessen competition and lead the networks to pay less attention to viewer demand for innovative, high quality programming. We therefore tentatively conclude that the primetime entertainment programming provided by the top-four broadcast networks and national television advertising time are each distinct products, the availability, price, and quality of which could be restricted, to the detriment of consumers, if two of the top-four networks were to merge. Accordingly, we tentatively conclude that the dual network rule remains necessary to foster competition in the provision of primetime entertainment programming and the sale of national television advertising time.[709] We seek comment on these tentative conclusions.

238. *Localism.* In addition to promoting our competition goal, we tentatively find that, consistent with past Commission findings, the dual network rule remains necessary to promote our localism goal.[710] Specifically, we tentatively find that the rule remains necessary to preserve the balance of bargaining power between the top-four networks and their affiliates, thus improving the ability of affiliates to exert influence on network programming decisions in a manner that best serves the interests of their local communities. Typically, a critical role of a broadcast network is to provide its local affiliates with high quality programming.[711] Because this programming is distributed across the country, broadcast networks have an economic incentive to ensure that the programming both appeals to a mass, nationwide audience and is widely shown by affiliates. A network's local affiliates serve a complementary role by providing local input in network programming decisions and airing programming that serves the specific needs and interests of that specific local community. As a result, the economic incentives of the networks are not always aligned with the interests of the local affiliates or the communities they serve.

239. In the context of this complementary network-affiliate relationship, we believe that the dual network rule is, as the Affiliates Associations asserted, "an important structural principle" that helps to maintain equilibrium.[712] Specifically, we tentatively find that a top-four network merger would reduce the ability of a network affiliate to use the availability of other top, independently owned networks as a bargaining tool to influence programming decisions of its network, including the affiliate's ability to engage in a dialogue with its network over the suitability for local audiences of either the content or scheduling of network programming. We seek comment on our tentative conclusion that the dual network rule remains necessary to foster localism.

---

(Continued from previous page) —————————————

Report and Order, 10 FCC Rcd 12165 (1995). We decline to revisit the Commission's decision to eliminate the fin/syn rules or to consider implementing a similar set of restrictions in the context of the 2014 Quadrennial Review.

[709] CBS questioned why a single entity is permitted to own multiple cable networks, including in conjunction with a top-four broadcast network, but is not permitted to own two of the top-four broadcast networks. CBS NPRM Comments at 17. We note, however, that issues related to the consolidation of cable network ownership are outside the purview of the dual network rule. Instead, the dual network rule prohibits mergers among the top-four *broadcast networks* because we believe they possess distinctive characteristics, relative to other broadcast and cable networks, which justify a rule specific to them. *See supra* ¶¶ 233-237.

[710] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2083-84, ¶ 141; *2002 Quadrennial Review Order*, 18 FCC Rcd at 13856, ¶ 615.

[711] *See supra* ¶ 234 (discussing the provision of primetime entertainment programming by the top-four broadcast networks).

[712] *See* Affiliates Associations NPRM Comments at 2.

240. The *NPRM* also sought comment on whether antitrust laws and our public interest standard are sufficient to address any harms to competition or localism that would result from a top-four network merger.[713] As discussed above, we are concerned here that a top-four network merger would restrict the availability, price, and quality of primetime entertainment programming to the detriment of consumers. We are also concerned that the bargaining power and influence of affiliates would be reduced. As the Commission has previously noted, we do not think antitrust enforcement would adequately protect against these harms.[714] We seek comment on these concerns.

241. *Dual Affiliation.* As noted above, TWC and ITTA urged the Commission to prohibit a TV station from affiliating with two or more top-four broadcast networks in a single market, because they contended that the practice allows stations to circumvent the intent of the dual network rule. Specifically, commenters claimed that dual affiliation allows a broadcaster to "do locally what the networks are forbidden from doing nationally," which is to consolidate the bargaining power of multiple top-four network signals under the control of a single entity.[715] We note, however, that the dual network rule addresses harms to competition and localism that would result from the consolidation of top-four network ownership at the national level. In particular, as discussed above, we tentatively find that a combination between top-four broadcast networks would reduce the number of networks competing for national advertisers and would reduce the ability of a local affiliate to use the availability of other top, independently owned networks as a bargaining tool to influence network programming decisions. By contrast, we believe that dual affiliation does not give rise to either of these harms because, as Fox pointed out, it does not reduce the number of network owners.[716] Although commenters are invited to offer opposing views, we do not perceive arguments related to dual affiliation as relevant to consideration of the dual network rule. Instead, we believe that issues related to dual affiliation, including the potential consolidation of market power by a single station owner in a local market, are more relevant to the local television ownership rule, and we discuss them above in that context.[717]

## IV.    DIVERSITY ORDER REMAND

### A.    Introduction

242. In addition to assessing each of our broadcast ownership rules, we are considering in this proceeding the Third Circuit's remand of certain aspects of the Commission's 2008 *Diversity Order*. In *Prometheus II*, the Third Circuit concluded that the decision in the *Diversity Order* to adopt a revenue-based eligible entity definition as a race-neutral means of facilitating ownership diversity was arbitrary and capricious, because the Commission did not show how such a definition specifically would assist minorities and women, who were among the intended beneficiaries of this action.[718] In light of this conclusion, the Third Circuit remanded each of the measures adopted in the *Diversity Order* that relied on the revenue-based definition.[719] The court further instructed the Commission to consider the other eligible entity definitions proposed in the *Diversity Third FNPRM* accompanying the *Diversity Order*, including a proposal based on the socially disadvantaged business ("SDB") definition employed by the Small

---

[713] *See NPRM*, 26 FCC Rcd at 17543-44, ¶¶ 144, 146.

[714] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2083, ¶ 141 n.451 (finding that antitrust enforcement would not protect against certain harms addressed by the dual network rule: "reduce[d] program output, choices, quality, and innovation to the detriment of viewers, and with reduced affiliate power and influence").

[715] TWC NPRM Reply at 13; ITTA NPRM Comments at 7-8.

[716] *See Fox NPRM Reply at 17-18.

[717] *See supra* ¶¶ 66-69.

[718] *Prometheus II*, 652 F.3d at 469-72.

[719] *Id.* at 471-73.

Business Administration ("SBA").[720] The *NPRM* sought comment on how the Commission should respond to the court's remand, and on other actions we should consider to enhance the diversity of ownership in the broadcast industry, including by increasing ownership opportunities for women and minorities.[721] We offer tentative conclusions in this FNPRM in response to the court's remand and seek comment on whether we should reconsider any of those conclusions based on additional or new information in the context of the 2014 Quadrennial Review.

243.    Based on our analysis of the preexisting eligible entity standard as well as the measures to which it applied, the Third Circuit's remand instructions, and the record thus far in this proceeding, we tentatively conclude that the revenue-based eligible entity standard should be reinstated and applied to the regulatory policies set forth in the *Diversity Order*. While we do not have an evidentiary record demonstrating that this standard specifically increases minority and female broadcast ownership, we anticipate that reinstating the previous revenue-based standard will promote small business participation in the broadcast industry. We believe that small businesses benefit from flexible licensing policies and that making it easier for small business applicants to participate in the broadcast industry will encourage innovation and enhance viewpoint diversity. We also believe that the benefits of reinstating the eligible entity standard and applying it to the regulatory measures set forth in the *Diversity Order* would outweigh any potential costs of our decision to do so. Accordingly, we tentatively have determined that this action will advance the policy objectives that traditionally have guided our analyses of broadcast ownership issues and will serve the public interest.

244.    For the reasons explained below, we tentatively conclude that the Commission is not in a position at this time to adopt an SDB eligibility standard, which expressly would recognize the race and ethnicity of applicants, or any other race- or gender-targeted measures. Based on applicable judicial precedent and the empirical evidence currently available to the Commission, we tentatively find that we do not have a sufficient basis at this time to adopt an SDB standard that would be likely to survive the heightened judicial scrutiny that a race- or gender-based eligible entity definition would trigger.[722] Notwithstanding this preliminary decision, the Commission remains committed to the promotion of ownership opportunities and diversity of ownership in broadcast media. To this end, we invite further input on ways to expand the participation of minorities and women in the broadcast industry. We also seek comment on specific measures, in addition to those that that we tentatively conclude should be reinstated, that may provide further opportunities for minorities and women to own and operate broadcast outlets. To the extent possible, commenters should provide evidence supporting any specific proposals.

245.    We discuss below the actions that we currently believe are appropriate in response to the Third Circuit remand of the *Diversity Order*. As a threshold matter, we discuss the Commission's recent initiatives to foster diversity, including our efforts to promote new entrant, minority, and female participation in communications industries. We also discuss the collection of data and other empirical evidence relevant to minority and female ownership issues. In particular, we discuss our recent efforts to collect and publicly release minority and female ownership data collected via our biennial broadcast ownership report, FCC Form 323.[723] We next discuss our preliminary analysis of the remanded revenue-based eligible entity standard as a tool to enhance ownership diversity. In addition, we evaluate the current record concerning possible adoption of a race- or gender-targeted SDB definition and the reasoning underlying our preliminary determination that implementing such a standard at this time is not

---

[720] *Id.* at 471-72. The Third Circuit specifically instructed the Commission to consider the alternative eligibility standards it had proposed in the *Diversity Order* "before it completes its 2010 Quadrennial Review." *Prometheus II*, 652 F.3d at 471.

[721] *NPRM*, 26 FCC Rcd at 17544, ¶ 147.

[722] *See, e.g., Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227-230, 235 (1995).

[723] FCC Form 323, Ownership Report for Commercial Broadcast Stations, *available at* http://transition.fcc.gov/Forms/Form323/323.pdf; *see also* 47 C.F.R. § 73.3615.

feasible. Finally, we discuss additional measures, aside from those the Third Circuit remanded in *Prometheus II*, which commenters proposed as potential means to enhance diversity of ownership.

### B. Background

#### 1. Commission Diversity Initiatives

246. In addition to promoting viewpoint diversity generally through the broadcast ownership rules, the Commission has a long history of promulgating rules and regulations intended to foster diversity in terms of minority and female ownership.[724] Although the Commission and Congress previously made available race- and gender-conscious measures intended specifically to assist minorities and women in their efforts to acquire broadcast properties, such as tax certificates and distress sale policies, those policies and programs were discontinued following the Supreme Court's 1995 decision in *Adarand Constructors, Inc. v. Peña*.[725] The Supreme Court held in *Adarand* that any federal program in which the "government treats any person unequally because of his or her race" must satisfy the "strict scrutiny" constitutional standard of judicial review.[726] Under strict scrutiny, racial classifications are constitutional only if they are narrowly tailored measures that further a compelling governmental interest. As a result, the Commission currently does not use race or ethnic origin as a factor in its ownership diversification policies. In addition, Congress repealed the tax certificate policy in 1995 as part of its budget approval process.[727]

247. After these measures were suspended, the Commission continued its efforts to promote the diversity of broadcast ownership through a variety of race- and gender-neutral initiatives, including the adoption of the revenue-based eligible entity standard in the *Diversity Order*.[728] As noted in the *NPRM*, the Commission's other recent efforts to foster ownership diversity have included, among others, the adoption of a requirement that non-discrimination provisions be included in advertising sales contracts[729] and the adoption of a ban on discrimination in broadcast transactions.[730] In addition, the

---

[724] *See, e.g., Statement of Policy on Minority Ownership of Broadcasting Facilities*, Public Notice, 68 FCC 2d 979, 980-81 (1978).

[725] 515 U.S. 200.

[726] *Adarand*, 515 U.S. at 229-30. Gender-based classifications must satisfy intermediate scrutiny. *United States v. Virginia*, 518 U.S. 515, 531-33 (1996).

[727] *See* Deduction for Health Insurance Costs of Self-Employed Individuals, Pub. L. No. 104-7, § 2, 109 Stat 93, 93-94 (1995).

[728] *See NPRM*, 26 FCC Rcd at 17545-46, ¶¶ 148-50. The Commission strongly believes that a diverse and robust marketplace of ideas is essential to our democracy. As the Supreme Court has recognized, "[s]afeguarding the public's right to receive a diversity of views and information over the airwaves is ... an integral component of the FCC's mission." *Metro Broad., Inc. v. FCC*, 497 U.S. 547, 567 (1990), *overruled in part on other grounds in Adarand*, 515 U.S. at 227. The Commission has established numerous policies and rules intended to further the proliferation of diverse and antagonistic sources. *See* INFORMATION NEEDS OF COMMUNITIES at 313. Furthermore, the Commission has a congressional mandate to disseminate spectrum licenses "among a wide variety of applicants, including . . . businesses owned by members of minority groups and women." 47 U.S.C. § 309(j)(3)(B).

[729] *See NPRM*, 26 FCC Rcd at 17545, ¶ 148; *see also Diversity Order*, 23 FCC Rcd at 5940-42, ¶¶ 43-50; *id.* at 5941-42, ¶¶ 49-50 (requiring broadcasters renewing their licenses to certify that their advertising sales contracts contain nondiscrimination clauses that prohibit all forms of discrimination). The Commission has revised its Form 303-S license renewal application form to include this certification requirement. FCC Form 303-S, Application for Renewal of Broadcast Station License, Section II, Item 7, *available at* http://transition.fcc.gov/Forms/Form303-S/303s.pdf; *see also Media Bureau Announces Revisions to License Renewal Procedures and Form 303-S*, Public Notice, 26 FCC Rcd 3809 (Med. Bur. 2011).

[730] *See NPRM*, 26 FCC Rcd at 17545, ¶ 148; *see also Diversity Order*, 23 FCC Rcd at 5939-40, ¶¶ 40-42 (adopting "a rule that bars discrimination on the basis of race or gender and related protected categories in broadcast transactions" and requiring certification of compliance); 47 C.F.R. § 73.2090.

Commission's Advisory Committee for Diversity in the Digital Age ("Diversity Advisory Committee") recommends policies and practices that will enhance the ability of minorities and women to participate in telecommunications and related industries.[731] Since the release of the *NPRM*, the Diversity Advisory Committee has continued its efforts to promote these goals.[732] In addition, the Commission's Office of Communications Business Opportunities ("OCBO") promotes diversity by serving as the principal advisor to the Chairman and the Commissioners on issues, rulemakings, and policies affecting small, women-owned, and minority-owned communications businesses.[733]

248.    The Commission announced in October 2013 that it is conducting a study of Hispanic television viewing.[734] The study is the Commission's first systematic examination of the Hispanic television market, a market that implicates an important and growing segment of the nation's population. It incorporates comprehensive data from our improved Form 323 biennial ownership reports, described below. Specifically, the study will consider: (1) the impact of Hispanic-owned television stations on Hispanic-oriented programming and Hispanic viewership in selected local television markets; (2) the extent of Hispanic-oriented programming on U.S. broadcast television; and (3) the role of digital multicasting in increasing the amount of Hispanic-oriented programming.

## 2.    Data Collection Concerning Minority and Female Ownership

249.    *Collection of Biennial Ownership Data.* As explained in detail in the *NPRM*, the Commission actively has sought in recent years to improve its collection and analysis of broadcast ownership information. Among other initiatives, the Commission has implemented major changes to its Form 323 biennial ownership reports to improve the reliability and utility of the data reported in the form, including data regarding minority and female broadcast ownership.

250.    Several commenters raised concerns about the Commission's past efforts to collect and publish Form 323 data. LCCHR, for example, asserted that, although it has been many years since the Commission initially expanded its collection of ownership data on Form 323 to include race and gender,

---

[731] *See* Federal Communications Commission, *FCC Encyclopedia*, *Advisory Committee for Diversity in the Digital Age*, http://www.fcc.gov/encyclopedia/advisory-committee-diversity-digital-age (visited Jan. 30, 2014).

[732] For example, in July 2012 the Diversity Advisory Committee co-sponsored, with the Commission's Office of Communications Business Opportunities, a "Supplier Diversity Workshop and Conference," which focused on government and private sector business opportunities for small, minority- and women-owned businesses. *FCC to Host a Supplier Diversity Conference and Workshop for Small, Minority- and Women-Owned Businesses, Tuesday, July 10, 2012*, Public Notice (OCBO, rel. June 12, 2012), *available at* http://transition.fcc.gov/Daily_Releases/Daily_Business/2012/db0612/DOC-314569A1.pdf. The conference provided one-on-one access to representatives from private industry, specifically telecommunications and technology firms, as well as government agencies, to provide insight to small businesses on ways to navigate the procurement process.

[733] OCBO regularly sponsors "Capitalization Strategies Workshops," which feature financial mentorship programs aimed at connecting entrepreneurs with financial decision-making experts. A July 2013 workshop showcased angel investment experts to discuss their investment strategies in the telecommunications, technology and media-related industries. The workshop highlighted the distinctions between venture capitalists and angel investors, and the criteria these investors use to select their projects. *See* Federal Communications Commission, *Official FCC Blog*, *FCC Hosts a Power-Packed Conference on Angel Investing for Small, Minority- and Women-Owned Businesses* (June 18, 2013), http://www.fcc.gov/blog/fcc-s-hosts-power-packed-conference-angel-investing-small-minority-and-women-owned-businesses (visited Jan. 30, 2014).

[734] *See FCC Announces New Study Examining Hispanic Television Viewing as Part of Commitment to Encourage Broadcast Diversity*, Press Release (rel. Oct. 24, 2013), *available at* http://transition.fcc.gov/Daily_Releases/Daily_Business/2013/db1024/DOC-323676A1.pdf.

the public has not seen a complete and accurate collection and release of this data.[735] According to LCCHR, this failure has hindered the Commission's ability to create sound policy.[736]

251.    We acknowledge that previous shortcomings in the Form 323 data have impaired the ability of the Commission and interested parties to study and analyze issues related to minority and female ownership. In the 2006 Quadrennial Review proceeding, study authors who attempted to use Form 323 minority and female ownership data for their analyses of broadcast ownership issues expressed concerns that the data were incomplete and inaccurate.[737] In addition, in March 2008, the U.S. Government Accountability Office ("GAO") released a report recommending that the Commission establish procedures to improve the reliability of its data on gender, race, and ethnicity so that it can more effectively monitor and report on the status of female and minority broadcast ownership.[738] Notwithstanding its conclusions that there was much that the Commission could do to improve its data collection and database systems, the GAO commended the Commission for taking several steps to address deficiencies in its collection efforts, noting, for instance, that the Commission now allows owners to modify information on a previously submitted Form 323 instead of requiring modifications to be submitted on a new form and that it precludes electronic submissions of incomplete forms.[739]

252.    The Commission has responded to Form 323-related criticisms and suggestions by substantially revising FCC Form 323. For example, the Commission has established a new, machine-readable Form 323 that enables for the first time electronic analysis of the reports filed by TV and radio broadcasters. The Commission also: (1) established a new uniform biennial filing deadline for Form 323[740] and (2) expanded the class of entities required to file the form.[741] In addition, the *Diversity Fourth FNPRM* sought comment on modifications to the Form 323-E ownership report for noncommercial

---

[735] LCCHR NPRM Comments at 4-5. LCCHR also asserted that the Commission has failed to publish a longitudinal analysis of media ownership data. *Id.* at 6. In addition, LCCHR has asserted that if the Commission found flaws with the Form 323 filings for the 2009 biennial ownership reports, it did not identify publicly any of those flaws or improve its data collection methods by the time the 2011 reports were due. Letter from Cheryl A. Leanza, Co-Chair, The Leadership Conference on Civil and Human Rights, to Marlene H. Dortch, Secretary, FCC, at 2 (Aug. 3, 2012).

[736] LCCHR NPRM Comments at 4; *see also* LCCHR July 26, 2012 *Ex Parte* Letter. In addition, NHMC *et al.* noted that in *Prometheus I*, the court signaled that "all of the FCC's media ownership rules [will be] vulnerable to being overturned 'until the Commission has developed a minority ownership database of sufficient accuracy to allow for reliable testing of the impact of the rules on minority ownership.'" NHMC *et al.* NPRM Comments at 32-33.

[737] *See Promoting Diversification of Ownership in the Broadcasting Services*, MB Docket No. 07-294, Report and Order and Fourth Further Notice of Proposed Rulemaking, 24 FCC Rcd 5896, 5900-01, ¶ 7 n.18 (2009) ("*323 Order*" and "*Diversity Fourth FNPRM*"), *recon. granted in part*, Memorandum Opinion and Order and Fifth Further Notice of Proposed Rulemaking, 24 FCC Rcd 13040 (2009) ("*323 MO&O*" and "*Diversity Fifth FNPRM*").

[738] *See 323 Order*, 24 FCC Rcd at 5901, ¶ 9 n.25 (citing U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-08-383, MEDIA OWNERSHIP: ECONOMIC FACTORS INFLUENCE THE NUMBER OF MEDIA OUTLETS IN LOCAL MARKETS, WHILE OWNERSHIP BY MINORITIES AND WOMEN APPEARS LIMITED AND IS DIFFICULT TO ASSESS (2008) ("GAO Report"), *available at* http://www.gao.gov/assets/280/273671.pdf (Report to the Chairman of the Subcommittee on Telecommunications and the Internet, Energy and Commerce Committee, House of Representatives)). GAO identified three weaknesses of the Form 323 data available at the time the report was issued: (1) exemptions from the biennial filing requirement for certain types of broadcast stations, (2) inadequate data quality procedures, and (3) problems with data storage and retrieval. GAO Report at 4.

[739] GAO Report at 22-23.

[740] The new uniform biennial filing deadline for the Form 323 is November 1. *See 323 Order*, 24 FCC Rcd at 5902-03, ¶ 12.

[741] Additional entities now required to file biennially include low-power television ("LPTV") stations, including Class A stations, as well as commercial broadcast stations licensed to sole proprietors and partnerships composed of natural persons. *See id.* at 5903-05, ¶¶ 12-16.

broadcast stations to gather race, ethnicity, and gender ownership data for noncommercial broadcast stations, including low-power FM stations, and related matters.[742] The *Diversity Fifth FNPRM* sought comment on whether to expand reporting to include certain non-attributable interests.[743] Most recently, the *Diversity Sixth FNPRM* sought comment on further efforts to improve the Commission's collection of ownership data.[744] Among other things, it solicited public comment on the Commission's requirement that an FRN, which is a unique identifier generated by the Commission's Registration System ("CORES FRN"), be obtained for each attributable individual reported on Form 323. The purpose of that proposal is to provide a unique identifier for individuals. Additionally, the notice asks for comment on a proposal to amend Form 323-E to require filers to report a CORES FRN for individuals with reportable attributable interests in a noncommercial educational station licensee. The Commission made these proposals in an effort to further refine and develop meaningful data collection in support of our ownership diversity measures. The proceeding is under consideration by the Commission.

253.    We also note that certain data from the 2009 biennial Form 323 report filings, as well as previous data collected by the Commission and third parties, were made available to the authors of the 11 peer-reviewed media ownership studies that are included in the record of this proceeding.[745] Of those 11 studies, seven utilized minority ownership data in their various examinations of factors such as media quality, innovation, viewpoint diversity, local informational programming, the provision of programming to minority audiences, and local television news, among other topics.[746] Some of these studies found that minority ownership of broadcast stations had little effect on these factors.[747] However, as discussed further below, several of the studies concluded that there is a positive relationship between minority station ownership and the provision of certain types of minority-oriented content or the consumption of broadcast content by minority audiences.[748] In addition, Form 323 data are available to the public as soon as the forms are filed with the Commission.[749] Sharing minority ownership data with the 2010

---

[742] *See Diversity Fourth FNPRM*, 24 FCC Rcd at 5910-11, ¶¶ 27-30.

[743] *See Diversity Fifth FNPRM*, 24 FCC Rcd at 13049-50, ¶¶ 16-24.

[744] *See Promoting Diversification of Ownership in the Broadcasting Services*, MB Docket No. 07-294, Sixth Further Notice of Proposed Rulemaking, 28 FCC Rcd 461 (2013) ("*Diversity Sixth FNPRM*") .

[745] The media ownership studies for the 2010 Quadrennial Review are available at http://www.fcc.gov/encyclopedia/2010-media-ownership-studies. Free Press maintained that none of the 11 media ownership studies commissioned by the Commission for the current ownership review addresses the causal factors or market structures that might promote or impede ownership of broadcast outlets by women and people of color. Free Press NPRM Comments at 16.

[746] The studies that utilized the 2009 minority broadcast ownership data, as well as other ownership data provided by the Commission, are as follows:  (1) Media Ownership Study 1; (2) Media Ownership Study 4; (3) Media Ownership Study 6; (4) Media Ownership Study 7; (5) Media Ownership Study 8A; (6) Media Ownership Study 8B; and (7) Media Ownership Study 10, Broadcast Ownership Rules and Innovation, by Andrew S. Wise (2011) ("Media Ownership Study 10").

[747] *See* Media Ownership Study 1 at 12-13; Media Ownership Study 4 at 26; Media Ownership Study 8A at 20-22; Media Ownership Study 10 at 49.

[748] *See* Media Ownership Study 8B at 15-17; Media Ownership Study 7 at 12-13, 19-21; *see also* Media Ownership Study 6 at 28.

[749] We note that no party to this proceeding submitted studies utilizing the minority or female ownership data collected via the revised Form 323 2009 biennial filings, even though the data from these filings were made available to the public when the forms were filed with the Commission in 2010. In addition, the Media Bureau released a separate data set comprised of all ownership reports filed in response to the 2009 biennial ownership requirement in February 2011. *See Media Bureau Announces Availability of 2009 Biennial Ownership Data Set for Commercial Broadcast Licensees*, MB Docket No. 07-294, Public Notice, 26 FCC Rcd 2024 (Med. Bur. 2011). UCC *et al.* requested that the Media Bureau provide them with (1) copies of the analysis that led to the findings in paragraph 156 of the *NPRM* discussing the 2009 FCC Form 323 data for minority ownership of full-power

(continued....)

Quadrennial Review study authors, as well as releasing a comprehensive report on 2009 and 2011 Form 323 data to the public as discussed below,[750] are among several affirmative steps the Commission has taken to build a record of empirical data that will undergird our ongoing efforts to develop sound ownership diversity policies.

254.  *2012 323 Report*.  The Media Bureau's *2012 323 Report* presents the first electronic analysis of commercial broadcast ownership data submitted pursuant to the revised biennial reporting requirements for 2009 and 2011.[751]  These "snapshots" of the status of minority and female ownership in the broadcast industry are a part of the series of planned, biennial "snapshots" that collectively should provide a reliable basis for analyzing ownership trends, including trends concerning ownership of broadcast stations by minorities and women.  The Commission's report provides detailed information by race, ethnicity, and gender concerning ownership of commercial television, radio, Class A television, and LPTV stations.  For example, the report analyzed data for 1,348 full-power commercial television stations as of October 1, 2011.[752]  Members of racial minorities held majority voting interests in 30, or 2.2 percent, of those stations.[753]  Of those 30 stations, Black or African-American owners held majority voting interests in 10 stations, accounting for 0.7 percent of all stations.  American Indian or Alaska Native owners held majority voting interests in 12 stations, or 0.9 percent, while Asian owners held majority voting interests in six stations, or 0.4 percent.  Native Hawaiian or Pacific Islanders held majority voting interests in one station, or 0.1 percent.  Similarly, individuals with two or more races held majority voting interests in one station, or 0.1 percent.  Hispanic or Latino owners held majority voting interests in 39 stations, or 2.9 percent.  Female owners held majority voting interests in 91 stations, or 6.8 percent.

255.  The *2012 323 Report* also analyzed data for 5,611 commercial FM stations as of October 1, 2011.  Members of racial minorities held majority voting interests in 196, or 3.5 percent, of these stations.  Of those 196 stations, Black or African-American owners held majority voting interests in 93 stations, accounting for 1.7 percent of all stations.  American Indian or Alaska Native owners held majority voting interests in 28 stations, or 0.5 percent, while Asian owners held majority voting interests in 45 stations, or 0.8 percent.  Native Hawaiian or Pacific Islanders held majority voting interests in 22 stations, or 0.4 percent, while individuals with two or more races held majority voting interests in 8 stations, or 0.1 percent.  Hispanic or Latino owners held majority voting interests in 151 stations, or 2.7 percent.  Female owners held majority voting interests in 323 stations, or 5.8 percent.

256.  Similarly, the *2012 323 Report* analyzed data for 3,830 commercial AM stations as of October 1, 2011.  Members of racial minorities held majority voting interests in 237, or 6.2 percent, of

(Continued from previous page) ——————————
television stations; (2) any analysis and findings regarding full-power TV station ownership by women; (3) any analysis of minority and female ownership of stations in the other services (LPTV, Class A TV, AM, FM); and (4) any analysis of the 2011 biennial ownership filings.  *See* UCC *et al.* NPRM Reply at 19-35, App. A:  Table 10 – No Controlling Interest Stations by DMA Rank, App. B:  Table 11 – No Controlling Interest Stations by Owner; *see also NPRM*, 26 FCC Rcd at 17549, ¶ 156.  In response to this request, the Media Bureau provided the spreadsheets used to compile the data described in the *NPRM* to UCC *et al.*  The most current version of the analysis provided is contained in the *2012 323 Report*.  In their reply comments, UCC *et al.* summarized several attributes of the minority-owned television broadcast stations listed in the spreadsheets.  *See* UCC *et al.* NPRM Reply at 19-35.

[750] *See generally 2012 323 Report*, 27 FCC Rcd 13814.

[751] *See id.*  The figures described are from tables contained in Appendix C of the report.  With the report the Commission released underlying data to enable academics and others to perform independent analysis.

[752] Some stations either did not file ownership reports as required or filed reports with apparently inaccurate or insufficient data to permit electronic calculation of voting interests.  Such stations are not included in the analysis contained herein.

[753] For purposes of its analysis, the Commission examined the race, ethnicity, or gender of owners with attributable voting interests in the entity that ultimately owns the station license and defined a majority voting interest as an interest that exceeds 50 percent alone or in the aggregate.

these stations. Of those 237 stations, Black or African-American owners held majority voting interests in 106 stations, accounting for 2.8 percent of all stations. American Indian or Alaska Native owners held majority voting interests in 16 stations, or 0.4 percent, while Asian owners held majority voting interests in 100 stations, or 2.6 percent. Native Hawaiian or Pacific Islanders held majority voting interests in 6 stations, or 0.2 percent, while individuals with two or more races held majority voting interests in 9 stations, or 0.2 percent. Hispanic or Latino owners held majority voting interests in 172 stations, or 4.5 percent. Female owners held majority voting interests in 300 stations, or 7.8 percent.

257.    As explained above, the Commission provided an opportunity for public comment in this proceeding after the release of the *2012 323 Report*.[754]  In the *Public Notice* announcing this opportunity, the Commission noted that the report confirms that minority and female ownership levels of broadcast stations remain disproportionately low.[755]  A number of commenters responding to the *Public Notice* similarly observed that the report demonstrated that minorities and women continue to be severely underrepresented in the ownership ranks of the broadcast industry.[756]  UCC *et al.* stated, for example, that the report "confirms that women and people of color control only a tiny fraction of broadcast stations of all types."[757]  Several commenters claimed that the report shows that the percentages of stations owned by minorities and women have continued to decline in recent years.[758]  Commenters also asserted that the report demonstrates the need for the Commission to take action to increase minority and female ownership.[759]  DCS maintained that the ownership data in the report illustrate a failure of the communications marketplace to serve diverse consumers and the failure of the Commission's multiple ownership rules to achieve the public interest goals of competition and diversity.[760]

258.    On the other hand, NAB observed that the *2012 323 Report* reflects some positive developments in the numbers of minority and female owners, attributable interest holders, and positional interest holders.[761]  For example, according to NAB, the data show that between 2009 and 2011 there was a 30 percent increase in the number of full-power television stations in which Hispanics hold a majority voting share, a 27 percent increase in the number of full-power television stations in which racial minorities hold a majority voting share, and a 10 percent increase in the number of television stations in which women hold a majority voting share.[762]  NAB added that it is "encouraged" by the increasing

---

[754] *2012 323 Report Comments PN.*

[755] *Id.* at 1.

[756] *See* UCC *et al.* 323 Report Comments at 1-6; LCCHR 323 Report Comments at 2 (noting that "data released by the Commission show that the state of women and minority ownership of broadcast stations is in crisis"); NABOB 323 Report Comments at 6-8; Free Press 323 Report Comments at 7-11; Media Alliance 323 Report Comments at 1; AWM 323 Report Comments at 3; Letter from Carolyn M. Byerly *et al.*, Howard Media Group, to Julius Genachowski, Chairman, FCC, at 2 (Dec. 18, 2012) (stating that the report shows that "the nation's second largest minority group has all but lost its ability to communicate within its own African American community or with broader publics").

[757] UCC *et al.* 323 Report Comments at i.

[758] *See, e.g.*, DCS 323 Report Comments at 3-4; Free Press 323 Report Comments at 17-18.

[759] *See* Free Press 323 Report Comments at 3; NABOB 323 Report Comments at 4.

[760] DCS 323 Report Comments at 4-5 (claiming that broadcast stations serving minority communities are going off the air with no replacements). DCS remarked that the *2012 323 Report* shows that "diverse ownership has not materially improved" and that "[t]he meager steps the Commission has taken to cure minority and female underrepresentation in the broadcasting industry are woefully inadequate." *Id.* at 4.

[761] NAB 323 Report Comments at 2.

[762] *Id.* at 2-3.

numbers of minorities and women who occupy positional or attributable interests in broadcast stations because these individuals represent the "talent pool from which future owners may emerge."[763]

259.     Some commenters criticized the Commission's *2012 323 Report* as flawed.[764]  Some, including UCC *et al.*, expressed concern that whatever modest increases in minority or female ownership are reflected in the report may be due to flawed data and thus may not represent real change in ownership levels.[765]  We note that the *2012 323 Report* itself fully identifies and describes such limitations in the data and cautions users concerning trend analysis.[766]  The report also notes that "[a]dditional data points will be provided by future biennial filings, and trend analysis should become increasingly reliable."[767] UCC *et al.* also maintained that the data in the report are "not available to the public in a form that can be easily searched, aggregated and cross-referenced."[768]  While the Commission has not had the opportunity or resources to create a fully interactive database of minority and female ownership information, we note that the *2012 323 Report* contains approximately 100 pages of tables summarizing the information on broadcast stations in a variety of ways.  In addition, the Commission provided the underlying data for the report in excel spreadsheets that can be searched, aggregated, and cross-referenced.[769]  As noted above, the Commission remains engaged in further efforts to refine its data collection.

260.     Free Press claimed that it made numerous "corrections" to the Commission's ownership data, including accounting for sold and missing stations, correcting "erroneous" race/ethnic classifications, and cross-referencing other ownership data, such as license cancellations.[770]  In general, Free Press altered the data in the report to reflect changes that have occurred since the 2009 and 2011 biennial ownership filings covered by the report were submitted.  Such alterations, therefore, are more properly characterized as updates rather than corrections.  As previously indicated, the *2012 323 Report* is intended to provide a snapshot of broadcast ownership at two particular points in time.  The Commission understands that these data are not static and expects changes to be reflected in future reports. Additionally, Free Press excluded from its analysis stations located in Puerto Rico and Guam because doing so conforms the recent Form 323 data to Free Press's earlier studies in 2006 and 2007 and because

---

[763] *Id.* at 3-4.

[764] *See* Free Press 323 Report Comments at 13-15; UCC *et al.* 323 Report Comments at 11-12; NHMC 323 Report Comments at 5-6.

[765] UCC *et al.* 323 Report Comments at 12 (suggesting that data from 2009 and 2011 may not be comparable in view of the large number of stations that did not comply with the Form 323 filing requirements for 2009 data).  UCC *et al.* note that the Commission indicates that 204 full-power television stations did not file ownership reports for 2009, but that most of the 204 stations were thereafter, in 2011, identified as either minority- or female-owned stations.  *See id.* at 12.  Similarly, in its reply comments on the report, Free Press reiterated its opinion that, in view of the large number of broadcasters who failed to file Form 323 reporting their 2009 ownership information, any increases in minority ownership between 2009 and 2011 reflected in the *2012 323 Report* may be misleading and not reflective of real change in ownership.  *See* Free Press 323 Report Reply at 9.  Free Press asserted that NAA, NAB, and NAMB each drew improper conclusions from the report.  *See id.* at 2, 9.

[766] *2012 323 Report*, 27 FCC Rcd at 13818, ¶ 9 n.10.

[767] *Id.*

[768] UCC *et al.* 323 Report Comments at i, 13-14.

[769] *See* Federal Communications Commission, *Ownership Report for Commercial Broadcast Station (Form 323), Form 323 Data, available at* http://www.fcc.gov/guides/ownership-report-commercial-broadcast-station-form-323 (Zip files containing tables for AM, FM, Class A, LPTV and full-power TV station ownership data for 2009, 2011; to access select the "Zip File (4 MB)" hyperlink) (visited Jan. 30, 2014).

[770] *See* Free Press 323 Report Comments at 13-15.  Taken together, Free Press asserted, these modifications confirm that the number of full-power broadcast television stations actually owned by racial and ethnic minorities totals 43 (3.2 percent), rather than 69, as tallied by the Commission.  *Id.* at 15.

Puerto Rico is not in a Nielsen DMA.[771] Other commenters asserted that there is no good reason to exclude stations licensed to U.S. territories.[772] Other reclassifications of the data Free Press performed were due to filing errors by a small number of stations and do not impact significantly the data contained in the report.[773] The *2012 323 Report* describes similar reclassifications that the Commission made to the data before releasing the report.[774]

261. Several commenters stated that the *2012 323 Report* itself does not satisfy the Commission's obligation to assess either the impact of its broadcast ownership rules on minorities and women or the feasibility of adopting policies to enhance minority or female ownership.[775] The Commission has not suggested that the *2012 323 Report* constitutes a study. Nor does the Commission suggest that the report alone fulfills its statutory obligation to assess the public interest implications of its broadcast ownership rules. Rather, the report contains valuable information about minority and female ownership of broadcast outlets that is being taken into account in this proceeding. This report and future reports like it, collectively, should provide a reliable factual underpinning for future analysis of trends concerning ownership of broadcast stations by minorities and women.

262. As noted, we are continuing to refine and improve the quality of our ownership data collection. As a result of our efforts in this area, third parties will have access to more and better data to study and analyze ownership trends. We also expect that additional data will advance the Commission's future research and analysis efforts.

## C. Discussion

### 1. Remand Review of the Revenue-Based Eligible Entity Standard

263. *Background.* We solicited comment in the *NPRM* on whether the Commission should reinstate the pre-existing revenue-based eligible entity definition to support the measures the Third Circuit vacated and remanded as well as other measures we may implement in the future.[776] In light of the Third Circuit's conclusion that the Commission previously had failed to demonstrate a nexus between this definition and our stated goal of promoting female and minority ownership, we asked commenters to supply any available evidence demonstrating that a revenue-based definition would support this specific policy objective.[777] In addition, we sought comment on whether re-adoption of the revenue-based standard would support our traditional diversity, localism, and competition goals in other ways, particularly by enhancing ownership opportunities for small businesses and other new entrants.[778]

264. The Commission adopted its revenue-based eligible entity definition in the *2002 Biennial Review Order* as an exception to the prohibition on the transfer of grandfathered station combinations that violated then newly adopted local radio ownership limits.[779] The Commission ruled that licensees would

---

[771] *Id.* at 13 n.20.

[772] *See* NAA 323 Report Reply at 2-3.

[773] *See* Free Press 323 Report Comments at 13-15.

[774] *2012 323 Report*, 27 FCC Rcd at 13832-33, App. B (note 2 for each service).

[775] *See, e.g.*, NHMC 323 Report Comments at 5-6 (claiming that the "Commission must use [data] to conduct studies to evaluate the impact of the rules on minority ownership"); NALIP 323 Report Reply at 1-2; Free Press 323 Report Comments at 12 (asserting that the *2012 323 Report* "is not a consideration of the *effect* of the Commission's broadcast ownership rules on female and minority ownership").

[776] *NPRM*, 26 FCC Rcd at 17550-51, ¶¶ 160-62.

[777] *Id.* at 17550, ¶ 160.

[778] *Id.* at 17550-51, ¶¶ 160-61.

[779] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13809-12, ¶¶ 487-90.

be allowed to transfer control of or assign a grandfathered combination to an eligible entity, which was defined as any entity that would qualify as a small business consistent with SBA standards for its industry grouping, based on revenue.[780] In addition, the Commission ruled that eligible entities would be permitted, with limited restrictions, to sell existing grandfathered combinations intact to new owners.[781] The Commission adopted this transfer policy as a means to promote diversity of ownership[782] and observed more generally that policies supporting the entry of new participants into the broadcasting industry also may promote innovation in the field.[783]

265.　　Thereafter, in the *Diversity Order*, the Commission concluded that additional uses of the eligible entity definition would advance its objectives of promoting diversity of ownership in the broadcast industry by making it easier for small businesses and new entrants to acquire licenses and attract the capital necessary to compete in the marketplace with larger and better financed companies.[784] In this regard, the Commission stated that the adoption of new measures relying on this definition would "be effective in creating new opportunities for broadcast ownership by a variety of small businesses and new entrants, including those owned by women and minorities."[785] The Commission further observed that facilitating market entry by new entrants into the broadcast industry would promote new programming services, particularly those that are responsive to local needs, interests, and audiences currently underserved.[786] Thus, between 2002 and the Third Circuit's remand of the measures relying on the eligible entity definition in 2011, the Commission used the revenue-based standard to support a range of measures intended to encourage ownership diversity.

266.　　Several commenters, including AWM and NAB, supported reinstatement of a revenue-based eligible entity definition and the measures to which it previously applied as a means to diversify broadcast ownership.[787] UCC *et al.* recommended that, instead of abandoning or repurposing the current eligibility definition, the Commission should assess whether it has had any measurable effect on the ownership of broadcast stations by minorities and women.[788] As discussed in more detail below, DCS believed that the Commission should adopt a revised eligible entity definition that incorporates the Overcoming Disadvantage Preference ("ODP") standard proposed by the Commission's Diversity Advisory Committee in 2010.[789] According to DCS, no meaningful impact on minority ownership will be achieved by relying on a definition based solely upon the SBA's revenue limits for small businesses.[790]

---

[780] *Id.* at 13810-11, ¶¶ 488-89.

[781] *Id.* at 13811-12, ¶ 490.

[782] *Id.* at 13810-11, ¶ 488.

[783] *Id.* at 13632, ¶ 40.

[784] *Diversity Order*, 23 FCC Rcd at 5926, ¶ 7; *see also id.* at 5928-45, ¶¶ 10-61 (describing measures relying on the eligible entity definition).

[785] *Id.* at 5927, ¶ 9.

[786] *Id.* at 5926, ¶ 7.

[787] AWM NPRM Comments at 6-7; NAB NPRM Comments at 56 ("[p]romoting broadcast ownership by small entities is also an independently worthwhile goal"); *see also* NAB NPRM Comments at 53, 55; NAB NPRM Reply at 33.

[788] *See* UCC *et al.* NPRM Comments at 30-32.

[789] *See* DCS NPRM Comments at 18-19; *infra* Section IV.C.2. The ODP proposal is based on a recommendation from the Diversity Advisory Committee that the Commission initiate a rulemaking proceeding to design, adopt, and implement a new preference in its competitive bidding process that would award bidding credits to persons or entities that demonstrate that they have overcome significant disadvantage. *See* DCS NPRM Comments at 2. The Commission released a Public Notice in 2010 in response to the Diversity Advisory Committee's recommendation. *See Media and Wireless Telecommunications Bureaus Seek Comment on Recommendation of the Advisory*

(continued....)

267.     *Discussion.* We tentatively conclude that a revenue-based eligible entity standard is an appropriate and worthwhile approach for expanding ownership diversity whether or not the standard is effective in promoting ownership of broadcast stations by women and minorities. We concede that we do not have an evidentiary record demonstrating that this standard specifically increases minority and female broadcast ownership. We invite commenters to supplement the record with any new data or analysis that may bear on this issue. Nonetheless, even in the absence of such evidence, we believe that reinstatement of the revenue-based standard would serve the public interest by promoting small-business participation in the broadcast industry. We believe that small-business applicants and licensees benefit from flexible licensing, auction, transactions, and construction policies. Often, small-business applicants have financing and operational needs distinct from those of larger broadcasters. By easing certain regulations for small broadcasters, we believe that we will promote our public interest goal of making access to broadcast spectrum available to a broad range of applicants. We also believe that enabling more small businesses to participate in the broadcast industry will encourage innovation and expand ownership and viewpoint diversity.[791]

268.     We seek comment on these tentative conclusions. We also seek input on other potential public interest benefits or detriments that could result from reinstating the eligible entity standard. We are interested in hearing from eligible entity broadcasters that have used one or more of the measures adopted in the *Diversity Order.* What measures were used? Did the eligible entity definition facilitate entry into broadcast ownership? Was increased financing and investment available to eligible entity broadcasters as a result of the existence of the eligible entity standard or any of the measures? The experiences of such broadcasters could aid the Commission's assessment of this standard and the measures that utilize the definition.

269.     Our records indicate that a large number of Commission permittees and licensees previously have availed themselves of policies based on the revenue-based eligible entity standard. In particular, the *Diversity Order* afforded eligible entities that acquire broadcast construction permits through an assignment from another permittee additional time to construct their facilities under certain circumstances,[792] and many small businesses made use of this measure. FCC Form 314 requires that

---

(Continued from previous page)

*Committee on Diversity for Communications in the Digital Age for a New Auction Preference for Overcoming Disadvantage,* GN Docket No. 10-244, Public Notice, 25 FCC Rcd 16854 (Med. Bur./Wireless Tel. Bur. 2010) ("*New Auction Preference Notice*"). DCS further recommended that the Commission issue a Notice of Proposed Rulemaking to adopt an ODP standard in the context of the competitive bidding process for broadcast licenses. *See* DCS NPRM Comments at 19-21.

[790] *See* DCS NPRM Comments at 19.

[791] The Commission repeatedly has concluded that greater ownership diversity fosters viewpoint diversity. As the Commission noted in the *NPRM,* "diffuse ownership among media outlets promotes the presentation of a larger number of viewpoints in broadcast content than would be available in the case of a more concentrated ownership structure." *NPRM,* 26 FCC Rcd at 17496, ¶ 16; *see also 2002 Biennial Review Order,* 18 FCC Rcd at 13630, ¶ 27 (concluding that "[a] larger number of independent owners will tend to generate a wider array of viewpoints in the media than would a comparatively smaller number of owners"). Beyond fostering viewpoint diversity, the Commission has previously held that taking steps to facilitate the entry of new participants into the broadcast industry may also promote innovation in the field, stating that "[t]he most potent sources of innovation often arise not from incumbents but from new entrants." *2002 Biennial Review Order,* 18 FCC Rcd at 13632, ¶ 40.

[792] *See Diversity Order,* 23 FCC Rcd at 5930, ¶ 15. The Commission noted that this revision of its rules was intended to provide eligible entities with additional market entry opportunities, while also accommodating the capital constraints often experienced by small businesses. *Id.* at 5930-31, ¶¶ 15-16; *see also* 47 C.F.R. § 73.3598(a) ("An eligible entity that acquires an issued and outstanding construction permit for a station in any of the services listed in this paragraph shall have the time remaining on the construction permit or eighteen months from the consummation of the assignment or transfer of control, whichever is longer, within which to complete construction and file an application for license.").

assignees in broadcast transactions indicate whether the assignee is an eligible entity as that term is defined in the *Diversity Order*.[793] Between the implementation of the eligible entity definition and the suspension of the definition following the *Prometheus II* decision,[794] Commission staff processed approximately 247 Form 314 construction permit assignment applications in which the assignee self-identified as an eligible entity.[795] Of those 247 applications, approximately 132 (53.4 percent) of the eligible entities have constructed their broadcast facilities and are now on the air.[796] Our data also reveal that the largest group of broadcasters that availed themselves of the eligible entity definition are noncommercial educational broadcasters. Of the 247 total eligible entities, 160 (64.7 percent) are NCE permittees or licensees.

270.    On the whole, we believe that these data indicate that the revenue-based eligible entity standard has been used successfully by small firms and has aided their entry into, as well as sustained their presence in, broadcasting in furtherance of the Commission's public interest goals. While these data may not include the total number of applicants and permittees that have availed themselves of one or more of the measures to which the eligible entity standard applied, this information nonetheless suggests that providing additional time to construct broadcast facilities and other measures have assisted market entry by small broadcasters.

271.    We also tentatively conclude that, if the Commission reinstates the eligible entity definition, it would be appropriate to readopt each measure relying on this definition that was remanded in *Prometheus II*. These measures include: (1) Revision of Rules Regarding Construction Permit Deadlines;[797] (2) Modification of Attribution Rule;[798] (3) Distress Sale Policy;[799] (4) Duopoly Priority for

---

[793] FCC Form 314, Application for Consent to Assignment of Broadcast Station Construction Permit or License, Section III – Assignee, Question 6(d), (e)(A)-(B), *available at* http://transition.fcc.gov/Forms/Form314/314.pdf. Specifically, the assignee must include a detailed showing demonstrating proof of status as an eligible entity.

[794] *See Media Bureau Provides Notice of Suspension of Eligible Entity Rule Changes and Guidance on the Assignment of Broadcast Station Construction Permits to Eligible Entities*, Public Notice, 26 FCC Rcd 10370 (Med. Bur. 2011) ("*Suspension of Eligible Entity Standard PN*").

[795] Overall, a total of 247 applicants answered "yes" on FCC Form 314, Section III – Assignee, Question 6(d), thereby claiming eligible entity status.

[796] An additional 11 (4.5 percent) eligible entities are not yet licensed or have not built out the facilities specified on their construction permits. Further, 104 construction permits (42.1 percent) held by eligible entities have been cancelled for various reasons. Additionally, it appears that 160 (64.7 percent) of the 247 eligible entities are noncommercial educational ("NCE") permittees or licensees. NCE licensees are not required to file information regarding the race, ethnic origin, or gender composition of their owners. In 1998, the Commission updated its Form 323 filing obligations by, among other things, requiring commercial radio and television broadcasters to file race, gender, and ethnicity data for its owners. *See 1998 Biennial Regulatory Review Order – Streamlining of Mass Media Applications, Rules and Processes*, MM Docket No. 98-43, Report and Order, 13 FCC Rcd 23056, 23097, ¶ 101 (1998). In that order, the Commission stated that it would determine at a later date whether to add the race, gender, and ethnicity question to the FCC Form 323-E required to be filed by noncommercial licensees. *Id.* at 23098, ¶ 103. In the *Diversity Fourth FNPRM*, we sought comment on whether NCEs should be required to provide race, gender, and ethnicity data as part of a revised Form 323, and on other questions regarding how ownership and control should be defined for NCEs. *See* 24 FCC Rcd at 5910-11, ¶¶ 27-30. That proceeding is ongoing.

[797] *Diversity Order*, 23 FCC Rcd at 5930, ¶ 15 (revising construction permit rules to allow the sale of an expiring construction permit to an eligible entity that pledges to build out the permit within the time remaining in the original construction permit or within 18 months, whichever period is greater); *see also* 47 C.F.R. § 73.3598(a). We propose that this exception to our strict broadcast station construction policy, if reinstated by the Commission, would be limited to one 18-month extension based on one assignment to an eligible entity. Moreover, to ensure realization of our policy goals, in reviewing the permit sale to the eligible entity, we propose to assess the *bona fides* of both the arms-length structure of the transaction and the assignee's status as an eligible entity.

[798] *Diversity Order*, 23 FCC Rcd at 5936, ¶ 31 (relaxing the equity/debt plus ("EDP") attribution standard for interest holders in eligible entities by "allow[ing] the holder of an equity or debt interest in a media outlet subject to

(continued....)

Companies that Finance or Incubate an Eligible Entity;[800] (5) Extension of Divestiture Deadline in Certain Mergers;[801] and (6) Assignment or Transfer of Grandfathered Radio Station Combinations.[802]

272.    We propose to define an eligible entity as any entity, commercial or noncommercial, that would qualify as a small business consistent with SBA standards for its industry grouping, based on revenue.[803] The Commission previously applied the SBA standards to define eligible entities, and we seek comment on whether those standards should apply if we re-adopt the eligible entity standard. We request comment on whether there is any reason to use different eligible entity definitions for commercial and noncommercial entities.[804] For all SBA programs, a radio or television station with no more than $35.5 million dollars in annual revenue currently is considered a small business.[805] To determine qualification as a small business, the SBA considers the revenues of the parent corporation and affiliates of the parent corporation, not just the revenues of individual broadcast stations.[806] We propose to do the same. In addition, in order to ensure that ultimate control rests in an eligible entity that satisfies the revenue criteria, we propose that the entity must satisfy one of several control tests. Specifically, the eligible entity would have to hold: (1) 30 percent or more of the stock/partnership shares and more than 50 percent voting power of the corporation or partnership that will hold the broadcast license; (2) 15 percent or more of the stock/partnership shares and more than 50 percent voting power of the corporation

(Continued from previous page) ————————————————

the media ownership rules to exceed the 33 percent threshold set forth in [the EDP standard] without triggering attribution where such investment would enable an eligible entity to acquire a broadcast station provided (1) the combined equity and debt of the interest holder in the eligible entity is less than 50 percent, or (2) the total debt of the interest holder in the eligible entity does not exceed 80 percent of the asset value of the station being acquired by the eligible entity and the interest holder does not hold any equity interest, option, or promise to acquire an equity interest in the eligible entity or any related entity"); *see also* 47 C.F.R. § 73.3555, Note 2(i)(2). In addition, pursuant to the new entrant bidding credits available under the Commission's broadcast auction rules, the modified EDP attribution standard was available to interest holders in eligible entities that are the winning bidders in broadcast auctions. *See* 47 C.F.R. § 73.5008(c)(2). We propose to reinstate this application of the modified EDP standard.

[799] *Diversity Order*, 23 FCC Rcd at 5939, ¶ 39 (modifying the distress sale policy by allowing a licensee that has been designated for a revocation hearing or has a renewal application that has been designated for hearing on basic qualification issues to sell the station to an eligible entity prior to the hearing).

[800] *Id.* at 5943, ¶ 56 (giving an applicant for a duopoly that agrees to finance or incubate an eligible entity priority over other applicants in the event that competing duopoly applications simultaneously are filed in the same market).

[801] *Id.* at 5943-44, ¶¶ 57-60 (agreeing to consider requests to extend divestiture deadlines when applicants actively have solicited bids for divested properties from eligible entities and further stating that entities granted such an extension must sell the divested property to an eligible entity by the extended deadline or have the property placed in an irrevocable trust for sale by an independent trustee to an eligible entity).

[802] *Id.* at 5944-45, ¶ 61 (permitting the assignment or transfer of a grandfathered radio station combination intact to any buyer so long as the buyer files an application to assign the excess stations to an eligible entity or to an irrevocable divestiture trust for the ultimate assignment to an eligible entity within 12 months after consummation of the purchase of the grandfathered stations).

[803] *Diversity Order*, 23 FCC Rcd at 5925-26, ¶ 6; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13810-11, ¶¶ 488-89. We propose to include both commercial and noncommercial entities within the scope of the term "eligible entity" to the extent that they otherwise meet the criteria of this standard.

[804] As previously noted, the majority of the 279 eligible entities (54 percent) are noncommercial educational permittees or licensees.

[805] *See* 13 C.F.R. § 121.201 (North American Industry Classification System ("NAICS") code categories); *see also* Small Business Size Standards, 77 Fed. Reg. 72,702, 72,704-05 (Dec. 6, 2012) (to be codified at 13 C.F.R. pt. 121). The definition of small business for the radio industry is listed in NAICS code 515112, and the definition of a small business for the TV industry is listed in NAICS code 515120.

[806] *Id.* §§ 121.103, 121.105.

or partnership that will hold the broadcast licenses, provided that no other person or entity owns or controls more than 25 percent of the outstanding stock or partnership interest; or (3) more than 50 percent of the voting power of the corporation if the corporation that holds the broadcast licenses is a publicly traded company.[807]

273.      We seek comment on the costs and benefits of our proposal to adopt a revenue-based eligible entity definition and the measures relying on this definition as proposed herein. To the greatest extent possible, commenters should quantify the expected costs or benefits of the proposals and provide detailed support for any actual or estimated values provided, including the source of such data and/or the method used to calculate reported values.

## 2.     Remand Review of a Race- or Gender-Conscious Eligible Entity Standard

### a.     Background

274.      The Third Circuit in *Prometheus II* instructed the Commission to address on remand the other eligible entity definitions it had considered when the revenue-based definition was adopted.[808] Specifically, in the *Diversity Third FNPRM*, the Commission sought comment on the possibility of replacing the revenue-based standard with a standard based on the SBA's definition of SDBs used for purposes of its Business Development Program.[809] Pursuant to the SBA's program, persons of certain racial or ethnic backgrounds are presumed to be disadvantaged; all other individuals may qualify for the program if they can show by a preponderance of the evidence that they are disadvantaged.[810] In response to the court's directive, the Commission sought comment in the *NPRM* on the benefits and risks of adopting an SDB standard to support the various ownership diversity measures remanded by the court. The Commission also solicited input on other proposals that were included in the *Diversity Third FNPRM* as well as any other race- or gender-conscious standards we should consider.[811]

275.      Under the SBA's 8(a) Business Development Program, certain individuals are presumed to be socially disadvantaged: African-Americans, Hispanic Americans, Asian Pacific Americans, Native Americans (American Indians, Eskimos, Aleuts, or Native Hawaiians), and Subcontinent Asian Americans.[812] Additionally, the SBA permits the applicant to show through a "preponderance of the evidence" social disadvantage due to gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar causes.[813]

276.      To the extent an SDB standard includes race-specific criteria, it would be subject to strict constitutional scrutiny.[814] As explained in the *NPRM*, rules and policies that operate based on race, ethnic

---

[807] *Diversity Order*, 23 FCC Rcd at 5925-26, ¶ 6 n.14 (citing *2002 Biennial Review Order*, 18 FCC Rcd at 13811, ¶ 489).

[808] *See Prometheus II*, 652 F.3d at 471-72 (directing the Commission to seek comment on "proposed SDB definitions" in the *Diversity Third FNPRM* on remand).

[809] *Diversity Third FNPRM*, 23 FCC Rcd at 5950, ¶ 81.

[810] 13 C.F.R. §§ 124.103(b)-(c), 124.104(a). To qualify for this program, a small business must be at least 51 percent owned and controlled by a socially and economically disadvantaged individual or individuals. *See id.* § 124.105; *see also* U.S. Small Business Administration, *8(a) Business Development*, http://www.sba.gov/content/8a-business-development-0 (visited Jan. 30, 2014).

[811] *See NPRM*, 26 FCC Rcd at 17552-53, ¶¶ 165-66.

[812] *See* U.S. Small Business Administration, *8(a) Business Development*, http://www.sba.gov/content/8a-business-development-0 (visited Jan. 30, 2014).

[813] *See id.*

[814] *See NPRM*, 26 FCC Rcd at 17551-52, ¶¶ 163-64.

origin, or gender are subject to an exacting constitutional analysis.[815] All race-based classifications imposed by the government "'must be analyzed by a reviewing court under strict scrutiny' . . . [and] are constitutional only if they are narrowly tailored to further compelling governmental interests."[816] The U.S. Supreme Court to date has accepted only two justifications for race-based action as compelling for purposes of strict scrutiny: student body diversity in higher education and remedying past discrimination.[817] Gender-based classifications are evaluated under an intermediate standard of review and will be upheld as constitutional if the government's actions are deemed substantially related to the achievement of an important objective.[818] In the *NPRM*, commenters were asked to explain in detail, based on relevant case law, whether and how the Commission could overcome the application of strict or intermediate constitutional scrutiny to any race- or gender-based standard.[819] The Commission sought data and explanation for whether and how proposals could be supported and applied in a consistent and rational manner.[820] In particular, the Commission solicited input on whether the Commission could demonstrate a compelling governmental interest in fostering viewpoint diversity, redressing past discrimination, or some other interest and, if so, whether policies based on a race-conscious standard would be a narrowly tailored means of addressing any such interest.[821]

277. The Commission acknowledged in the *NPRM* that its ownership data and other empirical evidence in the record at that time likely were insufficient to support the adoption of a race- or gender-based standard.[822] In this regard, the Commission acknowledged the problems it has experienced in the past with regard to the collection and analysis of such data. As noted in the *NPRM* and further explained above, we have continued to improve the data reflecting existing levels of minority and female ownership on our revised Form 323. In recognition of the fact that such data are not by themselves sufficient to satisfy the constitutional hurdle that has been established for race- and gender-based measures, the Commission asked in the *NPRM* that commenters supply any relevant evidence, including peer-reviewed studies, which could assist in supporting a race-conscious approach.[823] With respect to any proposals for a gender-conscious standard, commenters similarly were asked to address the relevant constitutional standards and to provide any available empirical support.[824]

278. A number of commenters supported the adoption of a race- or gender-conscious standard as a means to increase minority and female ownership.[825] Based on the Third Circuit's instructions in *Prometheus II*, commenters asserted that the Commission must fully consider the feasibility of adopting an SDB standard in this proceeding and that the Commission is not permitted to defer consideration of

---

[815] *See id.* at 17552, ¶ 164.

[816] *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (quoting *Adarand*, 515 U.S. at 227).

[817] *See generally Grutter*, 539 U.S. 306; *Adarand*, 515 U.S. 200.

[818] *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003) (applying intermediate scrutiny to gender-based classifications); *NPRM*, 26 FCC Rcd at 17546, ¶ 149 n.356.

[819] *See NPRM*, 26 FCC Rcd at 17550, ¶159.

[820] *See id.*

[821] *See id.* at 17552, ¶ 164.

[822] *Id.* at 17550, ¶ 158.

[823] *Id.* at 17551-52, ¶¶ 163-64.

[824] *Id.* at 17552, ¶ 164.

[825] *See* UCC *et al.* NPRM Comments at 30; DCS NPRM Comments at 15-18; Free Press NPRM Comments at 12; Hawkins NPRM Reply at 4, 14-15; NHMC *et al.* NPRM Comments at 30-33; NABOB 323 Report Comments at 3-6; *see generally* NABOB NOI Comments; LCCHR 323 Report Comments at 4.

race- or gender-based action until a future proceeding.[826] Free Press stated that the Third Circuit rejected the Commission's decision "to defer consideration of other proposed definitions [of the eligible entity standard] (such as a definition for a socially and economically disadvantaged business ('SDB'))" and that *Prometheus II* "directs the FCC to complete the diversity actions required on remand prior to the completion of the 2010 Review."[827] Some commenters also asserted that, prior to the conclusion of this proceeding, the Commission must provide any further data and complete any additional empirical studies that may be necessary to evaluate or justify the adoption of an SDB standard.[828] Similarly, several commenters asked the Commission not to make any changes to any of the media ownership rules until it collects and analyzes data on broadcast ownership by women and minorities in a manner that they view as consistent with the court's remand of the eligible entity standard.[829]

279.     Several commenters further asserted that *Prometheus II* not only obligates the Commission to consider fully the feasibility of implementing a race-conscious eligible entity standard in this proceeding, but also requires the Commission to adopt such a standard.[830] NABOB maintained that in this proceeding the Commission "must establish policies, similar to those it had prior to the *Adarand* decision, which were designed to specifically increase minority ownership of broadcast stations."[831] NABOB also stated that "[f]ailure to adopt a policy to promote minority ownership in this proceeding is contrary to the mandate of the Third Circuit in the *Prometheus II* case."[832] NABOB argued that "the Commission is obligated by the *Prometheus II* decision to continue this proceeding until it has completed the studies required and adopted a policy to promote minority ownership."[833] In addition, NABOB asserted that if the Commission does not take these actions in the instant proceeding, then it must, at a minimum, provide a specific timetable for developing a policy to promote minority ownership.[834]

---

[826] *See* Hawkins NPRM Reply at 14-15; Free Press NPRM Comments at 6, 9; UCC *et al.* 323 Report Comments at 4; NHMC 323 Report Comments at 4; LCCHR 323 Report Comments at 4; Media Alliance 323 Report Comments at 3-4.

[827] Free Press NPRM Comments at 6, 9. Free Press also questioned why the Commission's *NPRM* sought comment on an SDB standard, but did not propose adoption of that standard or any race- or gender-based standard. Free Press NPRM Reply at 43-44.

[828] *See* LCCHR 323 Report Comments at 4; NHMC 323 Report Comments at 4; UCC *et al.* 323 Report Comments at 4, 10, 27. In making these arguments, commenters relied on the Third Circuit's statements in *Prometheus II* that the Commission must (1) consider previously proposed SDB definitions "before it completes the 2010 Quadrennial Review," and (2) "get the data and conduct up-to-date studies" if it "requires more and better data to complete the necessary *Adarand* studies" for proposals using an SDB definition. *Prometheus II*, 652 F.3d at 471; *id.* at 471 n.42; *see* NABOB 323 Report Comments at 9-10; UCC *et al.* 323 Report Comments at 7; NHMC 323 Report Comments at 3-4. Several commenters further argued that the Commission's *2012 323 Report* does not satisfy the Third Circuit's directive for the Commission to fully consider the feasibility of adopting an SDB standard. *See* UCC *et al.* 323 Report Comments at 10-16; NHMC 323 Report Comments at 4-5.

[829] *See* Letter from Michael J. Scurato, Policy Counsel, National Hispanic Media Coalition, to Marlene H. Dortch, Secretary, FCC (July 2, 2012); UCC *et al.* NPRM Comments at 38; Free Press NPRM Comments at 10; LCCHR NPRM Comments at 1-4.

[830] *See* NABOB 323 Report Comments at 6; *see also id.* at 8 ("NABOB urges the Commission to delay issuance of the report and order in this proceeding until the Commission has adopted a policy to promote minority ownership of broadcast facilities, as required by the Third Circuit Court of Appeals in the *Prometheus II* case."); *id.* at 9-11; LCCHR 323 Report Comments at 4; NHMC 323 Report Comments at 7.

[831] NABOB 323 Report Comments at 3.

[832] *Id.* at 6.

[833] *Id.* at 12.

[834] *Id.* at 12-13. NABOB specifically argued that the Commission must include the following information in this proceeding: (1) a discussion of the studies previously prepared by the Commission or others, which the

(continued....)

280.     Advocates of a race- or gender-conscious standard cited the Supreme Court's rulings in *Grutter v. Bollinger* and *Metro Broadcasting v. FCC* as precedent for establishing a compelling interest in facilitating broadcast ownership diversity.[835] Professor Stacy Hawkins of Rutgers School of Law – Camden posited that "the FCC is capable of meeting the constitutional threshold necessary to adopt a race-conscious eligible entity standard on the record before it."[836] Citing *Grutter*'s endorsement of diversity in the educational context, Professor Hawkins asserted that it is plausible that a reviewing court could find that promoting broadcast diversity is a compelling governmental interest.[837] Professor Hawkins further argued that an SDB classification would comport with current constitutional standards because it neither would ensure minority broadcast owners an SDB designation nor would preclude non-minority broadcast owners from competing for such a designation.[838] In addition, Professor Hawkins argued that the Commission could devise a narrowly tailored SDB definition by limiting the duration of any race-conscious policies.[839] NABOB similarly suggested that the Commission can justify policies specifically designed to promote minority ownership because there is a "well-established nexus between minority ownership and minority programming viewpoint," which the Commission "has determined through years of study and research."[840] NABOB further claimed that the "Supreme Court has acknowledged and accepted that minority ownership leads to programming diversity" and that in *Prometheus II* the Third Circuit "acknowledged that the Supreme Court's determination of the nexus between minority ownership and programming is still the law of the land."[841]

---

(Continued from previous page) ————————————

Commission believes will help meet the requirements of the *Adarand* decision; (2) a discussion of the studies the Commission will prepare that will provide the final information required to comply with the requirements of the *Adarand* decision; (3) a timetable for the Commission's completion of these studies; and (4) a timetable for the Commission's completion of its analysis for adopting a new policy to promote minority ownership. *Id.* at 13.

[835] *See, e.g.*, Hawkins NPRM Reply at 5-14 (citing *Metro Broad.*, 497 U.S. 547; *Grutter*, 539 U.S. 306); *see also Prometheus II*, 652 F.3d at 471-72 & n.42 (citing *Metro Broad.*, 497 U.S. at 567) (noting that the Supreme Court has ruled that the interest in enhancing broadcast diversity is, at the very least, an important governmental objective that justified Commission policies designed to promote minority ownership in broadcasting); *see also* NABOB 323 Report Comments at 4-5.

[836] Hawkins NPRM Reply at 4.

[837] *Id.* at 6-9; *see also Metro Broad.*, 497 U.S. at 566-68.

[838] Hawkins NPRM Reply at 13.

[839] *Id.* If the Commission limited its use of a race-conscious SDB eligible entity standard only for as long as it is deemed necessary to achieve the compelling interest of broadcast diversity, Professor Hawkins contended, there would be no constitutional bar to recognizing the race of certain applicants. *Id.* at 14.

[840] NABOB 323 Report Comments at 4; *see also* LCCHR 323 Report Comments at 4; DCS 323 Report Comments at 4 (stating that "there is a strong empirical nexus between minority ownership and minority oriented programming available in a broadcast market"). In addition, DCS stated that approximately "73 percent of minority-owned stations serve the community by broadcasting minority-oriented programming in Spanish, Urban, Urban News, Asian, Ethnic and Minority-oriented Religious formats." DCS 323 Report Comments at 4 (citing Catherine Sandoval, Minority Commercial Radio Ownership in 2009: FCC Licensing and Consolidation Policies, Entry Windows, and the Nexus Between Ownership, Diversity and Service in the Public Interest 19-21 (2009) ("Sandoval Study")).

[841] NABOB 323 Report Comments at 5; *see also id.* at 10 (stating that "the Court in *Prometheus II* made clear that it believes the Commission can adopt an 'eligible entity' definition that is both race-conscious and meets the requirements of *Adarand*, and the Court expects that definition to be along the lines of the SDB definition used by other Federal agencies").

281. Some commenters suggested that the Commission currently lacks evidence sufficient to implement a race- or gender-targeted standard.[842] In light of this perceived deficiency, DCS suggested that the Commission promptly implement an ODP standard,[843] which it described as race- and gender-neutral, while the Commission develops the record necessary to adopt a constitutionally sustainable race-conscious definition.[844] Similarly, UCC *et al.* argued that "there are problems with the Commission's data collection and analysis that need to be fixed" prior to the adoption of race- or gender-conscious measures.[845] UCC *et al.* further argued that, because "the Commission will have to show that it tried race-neutral solutions and found them insufficient" in order to "defend against a constitutional challenge to any future policy that uses race as a factor," the Commission should move forward in this proceeding to "evaluat[e] whether its current race- and gender-neutral policies designed to promote opportunities for minorities and women are in fact working as intended."[846] NHMC *et al.* opined that "any consideration of [SDBs] is premature" until the Commission resolves the existing problems with its data and analysis and that any SDB proposal "would lack requisite supporting data and analysis necessary to withstand scrutiny from the court based on the current record."[847]

#### b. Discussion

282. We tentatively conclude that we do not have sufficient evidence at this time to satisfy the constitutional standards necessary to adopt race- or gender-conscious measures. In evaluating the possibility of adopting an SDB standard, or any other race-conscious standard, the first question we must consider is whether the standard could be justified by a "compelling governmental interest."[848] Assuming that such an interest could be established, we then would have to be able to demonstrate that the application of the race-conscious standard to specific measures or programs would be "narrowly tailored" to further that interest. We discuss below our preliminary approach to this analysis. While we tentatively find that a reviewing court could deem the Commission's interest in promoting a diversity of viewpoints

---

[842] *See* NHMC *et al.* NPRM Comments at 32-33 (indicating that the Commission has insufficient data to adopt a workable SDB definition); DCS NPRM Comments at 15, 17 (acknowledging that, in light of *Adarand,* the Commission would face a high hurdle in developing race-conscious remedies given current shortcomings in available data and a need to update existing studies); DCS 323 Report Comments at 6-7 (recommending that the Commission adopt race-neutral policies while it conducts *Adarand* studies to develop a more complete record should race- and gender-conscious proposals prove to be necessary); LCCHR 323 Report Comments at 3-4; UCC *et al.* NPRM Comments at 30.

[843] *See supra* note 789.

[844] *See* DCS NPRM Comments at 18. DCS asserted that the Commission should adopt a race-conscious standard that closely reflects the SBA's SDB standard once it gathers sufficient data to justify such an approach. *Id.* at 15-16. DCS opined that most minorities seeking ownership in the broadcast industry likely will fit within the SBA's definitions of a socially and economically disadvantaged business or individual. *Id.* at 15-16. Citing to the current low levels of minority and female ownership of broadcast stations, DCS also asserted that an SDB standard is appropriate because certain groups face considerable challenges in attempting to access spectrum opportunities. *Id.* at 2, 6-8.

[845] UCC *et al.* NPRM Comments at 30.

[846] *Id.* UCC *et al.* specifically recommended that the Commission analyze whether any transfers to eligible entities of co-located radio stations that otherwise would exceed the Commission's ownership limits have resulted in station ownership by minorities or females. *See id.* at 33. UCC *et al.* further recommended that the Commission analyze the impact of the FSSR and new entrant bidding credit on minority or female station ownership. *See id.* at 30-32; *see also* UCC *et al.* 323 Report Comments at 14-15.

[847] NHMC *et al.* NPRM Comments at 32-33. One commenter, Center for Equal Opportunity ("CEO") of Falls Church, Virginia, stated that preferences based on race and ethnicity are unconstitutional, unfair, divisive, and unnecessary to achieve programming diversity. CEO NPRM Comments at 1.

[848] *See Grutter*, 539 U.S. at 327.

compelling, we believe that we do not have sufficient evidence at this time to demonstrate that adoption of race-conscious measures would be narrowly tailored to further that interest. We also discuss the constitutional analysis that would apply if we sought to adopt gender-conscious measures based on that interest. Further, we tentatively find that we do not have sufficient evidence to establish a compelling interest in remedying past discrimination. We seek comment on both our preliminary analysis and our tentative findings.

283. As a threshold matter, we reject commenters' arguments that the Commission is required to adopt an SDB standard or another race-conscious eligible entity standard in this proceeding in light of the court's instructions in *Prometheus II*.[849] We also disagree with arguments that the Commission is not permitted to conclude this proceeding until we have completed any and all studies or analyses that may enable us to take such action in the future consistent with current standards of constitutional law.[850] The Commission intends to follow the Third Circuit's direction that we consider adopting an SDB definition before completion of this proceeding and evaluate the feasibility of adopting a race-conscious eligibility standard based on an extensive analysis of the available evidence. We do not believe that the Third Circuit intended to prejudge the outcome of our analysis of the evidence or the feasibility of implementing a race-conscious standard that would be consistent both with applicable legal standards and the Commission's practices and procedures.

### (i) Constitutional Analysis of Commission Interest in Enhancing Viewpoint Diversity

284. *Compelling Governmental Interest Analysis.* In the *NPRM*, the Commission reaffirmed its longstanding commitment to advancing a diversity of viewpoints.[851] The Commission noted that it "has relied on its media ownership rules to ensure that diverse viewpoints and perspectives are available to the American people in the content they receive over the broadcast airwaves," and stated that "media ownership limits are necessary to preserve and promote viewpoint diversity."[852] In this regard, the Commission further explained that it has "regulated media ownership as a means of enhancing viewpoint diversity on the premise that diffuse ownership among media outlets promotes the presentation of a larger number of viewpoints in broadcast content" than otherwise would be available.[853] The *NPRM* also noted that, in addition to viewpoint diversity, the Commission has considered the impact of its rules on program, outlet, source, and minority and female ownership diversity.[854]

---

[849] *See* NABOB 323 Report Comments at 6-11; LCCHR 323 Report Comments at 4; NHMC 323 Report Comments at 7.

[850] *See* LCCHR 323 Report Comments at 4; NHMC 323 Report Comments at 4; UCC *et al.* 323 Report Comments at 4, 10, 27.

[851] *See NPRM*, 26 FCC Rcd at 17495-96, ¶¶ 16-17. As the Commission previously has explained, "[v]iewpoint diversity refers to the availability of media content reflecting a variety of perspectives." *2002 Biennial Review Order*, 18 FCC Rcd at 13627, ¶ 19. The Commission further has emphasized that "[a] diverse and robust marketplace of ideas is the foundation of our democracy." *Id.*

[852] *See NPRM*, 26 FCC Rcd at 17495-96, ¶¶ 16-17.

[853] *See id.* at 17496, ¶ 16.

[854] *See id.* at 17496, ¶ 16. The Commission has explained that "[p]rogram diversity refers to a variety of programming formats and content. With respect to television, this includes dramas, situation comedies, reality shows, and newsmagazines, as well as targeted programming channels such as food, health, music, travel, and sports. With respect to radio, program diversity would be reflected in a variety of music formats such as jazz, rock, and classical as well as all-sports and all-news formats. Programming aimed at various minority and ethnic groups is an important component of program diversity for both television and radio." *2002 Biennial Review Order*, 18 FCC Rcd at 13631-32, ¶ 36. "Outlet diversity" refers to the number of "independently-owned firms" in a given market. *Id.* at 13632, ¶ 38. "'[S]ource diversity' refers to the availability of media content from a variety of content producers." *Id.* at 13633, ¶ 42.

285.     As the Third Circuit observed in *Prometheus II*, the Supreme Court long has recognized the Commission's interest in broadcast diversity.[855]  In *Metro Broadcasting*, the Supreme Court held, based on the application of intermediate constitutional scrutiny, that "the interest in enhancing broadcast diversity is, at the very least, an important governmental objective."[856]  In reaching this determination, the Court stated that "[s]afeguarding the public's right to receive a diversity of views and information over the airwaves is . . . an integral component of the FCC's mission" and that the Commission's "'public interest' standard necessarily invites reference to First Amendment principles."[857]  That opinion was issued prior to *Adarand*, however, which overruled the application of intermediate scrutiny in *Metro Broadcasting*.[858]  Notably, *Adarand* did not disturb other aspects of *Metro Broadcasting*, including the recognition of an important governmental interest in broadcast diversity.  Nonetheless, in the aftermath of *Adarand*, it is clear that the Commission would have to establish that its interest in promoting diversity is not only important, but compelling, in order to adopt a race-conscious standard.  In addition, the Supreme Court held in 2003 in *Grutter v. Bollinger* that diversity is a compelling governmental interest in the realm of higher education.[859]  That finding was based on the Court's determination that "universities occupy a special niche in our constitutional tradition" and on substantial evidence, including numerous expert studies and reports, regarding the educational benefits that flow from student body diversity.[860]

286.     We believe that the Commission's interest in promoting a diversity of viewpoints could be deemed sufficiently compelling to survive strict scrutiny analysis.  In a different context, the Supreme Court has recognized viewpoint diversity as an interest "of the highest order."[861]  In addition, the Supreme Court in *Metro Broadcasting* recognized similarities between broadcast diversity and the interest in promoting student body diversity the Court later recognized as compelling in *Grutter*:  "Just as a 'diverse student body' contributing to a '"robust exchange of ideas"' is a 'constitutionally permissible goal' on which a race-conscious university admissions program may be predicated, the diversity of views and information on the airwaves serves important First Amendment values."[862]  Other similarities between *Metro Broadcasting* and *Grutter* further strengthen the conclusion that viewpoint diversity may qualify as a compelling interest.  In both cases, the Supreme Court recognized that there were important First Amendment interests at stake and acknowledged that diversity was central to the relevant institution's

---

[855] *See Prometheus II*, 652 F.3d at 471 n.42 (explaining that the Supreme Court has upheld targeted Commission efforts to promote increased minority ownership).

[856] *Metro Broad.*, 497 U.S. at 567 (affirming the Commission's distress sale policy and use of minority preferences in comparative licensing hearings).  *See also Turner I*, 512 U.S. at 663 (finding that "assuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment"); *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 795 (1978); *United States v. Midwest Video Corp.*, 406 U.S. 649, 668 n.27 (1972) (plurality opinion); *Associated Press*, 326 U.S. 1.

[857] *Metro Broad.*, 497 U.S. at 567 (quoting *Nat'l Citizens*, 436 U.S. at 795).

[858] *See Adarand*, 515 U.S. 200.

[859] *See Grutter*, 539 U.S. at 327-33; *see also Fisher v. University of Texas*, 133 S. Ct. 2411 (2013) (noting that *Grutter* endorsed the Supreme Court's previous conclusion that "'the attainment of a diverse student body . . . is a constitutionally permissible goal for an institution of higher education,'" (*quoting Grutter*, 438 U.S. at 311-12)).

[860] *See id.* at 329-33.

[861] *Turner I*, 512 U.S. at 663 (internal quotations omitted).  The Court concluded that promoting the widespread dissemination of information from a multiplicity of sources was an important governmental interest served by cable must-carry provisions, and did not address whether the interest was compelling for equal protection purposes. *Id.* at 661-63.

[862] *Metro Broad.*, 497 U.S. at 567 (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 311-13 (1978)); *see also Metro Broad.*, 497 U.S. at 601-02 (Stevens, J., concurring).

mission.[863] In addition, just as the *Grutter* Court acknowledged the longstanding recognition of education's "fundamental role" in American society,[864] the Court long has recognized that broadcasting is "an essential part of the national discourse on subjects across the whole broad spectrum of speech, thought, and expression."[865]

287.     We note, however, that some decisions applying strict scrutiny have cast doubt on the likelihood that courts would accept the Commission's interest in viewpoint diversity as the basis for race-conscious action.  In 2007, the Supreme Court declined to recognize a compelling interest in diversity outside of "the context of higher education."[866]  Moreover, the D.C. Circuit held in *Lutheran Church-Missouri Synod v. FCC* that broadcast diversity does not rise to the level of a compelling governmental interest.[867]  The D.C. Circuit reasoned that "even the majority" of the Supreme Court "who thought the government's interest 'important' [in *Metro Broadcasting*] must have concluded implicitly that it was not 'compelling'; otherwise, it is unlikely that the majority would have adopted a wholly new equal protection standard to decide the case as it did."[868]  That reading is not compelled, however.  The *Metro Broadcasting* Court actually stated that "enhancing broadcast diversity is, *at the very least*, an important governmental objective,"[869] thereby leaving open the possibility that broadcast diversity might be a compelling interest.[870]

---

[863] *Compare Grutter*, 539 U.S. at 329 (recognizing "a constitutional dimension, grounded in the First Amendment, of educational autonomy" and that "attaining a diverse student body is at the heart of the Law School's proper institutional mission"), *with Metro Broad.*, 497 U.S. at 567-68 (broadcast diversity is "an integral component of the FCC's mission" and "serves important First Amendment values").

[864] *Grutter*, 539 U.S. at 331-32.

[865] *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 194 (1997) ("*Turner II*"); *see also Turner I*, 512 U.S. at 663 ("[I]t has long been a basic tenet of national communications policy that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public.") (internal quotations omitted); *Metro Broad.*, 497 U.S. at 555 (noting "'enormous impact which television and radio have upon American life'" (quoting *Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices*, Docket No. 18244, Memorandum Opinion and Order and Notice of Proposed Rulemaking, 13 FCC 2d 766, 771, ¶ 12 (1968))).

[866] *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 703 (2007).  Specifically, in *Parents Involved*, the Court struck down race-conscious primary and secondary school assignment plans that lower courts had upheld under *Grutter*, concluding that *Grutter* did not govern because it is limited to "a specific type of broad-based diversity" (*i.e.*, "'a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element'") and "the unique context of higher education." *Parents Involved*, 551 U.S. at 722, 725; *see also id.* at 725 ("The [*Grutter*] Court explained that '[c]ontext matters' in applying strict scrutiny, and repeatedly noted that it was addressing the use of race 'in the context of higher education.'") (internal citations omitted).

[867] 141 F.3d 344, 354-55 (D.C. Cir. 1998), *rehearing denied*, 154 F.3d 487 (D.C. Cir. 1998).

[868] *Lutheran Church*, 141 F.3d at 355; *see also id.* at 354 (stating that "the majority's analysis of the government's 'diversity' interest seems very much tied to the more forgiving standard of review it adopted").

[869] *Metro Broad.*, 497 U.S. at 567 (emphasis added).

[870] We also note that *Lutheran Church* rested on an assessment of the impact of *Adarand* that the *Grutter* decision may undermine.  The D.C. Circuit viewed *Adarand* as a retreat from recognition of any permissible basis for race-conscious actions other than remedying discrimination, and expressed its own doubt that "the Constitution permits the government to take account of racially based differences, much less encourage them."  *Lutheran Church*, 141 F.3d at 355. *Grutter* undermines this broad interpretation of *Adarand* by recognizing, in the context of higher education, a compelling state interest in student body diversity. *See Grutter*, 539 U.S. at 328 ("[W]e have never held that the only governmental use of race that can survive strict scrutiny is remedying past discrimination.").

288.     We seek comment on this preliminary analysis, including any other factors or relevant precedent that we should consider.  We also seek comment on other relevant interests that a reviewing court might recognize as compelling and the analysis of such interests under applicable judicial precedent.

289.     *Narrow Tailoring Analysis.*  Even assuming that the Commission were able to establish a compelling interest in diversity, we still would be required to demonstrate that the adoption of a race-conscious SDB standard, as well as the programs to which it would apply, would be "narrowly tailored" to further that interest.  As the Supreme Court has stated, "[e]ven in the limited circumstance when drawing racial distinctions is permissible to further a compelling state interest, government is still 'constrained in how it may pursue that end:  [T]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose."[871]  We tentatively conclude that the evidence in the record at this time does not satisfy this requirement for two reasons.  First, we tentatively find that it does not demonstrate that the connection between minority ownership and viewpoint diversity is direct and substantial enough to satisfy strict scrutiny.  Second, we believe that the record does not reveal a feasible means of carrying out the type of individualized consideration the Supreme Court has held is required for a diversity-based program to pass constitutional muster.

290.     We disagree with commenters who argued that a nexus between minority ownership and viewpoint diversity sufficient to satisfy strict scrutiny already has been established and accepted by the Supreme Court in *Metro Broadcasting*.[872]  We believe that empirical evidence of a stronger nexus between minority ownership and broadcast diversity than was demonstrated in *Metro Broadcasting* would be required for a race-conscious SDB standard to withstand strict scrutiny.  In finding that the Commission's minority ownership policies were substantially related to achieving broadcast diversity, the Supreme Court in *Metro Broadcasting* deferred to the judgment of Congress and the Commission, as corroborated by various social science studies.[873]  As stated above, however, the Supreme Court since has repudiated *Metro Broadcasting*'s application of intermediate scrutiny, and under strict scrutiny, the Commission's judgment regarding the relationship between minority ownership and broadcast diversity is unlikely to receive the same deference.[874]  In her dissent in *Metro Broadcasting*, Justice O'Connor argued that the Court should have applied strict scrutiny and that, under such scrutiny, the available evidence fell far short of the requisite direct and substantial connection, establishing at best "the existence of some rational nexus."[875]  Subsequent developments in constitutional jurisprudence further suggest that empirical

---

[871] *Grutter*, 539 U.S. at 333 (*quoting Shaw v. Hunt*, 517 U.S. 899, 908 (1996)); *see also Fisher*, 133 S. Ct. at 2419-20 ("Once the University has established that its goal of diversity is consistent with strict scrutiny, however, there must still be a further judicial determination that the admissions process meets strict scrutiny in its implementation.  The University must prove that the means chosen by the University to attain diversity are narrowly tailored to that goal.  On this point, the University receives no deference.").

[872] *See* NABOB 323 Report Comments at 4.

[873] *See Metro Broad.*, 497 U.S. at 581-83.

[874] *See Grutter*, 539 U.S. at 326 ("We apply strict scrutiny to all racial classifications to '"smoke out" illegitimate uses of race by assuring that [government] is pursuing a goal important enough to warrant use of a highly suspect tool.'" (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989))).  Further, although the *Grutter* Court accorded deference to a law school's academic judgment regarding the educational benefits of student body diversity, emphasizing the interest in educational autonomy grounded in the First Amendment, *Grutter*, 539 U.S. at 328-29, the First Amendment does not provide the Commission with similar autonomy.  *Cf. Parents Involved in Cmty. Sch. v. Seattle Sch. Dist., No. 1*, 377 F.3d 949, 982 (9th Cir. 2004) ("While it is clear that educators are uniquely positioned to gauge how classroom discussions respond to shifts in classroom racial composition, they are not similarly well-positioned to assess how marginal changes in schoolhouse racial demographics affect how students interact with each other years after they leave school for the 'real world.'").

[875] *See Metro Broad.*, 497 U.S. at 626 (O'Connor, J., dissenting) ("[T]he Court's discussion does not begin to establish that the programs are directly and substantially related to the interest in diverse programming.").  The studies the Supreme Court reviewed in *Metro Broadcasting* generally showed that most minority-owned stations

(continued....)

evidence of a stronger nexus between broadcast diversity and minority ownership than was shown in *Metro Broadcasting* would be required to withstand strict scrutiny.[876]

291. As explained below, there is a significant amount of evidence in this proceeding regarding the role and status of minorities in the broadcast industry. Although this evidence contributes valuable information to the record in this proceeding and informs our broader review of the broadcast ownership rules, we tentatively conclude that the evidence in the record would not satisfy strict scrutiny. Commenters are invited to address our tentative conclusions and evaluations of this evidence. In addition, we invite commenters to provide any additional evidence that may be relevant to our analysis. With regard to any such evidence, commenters should explain whether and, if so, how the evidence would bolster our ability to satisfy the requisite narrow tailoring standard.

292. The two recent studies in the record that directly address the impact of minority ownership on viewpoint diversity are Media Ownership Studies 8A and 8B.[877] Media Ownership Study 8A focuses on the relationship between local media ownership and viewpoint diversity in local television news.[878] The authors calculate a measure of viewpoint diversity based on program audience data and then analyze the relationship of this measure to certain aspects of the Commission's broadcast ownership rules, finding either that the relationship is not statistically distinguishable from zero or very small in absolute magnitude.[879] In particular, this study finds that the relationship between minority ownership and viewpoint diversity is not statistically distinguishable from zero.[880] As a result, this study does not appear to provide evidence that we could rely upon to justify race-conscious action.[881]

293. Media Ownership Study 8B examines viewpoint diversity in local television news through an analysis of television news transcripts.[882] In general, the authors find very little evidence of a robust relationship between available measures of market structure and viewpoint diversity, perhaps due to the fact that the measures of market structure are, in the words of the authors, "rather blunt."[883] With respect to minority ownership in particular, the authors find almost no statistically significant relationship between such ownership and their measure of viewpoint diversity.[884] Notably, the study does find a positive relationship between minority ownership and coverage of minority politicians, which suggests that minority-owned stations may focus on certain types of minority-oriented content more than other

---

(Continued from previous page)

target programming at minority audiences, that "an owner's minority status influences the selection of topics for news coverage and the presentation of editorial viewpoint, especially on matters of particular concern to minorities," and that "a minority owner is more likely to employ minorities in managerial and other important roles where they can have an impact on station policies." 497 U.S. at 581-82.

[876] *See Fisher*, 133 S. Ct. 2411 (finding that the Court of Appeals failed to assess whether the university could meet its burden of proof that its admissions process met strict scrutiny, *i.e.*, that the means chosen by the university to attain diversity are narrowly tailored and that no workable race-neutral alternatives would suffice).

[877] *See* Media Ownership Study 8A at 3, 5-6, 20, 22-23; Media Ownership Study 8B at 5-9, 14-19.

[878] *See* Media Ownership Study 8A at 1.

[879] *See id.* at 5-13, 20.

[880] *See id.* at 22.

[881] UCC *et al.* asserted that Media Ownership Study 8A "did not consider minority and women ownership at all." UCC *et al.* 323 Report Reply at 4. This is not the case. Minority ownership is one of the variables included in the analysis of 2007 and 2009 data in the study. *See* Study 8A at 18. However, as explained above, the study finds no statistically significant relationship between this variable and its measure of viewpoint diversity. *See id.* at 22.

[882] *See* Media Ownership Study 8B at 2, 5-9.

[883] *Id.* at 18.

[884] *See id.*

stations and which could be viewed as a measure of one form of viewpoint diversity.[885] Despite this finding, we tentatively conclude that Media Ownership Study 8B does not provide sufficient evidence to satisfy the requirements of strict scrutiny. First, the effects of minority ownership revealed in the study are quite limited overall, and minority ownership does not have an effect on most variables and disparity measures analyzed.[886] Second, in the vast majority of cases the authors study, the relationship between minority ownership and viewpoint diversity is not statistically different from zero.[887]

294.    Other studies in the record examine the relationship between minority ownership of broadcast outlets and other aspects of our diversity goal, such as programming or format diversity. We do not believe that evidence regarding program or other forms of diversity is as relevant as evidence regarding viewpoint diversity for the purpose of establishing narrow tailoring to a compelling interest. We tentatively conclude that, of any diversity-related interest that the Commission has authority to advance, viewpoint diversity currently is most likely to be accepted as a compelling governmental interest under strict scrutiny. Although the *Metro Broadcasting* Court did not define broadcast diversity with this level of precision, a court applying strict scrutiny is likely to require such precision, and the Supreme Court's prior recognition of broadcast diversity as an interest "of the highest order" seems to pertain to viewpoint diversity.[888] Media Ownership Study 7 assesses the relationship between ownership structure and the provision of radio programming, as measured by program formats, to minority (African-American and Hispanic) audiences between 2005 and 2009.[889] The study finds that minority audiences have different format tastes than white audiences and that minority-owned stations disproportionately cater to these tastes.[890] In addition, the regression analyses included in Media Ownership Study 7 show that, on a market-wide basis, the presence of minority-owned stations increases the amount of minority-targeted programming and that the availability of minority-targeted formats attracts more minorities to listening.[891] The study also concludes that most stations with minority-targeted formats are not minority-owned and that group ownership, including particularly ownership by non-minority owners, within a local market allows for greater format diversification.[892] Because this study is focused on format diversity and shows that non-minority stations provide a significant amount of minority-targeted programming, we tentatively find that it would have limited value as a justification for adopting race-conscious measures.

295.    In addition to the Media Ownership Studies commissioned for this proceeding, commenters have submitted a number of studies into the record that analyze issues related to minority broadcast ownership. We discuss those studies that appear to relate most closely to the impact of minority ownership on our diversity goals. Commenters are invited to supplement this discussion with

---

[885] *See id.* at 15.

[886] *See id.* at 18.

[887] *See id.*

[888] *See Turner I*, 512 U.S. at 663 (characterizing "assuring that the public has access to a multiplicity of information sources" as "a governmental purpose of the highest order, for it promotes values central to the First Amendment.").

[889] Media Ownership Study 7 at 1, 3.

[890] *See id.* at 2, 7-10.

[891] *See id.* at 17-24. As explained by the author, because the changes related to minority preferences over the period studied are gradual, a causal relationship between these preferences and minority ownership only can be inferred, and not proven. *See id.* at 4, 23, 25. In addition, the author notes that several of the results may stem from differences in broadcast signal strength, which could not be accounted for in the available dataset. *See id.* at 12. Further, the study reaches mixed conclusions regarding the relationship between minority ownership and minority listenership for individual stations: it finds that in some cases minority ownership of radio stations leads to increased minority listenership to those stations, but in other cases there is no positive correlation between minority ownership and minority listenership. *Id.* at 13.

[892] *See id.* at 17-24.

additional views of the relevance of these studies and to submit additional evidence that may be pertinent to our analysis. For example, "Media Ownership Matters: Localism, the Ethnic Minority News Audience and Community Participation," a 2006 study commissioned by the Benton Foundation, finds that there is a "nexus" between minority ownership and service to underserved communities.[893] This study used ethnographic and survey research to discern patterns in news consumption among minorities in the Washington, D.C., metropolitan area.[894] It finds that of the 18 percent of minority listeners who reported that they prefer to obtain news programming from radio, a majority of those listeners preferred minority-owned stations.[895] While this finding is informative, we tentatively find that the evidentiary value of this study in the context of a strict scrutiny analysis would be limited because it covered only three neighborhoods in one metropolitan area. In addition, the study does not provide any statistical analysis of or adjust for factors aside from minority ownership that may explain this result. Additionally, this finding represents only a small percentage of the individuals the authors surveyed (*i.e.*, a majority of 18 percent of the listeners surveyed). Furthermore, the study does not analyze the news content on minority-owned radio stations or provide analysis comparing such content to the news content on other stations.

296. Commenters also cite to a study by Catherine J.K. Sandoval, Assistant Professor, Santa Clara University School of Law.[896] Professor Sandoval's study examines 11,000 records from the Commission's Consolidated Database System ("CDBS") and Internet sources on radio ownership and program formats in mid-2009 to analyze the effect of Commission licensing and local multiple ownership rules on minority ownership of commercial radio stations, program diversity, and service to consumers.[897] Professor Sandoval finds that there is a strong link between minority radio ownership and certain types of formats. The study finds that 72.5 percent, or 591 of 815, of minority-owned radio stations broadcast minority-oriented formats, including Spanish, Urban, Urban News, Asian, Ethnic and Religious formats geared to minority audiences.[898] While this study is useful, we tentatively conclude that evidence of a link between minority ownership and particular formats would not be sufficient to demonstrate that our diversity goals, particularly our fundamental interest in advancing viewpoint diversity, would be "specifically and narrowly" served by the adoption of race-conscious measures.

297. Two studies commissioned by Free Press, "Out of the Picture 2007: Minority & Female TV Station Ownership in the United States" and "Off the Dial: Female and Minority Radio Station Ownership in the United States," provide a significant amount of valuable information regarding the status of minority and female ownership of television and radio stations.[899] However, these studies make

---

[893] *See* Carolyn M. Byerly, PhD, Department of Journalism, JHJ School of Communication, Howard University, Washington, D.C., Written Presentation at FCC Media Ownership Workshop on Minority and Female Ownership 3 (Jan. 27, 2010), *available at* http://transition.fcc.gov/ownership/workshop-012710/byerly.pdf) (citing Carolyn Byerly *et al.*, *Ownership Matters: Localism, the Ethnic Minority News Audience and Community Participation*, *in* DOES BIGGER MEDIA EQUAL BETTER MEDIA? FOUR ACADEMIC STUDIES OF MEDIA OWNERSHIP IN THE UNITED STATES 4 (Benton Foundation Social Science Research Council Oct. 2006) ("Byerly Study")).

[894] Byerly Study at 7-8.

[895] *Id.* at 4, 15-18.

[896] DCS NOI Comments at 4 n.10 (citing Sandoval Study); *see also* DCS NPRM Comments at 4 n.18; DCS 323 Report Comments at 4; Hawkins NPRM Reply at 8 n.32.

[897] *See* Sandoval Study at 1.

[898] *Id.* at 19.

[899] *See* Free Press NPRM Comments at 14, 17-23 (citing S. Derek Turner & Mark Cooper, Out of the Picture 2007: Minority & Female TV Station Ownership in the United States (Oct. 2007) ("Turner/Cooper TV Study") (update and revision); S. Derek Turner, Off the Dial: Female and Minority Radio Station Ownership in the United States (June 2007) ("Turner Radio Study")).

only limited conclusions that relate specifically to the impact of such ownership on viewpoint or other forms of diversity.[900] Another study submitted in the record by USC Annenberg, "The Triangle of Minority Ownership, Employment and Content: A Review of Studies of Minority Ownership and Diversity," identifies and summarizes 42 studies that are relevant to the interrelationship between minority ownership, employment diversity, and content.[901] The study notes the poor quality of the data in many of the previous studies and the limitations these flaws place on the inferences that can be drawn from them.[902] Although this analysis concludes that previous studies collectively are suggestive of a nexus between minority ownership and the other factors identified, the author also expressly acknowledges that the studies relied on for this proposition frequently use unsophisticated statistical techniques that are prone to error.[903] The author further states that "it remains unclear whether being a minority owner influences the nature of [the] workforce and programming content."[904]

298.    In sum, we believe that the body of evidence contained in the recent Media Ownership Studies and the studies submitted in the record by commenters do not demonstrate the "nearly complete" or "tightly bound" nexus between diversity of viewpoint and minority ownership that would be required to justify a race-based eligibility entity definition.[905] Nevertheless, we believe that the studies strengthen the evidence of a link between broadcast diversity and minority ownership. They also begin to answer questions raised by Justice O'Connor's *Metro Broadcasting* dissent, such as how to define minority

---

[900] For example, the Turner Radio Study offers a case study of the selection of certain radio talk shows by minority and non-minority station owners. *See* Turner Radio Study at 48-55. The Turner/Cooper TV Study offers a limited analysis of the carriage of local news programming by minority- and non-minority-owned stations. *See* Turner/Cooper TV Study at 31. These studies therefore offer only limited analyses of the content provided by minority stations and do not provide any definitive analysis of viewpoint diversity issues.

[901] *See* USC NPRM Comments (attaching Dam Hee Kim, The Triangle of Minority Ownership, Employment and Content: A Review of Studies of Minority Ownership and Diversity (unpublished manuscript, filed Mar. 5, 2012, with USC NPRM Comments) ("Kim Study")).

[902] Kim Study at 10, 15-16.

[903] *Id.* at 5-7, 18-22.

[904] *Id.* at 1. In addition to the studies noted above, a number of other studies that provide analyses of minority ownership issues have been identified or submitted in the record. *See* UCC *et al.* NPRM Reply at 19-34; Hawkins NPRM Reply at 11; USC NPRM Comments at 10-12; Media Ownership Study 5. Several of these studies and other studies noted above support the existence of broadcast ownership trends that generally are well-established and non-controversial. For example, studies submitted into the record conclude that the percentages of minority- and female-owned radio stations are substantially lower than the percentages of minorities and females in the general population. *See, e.g.*, UCC *et al.* NPRM Reply at 20; Turner/Cooper TV Study at 18-19, 32-34; Turner Radio Study at 17-19, 32-36. We believe that, despite their value, these data and studies taken together do not provide a sufficient basis on which to adopt a race- or gender-based policy. In addition, some of the studies submitted or identified by commenters appear to rely on outdated or unreliable data. For example, studies relying on data from early Form 323 filings are not reliable because, as explained above, the data were not maintained in a way that allows for reliable quantitative analysis. Moreover, some of the studies cited by commenters are more than ten years old and, in some cases, date back to the 1980s. *See, e.g.*, Kim Study; DCS NPRM Comments at 17 (acknowledging need for updated studies to support adoption of SDB standard); Hawkins NPRM Reply at 11.

[905] *Metro Broad.*, 497 U.S. at 626 (O'Connor, J., dissenting); *see also Fullilove v. Klutznick*, 448 U.S. 448, 537 (1980) (Stevens, J., dissenting) ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."). In *Grutter*, the Court found the required nexus between student body diversity and race-based admissions in part by relying on the concept of "critical mass" — the law school's need to admit a certain number of minority students precisely in order to diminish the force of racial stereotypes. *See Grutter*, 539 U.S. at 333; *see also id.* at 319-20. Only minority students could diminish the force of stereotypes as described in *Grutter*. We note that this approach is not easily transferable to broadcasting, because viewers and listeners usually do not know who owns broadcast stations. In addition, a station owner need not be a minority to contribute to broadcast diversity.

programming and whether such programming is underrepresented, that the Supreme Court found it unnecessary to address under intermediate scrutiny.[906] In particular, existing studies show that minority groups have distinct preferences, and that expanding minority ownership increases the amount of programming targeted to such preferences. As stated above, however, the evidence largely concerns program or format diversity rather than the viewpoint diversity that the Supreme Court has recognized as an interest "of the highest order" and that the Commission believes is most central to First Amendment values.[907] Many of the studies also support only limited conclusions and reflect a need for further analysis. Given our tentative assessments of these studies and other data, we cannot conclude at this time that the evidence demonstrates a sufficient nexus between minority ownership of broadcast stations and viewpoint diversity to withstand strict scrutiny.[908]

299. In addition, we tentatively find that the record in this proceeding does not reveal a feasible means of carrying out the type of individualized consideration the Supreme Court has held is required to pass constitutional muster under strict scrutiny. Where race-conscious governmental action is concerned, the Supreme Court previously has found that narrow tailoring requires individualized review, serious, good-faith consideration of race-neutral alternatives, minimal adverse impact on third parties, and temporal limits.[909] In particular, the Court found in *Grutter* that narrow tailoring demands that race be considered "in a flexible, non-mechanical way" alongside other factors that may contribute to diversity and that consideration of race was permissible only as one among many disparate factors in order to evaluate individual applicants for admission to an educational institution.[910] The manner in which the Commission allocates broadcast licenses is different in many important respects from university admissions, and we believe that implementing a program for awarding or affording preferences related to broadcast licenses based on the "individualized review" required in other contexts would pose a number of administrative and practical challenges for the Commission.[911] The Supreme Court has held, however,

---

[906] *See Metro Broad.*, 497 U.S. at 624 (O'Connor, J., dissenting) ("The FCC has posited a relative absence of 'minority viewpoints,' yet it has never suggested what those views might be or what other viewpoints might be absent from the broadcasting spectrum. It has never identified any particular deficiency in programming diversity that should be the subject of greater programming or that necessitates racial classifications."); *but see id.* at 584 n.36, 589 n.42 (noting practical and constitutional problems with specifically defining "minority viewpoints" and determining which ones are underrepresented).

[907] *Turner I*, 512 U.S. at 663 (internal quotations omitted).

[908] In response to NABOB's request that the Commission provide a specific timetable for completing future studies necessary to adopt a policy to promote minority ownership, we have identified in detail in this FNPRM the studies in the current record that we have found establish useful information regarding the relationship between viewpoint diversity and minority and female ownership of broadcast stations. *See* NABOB 323 Report Comments at 12-13. In addition, we have outlined ongoing and additional efforts to achieve important further analysis of the status and impact of minority ownership, including, but not limited to, the studies being conducted by OCBO and the Hispanic television viewing study discussed above. In addition, as we indicated in the *NPRM*, Form 323 ownership data will continue to be collected and analyzed and considered in connection with future media ownership reviews. The process for doing so will continue to be refined and improved. We cannot firmly establish herein a timetable for release of future biennial ownership data or the completion of studies, examinations, or assessments. Commenters may submit additional studies that we should consider in our analysis.

[909] *Grutter*, 539 U.S. at 341-43.

[910] *Id.* at 334, 338-39; *see also id.* at 334 (stating that, to be narrowly tailored a race-conscious admissions program may consider race or ethnicity only as a "'plus' in a particular applicant's file," *i.e.*, it must be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight" (citing *Bakke*, 438 U.S. at 315-17)).

[911] For example, the process of acquiring a new broadcast license is initiated through a highly structured, open, and competitive bidding process. 47 U.S.C. § 309(j). Individuals or entities must enter bids for broadcast allotments — a market-based regime — and must offer the highest monetary value for the allotment in order to acquire a

(continued....)

that "[t]he fact that the implementation of a program capable of providing individualized consideration might present administrative challenges does not render constitutional an otherwise problematic system."[912] We seek comment on our tentative conclusion and potential ways in which an individualized review process feasibly, effectively, and efficiently could be incorporated into any race-conscious measures adopted by the Commission.

300. Commenters generally did not suggest criteria, other than race and ethnic origin, that could be considered in an individualized, holistic evaluation system like that approved in *Grutter*.[913] DCS recommended that the Commission replace its revenue-based eligible entity definition with an ODP standard as a race-neutral means of advancing ownership diversity.[914] We note that it is not entirely clear whether the proposed ODP standard would be subject to heightened constitutional scrutiny.[915] Moreover, we believe that we do not have a sufficient record at present on a number of issues that would need to be resolved prior to the implementation of an ODP standard. Among other issues, no commenter provided

(Continued from previous page) ────────────────────

construction permit. *See Auction of FM Broadcast Construction Permits Scheduled for March 26, 2013; Comment Sought on Competitive Bidding Procedures for Auction 94*, AU Docket No. 12-239, Public Notice, 27 FCC Rcd 10830 (Med. Bur./Wireless Tel. Bur. 2012) (seeking comment on, *inter alia*, simultaneous multiple-round auction design, bidding rounds, reserve price or minimum opening bids, bid removal/bid withdrawal and post-auction payments); *see also Implementation of Section 309(j) of the Communications Act – Competitive Bidding for Commercial Broadcast and Instructional Television Fixed Service Licenses*, MM Docket No. 97-234, First Report and Order, 13 FCC Rcd 15920, 15923-24, 15961, ¶¶ 7-9, 112 (1998), *on recon.*, Memorandum Opinion and Order, 14 FCC Rcd 8724 (1999) ("*Broadcast First Reconsideration Order*"), *on further recon.*, Memorandum Opinion and Order, 14 FCC Rcd 12541 (1999), *aff'd, Orion Communications Ltd. v. FCC*, 221 F.3d 196, No. 98-1424, slip op. (D.C. Cir. June 13, 2000) (unpublished opinion available at 2000 WL 816046 (D.C. Cir.)); *aff'd, Orion Communications Ltd. v. FCC*, 213 F.3d 761 (D.C. Cir. 2000). We believe that the auctions framework does not easily lend it itself to the type of case-by-case consideration envisioned by *Grutter*. 539 U.S. at 338 (stating that the law school gives substantial weight to diversity factors besides race).

[912] *Gratz v. Bollinger*, 539 U.S. 244, 275 (2003).

[913] The Commission long ago abandoned assessing the relative strengths, weaknesses, and the probability of providing certain types of content as part of the broadcast licensing process. The comparative hearing process has been replaced by Congress's directive that the Commission award new broadcast allotments by competitive bidding. *Bechtel v. FCC*, 10 F.3d 875 (D.C. Cir. 1993). In *Bechtel*, the court overturned the longstanding Commission practice of preferring applicants that intended to integrate both ownership and management of the local station as predictive, among other factors, of providing broadcast service responsive to the needs and interests of the local community. It deemed the integration policy arbitrary and capricious, notwithstanding the Commission's defense that having owners involved in the day-to-day management of the station enhances the quality of broadcast service provided to the public. *Id.* at 878, 887; *see also* 47 U.S.C. § 309(j).

[914] *See* DCS NPRM Comments at 2, 18-19. DCS further suggested that the Commission apply an ODP standard to one or more of the measures DCS has proposed in this proceeding, "to determine how it might operate and to make any necessary adjustments so that it can be extended to other proposals . . . ." *See* DCS 323 Report Comments at 12-13; *see also* NAB 323 Report Reply at 4-5; *infra* Section IV.C.3. DCS also proposed that we adopt an ODP standard in the context of the Commission's competitive bidding rules. *See* DCS NPRM Comments at 19-21; *see also* NAB NPRM Comments at 55 (supporting adoption of ODP standard in the context of competitive bidding). The proposal to adopt an ODP standard in the context of competitive bidding remains the subject of a separate proceeding. *See generally New Auction Preference Notice*, 25 FCC Rcd 16854. In addition, Bonneville/Scranton suggested alternative eligibility criteria that could be employed with respect to DCS's broadcast incubation proposal. *See* Bonneville/Scranton 323 Report Reply at 13; *infra* Section IV.C.3.

[915] For instance, an ODP standard that includes race-conscious criteria would be subject to heightened scrutiny. It is unclear how an ODP standard that does not include any race-conscious criteria would enhance minority ownership, which appears to be among the goals of the proponents of this proposal. An ODP standard that does not facially include race-conscious criteria, yet is constructed for the purpose of promoting minority ownership, might be subject to heightened scrutiny.

input on (1) what social or economic disadvantages should be cognizable under an ODP standard, (2) how the Commission could validate claims of eligibility for ODP status, (3) whether applicants should bear the burden of proving specifically that they would contribute to diversity as a result of having overcome certain disadvantages, (4) how the Commission could measure the overcoming of a disadvantage if an applicant is a widely held corporation rather than an entity with a single majority shareholder or a small number of control persons, and (5) how the Commission could evaluate the effectiveness of the use of an ODP standard. Even if we could develop an adequate record on these issues, we are concerned that the Commission may lack the resources to conduct such individualized reviews. Moreover, the Commission would have to walk a very fine line in order to fully evaluate the potential diversity contributions of individual applicants without running afoul of First Amendment values.[916] We are concerned that the type of individualized consideration that would be required under an ODP standard could prove to be administratively inefficient, unduly resource-intensive, and inconsistent with First Amendment values. We seek comment on these issues and our foregoing analysis regarding the feasibility of adopting an ODP standard.[917]

---

[916] *See Metro Broad.*, 497 U.S. at 585 n.36 (noting that the Commission eschews involvement in licensees' programming decisions to avoid constitutional issues that would be raised if it "denied a broadcaster the ability to carry a particular program or to publish his own views, if it risked government censorship of a particular program, or if it led to the official government view predominating public broadcasting") (internal quotes and cites omitted).

[917] As noted above, UCC *et al.* claimed that "the Commission will have to show that it tried race-neutral solutions and found them insufficient" in order to "defend against a constitutional challenge to any future policy that uses race as a factor." UCC *et al.* NPRM Comments at 30-32; *see also Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 280 n.6 (1986) (holding that narrow tailoring must include, among other factors, an assessment by the governmental body of whether race-neutral or less restrictive alternatives have been or could be effective to achieve the desired objectives). To satisfy this obligation, UCC *et al.* specifically recommended that the Commission analyze the impact of the FSSR and new entrant bidding credit on minority or women station ownership. *See* UCC *et al.* NPRM Comments at 30-32.

The Commission does not collect data regarding the FSSR. A licensee may receive a waiver of the local television ownership rule if it can demonstrate that one of the stations it is seeking to acquire is either "failed" or "failing" pursuant to certain criteria. *See* 47 C.F.R. § 73.3555, Note 7. Applicants seeking such a waiver must demonstrate that they satisfied the FSSR by showing that the proposed in-market buyer is the only reasonably available entity willing and able to operate the subject station, and that selling the station to an out-of-market buyer would result in an artificially depressed price for the station. *Id.* This policy is intended to ensure that all out-of-market buyers, including qualified minority and female broadcasters, have notice of, and the opportunity to bid for, a station before it is combined with an in-market station. When the Commission adopted the failed/failing stations waiver policy, commenters raised concerns that it could hinder the ability of minorities and females to acquire stations by permitting additional consolidation in local television markets. *See 1999 Ownership Order*, 14 FCC Rcd at 12936-37, ¶ 72. The Commission responded to these concerns by noting that the FSSR's requirement to solicit out-of-market buyers would provide "minorities and women interested in purchasing a station" with "an opportunity to bid." *Id.* at 12936, ¶ 74; *see also 2002 Biennial Regulatory Review*, 18 FCC Rcd at 13706-08, ¶¶ 221-25; *Prometheus I*, 373 F.3d at 420 (noting that the FCC adopted the FSSR "[t]o alleviate concerns that its decision to allow duopolies would undermine television station ownership by minorities"). Station licensees that successfully sell a station to an out-of-market buyer do not require a failed/failing station waiver and therefore are not required to report their compliance with FSSR criteria to the Commission. Accordingly, such licensees do not provide information to the Commission substantiating the effects of the FSSR.

Additionally, since 1998, the Commission has offered auction bidding credits for broadcast construction permits to entities classified as new entrants, as defined by section 73.5007 of the Commission's rules. 47 C.F.R. § 73.5007. Pursuant to section 73.5007, a winning bidder is eligible for a 35 percent bidding credit if it has no attributable interest in any other media of mass communications. *Id.* A winning bidder is eligible for a 25 percent bidding credit if it has an attributable interest in no more than three mass media facilities. *See Implementation of Section 309(j) of the Communications Act – Competitive Bidding for Commercial Broadcast and Instructional Television Fixed Service Licenses*, MM Docket No. 97-234, First Report and Order, 13 FCC Rcd 15920, 15992-96, ¶¶ 186-90 (1998); *see also* 47 C.F.R. §§ 73.5000, 73.5007, 73.5008. Although eligibility for the new entrant bidding credit must be

(continued....)

301. *Analysis of Gender-Based Diversity Measures.* The Supreme Court has held that gender-based classifications must satisfy intermediate scrutiny and, as such, must be substantially related to the achievement of an important objective.[918] As noted above, the Supreme Court found in *Metro Broadcasting*, based on the application of intermediate constitutional scrutiny, that "the interest in enhancing broadcast diversity is, at the very least, an important governmental objective."[919] Applying intermediate scrutiny, the D.C. Circuit overturned the Commission's former gender preference policy in *Lamprecht v. FCC.*[920] Recognizing that *Metro Broadcasting* established broadcast diversity as an important government objective, the D.C. Circuit focused on its relationship to female ownership. The court stated that the existence of such a relationship rests on several assumptions, but chose to address only one: that women who own broadcast stations are more likely than white men to broadcast "women's programming."[921] The court concluded that the only available study failed to establish a statistically meaningful link between ownership by women and programming of any particular kind.[922] At this time, we cannot conclude that the record evidence establishes a relationship between the Commission's interest in viewpoint diversity and the ownership of broadcast stations by women that would satisfy intermediate scrutiny. While we acknowledge that the data show that women-owned stations are not represented in proportion to the presence of women in the overall population, we do not believe that the evidence available at this time reveals that the content provided via women-owned broadcast stations substantially contributes to viewpoint diversity in a manner different from other stations or otherwise varies significantly from that provided by other stations.[923] However, we seek comment on this preliminary determination as well as any relevant evidence regarding this issue.

(Continued from previous page) ——————————————

specified in an applicant's Form 175 application (Application to Participate in an FCC Auction), applicants are not required to provide information regarding minority or female ownership; thus, the Commission has not been able to assess and collect from Form 175 data on the total number of minorities and women utilizing these bidding credits. *See* FCC Form 175, Application to Participate in an FCC Auction, *available at* http://transition.fcc.gov/Forms/Form175/175.pdf. However, agency data reveal that new entrant bidding credits continue to be actively utilized in broadcast construction permit auctions. In FM Auction 93, held on April 20, 2012, of the 93 allotments for which the Commission received successful bids, 29 winning bids (31 percent) benefitted from the 35 percent new entrant bidding credit and 18 winning bids (19 percent) benefitted from the 25 percent new entrant bidding credit. Similarly, the previous two broadcast auctions, FM Auction 91 (May 2011) and FM Auction 79 (September 2009), also manifested a significant amount of bidding activity from new entrants. The Commission has collected data based on information voluntarily filed by auction participants utilizing FCC Form 175. Other information may be gleaned from cross-referencing other publicly available forms. *See Diversity Fourth FNPRM*, 24 FCC Rcd at 5910-11, ¶¶ 27-30.

[918] *Virginia*, 518 U.S. at 531-33; *Hibbs*, 538 U.S. 721 (applying intermediate scrutiny to gender-based classifications).

[919] *Metro Broad*, 497 U.S. at 567.

[920] 958 F.2d 382 (D.C. Cir. 1992). This policy was not before the Court in *Metro Broadcasting*. 497 U.S. at 558 n.7.

[921] *Lamprecht*, 958 F.2d at 395.

[922] *Id.* at 396-98. The study in question, Minority Broadcast Station Ownership and Broadcast Programming: Is There a Nexus?, was a Congressional Research Service ("CRS") report. The D.C. Circuit also noted that the CRS report was methodologically flawed in that it "does not define terms such as 'women's programming' (or 'minority programming,' for that matter), but rather, relied on the reporting stations to characterize themselves." *Lamprecht*, 958 F.2d at 397 n.8. The Supreme Court relied in part on the CRS report in *Metro Broadcasting*. 497 U.S. at 583 n.31.

[923] The only study included in the record of this proceeding that analyzes the relationship between female ownership and broadcast content is the Turner Radio Study, which finds that markets that contain radio stations with either female or minority ownership are more likely to broadcast certain progressive and conservative talk shows. *See* Turner Radio Study at 8, 48-55. This study does not appear to demonstrate a causal relationship between female or

(continued....)

### (ii) Constitutional Analysis of the Commission's Interest in Remedying Past Discrimination

302.    As an alternative to establishing a compelling interest in viewpoint diversity, race- or gender-based measures are permissible as a remedy to past or present discrimination.[924] To justify race-based remedial measures, the Commission would have to establish a "strong basis in evidence" of discrimination, *i.e.*, evidence "approaching a *prima facie* case of a constitutional or statutory violation."[925] To substantiate this approach, the Commission would have to identify, with specificity, evidence of public discrimination within the broadcast industry or private discrimination in which the government acted as a "passive participant."[926] Less evidence is required for gender-based measures, although an "exceedingly persuasive justification" is still necessary.[927] The Commission never has asserted a remedial interest in race- or gender-based broadcast regulation, and courts primarily have considered such measures in the context of public contracting decisions. Most commenters in this proceeding have not focused on establishing a case for remedial measures, although DCS argued that "remedying the present effects of past discrimination provides a compelling interest."[928] While some evidence supports a finding of discrimination in the broadcast industry, we tentatively conclude that it is not of sufficient weight to satisfy constitutional standards. We seek comment on the preliminary analysis described below, including any other relevant precedent or data we should consider.

303.    As the Commission concedes in this FNPRM, the proportions of minorities and females that own broadcast stations are lower than their proportions in the general population.[929] An inference of discrimination may arise "when there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors

(Continued from previous page) ———————————————————————

minority ownership and the diversity of viewpoints or content available, as it does not control for other factors that may explain both the presence of a greater diversity of talk shows and a higher percentage of female or minority ownership in certain markets. In any event, we tentatively conclude that this study is too limited in scope to establish a substantial relationship between female ownership and viewpoint diversity. Other studies in the record establish that female ownership of broadcast stations is well below the proportion of women in the population, a fact that is not in dispute in this proceeding. *See* Turner/Cooper TV Study at 14-20; Byerly Study at 30-34; *see also 2012 323 Report*, 27 FCC Rcd 13814. Because these studies do not indicate that increased female ownership will increase viewpoint diversity, we believe that they do not provide a rationale under the foregoing analysis for gender-based diversity measures.

[924] *Croson*, 488 U.S. at 522.

[925] *Id.* at 500.

[926] *Id.* at 492, 499, 504; *see also Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1167 (10th Cir. 2000), *cert. dismissed as improvidently granted*, 534 U.S. 103 (2001). Evidence of discrimination against a particular racial or ethnic group is required to justify measures concerning that group. *See Concrete Works of Colo., Inc. v. City and County of Denver*, 321 F.3d 950, 971 (10th Cir. 2003), *cert. denied*, 540 U.S. 1027 (2003) ("*Concrete Works II*"); *Adarand v. Slater*, 228 F.3d at 1176 n.18.

[927] *Virginia*, 518 U.S. at 530; *see also Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade County*, 122 F.3d 895, 909 (11th Cir. 1997) ("*ECA*"), *cert. denied*, 523 U.S. 1004 (1998). In particular, private discrimination need not be linked to governmental action under intermediate scrutiny. *See Concrete Works II*, 321 F.3d at 959-60 (citations omitted).

[928] DCS NPRM Comments at 4-13; DCS 323 Report Comments at 5-6. Additionally, Free Press asserted that, although the Commission cannot directly address the discrimination faced by women and minorities in the credit, equity, and financial markets, the agency can structure ownership regulations in a manner that lowers barriers to entry. *See* Free Press 323 Report Comments at 5, 9.

[929] *See also* DCS NPRM Comments at 7-8 (citing Sandoval Study and Turner/Cooper TV Study); Turner/Cooper TV Study at 14-20; Byerly Study at 30-34.

actually engaged."[930] But "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value."[931] Thus, the raw numbers reflecting existing levels of minority or female ownership by themselves are not sufficient to overcome the constitutional hurdle that has been established for race- and gender-based remedial measures.[932] In *Croson*, the Supreme Court warns against the "completely unrealistic assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population."[933] There is no evidence in the current record demonstrating a statistically significant disparity between the number of minority- and women-owned broadcast stations and the number of qualified minority and women-owned firms. Commenters are asked to address whether evidence of such a disparity is ascertainable, particularly given the low number of minority and women-owned firms. Based on relevant precedent, we tentatively conclude that we cannot demonstrate a compelling interest in remedying discrimination in the Commission's licensing process in the absence of such evidence. We seek comment on this tentative conclusion.

304.     Anecdotal or historical evidence of discrimination also can establish that a strong basis in evidence exists for remedial measures, although such evidence generally is helpful only when it reinforces statistical evidence.[934] DCS argued that a 2000 study comprising more than 100 interviews demonstrates that broadcast licensing procedures present challenges to minority and female access to spectrum and licenses.[935] In the Historical Study, minorities and women repeatedly report encountering discrimination in their efforts to obtain capital to finance their broadcast and wireless businesses, secure advertising on their stations, gain exposure and experience to qualify for ownership through employment opportunities, and learn of ownership opportunities.[936] The Historical Study reports no evidence, however, of actual discrimination by the Commission.

305.     DCS also argued that another 2000 study establishes that barriers inhibiting minority and female access to capital amount to industry discrimination in which the government has passively participated.[937] The Capital Markets Study found that both minority- and women-owned businesses were significantly less likely to obtain wireless licenses in auctions than were non-minority businesses and that

---

[930] *Croson*, 488 U.S. at 509.

[931] *See id.* at 501. Statistical evidence is often presented in the form of disparity indices comparing the availability and utilization of minority and women-owned firms on public contracts. *See ECA*, 122 F.3d at 914; *Concrete Works of Colo., Inc. v. Denver*, 36 F.3d 1513, 1523 n.10 (1994) ("*Concrete Works I*"). Generally, disparity indices of 80 percent or less are considered evidence of discrimination, but only far lower indices are considered dispositive evidence. *See ECA*, 122 F.3d at 914; *Concrete Works I*, 36 F.3d at 1526 (finding that disparity indices of .14 and .19 provide strong evidence of discrimination, and reviewing cases in other circuits finding that standard was met by disparity indices of .11, .22, and .04).

[932] *ECA*, 122 F.3d at 912 (concluding that "a strong basis in evidence can never arise from sheer speculation").

[933] *Croson,* 488 U.S. at 507.

[934] *Id.* at 509 (finding that "evidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend support to a local government's determination that broader remedial relief is justified"); *Adarand v. Slater*, 288 F.3d at 1166; *Concrete Works I*, 36 F.3d at 1530 (stating that anecdotal evidence "can bolster empirical data that gives rise to an inference of discrimination"); *see also Concrete Works II*, 321 F.3d at 960-62 (regarding historical evidence); *Concrete Works I*, 36 F.3d at 1524-25 (regarding historical evidence).

[935] DCS NPRM Comments at 13 (citing Ivy Planning Group LLC, Whose Spectrum Is it Anyway? Historical Study of Market Entry Barriers, Discrimination and Changes in Broadcast and Wireless Licensing, 1950 to Present 126-31 (2000) ("Historical Study")).

[936] Historical Study at 56-58; *see Adarand v. Slater*, 228 F.3d at 1168, 1171.

[937] DCS NPRM Comments at 8-13 (citing William D. Bradford, Discrimination in Capital Markets, Broadcast/Wireless Spectrum Service Providers and Auction Outcomes vi-vii (2000) ("Capital Markets Study")).

among current broadcast licensees, minority (but not female) applications for debt financing were significantly less likely to be approved than non-minority applications, and minority applicants paid higher interest rates.[938] The study also contains a literature survey of empirical studies using data over two decades, which is not specific to the broadcast industry, finding or suggesting that racial discrimination exists in U.S. capital markets in both denial rates and interest rates.[939] However, the study indicates that its results are not fully conclusive[940] and emphasizes the need for further analysis to control for potentially important variables.[941] Also, the focus on wireless auctions and other non-broadcast industry information makes it less probative of discrimination in the broadcast licensing process.[942] Further, the study does not address the secondary market for licenses.[943]

306. While the evidence offered is informative on these subjects, we preliminarily find that it is insufficient to satisfy the constitutional requirements to support a race- or gender-based remedial action. In this regard, comparison is instructive to *Adarand v. Slater*,[944] a leading public contracting case in which the Tenth Circuit found the requisite strong basis in evidence. The court found "significant" evidence of public discrimination in that case: the record contained 39 studies revealing an aggregate 13 percent disparity between minority business availability and utilization in government contracting, a figure which the court found to be "significant," if not overwhelming, evidence of discrimination.[945] Nevertheless, the court relied principally on evidence of private discrimination. The evidence was similar in nature to that discussed above — denial of access to capital, as well as the existence of racially exclusionary "old boy" networks and union discrimination that prevented access to the skills and experience needed to form a business — but greater in extent and weight. The court had the benefit of a Department of Justice report, prepared in response to the Supreme Court's decision in *Adarand*, summarizing 30 congressional hearings and numerous outside studies providing both statistical and anecdotal evidence of such private discrimination.[946] Here, in contrast, the only statistical evidence pertains to discriminatory access to capital. The rest of the evidence available at this time is anecdotal

---

[938] The Capital Markets Study examines survey data concerning the last acquisition from those who successfully obtained broadcast licenses through comparative hearings between 1970 and 1999. Capital Markets Study at 1, 9, 12-14.

[939] *Id.* at 3-7; *see also Adarand v. Slater*, 228 F.3d at 1169-70 (summarizing "striking" evidence in the area of race-based denial of access to capital).

[940] Capital Markets Study at ix ("Although this study indicates that minority- and women-owned firms are inappropriately disadvantaged in this line of business due to capital market forces, more research is needed to confirm and track these effects over time.").

[941] *See id.* (controlling for whether collateral and personal guarantees were required, but not for credit ratings due to deficiencies in the data collected.); *see also ECA*, 122 F.3d at 921-24 (discounting data that failed to control for relevant variable).

[942] *See Croson*, 488 U.S. at 498 (finding that factual predicate for race-based action was deficient where, among other things, government failed to make findings specific to the market to be addressed by the remedy).

[943] Other evidence cited by DCS included assertions that the nation suffers from a wealth disparity between white and certain minority populations, see DCS NPRM Comments at 9-10, and studies finding female and minority entrepreneurs lack access to capital for high tech ventures generally due to an "absence of 'excitement' around the 'human capital' they offer." *See* DCS NPRM Comments at 10-13.

[944] 228 F.3d at 1167.

[945] *Id.* at 1174.

[946] *See id.* at 1168 (citing Proposed Reforms to Affirmative Action in Federal Procurement, 61 Fed. Reg. 26,042, 26,050 App. (May 23, 1996) (The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey)).

and, therefore, of more limited value.[947]  Thus, it tentatively appears that the existing evidence of past discrimination in this case is not nearly as substantial as that accepted by courts in other contexts.[948]

### 3.     Additional Proposals Related to Minority and Female Ownership

307.     As explained above, we tentatively conclude that, if we reinstate the revenue-based eligible entity standard, it also would be appropriate to readopt each of the regulatory policies the Third Circuit remanded in *Prometheus II* that rely on this standard.  Several commenters asked the Commission to consider additional measures that they believed would foster ownership diversity.  For example, DCS submitted 47 proposals[949] that it claimed would "address the barriers to diverse participation in media ownership and . . . increase minority and women participation in broadcasting."[950]  Although DCS advocated adoption of all of these proposed measures, it focused on four that it believed the Commission "should immediately begin implementing."[951]  These recommendations include:  (1) relaxing the foreign ownership limitations under Section 310(b)(4) of the Communications Act; (2) encouraging Congress to reinstate and update tax certificate legislation; (3) granting waivers of the local radio ownership rule to parties that "incubate" qualified entities; and (4) migrating AM radio to VHF Channels 5 and 6.[952]  In addition, AWM asked the Commission to consider several actions to address the "historic underrepresentation of women" in ownership of broadcast stations and managerial positions in the broadcast industry.[953]

308.     As discussed below, the Commission has implemented some of these recommendations.  Because we believe that the remainder of these proposals would raise public interest concerns, may not provide meaningful assistance to the intended beneficiaries, or are outside of the proper scope of this broadcast ownership proceeding, we tentatively conclude that we should not adopt them here.  We seek comment on this tentative conclusion.

309.     *Foreign Ownership Restrictions*.  DCS recommended that the Commission relax its policies under Section 310(b)(4) of the Communications Act, which restricts foreign ownership and voting interests in entities that control Commission licensees.[954]  DCS claimed that this action would provide "U.S. broadcasters, particularly minorities, who have difficulty access[ing] capital" with "access

---

[947] *See, e.g.*, *Croson*, 488 U.S. at 509 ("[E]vidence of a pattern of individual discriminatory acts can, *if supported by appropriate statistical proof*, lend support to a local government's determination that broader remedial relief is justified.") (emphasis added).

[948] We note that narrow tailoring requirements for race-conscious remedial measures are similar to those applied to diversity-based measures, although there are important differences.  The individualized review requirement remains, for example, but is less exacting.  Rather than consider a wide range of potential diversity contributions, the government need only "tailor remedial relief to those who truly have suffered from the effects of prior discrimination." *Id.* at 508.

[949] *See generally* DCS NPRM Comments; DCS Supplemental NPRM Comments.  As reflected in DCS's filings in this proceeding, many of these proposals initially were submitted in other dockets and are therefore a part of the record in a wide range of proceedings. *See, e.g.*, DCS Supplemental NPRM Comments at 4, 7 n.20, 11 n.37, 13.

[950] DCS Supplemental NPRM Comments at 1.

[951] DCS 323 Report Comments at 7; *see also* DCS Supplemental NPRM Comments at 4-7 (Proposal 1:  Minority Ownership Incubation Proposal); *id.* at 7-10 (Proposal 2:  Relax Broadcast Foreign Ownership Restrictions); *id.* at 10-11 (Proposal 3:  Reinstate and Expand the Tax Certificate Policy); *id.* at 11-12 (Proposal 4:  Migrate Most AM Service to VHF Channels 5 and 6).

[952] DCS 323 Report Comments at 7.

[953] *See* AWM NPRM Comments at 5-7.

[954] *See* DCS Supplemental NPRM Comments at 7-10 (Proposal 2:  Relax Broadcast Foreign Ownership Restrictions); 47 U.S.C. § 310(b)(4).

to new sources of capital that are not available to them under the current regulatory paradigm."[955] Additionally, in a separate proceeding a broad coalition of broadcasters, public interest groups, and media brokers (Coalition for Broadcast Investment or "CBI") sought clarification of the Commission's policies and procedures in reviewing applications or transactions that propose foreign broadcast ownership that would exceed the 25 percent benchmark contained in Section 310(b)(4).[956] The Media Bureau issued a public notice inviting comment on the CBI Request.[957] The majority of comments filed in response to the public notice supported CBI's position.[958]

    310.    In November 2013, the Commission issued a *Declaratory Ruling* clarifying that the plain language of Section 310(b)(4) provides the Commission the authority to review applications for approval of foreign investment in the controlling U.S. parent of a broadcast licensee above the 25 percent benchmark on a case-by-case basis.[959] The Commission stated that such applications may be granted unless it finds that a denial will serve the public interest.[960] In issuing the *Declaratory Ruling*, the Commission observed the range of changes in the media landscape and marketplace since enactment of the foreign ownership restriction and noted that limited access to capital is a concern in the broadcast industry, particularly for small entities, including entities owned by minorities and women. The Commission further noted that a clear articulation of its "approach to Section 310(b)(4) in the broadcast context has the potential to spur new and increased opportunities for capitalization for broadcasters, and particularly for minority, female, small business entities, and new entrants."[961]

    311.    *Tax Certificate Legislation.* DCS also urged the Commission to "continue to support and encourage Congress to reinstate and expand" the former tax certificate policy, which permitted firms to defer capital gains taxation on the sale of media properties to minorities.[962] DCS claimed that "[t]ax

---

[955] DCS Supplemental NPRM Comments at 10.

[956] Letter from Mace Rosenstein and Gerard J. Waldron, Counsel for the Coalition for Broadcast Investment, to Marlene H. Dortch, Secretary, FCC (Aug. 31, 2012) ("CBI Request"). Commenters in this proceeding also supported increased foreign investment in domestic broadcast licensees. *See* Tribune NPRM Reply at 41-42; Bonneville/Scranton 323 Report Reply at 13; *see also* NAB 323 Report Reply at 3 (citing CBI Request).

[957] *Media Bureau Announces Filing of Request for Clarification of the Commission Policies and Procedures Under 47 U.S.C. §310(b)(4) by the Coalition for Broadcast Investment*, MB Docket No. 13-50, Public Notice, 28 FCC Rcd 1469 (MB 2013).

[958] DCS filed comments in MB Docket 13-50, stating that the Commission should relax its foreign ownership policies pursuant to section 310(b)(4) to provide new funding options for minority broadcast entrepreneurs and give all U.S. broadcasters the opportunity to increase their investments in foreign broadcast outlets. Additionally, Minority Media and Telecommunications Council filed comments on behalf of Thirty-one Civil Rights Organizations that supported CBI's request as a means to create reciprocal opportunities for American broadcasters to expand their footprint into foreign media markets, which are available at http://apps.fcc.gov/ecfs/document/view?id=7022281769.

[959] *Commission Policies and Procedures Under Section 310(b)(4) of the Communications Act, Foreign Investment in Broadcast Licensees*, MB Docket No. 13-50, Declaratory Ruling, 28 FCC Rcd 16244 (2013) ("*Declaratory Ruling*"). The Commission stated that, to the extent its past practice may have been interpreted as precluding case-by-case review of applications involving foreign investment in the controlling U.S. parents of broadcast licensees, the declaratory ruling is intended to clarify that the contrary is true. *Id.* at 16249-50, ¶ 11.

[960] *Id.* at 16249, ¶ 10.

[961] *Id.* As it has done in its review of the foreign ownership of common carrier applicants and licensees, the Commission indicated that it will continue to afford appropriate deference to the expertise of the Executive Branch agencies on issues related to national security, law enforcement, foreign policy, and trade policy. *Id.* at 16251, ¶ 14. Additionally, the Commission affirmed that the controlling parent companies of licensees may not exceed the statutory benchmark without prior Commission approval. *Id.* at 16251, ¶¶ 13-14.

[962] DCS 323 Report Comments at 11; *see also* DCS Supplemental NPRM Comments at 10 (Proposal 3: Reinstate and Expand the Tax Certificate Policy).

incentive policies have been the most effective measures to increase broadcast diversity."[963] It also suggested that an updated tax certificate policy could address previous congressional concerns if it were race-neutral, encompassed both media and telecommunications entities, and included limits on the size of eligible transactions and programs.[964] Several other parties likewise supported tax certificate legislation as a means to advance ownership diversity among minorities and women.[965] Media General stated that "passage of such legislation would effectively promote diversity in an efficient and expeditious manner" and that "[d]eferral of capital gains taxes would provide significant economic incentives to existing station owners to sell their stations to socially and economically disadvantaged businesses."[966] On the other hand, UCC *et al.* cautioned that the Commission has not conducted studies and analyses sufficient to justify congressional action focused on race and ethnic origin in creating new tax certificate legislation.[967] We agree that tax deferral legislation could prove an effective means to enhance broadcast ownership diversity. The Commission's most recent Section 257 Report to Congress addresses the benefits of tax certificate legislation to ownership diversity and includes a recommendation that Congress pass such legislation.[968]

312. *Incubation.* DCS requested that the Commission provide waivers of the local radio ownership rule to broadcasters that finance or incubate an SDB or a "valid eligible entity."[969] Specifically, DCS proposed that an entity that engages in a specified list of "qualifying incubating activities" be granted, under certain conditions, a waiver of the local radio ownership cap "by one station per incubating activity."[970] Several commenters expressed their support for this proposal.[971] For example, Bonneville/Scranton believed the Commission should "[a]dopt an incubator program to encourage existing broadcasters to financially assist new entrants."[972] They suggested that the Commission "review the options for defining those eligible to benefit from incubation as well as the types of support existing

---

[963] DCS Supplemental NPRM Comments at 10.

[964] DCS 323 Report Comments at 12.

[965] NAB 323 Report Reply at 2-3; NAMB 323 Report Comments at 7; Bahakel Communications 323 Report Comments at 1-2; Media General 323 Report Comments at 2; NAA 323 Report Comments at 10; Bonneville/Scranton 323 Report Reply at 14; Tribune NPRM Reply at 41-42.

[966] Media General 323 Report Comments at 2.

[967] UCC *et al.* 323 Report Reply at 5-8 (noting that race- or gender-targeted congressional action would need to comply with strict scrutiny and that the Commission, as the expert agency, should provide the data and analysis required to justify any new tax certificate legislation that specifically would be designed to assist minorities).

[968] *See Section 257 Report*, 26 FCC Rcd at 2965-66, ¶ 155; *see also* 47 U.S.C. § 257(c). Specifically, as part of its 2011 *Section 257 Report*, the Commission proposed a new tax incentive program to spur ownership diversity among small businesses, including those owned by women and minorities. *Section 257 Report*, 26 FCC Rcd at 2965-66, ¶ 155. Such a program, the Commission indicated, could permit deferral of the taxes on any capital gain involved in the sale of communications businesses to small firms, as long as that gain is reinvested in one or more qualifying communications businesses. *Id.* Such a program also could permit tax credits for sellers of communications properties who offer financing to small firms. *Id.*

[969] DCS Supplemental NPRM Comments at 3; *see id.* at 4-7 (Proposal 1: Minority Ownership Incubation Proposal).

[970] *Id.* at 5.

[971] *See* Letter from Rosemary C. Harold, Wilkinson Barker Knauer, LLP, Counsel, Bonneville International Corporation and The Scranton Times, L.P., to Marlene H. Dortch, Secretary, FCC, at 2 (Oct. 22, 2012) ("Bonneville/Scranton Oct. 22, 2012 *Ex Parte* Letter"); NAA NPRM Reply at 3-4; Tribune NPRM Reply at 41-42; NAB NPRM Reply at 32; Clear Channel NOI Comments at 48-49; NAB 323 Report Reply at 2-3; NAMB 323 Report Comments at 7; Bonneville/Scranton 323 Report Reply at 13-14.

[972] Bonneville/Scranton 323 Report Reply at 13.

broadcasters would have to provide . . . and the appropriate incentives for offering that support."[973] Other commenters expressed concern that adoption of such incubation policies could increase concentration and harm viewpoint diversity. For example, Free Press claimed that DCS's incubation proposal would "create a loophole" in the Commission's ownership rules that would permit increased concentration and could result in a net decrease in minority and female ownership.[974] Similarly, Mt. Wilson claimed that the incubation proposals fail to account for the adverse impact of group ownership on independent radio owners, including minority and female owners.[975]

313. The Commission shares concerns that proposals like DCS's incubation proposal that would allow blanket waivers of the local radio ownership rule could create a substantial loophole to our ownership caps without sufficient offsetting benefits. The Commission's local radio rules have been carefully calibrated to protect competition and new entry. By allowing broadcasters to exceed these caps, DCS's proposal could result in more local radio consolidation than is presently permitted under our rules. Moreover, it is unclear based on the record in this proceeding what kind of entities should be eligible to benefit from incubation. Bonneville/Scranton suggested that the guidelines for determining entities that would be eligible to be incubated could be based on the diversity channel set-aside requirement adopted by the Commission as a condition to the approval of the merger of XM and Sirius.[976] In that decision, the Commission ordered the combined new satellite radio entity to set aside channels to encourage new market entry, enhance viewpoint diversity, and promote the delivery of programming content to underserved audiences.[977] Bonneville/Scranton suggested that a voluntary broadcast incubation program modeled on this condition could permit a currently licensed broadcaster to select a "New Voice" to incubate based on certain minimal Commission requirements and general selection considerations, such as small business size and independence from the broadcaster.[978] NABOB cautioned, however, that "[a]ny policies the Commission adopts which do not have the effect of making it desirable for industry insiders to seek out minorities for broadcast ownership opportunities will be ineffective in increasing minority ownership."[979] We are concerned that implementation of such proposals would pose substantial legal, administrative, and practical challenges. To the extent that the program were limited to SDBs, it would pose the Equal Protection concerns described in detail above. If it were instead extended in the manner suggested by Bonneville/Scranton, it would be difficult for the Commission to administer as a broad-based program and could potentially open a wide loophole in our ownership rules, while possibly having little or no significant effect on minority and female ownership.

314. In addition, we are concerned that it would not be feasible for the Commission to monitor adequately the activities that would qualify an entity for an incubation waiver. As proposed by DCS, qualifying activities would encompass a broad array of arrangements, including, among others, underwriting or financing the operations of eligible entities, providing loans or other financial assistance to eligible entities, and local marketing arrangements between independent programmers and commercial

---

[973] *Id.*

[974] *See* Free Press NPRM Reply at 51-53.

[975] *See* Mt. Wilson NPRM Reply at 9.

[976] Bonneville/Scranton 323 Report Reply at 13 (citing *Applications for Consent to the Transfer of Control of Licenses XM Satellite Radio Holdings Inc., Transferor, to Sirius Satellite Radio Inc., Transferee*, MB Docket No. 07-57, Memorandum Opinion and Order, 25 FCC Rcd 14779 (2010) ("*XM/Sirius Set-Aside Order*")).

[977] *See generally XM/Sirius Set-Aside Order*, 25 FCC Rcd 14779.

[978] *See* Bonneville/Scranton 323 Report Reply at 13-14.

[979] NABOB 323 Report Comments at 5. NABOB noted that it "previously supported" an incubator proposal and would support such a proposal if it is "connected to a definition of eligible entity that could meaningfully promote minority ownership." *Id.* at 5 n.13.

broadcasters.[980] Given the challenges of monitoring over time the types of complex financing and other arrangements suggested under DCS's incubation proposal, there is a substantial risk that the Commission would not be able to ensure that such arrangements would be, or prospectively would remain, beneficial to eligible entities or other intended beneficiaries. Accordingly, we tentatively decline to adopt this proposal in this proceeding.

315.     *Migration of VHF Channels 5 and 6.* In addition, DCS recommended that the Commission migrate most AM service to VHF channels 5 and 6.[981] Aside from DCS, it does not appear that any party to this proceeding has supported this proposal.[982] We tentatively conclude that this proposal, which would involve extensive changes to the Commission's current licensing rules and spectrum policies, exceeds the proper scope of this broadcast ownership proceeding. Moreover, we note that Congress has directed the Commission to conduct an incentive auction of television broadcast spectrum and to reassign the remaining broadcast channels in order to make more spectrum available for wireless use.[983] Migrating AM services to VHF channels 5 and 6 has the potential to interfere with the Commission's implementation of Congress's directive.

316.     *Additional DCS Proposals.* Many of DCS's remaining proposals recommend changes to a wide range of Commission licensing, service, and engineering rules and policies.[984] Several of these recommendations propose modifications to the AM broadcast service.[985] The Commission recently adopted a notice of proposed rulemaking which seeks to revitalize the AM band by identifying ways to enhance AM broadcast quality and proposing technical rules that would enable AM stations to improve their service.[986] The *AM Revitalization NPRM* solicits comment on some of the technical issues DCS has raised in this proceeding, including modification of: (1) daytime community coverage standard for existing AM stations; (2) nighttime community coverage standards for existing AM stations; and (3) AM antenna efficiency standards. We anticipate that the *AM Revitalization NPRM* will lead to an examination

[980] *See* DCS Supplemental NPRM Comments at 6.

[981] *See* DCS Supplemental NPRM Comments at 11 (Proposal 4: Migrate Most AM Service to Channels 5 and 6); DCS 323 Report Comments at 10-11.

[982] *See generally* DCS 323 Report Reply.

[983] *See Incentive Auctions NPRM*, 27 FCC Rcd at 12385, ¶¶ 84-85 (noting statutory language making it an option for a television licensee to participate in the incentive auction by bidding to relinquish its UHF channel in exchange for reassignment to a VHF channel, including channels 5 and 6).

[984] *See* DCS Supplemental NPRM Comments at 17 (Proposal 8: Issue a One-Year Waiver, on a Case-by-Case Basis, of Application Fees for Small Businesses and Nonprofits), 24 (Proposal 12: Bifurcate Channels for Share-Times with SDBs), 28 (Proposal 14: Use the Time-Share Rule to Allow Broadcasters to Share Frequencies to Foster Ownership of DTV and FM Subchannels), 34 (Proposal 15: Retention On Air of AM Expanded Band Owners' Stations if One of the Stations Is Sold to an SDB), 36 (Proposal 16: Relax the Main Studio Rule), 38 (Proposal 17: Clarify that Eligible Entities Can Obtain 18 Months to Construct Major Modifications of Authorized Facilities), 42 (Proposal 18: Extend the Three-Year Period for New Stations Construction Permits for Eligible Entities and SDBs), 44 (Proposal 19: Create Medium-Powered FM Stations), 42 (Extend the Three-Year Period for New Station Construction Permits for Eligible Entities and SDBs), 45 (Proposal 20: Authorize Interference Agreements), 47 (Proposal 21: Harmonize Regional Interference Protection Standards; Allow FM Applicants to Specify Class C, C0, C1, C2 and C3 Facilities in Zones I and IA), 48 (Proposal 22: Relax the Limit of Four Contingent Applications), 61 (Proposal 26: Create a New Local "L" Class of LPFM Stations), 63 (Proposal 28: Redefine Community of License as a "Market" for Section 307 Purposes), 76 (Proposal 38: Remove Non-Viable FM Allotments).

[985] *Id.* at 52 (Proposal 23: Request the Removal of AM Nighttime Coverage Rules from Section 73.21(i)); 56 (Proposal 24: Relax Principal Community Coverage Rules for Commercial Stations); 58 (Proposal 25: Replace "Minimum Efficiency" Standard for AM Stations with a "Minimum Radiation" Standard).

[986] *See generally AM Revitalization NPRM*, 28 FCC Rcd 15221. Comments were due by January 21, 2014; reply comments were due by February 18, 2014.

**Federal Communications Commission** **FCC 14-28**

of important issues regarding the viability of AM broadcast service, and thus, address many of the concerns of minority broadcasters regarding the technical aspects of their licensed services.

317.　Some of DCS's proposals extend into areas that are beyond the Commission's authority, including proposals that ultimately would require legislative action or action by other federal entities aside from the Commission in order to create changes in rules or policies.[987] Other proposals involve cable operators and other non-broadcast services that are outside the scope of our quadrennial review proceedings.[988] Although these proposals are accompanied by detailed and thoughtful analysis, and some of them may warrant further consideration, we believe that they are outside the scope of this proceeding.[989] Thus, we do not anticipate taking further action within this or successive quadrennial review dockets on these proposals because they extend beyond our statutory mandate under Section 202(h).

318.　*AWM Proposals.* AWM's proposals include (1) preparing a primer on investment in broadcast ownership for smaller and regional lenders willing to provide loans to new broadcast entrants;[990] (2) preparing a primer for new entrants that provides guidance on how to find financing;[991] (3) establishing a link on the Commission's website to provide information on stations that may be available

---

[987] *See* DCS Supplemental NPRM Comments at 78 (Proposal 39: Study the Feasibility of a New Radio Agreement With Cuba), 81 (Proposal 41: Legislative Recommendation to Expand the Telecommunications Development Fund (TDF) Under Section 614 and Finance TDF with Auction Proceeds), 83 (Proposal 42: Legislative Recommendation to Amend Section 257 to Require the Commission to Annually Review and Remove or Affirmatively Prohibit Known Market Entry Barriers), 85 (Proposal 43: Legislative Recommendation to Clarify Section 307(b) to Provide that Rules Adopted to Promote Localism are Presumed to be Invalid if They Significantly Inhibit Diversity), 87 (Proposal 44: Legislative Recommendation to Amend the FTC Act (15 U.S.C. §§ 41-58) to Prohibit Racial Discrimination in Advertising Placement Terms and Advertising Sales Agreements), 89 (Proposal 45: Legislative Recommendation to Amend Section 614 to Increase Access to Capital by Creating a Small and Minority Communications Loan Guarantee Program), 90 (Proposal 46: Legislative Recommendation to Amend Section 614 to Create an Entity to Purchase Loans Made to Minority and Small Businesses in the Secondary Market), 90 (Proposal 47: Legislative Recommendation to Provide a Tax Credit for Companies that Donate Broadcast Stations to an Institution Whose Mission is or Includes Training Minorities and Women in Broadcasting).

[988] *See, e.g., id.* at 71 (Proposal 34: Must-Carry for Certain Class A Stations).

[989] In addition to those noted above, we find that other DCS proposals are beyond the proper scope of this quadrennial review proceeding. *See id.* at 13 (Proposal 5: Examine How to Promote Minority Ownership as an Integral Part of All FCC General Media Rulemaking Proceedings), 14 (Proposal 6: Designate a Commissioner to Oversee Access to Capital and Funding Acquisition Recommendations), 15 (Proposal 7: Create a Media and Telecom Public Engineer Position to Assist Small Businesses and Nonprofits with Routine Engineering Matters), 18 (Proposal 9: Grant Eligible Entities a Rebuttable Presumption of Eligibility for Waivers, Reductions, or Deferrals of Commission Fees), 21 (Proposal 10: Extend the Cable Procurement Rule to Broadcasting), 62 (Proposal 27: Collect, Study and Report on Minority and Women Participation in Each Step for the Broadcast Auction Process), 65 (Proposal 29: Increase Broadcast Auction Discounts to New Entrants), 66 (Proposal 30: Require Minimum Opening Bid Deposits on Each Allotment for Bidders Bidding for an Excessive Proportion of Available Allotments), 67 (Proposal 31: Only Allow Subsequent Bids to Be Made Within No More than Six Rounds Following the Initial Bid), 68 (Proposal 32: Require Bidders to Specify an Intention to Bid Only on Channels With a Total Minimum Bid of Four Times Their Deposits), 69 (Proposal 33: Mathematical Touchstones: Tipping Points for the Non-Viability of Independently Owned Radio Stations in a Consolidating Market and Quantifying Source Diversity), 72 (Proposal 35: Conduct Tutorials on Radio Engineering Rules at Headquarters and Annual Conferences), 74 (Proposal 36: Develop an Online Resource Directory to Enhance Recruitment, Career Advancement, and Diversity Efforts), 75 (Proposal 37: Engage Economists to Develop a Model for Market-Based Tradable Diversity Credits as an Alternative to Voice Tests), 80 (Proposal 40: Create a New Civil Rights Branch of the Enforcement Bureau).

[990] AWM NPRM Comments at 6.

[991] *Id.*

for sale to small businesses; and (4) allowing sellers to hold a reversionary interest in a Commission license in certain circumstances.[992] Although several parties broadly stated that they support some of these proposals, there is little record on these subjects in the current proceeding.[993] While we agree that primers on investment and financing could be useful to new entrants, we note that OCBO already engages in activities that provide similar resources to broadcasters and potential investors, including the regularly scheduled Capitalization Strategies Workshops noted above and in the *NPRM*.[994] We also believe that specific advice about investment and financing is more appropriately provided by private parties that are directly involved in the financial marketplace than by the Commission.

319.    In response to AWM's proposal that the Commission create a public listing of stations that may be available for sale to small businesses, we note that the Commission currently does not have at its disposal the information that would be necessary to create such a resource. In addition, we believe that many licensees would object to any requirement that would obligate them to make publicly available information regarding their plans to sell specific stations. Finally, we tentatively find that AWM's proposal to allow sellers to hold a reversionary interest in broadcast licensees as a means of financing sales of broadcast stations to women and minorities does not address the Commission's historical concerns about reversionary interests and is insufficiently developed to support departure from the Commission's longstanding policy against the holding of such interests.[995] At this time, therefore, we do not believe there is sufficient justification to adopt these proposed measures.

## V.    DISCLOSURE OF SHARED SERVICE AGREEMENTS

### A.    Introduction

320.·    In this FNPRM, we consider whether to require broadcast stations to disclose agreements for sharing services and/or resources with other broadcast stations that are not commonly owned, as discussed in greater detail below, to the extent that such agreements are not already separately defined and required to be filed and/or disclosed under our rules (*e.g.*, LMAs and JSAs).[996] Commenters in a number of proceedings have expressed concern about the impact on competition, localism, and diversity of agreements whereby one station shares studio space, operational support, staff, programming, and/or other services or support with a separately owned station. Often these sharing agreements are executed in conjunction with an option, right of first refusal, put/call arrangement, or other similar contingent interest, or a loan guarantee.[997] Because the Commission does not currently require the filing or disclosure of all

---

[992] *Id.*

[993] *See* NAB NPRM Comments at 54; NAB NPRM Reply at 32-33; Tribune NPRM Reply at 41-45. Bonneville/Scranton similarly supported initiatives to educate small, regional banks about investing in broadcasting and Commission sponsorship of engineering, financing, and legal tutorials for new broadcast entrants. *See* Bonneville/Scranton 323 Report Reply at 13-14.

[994] *See supra* note 733; *NPRM*, 26 FCC Rcd at 17546, ¶ 149.

[995] *See* 47 C.F.R. § 73.1150(a); *Facilitating the Provision of Spectrum-Based Services to Rural Areas and Promoting Opportunities for Rural Telephone Companies to Provide Spectrum-Based Services*, WT Docket No. 02-381, Report and Order and Further Notice of Proposed Rulemaking, 19 FCC Rcd 19078, 19108, ¶ 54 (2004); *Radio KDAN, Inc.*, Memorandum Opinion and Order, 11 FCC 2d 934 (1968).

[996] In formulating the proposals set forth in this FNPRM regarding SSAs, we have relied on relevant comments from the various Commission proceedings noted herein in which these issues have been raised and discussed.

[997] These contingent interest agreements are filed with the Commission as part of assignments/transfers of control of station licenses, and some contingent interest agreements are filed with the Commission outside the transaction context pursuant to section 73.3613 of the Commission's rules. *See* 47 C.F.R. § 73.3613(b)(iii). As discussed below, of the 22 transactions involving television JSAs reviewed by Commission staff in 2012 and 2013, all 22 transaction involved the sharing of other resources in addition to the joint sale of advertising time and 20 of those transactions included some type of contingent interest agreement. *See infra* notes 1041, 1047.

such agreements, the Commission and the public lack information about the content or breadth of the agreements or the frequency of their use, inhibiting a thorough analysis of the impact of these arrangements on our rules and policy goals. Accordingly, in order to enable the Commission and the public to better understand the terms, operation, and prevalence of these agreements, we propose today to define a class of sharing agreements that could impact our rules and policy goals and to require the disclosure of those agreements to enable a comprehensive assessment of their impact. Specifically, in this FNPRM we propose to define a category of sharing agreements designated herein as Shared Service Agreements ("SSAs"), we propose to require the disclosure of SSAs by commercial television stations, and we seek comment on the appropriate method for achieving such disclosure.[998]  Once disclosure is achieved, the Commission will be able to study these agreements and to determine what further regulatory action, if any, it should take with respect to them.

### B.    Background

321.    In the *Enhanced Disclosure FNPRM*, the Commission sought comment on whether to require the disclosure of sharing agreements that were not already defined and required to be disclosed under the Commission's rules (as are, for example, LMAs and JSAs), and whether to require stations to include such agreements in their online public files.[999]  Commercial television stations (full-power and Class A) are required under section 73.3526 of the Commission's rules to maintain a local public inspection file, the contents of which include, *inter alia*, the station's current authorization, citizen agreements, issues/programs lists, radio and television LMAs, and radio and television JSAs.[1000] Historically, the file was located at the station's main studio; however, in the Enhanced Disclosure proceeding, among other actions, the Commission modified section 73.3526 for commercial television stations to require that most of the contents of the public file (*e.g.*, LMAs and JSAs) be included in an online public file hosted by the Commission.[1001]  In the *Enhanced Disclosure Second R&O*, the Commission declined to adopt any new disclosure requirements for sharing agreements but indicated that it would continue to monitor the issue and revisit the disclosure requirement in the future.[1002]

322.    Concurrent with the pendency of the Enhanced Disclosure proceeding, the Commission sought comment in the *NPRM* about various types of sharing agreements, noting that commenters to the *NOI* had specifically identified sharing agreements and a subcategory of agreements, local news sharing ("LNS") agreements, as matters of concern, but acknowledging that these terms were not defined in Commission rules.[1003]  The *NPRM* invited views on the potential impact of such agreements on the

---

[998] While considering whether to require the filing of SSAs and how the term SSA should be defined for this purpose in order to obtain information that will inform our decision about what, if any, general rules might be appropriate with respect to such agreements, we will, of course, continue to consider such joint agreements, as relevant and appropriate, in deciding whether particular individual transactions serve the public interest.  *See, e.g.*, *Applications for Consent to Transfer of Control from Shareholders of Belo Corp. to Gannett Co., Inc.*, Memorandum, Opinion & Order, 28 FCC Rcd 16867, 16879, ¶ 30 n.88 (Med. Bur. 2013) (citing *Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, MM Docket No. 94-150, Report and Order, 14 FCC Rcd 12559, 12581, ¶ 44 (1999) ("*1999 Attribution Order*")) ("*Belo/Gannett*").

[999] *Standardized and Enhanced Disclosure Requirements for Television Broadcast Licensee Public Interest Obligations*, MB Docket No. 00-168, Order on Reconsideration and Further Notice of Proposed Rulemaking, 26 FCC Rcd 15788, 15805-06, ¶ 35 (2011).

[1000] *See* 47 C.F.R. § 73.3526(e).

[1001] *See generally Standardized and Enhanced Disclosure Requirements for Television Broadcast Licensee Public Interest Obligations*, MB Docket No. 00-168, Second Report and Order, 27 FCC Rcd 4535 (2012) ("*Enhanced Disclosure Second R&O*").

[1002] *Id.* at 4575, ¶ 84.

[1003] *NPRM*, 26 FCC Rcd at 17564-70, ¶¶ 194-208.

Commission's ownership rules and fundamental policy goals.[1004] It identified potential concerns about such agreements and potential benefits and invited submissions of further information about how to define such agreements and comment on whether they should be attributed or disclosed.[1005]

323. The response from commenters to the *NPRM* was mixed. Public interest and MVPD commenters contended that sharing agreements are not in the public interest, and they asserted that such agreements could be used to circumvent the local television ownership rule.[1006] For example, public interest commenters asserted that resource sharing pursuant to these agreements often results in significant job losses and the elimination of independent news sources.[1007] MVPD commenters asserted that sharing agreements that permit stations to jointly negotiate retransmission consent harm competition.[1008]

324. By contrast, broadcasters opposed the disclosure or attribution of sharing agreements. Broadcasters asserted that sharing agreements generally cover "back office" functions (such as payroll, accounting, or other administrative tasks) and do not provide the ability to influence or control a station's core operating functions.[1009] According to broadcasters, sharing agreements are a necessary and valuable tool for a station's survival — particularly in small and mid-sized markets — that enable stations to sustain labor-intensive local journalism, thereby offering more communities access to more local news content than could otherwise be achieved.[1010] They contended that sharing agreements preserve both diversity and localism and do not result in the "outsourcing" of local news content.[1011] In addition, broadcasters asserted that the public interest commenters' argument that sharing agreements lead to reductions in staff and news quality was based on the faulty assumption that each local station would

---

[1004] *Id.* at 17569, ¶ 204.

[1005] *Id.* at 17569, ¶ 205. The purpose of the broadcast attribution rules are discussed in paragraph 343, *infra*.

[1006] *See* ACA NPRM Comments at 25; AFTRA NPRM Comments at 4-9; CWA NPRM Comments at 6; Free Press NPRM Comments at 52-56; Free Press NPRM Reply at 27-35; ITTA NPRM Comments at 3 ("broadcasters that enter into sharing arrangements to combine station operations essentially agree not to compete with each other"); NHMC *et al.* NPRM Comments at 9 (stating that sharing agreements not only hurt diversity but can result in the broader dissemination of inappropriate or hateful speech); TWC NPRM Comments at 5; TWC NPRM Reply at 9; UCC *et al.* NPRM Comments at 4-8; UCC *et al.* NPRM Reply at 4-6.

[1007] *See, e.g.*, AFTRA NPRM Comments at 4-7; CWA NPRM Comments at 5-6; Free Press NPRM Comments at 52-56; UCC *et al.* NPRM Comments at 4-8.

[1008] *See, e.g.*, Mediacom/Suddenlink NPRM Comments at 22-23. The permissibility of agreements among stations that cannot be jointly owned to negotiate retransmission consent jointly is an issue in our retransmission consent rulemaking. *See Amendment of the Commission's Rules Related to Retransmission Consent*, MB Docket No. 10-71, Notice of Proposed Rulemaking, 26 FCC Rcd 2718, 2731-32, ¶ 23 (2011).

[1009] *See* NAB NPRM Comments at 67-68; NAB NPRM Reply at 38-40; NBCUniversal Media, LLC and NBC Owned Television Stations ("NBCU") NPRM Reply at 5; Nexstar NPRM Reply at 14-17; Small Market Coalition NPRM Reply at 18; Tribune NPRM Reply at 36-38.

[1010] *See* ARSO NPRM Comments at 6; CBS Corp. NPRM Comments at 15-16; Coalition to Preserve Local TV Broadcasting ("Local TV Coalition") NPRM Comments at 3-15; Cordillera NPRM Reply at 2; Cox NPRM Comments at 17-18; Fox NPRM Comments at 31; Grant Group NPRM Comments at 14-15; Gray NPRM Comments at 9-11; New Vision/TTBG NPRM Comments at 9-13; LIN NPRM Comments at 8-15; Mission NPRM Reply at 5-6; NAB NPRM Comments at 58-60; NAB NPRM Reply at 34-41; Nexstar NPRM Comments at 29-31; Small Market Coalition NPRM Reply at 9-11, 15-16; Tribune NPRM Comments at 73-74; Tribune NPRM Reply at 36-41.

[1011] ARSO NPRM Comments at 6; Cox NPRM Comments at 17; Entravision NPRM Comments at 12-14; Fox NPRM Comments at 31; Grant Group NPRM Comments at 14-15; Gray NPRM Comments at 10-11; Local TV Coalition NPRM Comments at 3, 9-11; NAB NPRM Comments at 58-59; Nexstar NPRM Comments at 29; Tribune NPRM Comments at 73.

employ a full news department but for sharing agreements; to the contrary, broadcasters asserted, in small and mid-sized markets many stations would not have the resources to retain an independent news department.[1012]

325.    In addition, many broadcasters disputed the public interest commenters' characterization of LNS agreements and asserted that LNS agreements are similar to press pools.[1013]  According to broadcasters, an LNS team typically consists of a few employees of each station who remain employees of their respective stations while assigned to the LNS team and use their station-owned vehicles and equipment when covering an event for the LNS.[1014]  Broadcasters stated that such an LNS team provides raw video footage to the participating stations, and it is up to each station to determine whether, and if so how, to incorporate the footage into its newscast.[1015]  In addition, according to Fox, participating stations can, and often do, send additional resources to events already covered by the LNS team in order to provide an alternate perspective on the event.[1016]  Moreover, the services provided pursuant to an LNS agreement are, according to broadcasters, generally in-kind, often with no money being exchanged between the stations.[1017]  Broadcast commenters asserted that each station retains its editorial discretion and does not cede any control over its core operating functions to any other station participating in the LNS; therefore, according to these broadcasters, LNS agreements do not possess the characteristics that typically lead the Commission to make an arrangement attributable.[1018]

326.    UCC *et al.* countered that LNS agreements are not similar to traditional video pools, as broadcasters claimed, as traditional pools were designed to accommodate a lack of physical access or space constraints.[1019]  According to UCC *et al.*, LNS agreements provide coverage for events that do not have such limitations, which increasingly include breaking news events.[1020]  In addition, UCC *et al.* claimed that LNS agreements do result in some influence over a station's editorial content, as the managing editor of the LNS team makes decisions regarding which events to cover, and they asserted that stations do not have an economic incentive to send additional staff to an LNS-covered event, even though stations theoretically retain the freedom to do so.[1021]  Despite their belief that LNS agreements reduce competition and diversity and harm stations' newsgathering abilities,[1022] UCC *et al.* did not believe that such agreements confer the same amount of influence over a station's core operating functions as other

---

[1012] *See, e.g.*, Local TV Coalition NPRM Comments at 14.

[1013] Fox NPRM Comments at 31-34; Fox NPRM Reply at 6; NAB NPRM Reply at 39; NBCU NPRM Reply at 2; Tribune NPRM Comments at 74; Tribune NPRM Reply at 37.

[1014] *See* Fox NPRM Comments at 33; NBCU NPRM Reply at 5.

[1015] Fox NPRM Comments at 33-34; Fox NPRM Reply at 8; NBCU NPRM Reply at 4-5.

[1016] Fox NPRM Comments at 33-34.

[1017] *Id.* at 33; NBCU NPRM Reply at 3-5.

[1018] *See* Fox NPRM Comments at 34-35; NAB NPRM Comments at 57-58; NBCU NPRM Reply at 5.

[1019] UCC *et al.* NPRM Reply at 13.

[1020] *Id.*

[1021] *Id.* at 13-14.

[1022] *Id.* at 14.  According to UCC *et al.*, the execution of an LNS agreement is usually accompanied by significant layoffs in the news staff and the loss of personnel is exacerbated by the resources devoted to the LNS team.  *Id.* Broadcasters, however, asserted that LNS agreements free up station personnel to cover other newsworthy events that could not otherwise be covered absent the LNS.  *See, e.g.*, Fox NPRM Comments at 35-36; NBCU NPRM Reply at 7-8.

sharing agreements; therefore, UCC *et al.* stated that the existence of an LNS agreement should be only a factor in the Commission's attribution analysis and not dispositive.[1023]

327. The records in the Enhanced Disclosure proceeding and in the 2010 Quadrennial Review proceeding do not contain comprehensive data or information about the breadth, content, or prevalence of sharing agreements between stations that are not commonly owned. We are not aware of any public source for this information. Although some such agreements are filed with the Commission in connection with applications for assignment or transfer of control of broadcast licenses, we have no way of knowing how many of these agreements exist or what they cover. The comments in the earlier proceedings make clear that there are various types of sharing agreements, including those that implicate local news production, that can involve differing levels of coordination — from those that involve back office functions or leases of property or equipment, to the sharing of raw video footage, to rebroadcasts of another station's entire newscast, to near-total outsourcing of a station's day-to-day operations. Accordingly, any impact on viewers or markets could vary depending on the substance of the agreement and the level of coordination. In the absence of greater information about the number of agreements that exist in the market and their content, the Commission and the public cannot fully evaluate the potential public interest harms and benefits of various arrangements, which is necessary for the Commission to formulate sound public policy.

## C. Discussion

328. We believe that commenters have raised important issues about how and to what extent sharing agreements implicate our competition, localism, and diversity policy objectives. Consideration of these issues is impeded because so little is known about the content, scope, and prevalence of sharing agreements. In order to assess these issues, however, we must first define the agreements between stations that are relevant to our improved understanding of how stations share services and resources and then create a mechanism for making such arrangements transparent to the public and the Commission.[1024] Accordingly, we seek comment on a proposed definition of SSAs and a requirement that commercial television stations be required to disclose these agreements to the public and the Commission. This is a necessary first step in determining whether our public interest goals will be furthered through additional regulation of these agreements, as some commenters suggest.

### 1. Definition of Shared Service Agreement

329. Commenters refer to sharing agreements using various terms, such as sharing agreements, SSAs, or LNS agreements; however the Commission's rules do not define these terms.[1025] LMAs and JSAs are two types of sharing agreements that are defined in the Commission's rules.[1026] A single sharing agreement, however named, may include provisions for time brokerage, local news production, joint advertising sales, and various other station-related services. All of these different kinds of arrangements present questions about the level and type of coordinated activity that may exist between stations and the impact of such cooperation on the public interest. Therefore, we tentatively conclude that we should define SSAs broadly enough to capture all types of resource sharing and collaboration that may take place between stations as the best means to inform the public and the Commission about the scope of any joint activities between stations. This information will provide the basis for informed decision

---

[1023] UCC *et al.* NPRM Reply at 14; UCC *et al.* NPRM Comments at 19-20 (proposing a multifactor attribution test for various agreements that are not individually attributable under the Commission's rules).

[1024] DOJ has stated that "more transparency would be useful and could be accomplished by requiring broadcasters to file all such agreements with the Commission" to assist the Commission in its review of the competitive effects of these agreements. DOJ February 20, 2014 *Ex Parte* Comments at 16-17.

[1025] *NPRM*, 26 FCC Rcd at 17564-65, 17569, ¶¶ 195, 205.

[1026] *See* 47 C.F.R. §§ 73.3555 Note 1(j), (k) (defining "time brokerage" and "joint sales agreement," respectively).

making about any necessary future Commission regulation impacting SSAs or particular categories of SSAs.[1027]

330.     Accordingly, for the purpose of implementing the proposed disclosure requirements discussed below, we tentatively define an SSA as any agreement or series of agreements, whether written or oral, in which (1) a station, or any individual or entity with an attributable interest in the station, provides any station-related services, including, but not limited to, administrative, technical, sales, and/or programming support, to a station that is not under common ownership (as defined by the Commission's attribution rules); or (2) stations that are not under common ownership (as defined by the Commission's attribution rules), or any individuals or entities with an attributable interest in those stations, collaborate to provide or enable the provision of station-related services, including, but not limited to, administrative, technical, sales, and/or programming support, to one or more of the collaborating stations.[1028]

331.     We believe that this definition, by focusing on the provision of station-related services and collaboration by and between broadcast stations, encompasses the universe of agreements that are broadly referred to as "sharing agreements." This would include, for example, the provision of back office services by one independently owned station to another; a joint news-gathering operation; or the joint negotiation of retransmission consent agreements. Each such example is a type of resource sharing, among many others, and the agreements that govern such arrangements are appropriately referred to as SSAs. These agreements, including those that relate to "back office" functions, reflect the range of interaction between stations, and we believe that disclosure of all such agreements will permit us to understand the scope of station interactions so that we can more effectively advance our public policy goals in this area.

332.     Moreover, we believe that the definition of SSA should not be limited to only those agreements to which station licensees are parties, as the licensees are not always a party to the sharing agreement that affects their station's operations. For example, the parent company of one station may contract with the parent company of another independently owned station to provide station-related services for the first station, using the same employees for both stations. If the definition were limited to agreements that involved licensees, this type of agreement would arguably not be included, even though this is certainly an example of the type of sharing agreement we seek to identify. Accordingly, limiting the definition of SSAs to agreements between licensees would exclude existing agreements that we intend to include in the definition, as well as afford a means to evade any disclosure requirements. Neither outcome would serve the public interest.

333.     We seek comment on our tentative conclusion that SSAs should be defined broadly to enable the Commission and the public to understand the potential concerns and benefits of these agreements. Is a broad definition the most appropriate way to inform the Commission and the public about the breadth and prevalence of agreements across the marketplace? We seek comment also on the proposed definition. Is it broad enough to include all types of resource sharing and service agreements between stations that may be relevant to our policy making initiatives? Is the definition too broad, such that it would apply to agreements that do not involve the provision of station-related services and/or collaboration between stations to enable the provision of such services? Is there an alternate definition that would better serve the Commission's purpose? Our transaction review experience indicates that

---

[1027] While recent *ex parte* submissions suggest that the Commission already has a sufficient record upon which to define and impose regulatory limitations on sharing agreements, we believe that the existing record requires further development. *See, e.g.*, Letter from Andrew Jay Schwartzman, Institute for Public Representation, to Marlene H. Dortch, Secretary, FCC (Mar. 6, 2014) ("[T]here is an ample record on which the Commission can act at this time, and . . . there is no need to solicit further comment with respect to SSAs."). A carefully crafted and considered approach is required to address this important subject.

[1028] Common ownership includes circumstances in which two or more stations share an attributable interest holder(s) and is not limited to stations that are wholly owned by the same parent entities.

SSAs are often accompanied by contingent interest agreements. We seek comment on whether this is also the case for SSAs that are not part of a transaction. If so, we seek comment on whether and how we should seek to achieve additional transparency concerning such contingent interest arrangements in this this proceeding. We encourage those who disagree with our proposed definition to provide specific alternative language to define SSAs for purposes of this proceeding.

334.     Should the term SSA instead be defined more narrowly, and if so how? For example, are there sharing agreements that are insignificant to the operation of the station(s), such that disclosure would not meaningfully benefit the Commission's or the public's understanding of station operations, and that should thus be excluded from the definition of SSA for this purpose? If so, what types of exclusions to the definition should we adopt? Would a *de minimis* financial exception be appropriate (*i.e.*, if the total dollar amount of the goods or services provided under the agreement is below a certain total dollar amount)? If so, what should the cutoff be? How should we determine where to set the cutoff? Could such an exclusion omit significant agreements that involve in-kind contributions? Should we define SSAs to implicate only agreements that involve local news operations or the provision or production of programming? Is so, how would such a definition be crafted? Would it implicate any special legal or Constitutional considerations? If so, how could the Commission address such issues? Should we limit the definition of SSAs only to those involving stations in the same local market? Could such a limitation exclude agreements that have a significant impact on station operations or programming? As discussed in the following section, we propose to limit disclosure of SSAs to commercial television stations. Accordingly, should we limit the definition of SSAs to only those agreements involving exclusively commercial television stations? We note that commenters focus primarily on sharing agreements involving commercial television stations; accordingly, we tentatively conclude that any disclosure requirement for SSAs should be limited to agreements involving exclusively commercial television stations. We seek comment on whether to expand the disclosure requirement to include agreements involving commercial radio stations and/or noncommercial stations. Are there many examples of agreements between commercial television stations and other types of stations (*e.g.*, noncommercial stations, AM/FM stations)? What are the costs and benefits of the definition we propose and of any alternate definitions offered? How would a narrower definition be reconciled with the Commission's and the public's interest in understanding the breadth and prevalence of agreements across the marketplace?

## 2.     Disclosure of Shared Service Agreements

335.     Although we believe that commenters have raised meaningful concerns about the potential impact of sharing agreements on competition, diversity, and localism in television markets, we also acknowledge that broadcast commenters have provided evidence that such agreements may produce public interest benefits. Currently, the Commission and the public lack a full understanding of the agreements and the ability to assess the impact of the agreements on Commission policy goals. Thus, we tentatively conclude that disclosure of SSAs as defined in this proceeding is necessary to inform the Commission and the public of joint operations and collaborations between independently owned commercial television stations. Section 73.3613, which governs the filing of contracts with the Commission, requires that a summary of the substance of oral contracts subject to filing under that section must be reported in writing.[1029] We propose that any disclosure requirement we may adopt for SSAs similarly require that the substance of oral SSAs be reported in writing. We seek comment on this proposal.

336.     We believe that disclosure of such agreements involving commercial television stations will permit the Commission to better understand the operation of stations and to assess the impact, if any, of SSAs on the television marketplace. Furthermore, members of the public will be able to gain a greater understanding of the relationships between independently owned stations that are parties to SSAs, which will allow them to evaluate whether such interaction has an impact on programming or other station

---

[1029] 47 C.F.R. § 73.3613.

operations.[1030] We seek comment on our tentative conclusion that disclosure of SSAs as defined herein is necessary to enable the Commission and the public to assess the implications of these agreements for the marketplace and the Commission's public policy goals. Does the Commission have any alternate means of assessing the breadth and prevalence of these agreements or their impact and implications? If so, what means are currently available to the Commission and the public?

337. We seek comment on the manner in which SSAs are to be disclosed to the public and the Commission. For example, should a television station be required to place a copy of each SSA for the station in its public inspection file? Under such a requirement, should we require that these agreements be placed in the local public inspection file located in the station's main studio or in the station's online public file, or both? Should the disclosure requirement apply to each station that is involved in the agreement (*e.g.*, the recipient of services and the provider of the services)? Would a requirement to disclose only in a physical (*i.e.*, not online) public inspection file limit the Commission's and the public's ability to learn about the content, scope, and prevalence of sharing agreements? The Commission already requires that all radio and television LMAs and JSAs between commercial broadcast stations be disclosed by placing them in the station's public file, regardless of whether the agreements are attributable or filed with the Commission.[1031] Should we extend this existing requirement for LMAs and JSAs to include all SSAs for commercial television stations?[1032] What are the costs and benefits of each method of disclosure?

---

[1030] It is well settled that the Commission has authority to require regulated entities to disclose information that the Commission deems necessary to carry out its duties under the Communications Act. *See, e.g., Stahlman v. FCC*, 126 F.2d 124, 127 (D.C. Cir. 1942) ("[F]ull authority and power is given to the Commission with or without complaint to institute an inquiry concerning questions arising under the provisions of the Act or relating to its enforcement. This . . . includes authority to obtain the information necessary to discharge its proper functions, which would embrace an investigation aimed at the prevention or disclosure of practices contrary to public interest.") (citing 47 U.S.C. § 403); *Stahlman*, 126 F.2d at 128 (Commission inquiry was "within the administrative powers of the Commission to initiate the proposed investigation for the purpose of ascertaining the facts for its guidance in making reasonable and proper public rules, for application to existing stations, and in the consideration of future requests."); 47 C.F.R. § 1.1 ("The Commission may on its own motion or petition of any interested party hold such proceedings as it may deem necessary from time to time in connection with the investigation of any matter which it has power to investigate under the law, or for the purpose of obtaining information necessary or helpful in the determination of its policies, the carrying out of its duties or the formulation or amendment of its rules and regulations. For such purposes it may subpoena witnesses and require the production of evidence. Procedures to be followed by the Commission shall, unless specifically prescribed in this part, be such as in the opinion of the Commission will best serve the purposes of such proceedings."); *see also* 47 U.S.C. § 303(r) (authority to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter"); 47 U.S.C. § 303(j) (Commission has "authority to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable"); 47 U.S.C. § 154 ("The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions."). The Commission has found that it is not required to address the appropriate regulatory status of agreements before requiring their disclosure, because disclosure could inform the Commission's decisions, and the Commission has wide latitude to require disclosure. *Enhanced Disclosure Second R&O*, 27 FCC Rcd at 4575, ¶ 84. In particular, the Commission has previously determined that it need not find that agreements are attributable in order to require their disclosure. *Id.* (citing 47 U.S.C. § 303(j)); *Office of Communication of United Church of Christ v. FCC*, 779 F.2d 702, 707 (D.C. Cir. 1985) ("There is no question but that the Commission has the statutory authority to require whatever recordkeeping requirements it deems appropriate.")).

[1031] *See* 47 C.F.R. §§ 73.3526(e)(14), (e)(16).

[1032] As noted above in paragraph 321, *supra*, certain types of sharing agreements are already specifically defined in the Commission's rules and are already subject to various regulations and policies (*e.g.*, LMAs and JSAs). We do not believe that the adoption of any proposal in this FNPRM should result in a duplicate disclosure obligation for

(continued....)

338.    Should we consider a requirement that SSAs be filed pursuant to section 73.3613 of the Commission's rules?  What are the benefits or drawbacks of this alternative?  Pursuant to section 73.3613, licensees or permittees of commercial or noncommercial AM, FM, television, or International broadcast stations must file copies of certain contracts (including written summaries of oral contracts) with the Commission within 30 days of execution.[1033]  These contracts cover a broad array of agreements that relate to station ownership and operation.  Because we propose to limit the disclosure of SSAs to commercial television stations, as noted above, any new filing requirement under 73.3613 would be similarly tailored.  How would such a requirement be structured?  Should we consider adopting a different filing process?  For example, should we create a new form to be filed with the Commission or open a dedicated docket in ECFS, in which licensees, permittees, or applicants would file copies of agreements?  What would such a process entail and what would be the benefits and/or drawbacks of that process?

339.    In addition, we propose that any disclosure requirement we may adopt be subject to the same redaction allowances made available with respect to the filing of LMAs and JSAs, namely, that licensees may redact confidential or proprietary information.[1034]  Would this approach be desirable with respect to the disclosure requirements we are proposing here?  Should we consider limiting any disclosure or filing requirement to larger markets, such as the top 50 or 100 Designated Market Areas?  What considerations would justify any proposed limitation, and what other factors should we consider in evaluating any limitation?  While such an approach might reduce burdens on stations in smaller markets, is the impact of SSAs in smaller markets potentially greater due to the typically smaller number of stations in these markets, such that limiting disclosure to larger markets would not be advisable?  For each potential alternative proposed, we seek comment on the associated benefits, burdens, and costs.  How much time should we provide for stations to come into compliance with this proposed filing requirement?  What burdens would the proposed disclosure requirement place on stations, and what costs are associated with those burdens?  How often would these burdens or costs be incurred?  Do SSAs as defined herein typically last for a period of multiple years, and if so does that fact mitigate any associated burdens or costs, and by how much?  How would the possible exclusions from the definition of SSA discussed above impact the burdens and costs?

---

(Continued from previous page)

such agreements.  For example, if we were to extend the existing public inspection file disclosure requirement for LMAs and JSAs to SSAs, an agreement that satisfies the definition of a JSA and an SSA would only need to be placed in the public inspection file once.  However, in the event that we adopt a disclosure requirement for SSAs that is different than the disclosure requirements already in existence for other types of sharing agreements — for example, a dedicated docket in the Commission's Electronic Comment Filing System ("ECFS") or a new form — we seek comment on the extent to which that disclosure requirement should apply to other sharing agreements that are already subject to various disclosure requirements, as well as the associated benefits, burdens, and costs of any such approach.

[1033] In addition, all contracts that are filed pursuant to section 73.3613 must be listed on a station's ownership report, FCC Form 323, and the station's public inspection file must contain such contracts or an up-to-date list of such contracts (making them available to the public upon request).  *See* 47 C.F.R. §§ 73.3526(e)(5), 73.3615(a)(4)(i).  Accordingly, any station that is party to a sharing agreement and is required to file an ownership report would be required to place the sharing agreement in its public inspection file, or, if the station includes a list of the relevant contracts in its public inspection file, to make the sharing agreement available upon request pursuant to 47 C.F.R. § 73.3526(e)(5).

[1034] *See id.* §§ 73.3526(e)(14), (e)(16).  Currently, stations are permitted to redact confidential or proprietary information when disclosing LMAs and JSAs, though the information must be made available to the Commission upon request.  We propose that the same procedure apply to the disclosure of SSAs.

## VI.    REPORT AND ORDER

### A.    Attribution of Television JSAs

#### 1.    Introduction

340.    While proposing to require disclosure of SSAs generally in order to increase our and the public's information about their content and operation, we find that we have sufficient information to act with respect to the attribution of television JSAs, an issue on which comment was sought previously and renewed in the *NPRM* in the 2010 Quadrennial Review proceeding.  We have looked closely at our standards for defining the kinds of agreements between stations that confer a sufficient degree of influence or control so as to be considered an attributable ownership interest under the Commission's ownership rules.  Consistent with the Commission's earlier findings regarding radio JSAs, we find that certain television JSAs convey sufficient influence to warrant attribution.[1035]  As discussed below, the ability of a broker to control a brokered television station's advertising revenue, its principal source of income, affords the broker the opportunity, ability, and incentive to exert significant influence over the brokered station.[1036]  For that reason, we will count television stations brokered under a same-market television JSA that encompasses more than 15 percent of the weekly advertising time for the brokered station toward the brokering station's permissible ownership totals, just as we long have done with respect to radio stations.[1037]

341.    We find that a transition period is appropriate to permit licensees that entered into television JSAs of this type prior to the release of this Order to conform their practices to its requirements. In addition, we clarify that our JSA attribution rules (radio and television) do not apply to national advertising representation agencies.  We find that the benefits of our decision to count certain television JSAs as attributable interests for purposes of our ownership rules outweigh any costs or other burdens that may result from our action.

#### 2.    Background

342.    A JSA is an agreement that authorizes a broker to sell some or all of the advertising time on the brokered station.[1038]  JSAs generally give the broker authority to hire a sales force for the brokered station, set advertising prices, and make other decisions regarding the sale of advertising time, subject to the licensee's preemptive right to reject the advertising.[1039]  By contrast, an LMA, also referred to as a time brokerage agreement ("TBA"), involves "the sale by a licensee of discrete blocks of time to a 'broker' that supplies the programming to fill that time and sells the commercial spot announcements in it."[1040]  Based on our ongoing review of television JSAs and the comments in the TV JSA proceeding, we find that television JSAs often involve the sale of significant portions of advertising time, and many

---

[1035] The Commission sought comment on the proposed attribution of certain television JSAs in a notice of proposed rulemaking in MB Docket No. 04-256.  *Rules and Policies Concerning Attribution of Joint Sales Agreements in Local Television Markets*, MB Docket No. 04-256, Notice of Proposed Rulemaking, 19 FCC Rcd 15238 (2004) ("*TV JSA NPRM*").

[1036] *See infra* Section VI.A.3.

[1037] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13742-46, ¶¶ 316-25; 47 C.F.R. § 73.3555, Note 2(k).  We will not count same-market JSAs toward the brokering licensee's national ownership cap to the extent that it would result in double-counting (*i.e.*, counting the same local population twice toward the national reach limit).  *1999 Attribution Order*, 14 FCC Rcd at 12598, ¶ 86.

[1038] 47 C.F.R. § 73.3555, Note 2(k).

[1039] *Cf. 2002 Biennial Review Order*, 18 FCC Rcd at 13743, ¶ 316 (making the same finding with respect to radio JSAs).

[1040] 47 C.F.R. § 73.3555, Note 2(j).

involve the sale of 100 percent of the advertising time on the brokered station.[1041]  These agreements may provide the brokered station a flat fee, compensation based on a percentage of revenues, or a mixture of both.[1042]  The agreements are often of substantial duration — typically five years or more, with provisions for renewal and cancellation by either party.[1043]  Further, they are often multifaceted agreements that include, or are accompanied by, other agreements that involve the provision of programming, technical support, and/or operational services.[1044]  In particular, the record indicates that television JSAs are often accompanied by various sharing agreements between the broker and the licensee, such as agreements that provide for technical assistance, sharing of studio or office space, accounting and bookkeeping services, or administrative services.[1045]  Many television JSA brokers also provide programming or production services to their brokered stations under the JSA or related sharing agreements.[1046]  In addition, television JSAs are often executed in conjunction with an option, right of first refusal, put/call arrangement, or other similar contingent interest, or a loan guarantee.[1047]  Over time, we have seen an increase in the prevalence of television JSAs, and recently such agreements have received more attention in broadcast television transactions.[1048]

---

[1041] *See, e.g., Shareholders of the Ackerley Group, Inc.*, Memorandum Opinion and Order, 17 FCC Rcd 10828 (2002) (describing a JSA that provided the brokering station with 100 percent of the advertising revenue) ("*Ackerley*").  In addition, in 2012 and 2013, Commission staff reviewed 22 transactions involving the sale of 31 television stations in which a JSA was part of the proposed transaction.  In each case, the JSA provided for the sale of 100 percent of the brokered station's advertising time.

[1042] Of the commenters that described their fee arrangements under their JSAs, none described fee arrangements that were solely based on a flat fee to the licensee.  We do not exclude this possibility since such arrangements appear in radio JSAs and since we did not receive information about fee arrangements in every existing television JSA, or even the arrangements in the JSAs held by commenters in the TV JSA proceeding.  Indeed, the JSA in the *Ackerley* case involved the payment of a flat fee to the licensee.  *See id.*

[1043] *See* NBC TV JSA Comments at 4; Nexstar TV JSA Comments at 4-5; Minden TV JSA Comments at 2; Paxson TV JSA Comments at 7-8; Sinclair TV JSA Comments at 6.

[1044] Minden TV JSA Comments at 1-2; Mission 323 Report Reply at 3; Nexstar TV JSA Comments at 5-6; Sinclair TV JSA Comments at 7-8 (referring to its Outsourcing Agreement in Tallahassee); *see also* Schurz 323 Report Reply at 3-4; Letter from David Pulido, Executive Vice President, TTBG LLC, to Marlene H. Dortch, Secretary, FCC, at 1 (Jan. 4, 2013) ("TTBG Jan. 4, 2013 *Ex Parte* Letter").

[1045] *See, e.g.*, Minden TV JSA Comments at 2 n.3; Nexstar TV JSA Comments at 4-6; Sinclair TV JSA Comments at 6-8; *see also* Mission 323 Report Reply at 3.

[1046] *See, e.g.*, Nexstar TV JSA Comments at 5; *see also* Mission 323 Report Reply at 3; Schurz 323 Report Reply at 3-4; TTBG Jan. 4, 2013 *Ex Parte* Letter at 1.  In a recent transaction, the station providing the brokering and operational services purchased all of the non-license assets of the brokered station, structuring the transaction in a way that escaped prior Commission review.  *See* Chris Sieroty, *Sinclair buys Reno NBC affiliate from Jim Rogers' company*, LAS VEGAS REVIEW-JOURNAL, Nov. 22, 2013, http://www.reviewjournal.com/business/sinclair-buys-reno-nbc-affiliate-jim-rogers-company (visited Jan. 30, 2014).

[1047] For example, of the 22 transactions involving television JSAs recently reviewed by Commission staff, see note 1041, *supra*, 20 involved some type of contingent interest agreement.

[1048] *See, e.g., Belo/Gannett*, 28 FCC Rcd at 16871, ¶ 8; *see also* Jonathan Make, *Widespread, Cost-Saving TV JSAs Lead Executives to Question Why FCC Would Attribute Them*, COMMUNICATIONS DAILY, November 29, 2012 (reporting that its own survey showed over 100 stations that were party to a television JSA and noting the increased prevalence of such agreements in recent years); Harry Jessel, *FCC Moving the Wrong Way on JSAs*, TVNEWSCHECK, Dec. 12, 2012, http://www.tvnewscheck.com/article/64074/fcc-moving-the-wrong-way-on-jsas (stating that the lack of an attribution rule for television JSAs has created "a bona fide loophole that many broadcasters have happily exploited") (visited Jan. 30, 2014); *see also* DOJ February 20, 2014 *Ex Parte* Comments at 11 ("Cooperative arrangements that should be analyzed like mergers have become relatively common in the broadcast television industry.  There has been a pronounced trend toward one station controlling another station that is nominally owned by a separate entity . . . .").  In addition, on March 12, 2014, the Media Bureau released a Public

(continued....)

343. Our attribution rules seek to identify those interests in licensees that confer on their holders a degree of "influence or control such that the holders have a realistic potential to affect the programming decisions of licensees or other core operating functions."[1049] Influence and control are important criteria in applying the attribution rules because these rules define which interests are significant enough to be counted for purposes of the Commission's multiple ownership rules. An interest that confers influence is an interest that is less than controlling, but through which the holder may obtain the ability to induce a licensee to take actions to protect the interests of the holder, and/or where a realistic potential exists to affect a station's programming and other core operational decisions.[1050] The attribution rules determine what interests are cognizable under the Commission's broadcast ownership rules; they are not ownership limits in themselves.

344. The Commission first adopted attribution rules for LMAs involving radio stations in the same geographic market in 1992.[1051] The Commission was concerned that absent such rules significant time brokerage under such agreements could undermine the Commission's competition and diversity goals.[1052] The Commission found that the ability to control the programming on a non-commonly owned in-market radio station allowed the brokering party the ability to unduly influence the brokered station. In 1999, the Commission extended the attribution of time brokerage agreements to include LMAs between television stations, finding that the rationale for attributing same-market radio LMAs applied equally to same-market television LMAs.[1053] In its *1999 Attribution Order*, the Commission considered also whether to attribute certain radio and television JSAs.[1054] The Commission acknowledged that same-market JSAs could raise competitive concerns but stated that, at that time, it did not believe that such agreements conveyed a sufficient degree of influence or control over station programming or core operations to warrant attribution, adding that JSAs could promote diversity by "enabling smaller stations to stay on the air."[1055] In the *2002 Biennial Review Order*, however, the Commission revisited its earlier decision not to attribute same-market radio JSAs.[1056] It concluded, on reexamination, that influence or control over the advertising revenue of a brokered station, generally the principal source of a licensee's income, afforded the JSA broker, like the LMA broker, the potential to exercise sufficient influence over

---

(Continued from previous page)
Notice "to provide guidance concerning the Bureau's processing of applications seeking Commission approval of proposed transactions that involve combinations of sharing arrangements and contingent or financial interests." *Processing of Broadcast Television Applications Proposing Sharing Arrangements and Contingent Interests*, Public Notice, DA 14-330 (MB, rel. Mar. 12, 2014).

[1049] *1999 Attribution Order*, 14 FCC Rcd at 12560, ¶ 1; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13743, ¶ 318 ("In considering revisions to our attribution rules, we have always sought to identify and include those positional and ownership interests that convey a degree of influence or control to their holder sufficient to warrant limitation under our ownership rules."). For purposes of the multiple ownership rules, the concept of "control is not limited to majority stock ownership, but includes actual working control in whatever manner exercised." *Review of the Commission's Regulations Governing Attribution of Broadcast Interests*, MM Docket No. 94-150, Notice of Proposed Rulemaking, 10 FCC Rcd 3606, 3609, ¶ 4 (1995) ("*Attribution Notice*").

[1050] *2002 Biennial Review Order*, 18 FCC Rcd at 13743-44, ¶ 318; *Attribution Notice*, 10 FCC Rcd at 3609-10, ¶ 4.

[1051] *1992 Radio Ownership Order*, 7 FCC Rcd at 2788-89, ¶¶ 64-67.

[1052] *Id.* at 2788-89, ¶¶ 64-66.

[1053] *1999 Attribution Order*, 14 FCC Rcd at 12597, 12612, ¶¶ 83, 122.

[1054] *See id.* at 12610-13, ¶¶ 117-23.

[1055] *1999 Attribution Order*, 14 FCC Rcd at 12612, ¶ 122.

[1056] *2002 Biennial Review Order*, 18 FCC Rcd at 13743, ¶ 317.

the core operations of a station to warrant attribution.[1057] It also concluded that same-market radio JSAs may sufficiently undermine the Commission's interest in broadcast competition to warrant limitation under the multiple ownership rules.[1058] As the Commission had not explicitly included the issue of attribution of television JSAs in the underlying Notice of Proposed Rulemaking, it did not address television JSAs in the *2002 Biennial Review Order*, but rather indicated that it would issue a further Notice of Proposed Rulemaking to seek comment on whether or not to attribute television JSAs. It subsequently did so in the *TV JSA NPRM*.

345. In the *TV JSA NPRM*, the Commission tentatively concluded that television JSAs have the same effects in local television markets that radio JSAs do in local radio markets and that the Commission should therefore attribute television JSAs.[1059] The Commission noted that it had no reason to believe that the terms and conditions of television JSAs differ substantially from those of radio JSAs.[1060] The Commission asked, however, whether differences existed between television and radio JSAs such that it should not attribute television JSAs, and it asked whether television JSAs should be grandfathered if they were deemed attributable.[1061]

346. The commenters in response to the *TV JSA NPRM* consist entirely of broadcasters, nearly all of whom urge the Commission not to attribute television JSAs. Commenters urge us to reaffirm the Commission's 1999 determination that television JSAs, unlike LMAs, do not convey a sufficient degree of influence or control over broadcast stations to warrant attribution.[1062] They argue that the record does not support a change in policy, and that the Commission must give a reasoned account if it now rejects the previous conclusion.[1063]

347. The Commission sought comment generally on attribution of agreements among co-market stations in the Notice of Proposed Rulemaking in the 2010 Quadrennial Review proceeding, specifically referencing the Commission's ongoing proceeding regarding the proposed attribution of television JSAs.[1064] Many parties addressed attribution of television JSAs in that proceeding.[1065] For example, UCC *et al.*'s comments in the 2010 Quadrennial Review proceeding support the Commission's tentative conclusion in the *TV JSA NPRM* that certain same-market television JSAs should be attributed.[1066] Numerous public interest groups, trade associations, and unions support the Commission's

---

[1057] As it had with respect to both radio and television LMAs, the Commission adopted a 15 percent weekly threshold for determining whether to attribute same-market radio JSAs. *See id.* at 13745-46, ¶ 323; *see also 1999 Attribution Order*, 14 FCC Rcd at 12598, ¶ 85; *1992 Radio Ownership Order*, 7 FCC Rcd at 2788, ¶ 65.

[1058] *2002 Biennial Review Order*, 18 FCC Rcd at 13743-45, ¶¶ 318, 320, 322.

[1059] *TV JSA NPRM*, 19 FCC Rcd at 15239, ¶ 2.

[1060] *Id.*

[1061] *See id.* at 15242-44, ¶¶ 12-20.

[1062] Entravision TV JSA Comments at 1-2; Entravision TV JSA Reply at 1-4.

[1063] Fisher Broadcasting Company ("FBC") TV JSA Comments at 1-4 (citing *Fox*, 280 F.3d at 1027); NAB TV JSA Comments at 6 (citing *Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)).

[1064] *NPRM*, 26 FCC Rcd at 17564-70, ¶¶ 194-208.

[1065] In addition to filing comments in the proceeding, several parties addressed the issue of television JSAs in *ex parte* presentations or in comments responding to the *2012 323 Report*. 27 FCC Rcd 13814.

[1066] UCC *et al.* NPRM Comments at 15, 17; *see also* Free Press NPRM Comments at 60; Free Press NPRM Reply at 36.

proposed attribution of certain television JSAs and its inquiry into SSAs.[1067]  Many broadcast commenters, however, assert that television JSAs should not be attributable or urge the Commission to seek additional comment on television JSAs before issuing a decision on attribution.[1068]

348.    On February 20, 2014, DOJ submitted *ex parte* comments strongly supporting the Commission's tentative conclusion to attribute television JSAs.[1069]  DOJ, noting its extensive and growing experience reviewing television JSAs in the context of its antitrust analysis of broadcast television transactions, asserts that television JSAs provide incentives similar to common ownership and should be made attributable under the Commission's rules.[1070]  DOJ asserts that failure to attribute such agreements could result in circumvention of the Commission's media ownership limits and frustrate competition in local markets.[1071]

### 3.    Discussion

349.    We believe that the record compiled in response to the *TV JSA NPRM*, as informed by our ongoing transaction review and comments in the 2010 Quadrennial Review proceeding, provides us with relevant and sufficient information from which to act.  Since the release of the *TV JSA NPRM*, the Commission has continued to review JSAs, often in conjunction with applications for approval to transfer or assign a television station license.[1072]  Based on our ongoing experience reviewing JSAs, we observe

---

[1067] *See, e.g.*, Letter from Bob Butler, President, National Association of Black Journalists, to Tom Wheeler, Chairman, FCC (Mar. 10, 2014); Letter from Andrew Jay Schwartzman, Institute of Public Representation, to Marlene H. Dortch, Secretary, FCC (Mar. 21, 2014) (recounting support of National Association of Broadcast Employees and Technicians-CWA, and Communications Workers of America, AFL-CIO, for attribution of JSAs and arguing that enforcement of attribution rules will promote diversity); Letter from Cheryl A. Leanza, Policy Advisor, UCC, to Marlene H. Dortch, Secretary, FCC (Mar. 21, 2014) (joining NHMC in support of the attribution of JSAs, alleging harm to diversity, localism, and competition); Letter from S. Derek Turner, Research Director, Free Press, to Mignon Clyburn, Commissioner, FCC (Mar. 24, 2014) (supporting attribution of JSAs and refuting argument that JSAs lead to new and diverse ownership); Letter from Terry O'Neil, President, National Organization for Women, to Tom Wheeler, Chairman, FCC (Mar. 24, 2014) (supporting attribution of JSAs and arguing that JSAs have not created true opportunities for female ownership); Letter to Tom Wheeler, Chairman, FCC (Mar. 24, 2014) (letter on behalf of multiple public interest groups, including National Association of Hispanic Journalists, Center for Media Justice, UCC, Common Cause, and Media Literacy Project, urging attribution of JSAs and other related agreements in order to promote greater diversity of voices in the broadcast television industry).

[1068] *See, e.g.*, Letter from Clifford M. Harrington, Pillsbury Winthrop Shaw Pittman LLP, Outside Counsel, Sinclair Broadcast Group, Inc., to Marlene H. Dortch, Secretary, FCC, at 1-3, 5 (Dec. 20, 2012) ("Sinclair Dec. 20, 2012 *Ex Parte* Letter"); TTBG Jan. 4, 2013 *Ex Parte* Letter at 1-2; Letter from Eugene Brown, Sole Member, MPS Media, to Marlene H. Dortch, Secretary, FCC, at 1 (Dec. 13, 2012); Letter from John Parente, CEO, New Age Media, to Marlene H. Dortch, Secretary, FCC, at 1 (Dec. 13, 2012); Letter from Letter from Joshua N. Pila, Senior Counsel, LIN Television Corporation, to Marlene H. Dortch, Secretary, FCC, at 1-3 (Dec. 21, 2012) ("LIN Dec. 21, 2012 *Ex Parte* Letter"); Local TV Coalition NPRM Comments at 8 & n.21; Mission 323 Report Reply at 1-10; Nexstar NPRM Reply at 15-16; Letter from Elizabeth Ryder, Vice President and General Counsel, Nexstar Broadcasting, Inc., to Marlene H. Dortch, Secretary, FCC, at 1-4 (Jan. 24, 2013); Schurz 323 Report Reply at 3-5.

[1069] *See generally* DOJ February 20, 2014 *Ex Parte* Comments.  These comments were submitted in the 2010 Quadrennial Review proceeding (MB Docket No. 09-182), the Diversity proceeding (MB Docket No. 07-294), and the TV JSA proceeding (MB Docket No. 04-256).

[1070] *Id.* at 10-12, 15-16.

[1071] *Id.* at 16.

[1072] We note that during the pendency of this rulemaking proceeding, the Media Bureau continued to consider and approve applications for the assignment of license or transfer of control of broadcast television licenses that complied with the Commission's rules in effect at the time of the transfer or assignment, some of which included television JSAs.  In the absence of a Commission rule attributing television JSAs, the Bureau reviewed and approved transactions that it determined did not raise questions of *de facto* control and where, in its opinion, the

(continued....)

that neither the terms and conditions of JSAs as described in the comments nor their competitive impact on markets appear to have changed significantly.[1073]  In addition, the submissions in the 2010 Quadrennial Review proceeding regarding television JSAs are consistent with the comments filed in the television JSA proceeding.[1074]  Furthermore, some of those more recent submissions that advocate an additional formal comment period primarily seek an opportunity to provide additional argument about the potential public interest benefits associated with combined station operation under television JSAs and the existence of increased competition for broadcast television stations from non-broadcast video alternatives.  We find, however, that those arguments bear on the issue of liberalization of the local television ownership rules and not on the question of whether JSAs give the brokering station a degree of influence and control that rises to the level of attribution, which is the sole focus of our inquiry here.  As discussed below, the asserted public interest benefits of common ownership, operation, or control of stations in the same local market, and the issue of whether competition from other video alternatives warrants relaxation of our ownership rules, are appropriately raised and considered in the context of setting the terms of the local television ownership rule.[1075]  Moreover, the record already includes numerous comments on those points with regard to television JSAs.[1076]  In addition, our decision is informed by our experience with the attribution of radio JSAs, which has operated to ensure that the goals of our radio ownership rules are not undermined by nonattributable agreements conferring the potential for significant influence over a

(Continued from previous page) ─────────────────────────

licensee of the brokered station retained a sufficient interest in the advertising revenue received from a JSA such that it retained control and remained invested in the successful operation of the station.  However, there has never been, as suggested by Commissioner Pai, a Media Bureau policy generally applicable to JSAs that the television licensee receive a specified percentage of the revenues under a JSA and, indeed, there is no requirement that JSAs even be approved by the Commission.  The Bureau's approval of particular transactions in no way limits the Commission's ability to change its attribution rules going forward or to adopt a reasonable transition period for parties to ensure that existing television JSAs comply with the new attribution standard.  Therefore, Commissioner Pai's reliance on the Media Bureau's approval of transactions that included a JSA during a period when there was no television JSA attribution rule is misplaced.  *See* Dissenting Statement of Commissioner Ajit Pai, *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 14-50, Further Notice of Proposed Rulemaking and Report and Order, FCC 14-28, at 227-28 (rel. April 15, 2014) ("Pai Dissent").  The Media Bureau applied the attribution rules in effect at the time it processed those applications.  Indeed, the Bureau's decisions in cases involving television JSAs — including two decisions cited by Commissioner Pai — often referred to the pending TV JSA proceeding and reminded parties that the Bureau's actions were subject to any subsequent Commission action in that proceeding.  *See SagamoreHill of Corpus Christi Licenses, LLC*, Letter, 25 FCC Rcd 2809, 2815 (Med. Bur. 2010) (discussing the pending TV JSA proceeding and declining to "reach a decision . . . that would anticipate the outcome of the pending rulemaking"); *Malara Broad. Grp. of Duluth Licensee LLC*, Letter, 19 FCC Rcd 24070, 24075 n.9 (Med. Bur. 2004) (referencing the pending TV JSA proceeding).  Even assuming that the Bureau's past decisions could be read to mean that same-market television JSAs, generally speaking, do not confer influence over programming decisions if the brokered station retains at least 70 percent of the station's advertising revenues, we reject that premise and reach a different conclusion in this Order.  *See Concast Corp. v. FCC*, 526 F.3d 763, 769-70 (D.C. Cir. 2008) ("[A]n agency is not bound by the actions of its staff if the agency has not endorsed those actions.").  The Media Bureau's review of future transactions will be guided by the new rule we adopt herein.

[1073] *See, e.g.*, *supra* notes 1041, 1047.

[1074] *See, e.g.*, Local TV Coalition NPRM Comments at 8 & n.21 (opposing attribution of television JSAs and asserting that "[a]ny decision regarding the attribution of [television] JSAs must be based on the complete record assembled in [the television JSA] proceeding"); Nexstar NPRM Reply at 15-16 (opposing attribution of television JSAs for reasons consistent with those set forth in the television JSA proceeding); UCC *et al.* NPRM Comments at 17 (supporting Commission's tentative conclusion in the television JSA proceeding regarding the attribution of certain television JSAs); *see also* LIN Dec. 21, 2012 *Ex Parte* Letter at 2-3; Mission 323 Report Reply at 4-7.

[1075] *See infra* ¶ 358.

[1076] *See, e.g.*, *infra* note 1103.

station's core operating functions.[1077]  Accordingly, we find that the existing record provides a sufficient basis on which to make the decision herein.

350.    On our further examination of the issue, we find that television JSAs, like radio JSAs and radio and television LMAs, have the potential to convey significant influence over a station's operations such that they should be attributable.  This is consistent with the Commission's more recent determination in 2003 to attribute same-market radio JSAs, which reversed the Commission's earlier determination in the *1999 Attribution Order* that same-market radio JSAs should not be attributable.[1078]  In *Prometheus I*, the Third Circuit upheld the Commission's change of course with respect to the attribution of radio JSAs, finding that the Commission's reexamination of the potential for a radio JSA to convey the ability for a brokering station to influence a brokered station satisfied the Commission's obligation to provide a "reasoned analysis" for the change in policy.[1079]  Consistent with the Commission's analysis supporting attribution of radio JSAs and with the tentative conclusion in the *TV JSA NPRM*, we now find that television JSAs involving a significant portion of the brokered station's advertising time convey the incentive and potential for the broker to influence program selection and station operations.  Thus, as the Commission concluded in 2003 with respect to radio JSAs, we conclude that the Commission's previous view that television JSAs do not convey sufficient influence to warrant attribution was incorrect. Whether a JSA provides the brokered station a fixed fee or a percentage fee, the broker's revenues depend on its ability to sell the ad time for the brokered station, which depends in turn on the popularity of the brokered station's programming.  The broker therefore has a strong incentive to influence the brokered station's programming decisions.  As Hubbard states, "the assumption of market risk associated with local advertising sales, and the ability to create greater market strength in sales, necessarily influences programming decisions.  In commercial broadcasting, programming and sales are inextricably connected."[1080]  In addition, to the extent it transfers market risk to the brokering station, the licensee of the brokered station will have less incentive to maintain or attain significant ratings share in the market.[1081]

---

[1077] *Cf. 1999 Attribution Order*, 14 FCC Rcd at 12598, ¶ 84 ("We are convinced that the radio LMA attribution rule adopted… has operated successfully to ensure that the goals set forth in the radio ownership rules are not undermined by the existence of unattributed influence over radio stations in the same market."); *see also Media Bureau Announces Requirement to File Certain Radio Joint Sales Agreements*, Public Notice, 20 FCC Rcd 1 (Med. Bur. 2005) (establishing framework for filing of attributable radio JSAs).

[1078] *See 2002 Quadrennial Review Order*, 18 FCC Rcd at 13742-46, ¶¶ 316-25; *1999 Attribution Order*, 14 FCC Rcd at 12612-13, ¶¶ 122-23.

[1079] *Prometheus I*, 373 F.3d at 429-30 ("[B]ecause we interpret the Commission's modification as a correction of its prior policy's 'inaccuracy,' the Commission's failure to cite a particular intervening change is not fatal to its reasoned analysis . . . . [W]e accept that the Commission's determination-upon 'reexamination of the issue' that the JSAs convey (and always have conveyed) a potential for influence-sufficiently rationalizes its decision to jettison its prior nonattribution policy and replace it with one that more accurately reflects the conditions of local markets.").

[1080] Hubbard TV JSA Reply at 3.

[1081] In his dissent, Commissioner Pai asserts that the Order is flawed because it does not recite specific instances where a brokering station exercised influence over a brokered station's programming decisions.  *See* Pai Dissent at 227.  In upholding the Commission's attribution rules in the past, however, courts have held that the Commission reasonably designed those rules to identify those interests that provide the holder with the incentive and ability to influence or control the programming or other core operational decisions of the licensees, rather than to address individual instances of actual influence or control.  *See, e.g., Time Warner Entertainment Co. v. FCC*, 240 F.3d 1126, 1139-41 (D.C. Cir. 2001) ("Presumably an owner of 5% or more [of the voting shares of a company's stock] typically has enough of an interest to justify the burden of informing himself about the company's activities and trying to influence (or supplant) management, a fact that management would bear in mind in deciding to whose exhortations it should pay attention."); *Prometheus I*. 373 F.3d at 429 (finding that the Commission reasonably

(continued....)

351.     We find that JSAs provide incentives for joint operation that are similar to those created by common ownership.  For example, when two stations are commonly owned, the paired stations may benefit by winning advertising accounts that are new to both of them (rather than by having one co-owned station win an account from the other) and, possibly, by being able to raise advertising prices above those that they would obtain if the stations were independently owned.  A broker selling advertising time on two stations, one of which is owned by the broker, has incentives similar to those of an owner of two stations to coordinate advertising activity between the two stations.  JSAs thus provide strong incentives for coordination of advertising activities rather than competition for advertising revenue.[1082]

352.     In addition, contrary to some commenters' claims, our experience indicates that television JSAs can be used to coordinate the operations of two ostensibly separately owned entities.[1083] For example, in *Ackerley*, the Commission found that the intertwined non-attributable television JSA and time brokerage agreement were "substantively equivalent" to an attributable LMA.[1084]

353.     Several commenters acknowledge that a JSA broker may have some influence over a brokered station, but they argue that the level of influence is minimal because the broker is involved only in non-network advertising sales.[1085]  They note that television JSAs differ from radio JSAs because television stations typically have network affiliations, and in such cases the network influences programming.  For example, Entravision argues that television station affiliations are motivated by the economic arrangements between the licensee and the network and have little relationship to non-network advertising; that affiliations do not tend to change; that the broker cannot control the network arrangement; and that, given the affiliation agreements, it is questionable whether a JSA broker could ever control the programming decisions of a network-affiliated licensee.  Entravision contrasts this with radio, where format changes occur regularly and where network affiliations are generally uncommon.  Entravision asserts that, because television stations produce little of their own programming other than news and public affairs, there is little room for the JSA broker to control anything except how advertising

---

(Continued from previous page) ─────────────────
explained that attribution of same-market radio JSAs was warranted "due to their potential to convey influence to brokering entities").

[1082] *See* DOJ February 20, 2014 *Ex Parte* Comments at 10-13, 16-17 (describing the ways in which JSAs can have economic effects similar to common ownership and how such collaboration can result in competitive harm, such as price coordination or reduced incentives for stations to compete for advertising).

[1083] Many commenters assert that their agreements are structured so that the brokered station maintains control of its programming and other core operations. *See, e.g.*, Belo TV JSA Comments at 8-9; Nexstar TV JSA Comments at 9; Paxson TV JSA Comments at 7.  This argument misses the point.  The issue in this proceeding is whether sufficient influence exists such that the interest should be counted in applying the ownership rules, which is a separate issue from whether the licensee has maintained ultimate control over its programming and core operations so as to avoid the potential for an unauthorized transfer of control or the existence of an undisclosed or unauthorized real party in interest.  47 U.S.C. § 310(d); 47 C.F.R. § 73.3540(a); *see also Solar Broadcasting Co., Inc.*, Memorandum Opinion and Order, 17 FCC Rcd 5467, 5486, ¶ 71 (2002) ("Although a licensee may delegate certain functions to an agent or employee on a day-to-day basis, ultimate responsibility for essential station matters, such as personnel, programming and finances, is nondelegable."); *Radio Moultrie, Inc.*, EB Docket No. 02-367, Order to Show Cause and Notice of Opportunity for Hearing, 17 FCC Rcd 24304, 24306-07, ¶¶ 7-9 (2002) (stating that "the Commission looks not only to who executes the programming, personnel, and finance responsibilities, but also to who establishes the policies governing those three areas"); *Choctaw Broadcasting Corp.*, Memorandum Opinion and Order, 12 FCC Rcd 8534, 8538-39, ¶ 11 (1997) ("[A] licensee involved in an LMA is not relieved of its responsibility to retain ultimate control.").

[1084] *Ackerley*, 17 FCC Rcd at 10841, ¶ 33.

[1085] Entravision TV JSA Comments at 5-6; FBC TV JSA Comments at 4-5; Minden TV JSA Comments at 4; Entravision Reply at 4-6.

is sold.[1086]  Accordingly, commenters argue, a television JSA does not convey influence over selection of programming or other core operations.[1087]

354.    We disagree.  It is possible for multiple parties to influence the programming decisions of a station.  Television stations provide local and/or syndicated programming, not merely network programming.  Thus, the fact that a station may air network programming does not prevent the broker from influencing the selection of non-network programming, be it local programming that the licensee of the brokered station produces or syndicated programming that it acquires to fill the rest of the broadcast day.[1088]  Furthermore, section 73.658(e) of the Commission's rules prohibits a station from entering into an affiliation agreement that does not permit the affiliate to preempt network programming that it finds "unsatisfactory or unsuitable or contrary to the public interest" and to substitute "a program which, in the station's opinion, is of greater local or national importance."[1089]  The JSA broker can potentially influence the brokered station's decision whether or not to pre-empt network programming, as well as its choice of non-network programs, and has an incentive to do so given the strong relationship between programming decisions and sale of advertising time discussed above.  In addition, a JSA broker can potentially influence the brokered station's choice of network affiliation.  A broker has a strong incentive to ensure that the brokered station provides programming — and an audience — that is complementary to that offered by its own station in order to maximize the attractiveness of the two stations to advertisers.  As a result, the effects of a JSA extend even to programming in dayparts in which the broker does not sell the advertising time.  The more time the broker sells, the more likely it becomes that the broker will have the ability to act on that incentive and influence the selection of the brokered station's programming.  Thus, the fact that some television stations have network affiliations does not undermine our finding that television JSAs confer sufficient influence that they should be attributed.

355.    In addition, many commenters argue that different treatment of radio and television JSAs is warranted because radio and television markets are different.  They contend that television stations incur special costs (such as greater programming and equipment costs) that radio stations do not,[1090] and also face more competition than radio stations, because television stations compete with a greater variety and increasing number of alternative media outlets.[1091]  Commenters also contend that television stations depend less on local advertisers than radio stations.[1092]  Hubbard disagrees that market differences between radio and television justify different treatment of JSAs.  According to Hubbard, there are fewer television outlets than radio outlets and fewer television programming networks than radio networks, so

---

[1086] Entravision TV JSA Comments at 4-6; Entravision TV JSA Reply at 5-6; *see also* FBC TV JSA Comments at 4-5.

[1087] Entravision TV JSA Comments at 1-5; Entravision TV JSA Reply at 1-6; Nexstar TV JSA Comments at 9-10; Sinclair TV JSA Comments at 6, 11; *see also* Sinclair Dec. 20, 2012 *Ex Parte* Letter at 2.

[1088] We note further that not all stations are affiliated with national networks, and even among those that are, the amount of programming time provided by a national network can vary widely.  Accordingly, the amount of non-network advertising time available on a station is not uniformly small, as some commenters would suggest, and the broker's ability to influence the brokered station may not be meaningfully constrained, even if we accepted commenters' arguments regarding the impact of network programming.

[1089] 47 C.F.R. § 73.658(e).

[1090] FBC TV JSA Comments at 10; NAB TV JSA Comments at 9-12; NBC TV JSA Comments at 8-9; Nexstar TV JSA Comments at 7-11.

[1091] Belo TV JSA Comments at 4-6, 7-10; FBC TV JSA Comments at 10-11; KTBS TV JSA Comments at 5-13; NAB TV JSA Comments at 9-10; NBC TV JSA Comments at 8-9; Nexstar TV JSA Comments at 8-9; White Knight TV JSA Comments at 3-5; *see also* LIN Dec. 21, 2012 *Ex Parte* Letter at 2; Sinclair Dec. 20, 2012 *Ex Parte* Letter at 3; TTBG Jan. 4, 2012 *Ex Parte* Letter at 1.

[1092] Belo TV JSA Comments at 4-6; FBC TV JSA Comments at 10-11; KTBS TV JSA Comments at 5-13; Nexstar TV JSA Comments at 8; White Knight TV JSA Comments at 2-3.

that "economic arrangements that tie local television stations together represent greater harm to diversity of programming and to competition than in radio."[1093]

356. We do not agree that market or service differences support treating radio and television JSAs differently.[1094] While television stations may depend less on local advertisers than radio stations as a percentage of overall advertising revenue, advertising revenue data demonstrate that television stations do depend on local advertising for revenues to a significant degree.[1095] Also, arguments that television stations need JSAs to survive in a competitive television market are properly addressed in the context of setting the applicable ownership limits rather than in deciding whether television JSAs confer influence such that they should be attributed in the first place. Ultimately, we find that the fundamental nature of television JSAs and radio JSAs is the same, in that they both allow an in-market, same-service competitor the right to sell advertising time on an independently owned station and give rise to the same types of incentives and opportunities to influence the programming and operations of the brokered station. We find that the fee structure associated with the JSA does not change this conclusion.[1096] Accordingly, we find that these agreements should receive the same treatment for attribution purposes. In deciding to change our attribution policy with respect to radio JSAs, we stated that our reexamination of the issue had led us to find that, because of the broker's control over advertising revenues of the brokered station, JSAs "have the same potential as LMAs to convey sufficient influence over core operations of a station" to warrant attribution.[1097] We believe that the same finding applies to television JSAs, notwithstanding any market differences, including the presence of network agreements.[1098]

357. Schurz asserts that the Commission should refrain from making television JSAs attributable without also relaxing the ownership limits in the local television ownership rule.[1099] According to Schurz, it has typically been the Commission's practice to find certain agreements attributable at the same time as or after relaxing the relevant ownership limits.[1100] Our attribution standards are not conditioned, however, on specific numerical ownership limits but instead help to ensure that the limits are not evaded. It is therefore necessary and appropriate for us to identify practices and agreements that confer a sufficient degree of influence that they should be counted toward the ownership

---

[1093] Hubbard TV JSA Reply at 1-4.

[1094] *See, e.g.*, Paxson TV JSA Comments at 4-6; Sinclair TV JSA Comments at 10-13.

[1095] In 2011, for example, local advertising revenue for the broadcast television industry was approximately $10.4 billion, compared to approximately $7.8 billion in national advertising revenue, or approximately 57 percent of broadcast television advertising revenue (local and national). SNL KAGAN ADVERTISING FORECASTS 2011 at 24.

[1096] In deciding to attribute radio JSAs, the Commission made clear that the *sine qua non* of attribution is an interest "through which the holder is likely to induce a licensee to take actions to protect the interests of the holder." *2002 Biennial Review Order*, 18 FCC Rcd at 13743-44, ¶ 318. And the Commission has calibrated attribution levels "based on our judgment regarding what interests in a licensee convey a realistic potential to affect its programming and other core operational decisions." *Id.* To be sure, the Commission has noted that some licensee/broker arrangements, such as radio JSAs providing for payment of a flat fee to the licensee, not only provide the broker with the incentive and ability to influence station operations and programming, but also deprive the licensee of a financial stake in its own station. *Id.* at 13744, ¶ 320; *see also Ackerley*, 17 FCC Rcd at 10840-41, ¶¶ 31-33 (broker retained all revenues). The Commission has never stated, however, that the licensee must be deprived of all financial stake in its station to warrant attribution. Regardless of the fee structure, the television JSA broker has the ability and incentive to influence the brokered station. *See supra* ¶ 350.

[1097] *2002 Biennial Review Order*, 18 FCC Rcd at 13744, ¶ 320.

[1098] *See* DOJ February 20, 2014 *Ex Parte* Comments at 16 (finding that attribution of television JSA is appropriate for reasons similar to those relied on in DOJ's support for attribution of radio JSAs).

[1099] Letter from Jack Goodman, Counsel, Schurz Communications, Inc., to Marlene H. Dortch, Secretary, FCC, at 3 (Dec. 19, 2012).

[1100] *Id.*

limits. Although at times the Commission has acted to modify ownership limits at the same time it has revised its attribution rules,[1101] this has not always been the case.[1102] Ultimately, it is not necessary to relax the television ownership limits in conjunction with our determination that television JSAs are attributable.

358.    Finally, some commenters acknowledge that television JSAs confer at least some influence over the programming of the brokered station, but argue that their public interest benefits outweigh these other considerations.[1103] Similarly, commenters in the 2010 Quadrennial Review proceeding fail to acknowledge the potential for influence over the programming of the brokered station, and argue that the Commission should refrain from attributing television JSAs because of the public interest benefits that result from the efficiencies that arise from sharing, including allegedly facilitating minority and female ownership and increasing diverse programming.[1104] While we recognize that cooperation among stations may have public interest benefits under some circumstances, particularly in small to mid-sized markets, these potential benefits do not affect our assessment of whether television JSAs confer significant influence such that they should be attributed. Rather, any such benefits should be

---

[1101] *See, e.g., 1992 Radio Ownership Order*, 7 FCC Rcd at 2756-60, ¶¶ 3-10; *1999 Ownership Order*, 14 FCC Rcd 12903, 12907-08, ¶¶ 7-8 (ownership determination made in order released on the same day as separate order announcing attribution determination).

[1102] *See, e.g., 2002 Biennial Review Order*, 18 FCC Rcd at 13731-32, ¶¶ 290-291; *see also 2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 02-277, Notice of Proposed Rulemaking, 17 FCC Rcd 18503, 18506, ¶ 7 n.13 (2002) ("The media attribution limits are set at the level the Commission believes conveys influence over the affairs of the company in which the interest is held. This level is not related to any changes in competitive forces, and hence the limits are not reviewed on a biennial basis."). The Third Circuit found that the Commission's decision in 2003 to replace the contour overlap method of defining geographic markets with a method based on Arbitron Metros was more restrictive than the contour overlap approach, even considering the Commission's decision to include noncommercial stations in its methodology. *Prometheus I*, 373 F.3d at 426 & n.65. The Third Circuit remanded the Commission's determination to retain its existing numerical caps because of flaws in the Commission's reasoning, *id.* at 432-35, but upheld the Commission's decision on remand. *Prometheus II*, 652 F.3d at 462-63.

[1103] *See, e.g.,* Communications Corporation of America ("CCA") TV JSA Comments at 6-9; KTBS TV JSA Comments at 2-3, 13, 18-20; Nexstar TV JSA Comments at 8-11.

[1104] *See, e.g.,* Letter from Clifford M. Harrington, Counsel, Sinclair, to Marlene H. Dortch, Secretary, FCC (Feb. 5, 2014); Letter from Jane Mago, Executive Vice President and General Counsel, NAB, to Marlene H. Dortch, Secretary, FCC (Feb. 18, 2014); LIN Dec. 21, 2012 *Ex Parte* Letter at 2 (Spanish-language programming); Mission 323 Report Reply at 4-10 (female ownership and local programing); Schurz 323 Report Reply at 3-4; TTBG Jan. 4, 2013 *Ex Parte* Letter at 1-2. Commissioner Pai's dissent also alleges that "the record is replete with evidence that JSAs promote localism and diversity." Pai Dissent at 222. Commissioner Pai cites a litany of examples that he asserts substantiate his position. *Id.* at 222-25. However, the examples Commissioner Pai cites include in virtually every instance (with only the potential exception of WLOO) stations that are involved in various other sharing and financing agreements between the brokered and brokering stations. Even accepting the broadcasters' claims at face value, the record contains no evidence linking the claimed benefits to that station's same-market television JSA. *See* Letter from Clifford M. Harrington, Counsel for Sinclair Broadcast Group, to Marlene H. Dortch, Secretary, FCC 1-2 (Feb. 26, 2014) (conflating benefits of "acquisitions and JSAs/SSAs"); Letter from M. Anne Swanson, Counsel for Media General, to Marlene H. Dortch, Secretary, FCC (Jan. 8, 2013) (asserting benefits of a JSA and SSA); Local TV Coalition NPRM Comments App. A at 5 (identifying benefits from SSAs); Pai Dissent at 224 (describing benefits of LIN Media "Sharing Arrangements"). Today's decision does not disturb other sharing agreements, such as those that allow stations to share facilities, provide local news production assistance, or share administrative and technical personnel, and any operational efficiencies and related potential public interest benefits created by these agreements will continue. Our action today with respect to sharing agreements is to seek comment on a disclosure requirement that would help the Commission and the public determine the extent to which these agreements may impact the Commission's policy goals. *See supra* Section V.

assessed in determining where to set the applicable ownership limit, *i.e.*, how many television stations a single entity should be permitted to own, operate, or control in a local television market.[1105] Nonetheless, we will afford transitional relief to stations that are party to existing television JSAs, as discussed below.

359. We do not wish to imply that all JSAs are harmful. We have recognized that common ownership may have public interest benefits in some circumstances, and we believe that the same may be true of JSAs. JSAs may, for example, facilitate cost savings and efficiencies that could enable the stations to provide more locally oriented programming.[1106] JSAs, however, should not be used to circumvent our local broadcast television ownership rules, which are designed to promote competition.[1107] Because television JSAs encompassing a substantial portion of the brokered station's advertising time create the potential to influence the brokered station and provide incentives for joint operation that are similar to those created by common ownership, we find that television JSAs that permit the sale of more than 15 percent of the advertising time per week of the brokered station, as described in greater detail below, should be cognizable interests for purposes of applying our ownership rules.[1108]

360. The Commission has consistently applied a 15 percent threshold to determine whether to attribute JSAs in radio markets and LMAs in both television and radio markets, and we find that it is

---

[1105] *See infra* ¶ 359; *1999 Attribution Order*, 14 FCC Rcd at 12598-99, ¶ 87 (concluding that potential public interest benefits of LMAs are relevant to the level of common ownership that should be permitted rather than to the question of whether LMAs confer sufficient potential for influence to warrant attribution). Our reexamination of the issue leads us to conclude that the contention that JSAs may rescue struggling stations by enabling smaller stations to stay on the air is not relevant to the question of whether JSAs confer the potential for significant influence, warranting attribution. *But see 1999 Attribution Order*, 14 FCC Rcd at 12612, ¶ 122. Rather, it is an argument that is relevant to our determination of where to set the ownership limits and potentially to whether a waiver of the ownership rules is warranted in a particular case. The same holds true for any other asserted public interest benefits of television JSAs. We are seeking comment on whether to revise the local television ownership rule herein, see Section III.A, *supra*, and we encourage interested parties to provide comment on any public interest benefits of increased common ownership in that context.

[1106] *See, e.g.*, *2002 Biennial Review Order*, 18 FCC Rcd at 13674-75, 13683, ¶¶ 147-150, 164.

[1107] Commissioner Pai's dissent and recent broadcaster *ex parte* submissions assert that it is unfair to attribute television JSAs while allowing MVPDs to engage in similar conduct through local "interconnects." *See* Pai Dissent at 221; Letter from Rick Kaplan, Executive Vice President, Strategic Planning, NAB, to Marlene H. Dortch, Secretary, FCC, at 2 (Mar. 13, 2014); Letter from John K. Hane, Counsel, LIN, to Marlene H. Dortch, Secretary, FCC, at 1-2 (Feb. 26, 2014). While there are various Commission rules relating to MVPD ownership, there is no counterpart in the MVPD context to the local television ownership rule. And the broadcast attribution rules are designed to ensure that parties cannot circumvent the broadcast ownership rules. Further, the issue of MVPD local interconnects was not subject to notice in either the *NPRM* in the 2010 Quadrennial Review or the *TV JSA NPRM*, and is beyond the scope of this proceeding. If interested parties perceive a problem that would be remedied by attribution of MVPD joint advertising arrangements, they may file a petition for rulemaking, which we will consider.

[1108] Paxson submits a declaration of Mark Fratrik, Ph.D., Vice President of BIA Financial Network discussing the impact on the Herfindahl-Hirschman Index ("HHI") — a measure used to analyze a proposed merger's potential impact on competition — of attribution of certain of Paxson's own television JSAs and other television JSAs it identified in publicly available records. Paxson TV JSA Comments at 4-6, App. (Mark Fratrik, Attributing Joint Sales Agreements: A Report for Paxson Communications Corporation (Oct. 27, 2004)). According to Paxson, the combinations reviewed would produce only a small increase in the HHI below the 100 point threshold that typically implicates DOJ antitrust issues. *Id.* at 5-6. The analysis, however, does not address the ability and incentive for the brokering station to exert influence over the brokering stations core operating functions. Rather, Paxson's analysis goes to the appropriateness of the Commission's local television ownership limits (or the appropriateness of a waiver of those limits), which are not based simply on a structural antitrust analysis, but rather on a broader concern with promoting competition, localism, and diversity.

appropriate to use that same threshold here.[1109] This threshold was most recently applied in the Commission's decision to attribute certain same-market radio JSAs, a decision that was upheld by the Third Circuit in *Prometheus I*.[1110] A 15 percent advertising time threshold will allow a station to broker a small amount of advertising time through a JSA with another station in the same market without triggering attribution, yet will fall short of providing the broker a significant incentive or ability to exert influence over the brokered station's programming or other core operating functions because it will not be selling the advertising time in a substantial portion of the station's programming.[1111] Just as in the radio context, we believe that a 15 percent advertising time threshold will identify the level of control or influence that would realistically allow holders of such influence to affect core operating functions of a station, including programming choices, and give them an incentive to do so.[1112]

361.     Sinclair asserts that applying the 15 percent threshold used for radio and television LMAs and radio JSAs would be arbitrary and capricious because of differences in the radio and television marketplace.[1113] We disagree. As discussed herein, we find that the differences between the radio and television markets do not warrant different treatment of radio and television JSAs. In addition, as discussed above, we find that the ability of the brokering station to control the advertising revenue of the brokered stations, the common component of JSAs and LMAs, gives the brokering station under a JSA the same incentive and ability to influence the brokered station's core operating functions as a brokering station under an LMA.[1114] For example, while an LMA gives the brokering station the direct ability to influence programming on the brokered station because the LMA broker provides the programming to the brokered station, we have found that the sale of advertising time pursuant to a JSA provides the brokering station with the indirect ability to influence the brokered station's programming. As the amount of advertising revenue controlled by the brokering station increases, so too does its incentive and ability to influence brokered station's programming — including programming in dayparts in which the broker does not sell the advertising time. We can see no benefit to permitting greater indirect influence over the

---

[1109] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13745-46, ¶ 323; *1999 Attribution Order*, 14 FCC Rcd at 12598, ¶ 85; *1992 Radio Ownership Order*, 7 FCC Rcd at 2788, ¶ 65.

[1110] *Prometheus I*, 373 F.3d at 429-30.

[1111] *2002 Biennial Review Order*, 18 FCC Rcd at 13745-46, ¶ 323 (citing *1999 Attribution Order*, 14 FCC Rcd at 12598, ¶ 85 n.183) (finding that the 15 percent threshold struck the appropriate balance between permitting a station to broker a small percentage of advertising time while preventing the brokering station from obtaining the ability and incentive to influence the core operating functions of the brokered station); *see also Prometheus I*, 373 F.3d at 429 (holding that the Commission was justified in its finding that in-market radio JSAs above the 15 percent threshold convey to the brokering entity a degree of influence warranting attribution).

[1112] *2002 Biennial Review Order*, 18 FCC Rcd at 13745-46, ¶ 323.

[1113] *See* Sinclair TV JSA Comments at 10-13. Sinclair's reference to comments DOJ filed in a prior attribution proceeding could be read to mean that DOJ determined that it was not appropriate to treat radio and television markets the same for attribution purposes. *See* Sinclair TV JSA Comments at 12 n.46. In fact, the cited comments merely pointed out that the agency had not analyzed television JSAs and therefore limited its comments to radio JSAs. Letter from Joel I. Klein, Acting Assistant Attorney General, Department of Justice, Antitrust Division, to Reed Hunt, Chairman, FCC, at 5 n.2 (May 8, 1997) (MM Docket Nos. 94-150 *et al.*). The recent *ex parte* submission from DOJ strongly supporting the Commission's decision to attribute television JSAs confirms that Sinclair's reading of DOJ's earlier comments was mistaken. *See* DOJ February 20, 2014 *Ex Parte* Comments at 15-16. In addition, Sinclair is misguided in asserting that television JSAs cannot be attributed in the absence of detailed definitions of categories of station's advertising and programming time. *See* Sinclair TV JSA Comments at 12-13. Such elements would apply equally to radio and television LMAs and/or radio JSAs and have not proved necessary as components of the rule for successful implementation in those attribution rules.

[1114] *See supra* ¶ 350; *see also 2002 Biennial Review Order*, 18 FCCC Rcd at 13744-45, ¶ 320 ("Upon reexamination of the attribution issue, we find that, because the broker controls the advertising revenue of the brokered station, JSAs have the same potential as LMAs to convey sufficient influence over core operations of a station. . . .").

brokering station's programming than could be achieved directly through an LMA; accordingly, we reject Sinclair's assertion that applying the 15 percent threshold to television JSAs would be arbitrary and capricious. Were we to establish a higher limit for JSAs, licensees and brokers could be expected to simply choose to enter into JSAs instead of LMAs because of the higher attribution threshold, thus creating a ready avenue for evading the LMA attribution rule and our ownership limits.

362. In addition, Paxson briefly offers two proposals of its own: (1) a 35 percent all-market advertising sales standard and (2) a "JSA-Plus" standard that would result in attribution in situations involving various levels of advertising sales, ownership options, and programming rights.[1115] Paxson's brief discussion, however, does not provide any empirical or theoretical basis upon which to adopt either of these proposals, both of which appear to focus primarily on the impact of the brokerage agreement on the competitive market rather than the broker's incentive and ability to influence the brokered station's core operating functions. Further, Paxson appears to have devised the thresholds, at least in the first option, in order to avoid the attribution of its own television JSAs.[1116] Ultimately, the record does not support the adoption of either of these alternatives, and we believe that a broker has the ability and incentive to exert influence over a brokered station's programming and operations well below the threshold or combination of interests that Paxson proposes.

363. The rationale for attributing LMAs and JSAs is the same for radio and television: to prevent the circumvention of our ownership limits.[1117] Ultimately, in attributing these other agreements, the Commission determined that the 15 percent threshold was the appropriate threshold, as below that threshold the Commission has found that a broker will lack significant incentive or ability to exert influence over the brokered station's programming or other core operating functions;[1118] and, as discussed above, we find no evidence that television JSAs are sufficiently unique as compared to other attributable agreements to justify a different attribution threshold. Thus, where an entity that owns or has an attributable interest in one or more television stations in a local television market sells more than 15 percent of the advertising time per week of another television station in the same market, it will be deemed to hold an attributable interest in the brokered station and such station will be counted toward the brokering licensee's ownership compliance.[1119]

364. Finally, we note that parties that believe that the application of our attribution rules to their particular circumstances would not serve the public interest always have the ability to seek a waiver.[1120] The Commission has an obligation to take a hard look at whether enforcement of a rule in a particular case serves the rule's purpose or instead frustrates the public interest.[1121] Thus, for example, a party seeking waiver of the attribution rule could attempt to demonstrate that a particular television JSA in context — including any related agreements or interests — does not provide the brokering entity with the opportunity, ability, and incentive to exert significant influence over the programming or operations of the brokered station. In considering a request for waiver of attribution, we will take into account the totality of the circumstances in order to assess whether strict compliance with the rule is inconsistent with

---

[1115] *See* Paxson TV JSA Comments at 13-16.

[1116] *See id.* at 15 ("this [35 percent] rule would have no effect on the vast majority of JSAs that, like [Paxson's] JSAs, do not pose any threat to competition or diversity").

[1117] *1999 Attribution Order*, 14 FCC Rcd at 12597, ¶ 83 (citing *1992 Radio Ownership Order*, 7 FCC Rcd at 2788, ¶ 65).

[1118] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13745-46, ¶ 323; *1999 Attribution Order*, 14 FCC Rcd at 12598, ¶ 85 n.183.

[1119] *See* 47 C.F.R. § 73.3555(b), (c), (d), (e).

[1120] *See* 47 C.F.R. § 1.3.

[1121] *See Northeast Cellular Tel. Co., L.P. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990); *WAIT Radio*, 418 F.2d at 1157.

the public interest. For example, to make such a showing, an applicant may provide the JSA together with any other agreements, documents, facts, or information concerning the operation and management of a brokered station that demonstrate that the underlying public interest considerations supporting the Commission's decision to attribute JSAs, as discussed herein, are not present in the particular case. The relevant factors may include, without limitation: (i) specific facts that show a lack of incentive or ability for the broker station to influence the brokered station's programming or operations, and (ii) specific facts that demonstrate that the brokered station has the incentive and ability to maintain independent operations and programming decisions that are not influenced by the broker station and the incentive and ability to exclude the broker station from exerting influence over programming and operations. A waiver request for a JSA that is limited in scope (*i.e.*, percentage of the station's advertising sales) and duration so as to minimize or eliminate any influence on operations or programming is more likely to be successful than an open-ended request.[1122] Similarly, as we point out in the FNPRM, if a licensee believes that application of the local television ownership rule in a particular situation would adversely affect competition, diversity, or localism, it may seek a waiver of that rule.[1123] The Commission will carefully review and consider any such request on an expedited basis. We recognize that broadcast transactions are time sensitive and that Commission action on assignment and transfer applications, including any associated waiver requests, must be taken promptly without unnecessary delay. We direct the Bureau to prioritize review of any applications for waiver necessitated by attribution of JSAs and to complete their review within 90 days of the record closing on such waiver petitions provided there are no circumstances requiring additional time for review.

365. We note that the FNPRM seeks comment on possible changes to our waiver policy under the local television ownership rule, including possible changes to the failed/failing station waiver policy and whether the Commission should adopt a new market size waiver standard. Information about any public interest benefits or efficiencies associated with joint ownership or operation in small local markets will inform our analysis of those issues. We encourage interested parties to provide comment in response to the FNPRM on any ways in which the rule or waiver policy could be modified to provide relief in circumstances where it is warranted while still promoting the local television ownership rule's policy goals.[1124]

## B. Filing Requirements and Transition Procedures

366. First, subject to OMB approval, we will require going forward that attributable television JSAs be filed with the Commission within 30 days after the JSA is entered into.[1125] Second, we will require parties to existing attributable television JSAs and/or parties to attributable television JSAs

---

[1122] *Cf.* Letter from James L. Winston, Executive Director and General Counsel, NABOB, to Marlene H. Dortch, Secretary, FCC (Feb. 27, 2014) (asserting that a case-by-case waiver analysis should favor factors such as limiting the duration of agreements (*e.g.*, a five-year period) and discussion of providing annual reports to the Commission "on the operational changes that have occurred in the reporting period that have turned over specific responsibilities to the licensee").

[1123] For example, an applicant may be able to demonstrate that a waiver would enable a school, community college, other institution of higher education, or other community support organization or entity to own a station and that the public interest benefits of such ownership outweigh the harms the Commission has identified with common ownership in support of the local television ownership limits. *See* 47 C.F.R. § 1.3.

[1124] *See supra* ¶¶ 58-60; *see also* 47 C.F.R. § 73.3555, Note 7.

[1125] Currently, commercial television stations are required under section 73.3526 of the Commission's rules to place a copy of any JSA involving the station in the local public inspection file, but are not required to file such agreements with the Commission. *See* 47 C.F.R. § 73.3526(e)(16). With the adoption of this Order, commercial television stations that are party to an attributable JSA will now be required to file a copy of the agreement with the Commission pursuant to section 73.3613, consistent with requirements for attributable LMAs and attributable radio JSAs. *See* 47 C.F.R. § 73.3613(d).

entered into after the release of this Order but before the filing requirement becomes effective to file a copy of such agreements with the Commission within 30 days after the filing requirement becomes effective.[1126] Third, we direct the Media Bureau to take the necessary steps to modify the relevant application forms to conform to the rule changes adopted in this Order, including the reporting of attributable television JSAs, for example, in connection with a request for authority to transfer or assign a station license.[1127]

367.    We reject arguments that we should automatically grandfather all television JSAs permanently or indefinitely.[1128]  In these circumstances, we find that such grandfathering would allow arbitrary and inconsistent changes to the level of permissible common ownership on a market-by-market basis based not necessarily on where the public interest lies, but rather on the current existence or nonexistence of television JSAs in that market when the new attribution rule becomes effective.  Instead, consistent with the Commission's treatment of existing radio JSAs when the Commission first made such agreements attributable, and as discussed in the *TV JSA NPRM*, parties to existing, same-market television JSAs whose attribution results in a violation of the ownership limits will have two years from the effective date of this Order to terminate or amend those JSAs or otherwise come into compliance with the local television ownership rule.[1129]  We find that such a transition period is necessary to avoid undue disruption to current business arrangements, and we believe that the two-year compliance period will give licensees sufficient time to make alternative arrangements.[1130]  We note that parties to television JSAs have long been on notice of the possibility that the Commission's would attribute certain same-market television JSAs.[1131]  Moreover, as noted above, licensees may seek a waiver of our rules if they believe strict application of the rules would not serve the public interest.

---

[1126] *See* 47 C.F.R. § 73.3613(d)(2) (as amended herein).  We will seek OMB approval for the filing requirement, and, upon receiving approval, the Commission will release a Public Notice specifying the date by which television JSAs must be filed.

[1127] Such forms would include, *inter alia*, FCC Form 314, Application for Consent to Assignment of Broadcast Station Construction Permit or License, and FCC Form 315, Application for Consent to Transfer Control of Entity Holding Broadcast Station Construction Permit or License.  *See 2002 Biennial Review Order*, 18 FCC Rcd at 13746, ¶¶ 324-25.

[1128] *See* NBC TV JSA Comments at 10; Nexstar TV JSA Comments at 12; Sinclair TV JSA Comments at 16-17; White Knight TV JSA Comments at 5-8; Belo TV JSA Comments at 9-10; Clear Channel TV JSA Comments at 3-4; Entravision TV JSA Comments at 6-8; Minden TV JSA Comments at 11-12; Nexstar TV JSA Comments at 12; *see also* LIN Dec. 21, 2012 *Ex Parte* Letter at 3.

[1129] *See TV JSA NPRM*, 19 FCC Rcd at 15244, ¶ 20; *2002 Biennial Review Order*, 18 FCC Rcd at 13746, ¶ 325.

[1130] No transition period is granted with regard to new television JSAs that would cause the broker to exceed our media ownership limits.  In order to avoid undue disruption, however, parties may renew existing television JSAs even if renewal would cause the broker to exceed our media ownership limits, provided that the renewal period shall not exceed the two-year transition period provided for in this Order.

[1131] *See generally TV JSA NPRM*, 19 FCC Rcd 15238; *see also 2002 Biennial Review Order*, 18 FCC Rcd 13743, ¶ 316 n.688 (attributing radio JSAs and indicating that the Commission would consider the attribution of television JSAs in a future proceeding).  In the *TV JSA NPRM*, the Commission sought comment on whether it should take the same approach for television JSAs that it had taken when radio JSAs became attributable, noting that pre-existing radio JSAs were not grandfathered but affected licensees were given a two-year compliance period.  19 FCC Rcd at 15244, ¶ 20.  In contrast, when the Commission proposed making television LMAs attributable, it proposed grandfathering LMAs entered into before the further notice of proposed rulemaking was issued.  *Review of the Comm'n's Regulations Governing Television Broad. Television Satellite Stations Review of Policy & Rules*, MM Docket No. 91-222, Further Notice of Proposed Rulemaking, 10 FCC Rcd 3524, 3583-84, ¶ 138 (1995).  Moreover, as with the Commission's radio JSA decision, we are providing a two-year transition period for licensees to come into compliance.  Thus, we disagree with Paxson that equitable considerations warrant the same grandfathering approach here as the Commission adopted for television LMAs.  *See* Paxson TV JSA Comments at 16-22.  Likewise, our decision not to grandfather existing television JSAs does not conflict with the grandfathering of non-

(continued....)

### C. National Sales Representatives

368. Sinclair sought clarification that the Commission would not attribute television and radio stations that are represented by national advertising representative firms ("rep firms") where a rep firm is co-owned with a broadcaster, and the parent owns a same-market station.[1132] Rep firms bring national advertisers who want to buy commercial time in selected markets together with the individual stations in those markets.[1133] For the reasons discussed below, we find that the record does not support attribution of a rep firm's client stations to a rep firm.

369. Some commenters argue that the Commission must reconcile its decision to eliminate the former "*Golden West*" cross-interest policy with respect to the attribution decision herein.[1134] Since eliminating the former cross-interest policy (by which a licensee was prohibited from having an interest in more than one station in the same service in the same area), the Commission consistently has held that advertising representation does not constitute an attributable interest.[1135] Under the Commission's former *Golden West* policy, the Commission prohibited representation of a radio or television station by a national sales representative owned wholly or partially by the licensee of a competing station in the same service in the same community or service area.[1136] However, the Commission abolished that policy with respect to attribution in 1981, holding that market forces and the remedies available under antitrust laws were sufficient to deter the anticompetitive practices the policy was meant to address.[1137] The Commission also noted "that the potential for impairment of economic competition that *Golden West* was designed to guard against will be mitigated by the incentive of the unaffiliated station to seek the sales representative that will most vigorously serve its interest."[1138] Since 1981, the Commission has consistently refused to prohibit or attribute sales rep agreements.[1139] We believe the Commission's

(Continued from previous page)

compliant ownership combinations. Pai Dissent at 229. Broadcasters have been on notice since 2004 of the Commission's tentative conclusion that certain television JSAs should be attributed and that existing television JSAs would not necessarily be grandfathered. Thus, any broadcaster that entered into or renewed a JSA after the *TV JSA NPRM* was released knew the risk of doing so. Moreover, broadcasters are not required to obtain prior approval of JSAs, and JSAs are not reviewed at all unless they are part of a transaction requiring approval. We also reject Paxson's claim that failure to grandfather pre-existing television JSAs for at least five years would result in impermissible retroactive rulemaking. *See* Paxson TV JSA Comments at 17-21. Our decision to make television JSAs attributable alters the future effect, not the past legal consequences, of television JSAs. It does not alter the past legality of television JSAs, does not impose liability for past actions, and does not introduce any retrospective duties for past conduct. *See Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006); *Sinclair Broad. Group, Inc. v. FCC*, 284 F.3d 148, 166 (D.C. Cir. 2002).

[1132] Sinclair TV JSA Comments at 13-15.

[1133] *See Shareholders of AMFM, Inc.*, Memorandum Opinion and Order, 15 FCC Rcd 16062, 16076, ¶ 34 (2000).

[1134] *See, e.g.*, Sinclair TV JSA Comments at 14-15.

[1135] *See, e.g.*, *AMFM*, 15 FCC Rcd at 16076-77, ¶¶ 34-38; *Shareholders of Hispanic Broadcasting Corporation*, MB Docket No. 02-235, Memorandum Opinion and Order, 18 FCC Rcd 18834, 18853, ¶ 50 (2003).

[1136] *Golden West Broadcasters*, Memorandum Opinion and Order, 16 FCC 2d 918 (1969); *Representation of Stations by Representatives Owned by Competing Stations in the Same Area*, BC Docket No. 80-438, Report and Order, 87 FCC 2d 668 (1981) ("*1981 Sales Rep Order*").

[1137] *See 1981 Sales Rep Order*, 87 FCC 2d 668. In addition, in the *1999 Attribution Order*, the Commission deleted the three remaining aspects of the cross-interest policy involving key employee relationships, non-attributable equity interests, and joint venture agreements. 14 FCC Rcd at 12609, ¶ 112.

[1138] *1981 Sales Rep Order*, 87 FCC 2d at 680, ¶ 29.

[1139] The Commission's Network Representation Rule prohibits stations, other than those owned and operated by their network, from being represented by their network in the non-network (spot) advertising sales market. 47 C.F.R. § 73.658(i). The Commission has found that the rule "protects broadcast affiliates from the networks exerting influence over affiliate programming decisions, and . . . fosters competition in the local and national

(continued....)

decision to eliminate the *Golden West* policy was sound, and our JSA attribution rules should not be read to disturb that decision.

370.     In this regard, we note that some commenters claim that attribution of television JSAs would be discriminatory and inconsistent with the Commission's previous decision not to attribute national advertising agreements, because both types of agreements provide one firm with the ability to influence an unaffiliated station's operations.[1140] As we explain in this Order, we are attributing same-market television JSAs because they convey a sufficient degree of influence to warrant attribution. National advertising agreements do not raise the same concerns. Unlike JSAs involving competing stations in the same local market, national advertising agreements do not combine ownership of a local, competing television station with the potential for significant influence over programming. Therefore, we disagree with commenters that our decision today to attribute same-market television JSAs is inconsistent with our previous attribution decisions.

371.     Given the unique nature of national advertising sales firms, as discussed below, we clarify that we will not generally apply our rules attributing television or radio JSAs to national advertising sales representation agencies. We observe that typically, national rep firms that are commonly owned with broadcast stations are operated separately from the commonly owned broadcast stations.[1141] With hundreds, if not thousands, of clients and a narrow business focus (namely, the sale of national spot advertising), rep firms are not involved in the day-to-day operations of their client stations, commonly owned or otherwise. In addition, there are fundamental differences in the relationship between a local station and a rep firm, and between local stations that are party to a JSA. For example, when a station contracts with a rep firm, it typically provides only enough information about its operations to enable the rep firm to sell national advertising spots on the station. Because of the way rep firms are structured and the contractual protections available to a local station, station-specific information is not provided to the competing stations in the market that also contract with the rep firm. By contrast, in a JSA involving multiple local stations, the advertising rate information and other otherwise confidential station information is shared between the parties.[1142] Ultimately, we conclude that the relationship

---

(Continued from previous page)
broadcast television markets." *Amendment of § 73.658(i) of the Commission's Rules*, BC Docket No. 78-309, Report and Order, 5 FCC Rcd 7280, 7280 (1990). Nevertheless, the Commission has granted a number of permanent waivers of the Network Representation Rule to allow networks to represent affiliates airing the networks' Spanish-language programming, concluding, among other things, that national rep firms lack the specialized experience to represent Spanish-language stations, and that waiver of the rule would promote the development of foreign-language programming. *See Fox Networks Group, Inc. (MundoFox) Petition for Waiver of Section 73.658(i) of the Commission's Rules*, MB Docket No. 12-31, Opinion, 27 FCC Rcd 5158, 5159-60 (Med. Bur. 2012); *Amendment of § 73.658(i) of the Commission's Rules*, 5 FCC Rcd at 7281-82.

[1140] CCA TV JSA Comments at 4-6; Holston TV JSA Comments at 8; NAB TV JSA Comments at 3-4; Pappas TV JSA Comments at 8-9; Entravision TV JSA Reply at 4-6.

[1141] For example, Cox Enterprises is the parent company of WSB-TV in Atlanta, Georgia, and its affiliated national rep firm, Cox Rep, also has an office in Atlanta. However, the television station and the rep firm operate out of separate offices in Atlanta nearly seven miles apart. *See* Cox Reps, *Our Locations* (office located at 3525 Piedmont Road), http://www.coxreps.com/index.php?id=5 (visited Jan. 30, 2014); WSB-TV, *Contact Us* (office located at 1601 West Peachtree Street NE), http://www.wsbtv.com/contact-us/ (visited Jan. 30, 2014); *see also* Sinclair TV JSA Comments at 13 n.48 (explaining that national rep firms are typically located "in a few commercial centers" that correspond to the location of national advertising agencies and not the location of local television stations). Cox Reps sales staff is employed by three distinct companies (TeleRep, HRP, and MMT) that provide sales services for more than 350 television stations in the U.S. and Canada. Cox Reps, *Our Services*, http://www.coxreps.com/index.php?id=11 (visited Jan. 30, 2014). These companies do not appear to have any involvement in the day-to-day operations of WSB-TV beyond any advertising sales services they may provide.

[1142] Moreover, as noted above, JSAs are often executed in conjunction with other types of sharing agreements, which leads to higher levels of common operation that are not present in relationships with rep firms.

between a rep firm and its client station, as described herein, does not confer the same potential and incentives for the rep firm to influence a licensee that are present in a traditional JSA relationship. Therefore, national rep firms should not generally be subject to our television and radio JSA attribution rules.[1143]

372. At the present time, we have no evidence to suggest that a national advertising representation firm that has a commonly owned broadcast station in a local market in which it also represents a client for advertising services would have the incentive or ability to exert significant influence over the programming or other core activities of its client. Nevertheless, we will entertain complaints based on a showing that a rep firm that is commonly owned with a broadcast licensee has not insulated the business of operating its commonly owned broadcast station from the business of providing advertising representation services in a market in which the rep firm has a commonly owned broadcast station. In such cases, we will make a case-by-case determination of whether attribution is appropriate.

## VII. PROCEDURAL MATTERS

### A. Regulatory Flexibility Act

373. *Final Regulatory Flexibility Analysis.* As required by the Regulatory Flexibility Act of 1980, as amended ("RFA"),[1144] the Commission has prepared a Final Regulatory Flexibility Analysis ("FRFA") of the possible significant economic impact on small entities of the policies and rules addressed in the Report and Order. The FRFA is set forth in Appendix C.

374. *Supplemental Initial Regulatory Flexibility Analysis.* As required by the Regulatory Flexibility Act,[1145] the Commission prepared an Initial Regulatory Flexibility Analysis ("IRFA") in the initial *NPRM* in this proceeding.[1146] We have now prepared a Supplemental IRFA, which is set forth in Appendix D. Written public comments are requested on the Supplemental IRFA. These comments must be filed in accordance with the same filing deadlines for comments on this Further Notice of Proposed Rulemaking, and should have a separate and distinct heading designating them as responses to the Supplemental IRFA.

### B. Paperwork Reduction Act Analysis

375. *Final Paperwork Reduction Act Analysis.* This Report and Order contains information collection requirements subject to the Paperwork Reduction Act of 1995 ("PRA"), Public Law 104-13. The requirements will be submitted to the Office of Management and Budget ("OMB") for review under Section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on the information collection requirements contained in this proceeding. The Commission will publish a separate document in the Federal Register at a later date seeking these comments. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. § 3506(c)(4), the Commission previously sought specific comment on how it might further reduce the information collection burden for small business concerns with fewer than 25 employees.

376. *Initial Paperwork Reduction Act Analysis.* This Further Notice of Proposed Rulemaking proposes a new or revised information collection requirement. As part of its continuing effort to reduce

---

[1143] While we are not aware of any instances of non-national advertising sales firms (*e.g.*, regional advertising sales firms) that are commonly owned with a broadcast licensee, the rationale we adopt herein for excluding national rep firms from our television and radio JSA attribution rules would apply to such non-national rep firms to the extent these firms are operated in the same manner as national rep firms (*i.e.*, completely separate and independent from the operation of the local broadcast stations).

[1144] *See* 5 U.S.C. § 603.

[1145] *Id.*

[1146] *NPRM*, 26 FCC Rcd at 17576-81, App. C.

paperwork burdens and as required by the Paperwork Reduction Act of 1995, Public Law 104-13 (44 U.S.C. §§ 3501-3520), the Commission will invite comments on the proposed information collection requirement and provide instructions for submitting such comments in the summary of this document that it will publish in the Federal Register. In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. § 3506(c)(4), the Commission will also seek specific comment on how it might "further reduce the information collection burden for small business concerns with fewer than 25 employees."

## C. Congressional Review Act

377. The Commission will send a copy of this Further Notice of Proposed Rulemaking and Report and Order to the Government Accountability Office pursuant to the Congressional Review Act, see 5 U.S.C. § 801(a)(1)(A).

## D. Ex Parte Rules

378. *Permit-But-Disclose.* The proceeding for this Further Notice of Proposed Rulemaking and Report and Order shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[1147] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

## E. Comment Filing Procedures

379. *Comments and Replies.* Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 C.F.R. §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Comment Filing System ("ECFS"). *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- ☐ Electronic Filers: Comments may be filed electronically using the Internet by accessing the ECFS: http://fjallfoss.fcc.gov/ecfs2/.

- ☐ Paper Filers: Parties who choose to file by paper must file an original and one copy of each filing. If more than one docket or rulemaking number appears in the caption of this proceeding, filers must submit two additional copies for each additional docket or rulemaking number.

---

[1147] 47 C.F.R. §§ 1.1200 *et seq.*

Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

☐ All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554. The filing hours are 8:00 a.m. to 7:00 p.m. All hand deliveries must be held together with rubber bands or fasteners. Any envelopes and boxes must be disposed of before entering the building.

☐ Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD 20743.

☐ U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington, DC 20554.

380. People with Disabilities: To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

381. *Availability of Documents.* Comments, reply comments, and *ex parte* submissions will be available for public inspection during regular business hours in the FCC Reference Center, Federal Communications Commission, 445 12th Street, S.W., CY-A257, Washington, D.C., 20554. These documents will also be available via ECFS. Documents will be available electronically in ASCII, Microsoft Word, and/or Adobe Acrobat.

### F. Additional Information

382. For additional information on this proceeding, contact Hillary DeNigro or Benjamin Arden of the Industry Analysis Division, Media Bureau, at (202) 418-2330.

## VIII. ORDERING CLAUSES

383. Accordingly, **IT IS ORDERED**, that pursuant to the authority contained in Sections 1, 2(a), 4(i), 303, 307, 309, 310, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 303, 307, 309, 310, and 403, and Section 202(h) of the Telecommunications Act of 1996, this Further Notice of Proposed Rulemaking and Report and Order **IS ADOPTED**. The rule modifications attached hereto as Appendix A shall be effective thirty (30) days after publication of the text or summary thereof in the Federal Register, except for those rules and requirements involving Paperwork Reduction Act burdens, which shall become effective on the effective date announced in the Federal Register notice announcing OMB approval. Changes to FCC Forms required as the result of the rule amendments adopted herein **WILL BECOME EFFECTIVE** on the effective date announced in the Federal Register notice announcing OMB approval.

384. **IT IS FURTHER ORDERED**, that the proceeding MB Docket No. 04-256 **IS TERMINATED**.

385. **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of the Further Notice of Proposed Rulemaking, including the Supplemental Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

386.    **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

## APPENDIX A

### Final Rule Changes

Part 73 of Title 47 of the Code of Federal Regulations is amended as follows:

PART 73—RADIO BROADCAST SERVICES

1. The authority citation for Part 73 continues to read as follows:

AUTHORITY: 47 U.S.C. 154, 303, 334, 336 and 339.

2. Amend § 73.3555 by deleting Note 2(k)(2) and adding new Note 2(k)(2) and Note 2(k)(3) to read as follows:

### § 73.3555 Multiple ownership.

* * * * *

**Note 2(k) to § 73.3555: * * ***

(2) Where two television stations are both located in the same market, as defined for purposes of the local television ownership rule contained in paragraph (b) of this section, and a party (including all parties under common control) with a cognizable interest in one such station sells more than 15 percent of the advertising time per week of the other such station, that party shall be treated as if it has an interest in the brokered station subject to the limitations set forth in paragraphs (b), (c), (d), and (e) of this section.

(3) Every joint sales agreement of the type described in this Note shall be undertaken only pursuant to a signed written agreement that shall contain a certification by the licensee or permittee of the brokered station verifying that it maintains ultimate control over the station's facilities, including, specifically, control over station finances, personnel and programming, and by the brokering station that the agreement complies with the limitations set forth in paragraphs (b), (c), and (d) of this section if the brokering station is a television station or with paragraphs (a), (c), and (d) of this section if the brokering station is a radio station.

* * * * *

3. Amend § 73.3613 by revising paragraphs (d) to read as follows:

### § 73.3613 Filing of contracts.

* * * * *

(d) * * *

(2) *Joint sales agreements:* Joint sales agreements involving radio stations where the licensee (including all parties under common control) is the brokering entity, the brokering and brokered stations are both in the same market as defined in the local radio multiple ownership rule contained in §73.3555(a), and more than 15 percent of the advertising time of the brokered station on a weekly basis is brokered by that licensee; joint sales agreements involving television stations where the licensee (including all parties under common control) is the brokering entity, the brokering and brokered stations are both in the same market as defined in the local television multiple ownership rule contained in §73.3555(b), and more than 15 percent of the advertising time of the brokered station on a weekly basis is brokered by that licensee.

Confidential or proprietary information may be redacted where appropriate but such information shall be made available for inspection upon request by the FCC.

* * * * *

## APPENDIX B

### Proposed Rule Changes

The Federal Communications Commission proposes to amend Part 73 of Title 47 of the Code of Federal Regulations as follows:

PART 73—RADIO BROADCAST SERVICES

1.      The authority citation for Part 73 continues to read as follows:

AUTHORITY:  47 U.S.C. 154, 303, 334, 336, and 339

2.      Amend § 73.3555 by revising paragraph (b) to read as follows:

**§ 73.3555 Multiple ownership.**

* * * * *

(b) *Local television multiple ownership rule.* An entity may directly or indirectly own, operate, or control two television stations licensed in the same Designated Market Area (DMA) (as determined by Nielsen Media Research or any successor entity) if:

(1) The digital noise limited service contours of the stations (as determined by § 73.622) do not overlap; or

(i) At the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top four stations in the DMA, based on the most recent all-day (9:00 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service; and

(ii) At least 8 independently owned and operating, full-power commercial and noncommercial TV stations would remain post-merger in the DMA in which the communities of license of the TV stations in question are located.  Count only those TV stations the digital noise limited service contours of which overlap with the digital noise limited service contour of at least one of the stations in the proposed combination.  In areas where there is no Nielsen DMA, count the TV stations present in an area that would be the functional equivalent of a TV market.  Count only those TV stations the digital noise limited service contours of which overlap with the digital noise limited service contour of at least one of the stations in the proposed combination.

* * * * *

## APPENDIX C

### Final Regulatory Flexibility Analysis

1.     As required by the Regulatory Flexibility Act of 1980, as amended ("RFA"),[1] an Initial Regulatory Flexibility Analysis ("IRFA") was incorporated in the *TV JSA NPRM* in MB Docket No. 04-256.[2] The Commission sought written public comment on the proposals in the *TV JSA NPRM*, including comment on the IRFA. The Commission received no comments in direct response to the IRFA. This present Final Regulatory Flexibility Analysis ("FRFA") conforms to the RFA.[3]

### A.     Need for, and Objectives of, the Report and Order

2.     Consistent with the Commission's earlier findings regarding radio joint sales agreements ("JSAs"), the *Report and Order ("Order")* finds that television JSAs similarly convey sufficient influence over the brokered station's finances, personnel, and programming decisions to warrant attribution. A JSA is an agreement that authorizes a broker to sell some or all of the advertising time on the brokered station.[4] In particular, the *Order* finds that television JSAs provide incentives — including incentives for stations to coordinate advertising activities and avoid competing with each other — that are in some cases similar to those created by common ownership. Accordingly, the *Order* concludes to count television stations brokered under a same-market television JSA toward the brokering station's permissible ownership totals under the Commission's broadcast ownership rules consistent with the treatment of radio JSAs.[5] Specifically, where an entity owns or has an attributable interest in one or more stations in a local television market, joint advertising sales of another television station in that market for more than 15 percent of the brokered station's weekly advertising time will create a cognizable interest for the brokering station for purposes of applying the broadcast ownership rules.[6] The 15 percent threshold is the same threshold adopted by the Commission for radio JSAs and will allow a station to broker a small amount of advertising time through a JSA with another station in the same market without triggering attribution, yet will fall short of providing the broker a significant incentive or ability to exert influence over the brokered station's programming or other core operating functions because it will not be selling the advertising time in a substantial portion of the station's programming. The *Order* finds that a two-year transition period is appropriate to permit licensees that entered into television JSAs of this type prior to the release of the *Order* to address those circumstances. In addition, parties to existing, attributable television JSAs, and/or parties to attributable television JSAs entered into after the release of the *Order* but before the filing requirement becomes effective, must file a copy of such agreements with the

---

[1] *See* 5 U.S.C. § 603. The RFA, see *id.* §§ 601-12, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *Rules and Policies Concerning Attribution of Joint Sales Agreements in Local Television Markets*, MB Docket No. 04-256, Notice of Proposed Rulemaking, 19 FCC Rcd 15238, 15248-51, App. (2004) ("*TV JSA NPRM*"). Issues raised in the *TV JSA NPRM* are addressed in this proceeding.

[3] *See* 5 U.S.C. § 604.

[4] 47 C.F.R. § 73.3555, Note 2(k).

[5] *See id.* § 73.3555(b), (c), (d), (e).

[6] *See 2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 02-277, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13742-46, ¶¶ 316-25 (2003) ("*2002 Biennial Review Order*"). The Commission will not, however, count same-market JSAs toward the brokering licensee's national ownership cap, as that would result in double-counting (*i.e.*, counting the same local population twice toward the national reach limit). *Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, MM Docket No. 94-150, Report and Order, 14 FCC Rcd 12559, 12598, ¶ 86 (1999). In addition, the Commission clarifies that the JSA attribution rules (radio and television) do not apply to national advertising representation agencies.

Commission within 30 days after the filing requirement becomes effective. Stations are already required to include these agreements in their public inspection file. Going forward, parties to attributable television JSAs must file copies of such agreements with the Commission within 30 days after execution.

3.    The Commission finds in the *Order* that the attribution of television JSAs is necessary because these agreements can be used to coordinate the operations of two ostensibly separately owned entities and can provide incentives that are similar to those created by common ownership. While the Commission has previously recognized the potential benefits of common ownership, and believes that JSAs may provide similar benefits, such as facilitating cost savings and efficiencies that could enable the stations to provide more locally oriented programming, the Commission finds that television JSAs should not be used to circumvent the local broadcast television ownership rule, which is designed to promote competition. Additionally, the *Order* finds that television JSAs provide the brokering stations the ability and incentive to influence the selection of non-network programming on the brokered stations. In addition, the Commission finds that a JSA broker can influence the brokered station's choice of network affiliation. The *Order* concludes that a broker has a strong incentive to ensure that the brokered station provides programming — and an audience — that is complementary to that offered by its own station in order to maximize the attractiveness of the two stations to advertisers. Thus, the fact that some television stations have network affiliations does not undermine the Commission's finding that television JSAs confer sufficient influence that they should be attributed.

4.    The Commission finds no support for treating radio and television JSAs differently. While the *Order* finds that television stations may depend less on local advertisers than radio stations as a percentage of overall advertising revenue, advertising revenue data demonstrate that television stations do depend on local advertising for revenues to a significant degree. Also, the Commission finds that arguments that television stations need JSAs to survive in a competitive television market are properly addressed in the context of setting the applicable ownership limits rather than in deciding whether television JSAs confer influence such that they should be attributed in the first place. In addition, the *Order* concludes that fundamental nature of television JSAs and radio JSAs is the same and that these agreements should be treated the same for attribution purposes. In deciding to change its attribution policy with respect to radio JSAs, the Commission stated that its reexamination of the issue had led it to find that, because of the broker's control over advertising revenues of the brokered station, JSAs have the same potential as LMAs to convey sufficient influence over core operations of a station to warrant attribution. The *Order* finds that the same finding applies to television JSAs, notwithstanding any market differences, including the presence of network agreements.

5.    Because television JSAs can create the potential to influence the brokered station and provide incentives for joint operation that are similar to those created by common ownership, as described in the *Order*, the Commission finds that same-market television JSAs that permit the sale of more than 15 percent of the advertising time per week of the brokered station should be cognizable interests for purposes of applying the broadcast ownership rules.

6.    The *Order* also clarifies that the radio and television JSA attribution requirements do not apply to national sales representative firms ("rep firms"). The Commission concludes that the relationship between a rep firm and its client station as understood by the Commission does not raise the same issues of control that are present in a traditional JSA relationship. Therefore, national rep firms should not generally be subject to the television and radio JSA attribution rules. However, the Commission will entertain complaints based on a showing that a rep firm that is commonly owned with a broadcast licensee has not insulated the business of operating its commonly owned broadcast station from the business of providing advertising representation services in a market in which the rep firm has a commonly owned broadcast station. In such cases, the Commission will make a case-by-case determination of whether attribution is appropriate.

**B.** **Legal Basis**

7. The *Order* is adopted pursuant to Sections 1, 2(a), 4(i), 303, 307, 309, 310, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 1544(i), 303, 307, 309, 310, and 403, and Section 202(h) of the Telecommunications Act of 1996.

**C.** **Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

8. The Commission received no comments in direct response to the IRFA.

**D.** **Description and Estimate of the Number of Small Entities to Which Rules Will Apply**

9. The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted.[7] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction"[8] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[9] A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).[10] The final rules adopted herein affect small television and radio broadcast stations and small entities that operate daily newspapers. A description of these small entities, as well as an estimate of the number of such small entities, is provided below.

10. *Television Broadcasting.* The SBA defines a television broadcasting station that has no more than $35.5 million in annual receipts as a small business.[11] The definition of business concerns included in this industry states that establishments are primarily engaged in broadcasting images together with sound. These establishments operate television broadcasting studios and facilities for the programming and transmission of programs to the public. These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule. Programming may originate in their own studio, from an affiliated network, or from external sources.[12] Census data for 2007 indicate that 2,076 such establishments were in operation during that year. Of these, 1,515 had annual receipts of less than $10.0 million per year and

---

[7] 5 U.S.C. § 604(a)(3).

[8] *Id.* § 601(6).

[9] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[10] 15 U.S.C. § 632.

[11] At the time the IRFA preceding this FRFA was published, television broadcasting stations with no more than $14.0 million in annual receipts were considered a small business pursuant to the SBA's standards. Those standards have since increased to $35.5 million in annual receipts. *See* Small Business Size Standards: Information, 77 Fed. Reg. 72,702, 72,705 (Dec. 6, 2012).

[12] U.S. Census Bureau, *2012 NAICS Definition*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch?code=515120&search=2012 (NAICS Search) (visited Jan. 30, 2014). Separate census categories pertain to businesses primarily engaged in producing programming. *See* Motion Picture and Video Production, NAICS code 512110; Motion Picture and Video Distribution, NAICS Code 512120; Teleproduction and Other Post-Production Services, NAICS Code 512191; and Other Motion Picture and Video Industries, NAICS Code 512199.

561 had annual receipts of more than $10.0 million per year.[13] Based on this data and the associated size standard, the Commission concludes that the majority of such establishments are small.

11. The Commission has estimated the number of licensed commercial television stations to be 1,387.[14] According to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database ("BIA") as of November 26, 2013, 1,294 (or about 90 percent) of an estimated 1,387 commercial television stations in the United States have revenues of $35.5 million or less and, thus, qualify as small entities under the SBA definition. The Commission has estimated the number of licensed noncommercial educational ("NCE") television stations to be 396.[15] The Commission notes, however, that, in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[16] must be included. This estimate, therefore, likely overstates the number of small entities that might be affected by this action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. The Commission does not compile and otherwise does not have access to information on the revenue of NCE stations that would permit it to determine how many such stations would qualify as small entities.

12. In addition, an element of the definition of "small business" is that the entity not be dominant in its field of operation. The Commission is unable at this time to define or quantify the criteria that would establish whether a specific television station is dominant in its field of operation. Accordingly, the estimate of small businesses to which rules may apply do not exclude any television station from the definition of a small business on this basis and are therefore over-inclusive to that extent. Also, as noted, an additional element of the definition of "small business" is that the entity must be independently owned and operated. The Commission notes that it is difficult at times to assess these criteria in the context of media entities and the estimates of small businesses to which they apply may be over-inclusive to this extent.

E. **Description of Reporting, Record Keeping, and other Compliance Requirements for Small Entities**

13. The *Order* adopts a requirement that parties to existing, attributable television JSAs, and/or parties to attributable television JSAs entered into after the release of the *Order* but before the filing requirement becomes effective, must file a copy of such agreements with the Commission within 30 days after the filing requirement becomes effective.[17] Going forward, parties to attributable television JSAs must file copies of such agreements with the Commission within 30 days after execution. The *Order* directs the Media Bureau to take the necessary steps to modify the relevant application forms to require applicants to file attributable television JSAs at the time an application is filed using the forms.[18]

14. In addition, the following FCC forms and/or their instructions will be modified to require the reporting of attributable television JSAs: (1) FCC Form 301, Application for Construction Permit For Commercial Broadcast Station; (2) FCC Form 314, Application for Consent to Assignment of Broadcast

---

[13] U.S. Census Bureau, *American Fact Finder*, http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_51SSSZ1&prodType=table (visited Jan. 30, 2014).

[14] *See Broadcast Station Totals as of September 30, 2013*, News Release (rel. Oct. 24, 2013) ("*Broadcast Station Totals*"), *available at* http://transition.fcc.gov/Daily_Releases/Daily_Business/2013/db1024/DOC-323674A1.pdf.

[15] *See id.*

[16] "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has to power to control both." 13 C.F.R. § 121.103(a)(1).

[17] The Commission will seek OMB approval for the filing requirement, and, upon receiving approval, the Commission will release a Public Notice specifying the date by which television JSAs must be filed.

[18] *2002 Biennial Review Order*, 18 FCC Rcd at 13746, ¶¶ 324-25.

Station Construction Permit or License; (3) FCC Form 315, Application for Consent to Transfer Control of Corporation Holding Broadcast Station Construction Permit or License; (4) FCC Form 323, Ownership Report for Commercial Broadcast Station. The impact of these changes will be the same on all entities, and compliance will likely require only the expenditure of *de minimis* additional resources.

### F. Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

15.     The RFA requires an agency to describe any significant alternatives that it has considered in reaching its approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[19]

16.     The *Order* finds that television JSAs convey sufficient influence to warrant attribution, such that the Commission will count television stations brokered under a same-market television JSA toward the brokering station's permissible ownership totals if the amount of time jointly sold is equal to or greater than 15 percent of the station's advertising time.[20] This rule brings the Commission's policy regarding JSAs in the television market in line with the existing rules regarding radio markets. While the *Order* recognizes that JSAs may have public interest benefits, particularly in small- to mid-sized markets, these potential benefits do not affect the assessment of whether television JSAs confer significant influence such that they should be attributed. The rule adopted in the *Order* protects local markets — including small businesses operating in local markets, as opposed to regional or national markets — from exposure to competitive harms that might result from contractual agreements between stations for control of advertising. Therefore, the Commission believes that in many cases the attribution of a same-market television JSA will protect small businesses, as well as large, from the adverse impacts of competing stations' coordination of advertising sales.

17.     Nonetheless, the *Order* finds that a transition period during which parties are required to come into compliance is necessary to avoid undue disruption to current business arrangements. Such a transition period will be especially helpful to small television stations that do not have the same financial and technical resources as large stations. Accordingly, parties to existing, same-market television JSAs whose attribution results in a violation of the ownership limits will have two years from the effective date of the *Order* to terminate or amend those JSAs or otherwise come into compliance with the local television ownership rule.[21] The *Order* finds that this transition period will give licensees with television JSAs sufficient time to make alternative arrangements — such as revise the agreement to limit the amount of advertising time sold to 15 percent of the weekly advertising time or enter into an agreement with another entity that would not result in an impermissible attributable interest — or to seek waiver relief from the Commission's rules, if appropriate.[22] Parties that believe that the application of the attribution

---

[19] 5 U.S.C. § 604(c)(1)-(4).

[20] The Commission uses a 15 percent threshold in determining whether to attribute JSAs in radio markets and LMAs in both television and radio markets. Using the same threshold for television JSAs will allow a station to broker a small amount of advertising time through a JSA with another station in the same market, yet fall short of providing the broker the incentive or ability to exert significant influence over the brokered station's programming or other core operating functions.

[21] No transition period is granted with regard to new television JSAs that would cause the broker to exceed our media ownership limits. However, parties may renew existing television JSAs even if renewal would cause the broker to exceed our media ownership limits, provided that the renewal period shall not exceed the two-year transition period provided for in the *Order*.

[22] *See* 47 C.F.R. § 73.3555, Note 7(1).

rules to their particular circumstances would not serve the public interest always have the ability to seek a waiver. These steps will minimize the adverse impact on small entities.

18.     In addition, parties to existing, attributable television JSAs, and/or parties to attributable television JSAs entered into after the release of the *Order* but before the filing requirement becomes effective, must file a copy of such agreements with the Commission within 30 days after the filing requirement becomes effective. Going forward, parties to attributable television JSAs must file copies of such agreements with the Commission within 30 days after execution. The impact of this filing requirement will be minimal and uniform for all entities. The Commission anticipates that compliance will only require the expenditure of *de minimis* additional resources, and believes, therefore, that the filing requirement is the least economically burdensome alternative. In addition, entities may be required to report attributable television JSAs on certain FCC Forms, for example, in connection with a request for authority to transfer or assign a station license. The Commission anticipates that compliance will only require the expenditure of *de minimis* additional resources. Accordingly, adverse economic impact on small entities will be minimal, at most, and in many cases non-existent.

### G.     Report to Congress

19.     The Commission will send a copy of the *Order*, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[23] In addition, the Commission will send a copy of the *Order*, including this FRFA, to the Chief Counsel for Advocacy of the SBA. A copy of the *Order* and FRFA (or summaries thereof) will also be published in the Federal Register.[24]

---

[23] *See* 5 U.S.C. § 801(a)(1)(A).

[24] *See id.* § 604(b).

## APPENDIX D

### Supplemental Initial Regulatory Flexibility Analysis

1.     As required by the Regulatory Flexibility Act of 1980, as amended ("RFA"),[1] an Initial Regulatory Flexibility Analysis ("IRFA") was incorporated in the *NPRM* in this proceeding.[2]  The Commission sought written public comment on the proposals in the *NPRM*, including comment on the IRFA.  The Commission received no comments in direct response to the IRFA.  Additionally, the Commission has prepared this Supplemental IRFA of the possible significant economic impact on small entities of the proposals in the *Further Notice of Proposed Rulemaking* ("*FNPRM*").  Written public comments are requested on this Supplemental IRFA.  Comments must be identified as responses to the Supplemental IRFA and must be filed by the deadlines for comments provided on the first page of the *FNPRM*.  The Commission will send a copy of the *FNPRM*, including this Supplemental IRFA, to the Chief Counsel for Advocacy of the Small Business Administration ("SBA").[3]  In addition, the *FNPRM* and Supplemental IRFA (or summaries thereof) will be published in the Federal Register.[4]

### A.     Need for, and Objectives of, the Further Notice of Proposed Rulemaking

2.     The *FNPRM* initiates the 2014 Quadrennial Review of the broadcast ownership rules, which was initiated pursuant to Section 202(h) of the Telecommunications Act of 1996 ("1996 Act").[5]  This review will incorporate and build on the record of the ongoing 2010 Quadrennial Review.  The Commission is required by statute to review its media ownership rules every four years to determine whether they "are necessary in the public interest as the result of competition"[6] and to "repeal or modify any regulation it determines to be no longer in the public interest."[7]

---

[1] *See* 5 U.S.C. § 603.  The RFA, see *id.* §§ 601-12, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See 2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 09-182, Notice of Proposed Rulemaking, 26 FCC Rcd 17489, 17576-81, App. C (2011) ("*NPRM*").

[3] *See* 5 U.S.C. § 603(a).

[4] *See id.*

[5] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) ("Appropriations Act") (amending Sections 202(c) and 202(h) of the 1996 Act).

[6] Section 202(h) of the 1996 Act, 47 U.S.C. § 303 note.  In *Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) ("*Prometheus I*"), the Third Circuit concluded that "necessary in the public interest" is a "'plain public interest' standard under which 'necessary' means 'convenient,' 'useful,' or 'helpful,' not 'essential' or 'indispensable.'"  *Id.* at 394.  The court stated that "the first instruction [of § 202(h)] requires the Commission to take a fresh look at its regulations periodically in order to ensure that they remain 'necessary in the public interest.'"  *Id.* at 391.  In 2004, Congress revised the then-biennial review requirement to require such reviews quadrennially.  *See* Appropriations Act § 629, 118 Stat. at 100.

[7] Section 202(h) of the 1996 Act, 47 U.S.C. § 303 note.  Contrary to the claims of certain commenters, there is no "presumption [in Section 202(h)] in favor of repealing or modifying the ownership rules."  *See, e.g.*, CBS NPRM Comments at 2-3 (citing *Fox Television Stations v. FCC*, 280 F.3d 1027, 1048 (D.C. Cir. 2002); *Sinclair Broad. Group, Inc. v. FCC*, 284 F.3d 148, 159 (D.C. Cir. 2002)).  The court in *Prometheus I* determined that Section 202(h) does not carry a presumption in favor of deregulation.  *See Prometheus I*, 373 F.3d at 395 (rejecting the "misguided" findings in *Fox* and *Sinclair* regarding a "'deregulatory presumption'" in Section 202(h)); *see also Prometheus Radio Project v. FCC*, 652 F.3d 431, 444-45 (3d Cir. 2011) ("*Prometheus II*") (confirming the standard of review under Section 202(h) adopted in *Prometheus I*).  Moreover, when modifying an existing rule, the Commission has the discretion "to make [the rule] more or less stringent"; Section 202(h) is not a "one-way ratchet."  *Prometheus I*, 372 F.3d at 395; *see also Prometheus II*, 652 F.3d at 445.  Whether the Commission determines that a rule should be

(continued....)

3. The media ownership rules that are subject to this quadrennial review are the local television ownership rule, the local radio ownership rule, the newspaper/broadcast cross-ownership rule, the radio/television cross-ownership rule, and the dual network rule.[8] As discussed in more detail below, the *FNPRM* proposes to retain two rules without modification — the local radio ownership rule and the dual network rule — and seeks comment on potential changes to two others — the local television ownership rule and the newspaper/broadcast cross-ownership rule. The *FNPRM* also seeks comment on whether to eliminate the radio/television cross-ownership rule. In addition, the *FNPRM* seeks comment on issues referred to the Commission in the Third Circuit's remand in *Prometheus Radio Project v. FCC* ("*Prometheus II*")[9] of certain aspects of the Commission's 2008 *Diversity Order*.[10] Lastly, the *FNPRM* seeks comment on the proposed disclosure of certain sharing agreements.

4. *Local Television Ownership Rule.* In the *FNPRM*, the Commission seeks comment on whether the current local television ownership rule remains necessary in the public interest and should be retained with a limited modification.[11] Specifically, the Commission seeks comment on whether to retain the existing ownership limits, including the top-four prohibition and the eight voices test, but replace the Grade B contour overlap test used to determine when to apply the local television ownership rule with a digital noise limited service contour ("NLSC") test, rather than the DMA-based approach proposed in the *NPRM*.

5. The item tentatively concludes that the current local television ownership rule remains necessary in the public interest and should be retained with a limited modification. Based on the current media marketplace and the record in this proceeding, the public interest would be best served by replacing the Grade B contour overlap test used to determine when to apply the local television ownership rule with a digital NLSC test, rather than the DMA-based approach proposed in the *NPRM*. The Commission believes that the local television ownership rule is necessary to promote competition. The Commission further believes that the competition-based rule proposed in the *FNPRM* also would promote viewpoint diversity by helping to ensure the presence of independently owned broadcast television stations in local markets and would be consistent with the Commission's localism goal. The Commission finds that the local television ownership rule proposed in the *FNPRM* would be consistent with the goal of promoting minority and female ownership of broadcast television stations. The Commission believes that the competition-based rule would also indirectly advance the Commission's viewpoint diversity goal by

(Continued from previous page) ———————————————————————
retained, repealed, or modified, the decision must be in the public interest and must be supported by reasoned analysis. *See Prometheus I*, 373 F.3d at 395; *Prometheus II*, 652 F.3d at 445.

[8] These rules are found, respectively, at 47 C.F.R. §§ 73.3555(b), (a), (d), and (c), and at 47 C.F.R. § 73.658(g).

[9] *Prometheus II*, 652 F.3d at 437.

[10] *Promoting Diversification of Ownership in the Broadcasting Services*, MB Docket No. 07-294, Report and Order and Third Further Notice of Proposed Rulemaking, 23 FCC Rcd 5922 (2008) ("*Diversity Order*" and "*Diversity Third FNPRM*").

[11] Section 202(h) of the 1996 Act, 47 U.S.C. § 303 note; *NPRM*, 26 FCC Rcd at 17498, ¶ 26; *see also 2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 06-121, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2060, ¶ 87 (2008) ("*2006 Quadrennial Review Order*"). Under the modified television ownership rule proposed in the *FNPRM*, an entity would be permitted to own up to two television stations in the same DMA if (1) the digital NLSCs of the stations (as determined by section 73.622(e) of the Commission's rules) do not overlap; or (2) at least one of the stations is not ranked among the top four stations in the market and at least eight independently owned television stations will remain in the DMA following the combination. Under the proposed rule, in calculating the number of stations remaining post-merger, only those stations whose digital NLSC overlaps with the digital NLSC of at least one of the stations in the proposed combination would be considered, which is consistent with the contour overlap provision of the previous rule. In addition, the Commission proposes to retain the existing failed/failing station waiver policy.

helping to ensure the presence of independently owned broadcast television stations in the local market, thereby increasing the likelihood of a variety of viewpoints. In addition, while the Commission does not propose to retain the rule with the specific purpose of preserving the current levels of minority and female ownership, the Commission tentatively finds that retaining the existing rule would effectively address the concerns of those commenters who suggested that additional consolidation would have a negative impact on minority and female ownership of broadcast television stations. Ultimately, the Commission believes that its proposed limited modification of the rule will better promote competition, and that this benefit would outweigh any burdens, which would be minimized by the proposal to grandfather combinations.

6.      The *FNPRM* also tentatively concludes that retaining the existing failed/failing station waiver criteria would be in the public interest. The Commission evaluated the various proposed waiver standards proffered by commenters,[12] and is concerned that many of the proposed waiver criteria would be difficult to monitor or enforce, are not rationally related to the ability of each station to compete in the local market, and could be manipulated in order to obtain a waiver. Ultimately, the Commission predicts that such standards would significantly expand the circumstances in which a waiver of the local television ownership rule would be granted. The Commission is concerned that such relaxation would be inconsistent with the tentative conclusion that the public interest is best served by retaining the existing television ownership limits. Moreover, the Commission believes that the existing waiver standard is not unduly restrictive and that it provides appropriate relief in markets of all sizes. Waiver of the Commission's rules is meant to be exceptional relief, and the item tentatively finds that the existing waiver criteria strike an appropriate balance between enforcing the ownership limits and providing relief from the rule on a case-by-case basis.

7.      *Local Radio Ownership Rule.* The *FNPRM* seeks comment on whether the current local radio ownership rule remains necessary in the public interest and should be retained without modification.[13] The *FNPRM* seeks comment also on whether to retain the existing AM/FM subcaps.

8.      The Commission tentatively finds that the current local radio ownership rule remains necessary in the public interest and should be retained without modification. The Commission believes that the rule is necessary to promote competition. In addition, the Commission believes that the radio ownership limits promote viewpoint diversity "by ensuring a sufficient number of independent radio voices and by preserving a market structure that facilitates and encourages new entry into the local media market."[14] Similarly, the Commission tentatively finds that a competitive local radio market helps to promote localism, as a competitive marketplace will lead to the selection of programming that is responsive to the needs and interests of the local community. The Commission tentatively finds also that the local radio ownership rule is consistent with the goal of promoting minority and female ownership of broadcast television stations. Ultimately, the Commission believes that these benefits outweigh any burdens that may result from our proposal to retain the rule without modification.

9.      The Commission agrees with commenters that supported retention of the AM subcaps in order to promote new entry. The Commission believes that broadcast radio, in general, continues to be a

---

[12] Commenters suggested distinct waiver criteria for the eight-voices test and the top-four prohibition and other waiver criteria that relied on criteria such as market position and news criteria.

[13] Section 202(h) of the 1996 Act, 47 U.S.C. § 303 note. Under the current local radio ownership rule, an entity may own: (1) up to eight commercial radio stations in radio markets with 45 or more radio stations, no more than five of which can be in the same service (AM or FM); (2) up to seven commercial radio stations in radio markets with 30-44 radio stations, no more than four of which can be in the same service (AM or FM); (3) up to six commercial radio stations in radio markets with 15-29 radio stations, no more than four of which can be in the same service (AM or FM); and (4) up to five commercial radio stations in radio markets with 14 or fewer radio stations, no more than three of which can be in the same service (AM or FM), provided that an entity may not own more than 50 percent of the stations in such a market, except that an entity may always own a single AM and single FM station combination.

[14] *See, e.g., 2006 Quadrennial Review Order*, 23 FCC Rcd at 2077, ¶ 127.

more likely avenue for new entry in the media marketplace — including entry by small businesses and entities seeking to serve niche audiences — as a result of radio's ability to more easily reach certain demographic groups and the relative affordability of radio stations compared to other mass media. AM stations are generally the least expensive option for entry into the radio market, often by a significant margin, and therefore permit new entry for far less capital investment than is required to purchase an FM station. While some commenters suggested that eliminating the subcaps could result in divestiture of properties that could be acquired by new entrants, the Commission tentatively finds that this speculative rationale is not persuasive. Therefore, consistent with Commission precedent, the Commission believes that the public interest is best served by retaining the existing AM subcaps, which would continue to further competition, and possibly also viewpoint diversity, by promoting new entry.

10.     In addition, the Commission tentatively finds that there continue to be technical and marketplace differences between AM and FM stations that justify retention of both the AM and FM subcaps in order to promote competition in local radio markets. As the Commission has noted previously, FM stations enjoy unique technical advantages over AM stations, such as increased bandwidth and superior audio signal fidelity. In addition, AM signal propagation varies with the time of day (*i.e.*, AM signals travel much farther at night than during the day), and many AM stations are required to cease operation at sunset. These technological differences often, but not always, result in greater listenership and revenues for FM stations.

11.     While the technological and marketplace differences between AM and FM stations generally benefit FM stations, and thus support retention of the FM subcaps, there continue to be many markets in which AM stations are "significant radio voices."[15] For example, a study provided by Clear Channel found that throughout the 300 Arbitron Metro markets, there are 187 AM stations ranked in the top five in terms of all-day audience share.[16] And according to NAB, AM stations are among the top revenue earners in some of the largest radio markets (*e.g.*, New York, Chicago, and Los Angeles).[17] Therefore, the Commission tentatively finds that retention of the existing AM subcaps is necessary to prevent a single station owner from acquiring excessive market power through concentration of ownership of AM stations in markets in which AM stations are significant radio voices.

12.     In addition, the Commission tentatively concludes that it is not in the public interest to tighten the numerical ownership limits; therefore, the Commission sees no need to reassess the subcaps

---

[15] *Prometheus II*, 652 F.3d at 463.

[16] Clear Channel NOI Comments at 39 (citing Mark Fratrik, The Importance of AM Stations in Local Radio Markets 2 (June 30, 2010) (Attachment D of Clear Channel NOI Comments)); *see also* NAB NPRM Comments at 38 (citing Clear Channel NOI Comments). These data do not, however, demonstrate that there is no longer any competitive difference between AM and FM stations, as Clear Channel and NAB contended. Across all 300 Arbitron Metro markets, there are 1,500 total stations that would be ranked in the top five (discounting any potential ties for the number five ranking), which means that AM stations account for approximately 12.5 percent of the top five stations in these markets. FM stations clearly continue to enjoy an overall competitive advantage over AM stations. In addition, we note that, since the study submitted by Clear Channel was completed, the number of Arbitron Metro markets has decreased to 274.

[17] In an effort to dispute the Commission's finding that AM stations are generally at a competitive disadvantage relative to FM stations, NAB provided 2010 BIA data showing that five of the top ten stations in the country in terms of revenue are AM stations. NAB NPRM Comments at 38 (citing BIA Media Access Pro data provided at Attachment H of NAB NPRM Comments). However, review of only the top ten stations provides an incomplete picture of the competitive landscape. For example, when 2010 BIA revenue data are analyzed for the top 50 stations, only 16 are AM stations, and only 25 of the top 100 stations are AM stations. *See* BIA/Kelsey, BIA Media Access Pro 4.6 Radio Database as of May 10, 2012 (evaluation of 2010 revenue data). Far from demonstrating that FM stations do not enjoy a competitive advantage over AM stations, the BIA data confirm it. The data also confirm that AM stations are significant voices in some radio markets, including some of the largest markets.

associated with each numerical tier, as proposed by Mt. Wilson.[18] Indeed, tightening the subcaps absent a concurrent tightening of the numerical ownership limits would result in an internal inconsistency in the rule, as an entity would be unable to own all the stations otherwise permitted under certain numerical tiers. For example, in markets with 30-44 stations, an entity currently may own up to seven stations, provided that no more than four of the stations are in the same service. If the subcap was tightened to three stations in the same service, an entity could then only own up to six stations, even though the rule's premise is that the public interest is best served by permitting ownership of up to seven stations in this particular market.

13. *Newspaper/Broadcast Cross-Ownership Rule.* The *FNPRM* seeks comment on the Commission's previous finding, which has been upheld in the courts, that the current absolute ban on newspaper/broadcast cross-ownership, first adopted in 1975, is overly broad.[19] The Commission continues to believe that some restriction on newspaper/broadcast cross-ownership is necessary to protect and promote viewpoint diversity in local markets; this view is consistent with the Commission's longstanding rationale for the NBCO rule. The Supreme Court has recognized the importance of the Commission's role in promoting viewpoint diversity, calling it a "basic tenet of national communications policy."[20]

14. In addition, the *FNPRM* seeks further comment on whether the restriction on newspaper/broadcast cross-ownership is necessary to protect and promote viewpoint diversity in local markets.[21] The *FNPRM* seeks comment on whether the absolute ban should be revised to allow combinations that would not unduly harm viewpoint diversity or localism. The *FNPRM* specifically requests comment on whether the prohibition on newspaper/radio combinations should be eliminated. The *FNPRM* seeks comment on approaches that would retain a ban on newspaper/television combinations in all markets and further seeks comment on whether to entertain waiver requests on a pure case-by-case approach, assessing each request independently and considering the totality of the circumstances each proposed transaction presents, or on a case-by-case waiver approach that would include presumptions that favor or disfavor the grant of waiver requests in accordance with certain prescribed guidelines.[22] The

---

[18] Mt. Wilson NPRM Comments at 2-7.

[19] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2018-57, ¶¶ 13-79 (adding a waiver provision to the NBCO rule, which the Third Circuit vacated and remanded in *Prometheus II*, 652 F.3d at 453); *2002 Biennial Review Order*, 18 FCC Rcd at 13747-67, 13790-807, ¶¶ 328-69, 432-81 (replacing the NBCO rule with cross-media limits, which were remanded by the Third Circuit in *Prometheus I*, 373 F.3d at 402-03); *Prometheus I*, 373 F.3d at 398-400 (finding that the Commission reasonably concluded that a blanket prohibition is unnecessary but remanding the Commission's modification of the rule).

[20] *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 663-64 (1994) ("*Turner I*") ("[T]he widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." (quoting *United States v. Midwest Video Corp.*, 406 U.S. 649, 668 n.27 (1972) (plurality opinion) (quoting *Associated Press v. United States*, 326 U.S. 1, 20 (1945)))). The Court stated that "assuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Turner I*, 512 U.S. at 663.

[21] The Commission has described viewpoint diversity as "the availability of media content reflecting a variety of perspectives." *2002 Biennial Review Order*, 18 FCC Rcd at 13627, ¶ 19.

[22] With respect to a waiver approach with presumptions, the *FNPRM* seeks comment on whether there should be a presumption that it is consistent with the public interest, convenience, and necessity to grant a requested waiver allowing an entity to own, operate, or control one daily newspaper and one full-power television station in a top-20 Nielsen DMA provided that: (1) the television station is not ranked among the top four television stations in the DMA, based on the most recent all-day (9 a.m.–midnight) audience share, as measured by Nielsen or by any comparable professional, accepted audience ratings service, and (2) at least eight independently owned and operating major media voices will remain in the DMA. Major media voices would include full-power television broadcast stations and newspapers that are published at least four days a week within the DMA in the dominant language of the market and have a circulation exceeding 5 percent of the households in the DMA. The *FNRPM* also

(continued....)

*FNPRM* seeks comment on whether the Commission should provide for an exception to a newspaper/television cross-ownership prohibition if the merger applicant demonstrates that either the television station or the newspaper has failed or is failing. The *FNPRM* also seeks comment on possible modifications to the 2006 rule to adjust for aspects of that rule that may be obsolete, difficult to prove or enforce, or ineffectual.

15.     In the event that the newspaper/television restriction were to be revised, the *FNPRM* seeks comment on the following aspects of the rule. First, should the obsolete analog Grade A contour be replaced with an approach that uses both the DMA and the digital the principal community contour ("PCC") to determine when the newspaper/television prohibition applies in order to approximate the former analog contour approach as closely as possible?[23] Second, should the four-factor test that all waiver applicants, even those entitled to a favorable presumption, were required to satisfy under the 2006 rule be eliminated?[24] The *FNPRM* suggests that the factors were vague, subjective, difficult to prove and enforce, and/or not directly linked to viewpoint diversity. Third, should the previous local news exception permitted by the 2006 rule under which the Commission reversed the negative presumption against a waiver when the proposed combination involved a broadcast station that had not been offering local newscasts and the applicants committed to airing at least seven hours of local news per week after the transaction be eliminated?[25] The Commission tentatively concludes that the potential difficulties in monitoring and enforcing such an exception would render it meaningless.

16.     *Radio/Television Cross-Ownership Rule.* The *FNPRM* seeks comment on whether the radio/television cross-ownership rule, which limits the combined number of commercial radio and television stations a single entity may own in the same market, is no longer necessary in the public interest, and whether it should be repealed.[26] Based on the current media marketplace and the evidence adduced in this proceeding, the *FNPRM* seeks comment on whether the local television ownership rule

(Continued from previous page) ─────────────────────────────

seeks comment on whether there should be a presumption that granting a requested waiver to permit a newspaper/television combination in all other cases and in any other DMA is inconsistent with the public interest, convenience, and necessity. The *FNPRM* seeks comment on whether, under such an approach, a party seeking to overcome a presumption should carry the burden of proof that the proposed combination will or will not unduly harm viewpoint diversity or localism within the DMA.

[23] The rule proposed in the *FNPRM* would prohibit common ownership of a full-power television station and a daily newspaper when: (1) the television station's community of license and the newspaper's community of publication are in the same Nielsen DMA, and (2) the principal community contour of the television station, as defined in section 73.625 of the Commission's rules, encompasses the entire community in which the newspaper is published.

[24] Under the four-factor test, waiver applicants were required to make showings regarding: (1) the extent to which the combined entity would increase the amount of local news in the market; (2) the ability of the newspaper and broadcast outlets to each continue to employ its own staff and exercise its own independent news judgment; (3) the level of concentration in the DMA; and (4) the financial condition of the newspaper or broadcast station, and if the newspaper or broadcast station was in financial distress, the proposed owner's commitment to invest significantly in newsroom operations. 47 C.F.R. § 73.3555(d)(5).

[25] *Id.* § 73.3555(d)(7)(ii).

[26] The current rule restricts common ownership of multiple television and radio stations depending on the number of independent media owners that would remain in the local market. Specifically, the rule permits an entity to own, operate, or control up to two television stations and four radio stations in a market, so long as at least 10 independently owned media voices would remain post-merger, and a single entity to own up to two television and six radio stations, or one television station and seven radio stations, in a market as long as at least 20 independently owned media voices remained post-merger. A combination of one radio and up to two television stations is allowed regardless of the number of voices remaining in the market. In all instances, the entity must also comply with the applicable local radio and local television ownership limits. *Id.* § 73.3555(c)(2). The cross-ownership rule is triggered when a station's city of license is encompassed by a specified service contour of the other co-owned stations. *Id.* § 73.3555(c)(1).

and the local radio ownership rule, which the *FNPRM* proposes to retain with limited modification, adequately serve the goals this rule was intended to promote, namely, competition and diversity in local markets. Thus, the *FNPRM* seeks comment on whether this additional prohibition on the cross-ownership of broadcast facilities is unnecessary. Further, the *FNPRM* seeks comment on whether this simplification of the rules will have minimal effects in most markets.

17. The Commission tentatively finds that the radio/television cross-ownership rule is not necessary to promote competition. The Commission has found previously that most advertisers do not consider radio and television to be good substitutes for one another, and that television and radio stations neither compete in the same product market nor do they bear any vertical relation to one another. This position is consistent with the long-standing conclusion of the Department of Justice, which considers radio advertising as a separate antitrust market for purposes of its competition analysis.[27] Similarly, the Commission tentatively finds that most consumers do not consider radio and television stations to be substitutes for one another and do not switch between television viewing and radio listening based on program content. Nothing in the current record undermines the Commission's previous conclusion that a television-radio combination, therefore, cannot adversely affect competition in any relevant product market. Given that radio and television stations do not appear to compete in the same market and that the local television and radio rules would prevent significant additional consolidation even in the absence of this rule, the record does not suggest that repeal of the radio/television cross-ownership rule would harm competition.

18. The Commission tentatively finds that the radio/television cross-ownership rule is not necessary to promote localism. The Commission agrees with industry commenters who maintained that some limited cross-ownership could create efficiencies that could benefit the public should broadcasters choose to invest additional resources in the production of local news and information programming.[28] When broadcasters engage in joint operations, whether those operations are focused on programming and news gathering or back office matters, we believe it likely that financial efficiencies result. Such efficiencies could lead ultimately to consumer benefits in the form of additional station investments in equipment for radio or television newsrooms, an increase in staffing for news and informational programs, or additional local news coverage on radio stations.

19. The Commission considered carefully whether there is evidence in the current record that elimination of the radio/television cross-ownership rule would likely adversely affect minority and female ownership. The Commission believes that the current record does not establish that such harm is likely. Furthermore, the Commission does not believe that record evidence shows that the cross-ownership ban has protected or promoted minority or female ownership of broadcast stations, or that it could be expected to do so in the future. Notably, radio/television cross-ownership combinations were not the focus of commenters' concerns raised in response to the *NPRM*. In fact, no commenter to the *NPRM* presented empirical data or other analyses that established that repeal of this rule would harm competition, localism, or viewpoint diversity in local markets. The Commission tentatively concludes that the rule is not necessary to promote competition or localism, and the record reflects that most radio commercial stations do not broadcast significant amounts of local news and information. The current record does not suggest that minority/female-owned radio stations contribute more significantly to viewpoint diversity than other radio stations or broadcast more meaningful amounts of local news on which consumers rely as a primary source of information.

---

[27] *2002 Biennial Review Order*, 18 FCC Rcd at 13714, ¶ 243 (citing Complaint at ¶¶ 11-14, *United States v. Clear Channel Commc'ns, Inc.*, No. 1:00CV02063 (D.D.C. Aug. 29, 2000); Complaint at ¶ 12, *United States v. EZ Commc'ns, Inc.*, No. 1:97CV00406 (D.D.C. Feb. 27, 1997)).

[28] *See* Tribune NPRM Comments at 77; NAB NPRM Comments at 50-51; NAB NPRM Reply at 5-6; Tribune NPRM Reply at 16.

20.     Moreover, while the Commission acknowledges the concerns raised by NABOB and others advocating for additional minority ownership opportunities, the Commission agrees with commenters, including NAB, that the low level of minority and female broadcast ownership cannot be attributed solely or primarily to consolidation.[29] Nor has any commenter shown that these low levels of ownership are a result of the existing radio/television cross-ownership rule. The Commission recognizes the presence of many disparate factors, including, most significantly, access to capital, as longstanding, persistent impediments to ownership diversity in broadcasting.[30]

21.     *Dual Network Rule.* The *FNPRM* tentatively concludes that the dual network rule, which permits common ownership of multiple broadcast networks, but prohibits a merger between or among the "top-four" networks (ABC, CBS, Fox, and NBC),[31] continues to be necessary to promote competition and localism and should be retained without modification.[32]

22.     The Commission tentatively finds that the dual network rule remains necessary in the public interest to foster competition in the provision of primetime entertainment programming and the sale of national advertising time. Specifically, the Commission tentatively finds that the primetime entertainment programming supplied by the top-four broadcast networks is a distinct product, the provision of which could be restricted if two of the four major networks were to merge. The Commission also tentatively finds that, consistent with past Commission findings, the top-four broadcast networks comprise a "strategic group" in the national advertising market and compete largely among themselves for advertisers that seek to reach large, national mass audiences. Accordingly, we continue to believe that a top-four network merger would substantially lessen competition for advertising dollars in the national advertising market, which would, in turn, reduce incentives for the networks to compete with each other for viewers by providing innovative, high quality programming. Based on their distinctive characteristics relative to other broadcast and cable networks, the Commission tentatively finds that the top-four broadcast networks serve a unique role in the provision of primetime entertainment programming and the sale of national advertising time that justifies retaining a rule specific to them.

23.     In addition, the Commission tentatively finds that, consistent with past Commission findings, the dual network rule remains necessary to promote the Commission's localism goal. Specifically, the Commission tentatively finds that the rule remains necessary to preserve the balance of bargaining power between the top-four networks and their affiliates, thus improving the ability of affiliates to exert influence on network programming decisions in a manner that best serves the interests of their local communities. Typically, a critical role of a broadcast network is to provide its local affiliates with high quality programming. Because this programming is distributed across the country, broadcast networks have an economic incentive to ensure that the programming both appeals to a mass, nationwide audience and is widely shown by affiliates. A network's local affiliates serve a complementary role by providing local input in network programming decisions and airing programming that serves the specific needs and interests of that specific local community. As a result, the economic

---

[29] *See, e.g.*, NAB NPRM Comments at 56.

[30] Free Press agreed, in part, with this assessment, stating that "there are myriad factors contributing to the abysmal state of diverse ownership, including but not limited to institutional discrimination in financing and access to capital and deals . . . [h]owever, market consolidation is chief among these factors and even exacerbates the other barriers." Free Press 323 Report Reply at 4.

[31] The rule provides that "[a] television broadcast station may affiliate with a person or entity that maintains two or more networks of television broadcast stations *unless* such dual or multiple networks are composed of two or more persons or entities that, on February 8, 1996, were 'networks' as defined in [section] 73.3613(a)(1) of the Commission's regulations . . . ." *Id.* § 73.658(g) (emphasis in original).

[32] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2082, ¶ 139; *2002 Biennial Review Order*, 18 FCC Rcd at 13858, ¶ 621. The Third Circuit upheld the Commission's decision in the *2006 Quadrennial Review Order* to retain the dual network rule to promote competition and localism. *Prometheus II*, 652 F.3d at 463-64.

incentives of the networks are not always aligned with the interests of the local affiliates or the communities they serve.

24. *Diversity Order Remand and Eligible Entity Definition.* In addition to evaluating each of the broadcast ownership rules, the *FNPRM* addresses the Third Circuit's remand of certain aspects of the 2008 *Diversity Order.* Based on the Commission's analysis of the preexisting eligible entity standard as well as the measures to which it applied, the Third Circuit's remand instructions, and the record in this proceeding, the *FNPRM* proposes to reinstate the revenue-based eligible entity standard and to apply it to the regulatory policies set forth in the *Diversity Order.*[33] While the Commission does not have an evidentiary record demonstrating that this standard specifically increases minority and female broadcast ownership, we anticipate that reinstating the previous revenue-based standard will promote small business participation in the broadcast industry. The Commission believes that small businesses benefit from flexible licensing policies and that making it easier for small business applicants to participate in the broadcast industry will encourage innovation and enhance viewpoint diversity. The Commission also believes that the benefits of reinstating the eligible entity standard and applying it to the regulatory measures set forth in the *Diversity Order* would outweigh any potential costs of the decision to do so. Accordingly, the Commission tentatively determines that this action will advance the policy objectives that traditionally have guided the Commission's analyses of broadcast ownership issues and will serve the public interest.

25. *Shared Service Agreements.* The *FNPRM* provides further consideration of the regulatory treatment of various agreements for the sharing of services between broadcast stations. Because the Commission does not currently require the filing or disclosure of all sharing agreements that do not contain time brokerage or joint advertising sales provisions, the Commission has limited information about the content or breadth of such agreements or the frequency of their use. Accordingly, in order to allow the Commission and the public to better understand the terms, operation, and prevalence of these agreements and their potential impact on the Commission's competition, localism, and diversity goals, the *FNPRM* seeks comment on proposals to require the disclosure of such agreements. Specifically, the *FNPRM* proposes a specific definition for a category of sharing agreements designated in the *FNPRM* as Shared Service Agreements ("SSAs"). Because the Commission desires to expand its knowledge of these agreements, the *FNPRM* proposes to adopt a broad definition of SSAs. The *FNPRM*, however, seeks comment on whether to narrow the scope of the definition, seeking comment, for example, on whether a *de minimis* financial exception would be appropriate. The *FNPRM* then seeks comment on various proposals for the disclosure of SSAs, including that commercial television stations be required to place copies of such agreements in their public inspection files, the filing of SSAs pursuant to 47 C.F.R. § 73.3613, or the adoption of a new filing process (*e.g.*, a new form or a dedicated docket in the Commission's Electronic Comment Filing System ("ECFS")). The Commission proposes that any disclosure requirement it may adopt be subject to the same redaction allowances made available to local marketing agreements and joint sales agreements, namely, that licensees may redact confidential or proprietary information.

26. The Commission believes that disclosure of these agreements will further its understanding of the television marketplace and inform future policy decisions to address any potential negative impacts of SSAs on the Commission's competition, localism, and diversity goals. The *FNPRM* tentatively concludes that disclosure will permit the Commission to better understand the operation of stations and to assess the impact, if any, of such combined operation on the television marketplace and that members of the public will be able to gain a greater understanding of the relationship between

---

[33] These measures include: (1) Revisions of Rules Regarding Construction Permit Deadlines; (2) Modification of Attribution Rules; (3) Distress Sale Policy; (4) Duopoly Priority for Companies that Finance or Incubate and Eligible Entity; (5) Extension of Divestiture Deadline in Certain Mergers; and (6) Transfer of Grandfathered Radio Station Combinations to Non-Eligible Entities. *Diversity Order*, 23 FCC Rcd at 5931, 5936, 5939, 5943-45, ¶¶ 15. 31, 39, 56-61

independently owned stations that are parties to SSAs, which will allow them to evaluate whether this interaction has an impact on programming or other station operations.

###### B. Legal Basis

27.     The *FNPRM* is adopted pursuant to Sections 1, 2(a), 4(i), 303, 307, 308, 309, 310, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 303, 307, 308, 309, 310, and 403, and Section 202(h) of the Telecommunications Act of 1996.

###### C. Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

28.     The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted.[34] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction"[35] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[36] A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).[37] The final rules adopted herein affect small television and radio broadcast stations and small entities that operate daily newspapers. A description of these small entities, as well as an estimate of the number of such small entities, is provided below.

29.     *Television Broadcasting*. The SBA defines a television broadcasting station that has no more than $35.5 million in annual receipts as a small business.[38] The definition of business concerns included in this industry states that establishments are primarily engaged in broadcasting images together with sound. These establishments operate television broadcasting studios and facilities for the programming and transmission of programs to the public. These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule. Programming may originate in their own studio, from an affiliated network, or from external sources.[39] Census data for 2007 indicate that 2,076 such establishments were in operation during that year. Of these, 1,515 had annual receipts of less than $10.0 million per year and 561 had annual receipts of more than $10.0 million per year.[40] Based on this data and the associated size standard, the Commission concludes that the majority of such establishments are small.

---

[34] 5 U.S.C. § 604(a)(3).

[35] *Id.* § 601(6).

[36] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[37] 15 U.S.C. § 632.

[38] *See* 13 C.F.R. § 121.201 (2012 NAICS Code 515120).

[39] U.S. Census Bureau, *2012 NAICS Definition*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch?code =515120&search=2012 (NAICS Search) (visited Jan. 30, 2014).  Separate census categories pertain to businesses primarily engaged in producing programming. *See* Motion Picture and Video Production, NAICS code 512110; Motion Picture and Video Distribution, NAICS Code 512120; Teleproduction and Other Post-Production Services, NAICS Code 512191; and Other Motion Picture and Video Industries, NAICS Code 512199.

[40] U.S. Census Bureau, *American Fact Finder*, http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_51SSSZ1& prodType=table (visited Jan. 30, 2014) .

30.     The Commission has estimated the number of licensed commercial television stations to be 1,387.[41] According to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database ("BIA") as of November 26, 2013, 1,249 (or about 90 percent) of an estimated 1,387 commercial television stations in the United States have revenues of $35.5 million or less and, thus, qualify as small entities under the SBA definition.

31.     The Commission notes, however, that in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[42] must be included. This estimate, therefore, likely overstates the number of small entities that might be affected by this action because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. In addition, an element of the definition of "small business" is that the entity not be dominant in its field of operation. The Commission is unable at this time to define or quantify the criteria that would establish whether a specific television station is dominant in its field of operation. Accordingly, the estimate of small businesses to which rules may apply does not exclude any television station from the definition of a small business on this basis and is therefore possibly over-inclusive to that extent.

32.     *Radio Broadcasting.* The proposed policies could apply to radio broadcast licensees, and potential licensees of radio service. The SBA defines a radio broadcast station as a small business if such station has no more than $35.5 million in annual receipts.[43] Business concerns included in this industry are those "primarily engaged in broadcasting aural programs by radio to the public."[44] According to Commission staff review of the BIA Publications, Inc. Master Access Radio Analyzer Database as of November 26, 2013, about 11,331 (or about 99.9 percent) of 11,341 commercial radio stations have revenues of $35.5 million or less and thus qualify as small entities under the SBA definition. The Commission notes, however, that, in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[45] must be included. This estimate, therefore, likely overstates the number of small entities that might be affected by this action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies.

33.     In addition, an element of the definition of "small business" is that the entity not be dominant in its field of operation. The Commission is unable at this time to define or quantify the criteria that would establish whether a specific radio station is dominant in its field of operation. Accordingly, the estimate of small businesses to which rules may apply does not exclude any radio station from the definition of a small business on this basis and therefore may be over-inclusive to that extent. Also, as noted, an additional element of the definition of "small business" is that the entity must be independently owned and operated. The Commission notes that it is difficult at times to assess these criteria in the context of media entities and the estimates of small businesses to which they apply may be over-inclusive to this extent.

---

[41] *See Broadcast Station Totals as of September 30, 2013*, News Release (rel. Oct. 24, 2013) ("*Broadcast Station Totals*"), *available at* http://transition.fcc.gov/Daily_Releases/Daily_Business/2013/db1024/DOC-323674A1.pdf.

[42] "[Business concerns] are affiliates of each other when one [concern] controls or has the power to control the other, or a third party or parties controls or has to power to control both." 13 C.F.R. § 121.103(a)(1).

[43] *See* 13 C.F.R. § 121.201 (NAICS Code 515112); *see also* Small Business Size Standards, 77 Fed. Reg. at 72,704.

[44] U.S. Census Bureau, *2012 NAICS Definition*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch?code=515112&search=2012 (NAICS Search) (visited Jan. 30, 2014).

[45] "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has to power to control both." 13 C.F.R. § 121.103(a)(1).

34. *Daily Newspapers.* The SBA has developed a small business size standard for the census category of Newspaper Publishers; that size standard is 500 or fewer employees.[46] Business concerns included in this category are those that "carry out operations necessary for producing and distributing newspapers, including gathering news; writing news columns, feature stories, and editorials; and selling and preparing advertisements."[47] Census Bureau data for 2007 show that there were 4,852 firms in this category that operated for the entire year.[48] Of this total, 4,771 firms had employment of 499 or fewer employees, and an additional 33 firms had employment of 500 to 999 employees.[49] Therefore, the Commission estimates that the majority of Newspaper Publishers are small entities that might be affected by this action.

**D.      Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements**

35. The *FNPRM* proposes rule changes that will affect reporting, recordkeeping, and other compliance requirements. Each of these changes is described below.

36. The *FNPRM* proposes modifications to several of the media ownership rules as set forth in Section A above. The proposals, if ultimately adopted, would modify several FCC forms and their instructions: (1) FCC Form 301, Application for Construction Permit For Commercial Broadcast Station; (2) FCC Form 314, Application for Consent to Assignment of Broadcast Station Construction Permit or License; and (3) FCC Form 315, Application for Consent to Transfer Control of Corporation Holding Broadcast Station Construction Permit or License. The Commission may have to modify other forms that include in their instructions the media ownership rules or citations to media ownership proceedings, including Form 303-S and Form 323. The impact of these changes will be the same on all entities, and the Commission does not anticipate that compliance will require the expenditure of any additional resources.

37. In addition, the *FNPRM* proposes changes that would affect reporting, recordkeeping, or other compliance requirements with regard to the proposed disclosure of SSAs. If this proposal is ultimately adopted, commercial television stations will be required to disclose all SSAs to the public and the Commission. Depending on the method of disclosure for SSAs that may ultimately be adopted, commercial television stations may be required to upload all SSAs to their online public file or place a copy of all SSAs in their physical local public inspection file. In addition, if the Commission were to require the filing of SSAs pursuant to 47 C.F.R. § 73.3613, commercial television stations would be required to file a paper copy of such contracts with the Commission; list the contracts on their FCC Form 323, Ownership Report for Commercial Broadcast Station; and either place the SSAs in their local public inspection file or maintain an up-to-date list of all contracts reported on Form 323 and make such contracts available on request. Other proposed alternatives may include the creation of a new form for the filing of SSAs or the creation of a dedicated docket in the Commission's Electronic Comment Filing System that could be used for filing purposes.

---

[46] *Id.* § 121.201 (NAICS code 511110).

[47] U.S. Census Bureau, *2012 NAICS Definition*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch?code =511110&search=2012 (NAICS Search) (visited Jan. 30, 2014). These establishments may publish newspapers in print or electronic form. *Id.*

[48] *See* U.S. Census Bureau, 2007 Economic Census, ID: EC0751SSSZ5, *Information:  Subject Series - Estab and Firm Size:  Employment Size of Firms for the United States: 2007*, http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_51SSSZ5&prod Type=table (NAICS code 511110) (visited Jan. 30, 2014).

[49] *Id.*

**E.    Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

38.    The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[50]

39.    In conducting the quadrennial review, the Commission has three chief alternatives available for each of the Commission's media ownership rules — eliminate the rule, modify it, or, if the Commission determines that the rule is "necessary in the public interest," retain it.  The Commission believes that the rules proposed in the *FNPRM*, which are intended to achieve our policy goals of competition, localism, and diversity, will continue to benefit small entities by fostering a media marketplace in which they are able to compete effectively and by promoting additional broadcast ownership opportunities, as described below, among a diverse group of owners, including small entities. This Supplemental IRFA discusses below several ways in which the rules may benefit small entities as well as steps taken, and significant alternatives considered, to minimize any potential burdens on small entities.

40.    *Local Television Ownership Rule.*  The Commission proposes to retain the local television ownership rule with only a minor modification, consistent with the proposal in the *NPRM*.  In the *NPRM*, the Commission proposed to retain the rule but sought comment on a number of alternatives to this proposal.  Specifically, the *NPRM* proposed to retain the top-four prohibition, eight-voices test, and numerical limits of the existing rule, while proposing to replace the Grade B contour overlap provision with a DMA-based approach.[51]  The *NPRM* also invited comment on whether to adopt a market size waiver standard, the impact of multicasting on the local television ownership rule, and the impact of the proposed rule on minority and female ownership.[52]

41.    Multiple commenters asserted that the Commission should retain, or tighten, the local television ownership rule to promote competition and create ownership opportunities for new entrants.  In contrast, broadcast commenters asserted that the local television ownership rule should be eliminated or substantially relaxed as a result of competition for viewers and advertising revenue from non-broadcast video alternatives.  A number of commenters argued that such relief is warranted particularly for broadcasters — including small entities — that operate in small and mid-sized markets.  Broadcast commenters also support adoption of a more flexible waiver standard for small and mid-sized markets.

42.    In the *FNPRM*, the Commission tentatively finds that the local television ownership rule remains necessary in the public interest and should be maintained with a limited modification. Accordingly, under the proposed modified television ownership rule an entity may own up to two television stations in the same DMA if (1) the digital NLSCs of the stations (as determined by section 73.622(e)) do not overlap; or (2) at least one of the stations is not ranked among the top four stations in the market and at least eight independently owned television stations will remain in the DMA following the combination.[53]  In calculating the number of stations remaining post-merger, only those stations whose digital NLSC overlaps with the digital NLSC of at least one of the stations in the proposed

---

[50] *See* 5 U.S.C. § 603(c).

[51] *NPRM*, 26 FCC Rcd at 17502-07, ¶¶ 36-51.

[52] *Id.* at 17507-11, ¶¶ 52-59.

[53] *See FNPRM* at App. B; *see also* 47 C.F.R. § 73.622(e).

combination will be considered. In addition, the Commission proposes to retain the existing failed/failing station waiver policy.

43. As noted above, the *NPRM* proposed to replace the Grade B contour overlap provision with a DMA-based approach. The Commission tentatively finds, however, that adoption of a DMA-based approach to replace the analog Grade B contour as the trigger for the rule would unduly expand the reach of the local television ownership rule in some DMAs, particularly in those DMAs that cover large rural areas in the western United States where numerous small television stations operate. Thus, the *FNPRM* proposes to adopt instead the use of a digital NLSC as the functional equivalent of the analog Grade B contour, which is no longer relevant following the digital television transition. In the *FNPRM*, the Commission tentatively affirms the *NPRM*'s proposal to grandfather existing ownership combinations that would exceed the numerical limits under the revised contour approach, though the Commission proposes that, going forward, the sale of such combinations must comply with the local television ownership rule then in effect.[54] The Commission believes that this approach will avoid disruption of settled expectations and prevent any impact on the provision of television service by smaller stations operating in rural areas. Moreover, the Commission believes that by preventing stations with the largest market shares from combining to achieve excessive market power, the local television ownership rule protects against potential harm to broadcasters with smaller market shares, including small entities. Accordingly, the Commission believes that the rule, as modified, will continue to ensure that local television markets do not become too concentrated and, by doing so, will allow more firms, including those that are small entities, to enter local markets and compete effectively.

44. The *FNPRM* also addresses the competitive challenges faced by broadcasters that operate in small markets — including small entities — by proposing to retain the existing failed/failing station waiver policy. The Commission finds that the existing waiver standard is not unduly restrictive and provides appropriate relief in markets of all sizes. In particular, the Commission notes that a review of recent transactions demonstrates that waivers under the failed/failing station policy are frequently granted in small and mid-sized markets, which often provides relief for small entities.[55] Moreover, waiver of the Commission's rules is meant to be exceptional relief, and the Commission believes that the existing waiver criteria strike an appropriate balance between enforcing the ownership limits and providing relief from the rule in circumstances where it is truly appropriate. However, the *FNPRM* seeks comment on whether to relax the failed/failing station waiver criteria or establish additional grounds for waiver. For example, the items asks whether there are circumstances in which the Commission should refrain from applying the four-percent all-day audience share requirement or adopt a higher threshold.

---

[54] *NPRM*, 26 FCC Rcd at 17503, ¶ 39.

[55] As noted in the *FNPRM*, a survey of recent transactions demonstrates that waiver under the failed/failing station policy is frequently granted in small and mid-sized markets. *See, e.g.*, *Freedom Broadcasting of New York Licensee, L.L.C.*, Letter, 27 FCC Rcd 2498 (Med. Bur. 2012) (granting waiver under the failed/failing station policy in the Albany-Schenectady-Troy, New York, DMA – DMA #58); *Riverside Media, LLC*, Letter, 26 FCC Rcd 16038 (Med. Bur. 2011) (granting waiver under the failed/failing station policy in the Ft. Smith-Fayetteville-Springdale-Rogers, Arkansas, DMA – DMA #101); *ACME Television, Inc.*, Letter, 26 FCC Rcd 5189 (Med. Bur. 2011) (granting waiver under the failed/failing station policy in the Green Bay-Appleton, Wisconsin, DMA – DMA #69); *Estes Broadcasting, Inc.*, Letter, 25 FCC Rcd 7956 (Med. Bur. 2010) (granting waiver under the failed/failing station policy in the Tyler-Longview, Texas, DMA – DMA #107); *Borger Broadcasting, Inc., Debtor in Possession*, Letter, DA 10-209 (MB, rel. Jan 29, 2010) (granting waiver under the failed/failing station policy in the Amarillo, Texas, DMA – DMA #130); *Davis Television Clarksburg, LLC*, Memorandum Opinion and Order, 23 FCC Rcd 5472 (Med. Bur. 2008) (granting waiver under the failed/failing station policy in the Clarksburg-Weston, West Virginia, DMA – DMA #170).

45. *Local Radio Ownership Rule.* The *FNPRM* proposes to retain the local radio ownership rule without modification, consistent with the *NPRM*. In the *NPRM*, the Commission proposed to retain the rule and sought comment on alternatives to this proposal.[56] Specifically, the *NPRM* proposed to retain the AM/FM subcaps, which limit the number of radio stations in the same service that an entity can own.[57] The Commission also sought comment on whether and, if so, how, to incorporate new audio platforms into the rule and sought additional comment on the impact of such platforms on the broadcast radio industry.[58] In addition, the *NPRM* sought comment on whether to adopt a specific waiver standard for the local radio ownership rule and on how the proposed rule would affect minority and female ownership opportunities.[59]

46. Several commenters supported the tentative conclusion to retain the local radio ownership rule, including the AM/FM subcaps. They asserted that the AM band, in particular, is a critical point of new entry in the marketplace. By contrast, many broadcast commenters supported eliminating or loosening the rule, including the AM/FM subcaps. In particular, NAB disputes the tentative conclusion that the subcaps promote new entry, asserting instead that elimination of the subcaps could spur market activity that leads to divested properties that could be purchased by new entrants, including small businesses and minority and women-owned businesses.[60]

47. The Commission proposes to retain the local radio ownership rule, including the AM/FM subcaps, finding that AM subcaps in particular promote new entry in the broadcast radio marketplace. Accordingly, an entity may own: (1) up to eight commercial radio stations in radio markets with 45 or more radio stations, no more than five of which can be in the same service (AM or FM); (2) up to seven commercial radio stations in radio markets with 30-44 radio stations, no more than four of which can be in the same service (AM or FM); (3) up to six commercial radio stations in radio markets with 15-29 radio stations, no more than four of which can be in the same service (AM or FM); and (4) up to five commercial radio stations in radio markets with 14 or fewer radio stations, no more than three of which can be in the same service (AM or FM), provided that an entity may not own more than 50 percent of the stations in such a market, except that an entity may always own a single AM and single FM station combination.[61]

48. The Commission tentatively concludes that, consistent with previous Commission findings, broadcast radio continues to be a viable avenue for new entry in the media marketplace, including by small businesses, minorities, women, and entities seeking to serve niche audiences. Specifically, the Commission tentatively finds that AM stations are generally the least expensive option for entry into the radio market, often by a significant margin, and therefore permit new entry for far less capital investment than is required to purchase an FM station.[62] The Commission believes that retention of the local radio ownership limits, including the AM/FM subcaps, will foster opportunities for new entry in local radio markets, particularly by small entities. Moreover, the Commission believes that by limiting

---

[56] *NPRM*, 26 FCC Rcd at 17511-12, ¶¶ 61-62.

[57] *See id.* at 17516, ¶ 77.

[58] *Id.* at 17514, ¶¶ 68-69.

[59] *Id.* at 17518, ¶¶ 81-83.

[60] NAB NPRM Comments at 39.

[61] 47 C.F.R. § 73.3555(a).

[62] For example, from 2008 through 2010, AM stations in Classes C and D had the lowest average station sales price (*e.g.*, \$310,000 per station for AM Classes C and D in 2010, compared to \$520,000 for the cheapest FM option – Class C3), with the average AM station generally selling for far less than the average FM station. SNL KAGAN, RADIO STATION DEALS DATABOOK 137 (2011).

the consolidation of market power among the dominant groups, the rule will ensure that small radio station owners remain economically viable.

49.     *Newspaper/Broadcast Cross-Ownership Rule.* The *FNPRM* seeks additional comment on the *NPRM*'s proposals regarding the newspaper/broadcast cross-ownership ("NBCO") rule. The *NPRM* offered a myriad of tentative conclusions and inquired about detailed scenarios. In particular, the *NPRM* sought comment on a number of alternatives, including whether to modify the top 20 DMA distinction, the top-four restriction, or the eight voices test.[63] The *NPRM* also proposed to eliminate the use of a station's analog signal contour in favor of a DMA-based approach for triggering the rule.[64]

50.     The Commission received a substantial number of comments on the NBCO rule, several of which discuss issues that may be of interest to small entities. For instance, several commenters claimed that lifting the newspaper/radio cross-ownership restriction will revitalize local news on radio stations and will provide struggling newspapers with a broader base of financial support and an increased ability to reach audiences.[65] In the *FNPRM*, the Commission seeks comment on whether the restriction on newspaper/radio cross-ownership is no longer necessary to promote viewpoint diversity and therefore should be eliminated from the NBCO rule.

51.     Additionally, in the *FNPRM*, the Commission tentatively concludes that it should not adopt a bright-line rule allowing some newspaper/television combinations, even under narrowly prescribed circumstances. The Commission is aware that bright-line rules are more likely to produce predictable and consistent outcomes in an expeditious and less costly manner than rules that incorporate a waiver process, which is inherently more uncertain. The Commission is concerned, however, that a bright-line rule is too blunt an instrument to be used for allowing newspaper/television cross-ownership, no matter how limited. Of particular interest to small entities, the Commission also is concerned that a bright-line rule allowing only certain combinations in the largest markets could foreclose merger opportunities in smaller markets where a combination might be acceptable.

52.     Although the Commission tentatively concludes that a general prohibition on newspaper/television combinations in all markets is the appropriate starting point when considering the impact of newspaper/television cross-ownership on viewpoint diversity, it recognizes that particular combinations might be shown to be consistent with its diversity goal. Therefore, it proposes to entertain requests for waiver of the general prohibition. An approach that incorporates a waiver process would provide the Commission with the flexibility to take into account the particular circumstances of a proposed merger and potentially provide relief for broadcasters — including small entities — by allowing the combination of a newspaper and a television station where appropriate.

53.     The Commission requests comment on what type of waiver process would enable it to identify any acceptable newspaper/television combinations most accurately and effectively. It asks whether it should implement a pure case-by-case approach that evaluates the totality of the circumstances for each individual transaction, considering each waiver request anew without measuring it against a set of defined criteria or awarding the applicant an automatic presumption based on a *prima facie* showing of particular elements. Additionally, the Commission seeks comment on an approach whereby the Commission would ascribe a favorable presumption to certain waiver applicants in the top-20 DMAs and a negative presumption to all other waiver applicants. It seeks comment on requiring as conditions for a favorable presumption that: (1) the proposed merger does not involve a television station ranked among the top-four television stations in the DMA and (2) at least eight major media voices remain in the DMA

---

[63] *See NPRM*, 26 FCC Rcd at 17528-29, ¶¶ 106-07, 110-11.

[64] *See id.* at 17525-26, ¶¶ 99-100.

[65] Cox NPRM Comments at 21-22; Morris NPRM Comments at 4-8, 13-18; Bonneville/Scranton NPRM Comments at 15-18.

following the transaction.[66] The Commission seeks comment on the pros and cons, costs and benefits of both these approaches.[67]

54. As noted above, the *NPRM* also proposed to eliminate the use of a station's Grade A contour in favor of a DMA-based approach for triggering the rule.[68] As commenters note, however, because DMAs can be much larger in size than the former Grade A contour areas, the proposed DMA-based approach could expand the reach of the rule and prohibit cross-ownership when there is no overlap between the community in which a newspaper is published and the primary service area of a broadcast station. To avoid that possibility, the *FNPRM* proposes instead to prohibit cross-ownership of a full-power television station and a daily newspaper when: (1) the community of license of the television station and the community of publication of the newspaper are in the same Nielsen DMA, and (2) the Principal Community Contour ("PCC") of the television station, as defined in section 73.625 of the Commission's rules, encompasses the entire community in which the newspaper is published. Under this proposal, both conditions must be met in order for the cross-ownership prohibition to be triggered. Furthermore, the Commission proposes to grandfather those existing combinations that would exceed the ownership limit by virtue of the change to this new DMA/PCC approach. The Commission believes that this approach will avoid disruption of settled expectations and prevent any impact on the provision of television service by smaller stations. Moreover, the Commission believes that the newspaper/television cross-ownership limits — including the top 20 DMA distinction, the top-four restriction, and the eight voices test — will continue to foster diffuse ownership among media outlets and thereby create more ownership opportunities for small entities.

55. *Radio/Television Cross-Ownership Rule.* In the *FNPRM*, the Commission seeks comment on whether to eliminate the radio/television cross-ownership rule, which limits the combined number of commercial radio and television stations a single entity may own in the same market.[69] In the *NPRM*, the Commission tentatively concluded that the radio/television cross-ownership rule is not currently necessary to promote the public interest. The Commission sought comment on a range of issues, including whether radio and television stations constitute different markets, whether repeal of the rule would encourage more and better competition in local media markets, whether repeal of the rule would result in additional broadcast consolidation, and what impact, if any, repeal would have on small, independent broadcasters, including those stations owned by minorities and women.[70] The Commission

---

[66] The Commission emphasizes that a presumptive approach merely would provide a starting point for the Commission's analysis of the likely impact of a proposed merger on a particular market. A presumption could be overcome if the weight of the evidence favors the party with the burden of proof. Waiver applicants in smaller markets would not be precluded from demonstrating that a proposed merger would create efficiencies that would serve the public interest without harming viewpoint diversity or localism.

[67] In addition, as applies also in the local television context, the Commission proposes to consider granting a waiver request when a proposed combination involves a failed/failing television station or newspaper. Such an approach could provide relief for struggling entities, including those that are small entities.

[68] *See NPRM*, 26 FCC Rcd at 17525-26, ¶¶ 99-100.

[69] The current rule restricts common ownership of multiple television and radio stations depending on the number of independent media owners that would remain in the local market. Specifically, the rule permits an entity to own, operate, or control up to two television stations and four radio stations in a market, so long as at least 10 independently owned media voices would remain post-merger, and a single entity to own up to two television and six radio stations, or one television station and seven radio stations, in a market as long as at least 20 independently owned media voices remained post-merger. A combination of one radio and up to two television stations is allowed regardless of the number of voices remaining in the market. In all instances, the entity must also comply with the applicable local radio and local television ownership limits. 47 C.F.R. § 73.3555(c)(2). The cross-ownership rule is triggered when a station's city of license is encompassed by a specified service contour of the other co-owned stations. *Id.* § 73.3555(c)(1).

[70] *NPRM*, 26 FCC Rcd at 17533-39, ¶¶ 119-35.

indicated in the *NPRM* that changes in the marketplace and evidence from the media ownership studies specifically supported the tentative conclusion that the rule is not necessary to promote viewpoint diversity in local media markets.[71]

56.     Most broadcast commenters supported the Commission's tentative conclusion, and asserted that the cross-ownership rule is no longer necessary to protect the public interest, particularly in light of competition from new media technologies and Internet-based information outlets.  Not all broadcasters, however, agreed.  Mt. Wilson, an independent broadcaster, asserted that CBS, its primary competitor, is able to wield significant power in the radio market because of its ability to leverage its non-radio holdings, which, in turn, adversely affects the ability of independent radio owners in the market to compete effectively.[72]  Mt. Wilson argued that elimination of the radio/television cross-ownership rule will benefit group owners, such as CBS, by allowing them to acquire additional co-owned radio stations in a market, and thereby giving them a further competitive benefit to the disadvantage of independent broadcasters.[73]

57.     Commenters who supported retention of the rule also expressed concern about the potential loss of viewpoint diversity in local markets if the rule were to be repealed.  They were skeptical of conclusions in the media ownership studies that consolidated broadcast stations air more local content, and thus, contribute more to viewpoint diversity than independent voices.[74]  Commenters also asserted that the Commission must take into account the public's reliance on broadcast stations and newspapers as the primary sources of information for individuals to learn about their local communities and to participate in local civic affairs.[75]

58.     In addition, public interest commenters claimed that broadcast radio is one of the few remaining entry points into media ownership for women and minorities, and that its usefulness as such would potentially be limited if the radio/television cross-ownership rule were eliminated.[76]  Other commenters argued more generally that any media consolidation disproportionately affects opportunities for women and minorities to become and remain broadcast station owners and that female- and minority-owned stations thrive in markets that are less concentrated.[77]  NHMC *et al.* contended that strengthening,

---

[71] *Id.* at 17534, ¶119.

[72] Mt. Wilson NPRM Reply at 12-13. Mt. Wilson disagrees with the *NPRM*'s tentative conclusion that "most consumers do not consider radio and television to be substitutes for one another," an assumption it contends ignores advertisers and their practices. According to Mt. Wilson, permitting a group owner to offer access [to advertisers] to "still more group-owned radio stations" through repeal of the cross-ownership rule adversely affects competition in local broadcast markets. *Id.*; *see also* AFCP *et al.* NPRM Comments at 4-5 n. 9.

[73] Mt. Wilson NPRM Reply at 13. Mt. Wilson adds that retention of the cross-ownership rule would ensure that group owners such as CBS continue to have competition from independent radio owners, which benefits consumers by ensuring access to more locally focused programming from independent owners. *Id.* at 2-3, 8.

[74] AFTRA NPRM Comments at 3.

[75] Free Press NPRM Comments at 24-25; NHMC *et al.* NPRM Comments at 37 (observing that over-the-air broadcast stations are free to the public and that radio reaches over 93 percent of Americans each week, with an even higher penetration rate in communities of color).

[76] FMC also predicted that elimination of the radio/television cross-ownership rule would result in less access for local voices. FMC NPRM Comments at 8-9; *see also* Free Press NPRM Comments at 26.

[77] Free Press NPRM Reply at 49-50. Free Press offered the following findings on minority ownership of radio stations from its own research:  (1) markets with female and minority owners have fewer stations per owner on average than markets without them; (2) the level of market concentration is significantly lower in markets with female and minority owners (this holds true if the size of the market and the level of minority population in the market are held constant); (3) the probability that a particular station will be female- or minority-owned is significantly lower in more concentrated markets; and (4) the probability that a particular market will contain a female- or minority-owned station is significantly lower in more concentrated markets. *Id.* Free Press noted that

(continued....)

or at least retaining, broadcast ownership limits is one of the few race- and gender-neutral ways to increase broadcast station ownership by women and minorities, thereby, avoiding the constitutional concerns raised by race- and gender-specific remedies.[78] NABOB asked that the Commission not take any action that would further erode minority broadcast ownership, particularly given that new media outlets are not positioned to replace traditional broadcasters and the information services they provide to minority communities.[79] NABOB contended that any deregulation allows consolidation and it asserted that consolidation enhances an entity's competitive advantage in obtaining advertising.[80]

59.     Consistent with prior Commission holdings, the Commission tentatively finds that the radio/television cross-ownership rule is not necessary to promote competition. The Commission has found previously that most advertisers do not consider radio and television to be good substitutes for one another and that television and radio stations do not compete in the same product market. This position is consistent with the long-standing conclusion of the Department of Justice, which considers radio advertising as a separate antitrust market for purposes of its competition analysis. The *FNPRM* tentatively finds that most consumers do not consider radio and television stations to be substitutes for one another and do not switch between television viewing and radio listening based on program content. Contrary to Mt. Wilson's conflicting opinion, the Commission believes that the weight of the evidence in the record of this proceeding and precedent supports these tentative conclusions.

60.     The *FNRPM* tentatively concludes that the radio/television cross-ownership rule is not necessary to promote localism. The Commission agrees with industry commenters who maintained that some limited cross-ownership could create efficiencies that could benefit the public should broadcasters choose to invest additional resources in the production of local news and information programming.[81] When broadcasters engage in joint operations, whether those operations are focused on programming and news gathering or back office matters, the Commission believes it likely that financial efficiencies result. Such efficiencies could lead ultimately to consumer benefits in the form of additional station investments in equipment for radio or television newsrooms, an increase in staffing for news and informational programs, or additional local news coverage on radio stations.[82]

61.     The Commission seeks comment on whether the radio/television cross-ownership rule is not necessary to promote viewpoint diversity. In addition, the *FNPRM* tentatively finds that the current record does not support claims that elimination of the radio/television cross-ownership rule would have a negative impact on minority and female ownership. Notably, radio/television cross-ownership

---

(Continued from previous page)
such findings suggest that consolidation disproportionately affects opportunities for women and people of color to become and remain broadcast station owners. *Id.*

[78] NHMC *et al.* NPRM Comments at 5. Free Press agreed with NHMC *et al.* and contended that the Commission should not eliminate a rule that could diminish opportunities for women and people of color without providing an analysis of the impact on such groups or even a current tally of radio ownership levels by women and people of color. Free Press NPRM Reply at 50-51. NHMC *et al.* also criticized the lack of minority ownership data or other analysis that would support relaxation or elimination of the radio/television cross-ownership rule. NHMC *et al.* Comments at 34.

[79] NABOB NOI Comments at 5. NABOB asserted that, if the Commission does not take affirmative steps to prevent more ownership consolidation, "it must at least refrain" from relaxing its current cross-ownership rules. NABOB 323 Report Comments at 3. In contrast, NAB maintained that the Commission should be skeptical of unproven assumptions about the relationship between relaxation of ownership limits and a reduction in the number of minority-owned broadcast stations. NAB NPRM Comments at 56.

[80] NABOB 323 Report Comments at 10-11.

[81] *See* Tribune NPRM Comments at 77; NAB NPRM Comments at 50-51; NAB NPRM Reply at 5-6; Tribune NPRM Reply at 16.

[82] *See NPRM*, 26 FCC Rcd at 17535, 17536-37, ¶¶ 125, 130.

combinations were not the focus of commenters' concerns raised in response to the *NPRM*. In fact, no commenter to the *NPRM* presented empirical data or other analyses that established that repeal of this rule would harm competition, localism, or viewpoint diversity in local markets. Moreover, while the Commission acknowledges the concerns raised by those advocating for additional minority ownership opportunities, the Commission agrees with commenters, including NAB, that the low level of minority and female broadcast ownership cannot be attributed solely or primarily to consolidation.[83] Nor has any commenter shown that these low levels of ownership are a result of the existing radio/television cross-ownership rule. The Commission recognizes the presence of many disparate factors, including, most significantly, access to capital, as longstanding, persistent impediments to ownership diversity in broadcasting.

62. *Shared Service Agreements.* The proposed filing requirement for SSAs is not expected to have a significant economic impact on any entities, whether small or otherwise. The filing requirement is limited to commercial television stations, so any small entities that are licensees of commercial radio stations and any small entities that are licensees of noncommercial television or radio stations are exempt from the filing requirement. Furthermore, the Commission believes that SSAs are generally executed for a period of multiple years, which likely limits the number of agreements that will be subject to the proposed disclosure requirement. However, the *FNPRM* seeks comment on ways to limit the disclosure requirement that could reduce the burden while not negatively impacting the policy justifications for requiring disclosure. For example, the Commission asks whether any category of agreements between stations should be excluded from the definition of SSA in this proceeding, for instance by adopting a *de minimis* financial exclusion, limiting the definition to agreements that involve local news production or that only involve stations from the same local market. The *FNPRM* also seeks comment on how much time should be provided for compliance with the proposed requirement, which could reduce the burden on all stations. Finally, the *FNPRM* seeks comment on whether to limit the disclosure requirement to certain larger markets (*e.g.*, the top 50 or 100 Designated Market Areas).

63. In addition, the *FNPRM* seeks comment on multiple alternatives for the proposed disclosure requirement. These alternatives include placing the SSAs in the stations' public inspection files (online or physical), filing the agreements with the Commission, the creation of a new form for the filing of SSAs, or the creation of a dedicated docket in ECFS that could be used for filing purposes. This gives commenters the opportunity to demonstrate that one of these alternatives may have less of an economic impact on small businesses and/or all entities. The Commission will consider all such comments.

64. *Diversity Order Remand/Eligible Entity Definition.* The Commission solicited comment in the *NPRM* on whether the Commission should reinstate the preexisting revenue-based eligible entity definition to support the measures the Third Circuit vacated and remanded as well as other measures the Commission may implement in the future.[84] In addition, the Commission sought comment on whether re-adoption of the revenue-based standard would support the Commission's traditional diversity, localism, and competition goals in other ways, particularly by enhancing ownership opportunities for small businesses and other new entrants.[85]

65. As noted above, the *FNPRM* tentatively concludes that the Commission should reinstate the preexisting revenue-based eligible entity definition, which includes those entities, commercial or noncommercial, that would qualify as small businesses consistent with SBA standards for its industry grouping, based on revenue. Specifically, the Commission believes that reinstating the revenue-based standard will promote small business participation in the broadcast industry. The Commission believes

---

[83] *See, e.g.*, NAB NPRM Comments at 56.

[84] *NPRM*, 26 FCC Rcd at 17550-51, ¶¶ 160-62.

[85] *Id.* at 17550-51, ¶¶ 160-61.

that small-sized applicants and licensees benefit from flexible licensing, auctions, transactions, and construction policies. Often, small-business applicants have financing and operational needs distinct from those of larger broadcasters. By easing certain regulations for small broadcasters, the Commission believes that it will promote the public interest goal of making access to broadcast spectrum available to a broad range of applicants. The Commission also believes that enabling more small businesses to participate in the broadcast industry will encourage innovation and expand viewpoint diversity.

66. In addition, the Commission proposes to readopt each measure relying on the eligible entity definition that was remanded in *Prometheus II*. These measures include: (1) Revision of Rules Regarding Construction Permit Deadlines;[86] (2) Modification of Attribution Rule;[87] (3) Distress Sale Policy;[88] (4) Duopoly Priority for Companies that Finance or Incubate an Eligible Entity;[89] (5) Extension of Divestiture Deadline in Certain Mergers;[90] and (6) Transfer of Grandfathered Radio Station Combinations.[91] The Commission's intent in proposing the reinstatement of the previous revenue-based eligible entity definition — and in applying it to the construction, licensing, transaction, and auction measures to which it previously applied — is to expand broadcast ownership opportunities for new entrants, including small entities. Therefore, the Commission anticipates that the measures proposed in the *FNPRM* will benefit small entities, not burden them.

67. The Commission tentatively concludes that it does not have sufficient evidence at this time to satisfy the constitutional standards necessary to adopt race- or gender-conscious measures. In evaluating the possibility of adopting a socially disadvantaged business ("SDB") standard based on the

---

[86] *Promoting Diversification of Ownership in the Broadcasting Services*, MB Docket No. 07-294, Report and Order and Third Further Notice of Proposed Rulemaking, 23 FCC Rcd 5922, 5930, ¶ 15 (2008) (revising construction permit rules to allow the sale of expiring construction permits to eligible entities that agree to complete construction within the time remaining on the permit or within 18 months, whichever period is greater) ("*Diversity Order*" and "*Diversity Third FNPRM*"); *see also* 47 C.F.R. § 73.3598(a).

[87] *Diversity Order*, 23 FCC Rcd at 5936, ¶ 31 (relaxing the equity/debt plus ("EDP") attribution standard for interest holders in eligible entities by "allow[ing] the holder of an equity or debt interest in a media outlet subject to the media ownership rules to exceed the 33 percent threshold set forth in [the EDP standard] without triggering attribution where such investment would enable an eligible entity to acquire a broadcast station provided (1) the combined equity and debt of the interest holder in the eligible entity is less than 50 percent, or (2) the total debt of the interest holder in the eligible entity does not exceed 80 percent of the asset value of the station being acquired by the eligible entity and the interest holder does not hold any equity interest, option, or promise to acquire an equity interest in the eligible entity or any related entity"); *see also* 47 C.F.R. § 73.3555, Note 2(i)(2). In addition, pursuant to the new entrant bidding credits available under the Commission's broadcast auction rules, the modified EDP attribution standard is available to interest holders in eligible entities that are the winning bidders in broadcast auctions. *See* 47 C.F.R. § 73.5008(c)(2). This application of the modified EDP standard also is being reinstated by the Commission.

[88] *Diversity Order*, 23 FCC Rcd at 5939, ¶ 39 (modifying the distress sale policy by allowing a licensee that has been designated for a revocation hearing or has a renewal application that has been designated for hearing on basic qualification issues to sell the station to an eligible entity prior to the hearing).

[89] *Id.* at 5943, ¶ 56 (giving an applicant for a duopoly that agrees to finance or incubate an eligible entity priority over other applicants in the event that competing duopoly applications simultaneously are filed in the same market).

[90] *Id.* at 5943-44, ¶¶ 57-60 (agreeing to consider requests to extend divestiture deadlines when applicants actively have solicited bids for divested properties from eligible entities and further stating that entities granted such an extension must sell the divested property to an eligible entity by the extended deadline or have the property placed in an irrevocable trust for sale by an independent trustee to an eligible entity).

[91] *Id.* at 5944-45, ¶ 61 (permitting the assignment or transfer of a grandfathered radio station combination intact to any buyer so long as the buyer files an application to assign the excess stations to an eligible entity or to an irrevocable divestiture trust for the ultimate assignment to an eligible entity within 12 months after consummation of the purchase of the grandfathered stations).

definition employed by the SBA, or any other race-conscious standard, the first question the Commission must consider is whether the standard could be justified by a "compelling governmental interest."[92] Assuming that such an interest could be established, the Commission then would have to be able to demonstrate that the application of the race-conscious standard to specific measures or programs would be "narrowly tailored" to further that interest. While the Commission tentatively finds that a reviewing court could deem the Commission's interest in promoting a diversity of viewpoints compelling, the Commission believes that it does not have sufficient evidence at this time to demonstrate that adoption of race-conscious measures would be narrowly tailored to further that interest. Additionally, the Commission tentatively finds that it cannot conclude that the record evidence establishes a relationship between the Commission's interest in viewpoint diversity and the ownership of broadcast stations by women that would satisfy intermediate scrutiny. While the Commission acknowledges that the data show that women-owned stations are not represented in proportion to the presence of women in the overall population, the Commission does not believe that the evidence available at this time reveals that the content provided via women-owned broadcast stations substantially contributes to viewpoint diversity in a manner different from other stations or otherwise varies significantly from that provided by other stations. Further, the Commission tentatively finds that it does not have sufficient evidence to establish a compelling interest in remedying past discrimination.

68. In addition, the Commission reject commenters' arguments that the Commission is required to adopt an SDB standard or another race-conscious eligible entity standard in this proceeding in light of the court's instructions in *Prometheus II*.[93] The Commission also disagrees with arguments that the Commission is not permitted to conclude this proceeding until the Commission has completed any and all studies or analyses that may enable it to take such action in the future consistent with current standards of constitutional law.[94] The Commission intends to follow the Third Circuit's direction that the Commission consider adopting an SDB definition before completion of this proceeding and evaluate the feasibility of adopting a race-conscious eligibility standard based on an extensive analysis of the available evidence. The Commission does not believe that the Third Circuit intended to prejudge the outcome of the Commission's analysis of the evidence or the feasibility of implementing a race-conscious standard that would be consistent both with applicable legal standards and the Commission's practices and procedures.

69. The Commission also declined to adopt at this time an eligible entity definition that incorporates the Overcoming Disadvantage Preference ("ODP") standard proposed by the Commission's Diversity Advisory Committee in 2010.[95] Commenters generally did not suggest criteria, other than race and ethnic origin, that could be considered in an individualized, holistic evaluation system like that

---

[92] *See Grutter v. Bollinger*, 539 U.S. 306, 327 (2003).

[93] *See* NABOB 323 Report Comments at 6-11; LCCHR 323 Report Comments at 4; NHMC 323 Report Comments at 7.

[94] *See* LCCHR 323 Report Comments at 4; NHMC 323 Report Comments at 4; UCC *et al.* 323 Report Comments at 4, 10, 27.

[95] *See* DCS NPRM Comments at 18-19. The ODP proposal is based on a recommendation from the Diversity Advisory Committee that the Commission initiate a rulemaking proceeding to design, adopt, and implement a new preference in its competitive bidding process that would award bidding credits to persons or entities that demonstrate that they have overcome significant disadvantage. *See* DCS NPRM Comments at 2. The Commission released a Public Notice in 2010 in response to the Diversity Advisory Committee's recommendation. *See Media and Wireless Telecommunications Bureaus Seek Comment on Recommendation of the Advisory Committee on Diversity for Communications in the Digital Age for a New Auction Preference for Overcoming Disadvantage*, GN Docket No. 10-244, Public Notice, 25 FCC Rcd 16854 (Med. Bur./Wireless Tel. Bur. 2010). DCS further recommended that the Commission issue a Notice of Proposed Rulemaking to adopt an ODP standard in the context of the competitive bidding process for broadcast licenses. *See* DCS NPRM Comments at 19-21.

approved in *Grutter*.[96] Commenters recommended that the Commission replace its revenue-based eligible entity definition with an ODP standard as a race-neutral means of advancing ownership diversity.[97] The Commission notes that it is not entirely clear whether the proposed ODP standard would be subject to heightened constitutional scrutiny.[98] Moreover, the Commission believes that it does not have a sufficient record at present on a number of issues that would need to be resolved prior to the implementation of an ODP standard. Among other issues, no commenter provided input on (1) what social or economic disadvantages should be cognizable under an ODP standard, (2) how the Commission could validate claims of eligibility for ODP status, (3) whether applicants should bear the burden of proving specifically that they would contribute to diversity as a result of having overcome certain disadvantages, (4) how the Commission could measure the overcoming of a disadvantage if an applicant is a widely held corporation rather than an entity with a single majority shareholder or a small number of control persons, and (5) how the Commission could evaluate the effectiveness of the use of an ODP standard. Even if the Commission could develop an adequate record on these issues, the Commission is concerned that it may lack the resources to conduct such individualized reviews. Moreover, the Commission would have to walk a very fine line in order to fully evaluate the potential diversity contributions of individual applicants without running afoul of First Amendment values.[99] The Commission is concerned that the type of individualized consideration that would be required under an ODP standard could prove to be administratively inefficient, unduly resource-intensive, and inconsistent with First Amendment values.

70. The Commission also tentatively declined to act on various recommendations from commenters regarding the promotion of minority and female ownership. These recommendations include: (1) relaxing the foreign ownership limitations under Section 310(b)(4) of the Communications Act; (2) encouraging Congress to reinstate and update tax certificate legislation; (3) granting waivers of

---

[96] The Commission long ago abandoned assessing the relative strengths, weaknesses, and the probability of providing certain types of content as part of the broadcast licensing process. The comparative hearing process has been replaced by Congress's directive that the Commission award new broadcast allotments by competitive bidding. *Bechtel v. FCC*, 10 F.3d 875 (D.C. Cir. 1993). In *Bechtel*, the court overturned the longstanding Commission practice of preferring applicants that intended to integrate both ownership and management of the local station as predictive, among other factors, of providing broadcast service responsive to the needs and interests of the local community. It deemed the integration policy arbitrary and capricious, notwithstanding the Commission's defense that having owners involved in the day-to-day management of the station enhances the quality of broadcast service provided to the public. *Id.* at 878, 887; *see also* 47 U.S.C. § 309(j).

[97] *See* DCS NPRM Comments at 2, 18-19. DCS further suggested that the Commission apply an ODP standard to one or more of the measures DCS has proposed in this proceeding, "to determine how it might operate and to make any necessary adjustments so that it can be extended to other proposals . . . ." *See* DCS 323 Report Comments at 12-13; *see also* NAB 323 Report Reply at 4-5. DCS also proposed that the Commission adopt an ODP standard in the context of the Commission's competitive bidding rules. *See* DCS NPRM Comments at 19-21; *see also* NAB NPRM Comments at 55 (supporting adoption of ODP standard in the context of competitive bidding). The proposal to adopt an ODP standard in the context of competitive bidding remains the subject of a separate proceeding. *See generally New Auction Preference Notice*, 25 FCC Rcd 16854. In addition, Bonneville/Scranton suggested alternative eligibility criteria that could be employed with respect to DCS's broadcast incubation proposal. *See* Bonneville/Scranton 323 Report Reply at 13.

[98] For instance, an ODP standard that includes race-conscious criteria would be subject to heightened scrutiny. It is unclear how an ODP standard that does not include any race-conscious criteria would enhance minority ownership, which appears to be among the goals of the proponents of this proposal. An ODP standard that does not facially include race-conscious criteria, yet is constructed for the purpose of promoting minority ownership, might be subject to heightened scrutiny.

[99] *See Metro Broad., Inc. v. FCC*, 497 U.S. 547, 585 n.36 (1990) (noting that the Commission eschews involvement in licensees' programming decisions to avoid constitutional issues that would be raised if it "denied a broadcaster the ability to carry a particular program or to publish his own views, if it risked government censorship of a particular program, or if it led to the official government view predominating public broadcasting") (internal quotes and cites omitted), *overruled in part on other grounds in Adarand*, 515 U.S. at 227.

the local radio ownership rule to parties that "incubate" qualified entities; and (4) migrating AM radio to VHF Channels 5 and 6.[100]  In addition, the Alliance for Women in Media, Inc. ("AWM") asked the Commission to consider several actions to address the "historic underrepresentation of women" in ownership of broadcast stations and managerial positions in the broadcast industry.[101]  The Commission has already implemented some of these recommendations.  Because the Commission believes that the remainder of these proposals would raise public interest concerns, may not provide meaningful assistance to the intended beneficiaries, or are outside of the proper scope of this broadcast ownership proceeding, the Commission tentatively concludes that it should not adopt them here.

F.    **Federal Rules that May Duplicate, Overlap, or Conflict With the Proposed Rule**

71.    None.

---

[100] DCS 323 Report Comments at 7.

[101] *See* AWM NPRM Comments at 5-7.

## STATEMENT OF
## CHAIRMAN TOM WHEELER

*Re:*    *Broadcast Media Ownership, Diversity and Joint Sales Agreements*, MB Docket Nos. 14-50, 09-182, 07-294, 04-256.

The Commission has long imposed limits on concentration of ownership of broadcast media to promote the statutory goals of competition, localism, and diversity.

Our action today with respect to Joint Sales Agreements (JSAs) will close off what has become a growing end-run around the one-to-a-market limitation. Our goal is not to prohibit agreements that advance the statute's public interest mandate. Rather, we are applying to television a rule that has worked well in radio. The agreements we address, under which one station typically sells all of the advertising time on another station, give a broadcaster the incentive and ability to unduly influence the operations of a competing station.

Joint sales agreements have become the tool to increase corporate control of local media. When one licensee controls the cash flow of another, it controls the other. The old admonition "follow the money" has never been more appropriate. The Justice Department's Antitrust Division has endorsed this proposal, arguing that "There has been a pronounced trend toward one station controlling another station that is nominally owned by a separate entity." DOJ added, "Failure to account for the effects of such arrangements can create opportunities to circumvent FCC ownership limits and the goals those limits are intended to advance."

What we do is no surprise. Industry participants, including investors, attorneys, and financial analysts, acknowledge that it has been anticipated for years that the Commission would close this loophole. Industry participants have disclosed this to investors, making statements like this: "[w]hile all of our existing local service agreements comply with current FCC rules and policies, the FCC may not continue to permit local service agreements as a means of creating duopoly-type opportunities."[1] Industry has known for some time that this day might come. Today is that day.

But let's be clear, attribution of TV JSAs does NOT change the number of TV stations a single entity may own in a market under the Local Television Ownership Rule. It just means that we won't tolerate any longer that licensees circumvent our rules.

It also does not end the use of sharing agreements that promote the public interest. It provides for an expedited waiver review process that will examine the merits of JSAs on a case-by-case basis. If a company can show that the benefits of a JSA serve the public interest, it will get a waiver.

Today, we are also taking the next step in our review of the broadcast ownership rules. The Further Notice allows the Commission to move toward a comprehensive analysis of the relevance of these important rules in today's dynamic and vital media marketplace. We will welcome input from various

---

[1] Nexstar Broadcasting Group, Inc., SEC Form 10-K for the Annual Period Ended December 31, 2013, at 40. SEC filings are also instructive in other ways. A cursory review of those filings discloses such things as (1) consolidation of the dependent stations' financials in the financial statements of the controlling entity; (2) "going concern" qualifications based on the dependent broadcaster's relationship with the independent broadcaster; (3) the contingent arrangements enabling acquisition of the dependent broadcaster on very favorable terms; (4) an implausibly small number of employees overseeing the operation of the dependent stations; and (5) low levels of compensation for broadcast group executives relative to peers managing multiple station groups.

industry sectors, the public, and watchdog groups about the realities of the marketplace in 2014 and how these rules serve the public interest. As noted by critics of our actions today, the Commission has been unable to complete the 2010 Quadrennial review. This does not reflect a lack of effort – my predecessor circulated an item in 2012 that languished for over a year. But an inability to achieve a majority on the 2010 review does not entitle us to shirk our responsibilities to take other action that is related to enforcement of our ownership rules. In any event, we are committed to completing both reviews. I have instructed the Media Bureau to complete this review by June 30, 2016, essentially half the time normally allocated to such a review.

We also reaffirm our commitment to ownership diversity and seek input on how our regulations can best assist small entities and niche communities in achieving broadcast ownership without running afoul of legal hurdles. We note in this regard the statements by organizations representing African-Americans, Hispanics, and women that JSAs and other sidecars have inhibited the opportunities for such small businesses to acquire television licenses. Organizations representing these interests and other public interest groups supporting our action today on JSAs include the ACLU, Asian Americans Advancing Justice/AAJC, Center for Media Justice, Color of Change, Common Cause, Communications Workers of America, Free Press, Georgetown Institute for Public Representation, Howard (University) Media Group, The Leadership Conference on Civil and Human Rights, Media Council Hawaii, Media Mobilizing Project, Media Literacy Project, Minority Media & Telecommunications Council, NAACP, National Association of Black Journalists, National Association of Black Owned Broadcasters, National Association of Broadcast Employees and Technicians – CWA, National Association of Hispanic Journalists, National Consumer Law Center, National Hispanic Media Coalition, National Organization for Women, National Urban League, Public Knowledge, Rainbow/PUSH, St. Paul Neighborhood Network, United Church of Christ, OC Inc., Women's Institute for Freedom of the Press and 19 Media and Communications Policy Scholars.

Finally, we seek to improve the transparency of operations in our broadcast industry. As broadcast stations continue to find new and innovative ways to cooperate in local communities, we need information about the implications of agreements between local television stations. Sharing agreements can offer public interest benefits in the form of increased efficiency that may result in more service to consumers. On the other hand, evidence points to the ability to pervert such agreements to undercut competition. We are seeking additional input on how to best to obtain sufficient information about these sharing arrangements to make a comprehensive evaluation.

Despite assertions otherwise, our interest in attributing JSAs does not mean that we are looking to eliminate the efficiencies and benefits of SSAs. Far from it. While they can be found together, SSAs and JSAs are not one and the same. No one should interpret our actions today on attribution of JSAs as risking the ability of stations to produce original programming and modernize their facilities. Such obfuscation is misleading.

Thank you to Bill Lake and his team in the Media Bureau for their work on this item, and for the work of Maria Kirby in my office.

# STATEMENT OF
# COMMISSIONER MIGNON L. CLYBURN

*Re:* *Broadcast Media Ownership, Diversity and Joint Sales Agreements*[1], MB Docket Nos. 14-50, 09-182, 07-294, 04-256.

True Southerners have a unique ability to turn lemons into lemonade, and that knack best reflects what I hope we have achieved in the matter before us today.

JSAs and SSAs have been around for some time — with the patent blessing of the FCC — and are the backbone of growth and profits for many broadcasters. Many of these arrangements have resulted in enhanced economic returns through the selling of advertising by a more experienced sales force, additional programming, and most notably, the production of local news. Many also have provided access to state of the art facilities for those stand-alone stations that could never afford them on their own.

JSAs and SSAs, however, have not been without controversy. Some arrangements, quite frankly, were thought to be "workarounds" of our local ownership rules, and the Commission's staff rightfully began to scrutinize these arrangements more closely.

In so doing, we uncovered some glaring abuses. In some markets, JSAs masked a threadbare ownership structure, where the brokered station owned little else beyond the FCC license. We found arrangements that masked full-scale control of the brokered station, right down to the same programming, the same talent, the same management, and the same studio. More egregiously, we have seen arrangements where the second station was little more than an orphan of the first, including veiled single ownership schemes.

At stake are billions of dollars in revenue, investment capital, and plain old profits for independent television stations in second and third tier markets. On this issue, the economics are truly local.

I am keenly aware of the impact of our actions on broadcasters; the effect on local communities; the reaction of capital markets and institutional investors; the present and future opportunities for minorities and small business entities; the concerns of public interest groups; and last, but not least, the appropriate role of this agency as the regulator of last resort, representing the public interest.

This item has also required me to respond to questions from allies and opponents, alike, about the timing, intent, and fundamental fairness of today's action. I am not sure whether all issues have been addressed satisfactorily, but in the course of our inquiry we have uncovered several new concerns raised by industry, public interest and minority groups, as well as policymakers, which we seek to address today.

To me, perhaps one of the most ironic and unexpected by-products has been that the issue of diversity, all of a sudden, has risen in the debate. When this was initiated, I had no idea that it would spawn such a

---

[1] *2014 Quadrennial Regulatory Review--Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996; 2010 Quadrennial Regulatory Review--Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996; Promoting Diversification of Ownership in the Broadcasting Services; Rules and Policies Concerning Attribution of Joint Sales Agreements in Local Television Markets, Further Notice of Proposed Rulemaking and Report and Order, CLAS # 140027.*

heated dialogue on the value and importance of minority broadcast ownership. It is my hope that this concern and expression of goodwill lives well beyond this item.

For the past several weeks, I have been very clear that my support of any policy shift would only come with a responsible balance of competing interests. First, this item gives a licensee the opportunity to seek a waiver of our local television ownership rule, if it can demonstrate that a JSA is in the public interest. For example, an applicant could demonstrate that a JSA would enable a school, community college, institution of higher education or other community support organization, to own a station, and to demonstrate that the benefits of such common ownership would advance the public interest.

Second, it establishes a shot-clock of 90 days for the Bureau's review of waiver requests. I believe that if we are going to have a viable waiver process, we need to have a definite set of rules concerning how those waivers are to be considered. This provides a level of predictability and certainty for licensees, so that their transactions do not become mired in FCC purgatory. In itself, this is a significant step forward.

Third, this item establishes guidelines for waivers, noting that if a waiver request for a JSA is limited in scope and duration, and has a time-frame for full operational control, it is more likely to succeed than one that is open ended. This should give smaller stations the amount of runway they need to take-off toward full independence.

What we have here today is an item that is admittedly not perfect, nor will it be fully embraced by every stakeholder or interest group. But, I am convinced of our earnestness and good faith to address the key issues involved in the media ownership debate. Responsible regulation requires the balancing of interests. On the one hand, we must uphold those well-defined rules in order to realize our goals of promoting predictability and stability for markets, business owners and investors. On the other hand, there is great value in the decision to uphold our statutory goals of localism, diversity and competition.

There is much more in this item, but in sum, I wish for it to be known that my objective from the beginning has been to provide licensees who want to advance local content in their area television markets, the incentive and framework to do so. And I am convinced that we can both enforce our rules and realize those objectives that the statute directs, if we simply pierce the veneer, abandon the platitudes, and embark on a legally sustainable pathway, to facilitate localism, diversity and competition.

I want to acknowledge the fine work on this item by the Media Bureau, the Office of General Counsel, Maria Kirby of the Chairman's office, and Adonis Hoffman, in my office.

## STATEMENT OF
## COMMISSIONER JESSICA ROSENWORCEL

*Re:*      *Broadcast Media Ownership, Diversity and Joint Sales Agreements*, MB Docket Nos. 14-50, 09-182, 07-294, 04-256.


Media ownership matters.  It matters because it plays a powerful part in shaping who we are as individuals, as communities, and as a nation.

So today we begin our most recent quadrennial review of our media ownership rules at a time when every one of us here can acknowledge the landscape is changing.  The ways we create, distribute, and consume content are different.  Information is now more plentiful than ever before.  Anyone with Internet access has his or her own digital printing press, and this is exciting.

Still, despite all this change, there is something unique about local broadcasting.  Local broadcasting remains the dominant force in local news.  It has special status under the law—and we have special duties under the law to ensure that the use of our airwaves is consistent with the values of localism, competition, and diversity.

As we begin this round of review of our media ownership policies, there has been an unusual amount of attention paid to female and minority ownership of commercial broadcasting.  Although our efforts to restrict Joint Sales Agreements have jumpstarted this conversation, there seems to be broad agreement among my colleagues, members of Congress, and many broadcasters that women and minority ownership of broadcast assets matters.  This consensus is a good thing.

After all, the number of women and minority owners and operators of full power, commercial broadcast stations can only be described as unacceptably low.  So we need policies that help bring us beyond the status quo.  I hope the steps we take today will make a difference.  I hope they are effective.  But I am open—open to new ideas on how to boost women and minority ownership; open to data that moves beyond intuition and anecdotal accounts; open to the best ideas put forward by all stakeholders—from civil rights groups to minority business advocates to broadcasters and to members of Congress.

I thank my colleagues for their vigorous interest in these issues and thank the Media Bureau for their hard work on this issue that matters so much to so many of us.

## DISSENTING STATEMENT OF
## COMMISSIONER AJIT PAI

*Re:    Broadcast Media Ownership, Diversity and Joint Sales Agreements*, MB Docket Nos. 14-50, 09-182, 07-294, 04-256.

During my time as a Commissioner, I have had the privilege of casting votes on hundreds of items. This, almost certainly, is the most unfortunate item I have encountered.

Today, the Commission abdicates its legal obligation to review our media ownership regulations every four years. It arbitrarily singles out one aspect of those regulations—our treatment of joint sales agreements (JSAs)—and changes our policies in a way that ignores the realities of the modern media marketplace, will harm localism and diversity, and will drive many television stations out of business. And in response to a court remand, the Commission refuses to take any action to promote ownership diversity. Because today's item is inconsistent with the law and unsupported by the facts, I dissent.

I.

Let's start with the Commission's failure to complete our current quadrennial review. Section 202(h) of the Telecommunications Act of 1996 states that the "Commission shall review its [media ownership rules] quadrennially . . . and shall determine whether any of such rules are necessary in the public interest as the result of competition."[1] This statutory provision then requires the Commission to "repeal or modify any regulation it determines to be no longer in the public interest."[2]

Our prior media ownership review began on June 21, 2006, and ended on December 18, 2007. It has therefore been *over six years* since we have completed a task that we are required by law to conduct every four years. This morning, the Commission could have and should have begun to live up to our legal responsibilities. I presented my colleagues with a plan that would have brought our current quadrennial review to a close today. It would have modernized our media ownership regulations while still preserving our core values of competition, diversity, and localism. I thank Commissioner O'Rielly for supporting my proposal.

Unfortunately, the Commission took another path. Rather than completing the 2010 iteration of the quadrennial review process, we are folding it into yet another quadrennial review that is being launched today. When will we finish these old and new reviews? All we've been told is that the Media Bureau will present recommendations to the Commissioners by June 30, 2016.[3] That's *more than eight-and-a-half years* after we finished our last quadrennial review.

Our decision today—or, to be more accurate, our lack of decision—is a thumb in the eye of Congress and an evasion of our legal obligations. What makes it even worse is that this item contains no meaningful explanation for why we are not resolving the quadrennial review. There are simply fleeting

---

[1] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 111–12 § 202(h) (1996), *as amended by* Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99–100 (2004).

[2] *Id.*

[3] Letter from Tom Wheeler, Chairman, FCC, to the Honorable John D. Rockefeller IV, John Thune, Mark Pryor, and Roger Wicker, U.S. Senate (Mar. 27, 2014).

references to a desire to "build on th[e] record" of the current proceeding and adopt rules that are based on a "comprehensive, refreshed record."[4]

But here are the facts. During the 2010 quadrennial review process, we have compiled an extensive record. The Commission began over four years ago with a series of eight workshops held between November 2009 and May 2010, which examined our media ownership rules.[5] Then, on May 25, 2010, the Commission issued a Notice of Inquiry pertaining to our media ownership rules and received a comprehensive set of comments.[6] On June 15, 2011, the Commission publicly released five research studies on media ownership and adopted procedures for public access to its data sets.[7] On July 21, 2011, the FCC released three additional research studies on media ownership,[8] followed shortly by the release of the final three remaining research studies on July 27, 2011.[9]

The FCC next issued a Notice of Proposed Rulemaking on its media ownership rules on December 22, 2011.[10] On December 3, 2012, the Commission sought comment on its report on female and minority ownership of broadcast stations.[11] Several months later, on June 7, 2013, the Media Bureau invited comments on a study by the Minority Media and Telecommunications Council concerning the impact of changes to our cross-ownership rules on ownership diversity.[12]

At each stage of this process, the Commission received a voluminous array of comments. And all the while, a wide range of stakeholders has given us information and feedback through our *ex parte* process.

Notwithstanding all of this, all the Commission decides today is that we are not yet ready to make a decision. What information do we need that we do not have? Today's item does not say. Moreover, any suggestion that the record we have compiled has grown stale would not only be untrue, it would also

---

[4] *Order* at para. 1. A statement accompanying the item (but not the item itself) suggests that we are not completing the 2010 quadrennial review today because of "an inability to achieve a majority." Statement of Chairman Tom Wheeler. This obscures the reality that the Chairman never presented the current roster of Commissioners a proposal for completing the 2010 quadrennial review.

[5] *See, e.g.*, *Media Bureau Announces Media Ownership Workshop on Financial Issues*, MB Docket No. 09-182, Press Release (Dec. 18, 2009), *available at* http://go.usa.gov/KM53.

[6] *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 09-182, Notice of Inquiry, 25 FCC Rcd 6086 (2010).

[7] *FCC Releases Five Research Studies on Media Ownership and Adopts Procedures For Public Access to Underlying Data Sets*, MB Docket No. 09-182, Public Notice, 26 FCC Rcd 8472 (Med. Bur. 2011).

[8] *FCC Releases Three Additional Research Studies on Media Ownership*, MB Docket No. 09-182, Public Notice, 26 FCC Rcd 10240 (Med. Bur. 2011).

[9] *FCC Releases the Final Three Research Studies on Media Ownership*, MB Docket No. 09-182, Public Notice, 26 FCC Rcd 10380 (Med. Bur. 2011).

[10] *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 09-182, Notice of Proposed Rulemaking, 26 FCC Rcd 17489 (2011).

[11] *Commission Seeks Comment on Broadcast Ownership Report*, MB Docket No. 09-182, Public Notice, 27 FCC Rcd 15036 (Med. Bur. 2012).

[12] *Media Bureau Invites Comments on Study Submitted by the Minority Media and Telecommunications Council in 2010 Quadrennial Review of Broadcast Ownership Rules*, Public Notice, 28 FCC Rcd 8244 (Med. Bur. 2013).

invoke the chutzpah doctrine.[13] It would be like a child who has murdered his parents throwing himself on the mercy of the court because he is an orphan. And it is bizarre to say that rules of ancient vintage must stay the same because the media marketplace is changing too quickly.

But my problem with today's item isn't just about process. For this isn't only a matter of fulfilling legal responsibilities or a concern about good government. Our dereliction of duty has a substantive impact in the real world. Our regulations should keep pace with the fast-changing media marketplace, but they are not.

Consider the newspaper-broadcast cross-ownership rule. The rule was enacted in 1975, a time when the information marketplace was vastly different than it is today. Back then, cable news didn't exist; neither did the Internet. Now, Americans can access an ever-widening range of news and information online at any time, day or night, so fewer and fewer of us choose to subscribe to a daily newspaper. And as online advertising becomes ever more local and mobile, the advertising niche once served by newspapers is fading fast. The numbers say it all. Since the newspaper-broadcast cross-ownership rule was enacted in 1975, over one in five newspapers in the United States has gone out of business. During that same time period, while the number of households in our country has increased by over 55%, newspaper circulation has declined by more than 25%. In the last few years, we've seen daily newspapers close in major markets like Denver, Cincinnati, Tucson, Honolulu, and Albuquerque. And in New Orleans, my former local newspaper, the *Times-Picayune*, is printed only three times a week.

Had the prohibition on newspaper-broadcast cross-ownership been eliminated years ago, the industry's prospects might look brighter today. Investments in newsgathering are more likely to be profitable when a company can distribute news over multiple platforms. And cross-owned television stations on average provide their viewers with more news than do other stations. Given these facts and the substantial challenges facing the newspaper business, it doesn't make sense to single out broadcasters and prevent them from operating newspapers. If you are willing to invest in a newspaper in this day and age, we should be thanking you, not standing in your way.

Nonetheless, the newspaper-broadcast cross-ownership rule is on track to celebrate its fortieth birthday next year. It is quite remarkable when you think about it. The Commission has approved numerous large mergers and acquisitions over the last two decades; there is no need for me to recount them here. But a single newspaper purchasing a single radio station in the same market? Somehow, that remains a bridge too far.

As one former FCC Chairman put it, "Under current conditions in the media business the FCC's rule is perverse. . . . If a profitable broadcaster wants to buy a newspaper in its city . . . the FCC should welcome this extra support for the trouble-plagued newspaper industry."[14] And who was that former Chairman? None other than my friend Reed Hundt. Indeed, former FCC Chairmen of both parties—

---

[13] *See, e.g., Marks v. Commissioner*, 947 F.2d 983, 986 (D.C. Cir. 1991) (fugitives from criminal prosecution argued that inadequate efforts were made to notify them of tax delinquency); *Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 & n.5 (D.C. Cir. 1991) (subcontractor asserted contractor was negligent for relying on subcontractor's advice).

[14] Reed Hundt, "The FCC Should Repeal Its Newspaper-Broadcast Ownership Rule," *Washington Post* (June 16, 2013), *available at* http://www.washingtonpost.com/opinions/the-fcc-should-repeal-its-newspaper-broadcast-ownership-rule/2013/06/06/7084e764-cebb-11e2-8845-d970ccb04497_story.html; *see also Communications Daily* (June 16, 2013) (quoting Hundt as saying in same speech that FCC's enforcement of cross-ownership rules has become "an exercise in intellectual contortions that persuade[s] on-lookers that the Commission is acting in an arbitrary fashion"), *available at* http://reedhundt.blogspot.com/2013/06/communications-daily-media-update-on.html.

Hundt, Powell, Martin, and Genachowski—all have recognized the folly of the rule in its current form. And the Commission in its two most recently completed quadrennial reviews has found that it is not in the public interest to maintain the rule as is. Yet the rule remains on the books. It's been said that after a nuclear holocaust, all that will be left are cockroaches and Cher. Perhaps the time has come to add a third thing to that list: the newspaper-broadcast cross-ownership rule.

It doesn't have to be this way, and it certainly shouldn't. Congress has instructed us to review the newspaper-broadcast cross-ownership rule every four years and repeal or modify it if we determine that it is no longer in the public interest. And here is the simple truth: The Commission has not been able to conclude *since 2000* that the newspaper-broadcast cross-ownership rule remains in the public interest. And today, the Commission dodges the issue entirely, putting off the issue until 2016, *sixteen years after our last determination*!

What's the solution at this point? While writs of mandamus are not to be issued lightly, I believe that the D.C. Circuit would now be justified in ordering the Commission to remove the newspaper-broadcast cross-ownership rule from our books.[15] We have had plenty of opportunities to justify maintaining the newspaper-broadcast cross-ownership rule, but instead we have chosen to punt— including today. This, in my judgment, is an unlawful effort to evade court review. The administrative process has gone off the rails, and the time has come for judicial intervention.

## II.

Today, the Commission is unable to reach a decision as to whether the local television ownership rule remains in the public interest, whether the local radio ownership rule remains in the public interest, whether the newspaper-broadcast cross-ownership rule remains in the public interest, whether the radio-television cross-ownership rule remains in the public interest, or whether the dual network rule remains in the public interest.

We do, however, cherry-pick one issue for resolution. Somehow, notwithstanding our inability to reach a decision on any other topic, we are able to and do in fact decide that JSAs should be attributable for purposes of our local television ownership rule.

## A.

What is a JSA? It is an agreement between broadcast stations that allows them to cut down on costs by using the same advertising sales force. As discussed below, the efficiencies created by JSAs have enabled many television stations to thrive and have promoted the Commission's interests in diversity, localism and competition. By entering into JSAs and shared service agreements (SSAs), local broadcasters are better able to secure bank financing,[16] attract advertising revenue,[17] produce original programming, including news,[18] and modernize their facilities.[19]

---

[15] *In re Core Communications, Inc.*, 531 F.3d 849 (D.C. Cir. 2008) (issuing writ of mandamus against the FCC after seven-year delay in making a decision).

[16] *See* Letter from Clifford M. Harrington, Counsel for Sinclair Broadcast Group, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182, 07-294, Attach. at 3 (Feb. 5, 2014).

[17] *See* Letter from John K. Hane, Counsel for LIN Television Corporation d/b/a LIN Media, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182, at 1–2 (Jan. 16, 2013) (LIN Jan. 16, 2013 *Ex Parte* Letter) (explaining JSAs as a "market response to [MVPD] interconnection agreements," because media buyers typically want "aggregate[ed] advertising inventory across many channels and entire markets").

[18] *See* Letter from Jennifer A. Johnson & Eve R. Pogoriler, Counsel for Bonten Media Group, Inc., et al., to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 07-294, 09-182, 10-71, at 2–3 (Feb. 19, 2014).

While local broadcasters across the nation benefit from JSAs, the effects are especially pronounced outside of our nation's largest markets. The need to achieve efficiencies in these markets is greater because advertising revenue there is much more challenging to come by. For example, in Fort Smith, Arkansas, the nation's 100th largest market, the average revenue per television station *is less than one-tenth* that of the average station in New York City. And in Ottumwa, Iowa, the nation's 200th largest market, the average revenue per station *is less than one-thirtieth* that of the average station in New York City. In smaller markets, the choice is not between two stations entering into a JSA and those same two stations flourishing while operating completely independently. Rather, the choice is between two stations entering into a JSA and at least one of those stations' viability being threatened. If stations in these smaller markets are to survive and provide many of the same services as television stations in larger markets, they must cut costs. And JSAs are a vital mechanism for doing that.

The efficiencies created by JSAs are not a luxury in today's digital age. They are necessary, as local broadcasters face fierce competition for viewers and advertisers. Between 2003 and 2012, Internet advertising grew at a compound annual growth rate of 18.7%, and cable TV advertising grew at a rate of 7.9%.[20] During that same time period, broadcast television station advertising revenue had declined at an annual rate of 0.2%.[21] Between 2013 and 2017, online/digital advertising revenues are expected to increase from $26.5 billion to $44.5 billion (a 13.8% rate), while traditional advertising revenues are projected to only grow slightly, at a rate of 0.1%.[22]

Furthermore, local broadcasters face intense competition in the market for local advertising from multichannel video programming distributors (MVPDs) like cable companies, direct broadcast satellite companies, and new entrants like Google Fiber. Increasingly, large and small MVPDs are joining together to form "local interconnects" that sell local advertising on a market-by-market basis, in direct competition with local broadcasters.[23] These local interconnects, which are increasing in size and scope, often serve larger shares of viewers than the local broadcasters with which they compete, and pose stiff competition for broadcasters in the market for local advertising.[24] I have no problem with MVPDs entering into such arrangements; like JSAs, they let MVPDs aggregate their reach to better serve advertisers. But effectively prohibiting television stations from entering into similar arrangements is arbitrary and capricious and puts local broadcasters at a competitive disadvantage.[25]

(Continued from previous page) ─────────────────

[19] *See* Letter from Jack N. Goodman, Counsel for Schurz Communications, Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 04-256, 09-182, 10-71, at 2–3 (Feb 26, 2014) (Schurz *Ex Parte* Letter).

[20] *See* Letter from Jane Mago, Executive Vice President and General Counsel, National Association of Broadcasters, MB Docket No 09-182, at 2 (Feb. 18, 2014) (citing SNL Kagan, *Ad market decelerates in 2013, projected to be up 1.4% to 223B* (Dec. 17, 2013)).

[21] *Id.*

[22] *See id.* (citing BIA/Kelsey, *BIA/Kelsey Forecasts Overall U.S. Local Media Ad Revenues to Reach $151.5B in 2017, Lifted by Faster Growth in Online/Digital*, Press Release (Nov. 19, 2013)).

[23] *See* Letter from John K. Hane, Counsel for LIN Television Corporation d/b/a LIN Media, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182, 07-294, 10-71, at 2 (Feb. 18, 2014) (LIN Feb. 18, 2014 *Ex Parte* Letter).

[24] "MVPD giants DISH and DirecTV—the second and third largest MVPDs—recently announced they will jointly sell political advertising." Letter from John K. Hane, Counsel for LIN Television Corporation d/b/a LIN Media, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182, 07-294, 10-71, at 2 (Feb. 26, 2014). Further, "in each of LIN's four JSA markets, local MVPDs sell advertising with respect to a larger share of viewing than LIN and its JSA counterparties combined." *Id.*

[25] The Commission does not deny that today's action puts local broadcasters at a competitive disadvantage vis-à-vis MVPDs. It sidesteps that point, arguing instead that there is not legal notice for the Commission to regulate MVPDs' local interconnects here. *See Order* at note 1106. While I certainly don't dispute that latter contention, it doesn't address the problem created by the Commission's decision and is not a credible excuse given that the

(continued....)

B.

The record is replete with evidence that JSAs promote localism and diversity. JSAs help television stations pay for services that we should want broadcasters to provide. They enable new entrants and diverse voices to participate in the broadcast industry. And they allow television stations to remain financially viable instead of going out of business. Here are just some of the uncontested facts.

In my home state of Kansas, a JSA between Schurz Communications, Inc. and Entravision Communications Corp. has allowed Entravision to provide valuable Spanish-language programming through KDCU, its station in the Wichita media market. Because of this JSA, KDCU is now able to broadcast weekday, hour-long newscasts in HD as well as weather programming and weather, emergency, and community activity closing "crawls," all in Spanish. With Wichita being located in "tornado alley," these services are crucial for the safety of the area's growing Latino population.[26] However, a representative of Entravision told me earlier this year that all of this Spanish-language news will go off the air if the company is forced to terminate its JSA with Schurz.

Across the border in the "Show Me" State, Missouri JSAs show JSAs' public interest benefits. In the Joplin market, a JSA between Nexstar Broadcasting, Inc.'s KSNF and Mission Broadcasting, Inc.'s KODE produced $3.5 million in cost savings. Some of that money was used to upgrade the stations' Doppler radar system, which likely saved lives when a devastating tornado destroyed much of Joplin in 2011. Moreover, JSAs between Nexstar and Mission have helped Mission become the largest female-controlled television company in the United States and air an additional 170 hours per week of locally produced news on its stations.

Seventy miles to the east in Springfield, Missouri, a JSA between Schurz-owned KYTV and Perkin Media, LLC-owned KSPR demonstrates just how dramatically JSAs can improve the quality of local programming. Before Schurz and Perkin Media entered into a JSA, KSPR provided limited news programming, had outdated facilities, and lacked the resources to cover news stories outside of the immediate Springfield area. Since entering into these agreements however, over $11 million dollars in capital improvements have been made to KSPR. As a result, KYTV and KSPR moved into two separate newsrooms. KSPR was able to produce the first HD local news broadcast in the Springfield market and conduct its own, independent investigative reporting. In fact, KSPR's news content has been so successful that it was awarded the prestigious Edward R. Murrow Award for the best newscast by a station in a market outside of the top 50. Moreover, KSPR's closed-captioning technique for its weather and sports newscasts recently served as the basis last month of the Commission's best practices template. In other words, JSAs not only allow local broadcasters to stay afloat, they enable local broadcasters to better serve their communities.

JSAs between the Bonten Media Group, Inc. and Esteem Broadcasting, LLC prove this point. For years, before Bonten and Esteem entered into a JSA in the Eureka, California market, neither Bonten's ABC-affiliated station nor Esteem's Fox-affiliated station were able to carry any local news. But as a result of the economies of scale created by their JSA, both stations are now planning on launching separate, non-repeat local newscasts in July 2014, tripling the number of competitors providing local news in the Eureka market. A similar agreement between Bonten and Esteem stations in the small Chico-Redding, California market have allowed their two stations to broadcast over 25 hours of combined local news per week. Without the efficiencies allowed by a JSA, producing this amount of local news

(Continued from previous page) ———————————————
Commission declines to examine interconnects in the accompanying Notice. To be clear, my solution to this dilemma would be to neither attribute JSAs nor regulate MVPD local interconnects.

[26] In Raleigh, North Carolina, a Latino family perished in a tornado in part because they were not able to understand local television warnings that were broadcast in English. *See* Schurz *Ex Parte* Letter at 3.

content would have simply been impossible in that market. In the Tri-Cities, Tennessee-Virginia market, a JSA between Bonten and Esteem has allowed Esteem's station to go from airing no local news at all, to airing 38 hours per week. And JSAs have also allowed Bonten and Esteem stations in the Eureka, Tri-Cities, and Greenville-New Bern-Washington, North Carolina markets to upgrade to HD, giving these stations a much stronger foothold in the competition for local advertising.

JSAs also play a critical role in facilitating minority ownership. For example, WLOO is owned by Tougaloo College, a historically African-American college in Jackson, Mississippi. As a college-owned station, WLOO also allows approximately 50 student-interns at a time to gain hands-on training in television production. This internship program provides its students with the skills needed to compete in today's job market. And since entering a JSA with Jackson's WDBD, WLOO has been able to thrive despite the College's limited resources. For example, WLOO has upgraded to HD. WLOO now produces its own content and carries programming created by and for African-American Southerners, providing a platform for diverse voices in the media marketplace.[27] And WLOO covers local high school sports, furthering the Commission's interest in localism. Without its JSA, none of this would have been possible for WLOO. Indeed, the station's general manager, Pervis Parker, sat in my office recently and told me that he doubts that the station would have survived but for the JSA.

Additionally, a JSA between Sinclair Broadcast Group and Howard Stirk Holdings has allowed Armstrong Williams to become one of the only African-American full-power broadcasters in the United States today. His company owns stations in Flint, Michigan, and Myrtle Beach, South Carolina. And, but for the Media Bureau's recent Public Notice announcing a new policy concerning transactions with sharing agreements and contingent financial interests, Howard Stirk Holdings would have soon owned stations in Harrisburg, Pennsylvania and Charleston, South Carolina, increasing the number of African-American owned stations in the United States by two. Because of the Commission's crackdown on JSAs, however, that deal is no more. Indeed, with respect to the issue of diversity, consider this: *There is only one African-American-owned full-power commercial television station in the United States that is not party to a JSA. And a study by my office estimates that 43% of female-owned full-power commercial television stations in the United States participate in a JSA.*[28]

---

[27] Due to the revenues generated by WLOO's JSA with WDBD, WLOO has been able to produce a program called "I.M.A.G.E. ("Imagine Making A Greater Effort . . . To Do the Right Thing"). This program seeks to educate teens about important issues such as "abuse, drinking, texting and driving, bullying, healthy eating, tobacco use, teen pregnancy, and violence" through sketches, music, and dance performances. WLOO has also been able to air programming produced by the Soul of the South network which covers the "events, lifestyles, and culture of African-American Southerners." WLOO is currently considering creating original programming for Soul of the South. *See* Letter from Jennifer A. Johnson & Eve R. Pogoriler, Counsel for Tougaloo College (WLOO), to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182, 07-294, at 2 (Feb. 28, 2014).

[28] *Office of FCC Commissioner Ajit Pai Releases Results of Broadcast Ownership Diversity Research*, Press Release (Mar. 20, 2014), *available at* http://go.usa.gov/Kz93.

The preceding examples, of course, do not constitute an exhaustive list of JSAs that have produced public interest benefits.[29]  Countless other JSAs have helped promote localism, diversity, and competition, including the following:

- ☐ Stations entering into JSAs with Sinclair Broadcast Group from October 2011 to December 2013 have added a net total headcount of 192 employees, added a net news headcount of 119 employees, added 64 hours per week of news programming, committed over $33,000,000 in additional resources to station operations, and committed $25,000,000 in additional resource for news operations.[30]

- ☐ Sharing arrangements involving LIN Media stations have facilitated:

  - o The broadcasts of local St. Patrick's Day and Martin Luther King, Jr. Day Parades and college sporting events in the Savannah, Georgia market.

  - o The broadcast of a local community talk show, live political debates, and investigative reporting segments in the Providence, Rhode Island market.

  - o The construction of new station facilities and broadcast of a new morning newscast in the Austin, Texas market.

---

[29] The Commission asserts in a footnote that the record contains no evidence linking these public benefits to JSAs and implies that, notwithstanding the fact that all of the stations discussed in the text above participate in JSAs, these benefits could solely be the result of other non-JSA sharing arrangements.  *See Order* at note 1103.  This argument, however, flies in the face of the uncontested record evidence.  For example, with respect to the benefits to the Wichita, Springfield, and Augusta markets described in the text above, Schurz Communications had this to report: "We . . . were asked if these benefits could continue if joint sales agreements were prohibited.  The answer was no.  First, the cost of a stand-alone sales operation would have to be undertaken by stations that now participate in joint sales agreements.  Those costs would reduce the funds available for news and other public service programming.  Second, without the potential for sharing in sales revenue, the price of the services provided under shared services agreements would have to reflect their full cost, and for stations like Entravision's startup KDCU-DT, those costs would not be sustainable, particularly in markets where the size of Latino population remains limited. . . . [Entravision's representative] also made clear that, the JSA was an essential part of its agreement with KWCH-DT in Wichita.  Without that agreement, KDCU-DT would not have been able to offer a Spanish-language local news program; its entry into broadcasting would have been delayed, as it developed a station facility on its own and on a more limited basis; and it would not have been as successful in convincing local advertisers of the benefits of reaching the Latino market."  Letter from Jack Goodman, Counsel for Schurz Communications, Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 04-256, 09-182, 10-71, at 3–4 (Feb. 26, 2014); *see also, e.g.*, Letter from Jennifer Johnson and Eve Pogoriler, Counsel for the Coalition of Smaller Market Television Stations, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 04-256, 07-294, 09-182, 10-71, at 7 (Mar. 20, 2014) (Coalition of Smaller Television Stations *Ex Parte*) ("Attribution of JSAs would require stations that participate in JSAs to undertake the cost of a stand-alone sales operation to secure a share of this local advertising business, which is particularly challenging in smaller markets.  Employing and training a sales staff with personal knowledge of the market that can engage in substantial, personal outreach (e.g., knocking on doors) to meet with prospective advertisers and make sales requires substantial resources that would have to be drawn away from service to the public.  Supporting a separate sales staff would siphon off resources that a station could invest directly in programming and infrastructure, and it would hinder a station's ability to compete for advertising because it would have a less desirable platform on which to air those ads."); Letter from Jane Mago, Executive Vice President and General Counsel, National Association of Broadcasters, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 04-256, 09-182, 10-71, at 2 (Mar. 14, 2014) ("Both Mr. Gorman and I noted that the proposal to make JSAs attributable would have the unintended consequence of creating serious harm to his company and the service he provides in the Chico market.").

[30] *See* Letter from Clifford M. Harrington, Counsel for Sinclair Broadcast Group, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182, 10-71, at 1–2 (Feb. 26, 2014).

o  The broadcast of simultaneous, competing newscasts in the Youngstown, Ohio market, as well as the broadcast of live high school and college sporting events, and local pre-game shows.[31]

☐  A JSA between two stations in the Augusta, Georgia market has led to an additional 10 hours per week of local news and four hours per week of locally originated programming.[32]

☐  A JSA in the Burlington, Vermont/Plattsburgh, New York market allowed WFFF-TV to launch its first-ever news operation and allowed WVNY(TV) to reestablish a news department, creating 28 new local jobs.[33]

☐  A JSA in the Baton Rouge, Louisiana market resulted in both participating stations airing their first ever news programs, as well as a local high school sports program.[34]

☐  A JSA in the El Paso, Texas market not only preserved KDBC-TV's local news programming, it allowed KDBC-TV to offer news and other content in HD.[35]

☐  A JSA in the Dayton, Ohio market allowed WBDT to add Bounce, an African-American oriented network, on a multicast channel.[36]

☐  A JSA in the Rochester, Minnesota market allowed KXLT-TV to broadcast a late evening newscast six nights per week.[37]

☐  A JSA in the Montgomery-Selma, Alabama market allowed WNCF, an ABC affiliate, to begin offering 17 hours a week of local news.[38]

☐  A JSA in the Fort Wayne, Indiana market has enabled both WISE and WPTA to air more hours of local news programming.[39]

☐  A JSA in the Peoria, Illinois market allowed WHOI-TV to avoid cutbacks in news coverage and staffing and instead hire more personnel and cover more stories.[40]

These are just some of the public interest benefits that are jeopardized because of today's Commission's action. The decision to scrap JSAs like these will mean less news programming, less high-quality journalism, less diverse programming, fewer upgrades to station facilities, and less ownership diversity. Even worse, it will lead to more television stations going out of business.

---

[31] *See* LIN Feb. 18, 2014 *Ex Parte* Letter, Attach. at 7.

[32] *See* Letter from M. Anne Swanson, Counsel for Media General, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 09-182 (Jan. 8, 2013).

[33] *See* Coalition to Preserve Local TV Broadcasting Reply, MB Docket No. 09-182, at 12–13 (July 26, 2010).

[34] *See id.* at 13.

[35] *See id.* at 14.

[36] *See* LIN Jan. 16, 2013 *Ex Parte* Letter at 2.

[37] *See* Letter from Jennifer A. Johnson, Counsel for NBC Television Affiliates, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 12-268, MB Docket Nos. 10-71, 09-182, 07-294, Attach. (Jan. 28, 2013).

[38] *See* Letter from M. Anne Swanson, Counsel for Bahakel Communications Ltd., to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182, 06-121, at 1–3 (Jan. 16, 2013).

[39] *See* Coalition to Preserve Local TV Broadcasting Reply, MB Docket No. 09-182, at 15 (July 26, 2010).

[40] *See id.* at 16.

C.

What is the Commission's response to all of this evidence contained in the record? The item essentially ignores it. To be sure, the order grudgingly admits that JSAs "may have public interest benefits in some circumstances."[41] But we are told that these benefits are irrelevant to today's decision, that they should be considered in the context of the local television ownership rule.[42]

However, the Commission refuses to make any decision today about whether our local television ownership needs to be modified. Instead, we have been informed that that decision perhaps will come sometime after June of 2016. This is a classic bait-and-switch tactic. The Commission won't consider broadcasters' arguments about JSAs' public interest benefits now. Rather, the Commission will evaluate them in a proceeding that won't be resolved *until after the Commission's two-year deadline for terminating JSAs.* This is the epitome of arbitrary and capricious decision-making. I hope that our nation's courts will not countenance this cynical maneuver by the Commission to wipe JSAs off the books without taking into consideration the resulting public interest harms.

The merits of our attribution rules can't be separated from the merits of our local television ownership rules. If, as the Commission submits, it is taking action today to "prevent the circumvention of our ownership limits,"[43] then it follows that we are obliged to take into consideration arguments regarding the adequacy of those ownership limits. The Commission attempts to justify its actions by pointing to the *2002 Biennial Review Order* as precedent for the Commission revising its attribution rules without also modifying its ownership limits.[44] There, the Commission altered its attribution rules for radio JSAs while largely maintaining its local radio ownership limits.[45] But the *2002 Order* affirmatively decided to maintain the radio ownership limits (rather than to relax them) and explained why that decision was in the public interest.[46] There was no attempt to dodge consideration of uncomfortable or inconvenient facts. By contrast, today's item fails to decide whether our current local television ownership rule remains in the public interest, reserving the issue for another day—or more accurately, another year.[47]

To summarize, the Commission says that the public interest arguments against making JSAs attributable must be considered in the local television ownership proceeding. But it won't resolve that proceeding now, even though we have already blown past the legal deadline for doing so by at least two years. Such a result should not be allowed to stand.[48]

---

[41] *Order* at para. 359.

[42] *Id.* at para. 358.

[43] *Id.* at para. 363.

[44] *Id.* at note 1098 (citing *2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 02-277, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13731–32, paras. 290–91 (2003)).

[45] *Compare 2002 Biennial Review Order*, 18 FCC Rcd at 13743, para. 317, *with id.* at 13731, para. 290.

[46] "We find that the concentration levels permitted by the current rule represent a reasonable and necessary balance for radio broadcasting that comports with general competition theory, and we decline to relax the rule to permit greater consolidation in local radio markets." *Id.* at 13731, para. 290.

[47] This outcome is all the more galling because, as explained above, the Commission is legally obligated to review its local television ownership rule every four years, and it has been over six years since the Commission last determined whether the rule in its current form remains necessary in the public interest.

[48] To be sure, the Commission is correct that attribution levels generally need not be included in a biennial (or now quadrennial) review. *See Order* at para. 357 & note 1101. But if the Commission wants to render a decision regarding attribution that, in combination with the local television ownership rule, bans JSAs in most markets, then

(continued….)

D.

So the record contains overwhelming evidence regarding the public interest benefits produced by JSAs, and today's item makes no serious effort to contest this fact. But all of these public interest benefits must be weighed against any harms caused by JSAs. And on this issue, the case presented in the item is embarrassingly weak.

Let's start with the basics. JSAs, of course, are principally about the sale of advertising time. It is curious, then, that the Commission fails to discuss the effect that JSAs have on advertisers. Ostensibly, one would think that if anyone would be harmed by JSAs, it would be advertisers. By uniting their sales efforts, might two parties to a JSA be able to request higher prices? Tellingly, the Commission does not rely on this theory. Even more curiously, the item does not cite a single advertiser who has complained about a JSA. Indeed, I am unable to find any evidence in the record at all of an advertiser complaining about the impact of JSAs. This is the equivalent of the dog that didn't bark at night in the Sherlock Holmes mystery "Silver Blaze."

The reason that dog hasn't barked in this proceeding is simple: JSAs probably help advertisers.[49] They allow them to make larger buys more efficiently. They help advertisers reach local, particularized markets that they may otherwise not be able to reach. And they provide for more robust competition for advertising dollars between broadcast stations and joint MVPD sales operations. So if advertisers are not being injured by JSAs, today's item begs a question that it does not answer: Who exactly is being harmed by JSAs?

The Commission's decision today relies almost entirely on its theory that a JSA allows one station to exert undue influence over another station's programming decisions and operations. But where is the evidence to support this theory? The item does not contain a single example of a station in a JSA exercising undue influence over another station. Indeed, the item does not contain a single instance where a JSA has allowed one station to influence *a single programming decision* of another station. Here is a second dog that hasn't barked.[50]

Moreover, this evidence-free theory contradicts long-established precedent based on economic realities. When a broadcast station retains a substantial portion of its advertising revenues, it has a significant economic incentive to control its programming and operations. If the station's advertising revenues go up, the brokered station will get the substantial majority of the upside. And if the station's



(Continued from previous page)

it may not refuse to address the consequences of such a prohibition and use the quadrennial review—especially one that is long overdue and won't be resolved until 2016 at the earliest—as its excuse for doing so.

[49] *See, e.g.*, Letter from Rob Fellman, Boardman Subaru, to David Coy, President/General Manager (Mar. 6, 2014) (Attachment to Coalition of Smaller Market Television Stations *Ex Parte*) ("As a[n] advertiser in the Youngstown market, I have purchased time from both WKBN and WYTV through your shared sales force. I've found your shared sales force to be honest, reasonable, and time-saving. Instead of having multiple account executives pitching me, I'm able to get exactly what I want from both WKBN and WYTV by contacting a single sales person. . . . I hope that the FCC doesn't take away this great service.").

[50] The Commission responds that it need not produce any such facts in support of its decision but rather may rely on its predictive judgment. *See Order* at note 1081. But in light of the fact that at least 85 JSAs have been in operation across the country for many years, the Commission may not so easily escape its responsibility to evaluate and weigh JSAs' real-world benefits and harms. And here, unfortunately, the Commission chooses to ignore this record evidence, raising the prospect of arbitrary and capricious agency action. *See Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency "*must* examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made" (internal quotation marks omitted and emphasis added)).

advertising revenues go down, the brokered station will get hit with the substantial majority of the downside. This might explain why, since 2008, the Commission has approved 85 JSAs in the course of transactional reviews.[51] For the Media Bureau has repeatedly approved JSAs only where the brokered station receives at least 70% of the advertising revenue generated by that station, reasoning that such a division of revenues does not give the brokering station *de facto* control of or undue influence over the brokered station.[52] The item's refusal to acknowledge this policy—even that it *is* a policy—is disappointing,[53] not to mention flatly contradicted by indisputable, contemporary facts. Less than four months ago, the Bureau approved JSAs in the context of the Gannett/Belo transaction where the brokered station would retain 70% of its advertising revenue.[54] The Bureau specifically found that opponents of the JSAs had even "fail[ed] to raise a substantial and material question of fact as to whether [the brokered stations] will have an economic incentive to control programming." Why? The Bureau explained that the brokered stations' "profits would align with their ownership of the stations in [those] markets."[55] This precedent, like dozens of precedents upon which it builds, is sound,[56] and we should adhere to it today.[57]

---

[51] Letter from Gordon H. Smith, President and CEO, National Association of Broadcasters, to Tom Wheeler, Chairman, FCC, MB Docket Nos. 10-71, 09-182, 07-294, 04-256 (Mar. 24, 2014).

[52] *See, e.g.*, *J. Stewart Bryan III & Media Gen. Commc'ns Holdings, LLC (Transferor), Shareholders of New Young Broadcasting Holding Company, Inc., and Its Subsidiaries (Transferor) and Post-Merger Shareholders of Media General, Inc. (Transferee) For Consent to Transfer Control of Licenses*, MB Docket No. 13-191, File No. BTCCDT-20130703ABQ *et al.*, Memorandum Opinion and Order, 28 FCC Rcd 15509 (Med. Bur. 2013) ("[U]nder the terms of the JSA, WLAJ(TV) retains 70% of cash flow resulting from operation of the station, a split that the Bureau has previously approved."); *Saga Broadcasting, LLC c/o Gary S Smithwick, Esq. H3 Communications, LLC c/o David Tillotson, Esq.*, File No. BALCDT-20120501ACQ, Letter, 28 FCC Rcd 399, 400 (Med. Bur. 2013) ("The draft JSA submitted in response to the September 12, 2012, staff letter indicates that CBG will collect revenues on H3's behalf, and pay 70% of those revenues to H3, and the SSA and JSA both indicate H3 will maintain full authority and control over the operation of the station, including programming."); *Sagamorehill of Corpus Christi Licenses, LLC c/o Todd Stansbury, Esq. Eagle Creek Broad. of Corpus Christi, LLC c/o Dennis Corbett, Esq. Channel 3 of Corpus Christi, Inc. c/o Robert B. Jacobi, Esq.*, File No. BALCT-20080730AKQ, Letter, 25 FCC Rcd 2809, 2811 (Med. Bur. 2010) ("In exchange for its sales representation, Evening Post will retain the lesser of the revenues it collects minus a set Base Rate, or 30% of all revenues."); *Nexstar Broadcasting, Inc. and Mission Broadcasting, Inc. c/o Howard M. Lieberman, Esq. Ft. Smith 46, Inc. c/o Peter Tannenwald, Esq.*, Letter, 23 FCC Rcd 3528, 3536 (Med. Bur. 2008) ("Mission will receive 70% of all advertising revenues . . . . The Structure of the relationship between Mission and Nexstar is markedly different from that considered in the *2002 Ackerly Order*, and does not support a finding of attribution.").

[53] *See Order* at note 1072.

[54] *See Applications for Consent to Transfer of Control from Shareholders of Belo Corp. to Gannett Co. Inc.*, MB Docket No. 13-189, File Nos. BTCCDT-20130619AAY *et seq.*, 28 FCC Rcd 16867 (Med. Bur. 2013) (*Gannett/Belo Order*); Belo Kentucky, Inc., Application for Consent to Assignment of Broadcast Station License (FCC Form 314), WHAS-TV, File No. BALCDT-20130619AFM, Exhibit 13, Asset Purchase Agreement at Exhibit B-2, Sec. 3.1(b) (granted Dec. 20, 2013) (70% of net sales revenue shall be retained by the brokered stations); KTTU-TV, Inc., Application for Consent to Assignment of Broadcast Station License (FCC Form 314), KTTU(TV), File No. BALCDT-20130619ADJ, Exhibit 13, Asset Purchase Agreement at Exhibit B-3, Sec. 3.1(b) (granted Dec. 20, 2013) (70% of net sales revenue shall be retained by the brokered station).

[55] *Gannett/Belo Order*, 28 FCC Rcd at para. 28.

[56] The Commission attacks a straw man by pointing out that it may change its rules and is not bound by Media Bureau precedent. *See Order* at note 1072. Of course those general propositions are true. In this instance, however, the Commission lacks a reasoned basis for taking either step, which raises not only policy but also legal concerns. *Cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) ("[T]he agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. Sometimes it must— when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. . . . It would be

(continued....)

To support its theory, the Commission relies on the decision over a decade ago to make same-market radio JSAs attributable. But that precedent is inapposite. In reaching its conclusion with respect to radio JSAs, the Commission specifically explained that "licensees of stations subject to [radio] JSAs *typically* receive a monthly fee *regardless of the advertising sales or audience share of the station. Therefore,* licensees of stations subject to JSAs have less incentive to maintain or attain significant competitive standing in the market."[58] And the Third Circuit relied on this fact in upholding the Commission's decision, stating that a brokering station "assumes the financial risks and rewards of advertising."[59] Then, in the 2004 NPRM addressing television JSAs, the Commission asked if the same was true for television JSAs.[60] Indeed, in setting forth the justification for attributing television JSAs, the Commission stated back then that "a JSA providing a licensee with a fixed monthly fee, *regardless of the advertising sales or audience share of the TV station,* transfers *all* market risk from the licensee to the broker."[61]

But the record here establishes that television JSAs are nothing at all like the radio JSAs addressed by the Commission in 2003.[62] As explained above, pursuant to Media Bureau policy, the licensee in a television JSA must receive at least 70% of advertising revenues. Far from transferring all market risk from the licensee to the broker, such a division of revenues gives the licensee a powerful economic incentive to control its programming and operations.

E.

A decision to attribute JSAs on a prospective basis would be bad enough. But unfortunately, it gets worse. Today, the Commission refuses to grandfather existing JSAs. Instead, JSAs in most markets must be unwound within two years.

---

(Continued from previous page) ——————————
arbitrary or capricious to ignore such matters. . . . [A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.").

[57] To be sure, the general manager of a brokered station may solicit programming advice from the broker station. But that same general manager may also solicit such advice from a consultant, his best friend, or his pastor. Entertaining programming advice from the broker station or any other quarter is not indicative of a surrender of control. There is no dispute that the brokered station retains the ultimate decision-making authority over its programming, and it also has a strong economic incentive to exercise that control.

[58] *2002 Biennial Review Order*, 18 FCC Rcd at 13744, para. 320 (emphasis added).

[59] *Prometheus Radio Project v. FCC*, 373 F.3d 372, 429 (3d Cir. 2004).

[60] *See Rules and Policies Concerning Attribution of Joint Sales Agreements in Local Television Markets*, MB Docket No. 04-256, Notice of Proposed Rulemaking, 19 FCC Rcd 15238, 15242–43, paras. 12–14 (2004).

[61] *Id.* at 15242, para. 13 (emphasis added).

[62] *See* Letter from Jane Mago, Executive Vice President and General Counsel, National Association of Broadcasters, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 04-256, 09-182, 10-71, at 2–3 (Mar. 14, 2014) ("[W]ith regard to various contentions that attributing television JSAs is rational because the agency already attributes radio JSAs, I made the point that the rationale that led the Commission to attribute radio JSAs does not apply to television JSAs. . . . [T]elevision JSAs do not rely on flat fees to brokers. Instead, licensees retain 70% or more of net sales revenue and thus, both the market risk and upside potential remain with the licensee."); *see* Letter from Elizabeth Ryder, Senior Vice President and General Counsel, Nexstar Broadcasting, Inc. to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 10-71, 09-182, 07-284, 04-256, at 12 (Mar. 10, 2014) ("[U]nder radio JSAs in effect at the time the Commission deemed them attributable interests, the broker retained all of the brokered station's revenues and paid the licensee a flat fee that remained the same regardless of what the brokered station revenues were. In contrast, television JSAs pay a percentage of the revenues (generally 70%) earned back to the brokered station licensee. This fundamental difference gives the brokered station licensee significant incentive to provide the best and most attractive programming on the station in order to increase its revenues earned.").

This is not how we usually do things. When the Commission adopted its newspaper-broadcaster cross-ownership rule, it grandfathered existing newspaper-broadcast combinations "because of the disruption and losses which could be expected to attend divestiture."[63] The same is true here; there will be extensive disruptions if existing JSAs must be unwound. Programming, such as Spanish language news in my home state of Kansas, will be forced off the air. Employees in news departments across the county will be laid off. And some stations will probably go off the air entirely.

Indeed, grandfathering reflects the basic principle that the Commission should not bless an agreement, only to change its rules and later force parties to unwind that agreement. As I mentioned earlier, since 2008, the Commission has approved transactions involving 85 JSAs. But what is our message today to companies that have entered into such arrangements? We borrow the expression often used by Emily Litella, the *Saturday Night Live* character brought to life by Gilda Radner: "Never mind."[64]

Furthermore, the ramifications of this decision extend far beyond the confines of this proceeding. By vitiating already-approved transactions, the Commission creates uncertainty throughout the communications marketplace. If we second-guess consummated transactions, could AT&T be told to spin off Cricket? If we prohibit foreign investment in carriers, should Softbank sell off Sprint? If we adopted a cable-broadcast cross-ownership rule, should Comcast prepare to break up with NBC? Investors will be more reluctant to risk their capital when the regulator has no compunction about undoing done deals. (And it's not as if private equity, venture capital, and other major financing have been flocking to small-town broadcasters as it is.)

I also fear what this decision means for the incentive auction. For broadcasters to participate in the incentive auction, they must be able to trust the Commission. They must believe that we will treat them fairly. And they must have confidence that we will follow through on our commitments. But what broadcaster can trust the Commission after today's item? Our promises regarding the incentive auction may prove as illusory as our prior approvals of JSAs.

A deficit of trust is especially problematic for the many broadcasters that may consider channel-sharing. On the one hand, the Commission wants our nation's broadcasters to embrace channel sharing, calling it a "once-in-a-lifetime opportunity."[65] But on the other hand, we are cracking down on stations

---

[63] *Amendment of Sections 73.34, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations*, Docket No. 18110, Second Report and Order, 50 FCC 2d 1046, 1080, para. 112 (1975).

[64] The Commission claims that the 2004 NPRM put broadcasters on notice that they may have to unwind JSAs. *See Order* at note 1130. That argument might have had force in 2005. But it is now 2014, and no broadcaster could be blamed for thinking that the Commission had abandoned its tentative conclusions from a decade ago. Indeed, just two years ago the Commission proposed to terminate that proceeding as dormant since no action had been taken nor any pleading filed since December 23, 2005. *See Consumer & Governmental Affairs Bureau Seeks Comment on Termination of Certain Proceedings as Dormant*, CG Docket No. 12-39, Public Notice, 27 FCC Rcd 1613, 1616, Attach. A (Consumer & Gov't Bur. 2012). Notably, no party objected to closing that proceeding. The only warning broadcasters had that the issue was still live was a cryptic proclamation that that "further action may . . . be necessary" in the proceeding, *Termination of Certain Proceedings as Dormant*, CG Docket No. 12-39, Order, 27 FCC Rcd 11284, 11286, para. 8 (Consumer & Gov't Aff. Bur. 2012). This is hardly the notice one might expect (or, legally speaking, would require) given that the Commission's only other action with respect to TV JSAs over the last six years was approving over seven dozen of them. Moreover, the Commission's argument entirely ignores the public interest harms that will result from disrupting existing JSAs.

[65] Remarks of FCC Chairman Tom Wheeler at the Computer History Museum, Mountain View, California, at 4 (Jan. 9, 2014), *available at* http://go.usa.gov/KtAY.

sharing an advertising sales force and we are signaling that the sharing of other services might soon be on the chopping block. And so broadcasters who volunteer to share channels might be the heroes of today. But will they become the villains of tomorrow?[66] And if so, can they rely on the Commission to shield them from future policy changes? Based on today's item, the answer to that question is a resounding no.

### F.

To mitigate the damage, the Commission points out that broadcasters are free to seek waivers. This is cold comfort. The waiver standard set forth in the item is not objective or measurable, but vague and inchoate. The Commission "will take into account the totality of the circumstances in order to assess whether strict compliance with the rule is inconsistent with the public interest."[67] To be sure, the Commission lists some relevant considerations, but they are as soft as mush. It is impossible to tell which considerations, if any, will be outcome-determinative.

This waiver standard will not provide broadcasters with any certainty, and I have no confidence that it will be used to avoid most of the negative impacts of today's decision. Rather, it is a fig leaf designed to allow members of the Commission to disclaim responsibility for the foreseeable consequences of today's item and to help a few politically-favored parties. We should not kid ourselves. Today's item gives the Media Bureau, under the direction of the Chairman, almost unbridled discretion to grant or deny a waiver request. And while I very much hope I am wrong—I fear that the substantial majority of requests will not meet with a favorable response.

### III.

Finally, a brief word about the Commission's treatment of the Third Circuit's remand of our 2008 *Diversity Order*.[68] I am disappointed that this item spends forty-one pages discussing the topic but doesn't take a single action to promote ownership diversity or new entry into the broadcasting industry. Our nation's President campaigned for office speaking of the "fierce urgency of now." This item, by contrast, exhibits the casual indifference of whenever.

Since taking office, I have heard repeatedly that the greatest barrier to minority ownership in the broadcast industry is a lack of access to capital. That's why the Commission should establish a voluntary incubator program as proposed by the Diversity and Competition Supporters—a program I've publicly supported for a long time now. Through this program, established broadcasters would be able to provide financing and other forms of assistance for new entrants looking to break into the business. By incubating a "valid eligible entity," a broadcaster under certain circumstances would be allowed to own one more radio station in a market than they otherwise could under our local radio ownership rule. This would be a limited and targeted measure. And the benefits of incubating a new voice in the market would far outweigh any harm—especially since an incubator is likely to be most valuable in small-town markets where broadcast spectrum is plentiful but the economics are tough.

Commissioner O'Rielly and I supported including an incubator program in today's item, but unfortunately, we fell one vote short. An incubator program has received widespread support from civil rights organizations, including the NAACP, LULAC, the National Urban League, the Rainbow PUSH

---

[66] Given today's disposition, it's not far-fetched to imagine a scenario in which the Commission determines that one channel-sharing broadcaster is effectively evading the media ownership limits by unduly influencing the sales, programming, and/or other decisions of a co-channel broadcaster.

[67] *Order* at para. 364.

[68] *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011) (reviewing *Promoting Diversification of Ownership in the Broadcasting Services*, MB Docket No. 07-294, Report and Order and Third Further Notice of Proposed Rulemaking, 23 FCC Rcd 5922 (2008)).

Coalition, the National Council of La Raza, the Minority Media and Telecommunications Council, and the Asian American Justice Center. I am saddened that we couldn't join together across party lines to establish such a program.

Here too, it appears the Commission's handling of media ownership is impervious to the law and impervious to the facts. An incubator program would increase minority ownership. But that's no match for the fervent ideological commitment to opposing at all costs any relaxation of a single media ownership regulation, no matter how slight or necessary that relaxation might be.

* * *

At the end of the day, today's item is little more than an elaborate shell game expressly designed to evade judicial review. We maintain the newspaper-broadcast cross-ownership rule without modification but refuse to find that doing so is necessary in the public interest. We make JSAs attributable for purposes of our local television ownership rule but refuse to address the substantial record evidence that taking this step will harm localism and diversity. That evidence, the Commission says, must be addressed in our evaluation of the local television ownership rule itself—an issue that we will hopefully get around to resolving in the summer of 2016, months after our deadline for unwinding JSAs. And we are declining to promote media ownership diversity . . . just because.

For all of the foregoing reasons, I hope that our nation's judiciary will restore sanity to our media ownership proceeding. I dissent.

## DISSENTING STATEMENT OF
## COMMISSIONER MICHAEL O'RIELLY

Re:      *Broadcast Media Ownership, Diversity and Joint Sales Agreements*, MB Docket Nos. 14-50, 09-182, 07-294, 04-256.

Today's action goes against the letter and the spirit of the law, imposes misguided restrictions on television broadcasters without basic data, and ultimately harms the statutory goals of competition, diversity and localism. I must, therefore, strenuously dissent.

I will start, where we all should, with the statute. Section 202(h) of the Telecommunications Act of 1996, as amended, was designed to force the FCC to regularly update its media ownership rules—rules that apply only to legacy media platforms: television broadcasters, radio stations and newspapers. It directs the FCC to review these ownership limits every four years and to repeal or modify the ones that can no longer be justified due to competition.[1] Even 18 years ago, Congress recognized that the media landscape was becoming more competitive and wanted the FCC to ensure that its ownership limits were only as restrictive as absolutely necessary.

Unfortunately, the Commission has failed to fulfill this Congressional mandate. It has not concluded a review of the media ownership rules since the 2006 proceeding (completed in 2007). Instead of completing the 2010 review that fell through the cracks under the last Chairman, the item turns the 2010 and the 2014 Review into a further notice of proposed rulemaking. Meanwhile, we are told that "recommendations" from this exercise may not be presented to the Commission until June 30, 2016.[2] This makes it highly likely that nearly a *decade* will pass before we update our media ownership rules. Our job is to comply with the law, even when it means making tough decisions. Failure to do that here is not only an enormous embarrassment, it is a damaging precedent for the agency, and I am deeply troubled by it.

While the record for the 2010 review has been deemed too outdated for any other issues to be acted upon, it picks out for exception Joint Sales Agreements or "JSAs," which the order effectively bans. These arrangements appear to work quite well, enabling smaller stations to take advantage of the economies of scale and put their cost savings toward improved local programing, thereby enhancing their ability to compete. JSAs are generally used in small and mid-sized markets where they often make the difference between a smaller station being able to offer local news or not.[3] In fact, I see nothing in the record to indicate any harm to consumers from JSAs.

In addition to the lack of concrete examples demonstrating any real problem with these cost-saving arrangements, there has been no analysis of what impact eliminating JSAs will have in various markets across the country. Like my colleague Commissioner Pai, I have repeatedly asked over my many months at the Commission for an accurate accounting of the number of JSAs, which markets they are in, and any particulars with their establishment. To date, I have been unable to obtain such information from either

---

[1] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) ("Appropriations Act") (amending Sections 202(c) and 202(h) of the 1996 Act). In 2004, Congress revised the then-biennial review requirement to require such reviews quadrennially. *See* Appropriations Act § 629, 118 Stat. at 100.

[2] Letter from Tom Wheeler, Chairman, Federal Communications Commission, to The Honorable Fred Upton, Chairman, Committee on Energy and Commerce, U.S. House of Representatives, at 2 (Mar. 27, 2014).

[3] Letter from Erin L. Dozier, Senior Vice President and Deputy General Counsel, National Association of Broadcasters, to Marlene H. Dortch, Secretary, Federal Communications Commission, MB Docket No. 09-182 (November 30, 2012), *available at*: http://apps.fcc.gov/ecfs/document/view?id=7022072920.

internal or external sources. Are we supposed to use proxy numbers or best guesses? Free Press indicates that there are 20 JSAs, if you analyze their data.[4] One Wall Street Journal article I read mentioned a Patrick Communications report that put the number at 128.[5] And informal conversations with the broadcast community suggest that they think there are between 100 and 200. The FCC is supposed to be a data driven agency. It has had a notice out on this issue since 2004. And still, we have not compiled this information. Will today's order lead to a loss of local news and diverse programing? Will it turn cash-strapped stations into video juke boxes? Will this harm viewers in small and mid-sized markets? We haven't done this analysis. I am deeply troubled that we appear to be basing this decision on a philosophical dislike of certain business practices while willfully lacking the facts and not knowing what effects our actions will have on communities that rely on these stations.

Even the Chairman acknowledges the fact that there are "good" JSAs.[6] And he says those stations will be allowed to seek a waiver from the rules on a case-by-case basis. Assuming for a moment that there are "good" and "bad" JSAs, which the item does not qualify, this process is not a viable solution. It puts all stations at the mercy of arbitrary and capricious decision-making. Any factor can come into play when determining if and when a waiver request is reviewed and how it is resolved, which means the process will be inherently uncertain and subjective. We have been told one overarching reason for today's action is to bring transparency and sunshine. And yet, these statements cannot be reconciled with the non-transparent and unpredictable waiver process.

Investors will flee from smaller stations and they will become weaker, potentially go dark, or have to cut back on local programming. How can this possibly be in the public interest? All of this is supposed to target so-called "covert consolidation," but instead it is pushing the market more rapidly in the opposite direction. Ironically, merger activity has increased and industry experts publicly state that this is due to the action the FCC is taking today.[7]

I am also concerned that this policy reversal on JSAs could be premature. For years the Commission has not only allowed these contractual relationships to go forward, it has sanctioned them in various transactions. Yet, today we effectively invalidate earlier decisions, and we tell the marketplace that that the investments made based upon Commission precedent is no longer legal and must be undone. Meanwhile, there is a distinct possibility that the record that develops as a result of our 2014 Quadrennial Review could require us to relax some of our TV ownership rules. That could make this effort to unwind JSAs a complete waste of time and money.

The Internet and advances in digital technologies have transformed the media marketplace. Today, the choices for entertainment and news are seemingly limitless and available on multiple platforms (*i.e.,* free-over-the-air, cable, telco, satellite, wireless). Everyone in this debate readily acknowledges the rapidly changing and highly competitive nature of our media platforms and yet our rules are stuck in the past. For example, our newspaper-broadcast cross ownership rule hasn't been changed since 1975. This is holding back our traditional media platforms from competing effectively to better serve consumers. Perhaps the best example of the harm from our antiquated rules is newspapers.

---

[4] *Covert Consolidation*, FREEPRESS, http://www.freepress.net/changethechannels (last visited Mar. 30, 2014).

[5] William Launder, *TV Stations Face New FCC Rules*, WSJ, Feb. 26, 2014, http://online.wsj.com/news/articles/SB10001424052702304071004579407581430183514.

[6] *Federal Communications Commission Fiscal Year 2015 Appropriations Hearing*, C-SPAN, Mar. 25, 2014, http://www.c-span.org/video/?318437-1/fy2015-fcc-budget.

[7] Mike Farrell, *Media General-LIN Deal Spurs Consolidation Talk*, MULTICHANNEL NEWS, Mar. 24, 2014, at 3.

Here are a few data points to consider:

☐ The attached chart shows the total number of daily newspapers in the U.S. decreasing from 1730 to 1382 between 1981 and 2011.[8]

☐ The advertising revenues of newspapers have decreased by more than 50 percent between 2003 and 2012, from $46 billion to $22 billion.[9]

☐ The FCC's own *Information Needs of Communities* found that "[a]bout as many Americans subscribe to newspapers today at did in 1945, even though the number of households is three times larger."[10]

☐ The Boston Globe was sold in 2013 to Baseball Red Sox Owner John Henry for $70 million and included the website Boston.com , the Worcester Telegram & Gazette, a 49 percent stake in Metro Boston, and the direct-mail marketing company GlobeDirect, but did not include the pension liabilities of $100 million.  This is significantly less than the $1.1 billion the New York Times paid for the Globe in 1993.[11]

☐ The Washington Post was sold in 2013 to Amazon.com founder Jeff Bezos for only $250 million, and that included a so-called "friendship premium," or overpaying because he had an arrangement with the previous owners.[12]

It is no secret that U.S. newspapers are in a very tough financial situation and, without the ability to get financial relief from cross ownership, this important news source for communities will continue to disappear.  Today's further notice seeks comment on eliminating the newspaper/radio cross-ownership ban.  But the record for the 2010 review provides ample justification for eliminating the newspaper/radio cross ownership ban and, I believe, the newspaper/television cross ownership ban as well.  Eliminating these bans could allow newspapers to raise needed capital and lower their debt ratio giving them a fighting chance.  With another two years to go before any answers on potential relief, unfortunately, today's item forces the rhetorical question: Which will happen first, the Commission eliminates the newspaper/broadcast bans or traditional daily newspaper publishing becomes extinct?

In closing, I am very opposed to today's item.  It takes an unjustifiable step backwards in tightening our media ownership rules and it fails in our duty to update these limits, in a timely fashion, to reflect robust competition in the marketplace.  I nevertheless hope that the Commission will expeditiously complete a comprehensive review of our ownership rules by the end of this calendar year and truly allow

---

[8] *See Number of Daily Newspapers in the United States from 1985 to 2011*, STATISTICA, http://www.statista.com/statistics/183408/number-of-us-daily-newspapers-since-1975/ (last visited Mar. 30, 2014).

[9] *See* Pew Research Center's Project for Excellence in Journalism, *State of the New Media 2013, Newspapers by the Numbers*, http://stateofthemedia.org/2013/newspapers-stabilizing-but-still-threatened/newspapers-by-the-numbers/ (last visited Mar. 30, 2014); Pew Reasearch Journalism Project, *Newspaper Print and Online Ad Revenue*, http://www.journalism.org/media-indicators/newspaper-print-and-online-ad-revenue/ (last visited mar. 30, 2014).

[10] FEDERAL COMMUNICATIONS COMMISSION, INFORMATION NEEDS OF COMMUNICATIONS, THE MEDIA LANDSCAPE 38 (July 2010), *available at* http://transition.fcc.gov/osp/inc-report/INoC-1-Newspapers.pdf.

[11] Christie Haughney, *New York Times Company Sells Boston Globe*, N.Y. TIMES, Aug. 3, 2013, at A15, *available at* http://www.nytimes.com/2013/08/04/business/media/new-york-times-company-sells-boston-globe.html?pagewanted=all&_r=1&.

[12] Alexander Abad-Santos, *Jeff Bezos Paid a "Friendship Premium" for the Washington Post*, THE WIRE, Aug. 7, 2013, http://www.thewire.com/business/2013/08/jeff-bezos-paid-friendship-premium-washington-post/68070/.

our nation's broadcast television stations, radio stations, and newspapers to compete more effectively to serve the public interest.